UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                       Plaintiffs,                    CV 18-3648
                                                   (SJF)(SIL)

     -against-

BRIAN FARRISH,
JAMIE GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT ATTORNEY'S
OFFICE,

                       Defendants.
-----------------------------------------------------------------x

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BARBARA D. UNDERWOOD
Attorney General of the State of New York
200 Old Country Road, Suite 240
Mineola, New York 11501
(516) 248-3302
Attorneys for State Defendants

RICHARD HUNTER YORKE
Assistant Attorney General
Of Counsel

## PRELIMINARY STATEMENT

The State Defendants respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction requesting an Order: a) enjoining the Defendants from enforcing the laws of the State of New York against Plaintiff Silva in Southampton Town Justice Court in case no. 17-7008, and b) otherwise interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish in Shinnecock Bay and its estuary and other usual and customary Shinnecock waters.

Plaintiff's Motion for Preliminary Injunction should be denied because it fails to meet the heavy burden required to have a federal court stay a pending state criminal court proceeding, as to Plaintiff Silva.  Further because the remaining Plaintiffs lack standing.  Further because Plaintiffs' have failed to demonstrate irreparable harm or a likelihood of success on the merits.

Annexed hereto is Appendix One, (Bates Stamp Silva-001-043) which includes documents which Plaintiffs refer to in their Complaint and Memorandum in Support of Preliminary Injunction, without attaching the substantive documents.  State Defendants ask that the Court take judicial notice of these and several related documents, as they were incorporated by reference in Plaintiffs' papers.

## ARGUMENT

### Younger Abstention

The Court should abstain from issuing injunctive relief as to Plaintiff Silva under the *Younger* abstention doctrine.  *Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that

proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims. *Diamond "D" Constr.*, 282 F.3d at 198.

*Younger* abstention doctrine creates a separate and independent barrier to federal court injunctions of pending state court proceedings. *Bess v. Spitzer*, 459 F. Supp. 2d 191, 203 (E.D.N.Y. 2006)(quoting Erwin Chemerinsky, Federal Jurisdiction § 11.2.1 (4th ed. 2003)). "This doctrine of federal abstention rests foursquare on the notion that, in the ordinary course, a state proceeding provides an adequate forum for the vindication of federal constitutional rights." *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2004)(citations and quotations omitted).

*Younger* abstention applies to suits seeking declaratory relief. *See Samuels v. Mackell*, 401 U.S. 66, 73-74 (1971)(holding that *Younger* also precludes the issuance of a declaratory judgment because "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the longstanding policy limiting injunctions was designed to avoid.")

Plaintiff Silva is the defendant in a pending state prosecution, involving New York State's enforcement of its generally applicable fishing regulations, outside of Shinnecock reservation land.  Generally, the second Younger element is satisfied whenever a party seeks to enjoin a pending criminal proceeding. *See Bess*, 459 F. Supp. 2d at 204 (citing *Davis v. Lansing*, 851 F.2d 72, 76 (2d Cir. 1988)).  Plaintiff Silva is able to raise all of the arguments he has made here as defenses in his criminal prosecution, and if convicted, can renew his arguments on appeal. *See Bess*, 459 F. Supp. 2d at 205.  Nor has Plaintiff shown that any constitutional issues he has alleged cannot be adequately adjudicated by a state court judge. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930 (1975)(stating: "The principle underlying *Younger* and *Samuels* is that

state courts are fully competent to adjudicate constitutional claims, and therefore a federal court should, in all but the most exceptional circumstances, refuse to interfere with an ongoing state criminal proceeding.").  Judge Weber, in his Decision on Plaintiff Silva's Motion to Dismiss, invited review of these issues, stating that on the trial of the matter, it may well be that at least one of the issues – including whether a member of the Shinnecock tribe can fish anywhere in the state without being constrained by regulation – will be resolved in favor of the Defendant (Silva), and asked for clarification from the parties on the question of whether Silva needed a fishing license to fish in non-tribal waters.  *See* Plaintiffs' Exhibit 5 to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction.

