UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

DAVID T. SILVA, GERROD T. SMITH, and
JONATHAN K. SMITH, Members of the
Shinnecock Indian Nation,

**REPORT AND**
**RECOMMENDATION**
18-CV-3648 (SJF)(SIL)

              Plaintiffs,

   -against-

BRIAN FARRISH, JAMIE GREENWOOD,
EVAN LACZI, BASIL SEGGOS, NEW YORK
STATE                DEPARTMENT                OF
ENVIRONMENTAL          CONSERVATION,    and
SUFFOLK COUNTY DISTRICT ATTORNEY'S
OFFICE,

              Defendants.
------------------------------------------------------------------X

**STEVEN I. LOCKE, United States Magistrate Judge:**

By way of Complaint dated June 22, 2018, Plaintiffs David T. Silva ("Silva"),

Gerrod T. Smith ("Gerrod") and Jonathan K. Smith ("Jonathan") (Silva, Gerrod and

Jonathan collectively, "Plaintiffs"), Members of the Shinnecock Indian Nation (the

"Tribe"), commenced this action alleging violations of their aboriginal usufructuary

fishing rights under the Supremacy Clause of the United States Constitution, U.S.

Const. art. VI, cl. 2, and a continuing pattern of race discrimination in violation of

Sections 1981 and 1982 of the Civil Rights Act of 1866, as amended, 42 U.S.C. §§

1981, 1982, by Defendants Brian Farrish ("Farrish"), Jamie Greenwood

("Greenwood"), Evan Laczi ("Laczi"), Basil Seggos ("Seggos"), the New York State

Department of Environmental Conservation ("NYDEC") and the Suffolk County

District Attorney's Office ("SCDA") (Greenwood and SCDA together, the "County

1

Defendants") (Farrish, Laczi, Seggos and the NYDEC collectively, the "State Defendants") (the County Defendants and the State Defendants collectively, "Defendants").  *See* Complaint ("Compl."), Docket Entry ("DE") [1].[1]  Presently before the Court, on referral from the Honorable Sandra J. Feuerstein for Report and Recommendation, are:  (i) the County Defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), DE [54]; (ii) the State Defendants' motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), DE [56]; and (iii) Plaintiffs' motion for leave to file a sur-reply to Defendants' respective motions, DE [59].  For the reasons set forth herein, the Court respectfully recommends that the supplemental materials submitted by Plaintiffs be considered as a sur-reply, but that Defendants' motions to dismiss nevertheless be granted and the Complaint be dismissed in its entirety. However, the Court further recommends that Plaintiffs be granted leave to replead, but only as to their statutory claims for monetary damages against Farrish, Laczi and Seggos in their individual capacities.

## I.    BACKGROUND

### A. <u>Relevant Facts</u>[2]

Plaintiffs are members of the Shinnecock Indian Nation, a federally-recognized Indian tribe,[3] who reside on the Shinnecock Indian Reservation (the "Reservation")

---

[1] Plaintiffs' claims are asserted against Farrish, Greenwood, Laczi and Seggos in both their individual and official capacities.  *See* Compl. ¶¶ 5-8; 21-25.

[2] Unless otherwise indicated, the facts set forth herein are taken from the Complaint and judicially noticeable materials, and are accepted as true for purposes of the instant motions.

located in Suffolk County, New York.  *See* Compl. ¶¶ 2-4.  At all relevant times, Plaintiffs have fished in the waters of Shinnecock Bay and its estuary.  *See id.* ¶ 14. According to Plaintiffs, the following "Colonial Deeds and related documents" support their aboriginal right to fish in such waters without interference:  (i) "Department of State Book of Deeds, Unpublished documents, Office of the Secretary of State, Albany, New York, 2: 85-86. (New York State Archives. Series 452, vols. 1-9"; (ii) "Gardiner, David Lion, 1873 [1840] *Chronicles of East Hampton*, Sag Harbor, N.Y.: Isabel Gardiner Mairs, 3"; (iii) "*Documents Relative to the Colonial History of the State of New York*, ed. Edmund Bailey O'Callaghan and Berthold Fernow, 15 vols. Albany, N.Y.: Weed Parsons, 1856-87, 14: 686, 692, 695, 718, 720"; (iv) "*Records of the Town of East Hampton*, ed. Joseph Osborne, 5 vols. Sag Harbor, N.Y. 1887, 1: 2-3, 1: 170-171"; (v) *Records of the Town of Southampton*, ed. William Pelletreau. 8 vols. Sag Harbor, N.Y. 1874-77, 1: 162, 167-68; 2: 354-55."  *See id.* ¶ 15.   Nevertheless, Plaintiffs have been ticketed and prosecuted for alleged violations of New York State (the "State") criminal laws pertaining to fishing and raising shellfish as a consequence of exercising their fishing rights.  *See id.* ¶ 16.  Specifically, in or about October 2008, the State commenced a criminal action against Gerrod in the Southampton Town Justice Court (the "Justice Court") based upon his alleged possession of undersized flounder, blackfish and porgy in the Shinnecock Bay in

---

[3] The Federally Recognized Indian Tribe List Act of 1994 (the "Act"), Pub.L. No. 103-454, 108 Stat. 4791, defines "Indian tribe" as "any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe."  25 U.S.C. § 5130.  Pursuant to the Act, the Secretary of the Interior "shall publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  *Id.* § 5131.

violation of State fishing and environmental conservation laws.  *See id.* ¶ 18; *New York v. Smith*, No. 08-cv-4422, 2009 WL 2390809, at *1 (E.D.N.Y. July 31, 2009). Following its removal to the United States District Court for the Eastern District of New York, that case was remanded to the Justice Court and thereafter dismissed. *See* Compl. ¶ 18; *Smith*, 2009 WL 2390809, at *3.  Around the same time, the State prosecuted Salvatore Ruggiero ("Ruggiero"), a non-Indian who was fishing with Gerrod, for possession of undersized flounder, undersized blackfish and undersized porgy in violation of New York law.  *See* Compl. ¶ 17.  That suit was dismissed for failure to establish jurisdiction.  *See id*.  The State subsequently brought charges against Jonathan, also in the Justice Court, for possessing a shellfish farm in the Shinnecock Bay without a license.  *See* Compl. ¶ 19.  That case was likewise removed to the Eastern District of New York and thereafter dismissed on June 15, 2010 for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).  *See id.*; *New York v. Smith*, No. 09-cv-571 (E.D.N.Y.), DEs [1], [5].

Most recently, on April 20, 2017, while Silva was fishing for elver eels[4] in the Shinnecock Bay, Laczi and Farrish—both Conservation Officers with the NYDEC—issued Silva a criminal appearance ticket alleging unlawful possession of undersized eels in violation of the Official Compilation of Codes, Rules & Regulations of the State of New York ("NYCRR"), title 6, Section 40-1(b)(ii).[5]  *See* Compl. ¶¶ 5, 7, 20.  Silva's

---

[4] According to James Gilmore, Director of the Division of Marine Resources at the NYDEC, juvenile American Eel are known as "elvers" or "glass eels" due to their transparency.  *See* Declaration of James Gilmore (the "Gilmore Declaration"), DE [47], ¶ 4.  The Court includes this information solely as background.

[5] The Complaint does not allege that Seggos, Commissioner of the NYDEC, *see* Compl. ¶ 8, was personally involved in the ticketing or prosecution of any Plaintiff.

catch, net and other fishing equipment were seized at that time. *See id.* ¶ 20. The State, through Suffolk County Assistant District Attorney Greenwood, then commenced a criminal action against Silva in the Justice Court, charging him with fishing without a license in violation of New York Environmental Conservation Law ("NYECL") Section 13-0355, as well as unlawful possession of underage eels and eels over limit in violation of NYCRR, title 6, Sections 40-1(b)(ii)-(iii). *See id.* ¶¶ 6, 20. Silva's efforts to obtain a dismissal of that action were unsuccessful. *See id.* ¶ 20. As of the date Plaintiffs filed their Complaint in the instant case, a trial in Silva's criminal case was scheduled to begin on August 30, 2018 in the Justice Court. *See id.*[6]

Plaintiffs allege that Defendants continue to ticket them and threaten prosecution. *See id.* ¶ 16. As a result, Plaintiffs "are in fear of exercising those same usual and customary aboriginal fishing rights secured and retained for them by their ancestors when Shinnecock territory was ceded to the English." *Id.*[7]

### B. <u>Procedural History</u>

On June 22, 2018, Plaintiffs filed their Complaint requesting preliminary and permanent injunctive relief, a declaratory judgment pursuant to the Declaratory

---

[6] Several months after filing this action, Plaintiffs notified this Court by letter that Silva's trial in the Justice Court commenced as scheduled on August 30, 2018, but was then continued to October 25, 2018. *See* DEs [57], [60]. The parties have not since updated the Court on the status of Silva's Justice Court proceedings.

[7] Notably, the Complaint contains no allegation that any of the Defendants interfered with Plaintiffs' on-Reservation fishing rights, and Plaintiffs do not otherwise assert that any of Defendants' conduct occurred on the Reservation. To the contrary, the Complaint describes the waters at issue as "adjacent to the lands of the Shinnecock Indian Reservation." Compl. ¶ 16. Moreover, the County Defendants have previously conceded in this action that Plaintiffs have a right to fish within the boundaries of the Reservation. *See* DE [44] at 2 n.2.

Judgment Act, 28 U.S.C. § 2201 *et seq.*, as well as Fed. R. Civ. P. 65, and monetary damages against Defendants.  *See generally* Compl.  In Count I of the Complaint, Plaintiffs assert that "Defendants' repeated interference, seizures and prosecution of the Plaintiffs by application of New York State fishing regulations violates Plaintiffs' fishing rights protected under the Supremacy Clause, was and is void, and was and is in excess of New York State jurisdiction."  *Id.* ¶ 23.  Plaintiffs further allege in Count II that Defendants' conduct amounts to "a continuing pattern and practice of purposeful acts of discrimination based on [Plaintiffs'] race as Native Americans in violation of [their] civil rights to equal security of the laws . . ." and to exercise their federally-protected fishing and other related rights without interference by Defendants.  *Id.* ¶ 25.  In their Prayer for Relief, Plaintiffs request, as to Count I:

> [A] declaratory judgment, and preliminary and permanent injunctive relief . . . enjoining the Defendants from enforcing the laws of the State of New York against . . . Silva in the . . . Justice Court in Case No. 17-7008, and from otherwise interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters.

*Id.* at WHEREFORE ¶ 1.  With respect to Count II, Plaintiffs seek "$102 million [in] punitive damages to deter and punish the Defendants for blocking Plaintiffs' participation in the elver eel market during the 2017 and 2018 seasons, plus any future seasons during the pendency of this action, plus attorney fees and costs."  *Id.* at WHEREFORE ¶ 2.

Together with their Complaint, and based upon the conduct alleged therein, Plaintiffs filed a motion for a preliminary injunction.  *See* DE [2].  In support of their application, Plaintiffs submitted, among other materials, a report prepared by Dr.

