JUSTICE COURT: TOWN OF SOUTHAMPTON
COUNTY OF SUFFOLK: STATE OF NEW YORK
-----------------------------------------------------------------------X
THE PEOPLE THE STATE OF NEW YORK

        -against-

DAVID T. SILVA,
                          DEFENDANT
-----------------------------------------------------------------------X

MEMORANDUM DECISION

BY: GARY J. WEBER, T. J.

DATE: June 5, 2019

DOCKET # S17-060545

TIMOTHY SINI, ESQ., DISTRICT ATTORNEY
BY: JAMIE GREENWOOD, ESQ.
Suffolk County District Attorney's Office
East End Bureau
32 Jackson Avenue
Hampton Bays, NY 11946

SCOTT M. MOORE, ESQ.
Attorney for the Defendant
Moore International Law, PLLC
45 Rockefeller Plaza, 20th Floor
New York, NY 10111

## FINDINGS OF FACT

### The Prosecution Witnesses

The Prosecution called Southampton Town Bay Constable, Richard Franks to testify.

Constable Franks testified that he has been employed by the Town of Southampton as a Bay Constable for 11 ½ years and that his duties pertained to enforcement of the Southampton Code especially as it relates to the Southampton Town Trustees who, among other things, regulate the use of the bay bottoms within Southampton Town waters, including the right to attach anything to the bay bottom within their jurisdiction.

Franks also testified that he was familiar with the boundaries of the Shinnecock Indian Reservation in as much as the Reservation land extends landward from the mean high water mark.

On April 17, 2017 Constable Franks received a telephone call from a Trustee indicating that the Trustee had been out bait fishing and he advised Franks that "there was a possible illegal net that was installed in Taylor Creek".

The following day (April 18, 2017) Officer Franks went to the place described to him by the Trustee and located the net in question.

Franks called the State Department of Environmental Conservation (hereinafter "D.E.C."), an agency with which he had cooperated in the past, "to see if somehow we could find out who the net belongs to."

Franks further testified that his phone call to the D.E.C was prompted by the fact that "he felt that the net was installed didn't have a permit" from the trustees, as is required, by Southampton Town Code.

As a result of the telephone call, the following day, April 19, 2019 Franks met with two officers of the D.E.C. at the southeast corner of Taylor Creek off Halsey Lane and Meadow Lane.

When Franks arrived the net was still there in the same location as it had earlier been observed by Franks. Constable Franks took three pictures of it (People's Exhibit #1, 2 & 3) which were marked into evidence over the objection of defense counsel.

Bay Constable Franks also identified People's Exhibit 4 & 5 which are maps showing the Shinnecock Reservation (Exhibit # 4) and the location of the net in question (Exhibit # 5).

The Prosecution called Lieutenant Sean Reilly of the D.E.C. to testify.

Lieutenant Reilly testified that he had been employed by the D.E.C. for 22 ½ years and is the supervisor of Nassau County and Marine Enforcement Unit for the field.

Lieutenant Reilly testified that on April 19, 2017 he had a meeting with D.E.C. Officers Bobsein and Taber in the D.E.C. Marine Office in Setauket.

Bobsein and Taber advised Reilly that they had received information from Constable Franks that there was a possibly illegal net set in the creek by Meadow and Halsey Neck Lane.

Lieutenant Reilly then directed Taber to drive to the location, verify if the net was still there and then to notify him.

Upon being notified that the net was in fact, at the location as described by Franks, Lieutenant Reilly assigned D.E.C. Officers Laczi and Farrish to take an unmarked vehicle to go down to that location at high tide to see if anyone came to pull the net.

The officers were to wear civilian clothes and to secrete themselves, so that anyone going to the net would not be scared off.

A little after six o'clock A.M. on April 20, 2017 Laczi notified Reilly that a vehicle had pulled up and that it appeared someone was approaching the net.

Reilly advised Laczi to stay out of sight and when "whoever it was returned back from that location to check them, what they had taken out of the net".

