UNITED STATES DISTRICT
COURT EASTERN DISTRICT
OF NEW YORK

------------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                Plaintiffs,

- against -

BRIAN FARRISH,
JAMIE GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE,

                Defendants.
------------------------------------------------------x

Case No.: 18-cv-3648 (SJF) (SIL)

**PLAINTIFFS' LOCAL RULE 56(1)(b) COUNTER-STATEMENT OF MATERIAL FACTS AS TO COUNTY DEFENDANTS**

    Plaintiffs respectfully submit the following Local Rule 56.1(b) counter statement of material facts corresponding to the County Defendants' numbered paragraphs:

1) No genuine issue of material fact.

2) No genuine issue of material fact.

3) No genuine issue of material fact.

4) No genuine issue of material fact.

5) No genuine issue of material fact.

6) No genuine issue of material fact.

7) All of Defendant Greenwood's conduct as alleged in the complaint related solely to her role in the prosecution of plaintiff Silva. (See Exhibit A).

**Genuine issue of material fact.**

Par. 25 of the Complaint, Exhibit 1, states:

> The Defendants' aforesaid acts against the Plaintiffs constitute a continuing pattern and practice of purposeful acts of discrimination based on their race as Native Americans in violation of Plaintiffs' civil rights to equal security of the laws and to exercise their lawful federally protected rights to use waters, fish, take fish, and hold their fish without interference, without seizure of person and property, and without prosecution by the Defendants.

**Exhibit 1**
**Complaint**

8) Defendant Greenwood was not involved in a determination that probable cause existed to charge the plaintiffs, or gave legal advice to the police on the propriety of investigative techniques, or was engaged in any coercive interrogations of the plaintiffs.

**Genuine issue of material fact.**

Discovery has been stayed and Plaintiffs have not had an opportunity to engage in discovery on this or any other issue in the case.

9) Plaintiffs have no proof that Defendant Greenwood was involved in a determination that probable cause existed to charge the plaintiffs, or gave legal advice to the police on the propriety of investigative techniques, or was engaged in any coercive interrogations of the plaintiffs.

**Genuine issue of material fact.**

Discovery has been stayed and Plaintiffs have not had an opportunity to engage in any discovery on this or any other issue in the case.

10) The complaint alleges no conduct on the part of Defendant Greenwood that can be characterized as administrative or investigative in nature. (See Exhibit A).

**Genuine issue of material fact.**

Par. 25 of the Complaint, Exhibit 1, states:

> The Defendants' aforesaid acts against the Plaintiffs constitute a continuing pattern and practice of purposeful acts of discrimination based on their race as Native Americans in violation of Plaintiffs' civil rights to equal security of the laws and to exercise their lawful federally protected rights to use waters, fish, take fish, and hold their fish without interference, without seizure of person and property, and without prosecution by the Defendants.

**Exhibit 1**
**Complaint**

11) Plaintiffs have no proof that Defendant Greenwood engaged in conduct that can be characterized as administrative or investigative in nature.

**Genuine issue of material fact.**

Discovery has been stayed and Plaintiffs have not had an opportunity to engage in any discovery on this or any other issue in the case.

12) The complaint is silent as to any custom or policy of the County of Suffolk that caused the alleged constitutional depravation. (See Exhibit A)

**Genuine issue of material fact.**

Par. 25 of the Complaint, Exhibit 1, states:

> The Defendants' aforesaid acts against the Plaintiffs constitute a continuing pattern and practice of purposeful acts of discrimination based on their race as Native Americans in violation of Plaintiffs' civil rights to equal security of the laws and to exercise their lawful federally protected rights to use waters, fish, take fish, and hold their fish without interference, without seizure of person and property, and without prosecution by the Defendants.

**Exhibit 1**
**Complaint**

13) Plaintiffs have no evidence that any custom or policy of the County of Suffolk caused a violation of plaintiff's constitutional rights.

### Genuine issue of material fact.

Discovery has been stayed and Plaintiffs have not had an opportunity to engage in any discovery on this or any other issue in the case.

### Additional Plaintiffs' statements and exhibits

14) The southern boundary of the Shinnecock Indian Reservation has never been established. Whatever the boundary, the location of the Silva fishing fyke net is clearly within retained fishing rights.