The exception to applying *Younger* abstention is upon a showing of bad faith, harassment or any other unusual circumstance that would call for equitable relief.  *See Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d at 198.  However, Plaintiffs bear the burden of establishing that the exception applies.  *Id*.  Plaintiffs have alleged no facts that suggest any of these circumstances. Moreover, Plaintiffs have alleged no facts challenging Silva's possession of undersized eels, over the legal limit, in violation of New York State law; they have merely asserted that the laws do not apply to them.

This Court should abstain from exercising jurisdiction under the principles of *Younger* abstention.

## Standing

The remaining Plaintiffs lack standing to seek injunctive relief.  Plaintiffs have not alleged that they are currently facing criminal charges or prosecution.  The Complaint merely

alleges that cases against these two plaintiffs were dismissed in 2009 and 2010.  *See* Complaint at ¶¶ 18, 19.

When seeking injunctive relief, "a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  In order to establish standing to seek injunctive relief, a plaintiff must establish that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged conduct. *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)(citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)).  "For an alleged injury to support constitutional standing, it must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015)(internal citations and quotations omitted).  A threatened injury must be certainly impending to constitute injury in fact, and allegations of possible future injury are not sufficient. *See McLennon v. City of New York*, 171 F. Supp. 3d 69, 104 (E.D.N.Y. 2016)(internal quotations and citations omitted).  "[A] plaintiff cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future." *Id*.

Plaintiffs have not alleged that they are currently being prosecuted or facing criminal charges.  Their prior prosecutions, according to the Complaint, were dismissed years ago.  They have merely alleged isolated past incidents, nearly a decade old, in which they were prosecuted for violating the State fishing laws.  They have not alleged any current facts regarding interactions with Defendants, or even alleged how any laws have been applied to them.  Their request for injunctive relief is entirely speculative and remote.  They have not stated a concrete

and particularized injury.  *Shain*, 356 F.3d at 215.  These Plaintiffs, alleging isolated past injury, lack standing to seek a preliminary injunction.

## Preliminary Injunction Standards

Plaintiffs have additionally failed to carry their heavy burden of persuasion in seeking preliminary injunctive relief against the government, which is an extraordinary remedy. Plaintiffs here are seeking to have this federal court stay a pending criminal proceeding in state court, and to prevent the state from enforcing its regulations in state waters.  They have failed to meet their heavy burden in requesting this extraordinary relief.

As this Court has pointed out, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion."  *Urlaub v. Inc. Vill. of Bellport*, 498 F. Supp. 2d 614, 618 (E.D.N.Y. 2007)(internal citations omitted, emphasis in original)(Feuerstein, J.).

This Court has explained the relevant standard: "In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its] favor."  *Nat'l Audubon Soc'y, Inc. v. United States Fish & Wildlife Serv*., 55 F. Supp. 3d 316, 349 (E.D.N.Y. 2014)(citations and quotations omitted)(Feuerstein, J.)

Where, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, "[a] plaintiff cannot rely on the 'fair-ground-for litigation' alternative … because governmental

policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Nat'l Audubon Soc'y*, 55 F. Supp. 3d at 349 (quotations and citations omitted). Plaintiffs must meet the higher standard of showing a likelihood of success on the merits. "Accordingly, in order to grant plaintiff a preliminary injunction in this case, the Court must be sure that, in all likelihood, defendants have acted unlawfully before substituting its judgment for that of the political branches." *Id*. at 350.  Where, as here, the injunction sought would alter rather than maintain the status quo, the moving party must further show clear or substantial likelihood of success.  *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1998).