John A. Stong, Professor Emeritus at Long Island University, which addressed the "Shinnecock rights to the bounty of their maritime ecosystem." DE [3-10]. Both the County Defendants and the State Defendants opposed Plaintiffs' motion. *See* DEs [44], [46], [47]. The State Defendants' arguments in opposition to Plaintiff's application for preliminary injunctive relief relied in part upon the Gilmore Declaration. *See* DE [47]. At a motion hearing held on July 27, 2018, Judge Feuerstein informed the parties that the motion for a preliminary injunction would be denied, set a briefing schedule on the County Defendants' and the State Defendants' anticipated motions to dismiss, and referred such anticipated motions to this Court for Report and Recommendation. *See* DE [49]. Several days after that hearing, on July 31, 2018, Judge Feuerstein issued a Memorandum and Order denying Plaintiffs' motion for a preliminary injunction on several grounds. *See* DE [48]. Initially, Judge Feuerstein found that Silva did not clearly show a likelihood of success on the merits of the Complaint due to factual questions concerning whether he was fishing outside the waters of the Shinnecock Reservation and whether he would need a New York State fishing license to fish in non-tribal waters. *See id.* at 8. Further, Judge Feuerstein concluded that the *Younger* abstention doctrine barred the relief sought by Silva because there was a pending state criminal action against him that implicated the State's interest in enforcing its generally applicable fishing regulations, and which provided an adequate opportunity for judicial review of his federal constitutional claim. *See id.* at 9. No exceptions to *Younger* applied, Judge Feuerstein ruled, as Plaintiffs failed to either submit adequate evidence of bad faith

or demonstrate any extraordinary circumstance warranting intervention.  *See id.* at 9-10.   Lastly, Judge Feuerstein determined that Gerrod and Jonathan lacked standing to obtain the injunctive relief they sought because each of their prior prosecutions occurred nearly ten years ago, and neither individual was, at the time, facing any related criminal charges.  *See id.* at 10-11.

The County Defendants and the State Defendants filed their fully briefed motions to dismiss on August 13, 2018 and August 23, 2018, respectively.  *See* DEs [54], [56].  Shortly thereafter, Judge Feuerstein entered an Order referring both motions to this Court for Report and Recommendation.  *See* Electronic Order dated August 24, 2018.

On October 8, 2018, Plaintiffs submitted a letter informing the Court that, while preparing for Silva's criminal proceeding in the Justice Court, they discovered evidence demonstrating that statements in the Gilmore Declaration were false and thus supporting their allegations of discriminatory conduct and bad faith.  *See* DE [57].  According to Plaintiffs, various NYDEC and U.S. Fish & Wildlife Services publications contradict Gilmore's contention that "American eel (Anguilla rostrate) are an important and *protected resource* [whose] . . . population is *depleted* and at *historically low levels* for several reasons, including *overfishing*."  *Id.* at 2 (emphasis in original) (quoting Gilmore Declaration ¶ 4).  Consequently, Plaintiffs requested leave to file the publications at issue as "supplement[s]" in connection with the pending motions to dismiss.  *See* DE [57] at 2.  The State Defendants opposed Plaintiffs' application, by letter dated October 9, 2018, on the basis that the proposed

supplemental filings have no relevance to any of the issues currently before the Court. *See* DE [58].   On October 12, 2018, Judge Feuerstein denied the motion without prejudice and directed Plaintiffs in any renewed application to, at a minimum:  (i) "specifically identify what they are seeking to supplement"; (ii) "provide specific citations to the proposed supplemental materials (including publication dates)"; and (iii) "articulat[e] the basis or bases for permitting such supplementation."  Electronic Order dated October 12, 2018.

Plaintiffs filed a renewed letter motion on October 15, 2018, addressing the initial deficiencies identified by Judge Feuerstein.  *See* DE [59].  At the outset, Plaintiffs clarified that they are seeking leave to file the letter, along with the exhibits attached thereto, collectively as a sur-reply to the pending motions to dismiss.  *See id.* at 1.  Moreover, Plaintiffs reiterated and expanded their argument that the materials undermine several assertions in the Gilmore Declaration. *See id.* at 2.  On October 22, 2018, Plaintiffs filed yet another letter supplementing their renewed motion.  *See* DE [60].  In that submission, Plaintiffs requested leave to submit two additional documents—internal NYDEC emails involving James Gilmore, which Plaintiffs obtained from Greenwood in connection with Silva's criminal case—as part of their sur-reply.  *See id.* at 1-2.  The State Defendants filed opposition to Plaintiffs' renewed request on October 22, 2018.  *See* DE [61].  Judge Feuerstein then referred Plaintiffs' application to this Court.  *See* Electronic Order dated October 26, 2018.

## II.    LEGAL STANDARDS

### A. <u>Fed. R. Civ. P. 12(b)(1)</u>

"Pursuant to Article III, § 2 of the United States Constitution, the jurisdiction of the federal courts is limited to 'Cases' and 'Controversies,' which restricts the authority of the federal courts to resolving 'the legal rights of litigants in actual controversies.'" *Amityville Mobile Home Civic Ass'n v. Town of Babylon*, No. 14-cv-2369, 2015 WL 1412665, at *2 (E.D.N.Y. Mar. 26, 2015) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71, 133 S. Ct. 1523, 1528 (2013)).   In the absence of a case or controversy, Fed. R. Civ. P. 12(b)(1) "provides that a party may move to dismiss a case for lack of subject matter jurisdiction." *Amityville Mobile Home*, 2015 WL 1412665, at *3; *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.").   The Second Circuit has held that "[t]he hallmark of a case or controversy is the presence of adverse interests between parties who have a substantial personal stake in the outcome of the litigation." *Evans v. Lynn*, 537 F.2d 571, 591 (2d Cir. 1975); *see also Ayazi v. N.Y.C. Bd. of Educ.*, No. 98-cv-7461, 2006 WL 1995134, at *2 (E.D.N.Y. July 14, 2006) ("Without standing, this court does not have jurisdiction to hear the claim."), *vacated on other grounds*, 315 Fed.Appx. 313 (2d Cir. 2009).   To survive a defendant's motion to dismiss for lack of subject matter jurisdiction, "a plaintiff must allege facts 'that affirmatively and plausibly suggest that it has standing to sue.'" *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217,

227 (E.D.N.Y. 2015) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(1), "a court must accept as true all material factual allegations in the complaint and refrain from drawing inferences in favor of the party contesting jurisdiction." *U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 449 (S.D.N.Y. 2001). However, "[w]here subject matter jurisdiction is challenged, . . . a court may consider materials outside the pleadings, such as affidavits, documents and testimony." *Id.*; *see also Forbes v. State Univ. of New York at Stony Brook*, 259 F. Supp. 2d 227, 231-32 (E.D.N.Y. 2003) ("In a Rule 12(b)(1) motion, the Court may consider affidavits and other material beyond the pleadings to resolve the jurisdictional question." (citation omitted)).  The party advocating jurisdiction bears the burden of establishing its existence by a preponderance of the evidence.  *See In re Jesup & Lamont, Inc.*, No. 12-1169, 2012 WL 3822135, at *2 (S.D.N.Y. Sept. 4, 2012).

### B. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1960 (2007)).  A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at

1949.  But, a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court must 'accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.'"  *U.S. ex rel. Siegel v. Roche Diagnostics Corp.*, 988 F. Supp. 2d 341, 343 (E.D.N.Y. 2013) (quoting *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009)).  Nevertheless, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal.  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted); *see Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  "The court's consideration on a motion under Fed. R. Civ. P. 12(b)(6) is limited to the factual allegations in the complaint; documents incorporated by reference into the complaint; matters of which judicial notice may be taken; and documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit."  *Messina v. Mazzeo*, 854 F. Supp. 116, 128 (E.D.N.Y. 1994) (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).

III.    DISCUSSION

A. <u>Plaintiffs' Supplemental Submissions</u>

As a threshold matter, the Court must determine whether, in evaluating the instant motions to dismiss, it should consider the "supplemental" materials electronically submitted by Plaintiffs nearly two months after Defendants filed their fully-briefed motions to dismiss.  The submissions at issue are:  (i) the supplemental letters themselves, DEs [59], [60]; (ii) a document published on the NYDEC website entitled "List of Endangered, Threatened and Special Concern Fish & Wildlife Species of New York State[,]" *see* DE [59], Exhibit ("Ex.") B; (iii) a research document about the American Eel published on the NYDEC website, *see id.*, Ex. C; (iv) a U.S. Fish & Wildlife Service press release entitled "American Eel Population Remains Stable, Does not Need ESA Protection[,]" *see id.*, Ex. D; (v) a U.S. Fish & Wildlife Service publication on the American Eel, *see id.*, Ex. E; and (vi) two internal NYDEC emails involving Gilmore, *see* DE [60], Exs. F, G.  Plaintiffs argue that the publications prove statements in the Gilmore Declaration to be false and, as a result, support their allegations of discriminatory conduct and bad faith.  *See* DE [59].  Most significantly, Plaintiffs assert that the publications demonstrate that Gilmore overstated the urgency of American Eel conservation efforts.  *See id.*  In addition, Plaintiffs contend that the emails in question show that "the Shinnecock were referred to and targeted for prosecution by race" and that they belie Gilmore's claim that the American Eel is "endangered, threatened, or . . . of special concern under New York law."  *See* DE [60].

13

In evaluating Plaintiffs' application, the initial question is whether the Court should consider the supplemental submissions in any respect. "Motions for leave to file sur-reply information . . . are subject to the sound discretion of the court." *Barbour v. Colvin*, 993 F. Supp. 2d 284, 287 (E.D.N.Y. 2014) (citation omitted). The Individual Rules of Judge Feuerstein provide that "all motion briefs, including reply briefs are to comply with the Court's Local Rules . . . [,] and *[n]o rebuttal, sur-reply, etc., shall be accepted*." (underline in original changed to italics). Nevertheless, based on Plaintiffs' representation that the subject documents were newly-discovered, the Court recommends that Plaintiffs' application to submit the materials at issue collectively as a sur-reply be granted. Plaintiffs' supplemental submissions touch upon questions involving the bad faith exception to the *Younger* abstention doctrine and discriminatory intent as it relates to Plaintiffs' claims under 42 U.S.C. §§ 1981 and 1982. As such, the Court deems them useful in evaluating the instant motions. Thus, in light of the legal standards summarized above, the Court considers all of the supplemental materials in connection with the State Defendants' Fed. R. Civ. P. 12(b)(1) motion, and only the legal assertions within the letters themselves in connection with Defendants' Fed. R. Civ. P. 12(b)(6) motions.