About a half an hour later Officer Laczi notified Lieutenant Reilly that they "had a subject that had a bucket with him that had glass eels in it."

Lieutenant then responded to the location on or about 9:00 AM .to supervise the collection and documentation of the evidence that was taken at that time.

Upon arrival at the scene, Lieutenant Reilly was shown a bucket which contained "glass eels" by the two D.E.C. Officers, Laczi and Farrish.

With the aid of Officer Doroski, the net was pulled from the water.

The net, the buckets and the "glass eels" or elvers were collected and taken to the D.E.C. Facility at Ridge, New York.

Lieutenant Reilly testified that, once the net was taken to Ridge, New York, an outdoor facility of the D.E.C., it was measured and found to be a fyke net, approximately 40 feet long with wings that brought it to 78 feet.

The Prosecution called D.E.C. Officer Evan Laczi to testify

Officer Laczi testified that he and D.E.C. Officer Farrish, pursuant to the request of Lieutenant Reilly, met at the State Police Headquarters in Riverside, New York and took an unmarked Jeep Grand Cherokee to the location of the net on the tip of 450 Meadow Lane, Southampton.

Wearing civilian clothes, the two officers arrived at the Meadow Lane location at around 5:00 A.M. and waited "in hopes that someone would come to claim the net or fish the net".

Sometime between 6:00 and 6:30 A.M., a pickup truck pulled up to 450 Meadow Lane.

Soon, Officers Laczi and Farrish observed an individual walk down to the location of the net and "take something from the larger net with a small net".

According to Officer Laczi the following then took place:

"So we took videos and pictures of the person in the creek. The person that was standing in the creek began walking toward Officer Farrish and I. Officer Farrish and I, again, were in plain clothes. I had a conversation with the individual when he walked up to me with the bucket in his hand. I asked the individual what was in the bucket. He replied just some bait. I asked if I could see the bait and that individual replied "I am in a hurry, I have to go and proceeded to walk back to his pickup truck." (Transcript, Proceedings February 21, 2019, Page 22, Lines 6-18)

Officer Laczi further testified:

Q. What happened after you approached the individual and he indicated there were bait fish in the bucket?

A. That individual said he was in a hurry and began walking back to his vehicle.

[Deleted Material]

Officer Farrish and I followed the individual back to his pickup truck. He placed the contents of the bucket on the bed of the truck, at which point Officer Farrish and I identified ourselves as New York State Department of Environmental Conservation Police Officers and asked again what was in the bucket and the individual replied elvers. He unscrewed the bucket and when I looked in; I saw a large pile of small American eels.

"Q. You said elvers then small American eels, are those the same thing?

A. We refer to undersize, immature eels as elvers.

Q. Can you describe what the elvers look like?

A. Elvers are very small, little eels. They are slippery. They have long tails, almost like a snake or a tadpoles.

Q. You mentioned earlier that you were trained in identifying fish and wildlife?

A. That is correct.

Q. Are one of the species you're trained in the American eel?

A. Yes. We went through training in the academy on elvers as well as the American eels and we went through field training identifying them as well.

Q. Based on that training and your experience as an officer with the Department of Environmental Conservation, were you able to determine at that time what you were looking at?

A. I was.

Q. Approximately, what size were the eels you saw in the bucket?

A. They were very small. Approximately, two inches in length."

(Transcript Proceedings February 21, 2019, Pages 23, 24, 25, Lines 21-25, 1-15)

Officer Laczi testified that, subsequent to the initial encounter with the Defendant when he had declined to open his bucket, the Defendant "unscrewed the bucket and when I looked in, I saw a large pile of small American eels (elvers)".

According to his testimony, after the Defendant unscrewed his bucket, revealing the elver eels, Officer Laczi swore that he asked the Defendant for permission to search his vehicle (the pickup truck).

Upon doing so, Officer Laczi discovered fishing equipment and a large net which were, along with the two five gallon buckets collected and brought to the D.E.C. facility in Ridge for which a receipt was given to the Defendant.