> "The Shinnecock Nation and other coastal Algonquin peoples on Long Island have depended from time immemorial on the bounty from their maritime environment". p. 2
> "The English acknowledged this relationship in a series of nation to nation agreements beginning in the spring of 1648 when Nowehdonah, the Shinnecock sachem, joined with the sachems from the Montauketts, Manhassetts and Corchaugs to negotiate with the governors of New Haven and Connecticut for the purchase of thirty thousand acres of land in what is now the town of East Hampton". p. 2.
> "On June 10, 1658 Sachem Wyandanch met with Lion Gardiner, one of the first English settlers on Long Island, to negotiate a nation to nation agreement concerning access to beaches adjacent to the Shinnecock lands in Southampton". p. 2.
> "The above agreements were made while the towns of Southampton, East Hampton, and Brookhaven were under the jurisdiction of Connecticut colony." p. 3.
> Dr. Strong concludes, "(t)he above documents clearly support the rights of the Shinnecock and the other native peoples of eastern Long Island to fish in the waters adjacent to their communities "without let or hinderance" and to dispose of their catches "as they think good". p. 4.
> **Exhibit 2**
> **Strong report - May 27, 2018**

15) Dr. John Strong testified on behalf of Silva:

> "There has been a court decision establishing the northern boundary of the reservation but the water boundaries around Shinnecock Neck have never been officially established." P. 6.
> "Although the jurisdictional boundaries over the off-shore water east of the Shinnecock Reservation have never been officially marked, all of the area on the eastern half of Shinnecock Bay around Shinnecock Neck have traditionally been considered Shinnecock

4

waters." P. 6.
"The use of these waters by the Shinnecock have never been challenged." P. 6.
"More recently the tribal oyster project began floating racks out in these waters in 1977 and is still operating there today." P. 6.
**Exhibit 3**
**Strong report - November 3, 2018**

Q. (by Scott Moore) Dr, Strong, regardless of where the reservation boundaries are or may be, do the Shinnecocks have fishing rights in the waters in any event?
A. You mean treaty rights?
Q. Yes.
A. Yes.
Q. Can you explain to the Judge what you mean by that?
A. … In that 1648 deed (to Easthampton) it says that the native peoples will have rights to hunt and fish, and I think the language is fish in all creeks and ponds, and in terms of that document and the terms of the people that were signing it at the time, that's what they understood it would be because they just kept fishing where they have been… 4/11/2019 Trial Transcript. p. 35
A … the Supreme Court has dealt with this many times and one of the conclusions that they drew was that whenever there were disagreements between fishing rights and ancient treaty rights, that they should be resolved by nation to nation interaction or agreement… 4/11/2019 Trial Transcript. p. 36
Q. (by Jamie Greenwood) On direct-examination that was, in fact, the only deed you indicated for retention of any rights to fish in creeks and ponds, correct; on direct-examination, that's the only deed you mentioned? 4/11/2019 Trial Transcript. p. 51
A. No. There was several other documents that related to fishing rights and they are all cited; 1657, 1662. This whole area here. It's a pattern. Id.
Q. (Greenwood) You would agree with me, the present day legal boundaries of the Shinnecock Reservation, is the area outlined in yellow on People's exhibit 4? Id. 57.
A. The yellow line there on the tax map? No. I would not agree with that.
Q. (Greenwood) Just to be clear, you indicated in what is marked as Defense Exhibit F, which is your additional report, that the Shinnecocks would use what we know as Taylor Creek to fish in, right? Id. pp. 58-59
A. Yes.
Q. So that wasn't land, correct?
A. It was Shinnecock waters, yes.
**Exhibit 4**
**Strong trial testimony April 11, 2019**

16) Silva's Town Court trial motion to dismiss led with *US v Winans* reserved rights and

was not examined by Judge Weber.

17) Judge Weber at this bench trial did not know where Silva was fishing, and had to solicit

fact testimony from the Prosecution to ascertain the location of the fyke net after the

5

Prosecution rested its case against Silva. "Where on the map was the fyke net, anybody know", he asked. He pressed, "(w)here is the net? Where is the fyke net on the map?" *People v Silva*, 2/21/19, Page 146, lines 4-11. Silva objected, Page 146, lines 7-8, and later moved to dismiss, 4/11/2019 Page 3, line 14 – page 6, line 4.

> **Exhibits 5 & 6**
> **J. weber remarks and objection transcripts**

18) Bryan Polite testified that he was not familiar with Taylor Creek. The follow up Prosecution questions refer to terrestrial landmarks such as the Southampton Village Meadow Lane ticketing location, which was not relevant to the in-water placement of Silva's fyke net in Shinnecock Bay.

> "Q.   Just turning your attention to People's 4 again, are you familiar with this creek?
> A. No, ma'am.
> Q.   Are you familiar with Southampton Village?
> A. Correct.  Yes.
> Q.   You would agree that this area of Meadow Lane is Southampton Village?
> A. Correct.  Yes.
> Q.   You would agree that location is not on the Shinnecock Indian Reservation as the boundaries stand?
> A.   Currently, yes." 2/21/2019 *People v Silva,* Page 138, line 21 – Page 139, line 10.
> **Exhibit 7**
> **Polite transcript**

19) Assessor Lisa Goree testified that maps of Shinnecock have been wrong before.