Plaintiffs' burden is even heavier where, as here, the relief requested is against a pending state criminal prosecution.  As the Supreme Court stated in *Kugler v. Helfant*, 421 U.S. 117, 123 (1975):

> In *Younger* v. *Harris, supra,* [401 U.S. 37 (1971)] and its companion cases, the Court re-examined the principles governing federal judicial intervention in pending state criminal cases, and unequivocally reaffirmed 'the fundamental policy against federal interference with state criminal prosecutions.' 401 U.S., at 46.  This policy of restraint, the Court explained, is founded on the 'basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.' *Id.,* at 43-44. When a federal court is asked to interfere with a pending state prosecution, established doctrines of equity and comity are reinforced by the demands of federalism, which require that federal rights be protected in a manner that does not unduly interfere with the legitimate functioning of the judicial systems of the States. *Id.,* at 44. Accordingly, the Court held that in the absence of exceptional circumstances creating a threat of irreparable injury 'both great and immediate,' a federal court must not intervene by way of either injunction or declaratory judgment in a pending state criminal prosecution.

**Irreparable Harm**

Plaintiffs have failed to show "irreparable harm" as required under the standards for a preliminary injunction.  They have not alleged how the state prosecution of Plaintiff Silva meets this standard.  "[T]he cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Younger*, 401 U.S. at 46.  Generally, there is no "irreparable injury" if the state proceedings provide an appropriate venue for the plaintiff to protect their federal rights. *See Miller v. County of Nassau*, 467 F. Supp. 2d 308, 317 (E.D.N.Y. 2006).

As to all Plaintiffs, merely alleging a constitutional deprivation does not satisfy irreparable harm, where the plaintiff fails to allege non-compensable damages.  *See Smith v. Fredrico*, 2013 U.S. Dist. LEXIS 3681 *18-23 (E.D.N.Y. 2013)(denying plaintiff Jonathan K. Smith's motion for preliminary injunctive relief where motion was made against the application of law to Shinnecock Indian Reservation Lands); *Donohue v. Paterson*, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010).  "Plaintiff must still convincingly show that a violation carries noncompensable damages in addition to monetary damages."  *KM Enters. v. McDonald*, 2012 U.S. Dist. LEXIS 20469, *10 (E.D.N.Y. 2012); *see also Smith v. Fredrico*, 2013 U.S. Dist. LEXIS 3681, *21-22 ("If the Plaintiff is ultimately successful and his constitutional rights were violated, he will be entitled to the declaratory relief he seeks and will possibly receive a return of his property or the monetary equivalent. Thus, there is no imminent harm that is being caused by the alleged constitutional violation.").  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995)(quoting *Sampson v. Murray*, 415 U.S. 61 (1974)).

Plaintiffs seek an injunction against interfering with their "use of waters, fishing, taking fish, and holding fish."  As apparent from the Complaint, Plaintiffs seek to participate in the elver eel market.  *See* Complaint, p. 7.  They have not provided how this alleged right to unregulated fishing access is noncompensable.  Plaintiffs have not given any details as to what the irreparable harm to them would be.

## Likelihood of Success on the Merits

Plaintiffs have likewise failed to carry their heavy burden of showing a likelihood of success on the merits.  In support of their motion for preliminary injunction, Plaintiffs have attached a memorandum from John A. Strong, emeritus professor at Long Island University, characterizing several deeds and colonial documents.  Plaintiffs have failed to attach original versions of these documents, content to quote selectively without providing context.  These documents do not stand for the proposition that Plaintiffs want them to.  They do not establish the existence of a treaty right; nor do they support the reservation of exclusive off-reservation fishing rights, as the Plaintiffs must claim, in order to be uniquely and exclusively free from state regulation, in state waters.  They are analyzed in turn below.

### April 29, 1648 Deed for East Hampton

The First document is the original purchase deed for the Town of East Hampton, between the Governors of the colonies of New Haven and Connecticut, and the sachems from the Montaukett, Manhansett, Corchaug, and Shinnecock tribes.  The relevant language, partially quoted by Plaintiffs is: "Allsoe, we, the said Sachems, have Covenanted to have Libertie, freely to fish in any or all the cricks and ponds, and hunt up and downe in the woods without

Molestation, they giving the English Inhabitants noe just offence, or Iniurie to their goods and

Chattells.  Likewise, they are to have the fynns and tails of allsuch whales as shall be cast upp, to

their proper right and desire they may bee dealt with in the other part.  Allsoe, they reserve

libertie to fish in all convenient places, for Shells to make wampum.  Allsoe, if the Indyans,

hunting of any deare, they should chase them into the water, and the English should kill them,

the English shall have the body, and the Sachem the skin."  Appendix One at Silva-003-005.