The Court does not, however, recommend converting Defendants' Fed. R. Civ. P. 12(b)(6) motions into motions for summary judgment under Fed. R. Civ. P. 56. On a 12(b)(6) motion, "[i]f matters outside the pleadings are presented to the court, a court may convert the motion to dismiss into a summary judgment motion." *Vailette v. Lindsay*, No. 11-cv-3610, 2014 WL 4101513, at *3 (E.D.N.Y. Aug. 18, 2014) (citing

Fed. R. Civ. P. 12(d)); *see also Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000) ("When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." (citation, internal quotation marks and alterations omitted)).  Whether to convert the motion is in the district court's discretion.  *See Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05-cv-217, 2008 WL 190310, at *3 (S.D.N.Y. Jan. 16, 2008). Here, the Court recommends that Judge Feuerstein decline to convert Defendants' motions to dismiss into motions for summary judgment, as the documents in question were not submitted with the parties' initial briefing, and neither party has raised the prospect of conversion.  Accordingly, the Court will consider Plaintiffs' supplemental submissions collectively as a sur-reply and in accordance with the standards governing Defendants' motions to dismiss.

**B. <u>Defendants' Motions to Dismiss</u>**

Having resolved this initial procedural issue, the Court turns to the respective motions to dismiss.  Applying the standards outlined above, and for the reasons set forth below, the Court respectfully recommends that Defendants' motions be granted and that the Complaint be dismissed.

1. The State Defendants

The State Defendants move to dismiss Plaintiffs' Complaint on the grounds that: (i) all claims against the NYDEC, as well as those against Farrish, Laczi and

Seggos in their official capacities, are barred by the Eleventh Amendment and principles of sovereign immunity, *see* State Defendants' Memorandum of Law in Support of Motion to Dismiss Complaint ("State Defs.' Mem."), DE [56-3], at 3-6; (ii) the claims for injunctive and declaratory relief as to Silva are precluded under the *Younger* abstention doctrine, *see id.* at 6-7; (iii) Gerrod and Jonathan lack standing to assert their claims for injunctive and declaratory relief, *see id.* at 7-9; (iv) the Complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6), *see id.* at 9-23; and (v) Farrish, Laczi and Seggos are entitled to qualified immunity with respect to the claims against them in their individual capacities, *see id.* at 23-24. Because, as explained herein, the Court recommends dismissal of Plaintiffs' claims for declaratory and injunctive relief as against the State Defendants on multiple jurisdictional bases and dismissal of Plaintiffs' claims for monetary damages against the NYDEC, as well as Farrish, Laczi and Seggos in their official capacities, on Eleventh Amendment grounds, the Court addresses the underlying merits of only Plaintiffs' claims for monetary damages and not their claims for declaratory and injunctive relief. *See Amityville Mobile Home*, 2015 WL 1412655, at *3 ("When presented with motions under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the Court must first analyze the 12(b)(1) motion to determine whether the court has the subject-matter jurisdiction necessary to consider the merits of the action."). Moreover, as Plaintiffs fail to state a claim against Farrish, Laczi and Seggos in their individual capacities under 42 U.S.C. § 1981 or § 1982, the Court does not analyze the State Defendants' qualified immunity argument.

a. Eleventh Amendment Sovereign Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., amend. XI. Absent consent to suit or an express statutory waiver of a state's otherwise presumed sovereign immunity, the Eleventh Amendment bars suits in federal court by private parties against the state. *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363, 121 S. Ct. 955, 962 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.").[8] This immunity extends not only to the state itself, but also to entities considered "arms of the state." *Clissuras v. City Univ. of New York*, 359 F.3d 79, 81 (2d Cir. 2004) (quoting *McGinty v. New York*, 251 F.3d 84, 95 (2d Cir. 2001)); *see Naples v. Stefanelli*, 972 F. Supp. 2d 373, 390-91 (E.D.N.Y. 2013) (dismissing claims against the NYDEC on Eleventh Amendment immunity grounds). "Likewise, the Eleventh Amendment bars suits for monetary damages against a state official acting in his or her official capacity." *LoSardo v. Ribaudo*, No. 14-cv-6710, 2015 WL 502077, at *2 (E.D.N.Y. Feb. 5, 2015) (citation omitted). Thus, a claim that is barred by a state's sovereign immunity is properly dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction. *See Seminole Tribe of Fla. v.*

---

[8] It is well established that federally-recognized Indian tribes and their members are subject to the Eleventh Amendment. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268, 117 S. Ct. 2028, 2033 (1997).

*Florida*, 517 U.S. 44, 54, 116 S. Ct. 1114, 1121 (1996) ("For over a century [the Supreme Court has] reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'").[9]

### i. The *Ex Parte Young* Exception

Notwithstanding the Eleventh Amendment, "[u]nder the well-known exception [to the sovereign immunity doctrine] . . . first set forth in *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 [(1908)] . . . , a plaintiff may sue a state official acting in his official capacity . . . for prospective, injunctive relief from violations of federal law." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal quotation marks and citation omitted).[10]  "The *Young* exception . . . rests upon the premise 'that when a federal court commands a state official to do nothing

---

[9] The Court is mindful that the question of "whether the claim of sovereign immunity [under the Eleventh Amendment] constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense" has not been definitively answered by the Supreme Court or the Second Circuit. *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (citing *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 391, 118 S. Ct. 2047, 2053 (1998)); *see Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237-39 (2d Cir. 2006) (holding that the burden of proof regarding sovereign immunity rests on the party asserting it as is true of affirmative defenses generally).  However, the Supreme Court repeatedly and recently has discussed the Eleventh Amendment as a jurisdictional bar and has confirmed that a state's sovereign immunity conferred by it can be raised for the first time on appeal.  *See Woods*, 466 F.3d at 237-38 (collecting cases).  Both holdings are consistent with the issue being essentially jurisdictional in nature.  *See id.*  Because the exact characterization of Eleventh Amendment immunity does not substantively impact this Report and Recommendation, the Court assumes the immunity inquiry to be a jurisdictional one and does not analyze the issue further.

[10] As alluded to above, courts have recognized two additional exceptions to Eleventh Amendment immunity, neither of which applies here.  First, "a State may waive its sovereign immunity by consenting to suit." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S. Ct. 2219, 2223 (1999) (citing *Clark v. Barnard*, 108 U.S. 436, 447-48, 2 S. Ct. 878 (1883)).  Second, "Congress may abrogate the sovereign immunity of the States by acting pursuant to a grant of constitutional authority." *Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444, 448 (E.D.N.Y. 2002) (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 80, 120 S. Ct. 631, 644 (2000)).

more than refrain from violating federal law, he is not the [s]tate for sovereign-immunity purposes,' . . . and 'is limited to that precise situation . . . .'" *Colvin v. State Univ. Coll. at Farmingdale*, No. 13-cv-3595, 2014 WL 2863224, at *9 (E.D.N.Y. June 19, 2014) (quoting *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254-55, 131 S. Ct. 1632, 1638 (2011)); *see Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423, 426 (1985) ("The theory of *Young* was that an unconstitutional statute is void . . . and therefore does not 'impart to [the official] any immunity from responsibility to the supreme authority of the United States.'" (alteration in original) (citation omitted) (quoting *Young*, 209 U.S. at 159-60, 28 S. Ct. at 453-54)).

The Supreme Court has, however, articulated a limited exception to the principles set forth in *Young*. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S. Ct. 2028 (1997). In *Coeur d'Alene*, the Court held in a 5-4 decision that an Indian tribe and its members who sought a declaration of their entitlement to exclusive use, occupancy and right to quiet enjoyment of submerged lands claimed by the State of Idaho, could not avail themselves of *Young* and avoid the Eleventh Amendment bar to suit. *See Coeur d'Alene*, 521 U.S. at 287-88, 117 S. Ct. at 2043. In the majority opinion authored by Justice Kennedy, the Court explained:

> We do not . . . question the continuing validity of the *Ex parte Young* doctrine. Of course, questions will arise as to its proper scope and application. In resolving these questions we must ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law.

*Id.* at 269, 117 S. Ct. at 2034. The Court adopted the previously-recognized notion that "[w]hen suit is commenced against state officials, even if they are named and

served as individuals, the [s]tate itself will have a continuing interest in the litigation whenever state policies or procedures are at stake." *Id.* (collecting cases). "The real interests served by the Eleventh Amendment[,]" Justice Kennedy instructed, "are not to be sacrificed to elementary mechanics of captions and pleading" and thus "[a]pplication of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction." *Id.* at 270, 117 S. Ct. at 2034. The Court further explained that, although "[a]n allegation of an ongoing violation of federal law where the relief requested is prospective is ordinarily sufficient to invoke the *Young* fiction[,]" the case before it was "unusual in that the [t]ribe's suit [was] the functional equivalent of a quiet title action which implicate[d] special sovereignty interests." *Id.* at 281, 117 S. Ct. at 2040; *see also id.* at 282, 117 S. Ct. at 2040 ("[T]he declaratory and injunctive relief the [t]ribe seeks is close to the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the [s]tate to the [t]ribe . . . . The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the [s]tate."). The Court proceeded to analyze the suit's impact on Idaho's "special sovereignty interests" in concluding that *Young* did not apply:

> It is apparent . . . that if the [t]ribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury. Under these particular and special circumstances, we find the *Young* exception inapplicable. The dignity and status of its statehood allow Idaho to rely on its Eleventh Amendment immunity and to insist upon responding to these claims in its own courts, which are open to hear and determine the case.

*Id.* at 287-88, 117 S. Ct. at 2043.  In reaching this outcome, the Court emphasized that "lands underlying navigable waters have historically been considered sovereign lands," and that "[s]tate ownership of them has been considered an essential attribute of sovereignty."  *Id.* at 283, 117 S. Ct. at 2041 (internal quotation marks and citation omitted).

But Justice Kennedy did not command a majority with respect to certain reasoning justifying the Court's departure from *Young*.  In a portion of his opinion joined by Chief Justice Rehnquist only, Justice Kennedy promoted a "case-by-case approach to the *Young* doctrine" requiring courts to apply a balancing test that weighs a broad range of factors—including the availability of a state forum to hear the case, the nature of the federal rights in question, and the state interests at issue— even when the complaint both alleges a continuing violation of federal law and seeks prospective relief.  *Id.* at 280, 117 S. Ct. at 2028.  Justice O'Connor, in a concurring opinion joined by Justices Scalia and Thomas, rejected what she described as Justice Kennedy's "vague balancing test that purports to account for a 'broad range' of unspecified factors," *id.* at 296, 117 S. Ct. at 2047 (citation omitted), as "unnecessarily recharacteriz[ing] and narrow[ing] much of [the Court's] *Young* jurisprudence[,]" *id.* at 291, 117 S. Ct. at 2045.  Justice O'Connor asserted that a court applying *Young* should instead conduct only a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective . . . ." *Id.* at 296, 117 S. Ct. at 2047.[11]  Notably though, Justice O'Connor agreed that where "a plaintiff seeks to divest the [s]tate of all regulatory power over submerged lands—in effect, to invoke a federal court's jurisdiction to quiet title to sovereign lands—it simply cannot be said that the suit is not a suit against the [s]tate." *Id.* at 296, S. Ct. at 2048.