After all of this had transpired, Officer Laczi testified that he obtained a "voluntary statement" from the Defendant (People's Exhibit 8).

Officer Laczi,, then, at the telephonic direction of Lieutenant Reilly, issued the Defendant an appearance ticket for possession of an undersized species.

After Officer Laczi returned with the evidence that he had to the Ridge headquarters of the D.E.C., Lieutenant Reilly and D.E.C. Officer Doroski arrived bringing with them the fyke net and 98 undersized eels (elvers) that had been retained in the net.

There were 247 eels (elvers) in the bucket(s) which Officer Laczi had already counted.

D.E.C. Officer Brian Farrish was called as a witness on behalf of the People and testified in pertinent part as follows:

"As he started approaching us, we asked what was in the buckets. He said some bait fish and then stated he had to get going. At that time, we continued the path back to his truck. We followed him. As he was putting his buckets on the tailgate, we identified ourselves as environmental police officers".

Q. Then what happened?

A. Then we asked him what he had in his buckets. He replied elvers.

Q. What are elvers?

A. Elvers are baby eels.

Q. What is significant about elvers?

A. They are glass eels, which are very tiny, small eels and there is a very big market for them to sell them.

Q. Is it legal to possess or fish for them in New York?

A. Eels less than nine inches are illegal to possess.

Q. So it is illegal?

A. Yes

Q. What happened after that individual told you he had elvers in the bucket?

A. We asked him to see what was in the bucket. He said sure. He opened the bucket. We saw some American Glass Eels swimming around the top. At that time, I asked him what he was going to do with the eels. He said he was going to take them back to the reservation and try and grow them.

Q. Did you have any further conversation with him at this time?

A. No

(Transcript February 21, 2019 Page 93, Page 94, Line 2-25, Line 1-12)

Following the revelation of the elvers in the Defendant's bucket, D.E.C. Officers Laczi and Farrish procured a "voluntary written statement" from the Defendant (People Exhibit 8) in which he admitted to seating the fyke net in the Taylor Creek, and to have taken baby eels or elvers from the net on several previous occasions in addition to the incident now at bar.

The People called Ms. Lisa Goree as a witness.

Ms. Goree testified to the effect that she is the Tax Assessor for the Town of Southampton (Coincidently, Ms. Goree is also a tribal member of the Shinnecock Nation).

Ms. Goree testified that the boundaries of the Shinnecock Nation are as shown on People's Exhibit 11 and that People Exhibit "4", which is an aerial photograph, marked with a red circle, shows a location outside the boundaries of the Shinnecock Nation.

Following the testimony of Ms. Goree, the People rested. The Defense moved to dismiss the charges against the Defendant for lack of jurisdiction.

The Court has treated this application as one for a Trial Order of Dismissal (C.P.L. §290.10). Decision on the Motion was reserved and the disposition of the same will be treated in the opinion which follows.

The Defense Witnesses

The defense called Mr. Bryan Polite to testify.

Essentially, Mr. Polite testified that he was a member of the Shinnecock Nation and had served in its government for a total of seven years in various tribal capacities.

In relevant part, Mr. Polite testified to the effect that "The official position of the Shinnecock Nation is [that] the Shinnecock Nation has never relinquished their rights to the bay".

Mr. Polite did testify as follows on cross examination; with respect to the subject location in question. (The fyke net)

"Q. You would agree that this area of Meadow Lane is Southampton Village?

A. Correct. Yes.

Q. You would agree that location is not on the Shinnecock Indian Reservation as boundaries stand?

A. Currently, yes".

(Transcript February 21, 2019, Page 139, Lines 4-10)

The Defendant called Dr. John A. Strong, Professor Emeritus in History and American Studies of Long Island University.

Professor Strong possessed strong credentials concerning the history and culture of the various indigenous Native American Tribes of Long Island, including the Shinnecock People in particular.

His testimony was both interesting and scholarly.