> Q.   Could you briefly summarize what that error was?
> A.   I believe -- well, these tax maps are made by Suffolk County Real Property Tax Office and I believe sometime ago there was an error in drawing the line which is part of the reservation.
> Q.   So it's possible the tax maps, as they are represented today, could be incorrect?
> A.   It's possible.
>  2/21/2019 People v Silva pages 119-120
> **Exhibit 8**
> **Goree testimony**

20) The DEC publishes a document on its website titled "List of Endangered, Threatened and Special Concern Fish & Wildlife Species of New York State". The American eel is not

6

listed under any category.

 **Exhibit 9**
 **DEC list**

21) The U.S. Fish & Wildlife Service previously issued a press release on its website titled: "American Eel Population Remains Stable, Does not need ESA Protection".

 **Exhibit 10**
 **USFW publication**

22) The U.S. Fish & Wildlife Service finding that the American Eel is not endangered is published in the Federal Register, Vol. 80, No. 195 (October 8, 2015) at 60834. The USF&W states "we find that the stressors are not of sufficient imminence, intensity, or magnitude to indicate that the American eel is in danger of extinction (an endangered species), or likely to become an endangered species within the foreseeable future (a threatened species), throughout all of its range. There are no threats currently affecting the American eel throughout the species range." 60837. Id.

 **Exhibit 11**
 **FR eel**

23) The ASMFC 2012 Report on Stock Assessment warns, "the overfishing and overfished status (of the American Eel) … cannot be stated with confidence."

 **Exhibit 12**
 **ASMFC 2012 Report**

24) The ASMFC American Eel Management Board increased the Atlantic Coastwide landing of the American eel on August 8, 2018.

 **Exhibit 13**
 **ASMFC American Eel Board Approves Addendum V . p. 1**

 **Exhibit 14**
 **ASMFC eel status 2018**

25) The Shinnecock, Unkechaug and other Native American nations are not signatories to the interstate compact creating the ASMFC. Article I of the interstate compact states, "It is not the purpose of this compact to authorize the states joining herein to limit the production of fish or fish products for the purpose of establishing or fixing the price thereof, or creating and perpetuating monopoly." ASMFC Compact. p. 2.

> **Exhibit 15**
> **ASMFC Compact**

26) Whales have been categorized with "great fish" since colonial times. Whaling is termed a "fishery" in the 1946/7 International Convention for the Regulation of Whaling Treaty. Pages 249-250, 252.

> **Exhibit 16**
> **whaling treaty**

27) In Unkechaug v NYSDEC., Judge Kuntz ruled Shinnecock and Unkechaug customary fishing waters are coextensive to a certain degree. Unkechaug v. NYSDEC. p. 13

> **Exhibit 17**
> **Unkechaug v. NYSDEC**

28) "The Shinnecock Nation and other coastal Algonquin peoples on Long Island have depended from time immemorial on the bounty from their maritime environment."
> **Exhibit 2**
> **Strong report - May 27, 2018, p. 2**

29) "The English acknowledged this relationship in a series of nation to nation agreements beginning in the spring of 1648 when Nowehdonah, the Shinnecock sachem, joined with the sachems from the Montauketts, Manhassetts and Corchaugs to negotiate with the governors of New Haven and Connecticut for the purchase of thirty thousand acres of land in what is now the town of East Hampton."
> **Exhibit 2**
> **Strong report - May 27, 2018, p. 2**

30) "On June 10, 1658 Sachem Wyandanch met with Lion Gardiner, one of the first English settlers on Long Island, to negotiate a nation to nation agreement concerning access to beaches adjacent to the Shinnecock lands in Southampton."
> **Exhibit 2**
> **Strong report - May 27, 2018, p. 2**

8

31) Dr. Strong concludes, "(t)he above documents clearly support the rights of the Shinnecock and the other native peoples of eastern Long Island to fish in the waters adjacent to their communities "without let or hinderance" and to dispose of their catches "as they think good"". Id. p. 4.
    **Exhibit 2**
    **Strong report - May 27, 2018, p. 4**

32) "There has been a court decision establishing the northern boundary of the reservation but the water boundaries around Shinnecock Neck have never been officially established."
    **Exhibit 3**
    **Strong report - November 3, 2018, p. 6**

33) "Although the jurisdictional boundaries over the off-shore water east of the Shinnecock Reservation have never been officially marked, all of the area on the eastern half of Shinnecock Bay around Shinnecock Neck have traditionally been considered Shinnecock waters."
    **Exhibit 3**
    **Strong report - November 3, 2018, p. 6**

34) "The use of these waters by the Shinnecock have never been challenged."
    **Exhibit 3 –**
    **Strong report - November 3, 2018, p. 6**

35) "More recently the tribal oyster project began floating racks out in these waters in 1977 and is still operating there today."
    **Exhibit 3**
    **Strong report - November 3, 2018, p. 6**