This deed was negotiated for the purchase of land in what is now the town of East

Hampton, as opposed to Southampton where Plaintiff Silva was ticketed.  This area does not

encompass or abut the Shinnecock Bay.  Plaintiffs fail to quote the qualifying language.  These

covenants were limited, in that the sachems would give "the English Inhabitants noe just offence,

or Iniurie to their goods and Chattells."  This deed did not reserve to the Shinnecocks an

exclusive right, unconstrained by state regulation, as they now allege they have, in comparison to

other residents of the State.

Plaintiffs make no showing that this was more than an individually negotiated term of

sale for particular land.  Plaintiffs have not alleged that these rights were generally reserved in

contemporaneous purchase deeds.  In fact, language varies considerably in contemporaneous

deeds, even within Plaintiffs' slim sampling.  Unacknowledged by Plaintiffs is that this 1648

East Hampton deed exists within a history that conflicts with their claims.

Notably, Plaintiffs have failed to acknowledge, in their limited sampling, the original

Indian Deed for Southampton itself, of December 13, 1640.  This deed, signed by Mandush, the

Shinnecock sachem, reserves no fishing rights, more concerned with securing English protection

from attacks by other Indians.  It states that the Indians: "doe absolutely and forever give and

grant and by these presents doe acknowledge ourselves to have given and granted to the partyes

above mentioned without any fraud, guile, mentall reservation or equivocation to them their heirs and successors forever all the lands, woods, waters, water courses, easmts, profits & emoluments, thence arising whatsoever . . ."  Further: "In full testimonie of this our absolute bargaine contract and grant indented and in full and complete ratification and establishment of this our act and deed of passing over all our title & interest in the premises with all emoluments & profits thereto appertaining, or in any wise belonging, from sea or land within our Limits above specified without all guile wee have sett to our hands the day and yeare above sayd." Appendix One at Silva-010-012.

### June 10, 1658 Deed to Beach

Plaintiffs next cite a deed between Wyandanch, sachem of the Montaukett tribe, and Lion Gardiner.  Plaintiffs have without support characterized this deed as a "nation to nation agreement."  This deed specifically establishes grazing access for horses and cattle on a specific land tract, replete with a yearly rental price.  It states: "Wiandance hath sould for a considerable sum of money and goods, a certaine tract of beach land, with all ye rest of ye grass that joynes to it, not seperated from it by water, which beach begins Eastward at the west end of Southampton bounds, and westward where it is separated by ye waters of ye sea, coming in out of the Ocean Sea, being bounded Southwards with the great sea, Northwards with the inland water; this land and the grass thereof for a range, or run, for to feed horses or cattle on, I say, I have sold to the aforesaid Lion Gardiner, his heirs, executor and assigns forever, for the sum aforesaid, and a yearly rent of twenty-five shillings a year, which yearly rent is to be paid to the foresaid Sachem, his heirs, executors and assigns for ever, in the eight month, called October, then to be demanded, but the whales that shall be cast upon this beach shall belong to me, and the rest of

the Indians in their bounds, as they have beene anciently granted to them formerly by my

forefathers."  Appendix One at Silva-013-014, 016-017, 018.

    As Professor Strong points out, this deed was for beach land adjacent to Shinnecock

lands.  Drift whaling was a highly lucrative aspect of the early Long Island economy. This refers

to the processing and sale of the carcasses of dead whales that washed up on shore.  *See* John A.

Strong, *The Montaukett Indians of Eastern Long Island* 25 (Syracuse University Press 2001).