In a subsequent case, the Supreme Court unequivocally adopted the approach to sovereign immunity articulated by Justice O'Connor in her *Coeur d'Alene* concurrence:  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645, 122 S. Ct. 1753, 1760 (2002) (quoting *Coeur d'Alene*, 521 U.S. at 296, 117 S. Ct. at 2047 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)).  In so holding, the *Verizon* Court emphasized that the inquiry concerning whether the relief sought is "properly characterized as prospective" should focus not merely on how the requested relief is captioned in the pleading, but also on its substance.  *See id.* at 645-46, 122 S. Ct. at 1760.  This inquiry, the Court further instructed, "does not include an analysis of the merits of the claim." *See id.* at 646, 122 S. Ct. at 1761.

---

[11] As the United States Court of Appeals for the Tenth Circuit has observed, it remains unclear precisely why Justice O'Connor agreed with Justice Kennedy's conclusion in *Coeur d'Alene* that the suit should be dismissed, notwithstanding the complaint's "seeming compliance with *Ex parte Young's* formalisms." *Hill v. Kemp*, 478 F.3d 1236, 1258 (10th Cir. 2007).  This Court finds convincing the *Hill* court's theory concerning Justice O'Connor's approach to *Young*: "Justice O'Connor seemed to suggest that we must assess whether a claim seeks relief effectively equivalent to a retrospective judgment regardless of how it is formally pled or denominated." *Id.*

Several years after the *Verizon* decision, the Second Circuit ruled in *Western Mohegan Tribe & Nation v. Orange County* that a suit brought by an Indian tribe against the New York State Governor seeking possession of certain land within the State was barred by the Eleventh Amendment.  *See* 395 F.3d 18, 23 (2d Cir. 2004). Although the court cited *Verizon* as controlling law and determined that the complaint had satisfied both components of the "straightforward" *Young* inquiry, *see id.* at 21, the Circuit nevertheless concluded, based upon *Coeur d'Alene*, that the Eleventh Amendment barred the tribe's suit:

> [T]he relief requested by the [t]ribe is, as much as that sought in *Coeur d'Alene*, the functional equivalent of quiet [*sic*] the Tribe's claim to title in the New York counties named in the complaint. . . .  As such, the action is squarely governed by *Coeur d'Alene*, regardless of whether one undertakes the *Ex parte Young* analysis advocated by the majority opinion, or instead adopts the categorical approach enunciated in the plurality opinion.

*W. Mohegan*, 395 F.3d at 23 (citations omitted).  Justifying its heavy reliance on *Coeur d'Alene*, the *Western Mohegan* court characterized the dispute before it as raising the same "core issues of land, state regulatory authority, and sovereignty . . . ." *Id.* at 23. The court rejected the premise that, because the tribe sought "only 'Indian title,' " which [the tribe] describe[d] as the right 'to camp, to hunt, to fish, [and] to use the waters and timbers' in the contested lands and waterways[,]" its claims were more limited in nature than those in *Coeur d'Alene* and therefore not governed by the same principles.  *Id.* at 22.  On that issue, the court underscored the tribe's concession that Indian title nonetheless connotes the right to "exclude all others."  *Id.*  In conclusion, the court explained that, "[w]hile we express no opinion on the *limits* of *Coeur*

Several years after the *Verizon* decision, the Second Circuit ruled in *Western Mohegan Tribe & Nation v. Orange County* that a suit brought by an Indian tribe against the New York State Governor seeking possession of certain land within the State was barred by the Eleventh Amendment. *See* 395 F.3d 18, 23 (2d Cir. 2004). Although the court cited *Verizon* as controlling law and determined that the complaint had satisfied both components of the "straightforward" *Young* inquiry, *see id.* at 21, the Circuit nevertheless concluded, based upon *Coeur d'Alene*, that the Eleventh Amendment barred the tribe's suit:

> [T]he relief requested by the [t]ribe is, as much as that sought in *Coeur d'Alene*, the functional equivalent of quiet [*sic*] the Tribe's claim to title in the New York counties named in the complaint. . . . As such, the action is squarely governed by *Coeur d'Alene*, regardless of whether one undertakes the *Ex parte Young* analysis advocated by the majority opinion, or instead adopts the categorical approach enunciated in the plurality opinion.

*W. Mohegan*, 395 F.3d at 23 (citations omitted). Justifying its heavy reliance on *Coeur d'Alene*, the *Western Mohegan* court characterized the dispute before it as raising the same "core issues of land, state regulatory authority, and sovereignty . . . ." *Id.* at 23. The court rejected the premise that, because the tribe sought "only 'Indian title,'" which [the tribe] describe[d] as the right 'to camp, to hunt, to fish, [and] to use the waters and timbers' in the contested lands and waterways[,]" its claims were more limited in nature than those in *Coeur d'Alene* and therefore not governed by the same principles. *Id.* at 22. On that issue, the court underscored the tribe's concession that Indian title nonetheless connotes the right to "exclude all others." *Id.* In conclusion, the court explained that, "[w]hile we express no opinion on the *limits* of *Coeur*

23

*d'Alene's* applicability, we are bound to follow the case where, as here, it directly controls." *Id.* (emphasis in original).[12]

## ii. Application

With the principles detailed above in mind, the Court turns to their application here. As a preliminary matter, it is undisputed by Plaintiffs that the Eleventh Amendment precludes jurisdiction over their claims for monetary damages under 42 U.S.C. §§ 1981 and 1982 against the NYDEC, *see DeFranco v. Dep't of Envtl. Conservation of the State of New York*, No. 16-cv-2014, 2017 WL 1497977, at *5 (E.D.N.Y. Apr. 26, 2017) (noting that the NYDEC is a "state entity" entitled to Eleventh Amendment sovereign immunity), and against Farrish, Laczi and Seggos in their official capacities, *see LoSardo*, 2015 WL 502077, at *2.[13] Plaintiffs maintain,

---

[12] Neither the Supreme Court nor the Second Circuit has provided further guidance regarding the scope of the *Coeur d'Alene* exception to *Young* as it applies to disputes over property rights involving Indian tribes, or their members, and states.

[13] The Court is cognizant of the Supreme Court's holding in *Jett v. Dallas Independent School District* that the remedial provisions of § 1983 constitute the exclusive federal remedy for violations by state actors of rights enumerated in § 1981. *See* 491 U.S. 701, 731, 109 S. Ct. 2702, 2721 (1989) ("We think the history of the 1866 Act and the 1871 Act recounted above indicates that Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981."). Though some courts have suggested that § 1981(c), which was added as part of the Civil Rights Act of 1991, statutorily overruled *Jett* by creating a private right of action against state actors, the Second Circuit has since unequivocally rejected that theory and held that "§ 1983 provides the sole cause of action available against state actors alleged to have violated § 1981." *Duplan v. City of New York*, 888 F.3d 612, 616 (2d Cir. 2018). Here, however, the proper construction of Plaintiffs' § 1981 claims is of no moment for purposes of the Court's sovereign immunity analysis, because "Congress has not abrogated sovereign immunity from claims brought under 42 U.S.C. § 1981 [or §] 1983. . . , nor has New York waived immunity with respect to such claims." *Allah v. City of New York*, No. 15-cv-6852, 2016 WL 676394, at *3 (E.D.N.Y. Feb. 17, 2016). Similarly, although the Court has found no cases in the Second Circuit addressing this issue with respect to § 1982 claims, the weight of authority in other circuits suggests that Congress did not intend to abrogate state sovereign immunity from such claims, *see Tariq-Shuaib v. City of Camden*, No. 09-4760, 2011 WL 383857, at *3 (D.N.J. Feb. 3, 2011) (collecting cases), and further, there is no indication that the State has waived its immunity by way of "clear declaration," *McGinty*, 251 F.3d at 93.

however, that the *Young* exception to sovereign immunity applies to their claims for injunctive and declaratory relief against Farrish, Laczi and Seggos in their official capacities. *See* Plaintiffs' Memorandum of Law in Opposition to State Defendants' Motion to Dismiss ("Pls.' Opp. to State Defs.' Mtn."), DE [56-6], at 8-11. More specifically, Plaintiffs assert that they have pled facts showing a continuing violation of the Supremacy Clause, and that they are seeking only prospective relief to protect their fishing rights. *See id.* at 8-9. Plaintiffs also seem to suggest that state regulation of Indian fishing rights is necessarily preempted by federal law. *See id.* at 9-11. The Court disagrees.

Initially, the Court acknowledges that Plaintiffs' claims for declaratory and injunctive relief, as pled in the Complaint, facially satisfy both components of the "straightforward inquiry" under *Verizon* for determining whether *Young* should apply. Count I, entitled "Continuing Supremacy Clause Violations of Un-relinquished Aboriginal Usufructuary Fishing Rights Retained in Ceded Territory[,]" alleges that "Defendants' repeated interference, seizures, and prosecutions of the Plaintiffs by application of New York State fishing regulations violates Plaintiffs' fishing rights protected under the Supremacy Clause . . . ." Compl., Count I & ¶ 23. Further, the Complaint asserts that Plaintiffs "are deterred and chilled from exercising their rights to fish" in the waters adjacent to their communities. *Id.* ¶ 14. Accepting as true Plaintiffs' claims that Defendants have previously interfered with Plaintiffs' rights under the Supremacy Clause and that they continue to do so, even if only by way of threats, the Court deems the continuing violation requirement

satisfied.  *See KM Enterprises, Inc. v. McDonald*, No. 11-cv-5098, 2012 WL 4472010, at *10 (E.D.N.Y. Sept. 25, 2012), *aff'd*, 518 F. App'x 12 (2d Cir. 2013) ("[W]here there is a threat of [a] future [violation] . . . that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied." (citation omitted)).  The Complaint likewise seeks injunctive relief that appears to be prospective in nature.  *See* Compl., WHEREFORE ¶ 1 ("Plaintiffs request the Court to issue . . . preliminary and permanent injunctive relief . . . enjoining the Defendants from enforcing the laws of the State of New York against . . . Silva in the . . . Justice Court in Case No. 17-7008, and from otherwise interfering with Plaintiffs' [fishing rights].").