It was interesting to learn that Taylor Creek was known in the Shinnecock tradition as "Turtle Creek", not only because of the abundance of snapping turtles which populated it, and served as a major food source for the Shinnecock People prior to the Colonial Period and after, but also for the shape of the mouth of the creek which resembles a turtle head.

The defense rested after the testimony of Dr. Strong.

The Court finds the testimony of all of the witnesses to have been credible in all relevant respects.

## ANALYSIS

### Jurisdiction of the State of New York (D. E. C.)
### at the Fyke Net

The Fyke Net in question was placed out in Taylor Creek and there appears to be no dispute that the location shown by the red circle on People's Exhibit 4 where the net was placed, is outside of the boundaries of the Shinnecock Nation.

Indeed, Mr. Bryan Polite, a member of the Shinnecock Nation and a member of the Shinnecock Government for at least seven years, was called as a defense witness and testified when asked if he agreed that the location was "not on the Shinnecock Indian Reservation as the boundaries stand", replied "currently, yes".

In an earlier matter decided by Justice Kooperstein of this Court on January 28, 2009 in *People v Ruggerio* where Justice Kooperstein correctly pointed out that the People had failed to meet their burden of proof as to the location of an alleged fishing violation on Shinnecock Bay by a member of the Shinnecock Nation. The factual scenario present here is otherwise.

In *Ruggerio*, there was a failure to prove exactly where the alleged violation took place relative to the borders of the Shinnecock Nation.

Here, based upon the current and indisputed mapping of the area, the fyke net was most certainly placed on Taylor Creek outside of the established boundaries of the Shinnecock Nation.

The Court understands that tribal lore and tradition does not lend itself easily to the imposition of mapped boundaries, especially in dealing with the traditional Native American understanding of hunting and fishing rights, which from all accounts gave scant attention to the mapped boundaries that the European colonists relied on so heavily.

The world around us has changed and this court is without the power to alter the legally established boundaries of the Shinnecock Nation or of the State of New York. Even if the court had such authority, on this record at least, no other conclusion can be drawn except that the subject fyke net was, in fact, placed not on waters or land belonging to the Shinnecock Nation, but on territory within the jurisdiction of the State of New York, acting through its D. E. C.

For these reasons the application for a Trial Order of Dismissal is denied.

Further, the People have proven beyond a reasonable doubt that the subject fyke net was set, maintained, operated or used in an area (Taylor's Creek) subject to the jurisdiction of the State of New York acting through the D. E. C.

### THE VIOLATION COMPLAINT CHARGING THE DEFENDANT
### WITH A VIOLATION OF SECTION 11-1303/71-0923 OF THE E.C.L.

This complaint charges the Defendant with the possession of eels in excess of a 25 fish limit in that he possessed 222 eels in excess of 25 fish in his bucket. A total of 247 eels.

The bucket and the fishing equipment as well as the statement taken by the D.E.C. Officers from the Defendant resulted from what the prosecution urges was a consensual search of the Defendant's bucket(s), as earlier herein described.

Both D.E.C. Officers Laczi and Farrish testified to the effect that when they first approached the Defendant and asked to see what was in his bucket, the Defendant refused to show the contents of the bucket to them.

Each Officer testified that in as much time as it took to walk to the Defendant's truck after their first encounter with him, the Defendant consented to the search of his buckets and his truck and the giving of a "voluntary statement" containing damaging admissions.

Case 2:18-cv-03648-SJF-SIL   Document 83-5   Filed 11/18/19   Page 7 of 8 PageID #: 787

In People v Gonzalez, 39 N.Y. 2d 122, 383 N.Y.S 2d 215, the New York Court of Appeals held among other things, "Consent to search is voluntary when it is a true act of will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle. As the Supreme Court stated in *Bumper v. North Carolina,* 391 U. S. 543 "Where there is coercion there cannot be consent." [As quoted in *Gonzalez*]

No one circumstance is determinative of the voluntariness of consent. Whether consent has been voluntarily given or is only a yielding to overbearing official pressure must be determined from the circumstances.