36) Q. (by Scott Moore) Dr, Strong, regardless of where the reservation boundaries are or may be, do the Shinnecocks have fishing rights in the waters in any event?
   A. You mean treaty rights?
   Q. Yes.
   A. Yes.
   Q. Can you explain to the Judge what you mean by that?
   A. … In that 1648 deed (to Easthampton) it says that the native peoples will have rights to hunt and fish, and I think the language is fish in all creeks and ponds, and in terms of that document and the terms of the people that were signing it at the time, that's what they understood it would be because they just kept fishing where they have been…
    **Exhibit 4**
    **4_11_2019 Strong Testimony, p. 35, lines 3-22**

37) A … the Supreme Court has dealt with this many times and one of the conclusions that they drew was that whenever there were disagreements between fishing rights and ancient treaty rights, that they should be resolved by nation to nation interaction or agreement…
    **Exhibit 4**
    **4_11_2019 Strong Testimony, p. 36, lines 4-10**

38) Q. (by Jamie Greenwood) On direct-examination that was, in fact, the only deed you indicated for retention of any rights to fish in creeks and ponds, correct; on direct-examination, that's the only deed you mentioned?
    A. No. There was several other documents that related to fishing rights and they are all cited; 1657, 1662. This whole area here. It's a pattern.
>    **Exhibit 4**
>    **4_11_2019 Strong Testimony,  p. 51, lines 12-20**

39) Q. (Greenwood) You would agree with me, the present day legal boundaries of the Shinnecock Reservation, is the area outlined in yellow on People's exhibit 4? Id. 57.
    A. The yellow line there on the tax map? No. I would not agree with that.
>    **Exhibit 4**
>    **4_11_2019 Strong Testimony,  p. 56, line ___ to p. 57, line 5**

40) Q. (Greenwood) Just to be clear, you indicated in what is marked as Defense Exhibit F, which is your additional report, that the Shinnecocks would use what we know as Taylor Creek to fish in, right?
    A. Yes.
    Q. So that wasn't land, correct?
    A. It was Shinnecock waters, yes.
>    **Exhibit 4**
>    **4_11_2019 Strong Testimony, p. 58, line 19 to p. 59, line 2**

41) In an 1854 Suffolk County Supreme Court case, the Southampton Town Trustees were liable for harvesting Shinnecock seaweed from the shores of Shinnecock Bay.
>    **Exhibit 26**
>    *Bunn v. Pierson et al*, Judgment, November 23, 1854 (Suffolk County Supreme Court)

>    **See also Exhibit 18, p. 56 (BIA Summary)**
>    *Bunn* is one of the cases referred to in the BIA Summary, page 3, as evidence of Shinnecock "exercise of political influence or authority" for Recognition Criterion 83.7(c) (p. 2). "Luther Bunn and Oliver Kellis, leasehold residents, sued non-Indians for 'taking and carrying away sea weed' from the 'shores of Shinnecock Bay' (New York Court of Appeals 3/-/1860)."

**Additional exhibits**

>    **Exhibit 27**
>    **Skibine Issues a Final Determination to Acknowledge the Shinnecock Indian Nation of Long Island, NY**

>    **Exhibit 28**
>    **Gov Patterson NY Times 9_24_2009**

10

**Exhibit 29**
**Witt March_2_ 2016 Email**

**Exhibit 30**
**Witt_May 9 2016 Shinnecock Overview**

**Exhibit 31**
**Witt_March 23 2016 Unkechaug Territory and Fishing Rights**

**Exhibit 32**
**1977_NOAA Long Island Underwater Lands Report**

**Exhibit 33**
**Natick Dictionary**

**Exhibit 34**
**Public Papers of Daniel D Tompkins Military Vol II**

**Exhibit 35**
**American State Trials, Vol. III, F.H. Thomas Law Book Co., St. Louis (1915)**

**Exhibit 36**
**New Netherland in 1627, p 344**

**Exhibit 37**
**1977 Audit of Lummi Indian School**

**Exhibit 38**
**1980 Dept of Commerce Shinnecock Hatchery Grant**

**Exhibit 39**
**Gadomski DEC 4_20_17 Emails**

**Exhibit 40**
**1664 Fort Albany Treaty**

**Exhibit 41**
**2019_NOAA Whale Part Request Authorization Shinnecock**

**Exhibit 42**
**2005_Shinnecock Whale_1640 Deed_NYT Article**

Dated: November 4, 2019
New York, New York

Respectfully submitted,

MOORE INTERNATIONAL LAW PLLC.

By: /s/ Scott M. Moore
_____
Scott Michael Moore, Esq.
*Attorneys for Plaintiffs*
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
T. (212) 332-3474
F. (212) 332-3475
E. smm@milopc.com