Plaintiffs have not shown how this particular reservation of highly lucrative drift whale carcasses

in a deed specifically for grazing rights supports an exclusive reservation of general fishing

rights.  The language in this deed varies considerably from the East Hampton deed above, and

makes no reference to fishing generally.  Indeed, as shown below, rights to drift whale carcasses

were bargained and sold in a variety of ways, in different deeds throughout this period.  An

agreement concerning horses, cattle and whales, however, does not support Plaintiffs' claims.


### May 12, 1659 Deed to John Ogden

The May 12, 1659 deed between Wyandanch, the Montaukett sachem, and John Ogden

states in relevant part: "I say all the land and meadow I have sold for a considerable price unto

Mr Iohn Ogden for himselfe his heirs executors and assigns for ever, upon condition as

followeth, first that Thomas Halsey and his Associates shall have the privilidge of the peice of

meadow called quancawnantuck the terms of yeares formerly granted to him or them but the land

lying between quancawnantuck and three miles northward he shall or may possess and improve

at present, but when the yeares of the aforesayed Thomas Halsey shall be expired then shall the

aforesaid Mr Iohn Ogden or his assigns fully possess and improve all quancaunantucke meadow

with the rest aforesayed and then shall pay or cause to be payed unto me wiandance my heires or

assigns the summe of twenty five shillings a yeare as a yearly acknowledgement or rent for ever. It is also agreed that wee shall keepe our prividges of fishing fowling hunting or gathering of berrys or any other thing for our use . . ."  Appendix One at Silva-020, 021-022.

This particular deed, known as the "Quogue Purchase" involved a tract west of the present Shinnecock Canal.  The agreement reserving certain privileges on the tract appears following conditional language that also gives Thomas Halsey, a colonist, certain rights to the tract.  There is no indication that this was more than an individually negotiated term in the sale of a specific tract.  This deed does not support Plaintiffs' claim that they have an exclusive fishing right, free of state regulation, unlike non-Shinnecock citizens.  At best, the agreement retained equal access in common with other citizens.  As stated in prior litigation involving one of the present Plaintiffs: "The Wyandanch to Ogden Deed of 1659 is also inapplicable because 'when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right to absolute and exclusive use and occupation of the conveyed lands.' *South Dakota v. Bourland*, 508 U.S. 679, 689, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993).  In sum, the Defendant, as a Shinnecock Indian, fails to state a federally protected right to have undersized scallops. Moreover, even if such right existed, it does not implicate racial equality concerns."  *New York v. Smith*, 952 F. Supp. 2d 426, 431 (E.D.N.Y. 2013).

**June 8, 1659 Deed to Lion Gardiner Concerning Whale Rights**

The June 8, 1659 deed between Wyandanch, the Montaukett sachem, and Lion Gardiner concerns only drift whales.  In fact, this document is a detailed apportionment of the rights and profits from drift whale carcasses from a certain beach tract.  In it, Wyandanch sells to Lion Gardiner, "all the Bodyes and Bones of all the Whales that shall come upon the Land, or come a

Shoare from the Western end of Southhampton Bounds, unto the place called Kitchaminchoke, yet reserving to ourselves and Indyans, all the Tailes and fins for Ourselves . . ."  The document then sets a term of twenty-one years for the agreement.  It states further:

> that if any Whale shall bee cast up in the bounds aforementioned, whether it bee found by English or Indyons, it shall bee judged by them both whether it bee a whole Whale or a halfe or otherwise.  Now for every whole whale that shall come up, the aforesaid Lyon Gardiner or his Assigns, shall pay or cause to be paid unto mee wyandance, the Sum of five pounds Sterling, or any good pay which wee shall accept of, but if it bee a halfe whale, a third part, or otherwise, they shall pay according to Proportion, and this pay shall be within two Monethes after they have cutt out and carryed the Whale home to their Houses, but in case there shall not five whales come up, within the terme abovesaid, then shall the aforesaid Lyon Gardiner, or his Assigns, have the next five Whales, that shall come up after the Terme, paying to mee, my heirs, Executors or Assigns, the Sum above mentioned, and for the true performance of the promises, Wee have hereunto Sett our hands and Seales.