Nevertheless, in accordance with the *Verizon* Court's guidance, this Court must assess whether the relief sought is *properly* characterized as prospective with reference to the underlying substance of the claims at issue.  *See* 535 U.S. at 645, 122 S. Ct. at 1760.  This more expansive inquiry leads this Court to conclude that the equitable relief sought by Plaintiffs here contains a retrospective quality similar to that requested in both *Coeur d'Alene* and *Western Mohegan*.  Significantly, the Prayer for Relief in the Complaint here identifies only the proposed injunction demanded by Plaintiffs, but lacks any description of the specific declaratory relief they seek.  *See* Compl., WHEREFORE ¶ 1.  But absent a declaration by the Court that Plaintiffs possess rights "to use . . . the waters, fish[ ], tak[e] fish, and hold[ ] fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters," *id.*, or similar rights, there would be no basis to enjoin Defendants from enforcing otherwise valid State fishing laws.  Consequently, the Court reads

Plaintiffs' Prayer for Relief as implicitly requesting a declaratory judgment to that effect. And, in the Court's view, an order granting such relief would be the functional equivalent of, or at least materially akin to, a declaration of quiet title. *Accord W. Mohegan*, 395 F.3d at 23 ("[T]he [t]ribe's claim is fundamentally inconsistent with the State of New York's exercise of fee title over the contested areas. To the extent that the complaint alleges that there has never been a lawful extinguishment of the [t]ribe's Indian title, it seeks a declaration from this court that New York's exercise of fee title remains subject to the [t]ribe's rights, *i.e.*, a determination that the lands in question are not even within the regulatory jurisdiction of the State." (citation and internal quotation marks omitted)). As the allegations in the Complaint make clear, this case is principally a dispute over property rights. *See, e.g.*, Compl. ¶ 15 ("Colonial Deeds and related documents clearly support the right of the Shinnecock and other native peoples of eastern Long Island to fish in the waters adjacent to their communities without interference."); *id.* ¶ 16 ("Plaintiffs are in fear of exercising those same usual and customary aboriginal fishing rights secured and retained for them by their ancestors when Shinnecock territory was ceded to the English."); *id.* ¶ 22 ("Plaintiffs exercised their lawful rights to use waters, fish, take fish, and hold their fish clearly within an area of aboriginal usufructuary fishing rights un-relinquished and retained by Plaintiffs' ancestors in the aforementioned Colonial Deeds and related documents ceding Shinnecock territory . . . ."). Plaintiffs' assertion that they do not seek "relief defining ownership or its equivalent," Pls.' Opp. to State Defs.' Mtn. at 9, is therefore unconvincing. To the contrary, as the State Defendants

correctly point out, a ruling in Plaintiffs' favor would unquestionably "affect the [S]tate's sovereign interest and regulatory authority over its waters, along with its ability to regulate and protect its wildlife." State Defs.' Mem. at 5. It therefore stands to reason that, in accordance with *Coeur d'Alene* and *Western Mohegan*, the Eleventh Amendment bars Plaintiffs' claims for declaratory and injunctive relief against Farrish, Laczi and Seggos in their official capacities.

To be sure, the Court acknowledges that *Coeur d'Alene*, *Western Mohegan*, and the instant case are distinguishable from one another, and that this case lacks some of the factual parallels to *Coeur d'Alene* that *Western Mohegan* possesses. In *Coeur d'Alene*, the nearest analogue to a conventional quiet title action, the tribe requested a declaration of its entitlement to exclusive use, occupancy and right to quiet enjoyment of the submerged lands in question. *See* 521 U.S. at 287-88, 117 S. Ct. at 2043. The tribe in *Western Mohegan*, by contrast, sought entitlement to a more limited property right, "Indian title," which, according to the tribe, included the rights "to camp, to hunt, to fish, [and to] . . . use the waters and timbers in the contested lands and waterways." *W. Mohegan*, 395 F.3d at 22 (internal quotations omitted). Despite those differences, the *Western Mohegan* court concluded that "the action [was] squarely governed by *Coeur d'Alene*," citing, among other considerations, the tribe's efforts to "exclude all others" from the subject lands. *Id.* at 23. Here, unlike the tribes in both *Coeur d'Alene* and *Western Mohegan*, Plaintiffs, albeit implicitly, seek a declaration of an even more limited right "to use . . . the waters, fish[ ], tak[e] fish, and hold[ ] fish and shellfish in Shinnecock Bay and its estuary and other usual

and customary Shinnecock fishing waters[,]" Compl., WHEREFORE ¶ 1, and they do not expressly seek to exclude all others from such areas.  This Court, however, finds these distinctions inconsequential.

The attributes common to all three cases—particularly the states' sovereignty interests in regulating land and bodies of water within their boundaries—dictate that each should receive similar treatment for Eleventh Amendment purposes.  To begin with, this case, like *Coeur d'Alene* and *Western Mohegan*, involves "core issues of land, state regulatory authority, and sovereignty . . . ."  *W. Mohegan*, 395 F.3d at 23. Moreover, just as the tribes did in *Coeur d'Alene* and *Western Mohegan*, Plaintiffs here are essentially seeking a declaration "that the [areas] in question are not even within the regulatory jurisdiction of the State."  *Coeur d'Alene*,  521 U.S. at 282, 117 S. Ct. at 2040.  As a result, if Plaintiffs were to prevail on their claim for a declaratory judgment, "substantially all benefits of ownership and control [of the waters at issue] would shift from the State to the [t]ribe," *id.*, and the State's "sovereign interest in its . . . waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury," *id.* at 287, 117 S. Ct. at 2043.  Finally, at issue here, as in *Coeur d'Alene*, are "lands underlying navigable waters[,]" which "have historically been considered sovereign lands" that "uniquely implicate sovereign interests."  *Id.* at 283-84, 117 S. Ct. at 2041 (internal quotation marks and citation omitted).[14]  In light of these "special circumstances," the Court concludes that

---

[14] As the Supreme Court observed in *Coeur d'Alene*:

The importance of [submerged] lands to state sovereignty explains our longstanding commitment to the principle that the United States is presumed to have held navigable

this case is governed by *Coeur d'Alene*.  Accordingly, the *Young* exception to Eleventh Amendment sovereign immunity does not apply to Plaintiffs' claims against Farrish, Laczi and Seggos in their official capacities.[15]

Based on the foregoing analysis, the Court respectfully recommends that Plaintiffs' claims against the NYDEC, along with those against Farrish, Laczi and Seggos in their official capacities, be dismissed as barred by the Eleventh Amendment.[16]

---

waters in acquired territory for the ultimate benefit of future [s]tates and "that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain."

521 U.S. 261, 283-84, 117 S. Ct. at 2041 (quoting *United States v. Holt State Bank*, 270 U.S. 49, 55, 46 S. Ct. 197, 199 (1926)).

[15] The cases relied upon by Plaintiffs in support of their preemption argument are inapposite. *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S. Ct. 1705 (1968), *United States v. State of Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd and remanded*, 520 F.2d 676 (9th Cir. 1975), and *United States v. State of Michigan*, 471 F. Supp. 192 (W.D. Mich. 1979) were decided well before *Coeur d'Alene*, did not address the issue of sovereign immunity, and, unlike this case, involved fishing rights expressly granted to or preserved by the tribes through treaty.  Further, the court in *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1205-06 (10th Cir. 2002) held only that the *Ex parte Young* exception applied to the tribe's claim seeking to enjoin the state from prosecuting tribe members for actions taken within reservation boundaries.  Here, however, there are no allegations that the conduct giving rise to Plaintiffs' claims occurred on the Reservation.

[16] Although the parties do not address this issue in their briefing, to the extent that Plaintiffs assert claims for injunctive and declaratory relief as against Farrish, Laczi and Seggos in their individual capacities, the Court recommends that those claims be dismissed as improper.  *See Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 69-70 (E.D.N.Y. 2018) (citing *Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011)) (dismissing individual-capacity claims for injunctive relief against government officials because the officials could provide the relief sought by the plaintiffs only in their official capacities); *see also Boddie v. New York State Div. of Parole*, No. 08-cv-911, 2009 WL 1033786, at *6 (E.D.N.Y. Apr. 17, 2009) ("Neither Judge Campbell nor Ms. Thompson in their *individual capacities* has the power or the authority to effectuate an order from this court granting plaintiff the prospective declaratory or injunctive relief he seeks in his sixth and seventh causes of action." (emphasis in original)), *opinion modified on denial of reconsideration*, 2009 WL 1938981 (E.D.N.Y. July 7, 2009).

b. *Younger* Abstention

Assuming, *arguendo*, that the Eleventh Amendment did not apply, subject matter jurisdiction over Silva's claims against the State Defendants seeking to enjoin his criminal proceeding in the Justice Court would still be wanting under the *Younger* abstention doctrine.   "*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger v. Harris*, 401 U.S. 37, 43-44, 91 S. Ct. 746, 755 (1971)).   Under *Younger* and its progeny, "abstention is appropriate when:  1) there is an ongoing state proceeding; 2) an important state interest is implicated; and 3) the plaintiff has an avenue open for review of constitutional claims in the state court." *Hansel v. Town Court for the Town of Springfield, N.Y.*, 56 F.3d 391, 393 (2d Cir. 1995).   "The relevant question under *Younger* is 'whether the state's procedural remedies *could* provide the relief sought[,] [not] . . . whether the state will provide' the constitutional ruling which the plaintiff seeks."   *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 79 (2d Cir. 2003) (emphasis and second and third alterations in original) (quoting *Kirschner v. Klemons*, 225 F.3d 227, 235 (2d Cir. 2000)).

Exceptions to *Younger* abstention should be made only on a "showing of bad faith, harassment, or . . . other unusual circumstance," *Younger*, 401 U.S. at 54, 91 S. Ct. at 755, and the plaintiff bears the burden in this regard, *Diamond "D"*, 282 F.3d at 198.   "A federal plaintiff seeking to establish that the bad faith exception to

*Younger* applies must show that the party bringing the state action [has] no reasonable expectation of obtaining a favorable outcome, . . . but rather brought the proceeding with a retaliatory, harassing, or other illegitimate motive." *Jackson Hewitt Tax Serv. Inc. v. Kirkland*, 455 F. App'x 16, 18 (2d Cir. 2012) (summary order) (brackets in original) (citations and internal quotations omitted).  In evaluating an assertion of bad faith, "the subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry." *Diamond "D"*, 282 F.3d at 199 (citations omitted).  Hence, "[a] state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception." *Id.* (citation omitted).  For the extraordinary circumstances exception to apply, a court must conclude:  "(1) that there [is] no state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation; and (2) that . . . the litigant will suffer 'great and immediate' harm if the federal court does not intervene." *Id.* at 201 (citing *Trainor v. Hernandez*, 431 U.S. 434, 441-42 & n.7, 97 S. Ct. 1911, 1917 & n.7 (1977)).

In her Memorandum and Order dated July 31, 2018, Judge Feuerstein ruled that, under *Younger*, the Court was required to abstain from granting the injunctive relief requested by Silva.  *See* DE [48] at 9.  In reaching that conclusion, Judge Feuerstein reasoned that:  (i) there was a pending State proceeding, namely, the subject criminal action against Silva in the Justice Court; (ii) that proceeding involved the "State's enforcement of its generally applicable fishing regulations

outside of reservation boundaries, implicating an important state interest"; and (iii) there was no indication that Silva had been, or would be, deprived of "an adequate opportunity for judicial review of his constitutional claim." *Id.* (citations omitted). Judge Feuerstein also determined that neither exception to *Younger* applied. *Id.* at 9-10. Plaintiffs did not establish bad faith, Judge Feuerstein found, because there was no indication that either Farrish or Laczi intended to harass Silva by issuing him a criminal appearance ticket and seizing his property. *Id.* at 10. And according to Judge Feuerstein, Gerrod's and Jonathan's prosecutions were "too temporally attenuated to Silva's" to show a pattern of harassment or support a finding of retaliation or other nefarious purpose. *Id.* In addition, Judge Feuerstein concluded that no extraordinary circumstances existed, observing that "the trial before Judge Weber in [the] Justice Court provides Silva with a meaningful, timely, and adequate means to address his alleged constitutional violation[,] . . . and there is nothing indicating [that] Silva will suffer 'great and immediate' harm" absent this Court's intervention. *Id.* (citations omitted).