An important, although not dispositive, factor in determining the voluntariness of an apparent consent is whether the consenter is in custody or under arrest, and the circumstances surrounding the custody or arrest. True custody, or, more compellingly, the immediate events of an arrest, especially a resisted arrest, do, however, engender an atmosphere of authority ordinarily contradictory of a capacity to exercise a free and unconstrained will.

Submission to authority is not consent. \*\*\*

Another factor to be considered in determining the voluntariness of an apparent consent is the background of the consenter. \*\*\*

Another factor to be considered is whether the consenter has been previously to the giving of consents, or for that matter even later, evasive, or un-co-operative with the law enforcement authorities. \*\*\*

A final factor is whether a defendant was advised of his right to refuse to consent. Such advice is not mandatory. Failure to advise, however, may be considered in determining whether a consent was voluntary."

The record of these proceedings is bare of any showing as to how it was that the initial refusal to permit a search of his buckets by the Defendant was converted within a short period of time into his consent to opening the bucket(s) and a search of his truck, as well as the voluntary giving of a written statement against his penal interests.

The Court also observes that the fyke net in question was first reported to the D.E.C. on April 17, 2017 and that the Defendant was ticketed for violations on April 20, 2017 when the encounter above described took place. There was more than ample time from the discovery of the net to the confrontation with the Defendant by the D.E.C. Officers to obtain a search warrant relative to anyone who appeared on the scene to tend the net.

The United States Supreme Court has sanctioned such a procedure. Justice Scalia wrote in *United States v Grubbs*, 547 U.S. 90 (2006) "Thus, when an anticipatory warrant is issued, 'the fact that the contraband is not presently located at the place described in the warrant is immaterial, so long as there is probable cause to believe that it will be there when the search warrant is executed.' *United States v Garcia*, 882 F. 2d 699, 702."

Accordingly, the Court has not considered the evidence adduced by the People relative to the buckets found to have contained the glass eels or the Defendant's statement given to Officers Laczi and Farrish.

### THE VIOLATION CHARGING THE DEFENDANT WITH A VIOLATION OF SECTION 13-0335/71-0923 OF THE E.C.L.

This section provides, when read in conjunction with its attendant regulations that it is prohibited to maintain, operate or use a fyke net greater than 40 feet in length without possessing a food fish license.

The fyke net in question was placed in open view in Taylor Creek on both Southampton Town Trustee controlled bottom land or private property; or both. Either way, it was open to the view and inspection of anyone who came to where it was placed in the creek.

As such, there could be no expectation of privacy with respect to the fyke net.

By approaching the net and extracting some content from it, the Defendant clearly was maintaining, operating or using the net and he was observed so doing by Officers Laczi and Farrish.

The People have proven the Defendant's violation of this section beyond a reasonable doubt.

However, the People have not proven beyond a reasonable doubt that the Defendant was guilty of possessing 98 eels (elver eels) from the fyke net.

This is so because these eels were found in the net after the Defendant had been ticketed and had left the scene.

There was no testimony as to how or when the eels entered the net and the only testimony as to the possession of the eels is that Lieutenant Reilly and Officer Doroski took the eels from the net after the Defendant, and Officers Laczi and Farrish had left the area.

### THE VIOLATION COMPLAINT CHARGING THE DEFENDANT WITH A SECOND VIOLATION OF SECTION 11-1303/71-0923 OF THE E.C.L.

This alleged violation pertains to the size of the 247 eels seized from the Defendants bucket(s).

This count suffers from the same deficiency as discussed with respect to the first alleged violation of E.C.L. Section 11-13031/71-0923 treated earlier herein. The search and seizure which yielded the evidence and the attendant statement was not proven to be constitutional.

### CONCLUSION

The Defendant is guilty of the violation of E.C.L. Section 13-0335/71-0923 dated June 6, 2017 relating to the lack of a marine commercial food fishing license and the use of a fyke net.

The Defendant is not guilty of the other two violations charged.

Let this Memorandum Decision also serve as the Order of the Court.

_____
Hon. Gary J. Weber
T. J.