Appendix One at Silva-023-026 (State Defendant have provided their transcription of this document as Silva-023).

This document, like several other contemporaneous sales of rights to drift whales, does not so much as mention fishing.  A similar sale of drift whale rights to Lion Gardiner for further beach land, dated July 28, 1659 is annexed hereto.  Appendix One at Silva-028-029.  These documents reflect the lucrative and prized nature of access to drift whale carcasses.  They reflect that they were sold and traded through a variety of negotiated terms.  They contain no indication of reserving exclusive fishing rights.  Plaintiffs' highly misleading and out of context quote from this document misstates its import.

Undercutting the argument that these deeds reserved exclusive rights to the Indians, Professor Strong has noted, in his academic work:

> The question of drift whales came up again in November 1658 when Wyandanch gave Lion Gardiner and the Reverend Thomas James of East Hampton half the whales "or other great fish" that drifted onto the beach between Napeague and the far end of Montauk.  This was an important grant because it gave the two men an

exclusive right to all of the ocean beaches on Montaukett lands.  The town of East Hampton owned the whale rights from Napeague west to the Southampton border and held them in common trust.  Wyandanch did require a small percentage of their profit, but left it to James and Gardiner to pay "what they shall judge meete and according as they find profit by them" ([Records of the Town of East Hampton] I:150).

John A. Strong, *The Montaukett Indians of Eastern Long Island* 26 (Syracuse University Press 2001).

The Southampton settlers, in contrast, had begun to take advantage of the lucrative whaling potential along the south shore as early as 1650, when John Ogden, an English settler in Southampton, established the first private whaling company (RTSH 1874-77, 1:70-71).  Ogden employed Indian whalers to hunt whales that migrated along the Atlantic shore from November through March.  In 1659 Southampton entrepreneurs had pushed their control of whaling rights on the south beach westward into Unkechaug territory.  In 1662 Ogden met with sachems Tobacus and Winecroscum to negotiate a contract for the rights to drift whales on the south beach lying to the west of the lease held by Anthony Waters.  This area of the barrier beach was probably between Enaughquamuck at the mouth of the Carman River and Namkee Creek on the west.

John A. Strong, *The Unkechaug Indians of Eastern Long Island* 56 (University of Oklahoma Press 2011)

Professor Strong has himself elsewhere expanded on the June 8, 1659 document,

characterizing it in a markedly different manner:

The following month Gardiner leased the whale rights to a section of Atlantic beach west of the area he had purchased from Wyandanch the year before (DSBD, 2:85-86). The lease ran for twenty-one years, and Wyandanch was promised five pounds sterling or an equivalent amount of goods for each whole whale carcass. The sachem reserved the tails and fins for himself. Gardiner then turned over the whale rights to John Cooper, who was beginning to develop a whaling enterprise, which would soon become a major industry on the south shore of eastern Long Island.

John A. Strong, *Wyandanch: Sachem of the Montauketts*  p. 17 of 23 (East Hampton Library, 1998 East Hampton 350th Anniversary Lecture Series January 31, 1998) http://easthamptonlibrary.org/wp-content/files/pdfs/history/lectures/19980131-2.pdf (last visited 7/16/18).

These various sales and leases of whaling rights do not support a reservation of exclusive whaling rights to the Shinnecock tribe, to say nothing of exclusive fishing rights.  Succinctly stated: whales are not eels.

### April 1662 Topping Purchase

Plaintiffs have again mischaracterized the cited deed, without attaching the actual document.  The relevant transfer of title within the deed states:

> Witnesseth that we the said Weany Anabackus and Iackanapes have given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a certain tract of land lying and being westward of the said Shinecock and the lawful bounds of Southampton above said, that is to say to begin at the canoe place otherwise Niamuck and soe to run westward te a place called and known by the name of Seatuck, and from thence to run northward across the said Island or neck of land unto a place called the head of the bay with all the meadow and pasture, arable land, easements profits benefits emoluments as is or may be contained within the limits and bounds before mentioned together with half the profits and benefit, of the beach on the south side the said Island in respect of fish whale or whales that shall by God's providence be cast up from time to time, and at all times, with all the herbage and feed that shall be, or grow thereon.
>
> To Have and To Hold, all the forementioned demised premises with all and singular the appurtanances thereto belonging or in any ways appertaining to him the said Thomas, his heirs executors, administrators, or assigns forever, without the lett trouble denial or molestation of us the said Weany, Anabaekus, and Iackanapes our heirs or assigns or any other person or persons lawfully claiming from, by, or under us our heirs executors Administrators or assigns…

Appendix One at Silva-031-032.

The deed in fact transfers half of the whaling rights from the beach, along with the herbage and feed to Topping.  It once again shows that the whaling rights were sold and transferred in a variety of ways, across various property sales.  Needless to say, it does not reserve an exclusive fishing right to the Shinnecocks.

**January 22, 1674-5 Resolution**

The next series of documents is blatantly mischaracterized by Plaintiffs.  Plaintiffs claim

that this document states that Indians who discover drift whales shall have such reasonable

satisfaction as hath been usual.  Plaintiffs do not state from whom this satisfaction shall be.  In

fact, they have mischaracterized a document that protected the Royal interest in these products.

The Crown, in fact, maintained privilege over drift whales, and attempted to protect its interests

on Long Island in the 17th Century.  This document states:

> The preserving of his Royal Highnesse Interest in a proportion of ye Drift as in ye
> Law is set forth, the same being taken into Consideracon.  It is resolved, That
> there be some particular man commissioned to take care of drift whales in ye
> middle & westernmost part of *Long Island*, who is to be accomptable for his
> Royall Highnesse dues thereof, according to Law.
>
> That if an Indyan find and give notice of any such drift whales, he shall have such
> reasonable satisfaccon as hath been usuall.  If a christian shall find any such
> whale or great fish & secure it, or give due notice to ye person empowered, where
> by the said Fish may be saved, hee shall be allowed a quartr part for his share.
> Provided yt no such whale being found, shall be cut up or embezeled, before
> notice be given to such Officrs or prsons empowered to take care therein.

Appendix One at Silva-035.

This document undercuts Plaintiffs' argument, as it sets out the Royal possessory interest

in the drift whales, and the proportion for the Crown and the discoverer, when a drift whale is

discovered.  It does not mention Shinnecock Indians, and reserves no rights to them.  State

Defendants have attached several other orders, which illuminate the Royal claims.  In an Order

from May 2, 1672, concerning neglect of the Royal share of the drift whales on Long Island, two

men were appointed to make inquiry by Indians or others as to drift whales cast up on the beach.

Appendix One at Silva-036.  The second order, from May 10, 1672, gave Jonathan Cooper

warrant to seize the whale-bone from a drift whale carried off his beach lands by several Indians.

Appendix One at Silva-037.  In Orders Relating to Whaling on L.I., from April 19, 1673, inhabitants of Brook-haven and Seatalcott complained that Indians were disturbing their whaling rights, and demanding payment from them.  The Order required that the Indians cease their unlawful actions, and cease molesting the whalers, to whom liberty had been given to use the beach.  Appendix One at Silva-038.

### May 23 and 24, 1676 Order Regarding Unkechaug

Plaintiffs have again mischaracterized this Order, selectively quoting the language in a misleading manner.  The records state on May 23, 1676:

> At a meeting of the Unchechaug Indyans of Long Island—before the Go: at the Fort.
>
> They give thankes for their peace, and that they may live, eate and sleepe quiet, without feare on the Island, They give some white strung seawant.
>
> They desire they being free borne on the said Island, that they may have leave to have a whale boate with all other materiells to fish and dispose of what they shall take, as to whom they like best.
>
> They complaine that fish being driven upon their beach etc. the English have come and taken them away from them per force.
>
> The Go: Demands if they made complainte of it to the Magistrates in the Townes, who are appointed to redresse any Injuryes.
>
> They say no, but another time will doe it.
>
> The Go: will consider of it and give them Answer tomorrow.