Plaintiffs now submit that, despite Judge Feuerstein's ruling, the Court is not required to abstain because the bad faith, harassment and exceptional circumstances exceptions to *Younger* apply.[17] *See* Pls.' Opp. to State Defs.' Mtn. at 11-15. Plaintiffs also assert that the *Younger* inquiry must be conducted "with[ ] reference to the

---

[17] Plaintiffs claim that they "did not have an opportunity to argue the *Younger* bad faith and harassment exceptions in response to the Defendants' opposition papers to Plaintiffs' motion for [a] preliminary injunction[ ] because the Court's docket entry show cause order did not provide for reply papers and stated no oral argument would be held." Pls.' Opp. to State Defs.' Mtn. at 11 n.6. As explained above, however, Judge Feuerstein nonetheless addressed, and found inapplicable, any potential exceptions to *Younger* in her Memorandum and Order dated July 31, 2018. *See* DE [48] at 9-10.

Native American backdrop," and then appear to conflate the *Younger* inquiry with the *Ex parte Young* framework.  *See id.* at 11-12.  Having considered Plaintiffs' newly-asserted arguments, the Court finds no basis to depart from Judge Feuerstein's findings on this issue.

Setting aside conclusory allegations, the Complaint is devoid of any facts from which the Court could infer either that Defendants acted in bad faith or that exceptional circumstances exist.   In their opposition brief, Plaintiffs identify Defendants' "failed prosecutions, seiz[ure] [of] property, and a continuing pattern of interference with [Plaintiffs'] aboriginal and retained Shinnecock fishing rights" as supporting their charge of bad faith.  Pls.' Opp. to State Defs.' Mtn. at 13.  But this conduct alone is insufficient to establish that Defendants somehow acted with intent to retaliate or harass, or with any other illegitimate purpose.  The Complaint does not allege facts showing that the so-called failed prosecutions were commenced for any reason other than to enforce generally-applicable State laws pertaining to wildlife preservation.  *See 333 E. 60th St., Inc. v. New York State Liquor Auth.*, No. 08-cv-4147, 2008 WL 4104012, at *4 (S.D.N.Y. Aug. 29, 2008) ("If the actions of [the] defendants were 'nothing more than a straightforward enforcement of the laws of New York, the case does not fall within the bad faith exception . . . .'" (quoting *Diamond "D"*, 282 F.3d at 199)).  Insofar as Silva attempts to demonstrate bad faith by alleging selective prosecution, that theory also lacks factual support—such as, for instance, examples of preferential treatment of non-Indians who violated the same laws—and is undermined by Plaintiffs' reference in the Complaint to the prior

prosecution of Ruggiero, a non-Indian, for violations of State fishing laws similar to those at issue here. *See* Compl. ¶ 17. The seizure of Plaintiffs' fishing equipment and catches is, without more, similarly insufficient to support a showing of bad faith, as criminal defendants' "personal effects are routinely . . . 'seized,' and placed in official custody." *Hudson v. Palmer*, 468 U.S. 517, 540, 104 S. Ct. 3194, 3207 (1984). Further, because "[a] state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception[,]" *Diamond "D"*, 282 F.3d at 199, the mere assertion that Defendants repeatedly interfered with Plaintiffs' aboriginal fishing rights in violation of the Supremacy Clause does not establish bad faith absent an accompanying, plausible allegation that they did so intentionally.

Plaintiffs' final arguments on this point—that bad faith and harassment are demonstrated by Defendants' failure to consult with the Tribe on matters involving fishing rights consistent with obligations under Executive Order No. 13175, Consultation and Coordination With Indian Tribal Governments, Exec. Order No. 13175, 65 Fed. Reg. 67249, 2000 WL 34508356 (November 6, 2000), and by Defendants' reliance on purportedly inaccurate statements in the Gilmore Declaration, *see* Pls.' Opp. to State Defs.' Mtn. at 14 & n.7; *see also* DEs [59], [60]— also lack merit. Neither the cited Executive Order itself nor its import is referenced anywhere in the Complaint, and Plaintiffs have not otherwise established that Defendants' conduct violated any of that Order's provisions.[18] Even if it did, Plaintiffs

---

[18] In light of Plaintiffs' failure to explain how the exceptional circumstances exception to *Younger* applies here, the Court will not address that issue in any further detail. Additionally, because

have offered no support for the proposition that a state government official's contravention of a federal Executive Order necessarily amounts to bad faith for *Younger* purposes.  Nor have Plaintiffs met their burden of showing bad faith by identifying assertions in the Gilmore Affidavit pertaining to the conservation status of the American Eel that are allegedly contradicted by statements on the NYDEC and U.S. Fish & Wildlife Service websites.  Notably, Plaintiffs' supplemental submissions attacking the Gilmore Declaration simply rehash the arguments on this point first raised in Plaintiffs' opposition brief and thus add nothing new to their argument.  The supplemental submissions similarly fail to support a finding of bad faith in any other respect.  Accordingly, the Court recommends that Plaintiffs' claims seeking to enjoin Silva's criminal prosecution in the Justice Court be dismissed on the alternative basis that this Court lacks subject matter jurisdiction under *Younger*.

### c. Standing

As with Silva, there is an additional basis for dismissing Gerrod's and Jonathan's claims for declaratory and injunctive relief against the State Defendants—lack of standing.   To establish standing, a plaintiff must satisfy three constitutional requirements: "(1) injury-in-fact—an injury that is 'concrete and particularized' and is 'actual or imminent, not conjectural or hypothetical'; (2) an injury that is fairly traceable to the challenged action; and (3) an injury that will likely be redressed by a favorable ruling of the court."  *Berkson v. Gogo LLC*, 97

---

Plaintiffs neglect to articulate why the "Native American backdrop" against which this case arises, *see* Pls.' Opp. to State Defs.' Mtn. at 11, should alter the Court's *Younger* analysis, that argument is rejected as well.

F.Supp.3d 359, 405 (E.D.N.Y. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992)); *see also Anjum v. J.C. Penney Co., Inc.*, No. 13-cv-460, 2014 WL 5090018, at \*6 (E.D.N.Y. Oct. 9, 2014) ("Standing refers to the requirement that a plaintiff in federal court suffer a non-speculative injury-in-fact, traceable to the conduct of the defendant, and capable of redress by a favorable decision." (citation omitted)).

"To establish injury-in-fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. ——, ——, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1, 112 S. Ct. at 2136 n.1. A "concrete" injury must be 'de facto'; that is, it must actually exist." *Spokeo*, 578 U.S. at ——, 136 S. Ct. at 1548. The plaintiff must establish that he "has sustained or is immediately in danger of sustaining some direct injury . . . [that] must be both real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02, 103 S. Ct. 1660, 1665 (1983) (citations and internal quotation marks omitted). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 102, 103 S. Ct. at 1665 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96, 94 S. Ct. 669, 676 (1974)). Further, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future

harm . . . ." *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S. Ct. 2318, 2325-26 (1972). Redressability is the "non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2130 (citation and internal quotation marks omitted). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court[.]" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107, 118 S. Ct. 1003, 1019 (1998).

Judge Feuerstein previously determined, in her Memorandum and Order dated July 31, 2018, that Gerrod and Jonathan lacked standing because, according to the allegations in the Complaint, their prior prosecutions for violating State fishing laws were dismissed years ago and they are not currently facing criminal charges. *See* DE [48] at 10-11. In reaching that conclusion, Judge Feuerstein noted that their request for injunctive relief was "entirely speculative and remote, [and thus] insufficient to carry their burden of establishing that they have 'sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Id.* at 11 (quoting *Lyons*, 461 U.S. at 101-02, 103 S. Ct. at 1665). Once again, Plaintiffs have identified no compelling reason that Judge Feuerstein's ruling pertaining to Gerrod's and Jonathan's standing to seeking a preliminary injunction should not govern in the context of their remaining equitable claims. Accordingly, as Gerrod and Jonathan have failed to establish a concrete and

particularized injury that can be redressed by a decision in their favor, the Court respectfully recommends that their claims for declaratory and injunctive relief be dismissed for lack of standing.[19]

### d. Failure to State a Claim – 42 U.S.C. §§ 1981 and 1982

Having found untenable Plaintiffs' claims for declaratory and injunctive relief against the State Defendants, as well as Plaintiffs' claims for monetary damages against the NYDEC and Farrish, Laczi and Seggos in their official capacities, the Court next evaluates the merits of Plaintiffs' claims for monetary damages under 42 U.S.C. §§ 1981 and 1982 against Farrish, Laczi and Seggos in their individual capacities.[20]  Section 1981 provides:

---

[19] The Court agrees with the State Defendants that, for the same reasons Gerrod and Jonathan lack standing, Silva's attempt to enjoin Defendants from interfering with his future use of the waters in question must fail.  *See* State Defs.' Mem. at 9.  Accordingly, to the extent that this component of Silva's claim for injunctive relief is not barred under *Younger*, the Court also recommends that it be deemed precluded based on his lack of standing.

[20] Again, the Court acknowledges that "§ 1981 does not provide a separate private right of action against state actors" *Duplan*, 888 F.3d at 621, and that, instead, "§ 1983 provides the sole cause of action available against state actors alleged to have violated § 1981[,]" *id*. at 616.  *See also Jett*, 491 U.S. at 731, 109 S. Ct. at 2721.  "The holding in *Jett* has been interpreted [by courts in the Second Circuit] to encompass not only governmental entities, but also individuals sued in their individual capacities who are state actors[,]" *Wilson v. New York*, No. 15-cv-23, 2017 WL 9674497, at *18 (E.D.N.Y. Jan. 24, 2017), *report and recommendation adopted*, 2018 WL 1466770 (E.D.N.Y. Mar. 26, 2018), such as Farrish, Laczi and Seggos.  Consequently, Plaintiffs' claims under § 1981 against Farrish, Laczi and Seggos in their individual capacities should, as a technical matter, be summarily dismissed.  But in the interest of judicial efficiency, this Court recommends construing the § 1981 claims as having been properly asserted under § 1983, as this approach does not materially impact the remaining recommendations herein.  42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.  Although § 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).  To prevail on a claim arising under § 1983, a plaintiff must demonstrate:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.  Similarly, pursuant to § 1982, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982; *see Costello v. Town of Huntington*, No. 14-cv-2061, 2015 WL 1396448, at *12 (E.D.N.Y. Mar. 25, 2015) ("Section 1981 establishes that all persons have equal right to make and enforce contracts, while § 1982 establishes that all persons have equal right to purchase, lease, sell, hold, and convey real and personal property." (citing 42 U.S.C. §§ 1981, 1982)).  To state a *prima facie* claim under either provision, plaintiffs may allege: "(1) they are members of a racial minority; (2) an intent to discriminate on the basis of their race by defendant; and (3) the discrimination concerned one or more activities enumerated in §§ 1981 or 1982, *e.g.*, making contracts or the purchase of personal property." *Costello*, 2015 WL 1396448, at *12 (citation and internal quotation marks omitted).[21]

---

"(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law." *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983).  Thus, because Plaintiffs seek to vindicate rights provided by § 1981, the Court must analyze their claims in the same manner irrespective of whether they are interpreted as independent § 1981 claims or claims under § 1983.