On May 24, 1676:

> The Indyans come againe to the Governor in presence of The Councell.
>
> What they desire is granted them as to their free liberty of fishing, if they bee not engaged to others; They say they are not engaged.
>
> They are to have an Order to shew for their priviledge.

The Order itself states:

> Resolved and ordered that they are at liberty and may freely whale or fish for or with Christians or by themselves and dispose of their effects as they as they thinke good according to law and Custome of the Government of which all Magistrates officers or others whom these may concerne are to take notice and suffer the said Indyans so to doe without any manner of let hindrance or molestacion they comporting themselves civilly and as they ought.

Appendix One at Silva-041, 042-043.

Aside from the obvious point that this was an Unkechaug party (and unknown whether they appeared on behalf of their tribe, or as individuals) who approached the Governor, and not members of the Shinnecock tribe, this document provides no exclusive rights, and in fact establishes that they needed to seek from the Governor leave for fishing and whaling, just as the English did.  Plaintiffs misleadingly omit the qualifying language that the order was "according to law and Custome of the Government."

Plaintiffs have failed to establish a reservation of exclusive fishing rights or the existence of a treaty granting them exclusive off-reservation fishing rights without regulation.  Plaintiffs have not cited to any treaty granting such rights, and none exists.  Plaintiffs' selective use of individual deeds, largely concerning drift whale carcasses does not equate to a treaty.  Plaintiffs legal arguments cite to a body of law specifically concerning federal treaty rights and interpretation.  But they have flatly failed to show the existence of any treaty.  The case law they cite is irrelevant.  "Absent a treaty fishing right, the State enjoys the full run of its police powers in regulating off-reservation fishing."  *People v. Patterson*, 5 N.Y.3d 91, 96 (2005).

Even where a true treaty provides a tribe "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory," the state may impose on Indians, equally with others, regulatory restrictions on the manner of fishing, necessary for conservation.

*See Tulee v. Washington*, 315 U.S. 681, 684 (1942); *New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 563 (1916).  Treaty-based usufructuary rights do not exempt Indians from state regulation, as the Supreme Court has often noted: "We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation."  *Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 205 (1999).  "The manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians."  *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968).

Here, however, Plaintiffs have failed to allege the existence of a treaty right in the first place.

### Balance of Hardships

Plaintiffs have further failed to show that the balance of hardships tips decidedly in their favor, as required to obtain a preliminary injunction.  *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010).  As stated in the Affidavit of James Gilmore, the American eel is a protected resource.  Their population is depleted, and at a historically low level, for reasons including overfishing.  There is tremendous demand for glass eels, the juvenile American Eel, in Asian markets, with prices reaching over $2000.00 per pound.  A recent stock assessment recommended that mortality be reduced on all life stages of the American Eel.  This assessment found that further fishing of American eel at every stage, particularly glass eels, could be particularly detrimental to the stock, especially if other sources of mortality (e.g., turbine mortality, changing oceanographic conditions) cannot be readily controlled.  *See* ASMFC, 2012.

American Eel Benchmark Stock Assessment. Stock Assessment Report 12-01 of the Atlantic

States Marine Fisheries Commission.  *See* Affidavit of James Gilmore, sworn to July 23, 2018, at

¶¶ 4-6.

Plaintiffs do not so much as acknowledge a countervailing interest in protecting depleted

wildlife.  They have failed to demonstrate that the balance of hardships tips decidedly in their

favor.


**CONCLUSION**

Based on the above, the State Defendants respectfully request that this Court deny

Plaintiffs' request for a preliminary injunction in its entirety.


Dated:  Mineola, New York
        July 23, 2018

Barbara D. Underwood
Attorney General of the State of New York
Attorney for State Defendants

By: _____ */s/ Richard Yorke* _____
        Richard Hunter Yorke
Assistant Attorney General
200 Old Country Road - Suite 240
Mineola, New York 11501
(516) 248-3302


To:     Counsel for all parties via ECF