[21] Claims under §§ 1981 and 1982 may also be based on reverse discrimination, meaning that a white plaintiff may maintain a claim based on his or her race. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87, 96 S. Ct. 2574, 2582 (1976) (Section 1981); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S. Ct. 400, 404 (1969) (Section 1982).

i. Discriminatory Intent

Plaintiffs asserting claims under both § 1981 and § 1982 "must allege facts supporting the [defendant]'s intent to discriminate against [them] on the basis of [their] race." *Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014); *see Griffin v. Santander Bank*, No. 12-cv-1249, 2014 WL 204229, at *5 (E.D.N.Y. Jan. 16, 2014) ("[C]laims brought under §§ 1981 and 1982 require a showing of discriminatory intent." (alteration in original) (citation omitted)); *Perry v. State of New York*, No. 08-cv-4610, 2009 WL 2575713, at *2 (S.D.N.Y. Aug. 20, 2009) ("A plaintiff is required to set forth factual circumstances from which discriminatory motive can be inferred . . . . In the absence of such allegations, dismissal at the pleading stage is warranted." (internal citations omitted)).  "In order to show a discriminatory intent, '[t]he events of intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for [the] [defendant]'s actions, must be specifically pleaded in the complaint.'" *Griffin*, 2014 WL 204229, at *5 (first and third alterations in original) (quoting *Shen v. A&P Food Stores*, No. 93-cv-1184, 1995 WL 728416, at *3 (E.D.N.Y. Nov. 21, 1995)); *see Grajales v. Mendez*, No. 11-cv-3069, 2011 WL 3163032, at *1 (E.D.N.Y. July 25, 2011) ("Plaintiff must . . . allege that [the] defendants' actions were purposefully discriminatory and racially motivated." (citations omitted)).  "Thus, '[f]act-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required,' and '[c]onclusory or naked allegations will not suffice.'" *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011) (alterations in original) (quoting *Dove v. Fordham Univ.*, 56 F. Supp.

2d 330, 338 (S.D.N.Y. 1999), *aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000)).

Here, the Complaint falls considerably short of alleging facts from which the Court could infer that either Farrish, Laczi or Seggos acted with discriminatory intent.  As Plaintiffs concede in their opposition brief, *see* Pls.' Opp. to State Defs.' Mtn. at 23, the only actions they rely upon in support of their charge of discrimination are:  (i) the prosecution of Ruggiero in or around 2008, *see* Compl. ¶ 17; (ii) the prosecution of Gerrod in or around 2008, *see id.* ¶ 18; (iii) the prosecution of Jonathan in or around 2010, *see id.* ¶ 19; and (iv) the ticketing of Silva and seizure of his fishing equipment and catch by Farrish and Laczi in 2017, along with Silva's subsequent prosecution, *see* Compl. ¶ 20.  Initially, the claims under §§ 1981 and 1982 fail because the Complaint pleads no facts demonstrating that Plaintiffs were treated less favorably than white citizens with respect to any contractual or property right.  In fact, as indicated above in the context of this Court's discussion of the bad faith exception to the *Younger* abstention doctrine, the State's prosecution of Ruggiero, a non-Indian, for violating State fishing laws actually weakens Plaintiffs' claim of discrimination.  But even assuming, *arguendo*, that the State Defendants had enforced State fishing laws in a discriminatory manner, even the most liberal reading of Plaintiffs' allegations does not suggest that Farrish, Laczi or Seggos were motivated by racial animus.  Based on the Complaint's allegations, the Court can infer only that Farrish and Laczi were acting consistent with their obligations to

enforce generally-applicable State fishing laws.[22]   Moreover, as explained further below, the Complaint lacks any allegations pertaining to Seggos specifically. Accordingly, the Court recommends that Plaintiffs' cause of action under 42 U.S.C. §§ 1981 and 1982 against Farrish, Laczi and Seggos in their individual capacities be dismissed for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).[23]

## ii. Personal Involvement of Seggos

Plaintiffs' claims against Seggos in his individual capacity must also be dismissed for failure to allege his personal involvement in any of the purportedly unlawful conduct. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("A claim seeking personal liability under [§] 1981 must be predicated on the actor's personal involvement." (citation omitted)); *Ebersole v. Pennsylvania Dep't of Corr.*, No. 4:06-cv-1368, 2009 WL 1010521, at *3 (M.D. Pa. Apr. 14, 2009) (dismissing § 1982 claims against government officials for failure to establish their personal involvement in the alleged violation); *see also CBOCS W., Inc. v. Humphries*,

---

[22] The Court would reach the same result even if it were to consider Plaintiffs' supplemental submissions in evaluating the Fed. R. Civ. P. 12(b)(6) component of the State Defendants' motion. No inference that Farrish, Laczi or Seggos acted with discriminatory intent can be drawn from either the allegedly inaccurate statements in the Gilmore Declaration or the two emails involving Gilmore. *See* DEs [59], [60].

[23] Based on the allegations in the Complaint, Gerrod's and Jonathan's claims under §§ 1981 and 1982 also appear to be time barred. The allegedly unlawful conduct giving rise to their claims— *i.e.*, their respective prosecutions—occurred in or around 2009 and 2010. Whether the Court applies a three- or four-year statute of limitations, *see Bacon v. Suffolk Legislature*, No. 05-cv-4307, 2007 WL 2288044, at *5-6 (E.D.N.Y. Aug. 8, 2007) (discussing statute of limitations periods for claims under §§ 1981, 1982 and 1983), the time to commence an action predicated on such conduct expired long before this case was initiated in 2018. Yet, in view of this Court's recommendation that Plaintiffs be granted leave to replead their statutory claims against Farrish, Laczi and Seggos in their individual capacities, the Court need not further address the issue of timeliness at this juncture.

553 U.S. 442, 447, 128 S. Ct. 1951, 1955 (2008) (observing that Supreme Court precedents have "have long construed §§ 1981 and 1982 similarly").   Plaintiffs' argument that their claims against Seggos are viable because, as Commissioner of the NYDEC, he "sets policy and sees to it that it is executed," Pls.' Opp. to State Defs.' Mtn. at 24, is unfounded.   An allegation to that effect is not made in the Complaint and, in any event, it would lack adequate detail concerning Seggos's role in the specific conduct at issue here to satisfy the applicable pleading standard.   Therefore, the Court recommends that Plaintiffs' claims under 42 U.S.C. §§ 1981 and 1982 against Seggos in his individual capacity be dismissed on this alternative basis.

### 2. The County Defendants

The Court next turns to Plaintiffs' claims against the County Defendants.   In support of their motion to dismiss, the County Defendants argue that:  (i) Plaintiffs' claims against Greenwood in her individual capacity are barred based on the theory of absolute prosecutorial immunity.   *See* Defendants Jamie Greenwood and Suffolk County District Attorney's Office Memorandum of Law in Support of Their Motion to Dismiss Pursuant to Fed. R. Civ. P. Rule 12(b)(6) ("County Def.'s Mem."), DE [54-3], at 2-5; (ii) the claims against Greenwood in her official capacity must be construed as against the State and thus dismissed under the doctrine of sovereign immunity, *see id.* at 6-9; (iii) the SCDA is not an entity susceptible to suit, *see id.* at 10; (iv) to the extent that Plaintiffs' claims are construed as against the County of Suffolk (the "County"), they must be dismissed both because the County cannot be liable for actions of the District Attorney and for failure to sufficiently plead that the alleged

conduct was the result of a practice or custom, *see id.* at 6-10; and (v) Plaintiffs' claim under the Declaratory Judgment Act must be dismissed for failure to allege real or immediate harm, *see id.* at 11-13.  The Court agrees with the County Defendants that Greenwood is entitled to absolute prosecutorial immunity, that the SCDA is not an entity susceptible to suit, and that Plaintiffs' claims should not be construed as against the County.  Based on these as well as the other conclusions herein, the Court need not address the County Defendants' remaining arguments.

### a. Claims Against Greenwood

It is well settled that a prosecutor enjoys absolute immunity from a civil suit premised on the "initiation and pursuit of a criminal prosecution" and for any acts taken in "present[ing] . . . the [s]tate's case at trial."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S. Ct. 2606, 2613 (1993); *see Imbler v. Pachtman*, 424 U.S. 409, 430-31, 96 S. Ct. 984, 995 (1976).  In other words, a state prosecutor enjoys absolute immunity when engaged in activities "intimately associated with the judicial phase of the criminal process."  *Imbler*, 424 U.S. at 430, 96 S. Ct. at 995; *see also Day v. Morgenthau*, 909 F.2d 75, 77 (2d Cir. 1990).  The purpose of the immunity doctrine is "'to preserve the integrity of the judicial process' and to enable 'zealous[ ] perform[ance of] prosecutorial duties . . . [without] the constant threat of legal reprisals.'"  *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995) (alterations in original) (quoting *Hill v. City of New York*, 45 F.3d 653, 656 (2d Cir. 1995)).

In determining whether prosecutorial immunity is available, courts employ a "functional approach" that "looks to the nature of the function performed, not the

identity of the actor who performed it." *Buckley*, 509 U.S. at 269, 113 S. Ct. at 2613 (citations and internal quotation marks omitted); *see also Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001) ("The actions of a prosecutor are not covered by absolute immunity merely because they were performed by a prosecutor; rather, the question is whether the actions are part of a prosecutor's traditional functions." (citation and internal quotation marks omitted)). Whether a prosecutor "may be sheltered by absolute immunity from liability for [her conduct] turns on whether or not [her conduct] occurred in the course of [her] role as an advocate." *Hill*, 45 F.3d at 662; *See Warney v. Monroe Cty.*, 587 F.3d 113, 121 (2d Cir. 2009) ("Those acts that are 'intimately associated with the judicial phase of the criminal process' would be shielded by absolute immunity, but not 'those aspects of the prosecutor's responsibility that cast [her] in the role of an administrator or investigative officer rather than that of advocate.'" (quoting *Imbler*, 424 U.S. at 430-31, 96 S. Ct. at 995)). A prosecutor's role as an advocate encompasses "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler*, 424 U.S. at 431 n.33, 96 S. Ct. at 996 n.33. "Conversely, where a prosecutor acts without any colorable claim of authority, [s]he loses the absolute immunity [s]he would otherwise enjoy." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987); *see Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) ("[T]he prosecutor has absolute immunity for the initiation and conduct of a prosecution 'unless [she] proceeds in the clear absence of all jurisdiction[.]'" (quoting *Barr*, 810 F.2d at 361)). "The scope of a prosecutor's jurisdiction is determined by law[,]" with reference to "whether the pertinent statutes

may have authorized prosecution for the charged conduct[.]"  *Shmueli* 424 F.3d at

237 (citations omitted).

Here, Plaintiffs' claims for monetary damages against Greenwood in her

individual capacity—namely, those asserted under 42 U.S.C. §§ 1981[24] and 1982—

are foreclosed by the doctrine of absolute prosecutorial immunity.[25]  As noted above,

Greenwood is the Assistant District Attorney handling the State's prosecution of

Silva in the Justice Court for his alleged violations of State fishing and environmental

conservation laws.  *See* Compl. ¶ 20.  Only one paragraph of the Complaint contains

allegations pertaining to Greenwood specifically:

> [The criminal case against Silva] is presently lodged and pending in the
> . . . Justice Court as Case No. 17-7008 and is being prosecuted by
> Greenwood.  Silva's attempt to obtain a voluntary dismissal by
> Greenwood was unsuccessful, and Silva's motion to dismiss for lack of
> jurisdiction was denied by that court.  Over Silva's objection, that case
> is presently scheduled for trial on August 30, 2018 at 9:00 am.

*Id.*  More generally, the Complaint asserts that Plaintiffs "have been . . . prosecuted

by the Defendants[ ] and are deterred and chilled from exercising their rights to fish

by the acts of the Defendants."  *Id.*  ¶ 14; *see also id.* ¶ 16 ("Over the last decade,

Defendants have . . . prosecuted the Plaintiffs for alleged criminal offenses in alleged

violation of New York State law involving fishing and raising shellfish in Shinnecock

---

[24] For the reasons explained above, Plaintiffs' claims under § 1981 against Greenwood in her individual capacity are improper under *Duplan*.  Yet, as with those § 1981 claims asserted against Farrish, Laczi and Seggos in their individual capacities, the Court recommends, in the interest of judicial economy, that such claims against Greenwood be construed as having been brought under § 1983 so that the Court may address their merits, and because doing so does not impact any other recommendation herein.

[25] It is well settled that prosecutors are not entitled to absolute immunity from claims for injunctive and declaratory relief.  *See Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 736-37, 100 S. Ct. 1967, 1977 (1980).

Bay and its estuary waters . . . .   Each of the prosecutions failed[;] [y]et, the Defendants persist and continue to . . . threaten prosecution.").

Even when viewed in the light most favorable to Plaintiffs, the allegations in the Complaint concerning Greenwood suggest that her conduct was "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, 96 S. Ct. at 995, and hence, occurred as part of her traditional function as a prosecutor.  *See Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (summary order).  That is, the Complaint merely states that Greenwood has been responsible for prosecuting Silva's case in the pre-trial stages—*i.e.*, acting in her role as an advocate on behalf of the State—but lacks allegations, even implicit, that any of Greenwood's actions were undertaken in the capacity of an administrator or investigative officer.  Nor does the Complaint plead facts demonstrating that Greenwood's conduct with respect to Silva's prosecution was outside the scope of her role as an advocate.  Indeed, even Plaintiffs' allegation regarding Defendants' "threaten[ed] prosecution[s,]" Compl. ¶ 16, is insufficient in that regard.  *Cf. Taylor v. Kavanagh*, 640 F.2d 450, 453 (2d Cir. 1981) (holding that a prosecutor's activities in the plea bargaining context warrant the protection of absolute immunity).

Similarly absent from the Complaint are any allegations from which the Court could infer that Greenwood has operated in the "clear absence of all jurisdiction." *Shmueli*, 424 F.3d at 237 (quoting *Barr*, 810 F.2d at 361).  Article 18 of the New York County Law provides that "it shall be the duty of every district attorney to conduct all prosecutions for crimes and offenses cognizable by the courts of the county for

which he or she shall have been elected or appointed[.]"  N.Y. County Law § 700. Greenwood, as an Assistant District Attorney, is thus plainly authorized by statute to commence prosecutions.  To that end, Greenwood, in exercising that mandate on behalf of the State, has brought criminal charges under various State laws applicable to Silva's conduct, namely, NYECL § 13-0355 and NYCRR, title 6, §§ 40-1(b)(ii)-(iii). The Court therefore finds no basis to conclude that Greenwood acted without any colorable claim of authority.

Accordingly, the doctrine of absolute prosecutorial immunity bars the claims for monetary damages against Greenwood in her individual capacity.  Moreover, the Court agrees with the County Defendants that, because Greenwood was acting in her role as a prosecutor, the official capacity claims against her must be construed as against the State.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) ("When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." (quoting *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988), *cert. denied*, 488 U.S. 1014, 109 S. Ct. 805 (1989)); *see also Greene v. City of New York*, No. 08-cv-00243, 2017 WL 1030707, at *29 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018).  For the reasons set forth in section III(B)(1)(a), *supra*, those claims are barred by the Eleventh Amendment.  *See D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) (summary order) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." (citations omitted)).  Finally, Plaintiffs' claims for declaratory and

injunctive relief against Greenwood in her official capacity are, as explained in sections III(B)(1)(b) and (c), *supra*, independently precluded under *Younger* and for lack of standing.[26]

### b. Claims Against the SCDA

Plaintiffs' claims against the SCDA fare no better.  "[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and[,] therefore, cannot sue or be sued."  *Leshore v. Comm'r of Long Beach P.D.*, No. 10-cv-6067, 2012 WL 1032643, at *7 (E.D.N.Y. Mar. 21, 2012) (alteration in original) (citation omitted).  It is therefore well-settled that district attorneys' offices in New York lack the capacity to be sued.  *See, e.g.*, *Boley v. DeVito*, No. 12-cv-4090, 2012 WL 3764493, at *2 (E.D.N.Y. Aug. 27, 2012) ("The Kings County District Attorney's Office is not a suable entity."); *Bristol v. Prob. Dep't of Nassau Cty.*, No. 14-cv-6647, 2016 WL 873336, at *1 n.1 (E.D.N.Y. Mar. 8, 2016) (collecting cases).

Plaintiffs assert that the SCDA is indeed a legal entity separate from the County and capable of being sued because the County provides the SCDA with a "prosecution fund" and the SCDA holds itself out to the public on its website as "an entity capable of holding intellectual property rights."  Pls.' Opp. to County Defs.' Mtn. at 8-9.  But Plaintiffs identify no legal support for their theory that these characteristics have any bearing on the SCDA's status as an "administrative arm" of

---

[26] Consistent with this Court's determination with regard to any claims for injunctive and declaratory relief as against Farrish, Laczi and Seggos in their individual capacities, *see* footnote 16, *supra*, the Court recommends, insofar as equivalent claims have been asserted against Greenwood, that they too be dismissed.

the County.   Absent authority suggesting otherwise, this Court will apply the uniformly-recognized principle that district attorneys' offices in New York are not subject to suit.   Accordingly, the Court respectfully recommends that Plaintiffs' claims against the SCDA be dismissed.[27]

### c. County Liability for Prosecutorial Acts

The Court also rejects the notion that either the claims against Greenwood in her official capacity or those against the SCDA should be construed as claims against the County.   As noted above, "a county cannot be liable for the acts of a district attorney related to the decision to prosecute or not prosecute an individual." *Martin v. Cty. of Suffolk*, No. 13-cv-2104, 2014 WL 1232906, at *5 (E.D.N.Y. Mar. 26, 2014) (citations omitted); *see also Jones v. City of New York*, 988 F. Supp. 2d 305, 314-17 (E.D.N.Y. 2013).   "With respect, however, to claims centering not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, the district attorney has been treated not as a state official but rather as an official of the municipality to which he is assigned." *Ying Jing Gan*, 996 F.2d at 536.   Examples of such administrative decisions include "building management, maintenance decisions, or discrimination against employees[.]" *Jones*, 988 F. Supp. 2d at 316.   Here, Plaintiffs' claims against the County Defendants deal exclusively with the latter's prosecutorial conduct in connection with Silva's case in the Justice Court.   That is to say, there are no

---

[27] Even if Plaintiffs' claims against the SCDA were to be construed as against the State, *see Ying Jing Gan*, 996 F.2d at 536, the Court would still recommend that they be dismissed for the reasons set forth in sections III(B)(1)(a)-(c), *supra*.

allegations in the Complaint suggesting that Plaintiffs' claims somehow arise from the County Defendants' administrative acts such that the County Defendants could be considered municipal actors. Accordingly, the Court recommends that neither Plaintiffs' claims against Greenwood nor those against the SCDA be construed as asserted against the County.[28]

## C. <u>Leave to Amend</u>

While leave to amend a complaint should be freely given "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citations omitted). "[A] district court may deny leave to amend when . . . amendment would be futile because the problem with the claim 'is substantive . . . [and] better pleading will not cure it.'" *Reynolds v. City of Mount Vernon*, 14-cv-1481, 2015 WL 1514894, at *5 (S.D.N.Y. Apr. 1, 2015) (second and third alterations in original) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). Here, the Court recommends that Plaintiffs be granted leave to replead only their statutory claims for monetary damages against Farrish, Laczi and Seggos in their individual capacities, but that they otherwise be denied leave to amend their Complaint. As an initial matter, Plaintiffs have not requested leave to amend in the

---

[28] Because this Court concludes that no viable claim predicated on the actions of Greenwood or the SCDA can lie against the County, it does not reach the question of potential municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978) and *Jett* arising from a practice or custom. Further, as the preceding analysis of Plaintiffs' claims for declaratory relief against the State Defendants, *see, e.g.*, sections III(B)(1)(a)-(c), *supra*, applies equally to the County Defendants, the Court need not address the County Defendants' argument that Plaintiffs have failed to allege sufficient real or immediate harm to pursue a claim under the Declaratory Judgment Act.

event of dismissal. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 126 (2d Cir. 2013) ("While leave to amend under the Federal Rules of Civil Procedure is freely granted, . . . no court can be said to have erred in failing to grant a request that was not made." (citations and internal quotation marks omitted)). Further, based on the findings above, amendment of Plaintiffs' claims for injunctive and declaratory relief and their statutory claims against the NYDEC and the County Defendants, would be futile in light of the numerous substantive deficiencies that could not be cured through supplemental pleading.[29] The Court cannot, however, conclude with certainty that amendment of Plaintiffs' statutory claims against Farrish, Laczi and Seggos in their individual capacities would be futile.[30] Accordingly, the Court recommends that Plaintiffs be granted leave to amend only to this limited extent.

## IV. CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Plaintiffs' motion for leave to file a sur-reply be granted, but that Defendants' motions to dismiss nevertheless be granted and the Complaint be dismissed in its entirety. However, the Court further recommends that Plaintiffs be granted leave to replead, but only as to their statutory claims for monetary damages against Farrish, Laczi and Seggos in their individual capacities.

---

[29] Although it is conceivable that Plaintiffs could plead additional facts demonstrating bad faith or harassment such that *Younger* would no longer bar Silva's claims for declaratory and injunctive relief, leave to amend those claims would nevertheless be futile considering this Court's findings with respect to Eleventh Amendment immunity.

[30] The Court has reviewed the State Defendants' qualified immunity argument, but deems it premature to address given the recommendation herein that leave to amend the statutory claims against Farrish, Laczi and Seggos in their individual capacities be granted.

## V.     OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.    Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days.    Failure to file objections within the specified time waives the right to appeal the District Court's order.    *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:     Central Islip, New York         s/ Steven I. Locke
           January 7, 2019                 STEVEN I. LOCKE
                                           United States Magistrate Judge