# PLAINTIFFS' EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                    Plaintiffs,          Case No.:  18-cv-3648     (   ) (   )

       - against -                  **COMPLAINT**

BRIAN FARRISH,
JAMIE  GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE,

                    Defendants.
-----------------------------------------------------x

     Plaintiffs, Shinnecock Indian Nation members, DAVID T. SILVA, GERROD T. SMITH,

and JONATHAN K. SMITH, by and through their attorneys, MOORE INTERNATIONAL

LAW PLLC, as and for their Complaint, allege as follows:

### _NATURE OF THE ACTION_

     1)     This is a suit by the above named Plaintiffs who are all on-Reservation members

of the Shinnecock Indian Nation, seeking a declaratory judgment and preliminary and permanent

injunctive relief against the above named Defendants, arising from a pattern of criminal

prosecutions by the Defendants against the Plaintiffs in excess of New York State jurisdiction

and interfering with Plaintiffs' un-relinquished aboriginal and retained rights to fish in the waters

of Shinnecock Bay and its estuary adjacent to the lands of the Shinnecock Indian Reservation,

and for monetary damages arising out of a continuing pattern and practice of illegal racial discrimination.

### ***THE PARTIES***

2)  Plaintiff, David T. Silva, ("Silva"), is an enrolled member of the Shinnecock Indian Nation, a federally recognized Indian Tribe, and resides on the Shinnecock Indian Reservation, located within the territorial limits of Suffolk County, State of New York.

3)  Plaintiff, Gerrod T. Smith, ("Gerrod Smith"), is an enrolled member of the Shinnecock Indian Nation, a federally recognized Indian Tribe, and resides on the Shinnecock Indian Reservation, located within the territorial limits of Suffolk County, State of New York.

4)  Plaintiff, Jonathan K. Smith, ("Jonathan Smith"), is an enrolled member of the Shinnecock Indian Nation, a federally recognized Indian Tribe, and resides on the Shinnecock Indian Reservation, located within the territorial limits of Suffolk County, State of New York.

5)  Defendant, Brian Farrish, ("Farrish"), is employed as a Conservation Officer by the New York State Department of Conservation and is sued in his personal and official capacities.

6)  Defendant, Jamie Greenwood, ("Greenwood"), is employed as an Assistant District Attorney by the Suffolk County District Attorney's Office and is sued in her personal and official capacities.

7)  Defendant, Evan Laczi, ("Laczi"), is employed as a Conservation Officer by the New York State Department of Conservation and is sued in his personal and official capacities.

8)  Defendant, Basil Seggos, ("Seggos"), is the Commissioner of the New York State Department of Environmental Conservation and is sued in his personal and official capacities.

9)      Defendant, New York State Department of Environmental Conservation, ("DEC"), is a regulatory and law enforcement agency for environmental issues of the State of New York.

10)     Defendant, the Suffolk County District Attorney's Office ("the DA") is the prosecutor's office of and for Suffolk County, State of New York.

## JURISDICTION AND VENUE

11)     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

12)     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL BACKGROUND

13)     The Shinnecock and other seafaring native peoples of eastern Long Island have fished in the waters surrounding Long Island and other areas since time immemorial.

14)     At all relevant times, Plaintiffs were and are enrolled members of the Shinnecock Indian Nation, a federally recognized Indian Tribe, ("the Shinnecock Nation"), reside on the Shinnecock Indian Reservation, have fished in the adjacent waters of Shinnecock Bay and its estuary, have been ticketed and prosecuted in New York State courts by the Defendants, and are deterred and chilled from exercising their rights to fish by the acts of the Defendants.

15)     Colonial Deeds and related documents clearly support the right of the Shinnecock and other native peoples of eastern Long Island to fish in the waters adjacent to their communities without interference, to Wit:

        a)      Department of State Book of Deeds, Unpublished documents, Office of the Secretary of State, Albany, New York, 2: 85-86. (New York State Archives. Series 453, vols. 1-9)

3

      b)      Gardiner, David Lion, 1873 [1840] *Chronicles of East Hampton*, Sag Harbor, N.Y.: Isabel Gardiner Mairs, 3.

      c)      *Documents Relative to the Colonial History of the State of New York,* ed. Edmund Bailey O'Callaghan and Berthold Fernow, 15 vols. Albany, N.Y.: Weed, Parsons, 1856-87, 14: 686, 692, 695, 718, 720.

      d)      *Records of the Town of East Hampton,* ed. Joseph Osborne, 5 vols. Sag Harbor, N.Y. 1887, 1: 2-3, 1: 170-171.

      e)      *Records of the Town of Southampton*, ed. William Pelletreau. 8 vols. Sag Harbor, N.Y. 1874-77, 1: 162, 167-68; 2: 354-55.

16)      Over the last decade, the Defendants have ticketed, seized fish and fishing equipment, and prosecuted the Plaintiffs for alleged criminal offenses in alleged violation of New York State law involving fishing and raising shellfish in Shinnecock Bay and its estuary waters, which are adjacent to the lands of the Shinnecock Indian Reservation. Each of the prosecutions failed. Yet, the Defendants persist and continue to ticket and threaten prosecution. The Plaintiffs are in fear of exercising those same usual and customary aboriginal fishing rights secured and retained for them by their ancestors when Shinnecock territory was ceded to the English. Ironically Plaintiff Silva is presently scheduled to stand trial on August 30, 2018, in the Town of Southampton Justice Court, located in Hampton Bays, New York, the building itself sitting on ceded Shinnecock territory.

17)      On January 28, 2009, in *People of the State of New York v. Salvatore J. Ruggiero*, Case No. 08-101350, Southampton Justice Court, Southampton, New York, after a bench trial and prosecution testimony by Farrish, that court found the Defendant, a non-Indian who was

fishing with Gerrod Smith, not guilty of possession of undersized flounder, undersized blackfish, and undersized porgy, for the Defendants' failure to prove jurisdiction.

18)     On October 14, 2009, in *People v Gerrod T. Smith*, Case No. 08-101351, Southampton Justice Court, Southampton, New York, after removal to this federal court, three criminal counts of possession by Gerrod Smith of undersized flounder, blackfish, and porgy in Shinnecock Bay, were dismissed in the Justice Court.

19)     On June 17, 2010, in *People v. Jonathan K. Smith*, Case No. 09-031419, Southampton Justice Court, Southampton, New York, after removal to this federal court and known as Case No. 09-0571 in the United States District Court for the Eastern District of New York, (Wexler, J.), a judgment of dismissal of criminal possession by Jonathan Smith of a shellfish farm in Shinnecock Bay without a license was entered for failure of the Defendants to prosecute.

20)     Most recently on April 20, 2017, Silva was stopped by two DEC Officers, Laczi and Farrish, while Silva was fishing for elver eels in Shinnecock Bay. Silva's eels, net, and other fishing equipment were seized, and Silva was issued a criminal appearance ticket alleging possession of undersized eels in violation of New York State law, 6 NYCRR 40-1(b)(ii). Silva was later charged with two additional criminal offenses, ECL 13-0355 (no fish license), and 6 NYCRR 40-1(b)(iii) (possession of eels over limit). This case is presently lodged and pending in the Southampton Town Justice Court as Case No. 17-7008 and is being prosecuted by Greenwood. Silva's attempt to obtain a voluntary dismissal by Greenwood was unsuccessful, and Silva's motion to dismiss for lack of jurisdiction was denied by that court. Over Silva's objection, that case is presently scheduled for trial on August 30, 2018 at 9:00 am.

## *CAUSES OF ACTION*

### Count I

### *(Continuing Supremacy Clause Violations of Un-relinquished Aboriginal Usufructuary Fishing Rights Retained in Ceded Territory)*

21)     Plaintiffs repeat the previous paragraphs as if fully and completely restated herein.

22)     The Plaintiffs exercised their lawful rights to use waters, fish, take fish, and hold their fish clearly within an area of aboriginal usufructuary fishing rights un-relinquished and retained by Plaintiffs' ancestors in the aforementioned Colonial Deeds and related documents ceding Shinnecock territory, all protected under the Supremacy Clause, U.S. Const., Article VI, clause 2.

23)     The Defendants' repeated interference, seizures, and prosecution of the Plaintiffs by application of New York State fishing regulations violates Plaintiffs' fishing rights protected under the Supremacy Clause, was and is void, and was and is in excess of New York State jurisdiction.

### Count II

### *(Continuing Pattern of Illegal Racial Discrimination in Violation of 42 U.S.C. §§ 1981 and 1982 of the 1866 Civil Rights Act, as amended)*

24)     Plaintiffs repeat the foregoing paragraphs as if fully and completely restated herein.

25)     The Defendants' aforesaid acts against the Plaintiffs constitute a continuing pattern and practice of purposeful acts of discrimination based on their race as Native Americans in violation of Plaintiffs' civil rights to equal security of the laws and to exercise their lawful federally protected rights to use waters, fish, take fish, and hold their fish without interference, without seizure of person and property, and without prosecution by the Defendants.

### *PRAYER FOR RELIEF*

**WHEREFORE,** Plaintiffs pray for the following relief:

**As to Count I:**

1)      Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed.R.Civ.P. 65, the Plaintiffs request the Court to issue a declaratory judgment, and preliminary and permanent injunctive relief in favor of Plaintiffs and against the Defendants, enjoining the Defendants from enforcing the laws of the State of New York against Plaintiff Silva in Southampton Town Justice Court in Case No. 17-7008, and from otherwise interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters;

**As to Count II:**

2)      The Plaintiffs demand a jury trial and a monetary award for actual and punitive damages in favor of Plaintiffs and against the Defendants, jointly and severally, in an amount to be determined at trial, including an amount of $102 million punitive damages to deter and punish the Defendants for blocking Plaintiffs' participation in the elver eel market during the 2017 and 2018 seasons, plus any future seasons during the pendency of this action, plus attorney fees and costs.

### *JURY DEMAND*

PLAINTIFFS demand a trial by jury on all issues so triable.

Dated:  June 22, 2018
New York, New York


                              MOORE INTERNATIONAL LAW PLLC.


                                         /s/ Scott M. Moore
                    By: _____
                                   Scott Michael Moore, Esq.
                                   *Attorneys for Plaintiffs*
                             45 Rockefeller Plaza, 20th Floor
                              New York, New York 10111
                                       T. (212) 332-3474
                                       F. (212) 332-3475
                                  E. smm@milopc.com

# PLAINTIFFS' EXHIBIT 2

Memorandum

To: Scott Michael Moore, Moore International Law, PLLC

From: John A. Strong, professor emeritus Long Island University.

Re: Shinnecock rights to the bounty of their maritime ecosystem

May 27, 2018

johnastrong2@gmail.com

mobile phone: 631-365-9045

   The Shinnecock Nation and other coastal Algonquian peoples on Long Island have depended from time immemorial on the bounty from their maritime environment. The English acknowledged this relationship in a series of nation to nation agreements beginning in the spring of 1648 when Nowedonah, the Shinnecock sachem, joined with the sachems from the Montauketts, Manhansetts, and Corchaugs to negotiate with the governors of New Haven and Connecticut for the purchase of thirty thousand acres of land in what is now the town of East Hampton (RTEH 1: 2-3). The sachems retained the "…liberty, freely to fish in any or all of the cricks and ponds and to hunt up and down on the woods without molestation…likewise they are to have the tails and fins of allsuch whales as shall be cast up… Allsoe they reserve the liberty to fish in all convenient places, for shells to make wampum. Allsoe, if the Indians, hunting any deere, they should chase them into the water, and the English should kill them, the English shall have the body and the sachem the skin." (The fins and tails were sacrificed to the spirits of the deep water in a ceremony described by David Gardiner in his *Chronicles of East Hampton* 1871, 3).

   On June 10, 1658 Sachem Wyandanch met with Lion Gardiner, one of the first English settlers on Long Island, to negotiate a nation to nation agreement concerning access to beaches adjacent to the Shinnecock lands in Southampton. In the negotiations Sachem Wyandanch agreed to grant Gardiner access to beach meadows for livestock grazing but refused to allow the English access to the bodies of drift whales, a lucrative source of whale oil. He stated that his claim to the bodies of the whales was based on an ancient tradition. "…the whales that

shall be cast upon this beach, "he insisted," shall belong to me and the rest of the Indians in their bounds as they have been anciently granted to them formerly by my forefathers…"(RTEH 1: 170-171). Gardiner accepted those terms.

A year later on May 12th Wyandanch and his son, Wyancombone, sold a tract of beach land west of the Shinnecock Canal to John Ogden with the stipulation that the Shinnecock retain " our privileges of fishing and fowling, hunting or gathering of berries or any other thing for our use…"(RTSH 1: 162; 2: 354-55). On June 8th , a month after the sale to Ogden, Wyandanch sold another tract of beach meadows to Lion Gardiner, again "reserving to ourselves and the Indians all the fins and tails..." (DSBD 2: 85-86).

Three years later, in 1662, this tradition of reserved rights to products from the coastal waters was reaffirmed by Weany, the Shinnecock sunksquaw when she sold a tract of land to Thomas Topping of Southampton. The Shinnecock retained half of the profits and benefits from the drift whales and, "all the herbage or feed growing thereon" (RTSH 1: 167-68).

The above agreements were made while the towns of Southampton, East Hampton and Brookhaven were under the jurisdiction of Connecticut colony. The issue of Native American fishing rights was addressed again after the establishment of the colony of New York in 1664. Questions about Indian access to drift whales came before Governor Edmund Andros in January 1675.

The governor ruled that Indians who discover the bodies of drift whales on their beaches "…shall have such reasonable satisfaction as hath been usual" (NYCD 14: 686). Andros ordered his secretary of state, Mattias Nicolls, to invite "the sachems on the south side of Long Island" to consult with him. These negotiations, unfortunately, were interrupted by King Philip's War in New England (1675-76). There were rumors that some Long Island Indians might give support to Philip. Andros declared a war alert and ordered the Long Island nations to disarm (NYCD 14: 692, 695).

In May 1676, as the tide turned against King Philip, a delegation from the Unkechaug, a closely related neighbor to the Shinnecock on the west, met with Andros to restore peacetime relations. They presented him with a gift of wampum, but then voiced a complaint (NYCD 14: 718). The Unkechaug complained that some English settlers had taken fish away from them on their beaches. Their representatives identified themselves as …"being free borne on Long Island," they told the governor that they wanted the freedom,  "….to fish and dispose of what

they shall take in to whom they like best" (NYCD 14: 720). After consideration the governor's council ruled that the Indians were "…at liberty and may freely whale and fish … and dispose of their effects as they think good…" The local magistrates were ordered to "take notice and suffer the said Indians so to doe without any manner of lett hindrance or molestation they comporting themselves civilly as they ought" (Ibid.) The council's action made it clear that the colony of New York continued to recognize the fishing rights established by the first English settlers in 1648.

Conclusion

The above documents clearly support the rights of the Shinnecock and the other native peoples of eastern Long Island to fish in the waters adjacent to their communities "without let or hindrance" and to dispose of their catches, "as they think good"

SOURCES

DSBD=Department of State Book of Deeds, Unpublished documents, Office of the Secretary of State, Albany, New York (New York State Archives. Series 453, vols. 1-9)

Gardiner, David Lion, 1873 [1840] *Chronicles of East Hampton,* Sag Harbor, N.Y.: Isabel Gardiner Mairs.

NYCD=*Documents Relative to the Colonial History of the State of New York,* ed. Edmund Bailey O'Callaghan and Berthold Fernow. 15 vols. Albany, N.Y.: Weed, Parsons, 1856-87.

RTEH=*Records of the Town of East Hampton,* ed. Joseph Osborne, 5 vols. Sag Harbor, N.Y. 1887.

RTSH=*Records of the Town of Southampton*, ed. William Pelletreau. 8 vols. Sag Harbor, N.Y. 1874-77.

PLAINTIFFS' EXHIBIT 3

ADDITIONAL REPORT

Additional Report.

To: Scott Michael Moore, Moore International Law, PLLC

From: John A. Strong, professor emeritus Long Island University.

Nov. 3, 2018

RE: "Whether it is possible that the location where David T. Silva was fishing at the mouth of Taylor Creek is within the Shinnecock Indian Reservation boundaries."

Yes, It is my opinion that David Silva was fishing within Shinnecock Reservation waters.

The reservation, established in 1859, has never been surveyed by a professional. The shore line has changed frequently over the last two centuries. No one knows, therefore, how many acres of land make up the reservation today. Gaynell Stone, former president of the Suffolk County Archaeological Association, made this point in her review of estimated acreage for the reservation over the years. The first "official" account published in the *New York State Assembly Report for 1865* (1862, 602) listed 630 acres but gave no source for that figure. In 1890 the *New York State Public Instructor* reported that the reservation had 400 acres (Vol. 1: 663). In 1910 Frederick W. Hodge in "Handbook of the Indians North of Mexico, Part Two," published by the *Bureau of American Ethnography* (1910, 55) estimated that there were 750 acres on the reservation. In 1919 a manuscript in the Smithsonian Archives reduced the number to 700 acres. Seventeen years later the Bureau of Indian Affairs sent two representatives, Allan Harper and W.K. Harrison to observe and report on the Shinnecock Reservation. Allan Harper in his report, filed on March 31, 1936 stated that the reservation "covers and area of 450 acres" (NARG, 75, Harper Report, p. 1). Four decades later, a grant in the *Long Island Catholic* records cited the largest figure of all. The CHD grant awarded on September 15, 1979 stated that the reservation included 800 acres (Stone, 1983, 308-310). It is possible, of course, that the larger figures may have included land under water on the bay bottom, but there is no mention of that in these documents. None of these accounts of acreage were made by a licensed surveyor.

There has been a court decision establishing the northern boundary of the reservation but the water boundaries around the Shinnecock Neck have never been officially established. The enabling legislation on March 16, 1859 stated that the northern boundary was marked by a ditch where a water fence stood at the time (*Laws of New York State* 82nd Session of the Legislature, 1859, 101-103). It was determined in *Suffolk County v. Great Cove Reality Co. 1955* that the northern boundary in 1955 ran along the southern edge of Montauk Highway (*New York Supplement,* Second Series, Vol. 137, 570-577). The judge of the Suffolk County Court, Edgar Hazelton, held that *reputation evidence* from four individuals-Charles Smith, a Shinnecock Trustee, and three long-time white residents, Edward Halsey, Augustus Raynor, and Timothy Downs-was sufficient to establish that boundary in the absence of data from a certified surveyor or from contemporary documents. His decision and the use of reputation evidence was appealed to the New York State Court of Appeals (6 NY 2nd 435) in 1959. The court overturned Hazelton's decision but the Supreme Court of New York, Appellate Division, Second Department (9 A.D. 2nd 948) affirmed Judge Hazelton's initial decision on Dec. 31, 1959. The U.S. Supreme Court dismissed Cove Reality's last attempt to appeal on April 17, 1961, leaving Hazelton's decision standing.

Although the jurisdictional boundaries over the off-shore waters east of the Shinnecock Reservation have never been officially marked, all of the area on the eastern half of Shinnecock Bay around Shinnecock Neck have traditionally been considered Shinnecock waters. During the 19th and early 20th centuries the Shinnecock men served as guides for duck hunters (including Theodore Roosevelt). Duck blinds have always floated in the waters of Heady and Taylor Creeks. The use of these waters by the Shinnecocks have never been challenged. In the Harper Report, cited above there is a reference to land claimed by the Shinnecock east of Taylor (Turtle) Creek where a series of mosquito control trenches were dug in the 1930s (NARG 75, 5) More recently the tribal oyster project began floating racks out in these waters beginning in 1977 and is still operating there today (Stone 1983, 400-402).

The arrest report identifies the location where Taobi Silva was fishing as "Taylor Creek." This name was applied by the English in post-contact times, probably after the Reverend Joseph Taylor, who served as the town minister from 1669 until his death in 1682 (Howell 1887, 105-107). The Shinnecocks however, called the stream *Matcik,* or Turtle Creek. *Matcik*, the Algonquian word for turtle, was first recorded by Thomas Jefferson when he visited the Unkechaug reservation

as a guest of William Floyd in 1791 (Strong 2011, appendix). It was still in use a century later in 1902, when Mark Harrington interviewed several elderly Shinnecocks about words in their ancient language during the time he was excavating a Woodland village site at Sebonac for the Museum of Natural History (Harrington 1903, 39). Harrington

The creek, so named, in part because it is a natural habitat for these reptiles, an important traditional food source for the Shinnecock, and, in part because the neck of land between Turtle (Taylor) and Heady Creeks has the appearance of a snapping turtle with its mouth open. The shape is clearly demarked on the 1894 map in the collections of the Southampton Historical Society. (See map.) These large reptiles are still frequently seen in these creeks today.

The land formation also resonated with the Shinnecocks because of the dramatic role of the turtle in Native American religion throughout North and South America. The Dutch explorer, Jasper Danckearts, recorded an origin legend wherein the earth was formed from the back of a turtle that rose up out of the ocean (James and Jameson 1913, 77-78). Donald Treadwell, an Unkechaug elder included a legend in his *Turtle People: The Unkechaug People of Spirit Island* recounting a time in the distant past when the giant turtle gave its life to enable the Long Island Indians to survive a period of starvion (1988, 124).

The turtle now replied with tears in his eyes. We, the turtles, wish our people to survive. We turtles will always survive, but you people are fragile. You must survive."

And as our father the sun rose above the trees, now barren of all the leaves, it was done. And as the giant turtle died, it cried a torrent of tears. The meat was now taken from the shell. The shell was made into a shrine. People would go to the shrine for many years, thanking the turtle for his sacrifice.

Miraculously the sky opened and it began to rain, beautiful, cool droplets of water. The trees came alive and opened their leaves, covering the people with a cool blanket. Our mother's hair, the grass, sprung from her scalp, high, long, and green. All the animals returned, slowly, cautiously. The ocean, in giant waves, roared back to the shore, splashing, ripping tearing away at the grass and sand and carrying in its wake an abundance of fish.

The three sisters-corn, beans, and squash-grew in abundance in large giant sizes. Everyone feasted and gave thanks. Later the larger animals came back—the bear, the deer, the fox, and the wolf. Things were good again.

In addition to these accounts there are artifacts related to the role of the turtle in the cosmology of the Long Island Indians. Harrington, for example, found evidence of religious beliefs related to turtles in his excavations at Sebonac, mentioned above. An elderly Shinnecock man had been buried with a tortoise shell bowl to accompany him in the spirit world. The bowl was likely used in religious ceremonies, perhaps the function suggested in Treadwell's account. Another artifact, a slate gorget incised with a turtle effigy, was found three miles east of Setauket in Nassakeag Swamp. The gorget, with four perforations, was typical of the Late Archaic Period (c. 1000 B.C). The effigy pendant is now in the Smithsonian collections (See illustration).

The BIA report indicating that Shinnecock claims were made to the areas east of the mouth of Turtle Creek, the legends and the prehistoric artifacts related to the turtle, the frequency of turtles in the streams flowing into Shinnecock Bay, and the turtle features on the narrow neck of land between Heady Creek and Turtle Creek support the reputation evidence provided by members of the Shinnecock Nation that David Silva was fishing in a stream identified in honor of the turtle spirit and well within Shinnecock jurisdiction.

John A. Strong

SOURCES

Dankers, Jaspar and Peter Sluyter 1679-80 (1867). *Journal of a Voyage to New York.* (Henry Murphy, ed.) Brooklyn: Memoirs of the Long Island Historical Society.

DSBD=Department of State Book of Deeds, Unpublished documents, Office of the Secretary of State, Albany, New York (New York State Archives. Series 453, vols. 1-9)

Gardiner, David Lion, 1873 [1840] *Chronicles of East Hampton,* Sag Harbor, N.Y.: Isabel Gardiner Mairs.

Harrington, Mark R. 1924. An Ancient Village Site of the Shinnecock. American Museum of Natural History, *Anthropological Association* Vol. 22, Pt 5

Howell, George R, 1887. *The Early History of Southampton.* Albany: Weed, Parsons and Company.

NARG=National Archives, Washington, D.C. Record Group, 75.

NYCD=*Documents Relative to the Colonial History of the State of New York,* ed. Edmund Bailey O'Callaghan and Berthold Fernow. 15 vols. Albany, N.Y.: Weed, Parsons, 1856-87.

RTEH=*Records of the Town of East Hampton,* ed. Joseph Osborne, 5 vols. Sag Harbor, N.Y. 1887.

RTSH=*Records of the Town of Southampton*, ed. William Pelletreau. 8 vols. Sag Harbor, N.Y. 1874-77.

Stone, Gaynell, ed. 1983. *The Shinnecock Indians: A Culture History.* Stony Brook, N.Y.: The Suffolk County Archaeological Association.

Strong, John A. *The Unkechaug Indians of Eastern Long Island.* Norman: University of Oklahoma Press.

Treadwell, Donald. 1988. *Turtle People: The Unkechaug People of Spirit Island.* Unpublished manuscript edited by Kathryn Jeanne Gallien, (on file in Unkechaug tribal archives).



*Do not assume all information is accurate.



Def 000145

People v. Silva, Case No. 17-7008, Southampton Town Justice Court

CM

Count: 1

**Cat. Number:** 184705.000

**Object Type:** Adornment/Jewelry

**Object ID:** Gorget

**Description:** Slate gorget with four perforations, incised decoration representing a turtle

General: Surface modifications > Incised

PLAINTIFFS' EXHIBIT 4

1

2          SOUTHAMPTON TOWN JUSTICE COURT

3          STATE OF NEW YORK: COUNTY OF SUFFOLK
           - - - - - - - - - - - - - - - - - - - - X
4          PEOPLE OF THE STATE OF NEW YORK,

5                                    Plaintiff,

6                  -against-

7                                    Docket# 17060545

8          DAVID T. SILVA,

9                                    Defendant.

10         - - - - - - - - - - - - - - - - - - - - X

11                        32 Jackson Avenue

12                        Hampton Bays, New York

13

14                        April 11, 2019

15                        9:00  AM

16

17

18

19

20         B E F O R E: Honorable Judge Gary J. Weber

21

22

23

24                        Jennifer Campbell
                          Court Reporter
25                        (631)848-4231

1

2

3      A P P E A R A N C E S:

4

5          SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE

6               Timothy D. Sini, District Attorney

7               Attorneys for Plaintiff

8               32 Jackson Avenue

9               Hampton Bays, New York 11946

10          BY: JAMIE GREENWOOD, ASSISTANT DISTRICT ATTORNEY

11

12

13          MOORE INTERNATIONAL LAW PLLC

14               Attorneys for Defendant

15               45 Rockefeller Plaza, Suite 2000

16               New York, New York 10111

17          BY: SCOTT M. MOORE, ESQ.

18

19

20

21

22

23

24

25

1               People v Silva
2   were no estates here or anything like that.
3       Q.   Dr. Strong, regardless of where the
4   reservation boundaries are or may be, do the
5   Shinnecocks have fishing rights in the waters
6   in any event?
7       A.   You mean treaty rights?
8       Q.   Yes.
9       A.   Yes.
10      Q.   Can you explain to the Judge what
11  you mean by that?
12      A.   In 1648 a transaction was made that
13  involved the Shinnecock Sachem, Montaukett
14  Sachem, Cutchogue Sachem and the Manhassett
15  Sachem.   In that 1648 deed it says that the
16  native peoples will have rights to hunt and
17  fish, and I think the language is fish in all
18  the creeks and ponds, and in terms of that
19  document and the terms of the people that were
20  signing it at the time, that's what they
21  understood it would be because they just kept
22  fishing where they have been, then, of course,
23  historically when the populations began to
24  increase, the English and so forth, not here
25  but throughout the North America, then you

36

1                          People v Silva

2      began to have, obviously, certain kinds of

3      restrictions that changed these things,

4      fishing regulations and so forth, but the

5      Supreme Court has dealt with this many times

6      and one of the conclusions that they drew was

7      that whenever there are these disagreements

8      between fishing rights and ancient treaty

9      rights, that they should be resolved by nation

10     to nation interaction or agreement, but that

11     often wasn't done and certainly wasn't done

12     here, but by that theory, the line should be

13     drawn by tribal counsel and the town coming

14     together and saying this is where we think it

15     should be.

16          Q.   Dr. Strong, have you had the

17     opportunity to review a DEC document known as

18     CP-43?

19          A.   Yes, I have.

20               MR. MOORE: I ask you show this

21               document to Dr. Strong.  It's

22               Defendant's proposed Exhibit C.

23          Q.   Have you reviewed that document and

24     what do you have to say about that document?

25               MS. GREENWOOD: Objection; based

1                          People v Silva

2          Q.    To clarify, that was the deed for

3    the Town of East Hampton, for what is known as

4    the Town of East Hampton?

5          A.    Yes.

6          Q.    And the red circle on that map is in

7    the Town of Southampton?

8          A.    Correct.  Yes.

9          Q.    And the circle on People's Exhibit 4

10   is in the Town of Southampton?

11         A.    Yes.

12         Q.    On direct-examination that was, in

13   fact, the only deed you indicated for

14   retention of any rights to fish in creeks and

15   ponds, correct; on direct-examination, that's

16   the only deed you mentioned?

17         A.    No.  There was several other

18   documents that related to fishing rights and

19   they are all cited; 1657, 1662.  This whole

20   area here.  It's a pattern.

21         Q.    There was a 1659 deed that you

22   reference in your memorandum where Wyandanch

23   and Wyan Comberlum (phoentic) sold a tract of

24   beach land west of the Shinnecock Canal to

25   John Ogdon?

56

1                        People v Silva

2    looked to the US sensus to see if there was

3    information regarding any of that?

4        A.    I did look.  I didn't see that

5    particular reference as relevant because it

6    was not a survey of acreage.  It was a very

7    general comment.

8        Q.    Are you telling me that a survey of

9    square miles is different than a survey of

10   acreage in terms of determining how much land

11   a person has?

12       A.    As far as I know it is.  I'm not

13   that knowledgeable specifically about that.

14   It was not a certified survey by a certified

15   surveyor.

16       Q.    You are telling me the US government

17   is not a licensed surveyor of land?

18       A.    I'm not familiar with that.

19             THE COURT: You can be if they

20             hire certain people, but the issue

21             isn't how much acres they got, it's

22             where are they.

23             THE WITNESS: Thank you.

24       Q.    You would agree with me, the present

25   day legal boundaries of the Shinnecock

57

1                     People v Silva

2    Reservation, is the area outlined in yellow on

3    People's Exhibit 4?

4         A.    The yellow line there on the tax

5    map?  No.  I would not agree with that.

6         Q.    You are telling me that the legal

7    boundaries, the legal boundaries of that

8    property, are different than what the tax map

9    suggests?

10        A.    I have no idea.  I don't know what

11   the basis of the tax map is.  I understood

12   that's not always solid.

13        Q.    But you would agree with me that

14   boundaries of property are important, right?

15        A.    Well, that's why I was saying that

16   it's important and it hasn't been determined.

17        Q.    You would agree with me people sell

18   and buy lands all the time?

19        A.    Yes.

20        Q.    And you would agree with me that the

21   boundaries of land people are selling and

22   buying are important for that, correct?

23        A.    Of course, yes.

24        Q.    And you would agree with me that

25   part of owning land is paying property taxes?

1                    People v Silva

2        A.    Unless you are on the reservation.

3        Q.    Correct.  If you owned land not on

4    the reservation, you are paying property

5    taxes?

6        A.    Yes.

7        Q.    So you would agree with me that it's

8    important to know where the reservation

9    starts, the land of the reservation starts, so

10   Southampton Town knows when they need to stop

11   collecting property taxes, correct?

12       A.    Yes.

13       Q.    You would agree with me that a map

14   from the Southampton Town Assessor's office

15   indicating where that property line is, would

16   be an important thing, correct?

17       A.    It would be an important bit of data

18   to have along with other things, yes.

19       Q.    Just to be clear, you indicated in

20   what is marked as Defense Exhibit F, which is

21   your additional report, your second report,

22   that the Shinnecocks would use what we know as

23   Taylor Creek to fish in, right?

24       A.    Yes.

25       Q.    So that wasn't land, correct?

                        People v Silva

2          A.    It was Shinnecock waters, yes.

3          Q.    You would also agree with me that

4     it's just as important for the town to know

5     where the boundaries between properties are;

6     you would agree with me it's important for the

7     town to know where private property ends when

8     it abuts the water, correct?

9          A.    Yes.

10         Q.    Are you aware --

11               THE COURT: They have been in

12               court many times over that.

13         Q.    Are you aware in the Town of

14    Southampton, the Southampton Town owns the bay

15    bottoms?

16         A.    Say that again.

17         Q.    Are you aware, yes or no, that in

18    the Town of Southampton, the Southampton Town

19    Trustees, that body, owns the bay bottoms

20    within the township?

21         A.    Yes.

22         Q.    And are you aware that you would

23    agree with me the private property ends and

24    Southampton Town ownership of the bay bottom

25    begins at mean high water mark or mean high

PLAINTIFFS' EXHIBIT 5

1

1

2     SOUTHAMPTON TOWN JUSTICE COURT

3     STATE OF NEW YORK: COUNTY OF SUFFOLK

      - - - - - - - - - - - - - - - - - - X

4     PEOPLE OF THE STATE OF NEW YORK,

5                              Plaintiff,

6              -against-

7                                    Docket# 17060545

8     DAVID T. SILVA,

9                              Defendant.

10     - - - - - - - - - - - - - - - - - - X

11                    32 Jackson Avenue

12                    Hampton Bays, New York

13

14                      February 21, 2019

15                    9:00  AM

16

17

18

19

20      B E F O R E: Honorable Judge Gary J. Weber

21

22

✦

146

1                    People v Silva

2          always available.  I leave that to

3          you, but I will do it.

4                    Where on that map was the fyke

5          net, somebody know?

6                    MS. GREENWOOD: Yes.

7                    MR. MOORE: I guess you have to

8          look through the testimony.

9                    THE COURT: The map is in

10         evidence.  Where is the net?  Where

11          is the fyke net on the map?

12                MS. GREENWOOD: Would it be fair

13          to say the record would reflect the

14          red oval is where the fyke net was?

15          Would you agree the record would

16          reflect that?

17                MR. MOORE: I think so, but the

18          pictures depict the location of the

19          net.

20                THE COURT: Okay.  Fine.  I'm

21          just looking at it relative to the

22          map right there, I think.

23          MS. GREENWOOD: This, yes.

24          THE COURT: That's the net.

25      Okay.

147

1

2              INDEX

3

4      Witness          Examined by          Page

5      ECO Evan Laczi   Ms. Greenwood-Direct   8-48

6                       Mr. Moore-Cross        49-72

7                       Ms. Greenwood-Redirect 72-76

PLAINTIFFS' EXHIBIT 6

1

2          SOUTHAMPTON TOWN JUSTICE COURT

3          STATE OF NEW YORK: COUNTY OF SUFFOLK
           - - - - - - - - - - - - - - - - - - - X
4          PEOPLE OF THE STATE OF NEW YORK,

5                                    Plaintiff,

6                  -against-

7                                    Docket# 17060545

8          DAVID T. SILVA,

9                                    Defendant.

10         - - - - - - - - - - - - - - - - - - - X

11                          32 Jackson Avenue

12                          Hampton Bays, New York

13

14                          April 11, 2019

15                          9:00   AM

16

17

18

19

20         B E F O R E: Honorable Judge Gary J. Weber

21

22

23

24                     Jennifer Campbell
                       Court Reporter
25                     (631)848-4231

2

```
 1
 2
 3        A P P E A R A N C E S:
 4
 5        SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE
 6            Timothy D. Sini, District Attorney
 7            Attorneys for Plaintiff
 8            32 Jackson Avenue
 9            Hampton Bays, New York 11946
10        BY: JAMIE GREENWOOD, ASSISTANT DISTRICT ATTORNEY
11
12
13        MOORE INTERNATIONAL LAW PLLC
14            Attorneys for Defendant
15            45 Rockefeller Plaza, Suite 2000
16            New York, New York 10111
17        BY: SCOTT M. MOORE, ESQ.
18
19
20
21
22
23
24
25
```

1          People v Silva

2          THE COURT: So we can do our

3     David Silva case now.  Come on up,

4     counsel.

5          MR. MOORE: Good morning.

6          THE COURT: Sorry to hold you up,

7     but you were a witness to what

8     happens here.  My recollection is

9     the People rested the last time we

10    were here and you had a witness who

11    couldn't make it because of a flight

12    cancelation, but we set it down for

13    today so he could come.

14         MR. MOORE: Yes.  Before we call

15    Dr. Strong, I have a motion to make

16    before the Court.

17         THE COURT: Okay.

18         MR. MOORE: It pertains to an

19    exchange at the very end of the

20    hearing the last time on the trial

21    in this matter on February 21, 2019

22    and the defense is moving to strike

23    a portion of that transcript.  It's

24    on Page 146, Lines 4 through 25.

25    The ground for that is a violation

4

1                      People v Silva

2            of the defendant's due process

3            rights under the state and federal

4            constitution.  In this exchange,

5            with all due respect it was

6            initiated by the Court, the Court

7            invited what amounted to fact

8            testimony from the prosecutor.  This

9            is a bench trial, so all the facts

10           that the prosecutor needs to prove

11           comes from the witnesses to the

12           Court, but the Court, it's clear

13           from the transcript, did not know,

14           and the prosecutor failed to prove,

15           where the defendant was fishing

16           relative to the map that has been

17           entered into evidence and the Court,

18           I'm reading from the transcript, the

19           Court asked, again this was at the

20           very end of the hearing, the witness

21           had stepped down, we were talking

22           about scheduling for today, the

23           Court asked, "Where on that map was

24           the fyke net, anybody know?"  It

25           begins Line 4 on Page 146.  The

```
1                    People v Silva
2         prosecutor says, "yes" and my
3         response was, "I guess you have to
4         look through the testimony" and the
5         Court pressed on, "The map is in
6         evidence.  Where is the net?  Where
7         is the fyke net on the map?"  At
8         this point there was no witness on
9         the stand and the Court is inviting
10        fact testimony from the prosecutor,
11        so the problem there is, the
12        prosecutor ended up testifying to
13        the Court on a fact question that
14        the Court was unclear of that the
15        prosecutor should have, had she met
16        her burden in her case in chief the
17        Court would have known, but the
18        Court did not know, so for that
19        reason, we are asking to strike that
20        portion and we are asking the Court
21        to dismiss the case against the
22        defendant because this is a bench
23        trial, we can't fix that.  If it was
24        a jury trial, the Court could strike
25        it, admonish the jury not to
```

6

1                        People v Silva
2          consider it, but we can't fix that
3          here, so we ask the Court to dismiss
4          the case.
5              THE COURT: People have something
6          to say on that?
7              MS. GREENWOOD: Yes.  First, the
8          record stands clear where the
9          location of the incident was from
10         every witness the People called and
11         the minutes of the trial would see
12         to that.  Second, the People's
13         response to "yes" in the minutes was
14         in response to the Court's question
15         whether or not somebody knew where
16         on the map the fyke net was and
17         People said yes we knew.  Further,
18         when the Court did ask again, the
19         People turned to defense counsel and
20         asked, "Would it be fair to say the
21         record would reflect the red oval is
22         where the fyke net was?  Would you
23         agree the record would reflect
24         that?"  Defense counsel said," I
25         think so?"  Further, the Court can

People v Silva

2   review the record to determine
3   whether that's accurate or not.
4   Second, it's well within the Court's
5   authority to determine what is
6   relevant and what is argument and
7   what is fact from the record and the
8   Court can make that determination as
9   it is a bench trial.  Therefore, the
10  People did prove the case through
11  the witnesses and particularly
12  proved the location of the incident
13  through the witnesses we provided
14  and the case should not be
15  dismissed.
16      THE COURT: All right.  The map
17  is in evidence, so there is no
18  question about that.  The reason I
19  was asking what I was asking,
20  invitation was open to either side
21  was, well, where on the map it was
22  shown, by whichever the witness it
23  was, where the net was located, so I
24  wanted to be clear on that, so your
25  motion is in all respects denied.

8

1                    People v Silva

2           So what else?

3               MR. MOORE: The defense calls Dr.

4           John Strong to the stand.

5               MS. GREENWOOD: Your Honor,

6           before the witness is brought in,

7           the People are seeking an offer of

8           proof as to the relevance of this

9           witness.

10              THE COURT: Why?  It's a nonjury

11          trial, so by the time I go through

12          listening to all your reasons why it

13          shouldn't be, we will spend more

14          time on that when I can decide

15          whether to pay attention to it or

16          not.  We don't have a jury.  Unless

17          you can tell me something wonderful.

18              MS. GREENWOOD: At this point,

19          the defense has not shown how this

20          witness can testify to anything

21          related to the case.  The witness

22          was not there at the time.  The

23          witness has not provided any

24          evidence as to anything regarding

25          the actual location at issue in this

# PLAINTIFFS' EXHIBIT 7

1

2     SOUTHAMPTON TOWN JUSTICE COURT

3     STATE OF NEW YORK: COUNTY OF SUFFOLK

      - - - - - - - - - - - - - - - - - - - X

4     PEOPLE OF THE STATE OF NEW YORK,

5                         Plaintiff,

6            -against-

7                          Docket# 17060545

8     DAVID T. SILVA,

9                         Defendant.

10    - - - - - - - - - - - - - - - - - - - X

11           32 Jackson Avenue

12           Hampton Bays, New York

13

14              February 21, 2019

15              9:00  AM

16

17

18

19

20    B E F O R E: Honorable Judge Gary J. Weber

127

8          MR. MOORE: Defense would like to

9      call Bryan Polite to the stand.

10         MS. GREENWOOD: Your Honor,

11      People would ask for an offer of

12      proof for this witness.

13         THE COURT: Why?

14         MS. GREENWOOD: To determine if

15      his testimony is relevant.

16         THE COURT: It's nonjury.

17         COURT OFFICER: Raise your right

18      hand.  Do you swear the testimony

19      you are about to give will be the

20      truth, the whole truth and nothing

21      but the truth?

22         THE WITNESS: I do.

23         COURT OFFICER: State your name

24      for the court reporter.

25         THE WITNESS: Bryan Polite.


                    128

1       People v Silva

2          COURT OFFICER: You are now under

3       oath.

4       BRYAN POLITE, the Witness herein, after having been

5       first duly sworn by the Court Officer, upon, being

6       examined, testified as follows:

7       DIRECT-EXAMINATION BY

8       MR. MOORE:

9       Q.  Good afternoon.

10      A.  Good afternoon.

11      Q.   Where do you reside, Mr. Polite?

12      A.   40 Montauk Highway on the Shinnocock

13   Reservation, Southampton, New York.

14      Q.   Are you a member of the Shinnecock

15   Indian Nation?

16      A.   Yes, sir.

17      Q.   Can you describe for the Judge what

18   you are wearing and what its meaning and

19   significance is?

20      A.   I am currently wearing a ribbon

21   shirt and it's basically attire worn in

22   ceremonial and also out in public and during

23   our annual pow wows.

24      Q.   Do you have experience in the

25   government of the Shinnecock Indian Nation?

129

15      Q.   In your experience in tribal

16   government, did the tribe exercise the

17   dominium and control over Shinnecock Bay?

18      A.   Yes.

19      Q.   Can you describe the ways in which

20   it did?

21      A.   Yes.  We applied for a Sandy grant

22   in 2014 and we were awarded a Sandy

23   restoration grant, which was basically the

24   reclamation of our shoreline on the south side

25   of the peninsula and over the course of three

130

1          People v Silva

2    years, we reclaimed about a hundred feet into

3    the bay or shoreline about a quarter mile down

4    on the peninsula.  We also did a massive

5    undertaking that involved the repopulation of

6    the shellfish population that was displaced

7    during the dredging.

8        Q.   In what areas was that reclamation

9    project?

10       A.   It covered the southern tip of the

11   peninsula and when we were in the phase when

12   we were dredging, they had a barge in the

13   middle of the bay and one set of tubes lead to

14   the beach and the other set of tubes went out

15   passed the inlet.

16       Q.   Can you describe where in the bay

17   that particular project was?

18       A.   It covered pretty much the entire

19   south end of the bay where the barge was in

20   the middle and it cut it half and half.

21       Q.   It's out in the water?

22       A.   Correct.  It's out in the water.

23       Q.   Can you describe the relationship,

24   as part of that project, the relationship with

25   say the Town of Southampton?

131

1          People v Silva

2      A.   The Town of Southampton we had

3   minimal interaction with during that project,

4   but we did contract Suffolk County Public

5   Works Department to do the dredging and to

6   help out also with boulders placed in phases

7   of the project.

8      Q.   I will restate the question.  With

9   respect to the reclamation project, can you

10   describe the relationship between the tribe

11   and the Town of Southampton and Suffolk

12   County?

13      A.   We had minimal contact with

14   Southampton during the project phase.  It was

15   more meeting and talking and telling them what

16   we were planning on doing, but with Suffolk

17   County, we engaged them in the contract for

18   the dredging portion of the project, the

19   Public Works Department of Suffolk County.

20      Q.   Did the tribe pay Suffolk County to

21   do that?

22      A.   Yes, sir.

23      Q.   Can you describe the practical

24   aspect of what that dredging project involved

25   in terms of water and land?

132

1          People v Silva

2      A.   Sure.  The whole Phase 1 probably

3   was the most important aspect of the project

4    because that's where the sand to rebuild the

5    shoreline came from and the county provided

6    the sand.  We bought the sand from them.  They

7    might have contracted that out, but we bought

8    sand from them and they did the dredging work.

9        Q.  Did the sand come from the bottom of

10   the bay?

11       A.  The sand I believe came from the

12   canal.  The other side of Shinnecock Canal.  I

13   keep confusing the inlet and canal.  The

14   inlet, not the canal.

15       Q.  But it came from underneath the

16   water?

17       A.  Correct.  Suffolk County also helped

18   with another phase in the project which was

19   boulders we placed on the shoreline after the

20   dredging portion?

                            133

11       Q.  What amount was the project worth in

12   terms of money received?

13       A.  We were awarded I believe

14   $2,400,000.00 from the fish and wildlife

15   department.

16       Q.  United States fish and wildlife?

17       A.  Correct.

18       Q.  Approximately, how much did the

19   tribe pay to do the dredging?

20       A.  I am not completely sure.  This was

21   two and a half years ago, but it ranged from

22    $850,000.00 to $1,200,000.00 and the large

23    portion of that was the cost of the sand -- I

24    mean the dredging portion.

25        Q.   Did you have any contact with the


                              134

1            People v Silva

2    New York State DEC during this period?

3        A.   We had contact with the DEC, yes.

4        Q.   What was that contact?

5        A.   There was contact beforehand with

6    our environmental director who was discussing

7    the project with the DEC prior to the dredging

8    portion, but there was an incident that

9    involved a professor from Stony Brook

10   University who made a complaint when we were

11   doing some of the dredging work.  DEC officers

12   came down and told Suffolk County to cease and

13   desist, which they did.  The counsel of

14   trustees, which I was a member of at that

15   time, was made aware there was a cease and

16   desist.  There was an e-mail written from the

17   environmental department to the DEC and two

18   days later work continued unabated.

19        Q.   What is the position of the

20   Shinnecock Indian Nation about ownership of

21   Shinnecock Bay?

22        A.   The official position is the

23   Shinnecock Nation has never relinquished their

24   rights to the bay.

25     Q.  To your knowledge, has the Town of

135

1         People v Silva

2   Southampton ever taxed the Shinnecock tribe

3   for fishing in Shinnecock Bay?

4     A.  Not as long as I can remember from

5   being a tribal member and certainly not when I

6   was in tribal government.

        p.136

24   CROSS-EXAMINATION BY

25   MS. GREENWOOD:

137

1         People v Silva

2     Q.  Would it be fair to say, you are

3   familiar with the body of water around the

4   reservation?

5     A.  Correct.  I am not an expert, but

6   I'm more into government than geography, but,

7   yes.

8     Q.  Have you lived on the reservation or

9   at that location you mentioned your entire

10   life?

11     A.  No, ma'am.

12     Q.  Have you lived in the Town of

13   Southampton your entire life?

14      A.  No, ma'am.

15      Q.  When did you move to Southampton?

16      A.  I moved to Southampton when I was in

17   8th grade, but before then, I lived in

18   Riverhead, so we were constantly on the

19   reservation, but we moved to Southampton in

20   1996.

21      Q.  I would like to turn your attention

22   to this document that is People's Exhibit 4 in

23   evidence.

24      A.  Yes.

25      Q.  You said you are familiar with the


138

1           People v Silva

2   bodies of water surrounding the reservation?

3      A.  Yes, but I'm not an expert.

4      Q.  Would it be fair to say, this body

5   of water east of the reservation is Heady

6   Creek?

7      A.  I am not sure.

8      Q.  Would it be fair to say, this body

9   of water west of the reservation is Shinnecock

10   Bay?

11      A.  Yes.

12      Q.  The body of water you were just

13   discussing was Shinnecock bay, correct?

14      A.  In regards to the dredging project,

15   correct, but there was also the oyster

16    projects on that side of Heady Creek which was

17    also part of the project because that's where

18    the oyster project is actually located.  It's

19    not located on the bay side.  It's located on

20    the east side of the peninsula.

21       Q.   Just turning your attention to

22    People's 4 again, are you familiar with this

23    creek?

24       A.   No, ma'am.

25       Q.   Are you familiar with Southampton

139

1              People v Silva

2    Village?

3       A.   Correct.  Yes.

4       Q.   You would agree that this area of

5    Meadow Lane is Southampton Village?

6       A.   Correct.  Yes.

7       Q.   You would agree that location is not

8    on the Shinnecock Indian Reservation as the

9    boundaries stand?

10       A.   Currently, yes.

140

7      Q.  You mentioned an oyster project?

8      A.  Correct.

9      Q.  Can you describe for the Court where

10    that oyster project was and is located and

11    what it involves?

12     A.  Sure.  The oyster project was

13    started in the 1970's.  I am not sure of the

14    particulars on the grant.  It was a pretty

15    massive undertaking that went all the way up

16    until the brown tide effected it.  In 1989 or

17    1990 it fell into disrepair from the brown

18    tide.  Throughout the 1990's it was still

19    operational, but nowhere near the capacity

20    that it was in 1980.  It's located on the

21    eastern side of the peninsula going down to

22    Heady Creek and currently it's being used as

23    the main operation for the eel grass that was

24    grown for the shoreline restoration and also

25    the shellfish repopulation, so there are tanks


141

1          People v Silva

2    and water tubes coming out from the creek and

3    out into the bay and it filters into the

4    oyster project.

5      Q.  This is out in the water?

6      A.  Correct.

7      Q.  On the east side?

8      A.  Correct.

9      Q.  Has the Town of Southampton ever

10    tried to tax your activity in the water?

11    A.  No.

12    Q.  Does the DEC know of those

13    activities out in the water?

14    A.  Yes.  I'm not sure what they know,

15    but the tribe has informed them many times of

16    their activity of the oyster project, be it

17    back in the 1970's and 1980's when it was

18    first conceived, and just recently with the

19    shoreline restoration project, there were

20    meetings with the DEC to explain the different

21    phases that the oyster project would be used

22    for.

23    Q.  Has the DEC, to your knowledge, ever

24    told you that what the tribe is doing, are

25    doing out in the waters, is illegal?


142

1          People v Silva

2      A.  No.  Except for that one instance

3      where there was the complaint from Stony

4      Brook, that Stony Brook University professor,

5      and the DEC had told them we didn't have the

6      authority to do what they were doing.  That

7      was the only time during my tenure.

8      Q.  That was the incident you said where

9    the tribe protested the DEC and then they

10   backed off?

11      A.  Correct.

144

5        THE COURT: Okay.  You want to

6        redirect?

7        MR. MOORE: May I ask one

8        question?

9        THE COURT: Sure.

10   REDIRECT-EXAMINATION BY

11   MR. MOORE:

12      Q.  Did anybody from the federal

13   government come out to visit the tribe

14   pertaining to that project?

15      A.  Yes.

16      Q.  Who was it?

17      A.  The Secretary of the Interior, Sally

18   Jewell, under the Obama administration.

19        MR. MOORE: Nothing further.

PLAINTIFFS' EXHIBIT 8

1

1

2    SOUTHAMPTON TOWN JUSTICE COURT

3    STATE OF NEW YORK: COUNTY OF SUFFOLK

     - - - - - - - - - - - - - - - - - - - X

4    PEOPLE OF THE STATE OF NEW YORK,

5                      Plaintiff,

6         -against-

7                        Docket# 17060545

8    DAVID T. SILVA,

9                      Defendant.

10   - - - - - - - - - - - - - - - - - - - X

11            32 Jackson Avenue

12            Hampton Bays, New York

13

14            February 21, 2019

15            9:00  AM

16

17

18

19

20   B E F O R E: Honorable Judge Gary J. Weber


                    p.112

MS. GREENWOOD: Excellent.  The

8         People call Lisa Goree as our next

9       witness.

10          COURT OFFICER: Raise your right

11      hand.  Do you swear the testimony

12      you are about to give will be the

13      truth, the whole truth and nothing

14      but the truth?

15          THE WITNESS: Yes.

16          COURT OFFICER: State your name

17      for the court reporter.

18          THE WITNESS: Lisa Goree.

19          COURT OFFICER: You are now under

20      oath.  Have a seat.

21      LISA GOREE, the witness herein, after having been

22      first duly sworn by the Court Officer, upon being

23      examined, testified as follows:

24      DIRECT-EXAMINATION BY

25      MS. GREENWOOD:


                        113

1           People v Silva

2       Q.  Good afternoon.

3       A.  Hi.

4       Q.  Who do you work for?

5       A.  Town of Southampton.

6       Q.  In what capacity.

7       A.  I am the assessor for the town.

8       Q.  What does that mean?

9       A.  I am in charge of all the property

10      values in the Town of Southampton.

11      Q.  As part of your job as assessor, are

12   you familiar with all the property boundaries

13   in the Town of Southampton?

14      A.  Yes.

15      Q.  How long have you been the assessor?

16      A.  Six years.

17      Q.  Have you held any other positions

18   prior to that?

19      A.  I have been with the town for 18

20   years.  I started as a clerk, then was

21   promoted to deputy assessor and then assessor

22   in 2013.

23      Q.  Are you a part of any professional

24   organization?

25      A.  The New York State Assessors'

114

1           People v Silva

2   Association.

3      Q.  What is that?

4      A.  The New York State Assessors'

5   Association is an organization made up of all

6   the assessors in the State of New York.

7      Q.  As part of your employment as the

8   town assessor, are you familiar with the

9   property and community boundaries in

10   Southampton Town?

11      A.  Yes.

12      Q.  Now, I would like you to take a look

13   at what has been entered into evidence as

14   People's Exhibit 4; do you know what that is?

15      A.   Yes.

16      Q.   What is that?

17      A.   That is an aerial of photography of

18   the Shinnecock Reservation, Shinnecock Hills

19   and the Village of Southampton.

20      Q.   Do you know when that aerial

21   photograph was taken?

22      A.   April of 2018.

23      Q.   Does it depict that area as it was

24   depicted in April of 2017?

25      A.   Yes.


                        115

1            People v Silva

2      Q.   Do you know where this image came

3   from?

4      A.   It came from an organization called

5   Eagle View Pictometry.  It's a company that

6   does aerial imagery for the Town of

7   Southampton.

8      Q.   Now, do you see on that map where

9   the Shinnecock Indian Reservation is?

10     A.   Yes.

11     Q.   Can you please describe where that

12   is?

13     A.   It is the area that is outlined in

14   the yellow.

15     Q.  As part of your job as the town

16   assessor, do those constitute the boundaries

17   of the Shinnecock Indian Reservation?

18     A.  Yes.

19     Q.  Now, I would like to draw your

20   attention to the red circle on that map; do

21   you see that?

22     A.  Yes.

23     Q.  Is that location located within

24   those boundaries we previously discussed on

25   the Shinnecock Indian Reservation?


                        116

1          People v Silva

2     A.  No.

3     Q.  Do you know, is that private

4   property?

5     A.  I believe it is private property,

6   yes.

7          MS. GREENWOOD: Now, I would like

8        to have this document, it's a seven

9        page document stapled together,

10        marked for identification as

11        People's 11.

12          MR. MOORE: No objection.

13          THE COURT: Do you mind if it

14        comes in?

15          MR. MOORE: I am not going to

16        object to it.

17          THE COURT: So it will come in

18      evidence.

19          (Whereupon, People's Exhibit 11,

20      document, was marked for

21      identification and moved into

22      evidence.)

23    Q.  Do you recognize what that is I'm

24  handing to you that is People's 11 in

25  evidence?


                        117

1          People v Silva

2    A.  Yes.

3    Q.  What is that?

4    A.  These are maps from the Suffolk

5  County real property tax map sections.

6    Q.  Do any of those maps indicate the

7  Shinnecock Indian Reservation?

8    A.  Yes.  The first page.

9    Q.  Is that boundary of that property

10  marked on that tax map?

11    A.  Yes.

12    Q.  Is it the same boundaries that is

13  depicted in People's Exhibit 4 with the yellow

14  outline?

15    A.  Yes.

16    Q.  Now, the red circle we talked about,

17  do you know if that is depicted on any of

18  those maps?

19    A.  It may be on the second page --

20  excuse me, the third page.

21    Q.  Did you look through all the pages?

22    A.  I believe it's on the last page.

23    Q.  Is that location within the

24  boundaries you described as the reservation on

25  the first page?

118

1        People v Silva

2    A.  No.

3    Q.  Now, what, if any, involvement do

4  you have with the Shinnecocks?

5    A.  I'm a tribal member of the

6  Shinnecock Nation.

7        MS. GREENWOOD: No further

8      questions.

9        THE COURT: Cross?

10        MR. MOORE: Thank you.

11  CROSS-EXAMINATION BY

12  MR. MOORE:

13    Q.  Did you receive a subpoena to

14  testify today?

15    A.  Yes, I did.

16    Q.  Who issued that?

17    A.  Jamie Greenwood from the DA's

18  office.

19    Q.  You testified that your

20  responsibility is fair and accurate assessment

21    role of property; is that correct?

22       A.  Yes.

23       Q.  So it has to do with value

24    assessment, correct?

25       A.  Correct.


                        119

1            People v Silva

2            MR. MOORE: Can I see the last

3          exhibit which is entered?

4       Q.  Could you take a look at the first

5    page?  Tax assessment roles have been wrong

6    before, correct?

7       A.  Correct.

8       Q.  In particular, please look at that

9    first page and look at the triangle and let me

10   know if the tax map has been wrong before

11   about the triangle at the top of Shinnecock

12   neck?

13      A.  What triangle are you referring to?

14   The top you said?

15            MR. MOORE: May I approach?

16      Q.  This triangle

17      A.  Okay.

18      Q.  Do you recognize that triangle?

19      A.  Yes, I do.

20      Q.  Has the tax map been incorrect about

21   that triangle?

22      A.  I believe so.

23     Q.  Could you briefly summarize what

24    that error was?

25     A.  I believe -- well, these tax maps

                           120

1          People v Silva

2    are made by Suffolk County Real Property Tax

3    Office and I believe sometime ago there was an

4    error in drawing the line which is part of the

5    reservation.

6      Q.  So it's possible the tax maps, as

7    they are represented today, could be

8    incorrect?

9     A.  It's possible.

10          MR. MOORE: No further questions.

11        Thank you.

12          THE COURT: Redirect?

13          MS. GREENWOOD: No redirect.

14          THE COURT: You can step down.

PLAINTIFFS' EXHIBIT 9

Case 2:18-cv-03648-SJF-SIL Document 83-9 Filed 11/18/19 Page 72 of 291 PageID #: 892



# List of Endangered, Threatened and Special Concern Fish & Wildlife Species of New York State

## Endangered

Those endangered species which meet one or both of the criteria specified in section 182.2(g) of 6NYCRR Part 182 and which are found, have been found, or may be expected to be found in New York State include:

| | Common Name | Scientific Name |
|---|---|---|
| Molluscs | [1]Dwarf Wedgemussel | *Alasmidonta heterodon* |
| | [1]Pink mucket | *Lampsilis abrupta* |
| | [1]Clubshell | *Pleurobema clava* |
| | [1]Fat pocketbook | *Potamilus capax* |
| | Rayed Bean | *Villosa fabalis* |
| | [2]Chittenango Ovate Amber Snail | *Novisuccinea chittenangoensis* |
| Insects | Tomah Mayfly | *Siphlonisca aerodromia* |
| | [1,3]American Burying Beetle | *Nicrophorus americanus* |
| | Hessel's Hairstreak | *Callophrys hesseli* |
| | [1]Karner Blue Butterfly | *Lycaeides melissa samuelis* |
| | Regal Fritillary | *Speyeria idalia* |
| | Persius Duskywing | *Erynnis persius* |
| | Grizzled Skipper | *Pyrgus centaureae wyandot* |
| | Arogos Skipper | *Atrytone arogos arogos* |
| | Bog Buckmoth | *Hemileuca species 1* |
| | Pine Pinion Moth | *Lithophane lepida lepida* |
| Fishes | [3]Shortnose Sturgeon | *Acipenser brevirostrum* |
| | [3]Silver Chub | *Macrhybopsis storeriana* |
| | Pugnose Shiner | *Notropis anogenus* |
| | Round Whitefish | *Prosopium cylindraceum* |
| | Bluebreast Darter | *Etheostoma camurum* |
| | [3]Gilt Darter | *Percina evides* |
| | [3]Spoonhead Sculpin | *Cottus ricei* |

| | Deepwater Sculpin | *Myoxocephalus thompsoni* |
|---|---|---|
| **Amphibians** | Tiger Salamander | *Ambystoma tigrinum* |
| | Northern Cricket Frog | *Acris crepitans* |
| **Reptiles** | Mud Turtle | *Kinosternon subrubrum* |
| | [2]Bog Turtle | *Clemmys muhlenbergii* |
| | [1]Atlantic Hawksbill Sea Turtle | *Eretmochelys imbricata* |
| | [1]Atlantic Ridley Sea Turtle | *Lepidochelys kempii* |
| | [1]Leatherback Sea Turtle | *Dermochelys coriacea* |
| | Queen Snake | *Regina septemvittata* |
| | [2]Massasauga | *Sistrurus catenatus* |
| **Birds** | Spruce Grouse | *Falcipennis canadensis* |
| | [3]Golden Eagle | *Aquila chrysaetos* |
| | Peregrine Falcon | *Falco peregrinus* |
| | Black Rail | *Laterallus jamaicensis* |
| | [1,2,4]Piping Plover | *Charadrius melodus* |
| | [1,3]Eskimo Curlew | *Numenius borealis* |
| | [1]Roseate Tern | *Sterna dougallii dougallii* |
| | Black Tern | *Chlidonias niger* |
| | Short-eared Owl | *Asio flammeus* |
| | Loggerhead Shrike | *Lanius ludovicianus* |
| **Mammals** | [1]Indiana Bat | *Myotis sodalis* |
| | [3]Allegheny Woodrat | *Neotoma magister* |
| | [1]Sperm Whale | *Physeter catodon* |
| | [1]Sei Whale | *Balaenoptera borealis* |
| | [1]Blue Whale | *Balaenoptera musculus* |
| | [1]Finback Whale | *Balaenoptera physalus* |
| | [1]Humpback Whale | *Megaptera novaeangliae* |
| | [1]Right Whale | *Eubalaena glacialis* |
| | [1,3]Gray Wolf | *Canis lupus* |
| | [1,3]Cougar | *Felis concolor* |

# Threatened

Those threatened species which meet one or both of the criteria specified in section 182.2(h) of 6NYCRR Part 182 and which are found, have been found, or may be expected to be found in New York State include:

Case 2:18-cv-03648-SJF-SIL Document 83-9 Filed 11/18/19 Page 74 of 291 PageID #: 894

|  | Common Name | Scientific Name |
|---|---|---|
| **Molluscs** | Brook Floater | *Alasmidonta varicosa* |
|  | Wavy-rayed Lampmussel | *Lampsilis fasciola* |
|  | Green Floater | *Lasmigona subviridis* |
| **Insects** | Pine Barrens Bluet | *Enallagma recurvatum* |
|  | Scarlet Bluet | *Enallagma pictum* |
|  | Little Bluet | *Enallagma minisculum* |
|  | [2,3]Northeastern Beach Tiger Beetle | *Cicindela dorsalis dorsalis* |
|  | Frosted Elfin | *Callophrys irus* |
| **Fishes** | Lake Sturgeon | *Acipenser fulvescens* |
|  | Mooneye | *Hiodon tergisus* |
|  | [3]Lake Chubsucker | *Erimyzon sucetta* |
|  | Gravel Chub | *Erimystax x-punctata* |
|  | [3]Mud Sunfish | *Acantharchus pomotis* |
|  | Banded Sunfish | *Enneacanthus obesus* |
|  | Longear Sunfish | *Lepomis megalotis* |
|  | Longhead Darter | *Percina macrocephala* |
|  | Eastern Sand Darter | *Ammocrypta pellucida* |
|  | Swamp Darter | *Etheostoma fusiforme* |
|  | Spotted Darter | *Etheostoma maculatum* |
| **Amphibians** | None Listed | --- |
| **Reptiles** | Blanding's Turtle | *Emydoidea blandingii* |
|  | [2]Green Sea Turtle | *Chelonia mydas* |
|  | [2]Loggerhead Sea Turtle | *Caretta caretta* |
|  | Fence Lizard | *Sceloporus undulatus* |
|  | Timber Rattlesnake | *Crotalus horridus* |
| **Birds** | Pied-billed Grebe | *Podilymbus podiceps* |
|  | Least Bittern | *Ixobrychus exilis* |
|  | Bald Eagle | *Haliaeetus leucocephalus* |
|  | Northern Harrier | *Circus cyaneus* |
|  | King Rail | *Rallus elegans* |
|  | Upland Sandpiper | *Bartramia longicauda* |
|  | Common Tern | *Sterna hirundo* |
|  | Least Tern | *Sterna antillarum* |
|  | [2]Rufa Red Knot | *Calidris canutus rufa* |
|  | Sedge Wren | *Cistothorus platensis* |
|  | Henslow's Sparrow | *Ammodramus henslowii* |

| Mammals | [2,3]Canada Lynx | Lynx canadensis |
|---|---|---|
| | [2]Northern Long-eared Bat | Myotis septentrionalis |

# Special Concern

The following are designated as species of special concern as defined in Section 182.2(i) of 6NYCRR Part 182. Species of special concern warrant attention and consideration but current information, collected by the department, does not justify listing these species as either endangered or threatened.

| | Common Name | Scientific Name |
|---|---|---|
| Molluscs | Buffalo Pebble Snail | Gillia altilis |
| | Fringed Valvata | Valvata lewisi |
| | Mossy Valvata | Valvata sincera |
| Insects | Unnamed Dragonfly Species | Gomphus spec. nov. |
| | Southern Sprite | Nehalennia integricollis |
| | Extra Striped Snaketail | Ophiogomphus anomalus |
| | Pygmy Snaketail | Ophiogomphus howei |
| | Common Sanddragon | Progomphus obscurus |
| | Gray Petaltail | Tachopteryx thoreyi |
| | Checkered White | Pontia protodice |
| | Olympia Marble | Euchloe olympia |
| | Henry's Elfin | Callophrys henrici |
| | Tawny Crescent | Phyciodes batesii |
| | Mottled Duskywing | Erynnis martialis |
| | Barrens Buckmoth | Hemileuca maia |
| | Herodias Underwing | Catocala herodias gerhardi |
| | Jair Underwing | Catocala jair |
| | A Noctuid Moth | Heterocampa varia |
| Fishes | Mountain Brook Lamprey | Ichthyomyzon greeleyi |
| | Black Redhorse | Moxostoma duquesnei |
| | Streamline Chub | Erymystax dissimilis |
| | Redfin Shiner | Lythrurus umbratilis |
| | Ironcolor Shiner | Notropis chalybaeus |
| Amphibians | Hellbender | Cryptobranchus alleganiensis |
| | Marbled Salamander | Ambystoma opacum |
| | Jefferson Salamander | Ambystoma jeffersonianum |
| | Blue-spotted Salamander | Ambystoma laterale |
| | Longtail Salamander | Eurycea longicauda |
| | Eastern Spadefoot Toad | Scaphiopus holbrookii |

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 76 of 291 PageID #: 896

List of Endangered, Threatened and Special Concern Fish & Wildlife Species of New York State - NYS Dept. of Environmental Conservation    10/27/16, 10:28 PM

| | Southern Leopard Frog | *Rana sphenocephala utricularius* |
|---|---|---|
| **Reptiles** | Spotted Turtle | *Clemmys guttata* |
| | Wood Turtle | *Clemmys insculpta* |
| | Eastern Box Turtle | *Terrapene carolina* |
| | Eastern Spiny Softshell | *Apalone spinifera* |
| | Eastern Hognose Snake | *Heterodon platyrhinos* |
| | Worm Snake | *Carphophis amoenus* |
| **Birds** | Common Loon | *Gavia immer* |
| | American Bittern | *Botaurus lentiginosus* |
| | Osprey | *Pandion haliaetus* |
| | Sharp-shinned Hawk | *Accipiter striatus* |
| | Cooper's Hawk | *Accipiter cooperii* |
| | Northern Goshawk | *Accipiter gentilis* |
| | Red-shouldered Hawk | *Buteo lineatus* |
| | Black Skimmer | *Rynchops niger* |
| | Common Nighthawk | *Chordeiles minor* |
| | Whip-poor-will | *Caprimulgus vociferus* |
| | Red-headed Woodpecker | *Melanerpes erythrocephalus* |
| | Horned Lark | *Eremophila alpestris* |
| | Bicknell's Thrush | *Catharus bicknelli* |
| | Golden-winged Warbler | *Vermivora chrysoptera* |
| | Cerulean Warbler | *Dendroica cerulea* |
| | Yellow-breasted Chat | *Icteria virens* |
| | Vesper Sparrow | *Pooecetes gramineus* |
| | Grasshopper Sparrow | *Ammodramus savannarum* |
| | Seaside Sparrow | *Ammodramus maritimus* |
| **Mammals** | Small-footed Bat | *Myotis leibii* |
| | New England Cottontail | *Sylvilagus transitionalis* |
| | Harbor Porpoise | *Phocoena phocoena* |

[1]Currently listed as "endangered" by the U. S. Department of the Interior.

[2]Currently listed as "threatened" by the U. S. Department of the Interior.

[3]Species is extirpated from New York State.

[4]Piping Plover is listed as federally endangered in the Great Lakes Region, and as federally threatened in the Atlantic Coastal Region.

**Definitions**

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 77 of 291 PageID #: 897

**Extinct** - Species is no longer living or existing.

**Extirpated** - Species is not extinct, but no longer occurring in a wild state within New York, or no longer exhibiting patterns of use traditional for that species in New York (e.g. historical breeders no longer breeding here).

**Endangered** - Any native species in imminent danger of extirpation or extinction in New York State.

**Threatened** - Any native species likely to become an endangered species within the foreseeable future in New York State.

**Special Concern** - Any native species for which a welfare concern or risk of endangerment has been documented in New York State.

## Authority

Environmental Conservation Law of New York, Section 11-0535 and 6 NYCRR (New York Code of Rules and Regulations) Part 182 - effective (last promulgated in state regulation) December 4, 1999.

## Revision History

Effective April 24, 2000 - Canada Lynx (*Lynx canadensis*) was added to the Threatened list.
Effective August 8, 2007 - Bald Eagle (*Haliaeetus leucocephalus*) was removed from the Endangered Species List by the U. S. Department of the Interior.
Effective May 4, 2015 - Northern Long-eared Bat (*Myotis septentrionalis*) was added to the Threatened list..

PLAINTIFFS' EXHIBIT 10

**U.S. Fish & Wildlife Service**

# News Release

 

Contact:
Meagan Racey, 413-253-8558, meagan_racey@fws.gov
Steve Shepard, 207-866-3344, ext 1116, steve_sheperd@fws.gov
Krishna Gifford, 413-253-8619, krishna_gifford@fws.gov

**American Eel Population Remains Stable, Does not Need ESA Protection**
*Conservation efforts should continue for long-term species health*

The U.S. Fish and Wildlife Service announced today that the American eel is stable and does not need protection under the Endangered Species Act (ESA). Nonetheless, for the species' long-term stability, the agency recommends continuing efforts to maintain healthy habitats, monitor harvest levels, and improve river passage for migrating eels.

The life of the American eel begins and ends in the Sargasso Sea in the North Atlantic Ocean. Millions of adult American eels leave waters from as far north as Greenland and south to Venezuela to reproduce in the Sargasso Sea. Hundreds of millions of American eel larvae return from the sea to freshwater, estuarine and marine waters. Their random mating behavior makes eels panmictic, meaning the species is composed of one population worldwide. They are a culturally and biologically important part of the aquatic ecosystems in the Western Hemisphere. American eels have been harvested for thousands of years by Native American cultures, and were an important part of the diet of early colonial settlers.

Today's decision, also known as a 12-month finding, follows an in-depth status review on a 2010 petition to list the eel as threatened under the ESA. The review was largely based on a biological species report peer-reviewed by the National Oceanic and Atmospheric Administration-Fisheries, U.S. Geological Survey, U.S. Forest Service, the Atlantic States Marine Fisheries Commission's Eel Technical Committee and academia. After examining the best scientific and commercial information available regarding past, present and future stressors facing the species, the Service determined the eel's single population is overall stable and not in danger of extinction (endangered) or likely to become endangered within the foreseeable future (threatened).

While American eels still face local mortality from harvest and hydroelectric facilities, this is not threatening the overall species. Harvest quotas and mechanisms restoring eel passage around dams and other obstructions have also reduced these effects. Dam removals, culvert replacements, night-time hydroelectric facility shutdowns, and updated passage structures have restored habitat access in many areas. The Service is working with partners across the range on conservation efforts to ensure long-term stability for the American eel and other migratory fish species. The agency's Northeast fisheries program alone has removed or improved more than 200 barriers to fish passage since 2009, opening more than 1,200 miles and 12,000 acres of rivers for aquatic wildlife including the American eel. The Service has also secured $10.4 million in Hurricane Sandy resilience funding to restore fish passage through removal of 13 dams in Connecticut, Maryland, New Jersey and Rhode Island.

American eels remain widely distributed throughout much of their historical range, despite habitat loss and reduced numbers over the past century. New information reiterates their flexibility and adaptability by indicating that some eels complete their life cycle in estuarine and marine waters, contrary to former research that suggested eels required freshwater for growing to adulthood.

This is the second time the Service has evaluated the American eel for listing under the ESA and found listing not warranted. The first decision came in 2007 after an extensive status review. This 12-month finding will be published in the *Federal Register* on October 8, 2015. The finding and supporting documents can be found at http://www.fws.gov/northeast/americaneel/.

*The mission of the U.S. Fish and Wildlife Service is working with others to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people. We are both a leader and trusted partner in fish and wildlife conservation, known for our scientific excellence, stewardship of lands and natural resources, dedicated professionals, and commitment to public service. For more information on our work and the people who make it happen, visit www.fws.gov.*

*For more information on our work and the people who make it happen in the Northeast, visit http://www.fws.gov/northeast/. Connect with our Facebook page, follow our tweets, watch our YouTube Channel and download photos from our Flickr page.*

PLAINTIFFS' EXHIBIT 11

$4 million, the determination must now have a higher level of approval for the contracting officer to select more than five offerors. A potential offeror may be more inclined to invest their pre-award efforts on solicitations where they have an increased chance of award.

### III. Executive Orders 12866 and 13563

Executive Orders (E.O.s) 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This is not a significant regulatory action and, therefore, was not subject to review under section 6(b) of E.O. 12866, Regulatory Planning and Review, dated September 30, 1993. This rule is not a major rule under 5 U.S.C. 804.

### IV. Regulatory Flexibility Act

This change is not expected to have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.* Nevertheless, an Initial Regulatory Flexibility Analysis (IRFA) has been prepared, and is summarized as follows:

This rule implements section 814 of the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015. Section 814 is entitled Improvement in Defense Design-Build Construction Process. Section 814 requires the head of the contracting activity, delegable to a level no lower than the senior contracting official, to approve any determinations to select more than five offerors to submit phase-two proposals for a two-phase design build construction acquisition that is valued at greater than $4 million.

The number of design-build construction awards is not currently tracked by the Federal government's business systems. In Fiscal Year 2014, the Federal government awarded 3,666 construction awards to 2,239 unique small business vendors. It is unknown what percentage of these contracts involved design-build construction services.

This rule does not impose new recordkeeping or reporting requirements. The new approval requirement for advancing more than five contractors to phase two of a two-phase design-build selection procedure only affects the internal procedures of the Government. For acquisitions valued over $4M, the head of the contracting activity (HCA) is required to now make a determination that it is in the best interest of the Government to select more than five

offerors to proceed to phase two. Any burden caused by this rule is expected to be minimal and will not be any greater on small businesses than it is on large businesses.

The rule does not duplicate, overlap, or conflict with any other Federal rules. No alternative approaches were considered. It is not anticipated that the proposed rule will have a significant economic impact on small entities.

The Regulatory Secretariat has submitted a copy of the IRFA to the Chief Counsel for Advocacy of the Small Business Administration. A copy of the IRFA may be obtained from the Regulatory Secretariat. DoD, GSA, and NASA invite comments from small business concerns and other interested parties on the expected impact of this rule on small entities.

DoD, GSA, and NASA will also consider comments from small entities concerning the existing regulations in subparts affected by the rule in accordance with 5 U.S.C. 610. Interested parties must submit such comments separately and should cite 5 U.S.C 610 (FAR Case 2015–018), in correspondence.

### V. Paperwork Reduction Act

The rule does not contain any information collection requirements that require the approval of the Office of Management and Budget under the Paperwork Reduction Act (44 U.S.C. chapter 35).

### List of Subject in 48 CFR Part 36

Government procurement.

**William Clark,**
*Director, Office of Government-wide Acquisition Policy, Office of Acquisition Policy, Office of Government-wide Policy.*

Therefore, DoD, GSA, and NASA propose amending 48 CFR part 36 as set forth below:

### PART 36—CONSTRUCTION AND ARCHITECT-ENGINEER CONTRACTS

■ 1. The authority citation for 48 CFR part 36 continues to read as follows:

**Authority:** 40 U.S.C. 121(c); 10 U.S.C. chapter 137; and 51 U.S.C. 20113.

■ 2. Amend section 36.303–1 by revising paragraph (a)(4) to read as follows:

#### 36.303–1 Phase One.

(a) * * *
(4) A statement of the maximum number of offerors that will be selected to submit phase-two proposals. The maximum number specified in the solicitation shall not exceed five unless the contracting officer determines, for that particular solicitation, that a number greater than five is in the

Government's interest and is consistent with the purposes and objectives of the two-phase design-build selection procedures. The contracting officer shall document this determination in the contract file. For acquisitions greater than $4 million, the determination shall be approved by the head of the contracting activity, delegable to a level no lower than the senior contracting official within the contracting activity.

* * * * *

[FR Doc. 2015–25613 Filed 10–7–15; 8:45 am]
**BILLING CODE 6820–EP–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

**[Docket No. FWS–HQ–ES–2015–0143; 4500030113]**

### Endangered and Threatened Wildlife and Plants; 12-Month Findings on Petitions To List 19 Species as Endangered or Threatened Species

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of 12-month petition findings.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service, FWS, or USFWS), announce 12-month findings on petitions to list 19 species as endangered species or threatened species under the Endangered Species Act of 1973, as amended (Act). After review of the best available scientific and commercial information, we find that listing the American eel, Cumberland arrow darter, the Great Basin distinct population segment (DPS) of the Columbia spotted frog, Goose Creek milkvetch, Nevares spring bug, Page springsnail, Ramshaw meadows sand-verbena, Sequatchie caddisfly, Shawnee darter, Siskiyou mariposa lily, Sleeping ute milkvetch, Southern Idaho ground squirrel, Tahoe yellow cress, and six Tennessee cave beetles (Baker Station, Coleman, Fowler's, Indian Grave Point, inquirer, and Noblett's cave beetles) is not warranted at this time. However, we ask the public to submit to us any new information that becomes available concerning the threats to any of the 19 species listed above or their habitat at any time.

**DATES:** The findings announced in this document were made on October 8, 2015.

**ADDRESSES:** These findings are available on the Internet at *http://www.regulations.gov* at Docket Number

FWS–HQ–ES–2015–0143. Supporting information used in preparing these findings is available for public inspection, by appointment, during normal business hours by contacting the appropriate person as specified under **FOR FURTHER INFORMATION CONTACT**. Please submit any new information, materials, comments, or questions concerning these findings to the appropriate person, as specified under **FOR FURTHER INFORMATION CONTACT**.

**FOR FURTHER INFORMATION CONTACT:**

| Species | Contact information |
|---|---|
| American eel | Northeast Regional Office, Endangered Species Program, 413–253–8615. |
| Cumberland arrow darter | Kentucky Ecological Services Field Office, 502–695–0468. |
| Great Basin DPS of the Columbia spotted frog | Nevada Fish and Wildlife Office, 775–861–6300. |
| Goose Creek milkvetch | Utah Ecological Services Field Office, 801–975–3330. |
| Nevares spring naucorid bug | Carlsbad Fish and Wildlife Office, 760–431–9440. |
| Page springsnail | Arizona Ecological Services Field Office, 602–242–0210. |
| Ramshaw meadows sand-verbena | Sacramento Fish and Wildlife Office, 916–414–6700. |
| Sequatchie caddisfly | Tennessee Ecological Services Field Office, 931–528–6481. |
| Shawnee darter | Kentucky Ecological Services Field Office, 502–695–0468. |
| Siskiyou mariposa lily | Yreka Fish and Wildlife Office, 530–842–5763. |
| Sleeping ute milkvetch | Western Colorado Ecological Services Field Office, 970–628–7184. |
| Southern Idaho ground squirrel | Idaho Fish and Wildlife Office, 208–378–5265. |
| Tahoe yellow cress | Nevada Fish and Wildlife Office, 775–861–6300. |
| Tennessee cave beetles (Baker Station, Coleman, Fowler's, Indian Grave Point, inquirer, and Noblett's cave beetles). | Tennessee Ecological Services Field Office, 931–528–6481. |

If you use a telecommunications device for the deaf (TDD), please call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

**Background**

Section 4(b)(3)(B) of the Act (16 U.S.C. 1533) requires that, for any petition to revise the Federal Lists of Endangered and Threatened Wildlife and Plants that contains substantial scientific or commercial information indicating that listing an animal or plant species may be warranted, we make a finding within 12 months of the date of receipt of the petition. In this finding, we determine whether the petitioned actions regarding the American eel, Cumberland arrow darter, the Great Basin distinct population segment (DPS) of the Columbia spotted frog, Goose Creek milkvetch, Nevares spring bug, Page springsnail, Ramshaw meadows sand-verbena, Sequatchie caddisfly, Shawnee darter, Siskiyou mariposa lily, Sleeping ute milkvetch, Southern Idaho ground squirrel, Tahoe yellow cress, and six Tennessee cave beetles (Baker Station, Coleman, Fowler's, Indian Grave Point, inquirer, and Noblett's cave beetles) are: (1) Not warranted, (2) warranted, or (3) warranted, but the immediate proposal of a regulation implementing the petitioned action is precluded by other pending proposals to determine whether species are endangered or threatened species, and expeditious progress is being made to add or remove qualified species from the Federal Lists of Endangered and Threatened Wildlife and Plants (warranted but precluded). Section 4(b)(3)(C) of the Act requires that we treat a petition for which the requested action is found to be warranted but precluded as though resubmitted on the date of such finding, that is, requiring a subsequent finding to be made within 12 months. We must publish these 12-month findings in the **Federal Register**.

**Summary of Information Pertaining to the Five Factors**

Section 4 of the Act (16 U.S.C. 1533) and the implementing regulations in part 424 of title 50 of the Code of Federal Regulations (50 CFR part 424) set forth procedures for adding species to, removing species from, or reclassifying species on the Federal Lists of Endangered and Threatened Wildlife and Plants. Under section 4(a)(1) of the Act, a species may be determined to be an endangered species or a threatened species based on any of the following five factors:

(A) The present or threatened destruction, modification, or curtailment of its habitat or range;

(B) Overutilization for commercial, recreational, scientific, or educational purposes;

(C) Disease or predation;

(D) The inadequacy of existing regulatory mechanisms; or

(E) Other natural or manmade factors affecting its continued existence.

We summarize below the information on which we based our evaluation of the five factors provided in section 4(a)(1) of the Act in determining whether the American eel, Cumberland arrow darter, the Great Basin DPS of the Columbia spotted frog, Goose Creek milkvetch, Nevares spring bug, Page springsnail, Ramshaw meadows sand-verbena, Sequatchie caddisfly, Shawnee darter, Siskiyou mariposa lily, Sleeping ute milkvetch, Southern Idaho ground squirrel, Tahoe yellow cress, and six Tennessee cave beetles (Baker Station, Coleman, Fowler's, Indian Grave Point, inquirer, and Noblett's cave beetles) are threatened species or endangered species. More detailed information about these species is presented in the species-specific assessment forms found on *www.regulations.gov*. In considering what factors might constitute threats, we must look beyond the mere exposure of the species to the factor to determine whether the species responds to the factor in a way that causes actual impacts to the species. If there is exposure to a factor, but no response, or only a positive response, that factor is not a threat. If there is exposure and the species responds negatively, the factor may be a threat. In that case, we determine if that factor rises to the level of a threat, meaning that it may drive or contribute to the risk of extinction of the species such that the species warrants listing as an endangered or threatened species as those terms are defined by the Act. This does not necessarily require empirical proof of a threat. The combination of exposure and some corroborating evidence of how the species is likely affected could suffice. The mere identification of factors that could affect a species negatively is not sufficient to compel a finding that listing is appropriate; we require evidence that these factors are operative threats that act on the species to the point that the species meets the definition of an endangered species or a threatened species under the Act.

In making our 12-month findings, we considered and evaluated the best

available scientific and commercial information.

## American Eel (Anguilla rostrata)

### Previous Federal Actions

For a complete petition history for the American eel prior to September 2011, see the Previous Federal Action section of our September 29, 2011, 90-day substantial petition finding. Publication of the 90-day finding in the **Federal Register** (September 29, 2011; 76 FR 60431) opened a period to solicit new information that was not previously available or was not considered at the time of our previous 2007 status review and not-warranted 12-month finding (February 2, 2007; 72 FR 4967), and initiated a new status review.

On December 23, 2011, the petitioner (Center for Environmental Science Accuracy and Reliability (CESAR), formerly known as the Council for Endangered Species Act Reliability) filed a Notice of Intent to sue the Service for failure to publish a finding within 12 months of receiving the April 30, 2010, petition. On August 7, 2012, CESAR filed a complaint with the U.S. District Court for the District of Columbia for the Service's failure to meet the petition's statutory timeline. On April 24, 2013, the Service entered into a court-approved settlement agreement with CESAR stipulating that the Service would complete a status review of American eel and deliver a 12-month finding to the **Federal Register** on or before September 30, 2015 (Stipulated Settlement Agreement, *Center for Envt'l Science Accuracy and Reliability* v. *Salazar, et al.* (D.D.C., Case No. 1:12–cv–01311–EGS), Doc. 18, filed April 24, 2013.).

To ensure the status review was based on the best scientific and commercial information available, the Service, in November 2013 through January 2014, requested any new or updated American eel information since the 2007 status review. The requests were sent to State and Federal agencies, Native American tribes, nongovernmental agencies, and other interested parties. In addition to any new or updated information, the requests specifically sought information related to panmixia, glass eel recruitment, climate change, oceanographic conditions, and eel abundance at fishways. See the lists of references reviewed and cited for a list of agencies, organizations, and parties from which we received information; these reference lists are available at *http://www.regulations.gov* and at *http://www.fws.gov/northeast/newsroom/eels.html*.

## Summary of Status Review

In making our 12-month finding on the petition, we consider and evaluate the best available scientific and commercial information. This evaluation includes information from all sources, including State, Federal, tribal, academic, and private entities and the public. However, because we have a robust history with the American eel and completed a thorough status review for the species in 2007, we are incorporating by reference the February 7, 2007, 12-month finding (72 FR 4967) and using its information as a baseline for our 2015 status review and 12-month petition finding.

A supporting document entitled, *American Eel Biological Species Report* (Report) provides a summary of the current (post 2007) literature and information regarding the American eel's distribution, habitat requirements, life-history, and stressors. The Report is available as a Supplemental Document at *http://www.fws.gov/northeast/newsroom/eels.html*. We describe in the Report or in our 12-month finding document any substantive changes that we identified in the data used in the February 7, 2007, 12-month finding or in conclusions drawn from that data, based upon our review of the best available scientific and commercial information since 2007.

American eel are a facultative catadromous fish species, meaning they commonly use brackish estuaries or near-shore marine habitats, in addition to the freshwater habitats. After mature eels spawn in the Sargasso Sea, the eggs hatch into "leptocephali," a larval stage that lasts for about 1 year. Leptocephali are transported by ocean currents from the Sargasso Sea to the Atlantic coast of North America, the Caribbean, Gulf of Mexico, Central America and northern portions of South America. Leptocephali metamorphose into "glass eels" while at sea and then actively swim across the continental shelf to coastal waters. Glass eels transform into small pigmented juvenile eels, commonly called "elvers," after taking up residence in marine, estuarine, or freshwater rearing habitats in coastal waters. As they grow, the larger juvenile eels are known as "yellow eels." American eels begin sexual differentiation at a length of about 20 to 25 centimeters (7.9 to 9.8 inches), well in advance of maturation as a "silver eel." Upon nearing sexual maturity, silver eels begin migration toward the Sargasso Sea, completing sexual maturation en route. In the United States, the American eel is found in fresh, estuarine, and marine waters in

36 States. The upstream extent of eel distribution in freshwater is limited by impassable dams and natural barriers. American eel are ubiquitous in many continental aquatic habitats including marine habitats, estuaries, lakes, ponds, small streams, and large rivers to the headwaters. They may be locally abundant to the extent that they sometimes constitute a large proportion of the total fish biomass in many watersheds.

The 2007 Status Review and the 2015 Report reviewed a number of stressors (natural or human induced negative pressures affecting individuals or subpopulations of a species) on the American eel, including the effects of climate change; parasites; habitat loss in estuaries, lakes, and rivers; migratory effects from hydroelectric projects; recreational and commercial harvests; and contaminants.

In terms of climate change, North Atlantic Ocean temperatures may continue to rise as a result of climate change, but a great deal of uncertainty remains regarding changes in physical oceanographic processes and how, or to what extent, those processes will affect eel migration, aggregation for reproduction, and ultimately abundance. The species report discusses in detail the complex subject of climate change and its foreseeable effects on the species. Based on our review of the best available scientific and commercial information, we conclude that climate change, based on its reasonably foreseeable effects, is not a threat to the American eel that puts it in danger of extinction or likely to become so in the foreseeable future, nor is it reasonably foreseeable that it would become such a threat in the future.

As for parasites, despite the spread of *Anguillicoloides crassus* and increasing mean infection rates over time, there is no direct evidence to support a conclusion that the parasite causes significant American eel mortality. Nor is there direct evidence to support or refute the hypotheses that *A. crassus* impairs the silvering process, prevents American eels from completing their spawning migration to the Sargasso Sea, or impairs spawning.

With regard to habitat loss, American eel have been extirpated from some portions of their historical range, mostly as a result of large hydroelectric and water storage dams built since the early twentieth century. Although dams have extirpated eels from some large rivers and certain headwaters, the species remains widely distributed over the majority of its historical range. We consider habitat loss from barriers to be a historical effect, and any population-

level effects likely have already been realized. The extensive range of American eel provides multiple freshwater and estuarine areas that support the species' life stages and thus buffer the species as a whole from stressors affecting individuals or smaller populations in any one area. Currently, ocean habitats and the full range of continental habitats (estuaries, lakes, and rivers) remain available and occupied by the American eel. Some American eels complete their life cycle without ever entering freshwater. Highly fecund females continue to be present in extensive areas of freshwater (lacustrine and riverine), estuarine, and marine habitats; males also continue to be present in these habitats. Recruitment of glass eels continues to occur in these habitats with no evidence of continuing reduction in glass eel recruitment. For these reasons, we conclude that the available freshwater, estuarine, and marine habitats are sufficient to sustain the American eel population.

With regard to migratory effects from hydroelectric projects, hydroelectric dams are obstacles that may delay the downstream migration of silver eels that mature in riverine habitats, and hydroelectric turbines can cause mortality or injury (eels that mature and migrate from estuary or marine habitats downstream are not affected by hydroelectric dams). The effects of turbine injury, including delayed mortality and possible impaired reproduction and increased predation risk, are poorly understood in the American eel. The best scientific and commercial information available indicates that mortality from hydroelectric turbines can cause significant mortality to downstream-migrating silver eels. The installation of effective downstream passage measures (*i.e.,* bypasses or night spillage) through the Federal Energy Regulatory Commission relicensing process has reduced, and continues to reduce this mortality.

In terms of recreational and commercial harvest, we continue to acknowledge that sometimes large numbers of individual American eel are recreationally or commercially harvested for food, bait, or aquaculture, but we conclude that harvest and trade are not threats to the American eel. The species is highly resilient, and remains a widely distributed fish species with a relatively stable population despite the levels of historical habitat loss and historical and current commercial and recreational harvest. That harvest is being managed and monitored via existing harvest quotas, licenses, and

reporting requirements to ensure the species' conservation.

In addition, contaminants may affect early life stages of the American eel, but without specific information, we remain cautious in extrapolation of laboratory studies to rangewide population-level effects (*e.g.,* there are no studies showing reduced recruitment of glass eels in the wild, which would be an indicator of decreased outmigration, or decreased egg or leptocephali survival). A correlation between the contamination of the upper Saint Lawrence River/Lake Ontario watershed and the timing of the 1980s decline of American eel in the upper Saint Lawrence River/Lake Ontario watershed is not evident.

Lastly, there are no individual stressors that rise to the level of a threat to the American eel. Some stressors can have cumulative effects and result in increased mortality. For example, the Report discusses known cumulative and synergistic interactions of various contaminants and known cumulative effects of increased predation and mortality at or below dams that block eel migration. While some individual American eels may be exposed to increased levels of mortality as a result of these contaminant or predation cumulative effects, we have no indication that the species is, or will be, significantly affected at a population level. Therefore, we conclude that there are no cumulative stressors that are a threat to the American eel now, or that will become a threat in the foreseeable future.

The best available information indicates that, American eel are a single panmictic population that lacks distinct population structure, breeds in the Sargasso Sea, and shares a single common gene pool. Panmixia is central to evaluating stressors to the American eel since, in order for any stressor to rise to the level of a threat (natural or human-induced pressure affecting a species as a whole), it must act upon a large portion of the population at some life-history focal point, or the stressor must be present throughout a large part of the species' range. And the stressor must elicit a response that results in significant mortality, impaired reproduction, or juvenile recruitment failure.

Several lines of evidence indicate that the American eel population is not subject to threats that would imperil its continued existence. Despite historical habitat losses and a population reduction over the past century, American eels remain widely distributed throughout a large part of their historical range. Glass eels are

recruited to North American rivers in large numbers. Elvers are also present in large numbers well inland on some east coast river systems—for example, more than 820,000 eels passed through a new fishway at the Roanoke Rapids Dam, located 137 miles inland on the Roanoke River in 2013, the fourth year of operation. American eels are plastic in their behavior and adaptability, inhabiting a wide range of freshwater, estuarine, and marine habitats over an exceptionally broad geographic range. Because of the species' panmixia, areas that have experienced depletion or extirpation may experience a "rescue effect" allowing for continued or renewed occupation of available areas. Trends in abundance over recent decades vary among locations and life stages, showing decreases in some areas, and increases or no trends in other areas. Limited records of glass eel recruitment do not show trends that would signal recent declines in annual reproductive success or the effect of new or increased stressors. Taken as a whole, a clear trend cannot be detected in species-wide abundance during recent decades, and, while acknowledging that there have been large declines in abundance from historical times, the species currently appears to be depleted but stable. While some eel habitat has been permanently lost and access to freshwater habitats is impaired by dams that lack upstream fish passage, access to freshwater habitat has improved, and continues to improve, in other areas through new or improved eel ladders and removal of barriers. Despite the loss of some freshwater habitat, the American eel population appears to be stable based on young-of-the-year indices and estimates of spawner abundance. In addition, since 2007, newer information indicates that some American eel complete their life cycle in estuarine and marine waters.

**Finding**

Based on our review of the best available scientific and commercial information pertaining to the five factors, we find that the stressors are not of sufficient imminence, intensity, or magnitude to indicate that the American eel is in danger of extinction (an endangered species), or likely to become an endangered species within the foreseeable future (a threatened species), throughout all of its range.

There are no threats currently affecting the American eel throughout the species' range. There are several stressors that cause individual mortality, including recreational and commercial harvest (Factor B),

predation (Factor C), and hydroelectric turbines (Factor E), but none that affect a portion of the species' range more than another. In addition, there are no portions of the species' range that are considered significant given the species' panmictic life-history. Therefore, we find that no portion of the American eel's range warrants further consideration of possible endangered or threatened status under the Act, and we find that listing the American eel as a threatened or endangered species throughout all or a significant portion of its range is not warranted at this time.

**Cumberland Arrow Darter (Etheostoma sagitta)**

*Previous Federal Actions*

The Cumberland arrow darter was first identified as a candidate for protection under the Act through our internal process in the Candidate Notice of Review published in the November 21, 2012, **Federal Register** (77 FR 69994); the subspecies was identified at the time as *E. sagitta sagitta*. Threats to the subspecies identified at that time were water pollution from surface coal mining and gas exploration activities; removal of riparian vegetation; stream channelization; increased siltation associated with poor mining, logging, and agricultural practices; and deforestation of watersheds. It was assigned a listing priority number (LPN) of 9. On November 22, 2013 (78 FR 70104), the LPN was changed to 8 due to morphological and genetic analysis resulting in the recognition of Cumberland arrow darter as a species (*E. sagitta*) as opposed to a subspecies, which it remained until evaluation for listing this year.

**Summary of Status Review**

The following summary is based on information in our files. From 2010 to 2012, the Service and its partners (Kentucky Department of Fish and Wildlife Resources (KDFWR), Kentucky State Nature Preserve Commission (KSNPC), and Tennessee Wildlife Resources Agency (TWRA)) completed a range-wide status assessment for the Cumberland arrow darter (USFWS 2012, pp. 1–2). We first generated a list of historical (pre-2000) records through review of agency databases (KDFWR, KSNPC, and TWRA), museum records (University of Tennessee), and published literature. From 2010 through 2012, surveys were completed at 187 of 202 historical sites and in 124 of 128 historical streams (sites corresponded to individual sampling reaches and more than one could be present on a given stream). Surveys were also conducted at

other sites/streams where habitat conditions appeared to be suitable for the species. When first considered for candidate status in early 2012, status surveys were still ongoing, and the species had been observed in 72 of 123 historical sites visited (58 percent) and 60 of 101 historical streams visited (59 percent). More comprehensive surveys in Tennessee in late 2012 and additional surveys in Kentucky in 2013–2014 expanded the species' known range to 98 streams, including 119 of 187 historical sites visited (64 percent), 85 of 128 historical streams visited (66 percent), and 13 new (non-historical) streams (USFWS 2012, pp. 1–2; USFWS unpublished data). New distributional records were obtained during each year of sampling, primarily from the middle and western portions of the species' geographical range. Within Kentucky, the species was observed at 87 of 143 sites (61 percent) and in 61 of 100 streams (61 percent). Within Tennessee, the species was observed at 32 of 44 sites (73 percent) and in 24 of 30 streams (80 percent). [Note that 2 of the historical streams surveyed occur in both Kentucky and Tennessee and are, therefore, included in each of the State totals provided in the previous sentences (*i.e.,* 100 and 30, respectively.] The species' most significant declines were documented within the Poor Fork, Clover Fork, Straight Creek, Clear Creek, and Clear Fork drainages, all of which are located within the eastern half of the species' geographical range. This portion of the upper Cumberland River drainage has less public ownership than the western half of the drainage and has been impacted more extensively by surface coal mining.

Over the last 3 years, new field surveys and monitoring efforts across the Cumberland arrow darter's range have improved our understanding of the species' distribution and stressors. Based on these findings, we have reexamined the species' status and reevaluated the magnitude and imminence of its stressors. We acknowledge that the species has suffered declines in portions of its range (*e.g.,* it has been extirpated from 43 of 128 historical streams) and portions of the range continue to suffer some level of water quality degradation and habitat disturbance. However, we have determined that the species' overall status is more secure than previously believed, and stressors acting on the species are not of sufficient imminence, intensity, or magnitude to indicate the species is in danger of extinction (an endangered species), or likely to become

endangered within the foreseeable future (a threatened species). The Cumberland arrow darter's status is bolstered by its large number of occupied streams (98) and its frequent occurrence in streams on public lands and in streams with listed species (*e.g.,* blackside dace). In support of this not-warranted finding, we offer the following specifics with regard to its status:

• The species' range (number of extant streams) is larger than first believed. When first identified as a candidate for listing in 2012, the Cumberland arrow darter was known from 72 of 123 historical sites visited (58 percent) and 60 of 101 historical streams visited (59 percent). More comprehensive surveys in Tennessee and additional surveys in Kentucky from 2012 through 2014 expanded the species' known range to 98 streams, including 85 of 128 historical streams (66 percent) and 13 new streams. The species' relatively broad distribution and high number of occupied streams increases its resiliency and redundancy.

• The species has demonstrated greater persistence in streams with at least 1 listed species (62 streams) or in streams located on public lands (45 streams). When combined, these two groups total 75 streams, or 77 percent of the species' known habitats. Historically, less habitat disturbance has occurred on public lands, and many of the species' best remaining habitats are located in these areas. The Cumberland arrow darter also benefits indirectly from listed species' protections provided by Federal and State statutes and regulations, especially in Kentucky where State water quality regulations (401 Kentucky Administrative Regulations 10:031, Section 8) provide added protections for streams supporting listed species ("Outstanding State Resource Waters").

The species utilizes larger streams more frequently than previously believed, bolstering the species' redundancy, resiliency, and representation (capacity of a species to adapt to changing environmental conditions). We have recent records (multiple individuals each) from Capuchin Creek, Elk Fork Creek, Jellico Creek (at Criscillis Branch), Marsh Creek (near mouth), and Roaring Paunch Creek, all of which are fourth-order streams or larger and have watersheds exceeding 65 square kilometers (25 square miles). This information suggests the species utilizes more stream kilometers (miles) than previously believed because most survey efforts have focused on smaller streams (third-order and smaller). The species'

PLAINTIFFS' EXHIBIT 12

Stock Assessment Report No. 12-01
of the

# Atlantic States Marine Fisheries Commission

*American Eel Benchmark Stock Assessment*



**Accepted for Management Use May 2012**



*Working towards healthy, self-sustaining populations for all Atlantic coast fish species*
*or successful restoration well in progress by the year 2015*

current year's index being below this level would provide strong evidence that the stock biomass is below the RP. The Panel considers the utility of this RP as limited. It is not clear what management action should be taken if and when an RP is met or exceeded as the RP is not derived from stock dynamics which could be used to inform a desired management response.

The TLA was applied to all individual, regional, and coast wide indices of relative abundance by the SASC. After scaling, each annual index was assigned to one of three color categories - white (good), gray (intermediate), or black (bad) - based on the 25th and 75th percentiles of each index series (see also ToR 1). The results were complex and difficult to interpret. Nonetheless, empirically-based RPs of this nature have been used in stocks (e.g. Hardie et al., 2011) for which population models are not available. As part of a TLA, they are one metric in a suite of many to inform managers of stock status. Pre-agreed upon decisions on management actions are made if and when RPs are met. The TLA is not without its problems but can allow management actions to ensure stock sustainability in data-poor situations (Halliday et al., 2001). Further, the TLA allows consideration of a wider suite of information than can normally be incorporated into a model (e.g. environmental indicators), thus allowing interpretation of model results in a broader context. *The Panel suggests that a TLA be explored which would incorporate a wide array of data related to American eel stock dynamics. This may be used to assist in coast wide and regional management decision-making while modeling efforts continue.*

The two $M$ stanza DB-SRA provided American eel stock RPs which were relatively robust to input assumptions. The carrying capacity (K) ranged from 16,274 - 23,595 t (median of 18,274t). $B_{MSY}$ ranged from 5,085 - 8,912t (median of 6,823t) while MSY ranged from 827 - 1510t (median of 1,060t). The associated $F_{MSY}$ ranged 0.14 - 0.26 (median of 0.19). The Panel considered, however, that while these RPs were generally representative of optimal stock dynamics, the uncertainties in the DB-SRA model did not permit statements on current stock status in relation to these RPs.

*In summary, the Panel is very encouraged by the modeling efforts of the SASC and finds they are a significant advance since the 2006 assessment (see also ToR 3). Notwithstanding this, while it is highly likely that the American Eel stock is depleted, the overfishing and overfished status in relation to the biomass and fishing mortality reference points cannot be stated with confidence.*

**6. Review the research, data collection, and assessment methodology recommendations provided by the Technical Committee and make any additional recommendations warranted. Clearly prioritize the activities needed to inform and maintain the current assessment, and provide additional recommendations that may improve the reliability of future assessments.**

The recommendations provided by the SASC were fairly comprehensive and the Panel feels these covered the primary areas needed to improve future assessments. The Review Panel has incorporated these recommendations into Table 1, with prioritization and comments explaining the priority provided.

PLAINTIFFS' EXHIBIT 13



# *Atlantic States Marine Fisheries Commission*

# NEWS RELEASE

*Vision: Sustainably Managing Atlantic Coastal Fisheries*

FOR IMMEDIATE RELEASE
August 9, 2018

PRESS CONTACT:  Tina Berger
703.842.0740

## ASMFC American Eel Board Approves Addendum V

Arlington, VA – The Commission's American Eel Management Board approved Addendum V to the Interstate Fishery Management Plan for American Eel. The Addendum increases the yellow eel coastwide cap starting in 2019 to 916,473 pounds. This modest increase in the cap (less than 1%) reflects a correction in the historical harvest. Further, the Addendum adjusts the method (management trigger) to reduce total landings to the coastwide cap when the cap has been exceeded and removes the implementation of state-by-state allocations if the management trigger is met. Lastly, the Addendum maintains Maine's glass eel quota of 9,688 pounds.

The Addendum responds to concerns with the previous Addendum's (IV) yellow eel management triggers given the timing and precision of landings data and the challenges of state-by-state quota management. Under Addendum IV, management action would have be triggered when (1) the coastwide cap is exceeded by more than 10% in a given year; or (2) the coastwide cap is exceeded in two consecutive years, regardless of the percent overage. If either of these triggers had been met, state-by-state quotas would have been required to be implemented.

Under Addendum V, management action will now be initiated if the yellow eel coastwide cap is exceeded by 10% in two consecutive years.  If the management trigger is exceeded, only those states accounting for more than 1% of the total yellow eel landings will be responsible for adjusting their measures. A workgroup will be formed to define the process to equitably reduce landings among the affected states when the management trigger has been met.

The Board slightly modified the glass eel aquaculture provisions, maintaining the 200 pound limit for glass eel harvest but modifying the criteria for evaluating the proposed harvest area's contribution to the overall population consistent with the recommendations of the Technical Committee. Under the revised provisions, the Board approved Maine's glass eel aquaculture proposal for the 2019 fishing season, allowing for an additional 200 pounds of glass eels to be harvested for development in domestic aquaculture facilities. This amount is in addition to the Maine's glass eel quota.

The implementation date for Addendum V is January 1, 2019. The Addendum will be posted to the Commission's website by the end of August at http://www.asmfc.org/species/american-eel under Managements Plans.  For more information, please contact Kirby Rootes-Murdy, Senior Fishery Management Plan Coordinator, at krootes-murdy@asmfc.org or 703.842.0740.

###

PR18-23

---

The Atlantic States Marine Fisheries Commission was formed by the 15 Atlantic coastal states in 1942 for the promotion and protection of coastal fishery resources.  The Commission serves as a deliberative body of the Atlantic coastal states, coordinating the conservation and management of nearshore fishery resources, including marine, shell and anadromous species.

PLAINTIFFS' EXHIBIT 14



# Atlantic States Marine Fisheries Commission
Sustainable and Cooperative Management of Atlantic Coastal Fisheries

ABOUT US   |   MANAGEMENT   |   SCIENCE   |   HABITAT   |   DATA   |   LAW ENFORCEMENT   |   NEWS   |

CALENDAR

**Program Overview**

Management 101

American Eel

Contacts

Pending Actions

Management Plans &
FMP Reviews

Stock Assessment
Reports

Meeting Summaries &
Reports

Press Releases

Quick Links

American Eel
Ageing Report

Eel Habitat
Factsheet

American Lobster

Atlantic Croaker

Atlantic Herring

Atlantic Menhaden

Atlantic Striped Bass

Atlantic Sturgeon



## American Eel

### Life History

American eel (*Anguilla rostrata*) are a catadromous fish species, spending most of their life in freshwater or estuarine environments, traveling to the ocean as adults to reproduce and die. Sexually maturing eel migrate to spawning grounds located in the Sargasso Sea, a large portion of the western Atlantic Ocean east of the Bahamas and south of Bermuda. American eel are a panmictic stock, meaning that individuals from the entire range come together to reproduce. American eel found along the eastern coast of Mexico are from the same population as eel found in the St. Lawrence River in Canada.

American eel have a multitude of life stages: leptocephali, glass eel (also known as elvers), yellow eel, and silver eel. Yellow eel are the primary life stage harvested by commercial and recreational fishermen.

In August 2018, a Symposium on American Eel titled, "Aristole's Mud to Modern Day: What Do We Actually Know About Catadromous Eels?" was held at the American Fisheries Society's Annual Meeting in Atlantic City, New Jersey. A link to the abstracts and presentations is included here.

### Commercial & Recreational Fisheries

American eel are an important resource from both a biodiversity and human use perspective. They serve as an important prey species for many fish, aquatic mammals and fish-eating birds.

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 94 of 291 PageID #: 914

Black Drum

Black Sea Bass

Bluefish

Coastal Sharks

Cobia

Horseshoe Crab

Jonah Crab

Northern Shrimp

Red Drum

Scup

Shad & River Herring

Spanish Mackerel

Spiny Dogfish

Spot

Spotted Seatrout

Summer Flounder

Tautog

Weakfish

Winter Flounder

Although fisheries are a fraction of what they were historically, eel support valuable commercial, recreational and subsistence fisheries.

From the 1970s to the mid-1980s, American eel supported significant commercial fisheries, with landings ranging from 2.5 -3.6 million pounds. Landings dropped to 1.6 million pounds in 1987 and have remained at low levels, ranging from 1.5 million to 700,000 pounds since then. State-reported landings of yellow eels in 2017 totaled approximately 851,637 pounds, a 10% decrease from 2016 and below the coastwide quota.



Since 2011, there has been a growing international demand for glass eels (an early life stage of American eel) for aquaculture purposes, which has increased landings and the price per pound of glass eels. In 2017, total glass eel harvest from Maine and South Carolina remained below Maine's quota.

Recreational harvest and release data for American eel is collected by the Marine Recreational Information Program (MRIP), formerly the Marine Recreational Fishery Statistics Survey (MRFSS) program. Recreational harvest along the Atlantic coast averaged 28,600 American eels from 1981-2016 and ranged from a high of 220,600 eels in 1985 to a low of 3,100 in 2008. The number of American eels released alive by recreational anglers averaged 82,400 eels and ranged from a low of 26,700 eels in 1997 to a high of 157,200 eels in 2003. American eel recreational harvest and live releases of American eels generally declined over the time series. There is very high error and low precision associated with the estimates due to the limited number of American eels that have been encountered during the survey.

## Stock Status

From a biological perspective, much is still unknown about the species. Information is limited about their abundance, status at all life stages, and habitat requirements. According to the 2017 stock assessment update, the American eel population remains depleted in U.S. waters. The stock is at or near historically low levels due to a combination of historical overfishing, habitat loss, food web alterations, predation, turbine mortality, environmental changes, toxins and contaminants, and disease. The assessment updates the 2012 American Eel Benchmark Stock Assessment with data from 2010-2016. Trend analyses of abundance indices indicated large declines in abundance of yellow eels during the 1980s through the early 1990s, with primarily neutral or stable abundance from the mid-1990s through 2016. Total landings remain low but stable. Based on these findings, the stock is still considered depleted. No overfishing determination can be made based on the analyses performed.



In 2011, the U.S. Fish and Wildlife Service (USFWS) initiated a status review of American eel under the Endangered Species Act (ESA) to assess the health of the population and the magnitude of threats facing the species. On October 7, 2015, USFWS announced that the American eel is stable and does not need protection under

the ESA. Nonetheless, for the species' long-term stability, the agency recommends continuing efforts to maintain healthy habitats, monitor harvest levels, and improve river passage for migrating eels. In 2014, the International Union for the Conservation of Nature (IUCN) listed American eel as "Endangered" on the Red List. The IUCN assesses flora and fauna globally to determine their conservation status (not evaluated to extinct). While the IUCN list has no legal implications, it is an important metric that accounts for a variety of factors including habitat, threats, potential stresses, and research status. Given these findings, and recent actions taken by the Commission and its member states, the Commission remains committed to closely monitoring American eel fisheries and the status of the resource, and making adjustments to the management program as necessary, to ensure stock rebuilding.

## Atlantic Coastal Management

American eel are a challenging species to conserve and manage on a coastwide basis for a number of reasons. During its life-span the American eel will have navigated through and resided in a wide range of habitats, from the oceanic waters of the Sargasso Sea to the brackish waters of coastal estuaries and the inland freshwater river systems. Additionally, throughout this journey, eel will have been under a myriad of management authorities, from international to multiple federal, state and local governments. Life history characteristics such as late age of maturity and a tendency to aggregate during certain life stages further confound conservation efforts.

American eel are managed by the Commission in territorial seas and inland waters along the Atlantic coast from Maine to Florida. Increasing demand for eel by Asian markets and domestic bait fisheries, coupled with concern about declining eel abundance and limited assessment data, spurred development of the first Interstate Fishery Management Plan (FMP) for American Eel in the mid-1990s. The plan, approved in 1999, provided several reasons why heavy harvest pressure may adversely affect American eel populations: (1) American eel have a slow rate of maturation, requiring eight to 24+ years to attain sexual maturity; (2) glass eel tend to aggregate seasonally during migration, making them vulnerable to directed harvest; (3) harvest of yellow eel is a cumulative stress, over multiple years, on the same yearclass; and (4) all fishing mortality occurs prior to spawning.

**Trend Analysis of Regional and Coastwide Indices of American Eel Abundance by Young-of-the-year (YOY) and Yellow Eel Life Stages**

| Region | Life Stage | Time Period | 2012 Trend | 2017 Trend |
|---|---|---|---|---|
| Gulf of Maine | YOY | 2001–2016 | NS | NS |
| Southern New England | YOY | 2000–2016 | NS | NS |
| | Yellow | 2001–2010 | NS | |
| Hudson River | YOY | 1974–2009 | ↓ | - |
| | Yellow | 1980–2016 | ↓ | ↓ |
| Delaware Bay/ Mid-Atlantic Coastal Bays | YOY | 2000–2016 | NS | NS |
| | Yellow | 1999–2016 | NS | NS |
| Chesapeake Bay | YOY | 2000–2016 | NS | NS |
| | Yellow | 1990–2009 | ↑ | ↑ |
| South Atlantic | YOY | 2001–2015 | ↓ | ↓ |
| | Yellow | 2001–2016 | ↓ | ↓ |
| Atlantic Coast | YOY (short-term) | 2000–2016 | NS | NS |
| | YOY (long-term) | 1987–2013 | NS | NS |
| | Yellow (40+ year) | 1974–2016 | ↓ | ↓ |
| | Yellow (30-year) | 1987–2016 | ↓ | ↓ |
| | Yellow (20-year) | 1997–2016 | NS | NS |

The arrows indicate the direction of the trend if a statistically significant trend was detected (P-value < α; α = 0.05). NS = no significant trend detected. A dash (-) indices that data were not updated.

In response to the 2012 stock assessment, which indicated that the American eel population in U.S. waters is depleted, the Commission approved Addendum III (August 2013) and Addendum IV (October 2014) to the Interstate FMP with the goal of reducing mortality and increasing conservation of American eel stocks across all life stages. Addendum III establishes new management measures for both the commercial (glass, yellow, and silver) and recreational eel fisheries, and implements fishery-independent and fishery-dependent monitoring requirements. Addendum IV establishes a 907,671 pound coastwide quota for yellow eel fisheries, reduces Maine's glass eel quota to 9,688 pounds (2014 landings), and allows for the continuation of New York's silver eel weir fishery in the Delaware River.

In 2018, Addendum IV provisions were replaced by Addendum V, which increases the yellow eel coastwide cap starting in 2019 to 916,473 pounds; adjusts the method (management trigger) to reduce total landings to the coastwide cap when the cap has been exceeded; and removes the implementation of state-by-state allocations if the management trigger is met. Lastly, the Addendum maintains Maine's glass eel quota of 9,688 pounds. Under Addendum V, management action will now be initiated if the yellow eel coastwide cap is exceeded by 10% in two consecutive years. If the management trigger is exceeded, only those states accounting for more than 1% of the total yellow eel landings will be responsible for adjusting their measures. A workgroup will be formed to define the process to equitably reduce landings among the affected states when the management trigger has been met.

The Board slightly modified the glass eel aquaculture provisions, maintaining the 200 pound limit for glass eel harvest but modifying the

criteria for evaluating the proposed harvest area's contribution to the overall population consistent with the recommendations of the Technical Committee. Under the revised provisions, the Board approved Maine's glass eel aquaculture proposal for the 2019 fishing season, allowing for an additional 200 pounds of glass eels to be harvested for development in domestic aquaculture facilities. This amount is in addition to Maine's glass eel quota. The implementation date for Addendum V is January 1, 2019.

## Contacts

Kirby Rootes-Murdy, Senior FMP Coordinator
Management Board, Marty Gary, Chair
Technical Committee, Jordan Zimmerman, Chair
Advisory Panel, Mari-Beth Delucia, Chair

## Management Plans & FMP Reviews

Addendum V (August 2018)
Addendum IV (October 2014)
Addendum III (August 2013)
Addendum II (October 2008)
Addendum I (February 2006)
Interstate Fishery Management Plan for American Eel (November 1999)
FMP Reviews 2018 2017 2016 2015 2014 2013 2012 2009 2008 2007 2006 2005 2004 2002 2001 2000

## Stock Assessment Reports

2017 American Eel Stock Assessment Update (Oct 2017)
American Eel Stock Assessment Overview (Oct 2017)
Americal Eel Benchmark Stock Assessment (May 2012)
Americal Eel Stock Assessment Overview (May 2012)
Terms of Reference & Advisory Report to the American Eel Stock Assessment Peer Review (Jan 2006)

## Meeting Summaries & Reports

| Board Proceedings | Technical Committee Meeting Summaries & Reports | Advisory Panel Meeting Summaries |
|---|---|---|
| 2018 Oct Aug Feb | 2018 Jul | 2018 Jun |
| 2017 Oct Aug Jan | 2017 Jul | 2016 Jan |
| 2016 Aug May Feb | 2016 Sep Jul Apr Jan Jan | 2013 May |
| 2015 Nov Aug | 2015 Oct AddIV Implementation Plans  Oct ME Life | 2008 Oct Advisory Panel Meeting |
| 2014 Oct Aug May Feb | Cycle Survey | Summaries  Aug Advisory Panel |
| 2013 Oct Aug May Feb | 2014 Oct May | Meeting Summaries |
| 2012 Oct Aug May | 2012 Aug | |
| 2010 May | 2009 Jul Atlantic Coast Diadromous Fish Habitat: A | |
| 2009 Feb | Review of Utilization, Threats, Recommendations for | |
| 2008 Aug May Feb | Conservation, and Research Needs  Jan | |
| 2007 Aug Jan | 2006 Sep | |
| 2006 Oct May Feb | 2005 Oct | |
| 2005 Oct Aug May Feb | 2004 Mar | |
| 2004 Nov Aug May | 2001 Dec | |
| 2002 Nov | 2000 May Feb Yoy Sampling Protocol  Jan | |
| 2001 Oct Jan | | |
| 2000 Jun | | |
| 1999 Nov Jan | | |

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 97 of 291 PageID #: 917

## Press Releases

ASMFC American Eel Board Approves Addendum V (August 2018)

States Schedule Public Hearings on American Eel Draft Addendum V (April 2018)

ASMFC American Eel Board Approves Draft Addendum V for Public Comment (February 2018)

American Eel Stock Assessment Update Finds Resource Remains Depleted (October 2017)

ASMFC American Eel Board Approves North Carolina Aquaculture Plan for 2016 (February 2016)

ASMFC Finds Delaware Out of Compliance with Addendum III to the Interstate FMP for American Eel (August 2015)

ASMFC American Eel Board Approves Addendum IV (October 2014)

ASMFC American Eel Management Board Delays Action on Draft Addendum IV until October (August 2014)

States Schedule Hearings on American Eel Draft Addendum IV (May 2014)

ASMFC American Eel Board Approves Draft Addendum IV for Public Comment (May 2014)

Maine Implements First Ever Quota for Glass Eel Fishery (February 2014)

ASMFC American Eel Board Postpones Action on Draft Addendum IV: Maine Commits to Develop Plan with Industry to Control Glass Eel Harvest (October 2013)

ASMFC American Eel Board Approves Addendum III and Initiates Draft Addendum IV (August 2013)

States Schedule Hearings on American Eel Draft Addendum III: RI Changes Hearing Date from April 29 to May 1 (April 2013)

States Schedule Hearings on American Eel Draft Addendum III (April 2013)

States Schedule Hearings on American Eel Draft Addendum III (March 2013)

ASMFC American Eel Board Approves Draft Addendum III for Public Comment (February 2013)

ASMFC American Eel Board Initiates Development of Draft Addendum III to Improve Conservation and Protection of the Stock (August 2012)

American Eel Benchmark Assessment Indicates Stock is Depleted (May 2012)

ASMFC American Eel Board Approves Addendum II (October 2008)

ASMFC American Eel Board Initiates Addendum to Facilitate Survival of Spawners and Enhance Biomass (February 2007)

ASMFC American Eel Board Approves Addendum I: *Addendum Aims to Improve Data Collection* (February 2006)

Non-Traditional Stakeholders Sought for Participation on ASMFC American Eel Advisory Panel (April 2005)

ASMFC American Eel Board Calls for Development of Amendment 1 to the Interstate Plan: Plan to Address Continued Stock Declines (March 2004)

2019 Atlantic States Marine Fisheries Commission | All rights reserved. | Website designed by TM Design Inc. | Powered by New North

PLAINTIFFS' EXHIBIT 15

# Atlantic States Marine Fisheries Commission

*Vision: Sustainably Managing Atlantic Coastal Fisheries*



# Compact
# &
# Rules and Regulations

**February 2016**

# ATLANTIC STATES MARINE FISHERIES COMPACT
**Public Law 539, 77th Congress**
**Chapter 283, 2nd Session, 56 Stat. 267**
**As Amended by Public Law 721, 81st Congress**
**Approved August 19, 1950**

## AN ACT
**(An Act creating the Atlantic States Marine Fisheries Commission)**

Granting the consent and approval of Congress to an interstate compact relating to the better utilization of the fisheries (marine, shell and anadromous) of the Atlantic seaboard and creating the Atlantic States Marine Fisheries Commission.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the consent and approval of Congress is hereby given to an interstate compact relating to the better utilization of the fisheries (marine, shell and anadromous) of the Atlantic seaboard and creating the Atlantic States Marine Fisheries Commission, negotiated and entered into or to be entered into under the authority of Public Resolution Numbered 79, Seventy-sixth Congress, approved June 8, 1940, and now ratified by the States of Maine, New Hampshire, Massachusetts, Rhode Island, New York, New Jersey, Delaware, Maryland and Virginia, which compact reads as follows:

The contracting states solemnly agree:

### ARTICLE I

The purpose of this compact is to promote the better utilization of the fisheries, marine, shell and anadromous, of the Atlantic seaboard by the development of a joint program for the promotion and protection of such fisheries, and by the prevention of the physical waste of the fisheries from any cause.  It is not the purpose of this compact to authorize the states joining herein to limit the production of fish or fish products for the purpose of establishing or fixing the price thereof, or creating and perpetuating monopoly.

### ARTICLE II

This agreement shall become operative immediately as to those states executing it whenever any two or more of the States of Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia and Florida have executed it in the form that is in accordance with the laws of the executing state and the Congress has given its consent.  Any state contiguous with any of the aforementioned state and riparian upon waters frequented by anadromous fish, flowing into waters under the jurisdiction of any of the aforementioned states, may become a party hereto as hereinafter provided.

PLAINTIFFS' EXHIBIT 16

# REGULATION OF WHALING

*Convention signed at Washington December 2, 1946, with schedule of regulations*
*Senate advice and consent to ratification July 2, 1947*
*Ratified by the President of the United States July 18, 1947*
*Ratification of the United States deposited at Washington July 18, 1947*
*Entered into force November 10, 1948*
*Proclaimed by the President of the United States November 19, 1948*
*Convention amended by protocol of November 19, 1956* [1]
*Schedule amended June 7, 1949,* [2] *July 21, 1950,* [3] *July 27, 1951,* [4] *June 6, 1952,* [5] *June 26, 1953,* [6] *July 23, 1954,* [7] *July 23, 1955,* [8] *July 16–20, 1956,* [9] *June 28, 1957,* [10] *June 23–27, 1958,* [11] *June 22–July 1, 1959,* [12] *June 24, 1960,* [13] *June 23, 1961,* [14] *July 6, 1962,* [15] *July 5, 1963,* [16] *June 26, 1964,* [17] *July 2, 1965,* [18] *July 1, 1966,* [19] *June 30, 1967,* [20] *and June 24–28, 1968* [21]

62 Stat. 1716; Treaties and Other
International Acts Series 1849

## INTERNATIONAL CONVENTION FOR THE REGULATION OF WHALING

The Governments whose duly authorized representatives have subscribed hereto,

Recognizing the interest of the nations of the world in safeguarding for future generations the great natural resources represented by the whale stocks;

---

[1] 10 UST 952; TIAS 4228.
[2] 1 UST 506; TIAS 2092.
[3] 2 UST 11; TIAS 2173.
[4] 3 UST 2999; TIAS 2486.
[5] 3 UST 5094; TIAS 2699.
[6] 4 UST 2179; TIAS 2866.
[7] 6 UST 645; TIAS 3198.
[8] 7 UST 657; TIAS 3548.
[9] 8 UST 69; TIAS 3739.
[10] 8 UST 2203; TIAS 3944.
[11] 10 UST 330; TIAS 4193.
[12] 11 UST 32; TIAS 4404.
[13] 13 UST 493; TIAS 5014.
[14] 13 UST 497; TIAS 5015.
[15] 14 UST 112; TIAS 5277.
[16] 14 UST 1690; TIAS 5472.
[17] 15 UST 2547; TIAS 5745.
[18] 17 UST 35; TIAS 5953.
[19] 17 UST 1640; TIAS 6120.
[20] 18 UST 2391; TIAS 6345.
[21] 19 UST 6030; TIAS 6562.

Considering that the history of whaling has seen overfishing of one area after another and of one species of whale after another to such a degree that it is essential to protect all species of whales from further overfishing;

Recognizing that the whale stocks are susceptible of natural increases if whaling is properly regulated, and that increases in the size of whale stocks will permit increases in the numbers of whales which may be captured without endangering these natural resources;

Recognizing that it is in the common interest to achieve the optimum level of whale stocks as rapidly as possible without causing widespread economic and nutritional distress;

Recognizing that in the course of achieving these objectives, whaling operations should be confined to those species best able to sustain exploitation in order to give an interval for recovery to certain species of whales now depleted in numbers;

Desiring to establish a system of international regulation for the whale fisheries to ensure proper and effective conservation and development of whale stocks on the basis of the principles embodied in the provisions of the International Agreement for the Regulation of Whaling signed in London on June 8, 1937 [22] and the protocols to that Agreement signed in London on June 24, 1938 [23] and November 26, 1945; [24] and

Having decided to conclude a convention to provide for the proper conservation of whale stocks and thus make possible the orderly development of the whaling industry;

Have agreed as follows:

## Article I

1. This Convention includes the Schedule attached thereto which forms an integral part thereof. All references to "Convention" shall be understood as including the said Schedule either in its present terms or as amended in accordance with the provisions of Article V.

2. This Convention applies to factory ships, land stations, and whale catchers under the jurisdiction of the Contracting Governments, and to all waters in which whaling is prosecuted by such factory ships, land stations, and whale catchers.

## Article II

As used in this Convention

1. "factory ship" means a ship in which or on which whales are treated whether wholly or in part;

2. "land station" means a factory on the land at which whales are treated whether wholly or in part;

---

[22] TS 933, *ante,* vol. 3, p. 455.
[23] TS 944, *ante,* vol. 3, p. 519.
[24] TIAS 1597, *ante,* vol. 3, p. 1328.

3. "whale catcher" means a ship used for the purpose of hunting, taking, towing, holding on to, or scouting for whales;

4. "Contracting Government" means any Government which has deposited an instrument of ratification or has given notice of adherence to this Convention.

## Article III

1. The Contracting Governments agree to establish an International Whaling Commission, hereinafter referred to as the Commission, to be composed of one member from each Contracting Government. Each member shall have one vote and may be accompanied by one or more experts and advisers.

2. The Commission shall elect from its own members a Chairman and Vice Chairman and shall determine its own Rules of Procedure. Decisions of the Commission shall be taken by a simple majority of those members voting except that a three-fourths majority of those members voting shall be required for action in pursuance of Article V. The Rules of Procedure may provide for decisions otherwise than at meetings of the Commission.

3. The Commission may appoint its own Secretary and staff.

4. The Commission may set up, from among its own members and experts or advisers, such committees as it considers desirable to perform such functions as it may authorize.

5. The expenses of each member of the Commission and of his experts and advisers shall be determined and paid by his own Government.

6. Recognizing that specialized agencies related to the United Nations will be concerned with the conservation and development of whale fisheries and the products arising therefrom and desiring to avoid duplication of functions, the Contracting Governments will consult among themselves within two years after the coming into force of this Convention to decide whether the Commission shall be brought within the framework of a specialized agency related to the United Nations.

7. In the meantime the Government of the United Kingdom of Great Britain and Northern Ireland shall arrange, in consultation with the other Contracting Governments, to convene the first meeting of the Commission, and shall initiate the consultation referred to in paragraph 6 above.

8. Subsequent meetings of the Commission shall be convened as the Commission may determine.

## Article IV

1. The Commission may either in collaboration with or through independent agencies of the Contracting Governments or other public or private agencies, establishments, or organizations, or independently

(a) encourage, recommend, or if necessary, organize studies and investigations relating to whales and whaling;

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 105 of 291 PageID #: 925

(b) collect and analyze statistical information concerning the current condition and trend of the whale stocks and the effects of whaling activities thereon;

(c) study, appraise, and disseminate information concerning methods of maintaining and increasing the populations of whale stocks.

2. The Commission shall arrange for the publication of reports of its activities, and it may publish independently or in collaboration with the International Bureau for Whaling Statistics at Sandefjord in Norway and other organizations and agencies such reports as it deems appropriate, as well as statistical, scientific, and other pertinent information relating to whales and whaling.

### Article V

1. The Commission may amend from time to time the provisions of the Schedule by adopting regulations with respect to the conservation and utilization of whale resources, fixing (a) protected and unprotected species; (b) open and closed seasons; (c) open and closed waters, including the designation of sanctuary areas; (d) size limits for each species; (e) time, methods, and intensity of whaling (including the maximum catch of whales to be taken in any one season); (f) types and specifications of gear and apparatus and appliances which may be used; (g) methods of measurement; and (h) catch returns and other statistical and biological records.

2. These amendments of the Schedule (a) shall be such as are necessary to carry out the objectives and purposes of this Convention and to provide for the conservation, development, and optimum utilization of the whale resources; (b) shall be based on scientific findings; (c) shall not involve restrictions on the number or nationality of factory ships or land stations, nor allocate specific quotas to any factory ship or land station or to any group of factory ships or land stations; and (d) shall take into consideration the interests of the consumers of whale products and the whaling industry.

3. Each of such amendments shall become effective with respect to the Contracting Governments ninety days following notification of the amendment by the Commission to each of the Contracting Governments, except that (a) if any Government presents to the Commission objection to any amendment prior to the expiration of this ninety-day period, the amendment shall not become effective with respect to any of the Governments for an additional ninety days; (b) thereupon, any other Contracting Government may present objection to the amendment at any time prior to the expiration of the additional ninety-day period, or before the expiration of thirty days from the date of receipt of the last objection received during such additional ninety-day period, whichever date shall be later; and (c) thereafter, the amendment shall become effective with respect to all Contracting

Governments which have not presented objection but shall not become effective with respect to any Government which has so objected until such date as the objection is withdrawn. The Commission shall notify each Contracting Government immediately upon receipt of each objection and withdrawal and each Contracting Government shall acknowledge receipt of all notifications of amendments, objections, and withdrawals.

4. No amendments shall become effective before July 1, 1949.

### Article VI

The Commission may from time to time make recommendations to any or all Contracting Governments on any matters which relate to whales or whaling and to the objectives and purposes of this Convention.

### Article VII

The Contracting Governments shall ensure prompt transmission to the International Bureau for Whaling Statistics at Sandefjord in Norway, or to such other body as the Commission may designate, of notifications and statistical and other information required by this Convention in such form and manner as may be prescribed by the Commission.

### Article VIII

1. Notwithstanding anything contained in this Convention, any Contracting Government may grant to any of its nationals a special permit authorizing that national to kill, take, and treat whales for purposes of scientific research subject to such restrictions as to number and subject to such other conditions as the Contracting Government thinks fit, and the killing, taking, and treating of whales in accordance with the provisions of this Article shall be exempt from the operation of this Convention. Each Contracting Government shall report at once to the Commission all such authorizations which it has granted. Each Contracting Government may at any time revoke any such special permit which it has granted.

2. Any whales taken under these special permits shall so far as practicable be processed and the proceeds shall be dealt with in accordance with directions issued by the Government by which the permit was granted.

3. Each Contracting Government shall transmit to such body as may be designated by the Commission, insofar as practicable, and at intervals of not more than one year, scientific information available to that Government with respect to whales and whaling, including the results of research conducted pursuant to paragraph 1 of this Article and to Article IV.

4. Recognizing that continuous collection and analysis of biological data in connection with the operations of factory ships and land stations are indispensable to sound and constructive management of the whale fisheries, the

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 107 of 291 PageID #: 927

Contracting Governments will take all practicable measures to obtain such data.

## Article IX

1. Each Contracting Government shall take appropriate measures to ensure the application of the provisions of this Convention and the punishment of infractions against the said provisions in operations carried out by persons or by vessels under its jurisdiction.

2. No bonus or other remuneration calculated with relation to the results of their work shall be paid to the gunners and crews of whale catchers in respect of any whale the taking of which is forbidden by this Convention.

3. Prosecution for infractions against or contraventions of this Convention shall be instituted by the Government having jurisdiction over the offense.

4. Each Contracting Government shall transmit to the Commission full details of each infraction of the provisions of this Convention by persons or vessels under the jurisdiction of that Government as reported by its inspectors. This information shall include a statement of measures taken for dealing with the infraction and of penalties imposed.

## Article X

1. This Convention shall be ratified and the instruments of ratification shall be deposited with the Government of the United States of America.

2. Any Government which has not signed this Convention may adhere thereto after it enters into force by a notification in writing to the Government of the United States of America.

3. The Government of the United States of America shall inform all other signatory Governments and all adhering Governments of all ratifications deposited and adherences received.

4. This Convention shall, when instruments of ratification have been deposited by at least six signatory Governments, which shall include the Governments of the Netherlands, Norway, the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland, and the United States of America, enter into force with respect to those Governments and shall enter into force with respect to each Government which subsequently ratifies or adheres on the date of the deposit of its instrument of ratification or the receipt of its notification of adherence.

5. The provisions of the Schedule shall not apply prior to July 1, 1948. Amendments to the Schedule adopted pursuant to Article V shall not apply prior to July 1, 1949.

## Article XI

Any Contracting Government may withdraw from this Convention on June thirtieth of any year by giving notice on or before January first of the same year to the depositary Government, which upon receipt of such a notice

254 MULTILATERAL AGREEMENTS 1946–1949

shall at once communicate it to the other Contracting Governments. Any other Contracting Government may, in like manner, within one month of the receipt of a copy of such a notice from the depositary Government, give notice of withdrawal, so that the Convention shall cease to be in force on June thirtieth of the same year with respect to the Government giving such notice of withdrawal.

This Convention shall bear the date on which it is opened for signature and shall remain open for signature for a period of fourteen days thereafter.

In witness whereof the undersigned, being duly authorized, have signed this Convention.

Done in Washington this second day of December 1946, in the English language, the original of which shall be deposited in the archives of the Government of the United States of America. The Government of the United States of America shall transmit certified copies thereof to all the other signatory and adhering Governments.

For Argentina:
  O. Ivanissevich
  J. M. Moneta
  G. Brown
  Pedro H. Bruno Videla

For Australia:
  F. F. Anderson

For Brazil:
  Paulo Fróes da Cruz

For Canada:
  H. H. Wrong
  Harry A. Scott

For Chile:
  Agustin R. Edwards

For Denmark:
  P. F. Erichsen

For France:
  Francis Lacoste

For the Netherlands:
  D. J. Van Dijk

For New Zealand:
  G. R. Powles

For Norway:
  Birger Bergersen

For Peru:
  C. Rotalde

For the Union of Soviet Socialist Republics:
  A. Bogdanov
  E. Nikishin

For the United Kingdom of Great Britain and Northern Ireland:
  A. T. A. Dobson
  John Thomson

For the United States of America:
  Remington Kellogg
  Ira N. Gabrielson
  William E. S. Flory

For the Union of South Africa:
  H. T. Andrews

## SCHEDULE

1. (a) There shall be maintained on each factory ship at least two inspectors of whaling for the purpose of maintaining twenty-four hour inspection. These inspectors shall be appointed and paid by the Government having jurisdiction over the factory ship.

(b) Adequate inspection shall be maintained at each land station. The inspectors serving at each land station shall be appointed and paid by the Government having jurisdiction over the land station.

2. It is forbidden to take or kill gray whales or right whales, except when the meat and products of such whales are to be used exclusively for local consumption by the aborigines.

3. It is forbidden to take or kill calves or suckling whale or female whales which are accompanied by calves or suckling whales.

4. It is forbidden to use a factory ship or a whale catcher attached thereto for the purpose of taking or treating baleen whales in any of the following areas:

(a) in the waters north of 66° North Latitude except that from 150° East Longitude eastward as far as 140° West Longitude the taking or killing of baleen whales by a factory ship or whale catcher shall be permitted between 66° North Latitude and 72° North Latitude;

(b) in the Atlantic Ocean and its dependent waters north of 40° South Latitude;

(c) in the Pacific Ocean and its dependent waters east of 150° West Longitude between 40° South Latitude and 35° North Latitude;

(d) in the Pacific Ocean and its dependent waters west of 150° West Longitude between 40° South Latitude and 20° North Latitude;

(e) in the Indian Ocean and its dependent waters north of 40° South Latitude.

5. It is forbidden to use a factory ship or a whale catcher attached thereto for the purpose of taking or treating baleen whales in the waters south of 40° South Latitude from 70° West Longitude westward as far as 160° West Longitude.

6. It is forbidden to use a factory ship or a whale catcher attached thereto for the purpose of taking or treating humpback whales in any waters south of 40° South Latitude.

7. (a) It is forbidden to use a factory ship or a whale catcher attached thereto for the purpose of taking or treating baleen whales in any waters south of 40° South Latitude, except during the period from December 15 to April 1 following, both days inclusive.

(b) Notwithstanding the above prohibition of treatment during a closed season, the treatment of whales which have been taken during the open season may be completed after the end of the open season.

8. (a) The number of baleen whales taken during the open season caught in any waters south of 40° South Latitude by whale catchers attached to factory ships under the jurisdiction of the Contracting Governments shall not exceed sixteen thousand blue-whale units.

(b) For the purposes of subparagraph (a) of this paragraph, blue-whale units shall be calculated on the basis that one blue whale equals:

(1) two fin whales or
(2) two and a half humpback whales or
(3) six sei whales.

(c) Notification shall be given in accordance with the provisions of Article VII of the Convention, within two days after the end of each calendar week, of data on the number of blue-whale units taken in any waters south of 40° South Latitude by all whale catchers attached to factory ships under the jurisdiction of each Contracting Government.

(d) If it should appear that the maximum catch of whales permitted by subparagraph (a) of this paragraph may be reached before April 1 of any year, the Commission, or such other body as the Commission may designate, shall determine, on the basis of the data provided, the date on which the maximum catch of whales shall be deemed to have been reached and shall notify each Contracting Government of that date not less than two weeks in advance thereof. The taking of baleen whales by whale catchers attached to factory ships shall be illegal in any waters south of 40° South Latitude after the date so determined.

(e) Notification shall be given in accordance with the provisions of Article VII of the Convention of each factory ship intending to engage in whaling operations in any waters south of 40° South Latitude.

9. It is forbidden to take or kill any blue, fin, sei, humpback, or sperm whales below the following lengths:

|     |                 |         |               |
| --- | --------------- | ------- | ------------- |
| (a) | blue whales     | 70 feet | (21.3 meters) |
| (b) | fin whales      | 55 feet | (16.8 meters) |
| (c) | sei whales      | 40 feet | (12.2 meters) |
| (d) | humpback whales | 35 feet | (10.7 meters) |
| (e) | sperm whales    | 35 feet | (10.7 meters) |

except that blue whales of not less than 65 feet (19.8 meters), fin whales of not less than 50 feet (15.2 meters), and sei whales of not less than 35 feet (10.7 meters) in length may be taken for delivery to land stations provided that the meat of such whales is to be used for local consumption as human or animal food.

Whales must be measured when at rest on deck or platform, as accurately as possible by means of a steel tape measure fitted at the zero end with a spiked handle which can be stuck into the deck planking abreast of one end of the whale. The tape measure shall be stretched in a straight line parallel with the whale's body and read abreast the other end of the whale. The ends of the whale, for measurement purposes, shall be the point of the upper jaw and the notch between the tail flukes. Measurements, after being accurately read on the tape measure, shall be logged to the nearest foot: that is to say, any whale between 75′6″ and 76′6″ shall be logged as 76′, and any whale between 76′6″ and 77′6″ shall be logged as 77′. The measurement of any whale which falls on an exact half foot shall be logged at the next half foot, e.g. 76′6″ precisely, shall be logged as 77′.

10. It is forbidden to use a land station or a whale catcher attached thereto for the purpose of taking or treating baleen whales in any area or in any

waters for more than six months in any period of twelve months, such period of six months to be continuous.

11. It is forbidden to use a factory ship, which has been used during a season in any waters south of 40° South Latitude for the purpose of treating baleen whales, in any other area for the same purpose within a period of one year from the termination of that season.

12. (a) All whales taken shall be delivered to the factory ship or land station and all parts of such whales shall be processed by boiling or otherwise, except the internal organs, whale bone and flippers of all whales, the meat of sperm whales and of parts of whales intended for human food or feeding animals.

(b) Complete treatment of the carcasses of "Dauhval" and of whales used as fenders will not be required in cases where the meat or bone of such whales is in bad condition.

13. The taking of whales for delivery to a factory ship shall be so regulated or restricted by the master or person in charge of the factory ship that no whale carcass (except of a whale used as a fender) shall remain in the sea for a longer period than thirty-three hours from the time of killing to the time when it is taken up on to the deck of the factory ship for treatment. All whale catchers engaged in taking whales must report by radio to the factory ship the time when each whale is caught.

14. Gunners and crews of factory ships, land stations, and whale catchers shall be engaged on such terms that their remuneration shall depend to a considerable extent upon such factors as the species, size, and yield of whales taken, and not merely upon the number of the whales taken. No bonus or other remuneration shall be paid to the gunners or crews of whale catchers in respect of the taking of milk-filled or lactating whales.

15. Copies of all official laws and regulations relating to whales and whaling and changes in such laws and regulations shall be transmitted to the Commission.

16. Notification shall be given in accordance with the provisions of Article VII of the Convention with regard to all factory ships and land stations of statistical information (a) concerning the number of whales of each species taken, the number thereof lost, and the number treated at each factory ship or land station, and (b) as to the aggregate amounts of oil of each grade and quantities of meal, fertilizer (guano), and other products derived from them, together with (c) particulars with respect to each whale treated in the factory ship or land station as to the date and approximate latitude and longitude of taking, the species and sex of the whale, its length and, if it contains a foetus, the length and sex, if ascertainable, of the foetus. The data referred to in (a) and (c) above shall be verified at the time of the tally and there shall also be notification to the Commission of any information which may be collected or obtained concerning the calving grounds and migration routes of whales.

In communicating this information there shall be specified:

(a) the name and gross tonnage of each factory ship;

(b) the number and aggregate gross tonnage of the whale catchers;

(c) a list of the land stations which were in operation during the period concerned.

17. Notwithstanding the definition of land station contained in Article II of the Convention, a factory ship operating under the jurisdiction of a Contracting Government, and the movements of which are confined solely to the territorial waters of that Government, shall be subject to the regulations governing the operation of land stations within the following areas:

(a) on the coast of Madagascar and its dependencies, and on the west coasts of French Africa;

(b) on the west coast of Australia in the area known as Shark Bay and northward to Northwest Cape and including Exmouth Gulf and King George's Sound, including the port of Albany; and on the east coast of Australia, in Twofold Bay and Jervis Bay.

18. The following expressions have the meanings respectively assigned to them, that is to say:

"baleen whale" means any whale other than a toothed whale;

"blue whale" means any whale known by the name of blue whale, Sibbald's rorqual, or sulphur bottom;

"fin whale" means any whale known by the name of common finback, common rorqual, finback, finner, fin whale, herring whale, razorback, or true fin whale;

"sei whale" means any whale known by the name of *Balaenoptera borealis,* sei whale, Rudolphi's rorqual, pollack whale, or coalfish whale, and shall be taken to include *Balaenoptera brydei,* Bryde's whale;

"gray whale" means any whale known by the name of gray whale, California gray, devil fish, hard head, mussel digger, gray back, rip sack;

"humpback whale" means any whale known by the name of bunch, humpback, humpback whale, humpbacked whale, hump whale, or hunchbacked whale;

"right whale" means any whale known by the name of Atlantic right whale, Arctic right whale, Biscayan right whale, bowhead, great polar whale, Greenland right whale, Greenland whale, Nordkaper, North Atlantic right whale, North Cape whale, Pacific right whale, pigmy right whale, Southern pigmy right whale, or Southern right whale;

"sperm whale" means any whale known by the name of sperm whale, spermacet whale, cachalot, or pot whale;

"Dauhval" means any unclaimed dead whale found floating.

PLAINTIFFS' EXHIBIT 17

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ APR 23 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNKECHAUG INDIAN NATION and
HENRY B. WALLACE,

          Plaintiffs,

        v.

NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION and
BASIL SEGGOS *in his official capacity as the
Commissioner of the New York State
Department of Environmental Conservation,*

          Defendants.

-------------------------------------------------------------X

  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :

**DECISION & ORDER**
18-CV-1132 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Plaintiffs bring this action challenging the New York State Department of Environmental Conservation's ("NYSDEC") regulations of their fishing rights in designated Reservation and in customary fishing waters. Plaintiffs argue their fishing rights under a treaty preempt the challenged regulations, and the regulations interfere with their freedom of religious expression in violation of the First Amendment to the United States Constitution. NYSDEC and Basil Seggos, the NYSDEC Commissioner (collectively, "Defendants"), filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion to dismiss is DENIED.

## BACKGROUND

On February 21, 2018, Unkechaug Indian Nation (the "Nation") and Henry B. Wallace (collectively, "Plaintiffs") filed a complaint challenging Defendants' actions to regulate, restrict, and criminally prosecute Plaintiffs from fishing in their Reservation and customary fishing waters. *See* Compl. ¶ 1, ECF No. 1. Plaintiffs seek a declaratory judgment from this Court that—based upon inherent native sovereignty, religious freedom and expression, treaties and federal laws—they are not subject to defendant NYSDEC's authority over fishing in reservation lands and Unkechaug customary fishing waters. *Id.*

1

As pleaded in the Complaint, the Nation is a federally recognized Indian Nation and is also legally recognized under the laws of the State of New York. *See id.* ¶ 2 (citing *Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F. Supp. 2d 442, 469-70 (E.D.N.Y. 2009) (Matsumoto, J.)); N.Y. Indian Law § 2. Fishing and whaling have been the Nation's "main economic engine" for centuries. Compl. ¶¶ 2, 28. Nation members also need access to waters to gather crustacean and shells to make wampum for religious and cultural uses. *Id.* ¶¶ 2, 27. Plaintiffs allege Defendants have subjected Plaintiffs, and specifically plaintiff Harry B. Wallace, the Chief of the Nation, to threats and fear of criminal prosecution for exercising their right to fish on reservation waters and in customary fishing waters. *Id.* ¶¶ 4, 20-25. Specifically, Defendants allegedly confiscated fish and fishing equipment from Nation members and issued criminal summonses to other Nation members for fishing on reservation lands and in Unkechaug customary fishing waters. *Id.* ¶¶ 22-23. Hugh Lambert Mclean, the Assistant New York State Attorney General, allegedly threatened to criminally prosecute Chief Wallace based on the New York State Environmental Laws for the sale of glass eels. *Id.* ¶ 25.

Plaintiffs assert several causes of action. First, Plaintiffs argue the state and local regulations asserted by Defendants are preempted by federal law, and the prosecutorial threats and actions by defendant Commissioner Seggos violate federal law, including but not limited to 25 U.S.C. § 232.[1] *Id.* ¶¶ 34-39. Second, the Nation possesses tribal sovereign immunity and the inherent authority to self-govern, which, Plaintiffs contend, shields them from state and local regulations when acting under tribal authority in this action. *Id.* ¶¶ 42-45. Third, Plaintiffs argue Defendants' state and local regulations violate Plaintiffs' freedom of religious expression under

---

[1] 25 U.S.C. § 232 provides in relevant part: "The State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York . . . Provided, That nothing contained in this section shall be construed to deprive any Indian tribe, band, or community, or members thereof, hunting and fishing rights as guaranteed them by agreement, treaty, or custom . . . ."

2

the First Amendment because the regulations restrict their ability to fish and obtain shells needed

for their religious practices. *Id.* ¶¶ 46-53. Fourth and finally, Plaintiffs allege Defendants'

enforcement of state and local regulations interfering with their fishing rights violates the May

24, 1676 treaty entered between the Nation and Governor Andros, providing that the Nation

members "are at liberty and may freely whale or fish for or with Christians or by themselves and

dispose of their effects as they think[] good . . . ." *Id.* ¶¶ 55-56. Plaintiffs seek declaratory relief

and a permanent injunction against attempts by Defendants to impose fishing restrictions on

Plaintiffs and to criminally prosecute them under state and local environmental laws. *Id.* at 11-

12.

On February 28, 2019, Defendants filed their fully briefed motion to dismiss this action,

and Plaintiffs filed their opposition thereto. *See* ECF Nos. 27-29. In support of their motion,

Defendants argue: (1) the Complaint fails to state any plausible claims; (2) Plaintiffs' action is

barred by the Eleventh Amendment of the United States Constitution; and (3) certain claims are

not justiciable. *See* Def. Mem. in Support of Mot. to Dismiss ("Def. Mem."), ECF No. 28-1. In

response, Plaintiffs argue they all have standing, each claim is justiciable and arises from a "case

or controversy," and the Eleventh Amendment does not bar their claims pursuant to *Ex Parte

Young*. *See* Pls. Opp. to Mot. to Dismiss ("Pl. Mem."), ECF No. 27. The Court held oral

argument on the motion on April 15, 2019. At the oral argument, the Court issued an oral ruling

denying Defendants' motion to dismiss. The Court now provides a written decision and order

setting forth the reasons for its ruling.

## LEGAL STANDARDS

An action may be dismissed under Rule 12(b)(1) of the Federal Rules Civil Procedure for

lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional

power to adjudicate" the case. *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (citation omitted). Plaintiffs bear the burden of showing that subject matter jurisdiction exists. *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141 (2d Cir. 2011). In reviewing a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court must accept all material factual allegations in the complaint as true. *See Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992); *see also Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.À.R.L*, 790 F.3d 411, 417 (2d Cir. 2015) ("In assessing the plaintiff's assertion of standing, we accept as true all material allegations of the complaint[.]" (internal quotation marks omitted)). The district court "may also rely on evidence outside the complaint." *Cortlandt*, 790 F.3d at 417.

When ruling on a motion to dismiss for failure to state a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts should construe the complaint "liberally, accepting all factual allegations . . . as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). So long as a claim is "plausible on its face," dismissal is inappropriate. *Sharkey v. Quarantillo*, 541 F.3d 75, 92 (2d Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In considering a motion to dismiss, the Court must accept all of the non-movant's factual allegations as true and draw all

4

reasonable inferences in the non-movant's favor. *Id.* at 555. However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

## ANALYSIS

### I.    The Eleventh Amendment

The parties do not dispute defendant NYSDEC is a state agency, and defendant Seggos is a state official. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. As such, "[a] State is thus immune from suits in federal court brought by its own citizens and such immunity extends to officers acting on behalf of the State." *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015) (Kuntz, J.) (internal citation and quotation marks omitted). State agencies considered "arms of the state" are also entitled to sovereign immunity under the Eleventh Amendment. *McGinty v. New York*, 251 F.3d 84, 95-96 (2d Cir. 2001). Sovereign immunity applies to suits against states brought by Indian tribes. *See Seminole Tribe v. Florida*, 517 U.S. 44, 55 (1996).

Eleventh Amendment immunity exists unless: (1) a state waives immunity; (2) Congress clearly abrogates state sovereign immunity; or (3) the suit is against a state official seeking prospective relief. *See Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 254-55 (2011); *Lapides v. Bd. of Regents*, 535 U.S. 613, 619 (2002); *Fitzpatrick v. Bitzer*, 427, U.S. 445, 455-56 (1976). Consent to suit is not lightly inferred, and federal courts strictly construe statutes allegedly providing consent to suit. *See Edelman v. Jordan*, 415 U.S. 651, 673-74 (1974); *Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 53-54 (1944). A state waives immunity by, for example,

5

subjecting itself to suit in federal court—it does not waive immunity by consenting to suit in its own courts. *Lapides*, 535 U.S. at 618-20.

Under the *Ex Parte Young* exception, "the Eleventh Amendment does not bar a suit against a state official when that suit seeks . . . prospective injunctive relief." *Seminole Tribe*, 517 U.S. at 55 (citing *Ex Parte Young*, 209 U.S. 123 (1908)). The *Ex Parte Young* fiction exists because "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office*, 563 U.S. at 254. Moreover, it is not necessary for the state official to have allegedly violated the law before being sued for the exception to apply since the relief sought is prospective. *See, e.g.*, *Ex Parte Young*, 209 U.S. 123 (1908) (upholding injunction against state attorney general preventing him from enforcing a railroad rate-reduction law that provided severe penalties for noncompliance). This exception "applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, and has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citation omitted). A court must "conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" when determining whether *Ex Parte Young* applies. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted).

Defendants argue no exception to sovereign immunity applies to the instant action, and therefore the Eleventh Amendment bars Plaintiffs' claims in their entirety. *See* Def. Mem. at 10-12; Def. Reply Mem. of Law in Further Support of Mot. to Dismiss ("Def. Reply") at 5-7, ECF No. 29. First, Defendants contend the Eleventh Amendment bars any claim against NYSDEC as

6

a state agency. Def. Mem. at 10. Second, they argue *Ex Parte Young* does not apply to

defendant Seggos because there is no evidence Plaintiffs can "'reasonably expect to encounter'"

enforcement of the regulations at issue in the future. *Id.* at 10-11 (quoting *Riley v. Cuomo*, 17-

CV-1631, 2018 WL 1832929, at *5 (E.D.N.Y. Apr. 16, 2018) (Spatt, J.)). In Defendants'

reading of the Complaint, "there are no factual allegations demonstrating that Plaintiffs are

actively planning to fish for glass eels and/or harvest crustaceans. . . . [I]f Plaintiffs do not intend

to do these things, there is no reasonable expectation that they will encounter enforcement of"

the regulations at issue. *Id.* at 11. There also are no allegations defendant Seggos himself

threatened to prosecute Plaintiffs for fishing, according to Defendants. *Id.* at 11-12. In their

reply to Plaintiffs' memorandum, Defendants claim because Plaintiffs do not dispute

Defendants' Eleventh Amendment defense, "these arguments . . . must be deemed conceded."

Def. Reply at 2. Despite this contention, Defendants respond to Plaintiff's waiver argument by

claiming Defendants did not waive immunity because they did not invoke federal jurisdiction.

*Id.* at 6-7.

   In response, Plaintiffs first argue defendant NYSDEC waived sovereign immunity when

it "used coercive power of arrest and threatened to charge Chief Wallace with felony

prosecution." Pl. Mem. at 22-23 (citing *Native Am. Mohegans v. United States*, 184 F. Supp. 2d

198, 201 (D. Conn. 2002)). Second, in Plaintiffs' view, the relief they seek—"recognition of

[their] rights to fish and depose of the fish consistent with their customs"—is permissible under

*Ex Parte Young*. *Id.* at 18. With respect to defendant Seggos, Plaintiffs allege the NYSDEC

confiscated property of the Nation and threatened to criminally prosecute plaintiff Wallace

"under the direction of Seggos." Pl. Mem. at 10-11. Plaintiffs also argue "Seggos directed

continuing criminal prosecution and confiscation of eels from the Plaintiffs in violation of the

7

Plaintiffs['] sovereign rights as an Indian Nation and under the Andros Treaty." *Id.* at 18. Plaintiffs cite several instances in which Seggos allegedly directed other officials to violate the rights of Plaintiffs. *See id.* at 19.

Defendant Seggos is a proper party to this action under *Ex Parte Young*. Plaintiffs have plausibly alleged there are threats of violations of federal law given a past practice of threats of criminal prosecution and recent statements suggesting this practice will continue in the future. *See* Compl. ¶¶ 20-27, 31. In response to Defendants' contention there is no harm Plaintiffs "can reasonably expect to encounter" in the future, Plaintiffs point to the letter from defendant NYSDEC's General Counsel, Thomas S. Berkman, as evidence of future actions that would violate Plaintiffs' treaty rights. *See* Pl. Mem. at 11; *see also* Compl. ¶ 31. Moreover, the relief they seek is clearly prospective: Plaintiffs do not seek a judgment holding Defendants violated federal law in the past but instead seek a declaration from this Court shielding them from future threats of prosecution in violation of their treaty rights. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). "The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law— clearly satisfies [the Supreme Court's] 'straightforward inquiry.'" *Verizon Md., Inc.*, 535 U.S. at 645.

The Court also finds rather illogical Defendants' contention that "there are no factual allegations demonstrating that Plaintiffs are actively planning to fish for glass eels and/or harvest crustaceans." Def. Mem. at 11. The Complaint explicitly states Nation members "always maintained the right to fish that included the harvesting of eels and sea crustaceans for the shells to make wampum. . . . The traditional methods of creating wampum are complex and requires many skills that were passed down from generation to generation by the Unkechaug *and are*

8

*used today* to make the sacred wampum." Compl. ¶ 3 (emphasis added); *see also* Declaration of Harry B. Wallace, Ex. 1 at 3, ECF No. 31-1 ("The Nation continues to fish in violation of the NYSDEC laws and shall continue to exercise our rights to fish despite the NYSDEC laws and criminal prosecution."). If seeking declaratory relief regarding their ability to fish were not enough to reflect their intent to fish in the future, Plaintiffs' repeated statements of their intent to actively fish for glass eels and harvest crustaceans certainly are.

The Court also concludes defendant NYSDEC is a proper party to this action at this stage in the litigation. Although it is not entirely clear that NYSDEC has explicitly waived immunity from suit, the Complaint alleges the Assistant New York State Attorney General Hugh Lambert McLean threatened to criminally prosecute plaintiff Wallace "unless the Nation would file an action in Federal Court asserting its rights." Compl. ¶ 25. Accepting this statement as true at the motion-to-dismiss stage, *see Cortlandt*, 790 F.3d at 417, defendant NYSDEC may have "voluntarily" appeared in federal court, thereby consenting to federal jurisdiction. *See Lapides*, 535 U.S. at 619-20 (detailing the "general principle" that a State consents to a federal suit when "it voluntarily invoked the federal court's jurisdiction" such that the Eleventh Amendment does not apply). The Court is conscious, however, that concluding a state agency has consented to suit in federal court is not lightly inferred. *See Edelman*, 415 U.S. at 673-74. Should Plaintiffs be unable to identify additional evidence of Defendants invoking federal jurisdiction, the Court very well may conclude defendant NYSDEC is not a proper party to the action.

## II.    Standing and Justiciability

Defendants also argue certain claims raised by Plaintiffs should fail on justiciability grounds, and Plaintiffs do not have standing to bring their religious expression claim.

9

Because federal courts may hear only actual cases or controversies, litigants must "satisfy the 'irreducible constitutional minimum' of Article III standing" before their claims may be properly heard in federal court. *Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2d Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To establish standing, a plaintiff must have first suffered an "injury in fact, . . . an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016). Second, a plaintiff must show the injury is "fairly traceable" to the defendant's challenged action. *Lujan*, 504 U.S. at 560 (alterations omitted). Third, a plaintiff must show "the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted). When a plaintiff raises a preenforcement challenge, a plaintiff need not "await and undergo a criminal prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Instead, "a plaintiff has standing to make a preenforcement challenge when fear of criminal prosecution . . . is not imaginary or wholly speculative." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (internal quotation marks omitted).

A claim must also be ripe for judicial review. "To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (internal quotation marks omitted). Ripeness is intended to avoid the "premature adjudication" of abstract disagreements. *Id.* (internal quotation marks omitted). If, on the other hand, subsequent events make it clear the allegedly wrongful behavior "could not reasonably be expected to recur," the case may be mooted. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)

10

(internal quotation marks omitted). Challenged conduct that is "capable of repetition yet evading review" will not be deemed moot if the plaintiff possessed standing at the time the action commenced. *Id.* at 190-91.

Defendants argue Plaintiffs' challenges to the regulation with respect to on-reservation fishing are moot because N.Y. Environmental Conservation Law § 11-0707(8) permits hunting, fishing, and trapping within their reservation. Def. Mem. at 13. Defendants also argue Plaintiffs' First Amendment claim—to the extent Plaintiffs argue Defendants "are seeking to impose *additional* regulations on the harvest of crustaceans"—is not ripe for the Court's review. *Id.* at 14. They further argue Plaintiffs lack standing to raise their First Amendment claim because they do not identify the Nation's religious practices or individuals as adherents of the Nation's faith. *Id.*; *see also* Def. Reply at 4. With respect to plaintiff Wallace, Defendants argue he does not have standing because "the Complaint fails to actually allege that he is an adherent of the Unkechaug faith . . . ." Def. Mem. at 15. Because the Nation is a "non-sentient entity" that cannot have religious beliefs, it similarly does not have standing to pursue a religious interference claim in Defendants' view. *Id.* at 15 & n.9.

In response, Plaintiffs argue they have standing to bring their claims because they have shown a genuine threat of prosecution by Defendants that establishes an injury-in-fact. Pl. Mem. at 12-13. Following the standard set forth in *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010), Plaintiffs contend they have: (1) articulated a concrete plan to violate the laws in question because Plaintiffs continue to follow their own ancestral regulations for fishing; (2) defendant NYSDEC has confiscated property and communicated a specific threat to initiate criminal proceedings; and (3) there is a history of past prosecution and enforcement under the challenged

11

laws. *Id.* at 13-17 (citing *Wolfson*, 616 F.3d at 1058). Accordingly, in Plaintiffs' view, they have established an injury-in-fact for purposes of Article III standing.

In response to Defendants' contention their First Amendment claim is either not ripe or fails to state a plausible claim, Plaintiffs cite to a policy statement from defendant NYSDEC, which states: "The department recognizes that hunting, fishing and gathering are activities of cultural and spiritual significance to the Indian Nations." Pl. Mem. at 23-24 (citing Ex. 5 at 5, ECF No. 31-36). This statement, in Plaintiffs' view, is in direct conflict with Defendants' argument. *Id.* In addition, Plaintiffs provide further detail on their religious and spiritual beliefs, explaining "the Unkechaug people have an obligation to maintain their traditions and spiritual beliefs based upon their relationship to the natural world. . . . Their Tribal symbol emphasizes the power of the natural world that has sustained their people and their way of life." *Id.* at 24.

The Court agrees Plaintiffs have established standing to bring their preenforcement challenges against Defendants. Plaintiffs' intent to fish in Reservation and customary fishing waters is evident from their Complaint, such that they possess "concrete plans" that could be subject to criminal prosecution by Defendants, taking the allegations of the Complaint as true at this stage. Plaintiffs do not aver "mere some day intentions to commit an act," but instead have articulated a concrete plan, including fishing in waters they consider customary under their treaty rights, which would violate the regulations in question. *Jones v. Schneiderman*, 101 F. Supp. 3d 283, 291 (S.D.N.Y. 2015) (Wood, J.) (internal quotation marks omitted) (citing *Wolfson*, 616 F.3d at 1058); *see also Nat'l Org. for Marriage*, 714 F.3d at 687; *Skokomish Indian Tribe*, 994 F. Supp. 2d 1168, 1182 (W.D. Wash. 2014) ("[T]he fact that Skokomish Indian Tribe members have been prosecuted while exercising their Treaty hunting rights in the past supports their claim that the alleged threat of prosecution today is genuine.")). Moreover, in addition to citing past

12

criminal summonses and seizure of property from 2014 and 2016, Plaintiffs also cite in their

Complaint a 2018 article discussing defendant NYSDEC's position that the fishing regulations

apply to any water outside reservation boundaries—therefore including Plaintiffs' customary

fishing waters. *See* Compl. ¶ 20. As such, Plaintiffs have alleged sufficient facts to show they

can "reasonably expect to encounter" a genuine threat of criminal prosecution in the future to

confer standing. *See Cayuga Nation*, 824 F.3d at 331.

The Court further concludes Plaintiffs have standing to bring their religious expression

claim, and this claim is ripe for review. First, the Complaint makes several references to the

continuing religious and cultural practices of Plaintiffs that would interfere with the regulations

at issue. *See, e.g.*, Compl. ¶¶ 27, 32, 47-53. At this stage, the Court must accept these

allegations as true, and the Court finds Plaintiffs' religious beliefs and practices to be sincere.

Second, the Nation may bring a religious expression claim on behalf of its members. *See Lyng v.*

*Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 441-42, 447 (1988) (reaching the merits of

a religious expression claim on behalf of members of three American Indian tribes); *Havasupai*

*Tribe v. United States*, 752 F. Supp. 1471, 1484-85 (D. Ariz. 1990) (same). Defendants cite no

case law to support their assertion the Nation does not have standing in this regard. Finally, on

the face of the Complaint, Plaintiffs clearly allege they have a treaty right to fish in waters within

their Reservation as well as in customary fishing waters, which is a material issue disputed in

this action. The regulation Defendants cite, Law § 11-0707(8), does not moot the Complaint

because it makes no reference to customary fishing waters.

## III. Failure to State a Claim Under Rule 12(b)(6)

Defendants argue Plaintiffs fail to allege sufficient factual detail in their Complaint.

Specifically, they argue the Complaint is generally factually sparse, fails to describe adequately

"the scope of the geographical area" of "customary waters," and also fails to sufficiently describe the religious activities in question. Def. Mem. at 7-8. As such, Defendants argue Plaintiffs fail to state a claim, and the Complaint should be dismissed in its entirety. *Id.* at 9.

Plaintiffs aver they have a right under the Andros Treaty of 1676 to "freely whale and fish for or with Christians or by themselves and dispose of their effects as they think[] good according to Custom[.]" Pl. Mem. at 6 (citing Andros Papers, 1674–1676 Dec. JFS Ex. 2, ECF No. 31-2). Because the treaty does not limit their right to fish to the reservation, in Plaintiffs' view, their right to fish should extend to what the Nation considers to be its customary waters, as they seek a declaration of their fishing rights under the language of the treaty. *Id.* Indeed, Plaintiffs allege in their Complaint the location of the specific shells traditionally used to make wampum is "[t]he customary Unkechaug fishing waters in Poospatuck Bay, off the reservation land." Compl. ¶ 32.

At this time, Plaintiffs have plausibly alleged Defendants are enforcing regulations and threatening criminal prosecutions that conflict with their treaty rights. Under federal law, "the language of [an Indian] treaty should be understood as bearing the meaning that the [Indian tribe] understood it to have" at the time it was entered. *Wash. St. Dep't of Licens. v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1011-12 (2019); *see also Washington v. Wash. St. Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675-76 (1979) (noting the rule that treaties are interpreted in light of "the intention of the parties" and "in the sense in which [the treaty's words] would naturally be understood by the Indians" (internal quotation marks omitted)). As such, the Complaint plausibly alleges Plaintiffs' treaty rights preempt Defendants' challenged regulations. *Accord Tulee v. Washington*, 315 U.S. 681, 685 (1942) (holding fishing rights reserved in a treaty preempted the State's application of a fishing licensing fee to a Yakima fisherman).

14

Defendants do not even directly address Plaintiffs' claim regarding treaty rights and in fact state they are not disputing its enforceability "in the instant motion" but instead will challenge the "document" if the Complaint is not dismissed. *See* Def. Reply at 1-2 & n.2.

The Court also concludes Plaintiffs have plausibly alleged a First Amendment claim. Plaintiffs explain "the Unkechaug people have an obligation to maintain their traditions and spiritual beliefs based upon their relationship to the natural world. . . . Their Tribal symbol emphasizes the power of the natural world that has sustained their people and their way of life. . . ." Pl. Mem. at 24-25. As previously discussed, the Complaint makes several references to the continuing religious and cultural practices of Plaintiffs that would interfere with the challenged regulations. *See, e.g.*, Compl. ¶¶ 27, 32, 47-53. Accepting these factual allegations as true, the Court is satisfied Plaintiffs have alleged a legally cognizable burden upon their religious expression; accordingly, their First Amendment claim survives Defendants' motion under Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motion pending at ECF No. 28.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 18, 2019
      Brooklyn, New York

PLAINTIFFS' EXHIBIT 18

Summary under the Criteria and Evidence

for the Proposed Finding

for Acknowledgment of the

Shinnecock Indian Nation (Petitioner #4)

Prepared in response to a petition
submitted to the Secretary of the
Interior of Federal Acknowledgment that
this group exists as an Indian tribe.

Approved on: _December 14, 2009_

_____

Acting Principal Deputy Assistant Secretary – Indian Affairs

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Criterion 83.7(a)

In 1950, the *Manual for the Use of the Legislature of the State of New York* lists population
figures for New York's "Indian Reservations," including a "Shinnecock" reservation near
Southampton on Long Island (Curran 1950). In 1952, New York's "Report of Joint Legislative
Committee on Indian Affairs" referred to the petitioner as an American Indian entity when it
discussed the Shinnecock Indians and their "Shinnecock Reservation" (NY 2/26/1952). A 1956
contract to provide transportation for school children on the "Shinnecock Indian Reservation"
also identifies the petitioner as an American Indian entity (NY State Indian School 10/29/1956).
A 1959 article states that "the tribe's members" are the "joint owners of the 1,000 acres of land"
on the "Shinnecock Indian reservation" and are "wards of the state [of New York]" (*Long Island
Press* 10/4/1959).

In 1960, the *Manual for the Use of the Legislature of the State of New York* lists population
figures for New York's "Indian Reservations," including a "Shinnecock" reservation near
Southampton on Long Island (Simon 1960). In 1960, New York State passed a law entitled, "An
Act to enable Douglas King or his successors in interest to maintain action against the
Shinnecock Tribe of Indians and to enable the Shinnecock Tribe of Indians to defend such
actions . . . [regarding certain property] at Hampton Bays, town of Southampton, Suffolk County,
New York" (NY Laws 4/7/1960). A 1966 article, "L. I. Tribe Is Host to Indian Powwow,"
discusses the "Indians" of the "Shinnecock reservation" (*New York Times* 9/6/1966). In 1969,
New York State passed a law entitled, "An act making an appropriation to the State Bureau of
Indian Affairs for the construction of fire wells on the Shinnecock Indian Reservation in Suffolk
County" (NY Laws 5/22/1969). New York State intended this appropriation to serve the
population on the Shinnecock Indian Reservation, and it is an acceptable identification for
criterion 83.7(a).

In 1970, the *Manual for the Use of the Legislature of the State of New York* lists population
figures for New York's "Indian Reservations," including a "Shinnecock" reservation near
Southampton on Long Island (Lomenzo 1970). A 1971 article, "Shinnecock Indians Resist
Tempting Bids for Land," notes that "the trustees represent the tribe in legal matters" (*New York
Times* 3/14/1971). A 1973 doctoral dissertation examines culture change in the "Shinnecock
Indian Tribe" (Laudin 1974, 4). In 1974, a newspaper discussing Long Island Indians and
Thanksgiving notes that "Charles Smith, 56, has been one of the Shinnecock tribe's three ruling
trustees for 25 years as Chief Red Fox" (*Newsday* 11/24/1974). A 1977 report from the U.S.
Department of Commerce, "Aquaculture, Fisheries, and Food Processing as a Combined
Economic Development Option for Indian Communities," has a chapter entitled, "Designing a
Food Processing Industry for the Shinnecock Tribe." The chapter states that the "Shinnecock
Indian Tribe . . . is presently engaged in the production of shellfish" (U.S. Dept of Commerce,
40; see also 41-65). A 1979 article, "Shinnecock Indians Aiming for First Industry," notes a
"400-acre Shinnecock Indian Reservation" and that the "Shinnecock Indians" are a "tribe that is
little known to the surrounding area" (*New York Times* 11/11/1979).

In 1980, the *Manual for the Use of the Legislature of the State of New York* lists population
figures for New York's "Indian Reservations," including a "Shinnecock" reservation near
Southampton on Long Island (Paterson 1980). A 1984 article, "Indian's Case Due in Court,"
mentions that there is a "particular issue of who does have authority on the reservation," and that

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Criterion 83.7(c)

**Criterion (c)**

83.7(c)   **The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present.**

**(2) A petitioning group shall be considered to have provided sufficient evidence to demonstrate the exercise of political influence or authority at a given point in time by demonstrating that group leaders and/or other mechanisms exist, or existed, which:**

**i) Allocate group resources such as land, residence rights and the like on a consistent basis.**

<u>Background and Overview</u>

*Evidence sufficient in itself to meet criterion 83.7(c)*

Criterion §83.7(c)(2)(i) indicates that a petitioning group shall be considered to have provided sufficient evidence to demonstrate the exercise of political influence or authority by demonstrating that mechanisms exist which allocate group resources such as land, residence rights, and the like on a consistent basis.  This PF finds that evidence demonstrates that, from 1789 to the present, the Indian group living at and near Shinnecock Neck in Suffolk County, Long Island, has exerted authority over the use of its land and resources, and that an on-going system of Indian Trustees has regulated reservation land use.  Elected Trustees allocated residential sites, fields for cultivation and grazing, wood, seafood, and other resources connected to the land and tidal areas under the group's control.  These leaders consistently controlled access to resources not only to group members but also to non-Indian short-term leaseholders.  Leases of common lands to outsiders produced income, which the group used for their common benefit.

In addition, through consensual decision-making and joint actions, the group has protected the land and resource base from trespass by non-Indians or encroachments by unauthorized persons building on its lands or taking wood, seaweed, and other resources without permission.  They have regulated hunting and fishing there.  Since at least 1850, the group has maintained a cemetery for the exclusive use of its members and their spouses.  Finally, the group has significantly influenced economic activities by its members by controlling access to agricultural fields, woodlots, seafood collection areas, allotments with access from Montauk Highway, where individual Shinnecock operate businesses, and other resources.  Aspects of these economic activities have sometimes involved cooperative labor such as field burning, laying out and fencing common fields, excavating wells, and hauling lumber and firewood.

35

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Criterion 83.7(c)

the *Indian Records Books* were either silent on land and resource allocations or unavailable. To cure this absence of evidence, OFA evaluated other records submitted by the petitioner and parties or located by OFA researchers. These records included evidence of court actions involving the group or individuals in the group and commonly held land and resources, local histories, government reports, newspaper articles, and official censuses. Since 1958, oral interviews, corroborated by council and Trustee meeting minutes and other documents, have also provided information about land allocation and other management activities of the Trustees. The combined evidence provides continuous coverage to show the group's consistent allocation and management of its resources, economic cooperation, and control of behavior from 1789 to the present.

The evidence demonstrates that, before 1816, in a regulated process, individuals sometimes leased out to non-Indians some of the lands assigned to them by the Indian Trustees during an annual "draw," or lottery. The Town Clerk collected the lease payments on their behalf. The Trustees also reassigned houses and out buildings, drew boundaries between residents, and controlled land use in general on the reservation. They regulated fencing, roads, and the annual burning of the fields. Between 1800 and 1822, they persisted in defining their membership to include people they believed had rights to use Indian lands or participate in the annual "draw" for lands to lease out, despite apparent pressure from Town officials not to include them. Evidence from news stories and litigation documents indicates that the residents argued often with non-Indian neighbors over grazing leases on the Indian leasehold between 1838 and 1860 (*Long Islander* 1845; New York Court of Appeals 3/-/1860). From 1880 to 1900, they continued to lease lands to non-Indians. On occasion, they rented piers to non-Indian summer residents and leased rights to harvest oysters and seaweed. Repeatedly, they objected to attempts by non-Indians to whittle away acreage from the reservation in the 20th century. They hired attorneys to represent them in these suits, to advise them on other matters, and to write leases at their instructions.

The group maintained leases with no more than 10 or 15 outsiders per year between 1792 and 1815 and after 1880 until the mid-20th century. The proceeds from individual "draws," which were then leased benefitted individuals. The group used the proceeds from leases of the common lands and resources for the benefit of the group. These proceeds improved the reservation, built fences, maintained the church or churches, and, on occasion, supported the elderly and poor. Little evidence revealed how the Shinnecock group actually managed the money, but, before 1830, the Town Clerk handled it. Sometime between 1834 and 1880, probably around 1859, the Town Clerk stopped managing lease payments. The *Indian Records Books* became available again in 1880. These records indicated that the group encountered some problems, especially when Trustees acted without authorization of all the Trustees or the group's voters. The group punished those who had acted without authority. From 1880 to 1980, the *Indian Records Books* indicate that the group discussed how to spend the money in meetings of the group's men.

In general descriptions published in 1845, 1864, and 1865 local historians discussed what they had witnessed on the reservation from 1818 to 1865 (Fithian 1864; Hough 1865; Prime 1845). They indicated that the Trustee system continued to provide a mechanism to manage and guard the communal land base and resources during the mid-1800s. They described a group living in a distinct Indian settlement called "Shinnecock Neck," where residents farmed, raised livestock,

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Criterion 83.7(c)

natives'" of other continents that have come to America (Prime 1848, 120). Between 1838 and 1860, the Shinnecock dealt with these litigations concerning rights to the Shinnecock Hills, and at one point, a group of Shinnecock men and women mounted a non-violent demonstration by seizing a large herd of sheep (*New York Daily News*, 12/15/1853).

Southampton sued Vincent Cuffee, identified as "one of the Shinnecock tribe of Indians," for grazing animals on the Shinnecock Hills in 1838, three years after *Indian Records Book* 2 documented the last Trustee election (New York Court of Appeals 3/-/1860). In March 1850, the Town Trustees sued Vincent Cuffee again for overgrazing part of the Shinnecock lease. In 1845, Vincent Cuffee, a Shinnecock resident, was a Deacon at the annual June Meeting, attended by Indians from several communities (*Indian Assemblage of 1845* 1845). He had also served as Shinnecock Trustee from 1830 to 1834 and would serve again in 1862. It is likely that the suit named him because of his stature as a leader. In two other actions before 1853, Luther Bunn and Oliver Kellis, leasehold residents, sued non-Indians for "taking and carrying away sea weed" from the "shores of Shinnecock Bay" (New York Court of Appeals 3/-/1860). The seaweed suits did not involve individual home allotments, barns, or gardens. No one had individual claims to the seaweed, nor did Cuffee have an individual claim to pastures. These cases concerned the resources held in common by the Shinnecock group. Two men named in the titles acted as Shinnecock Trustees during periods when the *Indian Records Books* 2 and 4 documented elections. Luther Bunn, like Vincent Cuffee, served as Trustee in 1834.

In 1853, a local sheep owner sued two brothers, Luther and James Bunn, and Francis Willis, a non-Indian married to Acenthia Cuffee. The suit continued through the final appeal in 1859. The dispute began when sheep damaged the Indians' corn on the Shinnecock Hills, and a group of at least 16 Indians seized 320 of the sheep in retaliation. In addition to the Bunn brothers and Francis Willis, the Shinnecock answer brief listed 13 other people,[55] who represented households enumerated on the 1850 Federal census, most likely on the leasehold in the settlement at Shinnecock Neck. Court documents indicate that they had not planted corn on the Shinnecock Hills for several years before 1853, but in that year they planted 19 separate parcels, which they did not fence (New York Court of Appeals 3/-/1860). The Indians argued before the court that they wanted the animals as compensation for their losses, even though Suffolk County had already returned the sheep to their owners (New York Court of Appeals 3/-/1860). The Shinnecock acted together to protest what they viewed as encroachments on their fields by non-Indians' livestock. Newspaper coverage described the case as an action against "the Indians" and as a test of the 1703 "1,000-year" lease. The question before the court was "whether the Indians, when they plow and plant any portion of Shinnecock Hills, are obliged to surround each plowed land with fences, in order to protect their crops from the cattle of the leasors" (*New York Daily Times* 12/15/1853). The Indians lost when the Court found the 1703 lease required Indians to fence their crops for 7 months in the winter. Wicks Cuffee, one of the 13 named on the answer brief, filed a countersuit. He had been Trustee in 1835, the last year *Indian Records Book*

---

[55] Named in addition to Bunn, Bunn, and Willis are Stephen Walker, David Bunn, Paul Cuffee, Wicks Cuffee, Oliver Killis, Ann [Walker] Williams, Darius Jackson, Thomas Beman, Minerva [Walker] Green, Age[e] Cuffee, Charles Killis, James Lee and Charles Smith." All of these people lived on the reservation according to their statements. Although at least three non-Indians and a Montauk man are listed; all of them are married to Shinnecock women, according to the petitioner's genealogical database. The 1850 Federal census recorded these indivdiauls consecutively, thus indicating that it was the reservation being enumerated on those schedules. The schedule document did not specifically name the reservation.

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Criterion 83.7(c)

The *Indian Records Books* describe the allocation of lands after 1880 using physical features of roads, streams, and fields. The names of people allotted on neighboring lands, apparently between 1835 and 1880, appear in land descriptions made after 1880. These names provide circumstantial evidence that lands were allocated and inherited during the period covered by the missing *Indian Records Book* 3. For example, Indian records show that the Trustees leased out two acres of land to non-Indian Peter H. Howell in 1896. The land description states the boundaries of Howell's new allotment. To the north is a road leading to John Thompson. Andrew Cuffee occupies land to the west land and Nettie Eleazer land to the south. To the west is land occupied by F. H. Williams. Andrew Cuffee, named in this 1896 land description, was born in 1830, came of age in 1851, and was married in 1858. By 1865 he, his wife, and two children lived in their own home, where the 1865 State census of the reservation enumerated them. Their parents were still alive, so it is unlikely that they inherited their property. That the Andrew Cuffee has a home on the reservation implies that land was allocated to him, his wife, or the couple sometime between 1851 and 1865. A similar example involves Mrs. Emma J. (Cuffee) Lee, the widow of Ferdinand Lee. The 1865 State census shows the couple living in the home of her father Vincent Cuffee on the reservation. Sometime between 1865 and 1880, however, she received land on her own or as part of a married couple, or inherited it as a spouse. *Indian Records Book* 4 contains numerous similar examples of people, who most likely received or inherited land between 1834 and 1880, named in boundary descriptions.

The Trustees generally did not interfere in inheritance of family properties. An 1889 State report described "their law of intestate succession." It stated, "Upon the death of her husband, the wife usually takes all of his estate; if the wife be dead, all things being equal, the eldest daughter inherits, but if there be any child apparently in great need of the property than any other, that one receives the estate" (New York General Assembly 2/1/1889, 55). Most of the time in more recent times, inheritance ran according to a family's wishes. According to interviews in 2009 and an ethnography in 1983, the Trustees became involved only if irreconcilable differences arose among family members. Interviews in 2009 indicated that people often wrote wills leaving their homes and allotments to specific family members.

*Political Authority on Shinnecock Reservation: 1880 to 1940*
After 1880, Trustees faced annual elections held in the school on the reservation (*Indian Records Book* 4/6/1880; 5/11/1880) or in the Presbyterian Church in Southampton, where the New England-style Town meeting met each year on the first Tuesday in April. The Trustees also met in the Town Clerk's home or other places (*Indian Records book* 10/4/1880). The Trustees gave permission for non-Indians to lease or rent lands. For example, in the 1880s and 1890s, the painter William Merritt Chase and the Shinnecock Trustees signed annual agreements, which allowed the celebrated artist and his students in the "Shinnecock School of painting" to paint on the reservation for educational purposes and to use reservation boating facilities. Trustees more commonly leased pasturage or farmland to non-Indians. The Trustees also auctioned seaweed privileges "for the good of the tribe," and "the pasture field" (*Indian Records book* 5/11/1880; 4/11/1881). Trustees made administrative decisions involving fences and gates. The Shinnecock electorate voted on matters, such as the number of seaweed lots to rent to outsiders. They voted not to lease out quail rights (*Indian Records book* 4/13/1883). They voted to pay to clean the schoolhouse (*Indian Records Book* 4/11/1881; 4/13/1883; 5/2/1883; 4/8/1884). They leased land

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Criterion 83.7(c)

responsibility because they have the authority over residency on the reservation, land allocation, and preservation and maintenance of the land base and its resources.

As members of the group, particularly women, agitated in the 1970s and 1980s for more attention being paid to the quality of life on the reservation, members increasingly called upon the Trustees to deal with issues only coincidentally related to land and resources. Events, issues, and problems that happened on the reservation became the concern of the Trustees because they occur on reservation lands. This means that an issue as small as a burned out street light to issues as important as the availability of health care on the reservation ultimately become their concern. After 1980, increasing numbers of programs called for the Trustees' attention, including programs funded by the Federal Office of Economic Opportunity, Indian Education, and the Economic Development Administration's oyster project (M. Smith 9/12/2009).

There is evidence that by 1980, safety and security issues on the reservation were alarming some residents. In the February 1980 newsletter, there were references to a theft and robbery and to a dangerous situation in the community center where children were present, possibly involving drinking and gunplay near children. The Trustees sent a message by way of the newsletter warning people about trespassers—defined as anyone not a blood Shinnecock or their spouse— and handling fire arms and hunting and fishing rules. A 1982 notice, stamped "Official" at the bottom, laid out three "laws … effective immediately." The law limited the amount of time non-blood member guests may stay on the reservation to a "total of two weeks yearly." It also prohibited non-members who have trespassed or committed other offences "against the tribe" from ever living on the reservation, even "upon marriage to a tribal member," and required documentation of marriage and birth certificates before being assigned land (J. Eleazer et al. 7/26/1982 [3?]). According to a man who was Trustee during these events, the residents voted to have these "trespassers" removed from the reservation.

Most of the eleven trespassers left on their own volition; however, four stayed. The Trustees sent out four letters on July 27, 1983, to three women and one man asking them to document that they were married to demonstrate that a "non-Shinnecock guest" in their home was their legally married spouse (J. Eleazer, et al. 7/27/1983). At least two of the recipients were close relatives of a Trustee. Evidence indicates that these actions continued, and, if the recipient did not respond appropriately, the Trustees asked Suffolk County to evict them. For example, in May 1988, the Suffolk County District Attorney's office notified a member that the Trustees had lodged a "formal complaint … that a young female, identity unknown, who is not a member of the Shinnecock Tribe, presently lives in your residence on the Shinnecock Reservation" (Hovani 5/2/1988). The letter stated that under "Indian Law of the State of New York, the District Attorney is obliged to institute a proceeding in County Court for her removal from the Reservation" (Hovani 5/2/1988). Also in 1988, the Trustees asked the District Attorney of Suffolk County to remove the stepdaughter of a Shinnecock member from the reservation residence.[73]

---

[73] Marriage does not necessarily guarantee a non-Shinnecock may reside with his or her spouse on the reservation. The Trustees have also denied residence to spouses of Shinnecock members who "were not welcome in [the] community," based on his or her behavior and social problems (M. Smith 9/8/2009). Another man who sued the Shinnecock after he was stabbed in an altercation during the powwow, was asked to leave the reservation. He was invited to return only after a 22-year absence (M. Smith 9/8/2009).

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Criterion 83.7(d)

## Criterion 83.7(d)

**83.7(d)** **A copy of the group's present governing documents including its membership criteria. In the absence of a written document, the petitioner must provide a statement describing in full its membership criteria and current governing procedures.**

The Shinnecock petitioner does not have a formal, written governing document. The petitioner's attorney of record summarized to the Department that "the Shinnecock Indian Nation governs itself without a constitution, ordinances, articles of incorporation[,] or other documents" (Tilden 8/27/2003). However, a combination of written statements, historical state acts, and group actions define the historical governance of the group.

<u>Governing Documents</u>

*1978*
In 1978 the petitioner submitted to the Department a request to join it in land claim litigation, which was accompanied by a presentation showing how the petitioner thought it could meet the acknowledgment criteria then being promulgated. That presentation did not include text addressing the governing document criterion specifically, but it included text addressing political authority. The political authority text described the New York State 1792 Act, which established the election of Shinnecock Trustees and their authority to allocate land and resources for the benefit of the tribe; the frequency and nature of "tribal" and "community" meetings; and "informal governing procedures delegated by custom to the trustees" (Aschenbrenner [2/8/1978], 23-26). The informal governing procedures section described how the Trustees mediate between "reservation Shinnecocks and outsiders," which include local agencies and New York State agencies. The Trustees work with the church minister to coordinate the Pow Wow and Thanksgiving events. "In issuing allotments and burial plots, they effectively approve applications for Blood Shinnecock enrollment" (Aschenbrenner [2/8/1978], 25). Trustees preserve the peace on the Shinnecock Reservation and are responsible for contacting State police in emergency situations. They enforce restrictions on reservation hunting and fishing by outsiders. Trustees administer the income from leases, fund-raising events, and state agencies, and are responsible for the upkeep of the reservation.

*1998*
The group's 1998 documented petition submission included one page addressing criterion 83.7(d). The text advised that the "report for section 83.7(c) contains the current governing procedures for the Shinnecock Indian Tribe" (SHN 9/25/1998, 81). The next paragraph described the membership process and criteria.

The Department's December 22, 1998, TA letter to the petitioner noted that the 1998 documented petition submission "describes the current activities of the trustees, but contains no

Shinnecock Indian Nation (Petitioner #4) Proposed Finding
Appendix A

with the other contemporary documents—is not substantial evidence of unambiguous Federal acknowledgment and the petitioner is not eligible to be evaluated under 25 CFR §83.8. Instead, these documents created by the Department only provide evidence that the Federal Government was aware of the Shinnecock population on Long Island.

The Petitioner's Claims for
Acknowledgment by the Criminal Jurisdiction Acts of 1948 and 1950

The petitioner requests that the Department consider 1948 and 1950 as two alternative dates for unambiguous previous Federal acknowledgment. The petitioner suggests that two acts by Congress—the Criminal Jurisdiction Act of 1948 and the Civil Jurisdiction Act of 1950—effectively constituted Congressional recognition of petitioner as an Indian tribe.

The full text of the 1948 act (62 Stat. 1224, July 2, 1948) reads:

> *An Act to confer jurisdiction on the State of New York with respect to offenses committed on Indian reservations with such State*: Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State: Provided, That nothing contained in this Act shall be construed to deprive any Indian tribe, band, or community, or members thereof, hunting and fishing rights as guaranteed them by agreement, treaty, or custom, nor require them to obtain State fish and game licenses for the exercise of such rights. (62 Stat. 1224 July 2, 1948; also in Kappler vol. 6, 427-428)

The 1948 act does not show—unambiguously or otherwise—that Congress intended to establish, or had, a political relationship with the petitioner. In fact, the act does not mention the petitioner by name. The purpose of this act is to establish New York State's jurisdiction over crimes committed on Indian reservations. The act references treaties and agreements, but there were—and are—no agreements or treaties between the petitioner and the Federal Government.

A selection from the text of the 1950 act reads:

> *An Act to confer jurisdiction on the courts of the State of New York with respect to civil actions between Indians or to which Indians are parties.* Be it enacted by the Senate and House of Representatives . . . That the courts of the State of New York under the laws of such State shall have jurisdiction in civil actions and proceedings between Indians or between one or more Indians and any other person or persons to the same extent as the courts of the State shall have jurisdiction in other civil actions and proceedings, as now or hereafter defined by the laws of such State . . . . (64 Stat. 845 September 13, 1950; also in Kappler vol. 6, 518)

PLAINTIFFS' EXHIBIT 19

C 1.2:
A₂ 3

# Aquaculture, Fisheries, and Food Processing

## AS A COMBINED ECONOMIC DEVELOPMENT OPTION FOR INDIAN COMMUNITIES



11542

**U.S. DEPARTMENT OF COMMERCE**
Office of Minority Business Enterprise


UNIVERSITY OF VIRGINIA LIBRARY
X030348818

Original from
UNIVERSITY OF VIRGINIA

# Aquaculture, Fisheries, and Food Processing

AS A COMBINED
ECONOMIC DEVELOPMENT OPTION
FOR INDIAN COMMUNITIES

Prepared for the
Office of Minority Business Enterprise

by

Dr. Richard T. Haard, Project Director
Dr. William M. Dickson, Management/Research Associate
Ms. Doreen Y. Feng, OMBE Project Officer
Dr. Wallace G. Heath, President
Mr. Frank A. Archambault, Chairman
Mr. Samuel M. Cagey, Vice-President
Mr. Scott Johnnie, Project Assistant
Ms. Susan E. Barrett, Chart and Graph Designer

AMERICAN INDIAN DEVELOPMENT ASSOCIATION

June 1977
(Expanded October 1977)

Contract No. 7-36435

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

# EXECUTIVE SUMMARY

This paper has been written for the information of reservation planners and other Indian groups interested in economic development through the utilization of aquatic resources. This document is needed because, unlike agricultural development, aquacultural development information is not so commonly understood, nor is it so easily obtained. It is much more difficult for Indians interested in aquaculture to know where to start, who to ask and the critical questions that should be asked.

We have recommended that the question you ask yourself be: "Can you sell what you make?" It is absolutely essential that the tribal staff be capable of raising and answering questions dealing with marketing and sales first, even though their technical backgrounds may be in accounting, biology, economics, or planning. If the tribe has a staff biologist or a planner who does not understand marketing and insists that markets and sales can be worked out after production has begun, he should be replaced with a person who has the technical marketing skills essential to planning a new development.

Too often developers focus on the equipment, the building, management politics, or the technical aspects of harvesting the resource without first determining what the market is, how many can be sold, and how much profit can be made on each sale. It is this profit which determines how all else should be planned. Resource development skills are much easier to obtain than marketing skills.

Returning to the point of project birth, the first task is to determine a resource base. Once this resource is identified, the key question is: "What can we do with the resource which will help our people?" One often overlooked resource is water. A great many Indian reservations have untapped water resources at their fingertips. There are many problems in developing water resources. The first hurdle is overcome when it is realized that the "big lake" out there is good for something other than water skiing. Then technical information about the water resource (lake, river, stream, bay, or whatever) can be run down and collected.

After resource information has been located and collected, it still must be interpreted. Part 1 can be used as a guide for investigating *your* water resources with *your* own planning and management staff. Our approach is to show you how to locate and gather resource information. Very often this can be done free of charge by utilizing public agencies such as the Environmental Protection Agency, State Departments of Natural Resources, State Fish and Game Departments, the Federal agencies of the Departments of Interior and Agriculture, and possibly private foundations such as the Sierra Club. This paper then reviews the kinds of resource information needed and how it should be interpreted.

There are many optimistic reports about new technical developments in the field of aquaculture reported in newspapers and magazines. Aquaculture has lots of romance and glamour. It is essential that this glamour and prestige appeal be removed from consideration. The tribe must look at the cold reality. They must ask, "Will it work here? If it does, will it make money?"

Part 2 looks at some aquaculture systems which might be adapted to reservations with water resources. The aquaculture development options of enhancement, confinement, release and return, and hatchery operations are briefly reviewed. Each type of aquaculture technology is presented with a summary of the state of the technology in the United States, i.e., is it a young technology subject to rapid change or is it established and stable? In addition, some basic economic considerations are discussed to provide common sense insights.

For example, it becomes obvious that a tribe should beware of competition in the trout market unless its resources can match those of Idaho, the world's center of trout production.

It was felt that a discussion of aquaculture, fisheries, and food processing would not be complete without some treatment of how business and resource development go hand in hand. Part 3 presents subjects such as an outline of what a business really is, how one goes about organizing businesses, and management team concepts.

Part 4, Marketing, a Prerequisite to Successful Economic Development, recognizes that a business venture can start at any point of activity, but probably one of the better starting places is with marketing: determining what can be sold. We recommend the following procedure: First, find out what people will buy, for how much, and how many. Secondly, make a few, try selling them, and then do it again with something else until you think you have the right product. Then gradually expand and at the same time try other products. Get more involved in sales and distribution and develop a solid all-profitable product line. Lastly, do not start with complex production schemes, large capital expenditure processing lines, outside managed activities, long training, or technically intensive systems. Concentrate instead on what you can sell profitably now.

iv



Original from
UNIVERSITY OF VIRGINIA

Part 5, A Cost/Benefit Analysis, deals with figuring out what things cost and whether the cost is justified by what is produced. Do the results justify the expense? This question must be asked for each possible line of action, but before you can ask such a question you must know what results you want.

The cost/benefit analysis begins with determining dollar costs, determining fixed and variable costs, the cost of finance, and non-dollar costs such as seasonality, resource variations, and cultural impact.

The last step in this paper is to illustrate with a practical example how one real project was indeed developed. In this part, we discuss the development of a food processing industry for the Shinnecock Tribe as a model of the procedural steps carried out in the establishment of a real food industry business.

Since this last part is an application of conceptual prin-

ciples presented in the previous portions of the paper, we have tried to be as frank and open as possible in order to share with you some of the problems, mistakes, and even successes through serendipity that occurred in the two-year planning and development process. The model development scheme is illustrated in Figure 14 which shows the time and kinds of work which were required to create an industry based upon Shinnecock's most abundant resources, shellfish and underutilized fish species.

This does not mean that we are suggesting that your best economic development option is one which follows a path remotely similar to Shinnecock's. As we have said all through the paper, the best way to determine an economic development mix for your reservation is through resource assessment, market research, and organization of a business mix which is compatible with the needs of your community.

v

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

# AQUACULTURE, FISHERIES, AND FROZEN FOOD PROCESSING AS A COMBINED ECONOMIC DEVELOPMENT OPTION FOR INDIAN COMMUNITIES

## Introduction

*Scope of Study.* This paper attempts to present logically a series of economic development options which can be taken by Indian tribes. The most frustrating phase in such projects is the initial gathering of technical information pertaining to establishment of fisheries, aquaculture, and processing, as well as subsequent evaluation of feasibility.

Can we grow catfish economically in our waters? Who supplies feed and materials needed for culture systems? What private, State, and Federal agencies offer free technical assistance services? These are a few of the questions which this study will not answer directly, but will show methods for answering them yourself using existing reservation planning staff.

Although we discuss fish and shellfish culture, this is not the major emphasis of the model. In this paper we are dealing with the creation of food processing industries which depend upon both aquaculture and fisheries as a source of supply. Fish and shellfish such as salmon, oysters, and clams, which are already market commodities (foods which are sold in their original form) can bring higher prices when processed into convenience foods. Although certain aquaculture and harvested fish such as carp (freshwater) and hake (marine) have very low initial value, processing of these fish can increase their value and sales potential dramatically.

The major accomplishments of the proposed system are community benefits, income, and jobs through:



*Critical Path Concept.* The Critical Path is a production concept that starts with an end state or objective, and identifies the *activities* necessary to achieve that end state. These activities are identified sequentially from the end state, or project conclusion, back to the start-up date. A typical critical path for a business development in an Indian Community might look like this:



1

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

As you see, the critical path identifies *all of the activities necessary* and also *schedules* the date that activity must be completed to *insure a smooth and profitable start-up* process. Preparation of the critical paths of each major project segment and their combination into a master schedule insures cooperation, coordination, and identifies potential problems *before* they materialize. It shows what is critical. We recommend that these critical paths be developed by technical specialists, but in full consultation with the Indian community leaders. The possibility of the community objectives being lost in a technical exercise always constitutes a problem and the optimum use of this and other techniques requires *Indian leadership and control over the technicians.* These leaders are fully capable of understanding the technique generally within an hour or so and should experience no difficulty in maintaining control of the technicians.

Let us assume that we have a community commitment to some sort of economic development through food production. Information on techniques available for culturing, processing, and marketing produce is generally available, but a conceptual approach for evaluation and implementation of production goals is not.

This paper proposes using logic, which simply requires that decisions on a specific design or model will not be made until all *reasonable* possibilities are considered. In other words, rather than trying to fit trout culture into a specific reservation lake, a study is made of all possible enterprises which could reasonably be introduced into the community.

Indian communities over the years have historically developed their own specific resource utilization systems based on experience and need. These systems include not only harvesting and processing, but also patterns for leadership, management, decision-making, labor rules, trade and marketing, and all other facets of human activity. In order for a resource development plan to be successful, the plan must be one that fits these cultural patterns for getting things done. For example, in conducting a fisheries resource analysis on the Mandan, Hidatsa, and Arikara reservation in North Dakota on Lake Sakakawea, we uncovered the fact that no one from the area, white or Indian, was involved in the fisheries. The only fishermen (three) were from Washington State and Minnesota, areas where commercial fishing is a cultural tradition. Upon reflection, we realized that the lake was new to the area (15 years) and there were no cultural patterns locally. Attempts to institute economic schemes which are not consistent with the work patterns of a community have often failed. Indian communities have a rich history of having various agencies and groups encourage their undertakings of economic projects which are not only economic disasters, but are also not

compatible with their tradition, interests, and skills. This must be avoided.[1]

As the study progresses, a finer and finer focus is brought upon the best options for that reservation based upon the social, economic, and resource capabilities of the reservation. After the community has discussed and agreed upon social objectives, the specific economic development options can be considered.

The approach we recommend is to first develop an inventory of available resources and determine environmental quality. This would include water quantities, weather factors and water quality (temperature, pH, oxygen content, pesticide accumulation). In addition, the existing plants and animals which occur in the area should be surveyed. Later, prospective food production should be investigated from the standpoint of relative yields and some estimate made of how much of this food can be sold at a profit. The planning process should reflect a gradual zeroing in on the specific method of attaining the ultimate goal: establishing a profitable food industry.

*Indian Management Considerations.* As part of the critical path concept for technical feasibility, it is very important to consider the human resource. Indian communities are no different from any other in requiring a management formula which will work for each specific community. A discussion of methods for finding a management formula which is best suited to a specific community is therefore very advisable.

The kinds of social organization questions which must be considered for Indian communities are: What is the existing tribal community organization? How does the tribe, as a government and community unit, organize to get a job done?

Since many tribes have a government system brought about by outside influence, we must look to other sources for alternative management formulas. It is widely recognized that the so-called aboriginal management systems of Indians were capable of running complex governmental and trade operations. It should be advisable, therefore, to recapture, or at least recreate, the essence of this native management system. We should therefore attempt to redevelop these native management systems by looking at the traditional (as opposed to governmental) leadership and family organization elements of the community.

### Statement of Aquatic Resource Potential for Coast and Inland Indian Reservations

During the course of the model development program, AIDA personnel visited over 20 Indian reservations, mostly in the northern tier of States across the United States (Fig. 1). Specific studies and interviews were conducted at nine reservations having water resources which were felt to be typical of reservations within the region (Table 1).

---

[1] For a current example, see H. G. Clement, *The Gift That Hurt the Indian,* Checci & Co., Washington, D.C., 1977.



Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA



FIGURE 1.—Indian Reservations of the United States showing the location of our specific sites (darker print) and most likely fish to cultivate in confinement or ranching systems. Areas 1, 3, and 4—salmon ranching; 2—carp and limited trout cultivation; and 5—catfish cultivation.

TABLE 1.—*Indian reservations having water resources visited by AIDA personnel during the contract period.*

| Reservations | Location |
|---|---|
| 1. *West Coast Reservations* | |
| * Lummi Indian Reservation | . .Western Washington on Puget Sound |
| 2. *Inland Reservations* | |
| Colville Indian Reservation | . . Columbia River, Washington State |
| Rocky Boy's Reservation | . . . . Bear Paw Mountains, Montana |
| Fort Berthold Reservation | . . Upper Missouri River, North Dakota |
| Lower Brule Reservation | . . . Missouri River, South Dakota |
| Seneca Nation Reservations | . Lake Erie & Allegheny River, New York |
| Fort Quechan Indian Reservation | . . . . . . Yuma, Arizona |
| 3. *East Coast Reservations* | |
| * Gay Head Wampanoag Indian Reservation | . . . . . . Coastal Estuary, Martha's Vineyard, Massachusetts |
| * Shinnecock Indian Reservation | . . . . . . . . . . . . . Coastal Estuary, Long Island, New York |

* Food production through aquaculture in progress.

Our studies ranged from intensive field studies to interviews with planning staff and site visits. Certain conclusions can be drawn from these visits that demonstrate mutual needs for application of this model to all reservations with water resources. (Fig. 2–4)

Virtually every reservation visited had *underdeveloped resources* from two standpoints. First, water resources were totally unused or were managed by outside influences for the sole benefit of outside persons. Second, people were underutilized, under-educated, and, in some cases, poorly nourished from government food subsidy programs which supply poor nutritional balance.

The reasons for resource underdevelopment on Indian reservations are complex.[2] One or more of the following list may be applicable to each reservation:

1. Creation of Indian reservation having no apparent resources.
2. Social or economic isolation.
3. Benign neglect.
4. White prejudice.
5. Inappropriate education.
6. White religious and economic exploitation.
7. Geographic isolation.
8. Historical short-sighted bureaucratic management and introduction of inappropriate technology and business systems.

[2] Congressional American Indian Policy Review Commission, Task Force #7—Reservation Development and Resource Protection, Final Report, July, 1976. This report is good further reading in developing food production on Indian Reservations.

9. Checker-boarding of lands following the Allotment Act of 1887.
10. Difficulty in locating private financing for reservation entrepreneurs or tribal projects.
11. A history of failure.
12. Special community and organizational needs have not been recognized.

With the development of water resources (and land resources) for food production, programs can be initiated for the specific benefit of the Indian community whose goals are *not* necessarily the same as the goals of individual entrepreneurs living on similar land areas. Hence, tailored programs must be initiated. (Fig. 7)

## Special Comments on Coast Reservations

Fisheries are an ancient, traditional, established enterprise in coastal areas. Scalloping and clam dredging on the Wampanoag Reservation (Fig. 5) is typical of an East Coast reservation and salmon harvest is typical of West Coast sites. In both cases the product of the fishermen goes into the commodity market, yielding the least or lesser economic returns.

For instance, prices received by the fishermen for whole clams are 8¢/lb. on the East Coast and 10-12¢/lb. in the west. Although the clam meat is selling for $1.75 to $2.00 per pound, the fisherman's share is only 24¢ to 48¢ per pound. Reservation residents could pick up these "middlemen" profits, or if the same clam meat was combined with matrix, batter, and breading, a higher price yet could be received for the product. This could add employment and profits for reservation residents.

Enhancement (increasing yields) and cultivation programs now underway at Martha's Vineyard estuary (scallops and clams) and the Lummi Indian Aquaculture Project (oysters and salmon) provide an added income and employment for both regional fishermen and tribal enterprises, as well as boosting the local economy, both Indian and non-Indian. (Fig. 6)

Clearly, enhancement and cultivation programs would benefit both coast and inland reservations possessing water resources. Technology is well refined for salmon and shellfish culture systems at coastal sites. It is more difficult to make a sweeping statement about intensive fish culture inland. Water quantity and quality, distance to market, and market saturation by trout and catfish producers are distinct problems for inland fishery programs. Research programs, however, could develop new species for cultivation such as perch, walleye, or carp varieties which are even better adapted to northern reservations than either catfish or trout.

4

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

# PART I.  A GUIDE FOR INVESTIGATING YOUR WATER RESOURCES WITH YOUR OWN PLANNERS AND MANAGEMENT

## How to Conduct an Aquatic Resource Assessment

### Feasibility Studies

This section deals with how to gather water resource data which can be used for acceptance or rejection of a fisheries idea. This idea may be sport fishery enhancement, oyster farming, or any other pertinent aquaculture endeavor. Any small business starts with a feasibility investigation which is carried out by the individual or individuals who are starting up the business. It is generally paid for with their existing funds. The time and financial commitment will vary greatly with individual preferences, money limits, and overall project goals. A large corporation or a city may, for instance, commit a great amount of money to demonstrate project feasibility. This approach does not seem to guarantee success even though plenty of money is spent. An alternative strategy of donated labor and services by involved Indian community members and local and regional public agencies has perhaps a better chance for success. This is the approach we recommend in this model.

### Do-It-Yourself

In this study we are assuming that the tribe and the individuals in the tribe do not have the financial resources to carry out an exhaustive feasibility study using outside paid consultants and the tribe is, therefore, doing it themselves. The following is an example of how to go about gathering data pertinent to a proper environmental study, a logical sequence of raising questions, and how to go about finding answers to these questions.

### Water Quality Questions

*Baseline data requirements:* The minimum water quality information necessary to determine project feasibility is summarized by the following list:

1. The range of water temperature with depth and season.
2. The range of pH.
3. The range of dissolved oxygen with depth and season.
4. The turbidity.
5. Salinity.

6. Pollution parameters such as biochemical oxygen demand, pesticide accumulation, heavy metals.
7. The daily, seasonal, and long-term wet/drought cycle variations in water flow available to the potential aquaculture system.
8. Ground water availability in terms of the above environmental criteria.

*Long-range considerations:*

1. Has the tribe established water rights?
2. Is enough water available for both aquaculture and reservation use, i.e., irrigation of agricultural land and proposed fisheries, as well as future industrial and municipal uses.
3. What impact is upstream development going to have on water quality?
4. Will these projected changes have an adverse effect on new or proposed aquaculture development?

This last question may be difficult to answer but very good indications can be gotten from various Energy Research and Development Administration (ERDA) and other agency publications dealing with long-term water use projections for various watersheds. For example, studies exist which attempt to predict projected water flow of the Yellowstone and Missouri Rivers as late as the year 2000 reflecting increased demand for water for agriculture, industry, and municipal uses. These studies give some idea of what changes will occur in river silt load, salinity, and temperature.

### Sources of Water Quality Information

A good many sources of information are available. Be warned, however, that no one source is complete.· Extensive use of a library is the only solution to this problem.

1. *State Departments of Natural Resources (or equivalent):* May have access to many environmental studies done in the State's waters. Contact the department directly or visit a land grant college library and ask someone to help you seek out pertinent references in the Government documents section. Many states such as North Dakota are now establishing a computer accessed file of baseline environmental information. Inquire about its existence and use.

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

2. *State Game and Fish Departments:* Many of these agencies have existing studies on bodies of water in question. Frequently they are done in conjunction with the State university as part of the thesis and faculty research programs. These kinds of data will be available: (a) water quality studies, (b) biological studies on fish populations, experimental stocking, harvest reports, and (c) recreational based water use reports on fishing, economic reports on game fishing, and reports on commercial fishing programs. Ask for them. (See Exhibit A for addresses.)

3. *Federal Agencies:* (a) Fish and Wildlife Service—research reports similar to fish and game departments; (b) National Oceanic and Atmospheric Administration (NOAA)—among many sources of information and services are a computer access bibliographic search service, and water quality computer access similar to STORET mentioned below. NOAA's computer-accessed environmental data emphasize the oceans; (c) lastly, the most convenient way to locate this information is to use a computer access data recall system available at the Environmental Protection Agency. (See Exhibit B for Fish and Wildlife agency addresses.)

### How to Secure a Free Environmental Inventory

To gain access to this wealth of data, simply send a letter to the Freedom of Information officer, in care of your regional Environmental Protection Agency office.

The letter should request a STORET retrieval and list the reservation longitudes and latitudes, which are available from any U.S. Geological Survey map and is presented reading from the right in clockwise fashion (see Table 2). In other words, if you have a square reservation, send the latitude and longitude for every corner of the reservation, reading in a clockwise fashion. If your reservation is shaped like a star, or has an irregular shape, send the latitude and longitude of every point which you want included within the area being described. If any problems arise, any local surveyor can help you submit the right numbers.

TABLE 2.—*Sample latitude/longitude data for Roosevelt Lake, Washington.*

| Beginning | 48°40′44″ South | 118°01′02″ West |
|---|---|---|
| to | 48°40′50″ South | 117°58′20″ West |
| to | 47°48′43″ South | 118°18′60″ West |
| to | 47°56′56″ South | 119° 0′ 0″ West |
| to | 47°59′07″ South | 118°27′60″ West |

### This is What You Get From a STORET (Computer Search)

The initial information received from the STORET retrieval will be a catalog of water quality summaries taken within the boundaries circumscribed by your request (Tables 3-5). The amount of data will vary, from a single

9

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

# PART VI. DESIGNING A FOOD PROCESSING INDUSTRY FOR THE SHINNECOCK TRIBE

## A Model to Illustrate Procedural Steps Carried Out in the Establishment of a Real Food Industry Business

### Introduction

The marketing section of this report outlined a procedure for reducing the risk in new venture development. Briefly, we suggested very strongly to start with marketing. The approach of starting at the market end and working backwards in order to fit the program into the resources, markets, and other labor, capital, and cost advantages is clearly the most sensible approach.

This final chapter deals with the successes, procedures, frustrations, and all of the other activities associated with a real project. We will therefore be discussing methods and specific results obtained from our work toward establishing a food industry for the Shinnecock Indians. This does not presume that *your* economic development project should resemble in any way the Shinnecock plan as it is now shaping up. *Your* program should be the result of *your* resource analysis, market research program, and the wants and needs of the reservation community.

The process which is to be described is illustrated by a flow-chart (Fig. 14), which starts off with testing of new product concepts by the American Indian Development Association in 1975. This phase of the research involved product development, consumer testing, and test marketing. The work actually took place during 1975-76. A more complete presentation is given in the Final Report for OMBE Contract #5-36699.

Once this product feasibility phase was completed, AIDA was confident that extruded seafood products could be used as an economic development opportunity by Indian reservations. The Shinnecock Indians was the first tribe to take advantage of this idea. The following text material (illustrated in the flow chart) also covers in a chronological fashion their market research, additional product development, and adjustment in project goals to meet the best market potential for this region.

We have tried to be as frank and open as possible in order to share with you some of the problems, mistakes, and even successes through serendipity that occurred in this two-year process. In this way the Shinnecock program can truly be a model, illustrating how this kind of economic development is carried out.

### Statement of Project Purpose

The Shinnecock Indian Tribe, along with several other tribes that AIDA has been associated with (Wampanoag, Lummi), is presently engaged in the production of shellfish. These programs involve the intensive cultivation of clams, oysters, and scallops, that can result in large quantities being produced from a relatively small area. In 1975 the question was raised: Will the projected shellfish production from these projects either flood the market or be difficult to fit into existing market systems? AIDA's research on the West Coast indicated that the Lummi Indian Aquaculture Project will indeed experience some marketing difficulties when their full-scale production comes on line in 1978.

One of the possible solutions to the problems of market penetration (squeezing into traditional buying patterns) and market saturation (raising production faster than demand) is to create a new product or new method for marketing that does not compete with shellfish in the traditional sense. Secondly, some form of processing on these shellfish might result in additional profits for the tribal enterprises. For these reasons the Office of Minority Business Enterprise (OMBE) and the Rockefeller Foundation funded a one-year study to develop new products and markets for Indian oysters and smoked salmon. AIDA conducted this study because it was involved with several tribes, both on the east and west coasts, in shellfish production.

### New Product Development[1]

After some initial research, a product concept based upon shellfish and fish mixtures, battered, breaded, and deep-fried, was developed. This product was first conceived by the staff at the National Marine Fisheries Service Research Lab in Seattle and later refined by AIDA and the Oregon State University Seafood Lab. These product development services, incidentally, were offered to AIDA at a cost of materials only. We were able to use both laboratories and other research facilities to manu-

---

[1] Method of new product development is covered in depth in a later section.

 Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

Digitized by Google

Original from UNIVERSITY OF VIRGINIA

41



FIGURE 14.—Flow chart to show model development scheme.

facture and test small quantities of these new product materials whenever space and time were available. In addition, technical assistance was usually offered at the same time to aid AIDA staff in operating machinery and solving problems.

## Market Testing

Once we were convinced that these new shellfish-fish mixtures were ready for market testing, Northwest Certified Surveys (NCS), a consumer research company, was engaged to conduct a series of market tests to evaluate the acceptance and market demand for these new oyster products in local and national markets. The specific objectives and areas of investigation were to:

1. Explore among consumers the concept of oysters as a food item—likes, dislikes, favored consumption settings, and other dimensions of the perception of oysters. Also to explore reactions to concepts of the specific oyster products developed, and possible alternative forms of the products.

2. Explore among intermediate buyers (restauranteurs, fast food franchisers, institutional food service outlets, brokers, etc.) the concept of oyster products in the forms developed.

3. Determine how often people eat oyster products, where they eat them (at home, restaurant, other), and in what part of the country.

4. Taste-test the appeal of an oyster-fish blend, oyster snack food, and IQF (individually quick frozen, whole) oyster among consumers, with tests being conducted first in Northwest markets, and if successful locally, in another selected national market.

5. Measure how much of each product people might purchase along with taste testing.

6. Measure the market demand for the oyster products among intermediate buyers locally and in selected national markets.

7. Make strategic and tactical marketing recommendations based upon the findings and the experience of NCS relative to:
   a. Product introduction
   b. Alternative product forms with high success potential
   c. Market segments to which to appeal
   d. Distribution of product
   e. Pricing
   f. Branding and packaging
   g. Advertising
   h. Monitoring of progress after product introduction.

The NCS field research was broken into two categories: *Focus Groups* and *Consumer Intercepts*. The difference between the two is that the former involved a small pre-screened group and the latter a large sample taken in a specific marketplace. The advantage of this procedure is that the focus groups are relatively inexpensive and offer a chance for improvement of product and strategies for introduction in the larger and more comprehensive intercept test. (Fig. 15)

In addition to the focus groups and consumer intercepts, AIDA and NCS tested institutional and retail markets. The first, conducted by NCS, was done by interviewing 50 intermediate buyers of food products to receive their opinions of product potential. Lastly, AIDA actually put the oyster-fish product to a retail test market. This involved placing the product on the shelf with other competitive products. (Fig. 16)

### Focus Group Research

The concept of oysters as a food item, including likes and dislikes, favored consumption settings, and other attitudes toward oysters, was explored among small groups of consumers and institutional buyers.

These focus groups consisted of about 8 to 10 individuals each. Individuals were selected at random, representing different socio-economic, age, and product consumption segments. A discussion among these respondents was moderated (not directed) by a qualified professional. There was a free-flowing discussion regarding the concept and product in question. The sessions were tape recorded and reviewed in depth by the project director.

Four discussions were conducted, one each with the following segments:

> First Group: Consumers who are already active oyster consumers.
>
> Second Group: Consumers who do not often, or never, eat oysters.
>
> Third Group: Intermediate buyers of oyster products—fast food franchisers, institutional food service outlet managers, brokers.
>
> Fourth Group: Intermediate buyers—white table restaurant owners.



Figure 15.—Typical consumer interview setting at Seattle and Kansas City. A simple divider was used to conduct taste tests and interviews in a corner of the supermarket.

42

Digitized by Google

Original from UNIVERSITY OF VIRGINIA

*Consumer Supermarket Intercept*

The next step was to conduct taste tests in Northwest and Midwest markets. In Seattle, two sites were selected (suburban and urban). In Kansas City testing occurred only at one location.

The taste tests were conducted in shopping centers through the intercept interview approach. Respondents were selected at random, prescreened for qualification, then either rejected or submitted to one of two taste interviews. A typical interview lasted 30 minutes and 300 respondents were tested in both Seattle and Kansas City.

In addition to responses relating to *taste* and *texture* of the products, the consumers were also asked the following:

1. Probability of purchase of the product.
2. Possible improvements in the product.
3. When and through which outlets they would desire to consume each product.
4. Their present consumption habits regarding oysters and oyster products.
5. Attitudes toward oysters and convenience foods.
6. Demographics.

The following products were tested among a sample of 100 consumers:

1. Oyster-fish mixture
2. Oyster snack food (Seattle only)
3. IQF oysters
4. Smoked salmon (Kansas City only)

*Oyster-Fish Blend—Results of Research*

This product has the potential of opening an entirely new market for oysters among people who normally dislike them because of their texture and appearance. Our taste-testing showed that the product does indeed have strong acceptance by people who have a limited taste for oysters. This market segment is considerably larger than that which buys and eats whole oysters. The focus group research found that oyster dislikers showed some acceptance but didn't care for contrived shapes, finely ground texture, smoke flavor or inherent greenish color.

The most appealing variations were found to be 50 percent oyster coarsely chopped and 30 percent oyster finely chopped. These two variations were included in the Northwest consumer taste test which followed, along with a 50 percent oyster small ball shape, suitable as an hors d'oeuvre size. The small variation was rejected on the basis of appearance (again, the contrived shape), but the other two variations were well-accepted on all three criteria—appearance, flavor and texture—by *both oyster likers and dislikers*. The oyster likers preferred the 50 percent coarse sample. These consumers further showed high purchase intent and expectations of high cost. The oyster shape was preferred and a Northwest Indian design package was well accepted.



FIGURE 16.—Location photograph of Vancouver, British Columbia, test market. Illustration shows large frozen food section available to shoppers.

The two successful products from the Northwest test were taken on to a Midwest test where the response and acceptance was very similar. The only difference seen in the Midwest was a higher acceptance for the 30 percent sample and a feeling that the Indian design was meaningless and confusing for an oyster product.

Positives were:

1. High acceptance and purchase intent.
2. Willingness to accept higher cost.
3. Appeal to oyster eaters and non-eaters alike.
4. Convenience of preparation.
5. Viable alternative to fish sticks.

Negatives were:

1. Non-acceptance of contrived, formed shapes.
2. Lack of knowledge outside the Northwest of relationship between Indians and oysters.

A series of intermediate buyer interviews were done with seafood brokers, institutional and cafeteria food buyers, and fast food franchisers to determine the demand in those markets. The response by intermediate buyers was basically positive and encouraging. Although they were favorable to purchase for distribution through their outlets, many were skeptical of the amount of promotion that would be needed to introduce the product on the retail level.

*Attitudinal Differences Between Consumers*

Consumer attitude studies revealed significant differences between individuals *within* each of the Northwest and Midwest markets and *between* the two markets as well. (Fig. 18)

43

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

The Northwest is characterized by a medium-large group of people who are convenience-food-oriented, a large group whose members are "natural food" conscious, and two small groups polarized on attitudes toward oysters—one highly favorable toward oyster consumption and one highly unfavorable.

The Midwest market, on the other hand, can be viewed as being composed of a large group of non-convenience food-oriented traditionalists, who prefer fully prepared meals consumed at home; and three small groups which are either highly favorable toward oysters, highly convenience-food-oriented, or highly progressive in the adoption of innovative food products in general, but not particularly favorable toward new oyster product forms.

The implications of these findings are that the risks of failure of the oyster-fish blend and snack are greater in the Midwest than in the Northwest.

### Oyster-Fish Mix Retail Promotion and Market Test

The oyster-fish mix labeled as "Oyster Puffs" were sold at 85¢ for an 8-ounce package in a supermarket in Vancouver, B.C. The sales volume was acceptable to the store and was the equivalent to that of similar products sold with comparable promotion. The gross of $1.70 per pound accomodates a variety of production and marketing strategies. (Fig. 17)

### Promotion Scheme

The largest volume supermarket in Vancouver, a city of over one million, was chosen to determine if consumers would purchase "Oyster Puffs" at a specific price. The price was established by the cost of the product, price of competitive items, and the characteristics of the market. The product used for the test was custom packed. Estimates of normal production and marketing costs were made since this was only a one-time marketing effort. A very safe, conservative estimate of cost per pound for the product including a normal business overhead for management, profits, and promotion, would be approximately $1 per pound.

The most similar competitive product was a variety package including oyster and fish, shrimp and fish, and plain fish product. It was estimated that it would have sold for approximately 85¢ if it were only packed as an oyster and fish product. The variety package varied from 74¢ to 94¢ for an 8-ounce package. Similar to large supermarkets elsewhere on the West Coast, the market served was predominantly lower to upper middle class.

The supermarket itself sells more groceries than any other in the city of Vancouver. It carries a full line of fish products: frozen, fresh, canned, and dried. The store is large, well-stocked, and in a pleasant location. The management was very cooperative and accepted the request for a test product primarily because of prior Indian involvement.



FIGURE 17.—Competitive product to the "Oyster Puff" at the Vancouver test market. No packages were sold during the test market, although our product sold well. The store manager claimed this competitive product moved quite well during the holiday season.

### Promotion

The competitive product is but one of a long line of 25 to 35 items, and the entire line is prestigious. Products of the firm are at the top in every category. The products



FIGURE 18.—Typical hors d'oeuvres plate of oyster-fish blend now being served at the "Top of the Hilton" restaurant in Seattle, Washington.

44

Digitized by 

Original from
UNIVERSITY OF VIRGINIA

are individually advertised and the firm brand name is well-known throughout the community. The products sell well and the firm enjoys considerable business success.

This halo effect due to the competing manufacturer's reputation and brand identification, and the absence of any form of previous advertising for the Indian product created a problem for a truly comparative evaluation of the relative acceptability of "Oyster Puffs."

### In-Store Demonstration

The tactic chosen to introduce the product was to have an in-store demonstration. A reputable demonstrator was secured and a good location in the store selected. A freezer to hold and display the product was moved to the central store location.

The product was prepared in an electric frying pan and generous samples were given to interested shoppers. The product had been tested by the demonstrator prior to the demonstration. She was extremely careful in the preparation of the product, and was quite aggressive in her sales behavior. She asked customers if they would take a package home and assisted them in placing packages in their shopping cart. This aggressive sales behavior in some ways compensated for the absence of brand name familiarity, advertising, or product identity. In spite of this aggressive sales tactic, very few packages were abandoned in other freezer display chests in the store, only three to four a day.

### Sales

Sales were relatively brisk. This analysis is based on the store manager's estimate of store traffic and volume during test period, which was much less than normal. Over 200 packages were sold during the four-day demonstration. During the test period *not one* of the competitor's products similar to "Oyster Puffs" was sold.

### Follow-up Interviews

Follow-up interviews were made with 23 consumers who purchased the oyster fish blend. Twenty persons gave the product a high rating, two gave it a low rating and one definitely disliked the product. Most persons served the product as an entree and would definitely purchase the product if offered again in the store.

### Conclusion

"Oyster Puffs" sell well in a competitive market and have good acceptance with reasonable marketing support.

### Summary

#### I. Specific Findings

1. A new seafood product has been developed and tested which is based upon mixtures of oyster and fish. The product is extruded into various forms, battered breaded, frozen and later served as an entree or hors d'oeuvres.

2. Consumer acceptance studies have shown a very impressive consumer interest in the new product. Ratings for flavor, texture and appearance were comparable or higher than new products which were later successfully introduced. Consumers also accepted a price of 85¢ per 8-ounce package. An opinion survey also reported that 34 percent of the consumers interviewed were willing to pay 30¢ more than for a similar box of fishsticks.

3. Since a large segment of the anticipated market represents a new market of non-oyster consumers, introduction of this product will result in a general expansion of oyster consumption providing an additional prosperity for Indian oyster producers.

4. From an economic standpoint the oyster-fish blend allows a greater economic return than any other oyster product investigated.

5. Market studies have shown the most economically sound strategy for product introduction is in the institutional markets. Impressive buyer interest has appeared in white table restaurants and taverns as an hors d'oeuvre.

#### II. General Implications

1. As a baseline conclusion we are confident in stating that a valid test has been successfully conducted on the concept of a minced fish-shellfish blend, and that there are several other similar product combinations which also can be included, such as clam, scallop, shrimp, crab, mussel and lobster in combination with fish.

2. Consumer attitude studies and intermediate buyer interviews show a definite niche for a product line servicing the hot hors d'oeuvres market.

3. An Indian tribe can be involved in this product/market system with either fish, shellfish, or labor/facility.

4. A product line based upon shrimp, scallop, clam, crab, mussel and oyster in combination with fish would serve as an excellent training ground for tribal food production enterprises.

   The areas of benefit of such a program would be:

   A. Efficient use of existing food and human resources.

   B. Training in food processing technology and management.

   C. Training in small business organization and management.

   D. Training in small business sales techniques in terms of promotion, product service and direct sales techniques.

45


Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

### The Shinnecock Program

With the completion of the OMBE Indian Seafood Marketing Project in September, 1976, our first step was to begin the design of a processing system for the Shinnecock Indian Tribe which would allow production and marketing of these new products. The basic goal of the project would be to create more jobs for the Shinnecock Indians than would be obtained by the normal passage of seafood materials (fish, oysters, scallops, shrimp, etc.) through a fishing community. Secondly, since a frozen pre-cooked product would be manufactured, additional profits would be provided for the Shinnecock Indian Tribal Enterprises. The design of a successful project, however, required a serious look at the following technical and organizational questions:

1. Does the regional seafood market now have the flexibility to absorb new production from oyster and scallop culture projects? The basic assumption is that a large shellfish aquaculture project will be established producing annually somewhere in excess of five million half-shell oysters and half a million pounds of shucked scallop meat ready for market. It is also assumed that marketing would occur in a traditional way, i.e., fresh produce moved to seafood distribution centers and key institutional buyers. (Answer: NO, see p. 46)

2. Can extruded products be developed which would provide standby markets for the above mentioned new aquaculture systems? (Answer: conditional YES, p. 49)

3. Can the production of extruded products only, as opposed to the production of a product line within the capabilities of a specified processing plant, justify the capital investment and other costs of such a business operation? (Answer: NO, see p. 53)

4. Do markets exist for alternative products which will be manufactured at a processing facility? (Answer: conditional YES, see p. 53)

5. What are the market strategies for a product line which is produced by a processing plant servicing such a proposed aquaculture system? (See p. 54)

### East Coast Shellfish Market, Production, Hatchery, and New Product Study for the Shinnecock and Wampanoag Tribes

#### *Market Analysis*

A survey of the traditional market to determine market depth and possible insertion of Shinnecock tribal oysters into the fresh market and other market possibilities was made January 17-20, 1977. Interviews with fish distributors were conducted to determine if oysters, scallops, and clams were in adequate supply and to learn some of the problems which may exist in the market. The following outline was used in conducting this survey:

1. What forms of shellfish do you handle, i.e., half-shell, shucked, IQF, breaded?

2. Who do you normally sell your product to, i.e., retail, wholesale, restaurant?

3. Problems encountered—handling, shipping, quality, supply, prices.

4. Reaction to test oyster/shellfish product such as breaded or extruded product.

Buyer attitude, feelings and prediction of market depth were recorded. Reaction to marketing a product produced by an Indian tribe was also determined.

Some of the buyers were very cooperative and provided all the information needed. One refused to be interviewed and one cut the interview short.

The survey also included interviews with the Marketing Branch of the National Marine Fisheries Service in Gloucester, Mass., the Fishery Council, and the Maryland Oyster Authority. These interviews were added in an attempt to get their reaction to the marketing situation.

In New York City the bulk of the oysters are marketed fresh, either in the half shell or as raw sbucked oysters in jars or cans. This product is primarily consumed by high class restaurants which pay a premium price for oysters of good quality. Most of the half-shell oysters are supplied by growers on Long Island and the shucked product comes from Maryland and other southern producers. Chesapeake Bay oysters apparently have poor shells and are not of good appearance. The more flavorful oysters of Long Island are preferred by the restaurants, apparently as a result of good water with good circulation, which contributes to their firmness. This reputation has developed over the years and as a result these oysters may sell for up to $25 per bushel or about 8 to 10 cents each wholesale.

Only one of the dealers indicated he had IQF and breaded oysters and this interview was cut short before we could determine how many were used. The indication was that only a small amount was processed in this form.

It appears that if Shinnecock is to enter the oyster market in this area the most favored means would be to develop outlets for half-shell oysters. Quality oysters such as are now produced by Shinnecock would easily be integrated into the market. This will require some searching and salesmanship, but it appears possible. Oysters sold in this fashion are easily processed to clean them and make them ready for market. Storage and handling are minimal. Since Long Island oysters already enjoy a good reputation, every effort should be made to market oysters in this fashion.

Even though the market survey indicated that only fresh oysters were sold, there appears to be a very sizable market in hors d'oeuvres for sale to bars and restaurants. Each night appetizers are offered during early evening hours for bar patrons. Using seafood for this could repre-

46



Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

sent a sizable outlet. Breaded fried finger type foods are preferred, and an extruded or formed product would fit very well into this category. Misshaped and small oysters could be used to manufacture a suitable product.

Even though the market survey indicated a favorable reaction to Indians, the dealers are apparently very traditional. They are difficult to convince or change. Coming into the market with government money and pushing out established firms will not sit well with many of the producers.

In view of the position of the Shinnecock Tribe in the market it appears the best means of gaining acceptance and selling of all their products would be to sell extruded or formed products. In a market as large as New York City this method may be easier, result in less friction, get more people eating seafood and eventually establish a deeper market than trying to enter a market already saturated with fresh oysters. Seeking markets away from the coast is also a possibility; however, this would require considerable market research and promotion to develop.

### Scallops

The scallop market appears to be very stable, and the product is in high demand. Competition from southern producers has kept the price down, since northern areas are now producing only limited numbers of scallops. Some companies in the south are producing scallop seed in hatcheries and are in the process of building scallop farms. The fast growth of the scallop makes it a prime target for aquaculture. Suitably sized animals can be grown in six months, if hatchery seed is available in the spring.

### Clams

The clam market appears to be the tightest, with the least predictable supply. Most of the buyers indicated they at one time or other were unable to obtain adequate supplies of clams. The price is also high, especially for steamer and half-shell type clams. Pollution and overfishing have apparently reduced clam populations drastically in most areas. Several of the dealers expressed hope in the clam farms which are now being started both in the north and the south.

Work at Milford Laboratory shows that a steamer type clam can be produced in less than one year using surf clams. These are very fast growing and have an excellent appearance. They are also easy to rear in the hatchery.

### Hatchery Survey

Interviews with four East Coast hatchery operators were conducted, including Long Island Oyster Company, Shelter Island Oyster Company, Flowers and Sons Oyster Company, and Shellfish Incorporated. This survey showed that 50 percent of the hatcheries were making significant contributions to their operations and that the others expected to be economically productive in the near future.

Those hatcheries which were making significant contributions are considered indispensable to oyster production by providing a constant source of high quality seed oysters.

Clams were also produced by the hatcheries in large enough quantities to be significant economically. These seed are planted at various sizes on the beds to enhance natural production. This appears to be very promising since clams are constantly in demand. Some of the large clam species such as the surf clam have been spawned in the hatchery, and steamer size clams have been produced in less than one year from these species.

It appears that the Shinnecock Tribe could benefit from a modest size hatchery, primarily for their own use, to produce seed clams, scallops, and oysters. This is necessary to insure the production of seed in years when natural conditions are not suitable.

Some seed is now available from existing hatcheries. However, all of these operations on the East Coast are designed to produce seed for their own use and only small amounts are available for sale. Two hatcheries on the West Coast, International Shellfish and Pigeon Point, produce American oyster seed for sale. This seed costs from $8.50 to $13 per thousand, depending on size. Clams are available also, at slightly lower cost. Seed from Milford Laboratory (NOAA) is available on a very limited basis. AIDA has been in contact with them and has been assured of every help possible.

### Buyer Interview notes:

1. Monani Fish Company:

    *Oysters:* Handles fresh oysters only, shucked and in the half shell, no problem with supply. Does not handle any IQF or breaded oysters, feels the oyster supply is large enough for demand. Would be hard to expand market—people who ask for oysters are the only demanders. Would buy Indian products.

    *Scallops:* Long Island scallop fishery very slim—gets enough from southern suppliers and sea scallops. Appears to be no problem.

    *Clams:* Market very tight, clams expensive and hard to get, pollution has caused great problems.

2. Top C Seafood:

    *Oysters:* Handles fresh, frozen, breaded, half shell. Oysters now hard to get as beds are frozen. Low demand for IQF or breaded oysters. Cut conversation to load truck.

3. Massucci and Sons:

    *Oysters:* Supplied by Long Island Oyster Company. Does an excellent job. Oysters fine quality. No IQF or breaded oysters. Suggest this is a Safeway, chain store item. Primarily restaurant trade.

    *Scallops:* Supplied from the south—no problems.

    *Clams:* Market tight, not always able to get, uses steamers on demand.

47

 Original from
UNIVERSITY OF VIRGINIA

*Mussels:* 10+ bags per day primarily to French restaurants.

Buys salmon from Northwest Indians at present. Would buy anything available as long as supply is good.

4. Still, George M. Inc.

*Oysters:* No problems with oysters, good supply. No IQF or breaded oysters. Gets shucked oysters from Maryland (apparently most shucked oysters come from there). Takes half-shell quality oysters to Maryland to sell—good market if quality high, price is excellent.

*Scallops:* No problem—good supply from the south.

*Clams:* No problem, gets all he wants.

Part Indian—would buy available products as long as good quality. Distributor Maryland—Rockhaul Clam & Oyster—301/639-2200

5. The Fishery Council—516/WO 7-1608

*Oysters:* All Long Island Oysters sold as half-shell oysters. Claims oysters have too high a moisture content to freeze. Cells break and oyster bleeds. No demand for IQF or breaded oysters. Would be a Safeway item but need large quantities for this market.

*Scallops:* Good steady item—$27/gal (8 pound)

*Clams:* Little necks $50/bushel.

Oysters of high quality move easily on the market—pick-up points available or could pick up for other producers and sell. All fishery products on East Coast are fresh—clams, oysters, etc. no good frozen.

6. New England Fish Company

*Oysters:* Has no experience with oysters, willing to expand experience as market appears favorable. Primary experience in salmon and shrimp. Presently examining concept of extrusion formed products. Oysters could be frozen in the half-shell—probably needs some experimentation in freezing techniques. Feels market available for low-cost quality seafood which will get to middle class market. Preferably in the neighborhood of $1 per pound. Present seafood market dominated by luxury class items which are expensive and relatively unavailable. Sincerely feels market for properly priced seafood unlimited. New England would be glad to buy from Indian Tribes.

7. Marketing Branch—NOAA (Mr. MacAvoy), Gloucester, Mass.

*Oysters:* Experience limited, however they feel more could be harvested. Helped Long Island Oyster Company develop 4 or 5 products, i.e. Oysters Rockefeller, Clams Casino, etc. Did some survey on

potential of oysters less than 3″ and found potential very low.

Present oyster production limited by methods, i.e., tongs, sailing harvesters, etc.

Current prices very high $3 to $4/half pint (standards & selects) or about 30-40 cents per oyster.

*Fishing Industry:* Future of fishing industry brighter as a result of 200-mile limit. The absence of foreign fleets should allow stocks to rebuild. Main problem in developing new products is reluctance of processors to leave tried and true species and established markets.

8. Product Development Section (Joe Licciardella) 617/281-3600

*Oysters:* Did some work on oyster patty—adverse reaction to color. Adjust flavor with ingredients. Good anti-oxidant effects achieved using ascorbic acid, 1 percent dip, and sodium erythobate. If vitamin C is exposed to iron the vitamin C vanishes. Frozen shelf life with ascorbic acid much better than controls. Green color problem partially solved by slightly cooking oyster—used steam and shake method on poorly shaped and small oysters.

9. Maryland Oyster Authority (Gordon Hallock) 301/269-3461, 1748 Forest Dr., Annapolis, MD 21401

*Oysters:* Did some market development with Columbus, Indianapolis, and Pittsburgh as target cities. Newspaper, radio and all possible media coverage were utilized. Fresh oysters were prepared for consumption and served at target sites. Due to increases in production which now appear likely in Chesapeake Bay they are looking for outlets for oysters. Considered oyster sandwich, IQF, breaded. Maryland now produces 3 million bushels, 60 percent is used in Virginia. Production in Virginia appears to be increasing and Maryland and Virginia are faced with the need to get rid of the excess. Product development appears to be the answer.

*Hatcheries Surveyed:*

1. Shelter Island Oyster Company (Paul Chanley) 516/GR 7-1171

Now producing clams, oysters, and scallops. Also doing some work on squid. Production low but have solved problems for production runs. Still in the red but next two years will increase output to economic level. Some scallop, oyster, and clam seed available, but supply very limited.

2. Flowers and Sons Oyster Company 516/NA 8-2077

Has grown oyster seed for several years at prices competitive with wild seed. Hatchery supplies entire

48

Digitized by 

Original from
UNIVERSITY OF VIRGINIA

operation with seed. Oysters are set on ¼" pieces of shell, grown for a short time in the hatchery and then transferred to trays 2' x 4' stacked 6-7 deep on styrofoam rafts, a 4-5" space is left between trays. Every two weeks the seed is sorted mechanically and anything over ½" is planted in dense well-managed beds. The sorting process tends to break up the clusters. Seed from the bed is transferred to growing beds. The process requires 3 years. Raft-culture tends to accelerate the process and shells of the oysters may be thinner due to the more rapid growth. Uses all the seed in their own operation.

3. Shellfish Incorporated 516/589-5770 (Charley Hart)

Problems with oysters in hatchery, producing clams only to supplement natural production. Planted only very small seed (recent metamorphosis), some success. Now will hold for a short time to 2-10 mm. before planting. Indications are they will be more successful. No seed available.

4. Long Island Oyster Farms 516/477-0195

Operates two-thirds of the time, has had some technical problems solved with additional filtration and sulfa drug. Due to uncertain nature of oyster set they would not be in the business without the hatchery. Due to workup time and cost of development they would not use the hatchery for small operation. Suggest they would buy the seed from other hatchery such as International Shellfish in California, Pigeon Point, or Fishers Island Seed Oyster Company.

Grew seed clams to supplement natural set—appeared as successful as oyster operation.

Scallops were hatched on a novelty basis.

## Developing Extruded Product Formulations for Shinnecock Market Test

The main sources of technical information and technical assistance in any product development project are three-fold. These are: (1) Government agencies, (2) academia, and (3) private technical assistance agencies.

By coincidence during the course of its studies, AIDA contacted consultants from all of these channels. The National Marine Fisheries Service in Seattle, the same Government branch in Boston, and Sea Grant in Ann Arbor, Michigan were consulted on potential formulations and product ideas. In addition, we discussed our project with Dr. Eugene Sander of the Department of Food Technology, University of Minnesota. Lastly, we used trial formulations and laboratory facilities available at the Modern Maid Research Laboratory in Jamaica, New York, a private company servicing the food industry.

It is not necessarily required or even advisable to use such a wide array of technical assistance channels. In this case we were interested in locating all possible product variations that could be made in the proposed Shinnecock processing plant. In each formulation example, some products are now being manufactured and are indeed on the market. Each formulation has its own texture, flavor and appearance properties which are appropriate to specific products and markets.

### Formulation 1: National Marine Fisheries Service—Oyster-Fish Blend

This product was created and initially tested by the NMFS to provide a product which more or less duplicates the texture (mouth feeling) of a deep-fried oyster. When the extruded mix is combined with batter and breading the product has a crisp outside and the soft, not chewy, texture of the inside of a fried oyster. It is highly whipped and combined with emulsifying agents to provide a uniform texture and color.

#### Procedure for Preparing Oyster-Fish Blend

| Ingredients | Percent by Weight |
|---|---|
| 1. Minced fish flesh | 51 vs. 30 |
| 2. Oyster meat (blanched vs. unblanched) | 30 vs. 51 |
| 3. Salt | 1 |
| 4. Corn syrup solids (DE 42) | 2 |
| 5. Carboxymethyl cellulose | 0.2 |
| 6. Potassium sorbate | 0.1 |
| 7. Monosodium glutamate | 0.5 |
| 8. Ribotide | 0.05 |
| 9. Sodium tripolyphosphate | 0.15 |
| 10. Vegetable oil (cottonseed or corn) | 10 |
| 11. Span 80 | 0.02 |
| 12. Tween 80 | 0.02 |
| 13. Butylhydroxyanisole (BHA) | 0.003 |
| 14. Butylhydroxytoluene (BHT) | 0.003 |
| 15. Starch | 5 |

#### Procedure

1. Cut-and-mix the minced fish flesh and the dry ingredients (items 3 through 9) for about 2 minutes in the silent cutter (a commercial blender).

2. Add the oysters and the vegetable oil containing the antioxidant mixture (items 10 to 14) to the material in the silent cutter and mix for another 2 minutes.

3. Add the starch and mix for another 10 minutes.

4. Pack in freezer cartons and freeze in plate freezer.

This product was tested in four focus groups during the course of the OMBE project, 1975-76. The focus groups consisted of pre-selected consumers: seafood consumers, people who do not eat seafood often, and intermediate buyers and white table restauranteurs.

The findings of the focus groups showed definite promise for the highly whipped oyster texture simulation of the NMFS formulation, but we lacked facilities which had the specialized equipment needed for producing quantity for market testing. As a result, a second formulation was in-

49

 Original from UNIVERSITY OF VIRGINIA

troduced which is based upon a modification of the NMFS formula.

## Oregon State University Modification of NMFS Formula (Fishcake Texture)

This product has a flavor and appearance identical to the NMFS formula, but is textured more like deviled crab or fish sticks made from minced fish. This was the subject of our OMBE research program and has shown quite high consumer acceptance as a potential retail and wholesale institutional product. The advantage over the first formulation is that it can be manufactured without the purchase of very expensive micro-cutting and whipping equipment required for the first formulation.

Oregon State University Formulation:

| | |
|---|---|
| Fish | 68% |
| Oyster | 30% |
| Cornstarch | 2% |

Run fish through ¾" plate in grinder, combine with coarsely minced, poached oysters, liquid and starch. Mix for 2 to 3 minutes.

## Isolated Soy Protein as a Texture Modifier

Some types of seafood products such as clams and shrimp require a chewy mouth feel to simulate the real thing. With the addition of 2-3 percent isolated soy protein, along with shellfish and/or fish, a texture which may border on that of chicken flesh or shrimp flesh can be achieved. We manufactured several batches of this product for testing of shrimp and clam versions of the extruded products. The result in Seattle was unsatisfactory. Subsequently, a manufacturer was located who supplied adequate supplies of shrimp and clam product which had a better texture.

## Modern Maid Food Products, Inc., Formulation for Extruded Seafood Products

The Modern Maid extrusion process is used by a great many seafood manufacturers. It uses their own binder (matrix) formulation which acts as a filler material and also creates a protective skin on the outside of the product before it goes into a batter/breading line (see fig. 21c). The formulations we tested were basically a modification of the OSU formula using shellfish, fish, Modern Maid matrix, and calcium chloride.

| | |
|---|---|
| Fish | 50-70% |
| Shellfish | 10-40% |
| Matrix | 5-15% |

Run fish and shellfish through a ⅜" to ½" plate on grinder. Combine with matrix material amounts of fish, shellfish, and matrix depending first upon flavor penetration required by product and second upon the amount of moisture in the initial products. If shellfish-fish mixture is dry and firm, i.e., holds its own shape in the pan, then 5% matrix is required. If the mixture is runny or watery, then as much as 15% may be required. Combine all ingredients and place in the extruder using a calcium chloride spray as the product comes through to set the surface skin.

## Manufacture of Product Material for Market Testing Purposes

The above formulations are samples of the kinds of formula variations which are found today in the extruded seafood business. Our Boston/New York research program included three products using the Modern Maid formulation (crab, mussel, and oyster) and two products using a soy binder (clam and shrimp). It goes without saying that once the processing plant is operating, then formulation and product development will be an on-going project to provide special services to institutional and contract purchasers.

During the winter and spring a great deal of effort was put into locating a small processing plant or Federal laboratory where we could produce from several hundred to a thousand pounds of extruded shellfish product. This kind of pilot production, it turned out, was beyond the capability of the Federal laboratories we had used in the past. The last 2,000-lb. batch of material we used in the OMBE project was made by Dr. Jerry Babbit at the Pacific Shrimp plant in Astoria, Oregon, but was essentially hand-made. This time we wanted to make an honest to goodness extruded product.

We had some contact with DCA (Donut Corporation of America), a company which franchises a patented trade secret method and formulation for a variety of extruded products. It was their feeling that we could use one of their contracting plants to make some products. As a result materials for making our products were purchased, including oysters, scallop viscera, clams from Martha's Vineyard, and snow crab. DCA then put us in touch with a processor in Seattle to set up an appointment. Unfortunately over the period of about 2½ months they kept telling us, "next week."

The results of this phase were therefore quite disappointing, since we never did get into the processing plant. We were able to make one small batch of shrimp product using DCA's formulation and did not like it anyway. The product had too much soy protein and hence was quite elastic in texture.

### Market Research Activities

At this point we were really getting concerned about getting together any product at all. Looking through a trade journal one afternoon (*Quick Frozen Foods*), an advertisement by Modern Maid Foods was noticed. It basically said, "Contact us for all your product development needs for extruded products." We called immediately and talked with Kathy McCarthy of Modern Maid who said they would be able to make at least a couple of hundred pounds of product for us in their laboratory, and that they could offer whatever assistance was needed in terms of formulation, special breadings, equipment, and advice.

50



Original from
UNIVERSITY OF VIRGINIA

After making the necessary arrangements, we went to their Jamaica, N.Y., laboratory in May to make these product materials. Modern Maid had a single-head extruder which is capable of putting out about 100 pounds of product per hour. However, they were very cramped for working space and short staffed in their laboratory and had absolutely no freezing equipment that would handle this kind of production. We worked under these conditions for two days along with several Shinnecock people including Brad Smith and Ben Silva, as well as Beverly Wright of Wampanoag and Doreen Feng of OMBE. The lack of freezing equipment kept production down to about 150 pounds per day.

In addition, some shrimp and clam products (extruded) were also purchased from a DCA contractor in Boston.

The most important aspect of this Modern Maid phase was the personal contacts made between Modern Maid staff, and the Wampanoag, Shinnecock, and OMBE people. Their exposure to the actual technology of extrusion provided a clearer understanding of the project concept. The negative part of the project was the fact that most of the products we developed over a few days reflected the fact that it was a very rushed job. Another two weeks of work on formulations would have produced truly superior products which would have given a better idea of market applicability.

At this point cold storage drop points in Boston and Long Island were established. Using great quantities of dry ice, Brad Smith (Shinnecock Tribal Oyster Project Director) and Richard Haard began market interviews. It was decided to work first on Manhattan Island from about 50th to 110th Streets covering every restaurant, "pub", and other place that might be interested in the seafood product. Basically these products were presented to restauranteurs as an hors d'oeuvres item, however, the entree concept was investigated. The procedure was to drive down, for example, Second Avenue and double park with one person running in to try out a place. When contacting the manager or owner we asked them if they would like to try an experimental product which we would hold in our hands for them to see. We got three kinds of reactions: "Go away, I'm too busy;" "It just wouldn't fit into my restaurant or tavern;" or some positive response which ranged from "Let's give it a try and I'll let you know" to "I don't really want to take it but I'd love to sit down with you and talk over this project." From this latter category we had quite a few interesting discussions with restauranteurs and pub owners. Tables 10 and 11 show the questioning procedure and types of responses. Results from a typical interview follow.

In summary, our New York work did not indicate great possibilities for the presumed strategy of door to door institutional marketing of a specialty seafood product. It was our conclusion, therefore, that these extruded hors d'oeuvres items would best be sold through brokers in the New York City marketplace. No estimate can be made of

potential volume because of the generally poor showing in our interviews.

We then went out to Long Island, feeling a little disappointed with our New York City results. We again started working taverns and restaurants in the middle-class sections of Queens, then to Valley Stream, Floral Park, Franklin Square, Hempstead, Westbury, Farmingdale, and beyond. We went back and forth along Jericho Turnpike and Hempstead Turnpike, criss-crossing the area, making as many contacts as possible. Timing is very important; managers don't usually show up until about 11:00 a.m. and they don't want to talk during the hour-and-a-half rush period at lunch. The best time to make contact is in the early afternoon. Therefore, we had only about four hours to contact managers. The total possible contacts and discussions that we could hold were somewhere between 10 and 15 per day.

The results from our Long Island work were much better than New York. We reached the point where we could often predict the manager's reaction before we went in. This means that we could intuitively peg a place as to being a potential customer. Brad (Shinnecock Indian) did better than Haard (Anglo), which might mean something; and there was a genuine interest; hence we are able to present a stereotype of our market. Among other conclusions, when considering these products as "happy hour" hors d'oeuvres, price seemed to be the most critical point. The product would only sell if priced around 80¢ to $1 or less. The conclusions we have drawn from our Long Island studies are that a direct marketing of extruded products could be done in the Long Island marketplace with a volume to employ one, maybe two, salesmen. With 30 accounts, volume could range from 500 to 1,500 pounds per week.

After our activities on Long Island, R. Haard went up to Boston to see how the New England region compares to Long Island. Some time was spent in downtown Boston obtaining about the same results as New York City (basically not very good). Another two days were spent cruising the Boston perimeter, going some 50 to 75 miles from Boston to the smaller communities. It was hoped that the same type of establishments as those on Long Island could be found. Basically, we couldn't find them. It seems the entertainment and restaurant scene is different in the Boston area than in New York. It is possible that our initial assessment is incorrect and that with more time markets could be located in the Boston area.

### Typical Interview with Restauranteur

The first contact in Manhattan was with the manager and owner of the Fish Factory, a wholesale/retail fish operation and owners of the three restaurants, Nodelini's, Cockyed Clams, and Hobinaus. The owner of the Fish Factory was in the process of developing his own version of a fast food fish franchise based upon fresh "head-on" fish and some fancy extruded products.

51

Digitized by 

Original from
UNIVERSITY OF VIRGINIA

TABLE 10.—*Summary of interview topics covered during each contact.*

**Interview Topics**

1. Restaurant type?: Fast-food, white table, tavern.
2. Size and appearance—apparent volume.
3. Owner or manager, name.
4. Address.
5. Would these products fit into menu? How would they be used?
6. How much would he pay?
7. Expected volume.

**Owner's Impression**

1. His personal opinion of flavor, texture, appearance.
2. His opinion of how customers would accept product.
3. Owner's suggestions of best product versions for his market, including suggestions for product improvement.

**Customer Reaction to Product**

1. Extremely well-liked, moderately liked, neutral, moderate dislike, extreme dislike.
2. Solicited or unsolicited consumer comments.

We first met the manager (Nelville) and talked over our plans of doing some test marketing and told him basically what we were doing in terms of long-term thoughts of development work and in the short term testing of some new products and new product concepts. We decided to try out a sample of the product and took it to a fellow standing behind the fryer who later turned out to be the owner of the operation. He cooked up a couple of the crab-fish mix and Nelville said, "Boy, this stuff is really great, I think this is fantastic, really good," and Bob (the owner) nodded his head in agreement. Nelville left for the duration of the interview and Bob put in a few pieces of mussel product, fired it up, and tried it out. He made a terrible face and told us that the mussel tasted too much like the sea, all of our products had too much breading and that, by and large, extruded products don't generally fit in with his restaurant's theme. We ought to note in all fairness that he is using an extruded (stuffed) shrimp with a real shrimp tail tucked into the end. This product, incidentally, is selling very well.

We talked at length about many sorts of ideas along the line of the Shinnecock food manufacturing project. He was rather pessimistic about the chances that a small operation would have, but made the point that quality and

TABLE 11.—*Restaurants and taverns visited at Manhattan and Long Island.\**

| Establishment | Type | Reaction | Notes |
|---|---|---|---|
| *Summary of Manhattan Interviews* | | | |
| Beach Cafe | D | — | No manager. |
| Sibett Tavern | T | — | No cooking. |
| Soup/Burg | F | + | Possible entree. |
| Silver Star | WT | — | Uses fresh fish only. |
| Oscar's Salt & the Sea | WT | — | No manager. |
| Larsens | WT | — | No manager. |
| Pub 92nd & 3rd | T | — | No manager. |
| Pub 88th and 3rd | T | — | No manager. |
| Pub 93rd & Lexington | T | + | Tavern Snack |
| Dal Foodshop | D | — | Does not fit. |
| Lenox Hill Restaurant | WT | + | As appetizer |
| Tuppence Pub | T | — | No manager. |
| Frontier Coffee Shop | D | — | Doesn't fit. |
| Sultan Restaurant | D, T | + | For tavern only. |
| Koki Beach | F | + | Entree. |
| *Summary of Long Island Interviews* | | | |
| Charcoal Ranch | WT | + | Appetizer. |
| Spirit 76 Restaurant | D | — | Doesn't fit. |
| Red Pepper Lounge | C | + | Snack. |
| Jupiters Lounge | C, catering | + | Catering only. |
| Jack's Lounge | T | — | No manager. |
| Bradley's Pub | T | + | Snack (no storage). |
| Nassau Inn | Catering | — | Doesn't fit. |
| Ma Mahans Pub | T | + | Snack. |
| J.J. Pools | C | + | Appetizer. |
| Mi Mi Lounge | T | — | No food service. |
| Frank's Alibi | T, WT | + | Appetizer. |
| Quodros | C | + | Appetizer. |
| Panda Inn | C | + | Appetizer, but would probably use own chef. |

| | | |
|---|---|---|
| D   = Diner | C   = Club | F   = Fast food service |
| WT = White table restaurant | T   = Tavern | |

\* Not all negative contacts are listed, those included are only to indicate any trends.

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA


uniqueness should be very important areas to go into if a small operation is going to compete with the big guys. He later came back and said that extruded products would have a place in his restaurant, but would not be a featured item. He used the term "imitation fish" for these kinds of products and indicated that if the breading suited his taste, he might be more agreeable to using this product in his restaurant.

### Conclusions from Interviews

If it is assumed that a processing plant with 2,000 to 4,000 pounds per day capacity produces a single product line based upon shellfish-fish combinations to be used primarily in the hors'd'oeuvres market, (1) it would be very difficult to market its output on Long Island, and (2) it can't be done in Boston. The conclusion is, therefore, that we can find no justification to construct a plant to produce a single concept line (shellfish-fish mixtures).

### Reasons

Long Island would require one to two years to properly develop markets, hence a Long Island based plant would have to sell products outside this region, taking additional market development time.

### Alternate Ideas

Let's look at the whole project concept and re-examine what it is we are really trying to do. What we are really trying to do is to create economic development through food processing and provide markets for scallops, oysters, and other shellfish which do not compete with traditional marketing systems. If we can use the plant for other products, then expenses can be covered as the difficult market development period for the shellfish-fish mixtures continues.

Let's consider what else we can make in this plant which would offer an assured or guaranteed market. Immediately, one can list a series of options: (1) SBA minority business contracts for Government (military and other purchase of deep-fried fish products), (2) other institutional (schools, rest homes, hospitals) markets for batter-fried fish products, (3) custom packing of private label products for other agents (14 percent of all battered fish and approximately 30 percent of onion rings and potato products sold in the United States are co-packed, meaning private label custom packed), and (4) fast food contracts.

Examining the processing plant notion along this line leads to a completely different outlook. First of all, an SBA contract would assure cash flow for the first two years. Secondly, we have already been conducting interviews with schools and other institutional markets of minced fish, battered and breaded, and have had some promising results.

The extruded shellfish products could fit into this program as an add-on rather than the main basis for the product line. AIDA staff and the Shinnecock people feel much better about this approach, especially since we have had some promising preliminary interviews with SBA. With these results we have decided to go ahead and design Shinnecock's operation around this concept.

### Model for Revised Project Concept

A small processor who has been in the batter/breading and extrusion business for three years, Norm Fryer of Fry Foods, Inc., was interviewed on a visit to Sandusky, Ohio. Fry and Stein (an equipment-service company) people were very helpful and informative, providing basically all of the information asked for. Fry Foods was established three years ago as an alternative means for marketing mushrooms. Mr. Fryer was a mushroom farmer at that time and had no knowledge of the batter/ breading industry, as well as extrusion. He used the services offered by Modern Maid Foods and Stein to design methods and machinery for applying a batter coating to mushrooms. Over a period of three years he has developed a market for battered mushrooms. He is a pioneer in this field and is at this point approaching a third and very significant expansion in his plant.

His plant presently has three processing lines. A processing line is a set of machinery based upon a conveyor belt leading into a deep-fryer. Machinery is flexible, it rolls in and out so that with interchangeable parts it could be an extruder, onion slicer or just a belt going into a batter/breading machine. Many variations in coatings are possible. After pre-frying, the product is frozen in a blast tunnel and then packaged.

The day of the visit he was running two lines of onion rings, one pre-fried and the other unfried. He also manufactures extruded onion shapes (from onion trimmings) and other products along with his mushrooms.

With no knowledge of the business, it was assumed that the batter and breading was batter and breading. This is not true. He has at least six variations of batter fry, batter breading with the incredible permutations available in coatings and flavorings. As a result, with two or three basic products Fry is able to put together an extremely diverse product line. He claims that his success has been due to this versatility, in that people come to him with their special needs in their particular marketplaces. The onion ring market is apparently very good. He also, incidentally, does some fish products. He has expanded to co-packing, mainly because he is a small processor with a very flexible processing line making his plant very adaptable to this option.

Fry's example should serve as a model of how to develop processing systems. A single-concept plant (one product line) would be a serious mistake. In order to be successful, you must be willing to make whatever you can have a market for. If it's onions this week, this week you make onions. If you can land a contract for fish sticks, then you make fish sticks.

53

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA


*The Multiple Purpose Plant*

Modern Maid and Stein were lukewarm to the first concept of a shellfish-fish line. They were very enthusiastic about the possibility for the expanded concept. Once the plant is operational, NMFS will be able to offer much assistance in locating markets. With this feedback and also some positive interviews from a few markets behind us, we've designed the Shinnecock system to consist of one processing line based upon two batter/breading machines, a four-head extruder, high-speed frier, and freezing equipment to handle initially 4,000 pounds of product per day. Plant expansion would be made by adding a second line in existing floor space and a third line in an easy expansion. Freezing facilities would have to be expanded or changed in concept (IQF equipment) once 4,000 lbs-per-day capacity was exceeded. The four-head extruder and single line could produce 8,000 or 12,000 lbs./day.

Products to be manufactured by the Shinnecock plant would be (1) minced fish products, based upon a bread and butter Government contract, (2) onion rings, clam strips, and similar items. For existing institutional markets, (3) premium quality pre-cooked or uncooked batter/breaded fish fillets, crab stuffed trout, crab stuffed shrimp, (4) a low-cost hors d'oeuvres line based upon such items as shellfish-flavored fish, heavy breading (50 percent or more), potato with bacon and cheese flavor, and zucchini rings, and (5) custom packing.

This operation runs very well when set up on paper. Assuming inflated input costs for future price increases, the model shows $200,000 profit in its first bug-free operating year (see "Processing Segment—Cost Summary" following).

The key to the establishment of a successful seafood plant at Shinnecock at this point depended on a supply of inexpensive minced fish. Through the previous phase of our research we established a product line based upon minced fish and shellfish combinations which has a very promising initial market. The last problem to be solved on this project was locating a supply of fresh minced fish. It is possible to buy frozen blocks of minced fish, but they experience some loss of quality with thawing, processing, and refreezing.

Through interviews with USDA, the New York State Department of Agriculture, Sea Grant, and NMFS, we have located supplies of vegetable materials for extrusion in batter/breading processing, as well as a virtually unlimited supply of fresh, unfrozen, minced fish.

Cornell University and NMFS have been working for the past few years on products and markets based upon underutilized fish species. They have been anxious to convince one of the small fish processors in Bridgehampton, Long Island, to add a de-fleshing machine in order to provide a market for fishermen of a variety of underutilized but high quality fish species. We walked in the door with a request for one million pounds of fresh minced fish per year.

This excited all parties because we were the first processor looking at installing this processing line. Since we provided the Bridgehampton processor with his first market he will key his development to Shinnecock's progress. We believe that a contractual arrangement can be set up on fish prices and supplies of materials. In addition, we will be receiving a large amount of technical assistance, market testing, product development services and publicity from Sea Grant. Bridgehampton is located about 15 miles away from the Shinnecock processing plant. This allows us to use unfrozen minced fish in our extruded products, making a much superior product to thawing, grinding, extruding, and then refreezing a frozen product.

Unfortunately, minced fish has lately had a bad reputation because of an unsuccessful attempt by Canadians to get into this business. The basic mistake Canadian processors made was to pack the minced fish into cardboard boxes and freeze them without any protection. Under these conditions fillets may keep for a couple of months, but minced fish almost immediately goes rancid. With the proper protection, shelf-life now matches that of fillets. We are confident that with the expertise offered by Cornell University we can put a superior product on the market.

### Shinnecock Processing Plant—Specifications and Estimated Capital Investment

*Building Description*

20' x 40' frame, 2 story, first floor has 12' ceilings, office on second floor = 12' x 16' (remainder full ceiling 20'), slab floor, drains, stainless steel tables, FDA-approved food processing equipment and layout. (See Fig. 19)

*Processing Plant*

| | |
|---|---:|
| Building (4,300 sq. feet) ............ | $ 85,000 |
| Plumbing and water & sewer hookup .... | 5,000 |
| Parking area (2,400 sq. feet) ......... | 9,600 |
| Subtotal ...................... | $ 99,600 |

*Processing Equipment\**

| | |
|---|---:|
| Safety equipment ................... | $ 1,000 |
| 4 head extruder .................... | 11,000 |
| 14' conveyor belt .................. | 2,000 |
| Slurry pump ....................... | 1,000 |
| Mixer ............................. | 5,000 |
| Grinder ........................... | 1,000 |
| Tanks ............................. | 1,500 |
| Batter/breading machine (2 ea.) ...... | 20,000 |
| Fryer ............................. | 20,000 |
| Pressure cooker ................... | 2,500 |
| Packaging line ..................... | 6,700 |
| Smoker ........................... | 1,500 |
| Garbage composter ................. | 1,850 |
| Fork lift .......................... | 4,775 |
| Tools ............................. | 1,650 |
| Subtotal ...................... | $ 81,475 |

NOTE: The remainder of the following costs are based upon 4,000 lbs of production per day for 180 days plant operating time/year.

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA

*Contractual Costs Plant (Plant)*

**Blast freezer (lease) @ $.075/lb of**

| | |
|---|---|
| processed product .................. | $ 75,000 per year |
| Freezer (lease) ...................... | 11,000 per year |
| Back-up storage .................... | 21,600 per year |
| Semi truck-trailer (lease) ............ | 9,500 per year |
| Subtotal ......................... | $117,100 |

*Overhead Costs*

| | |
|---|---|
| Electricity .......................... | $ 12,000 per year |
| Heat ................................ | 6,000 per year |
| Insurance .......................... | 1,000 per year |
| Water .............................. | 150 per year |

Office:

| | |
|---|---|
| Typewriter ...... $ 50 per month | |
| Xerox .......... 100 per month | |
| Telephone ....... 350 per month | |
| Supplies ........ 50 per month | |
| Furn. rental .... 100 per month | |
| $650 per month | $ 7,800 per year |

| | |
|---|---|
| Subtotal ...................... | $ 26,950 |

*Personnel Costs*

| | |
|---|---|
| Line crew, 12 @ 3.25/hr × 40 hrs/wk × 48 wk/yr ...................... | $ 74,880 |
| Crew leader, 3 @ 4.50/hr × 40 hrs/wk 48 wk/yr ......................... | 25,920 |
| Executive, 2 @ $15,000 .............. | 30,000 |
| Subtotal ......................... | $130,800 |

*Contracted Services*

| | |
|---|---|
| Engineering services ................. | $ 10,000 |
| Accounting services .................. | 6,000 |
| Legal services ...................... | 2,000 |
| Subtotal ......................... | $ 18,000 |

\* Used equipment where possible; prices based upon 5-year life span.

### Processing Segment—Cost and Income Summary

*Expenses*

| | |
|---|---|
| Salary and Benefits ...................... | $143,880 |
| Overhead ............................... | 31,150 |
| Contractual: | |
| Equipment .......................... | 117,000 |
| Services ............................ | 18,000 |
| Depreciation: | |
| Plant ............................... | 4,000 |
| Equipment .......................... | 12,850 |
| Contingency Reserve ...................... | 50,000 |
| | $376,980 |

*Materials*

| | |
|---|---|
| Fish (409,000 lbs @ $.80) ................ | $327,500 |
| Other (317,000 lbs @ $.26) ............... | 85,000 |
| | (412,000) |
| Packaging ............................... | 40,000 |
| Handling ................................ | 20,000 |
| Marketing & Promotion ..................... | 75,000 |
| | $547,000 |
| *Total Expenses* ............................... | $923,980 |

#### Income Summary

| | |
|---|---|
| Total production = 720,000 lbs ........Breakeven | |
| Normal Profit ................................ | $1.32/lb .39 |
| Average Wholesale Price .................. (Retail Price = $1.94 to $2.05) | $1.71 |

Net Profit = $200,000 per year anticipated profit.

---

### NOTES

1. This scenario assumes a year beyond the second year. The first two years would possibly operate at diminished efficiency, slow start-up, and with the usual redesign activities.

2. Assumes trained personnel—learning curves are programmed in Management Training at one year.

3. Assumes current market prices, costs, and inflation at less than 7 percent.

4. Assumes non-recessionary conditions, low labor turnover, and community interest.

### Extruded Shellfish/Fish Product Cost Determination

(SOURCE: Modern Maid Food Products, Inc.)

1. *Chopped Shellfish & Fish:*
   Oysters: ⅜" grind at $2.00/lb.
   Clams: ⅜" grind at $1.50/lb.
   Fish: ¾" grind at $0.40/lb.

2. *Ingredient Cost:* For calcium chloride, textured protein, batter and breader are delivered to you.

3. *Personnel Cost:* A wage of $3.25 for the line workers and $4.50 for the line supervisor's wage.
   An output of 60 patties at 3 oz. finished weight each per minute is used for costing purposes. This is actually 675 lbs/hr for the two head machine and is approximately the same output when using the oyster shaping or clam strip nozzles.

4. *Losses:* Our experience has been that waste is an insignificant factor, and if losses do occur, the product can be readily rechopped and recycled.

5. *Packaging and Packing:* Without pre-frying, bulk packaging would not be suitable, so apply your price for oyster trays, separator sheets, boxes and cartons.

6. *Projected Ingredient Costs:*

| Item | Amount | Cost/lb. | Total |
|---|---|---|---|
| Minced fish ............ | 50 lbs | $ .40 | $ 20.00 |
| Chopped oysters ........ | 40 lbs | 2.00 | 80.00 |
| Matrix mix E-19-7 ..... | 26 lbs | .60 | 15.60 |
| Flavoring and seasoning . | 8 ozs | 2.00 | 1.00 |
| Textured protein ....... | 7 lbs | .25 | 1.75 |
| Calcium chloride ....... | 8 ozs | .40 | .20 |
| Batter #4310 .......... | 9 lbs | .21 | 1.89 |
| Water ................ | 11 lbs | — | — |
| Breader #8864 ......... | 22 lbs | .26 | 5.72 |
| Total ............ | 181 lbs | | $126.16 |
| Freezer moisture loss ... | 2 lbs | | |
| Net Yield ....... | 179 lbs | | |

This will produce a final ingredient cost of $126.16/179 lbs or 70.5¢/pound for the finished product.

A similar analysis of extruded clam strips using clams at $1.50 per pound would be:

| Item | Amount | Cost/lb. | Total |
|---|---|---|---|
| Chopped clams ........ | 100 lbs | $1.50 | $150.00 |
| Clam strip matrix ...... | 15 lbs | .45 | 6.75 |
| Calcium chloride ....... | 8 ozs | .40 | .20 |
| Batter mix #4113 ...... | 6 lbs | .21 | 1.26 |
| Water ................ | 14 lbs | — | — |
| Breader #8864 ........ | 30 lbs | .26 | 7.80 |
| Total ............ | 173 lbs | | $166.01 |
| Freezer moisture loss ... | 2.5 lbs | | |
| Net Yield ....... | 170.5 lbs | | |

This produces a final ingredient price of $166.01/170.5 lbs. or 97¢/lb.

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA




FIGURE 19a-d.—Shinnecock model processing plant—a combination facility with tribal business offices, meeting rooms. and a processing facility which can easily be expanded to three lines (8,000 to 12,000 lbs of product per day). Freezing equipment will be leased, modular, and attached at south and east end of building.

56

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA



57

Digitized by Google

Original from
UNIVERSITY OF VIRGINIA



FIGURE 24.—Processing plant with add-on retail vegetable/fish sales area. Some facilities needed by both units (retail and processing) can be shared.

### Shinnecock Retail Vegetable Marketing

This segment of the model deals with the establishment of a retail/wholesale vegetable marketing business as shown in Options 2 and 3. The assumptions are that the vegetables are both purchased and grown in sufficient volume to meet market requirements for four months (120 days) and provide employment for three people (50 hour week) during that period.

*Expenses*

| | |
|---|---|
| Buildings and Land (Capital Investment): | |
| Retail Sales Area: Specs: 400 sq. feet, frame, open front, shutters, display cooler, sinks, lights, awnings | $ 8,000 |
| Storage & preparation area: Specs: 400 sq. feet, frame, enclosed, slab floor, drains, sinks, ice machine & walk-in cooler | 22,000 |
| | $30,000 |
| Salaries and Benefits | 13,620 |
| Overhead | 500 |
| Contractual (Equipment & Services*) | } 4,000 |
| Depreciation (Plant & Equipment*) | |
| Contingency Reserve | 1,000 |
| Materials | |
| Vegetables | 34,240 |
| Fruit | 35,625 |
| Packaging | 18,465 |
| Marketing & Promotion | 1,800 |
| Total Expenses | $109,250 |

*Income Summary*

| | |
|---|---|
| Total Fruit | $ 65,625 |
| Total Vegetables | 64,100 |
| Gross Income | $129,725 |

### Produce To Be Marketed, Estimated Costs and Volumes

| Lettuce | Cucumbers | Strawberries |
|---|---|---|
| Carrots | Peas | Cherries |
| Beans | Peppers | Grapes |
| Onions | Spinach | Nuts |
| Cabbage | Tomatoes | Squash |
| Cauliflower | Apples | Potatoes |
| Corn | Peaches | |

Estimated Vegetable Costs = 15¢/lb.

Estimated fruit costs = 35¢/lb.

*Estimated Volumes*
Vegetables = 26,750 lbs per week
Fruit = 11,718 lbs per week

### Consolidated Income From Combined Retail Vegetable Sales and Frozen Fish/Shellfish Processing

| | |
|---|---|
| Vegetable Retail Sales | $ 24,175 |
| Fish Processing | 200,000 |
| | $224,175 |

### *Conclusions*

This scenario has shown that there is a financial feasibility and thereby a high likelihood of success for a vertically integrated Shinnecock food processing system. When comparing the individual components, the food processing option allows for greater employment and income. In addition, the operating period of the processing plant is 12 months per year, whereas retail vegetables operate for only four to six months. Because of these factors we are concluding that processing and oyster production should be emphasized in the actual application of the model.

The estimated capital investment, variable costs, overhead costs, personnel costs, and income potential are based upon our *estimates* of probable costs and markets for the Southampton area. There may be some change in these actual figures when the project is implemented. However, we do not feel that the figures are far enough off to make a change in the very favorable income estimate for this project.

The appendix includes an annotated list of sources of materials, technical assistance, and financing for such a project.

65

Digitized by **Google**

Original from
UNIVERSITY OF VIRGINIA

# PLAINTIFFS' EXHIBIT 20

Farrish, Brian R (DEC)

| | |
|---|---|
| From: | Bengel, Dallas (DEC) |
| Sent: | Tuesday, March 28, 2017 12:18 PM |
| To: | Amato, Christopher J (DEC); Bengel, Dallas (DEC); Bevis, Kyle A (DEC); Blaising, Matthew P (DEC); Bobseine, Ike G (DEC); Bohling, Justanna N (DEC); Brown, Timothy J (DEC); Burnell, William J (DEC); Carbone, Frank D (DEC); Carpenter, Emma C (DEC); Carpenter Gerard W (DEC); DeRose, Christopher M (DEC); Doroski, Jordan P (DEC); Eastwood, Jeremy T (DEC); Farrish, Brian R (DEC); Fay, Timothy J (DEC); Ferraro, Denise (DEC); Gadomski, Thomas (DEC); Godson, Nathan E (DEC); Grady, Kaitlin M (DEC); Hansen, Thomas (DEC); Helmer, Ian S (DEC); Howe, Robert R (DEC); Jakaub, Katie L (DEC); Jenulewicz, Diane (DEC); Laczi, Evan G (DEC); Lapinski, Frank J (DEC); Lawston, Alena (DEC); Reilly, Sean A (DEC); Simmons, Landon T (DEC); Simmons, Mark (DEC); Tabor, Benjamin P (DEC); Unger, Michael J (DEC) |
| Cc: | Gilmore, James J (DEC); Florence, Scott (DEC); thomas_loring@fws.gov; Schneider, Joseph H (DEC) |
| Subject: | Shinnecocks and glass eels |
| **Importance:** | High |

Word is out that the Shinnecocks are actively seeking a shipper for glass eels.  Apparently they have been in contact with the Unkachaugs and the Passamaquoddys (Maine).  Although my guess is that much of any shipment would be elvers from other states, I'm sure that there will be local harvests going on also.  I'm not sure of their ability to harvest any real quantities of elvers on their reservation lands so we will have to work the off reservation areas diligently to prevent illegal harvest.

Lt Carbone - your thoughts on the creek adjacent to the east side of the reservation?

Lts - please put together a elver patrol/detail plan for your Zones.

I will keep you posted as I learn more.

Thanks and good luck

# Dallas Bengel
Captain, NYS ENCON Police

**New York State Department of Environmental Conservation**
Region 1
50 Circle Rd, SUNY Stony Brook NY 11790
P: (631) 444-0250 | F: (631 444-0251 | dallas.bengel@dec.ny.gov
24/7 Dispatch Center 1-844-DEC-ECOS
www.dec.ny.gov | **f** | 

1

PLAINTIFFS' EXHIBIT 21

[illegible faded text]

[illegible faded text] 631-444-0250 [illegible] (516)779-9358 | Fax (361) 844-0251 | [illegible]

[illegible] Dispatch Center 1-844-DEC-ECOS

[illegible] | [illegible] |

**From:** Bengel, Dallas (DEC)
**Sent:** Tuesday, April 25, 2017 10:55 AM
**To:** Kreshik, Monica L (DEC) <monica.kreshik@dec.ny.gov>; Gilmore, James J (DEC) <james.gilmore@dec.ny.gov>; Gallagher, Carrie M (DEC) <Carrie.Gallagher@dec.ny.gov>; Montalvo, Aphrodite (DEC) <aphrodite.montalvo@dec.ny.gov>; Crisafulli, Scott w (DEC) <scott.crisafulli@dec.ny.gov>
**Cc:** Florence, Scott (DEC) <scott.florence@dec.ny.gov>; Putnick, Dena N (DEC) <dena.putnick@dec.ny.gov>; Naughton, Michael P (DEC) <michael.naughton@dec.ny.gov>; Sanza, Mark D (DEC) <mark.sanza@dec.ny.gov>; Schneider, Joseph H (DEC) <joseph.schneider@dec.ny.gov>; Reilly, Sean A (DEC) <sean.reilly@dec.ny.gov>; Carbone, Frank D (DEC) <frank.carbone@dec.ny.gov>
**Subject:** RE: Shinnecock - Fishing

Monica,

There are 2 historically weak parts to successful prosecutions in Southampton, the DA's Office and Southampton Town judges. I believe that we need to have a meeting with the DA's Office on this issue, or go to the AG. I can reach out to the East End Bureau Chief Cathy Loeffler. (Can we get anyone above our pay grades to reach out to DA Tom Spota?). Good news is that at this point, the Southampton Bay Constables are looking to charge Silva with an illegal net, but of course that could change. Silva alleges that he was on Heady Creek, he was actually on Taylor's Creek, about ½ mile further to the east. The Southampton Judges have quite often ruled against us, usually when a case is involving Southampton Town resident commercial fishermen.

Thanks
Dallas

# Dallas Bengel
Captain, NYS ENCON Police

## New York State Department of Environmental Conservation
Region 1
50 Circle Rd, SUNY Stony Brook NY 11790
P: (631) 444-0250 | F: (631 444-0251 | dallas.bengel@dec.ny.gov
24/7 Dispatch Center 1-844-DEC-ECOS
www.dec.ny.gov | [icon] | [illegible]

**From:** Kreshik, Monica L (DEC)
**Sent:** Tuesday, April 25, 2017 10:19 AM
**To:** Gilmore, James J (DEC) <james.gilmore@dec.ny.gov>; Gallagher, Carrie M (DEC) <Carrie.Gallagher@dec.ny.gov>; Bengel, Dallas (DEC) <dallas.bengel@dec.ny.gov>; Montalvo, Aphrodite (DEC) <aphrodite.montalvo@dec.ny.gov>;

2

Crisafulli, Scott W (DEC) <scott.crisafulli@dec.ny.gov>
Cc: Florence, Scott (DEC) <scott.florence@dec.ny.gov>; Putnick, Dena N (DEC) <dena.putnick@dec.ny.gov>; Naughton, Michael P (DEC) <michael.naughton@dec.ny.gov>; Sanza, Mark D (DEC) <mark.sanza@dec.ny.gov>
Subject: RE: Shinnecock - Fishing

The state of New York asserts jurisdiction to regulate fishing in the waters surrounding the reservation. Although the land under the water is owned by the town under Patent, the DEC is authorized to regulate fishing in these waters.

I am not sure why the patents were not entered into evidence in the attached case. The State "retains the authority to regulate and control the right of fishing for migratory marine fish." in navigable waters of the state, including the waters surrounding the reservation land.

The Shinnecock assert that they have treaty right to exercise their aboriginal fishing practices. This may be true. However, State law or regulation may impair an off-reservation treaty fishing right when (1) it represents a reasonable and necessary conservation measure and (2) does not discriminate against the Native American treaty rightholders.

Conservation necessity clearly applies to American Eel.

I did not attend the meeting held with the Nations last year. So, I will consult with several people here for any input they may have.

We should do everything possible to preserve a good working relationship with the Shinnecock. However, I believe we need to impress our position concerning eel.

I will get back to you asap with more info.


From: Gilmore, James J (DEC)
Sent: Tuesday, April 25, 2017 8:45 AM
To: Gallagher, Carrie M (DEC) <Carrie.Gallagher@dec.ny.gov>; Bengel, Dallas (DEC) <dallas.bengel@dec.ny.gov>; Montalvo, Aphrodite (DEC) <aphrodite.montalvo@dec.ny.gov>
Cc: Kreshik, Monica L (DEC) <monica.kreshik@dec.ny.gov>
Subject: RE: Shinnecock - Fishing

There is an active case on this; will fill you in with the details later.


From: Gallagher, Carrie M (DEC)
Sent: Monday, April 24, 2017 10:00 PM
To: Bengel, Dallas (DEC) <dallas.bengei@dec.ny.gov>; Montalvo, Aphrodite (DEC) <aphrodite.montalvo@dec.ny.gov>; Gilmore, James J (DEC) <james.gilmore@dec.ny.gov>
Subject: Fwd: Shinnecock - Fishing

Dallas - does this incident sound familiar?

3

PLAINTIFFS' EXHIBIT 22

## CP-42 / Contact, Cooperation, and Consultation with Indian Nations

New York State Department of Environmental Conservation
### DEC Policy

**Issuing Authority:** Alexander B. Grannis, Commissioner

| **Date Issued:** March 27, 2009 | **Latest Date Revised:** |
|---|---|

## I.    Summary

This policy provides guidance to Department staff concerning cooperation and consultation with Indian Nations on issues relating to protection of environmental and cultural resources within New York State.  Specifically, this policy (i) formally recognizes that relations between the Department and Indian Nations will be conducted on a government-to-government basis; (ii) identifies the protocols to be followed by Department staff in working with Indian Nations; and (iii) endorses the development of cooperative agreements between the Department and Indian Nations to address environmental and cultural resource issues of mutual concern.

## II.    Policy

It is the policy of the Department that relations with the Indian Nations shall be conducted on a government-to-government basis.  The Department recognizes the unique political relations based on treaties and history, between the Indian Nation governments and the federal and state governments.  In keeping with this overarching principle, Department staff will consult with appropriate representatives of Indian Nations on a government-to-government basis on environmental and cultural resource issues of mutual concern and, where appropriate and productive, will seek to develop cooperative agreements with Indian Nations on such issues.

## III.    Purpose and Background

### A.  General

Nine Indian Nations reside within, or have common geographic borders with New York State: the Mohawk, Oneida, Onondaga, Cayuga, Seneca, Tonawanda Seneca, Tuscarora, Unkechaug, and Shinnecock.  The United States formally recognizes all but the Unkechaug and Shinnecock Nations.  The State of New York recognizes all nine Nations.

The Mohawk, Oneida, Onondaga, Cayuga, Seneca, Tonawanda Seneca, and Tuscarora are known as the Six Nations or Haudenosaunee.  Relations between the Department and the Haudenosaunee will be conducted in the spirit of Peace and Friendship established in the 1794 Treaty of Canandaigua.

All nine Indian Nations and their diverse governments and governmental entities may share mutual interests with the Department concerning environmental and cultural resources.  For the purposes of this policy, the Department will communicate with representatives from any Indian Nation government where there are environmental or cultural resource issues of mutual concern.

1

The Department interacts with Indian Nations in two critical areas of mutual importance: the environment (including air, land use, water, fish and wildlife) and cultural resources (including sacred sites, traditional cultural properties, artifacts, ancestral remains, cultural items, and pre- and post-contact historic sites). It does so in several capacities, including, but not limited to, permit application review, site remediation, hunting and fishing regulation, and the development, implementation, and enforcement of regulations.

It also has care, custody and responsibility for 13 percent of the State's land area, and, as such, is its largest single steward of archaeological resources. The Department wishes to ensure that its actions with respect to the environment and cultural resources are sensitive to the concerns of Indian Nations, and that the perspective of the recognized Indian Nations is sought and taken into account when the Department undertakes an action having implications for Indian Nations or their territories.

### B. Consultation

Close consultation ensures that the Department and Indian Nations are better able to adopt and implement environmental and cultural resource protection policies and programs in a manner that is cognizant of shared concerns and interests. Additionally, mutually beneficial cooperation and the appropriate resolution of occasional disagreements or misunderstandings can best be achieved if there is a commitment to regular consultation on environmental and cultural resource issues of mutual concern. While successful intergovernmental communication and cooperation are not guarantees of agreement on every issue, communication and cooperation will ensure a durable, effective working relationship between the Department and Indian Nations.

Communication between the Department and Indian Nations should be direct and involve two-way dialogue and feedback. Meetings between Indian Nation representatives and Department policy and/or technical staff, as appropriate, can increase understandings of any proposed actions and enhance the development of effective outcomes and solutions. Face-to-face meetings are generally desirable; however, phone calls, correspondence, and other methods of communication are also encouraged.

Identifying the need for consultation and making the decision to consult may be difficult to determine in some cases and will vary among the diverse Indian Nation governments. The main guide, though, and one that requires further delineation, is that consultation is required for any Department decision or action which could foreseeably have Indian Nation implications. Consultation can be initiated by either the Department or an Indian Nation. The Department understands that its planning and permitting processes may not be familiar to the Nations and shall take that into account when initiating consultation. To ensure sufficient time for input before decisions are made and actions taken, early involvement of Indian Nations is essential.

Good faith efforts should be undertaken to involve Indian Nations. The Department should strive to ensure that appropriate communication and response for any particular Indian Nation government or governmental entity is provided to any request for consultation.

### C. Protection of Environmental Resources

Since all the natural world is interconnected and interrelated, environmental issues transcend geographic boundaries. As such, there are numerous unexplored opportunities

2

for the Department and Indian Nations to pursue programs and policies through partnership for the betterment of all of our communities and citizens.

The Department and Indian Nations share key roles in protecting and preserving natural and cultural resources important to all citizens, and early consultation and cooperation between the Department and Indian Nations will foster more comprehensive protection and preservation of those resources.

### D.  Protection of Cultural Resources

The preservation of Native American sacred sites, pre- and post-contact historic sites, and traditional cultural properties, and the preservation, disposition, and repatriation, when appropriate, of Native American ancestral remains, funerary objects, artifacts, cultural items, and cultural property ("Native American Sites and Objects") displays respect for Indian Nations, and preserves the historical, ancestral, and cultural heritage of Indian Nations and all New Yorkers.  Actions approved, undertaken, or funded by the Department may have the unintended and inadvertent result of disturbing or adversely affecting Native American Sites and Objects.  Accordingly, early consultation with Indian Nations connected to such Native American Sites and Objects is necessary to ensure proper and respectful treatment and to avoid any irreplaceable loss.

The careful consideration of the preservation, disposition, and repatriation of Native American Sites and Objects is consistent with the State Historic Preservation Act, State Environmental Quality Review Act, the federal Native American Graves Protection and Repatriation Act, and the National Historic Preservation Act.

## IV.  Responsibility

The Department's Office of Environmental Justice in the Office of General Counsel will provide oversight to ensure compliance with this policy.  It shall assess the policy's effectiveness and initiate changes as needed, and shall appoint an individual to serve as Indian Nations Affairs Coordinator for all matters concerning this policy.  The Office of Environmental Justice will maintain a list of current contacts for each Indian Nation, and will provide the contact list and any updates to the list to regional and central office staff.

All the Department's divisions and regional offices will fully cooperate and work closely with the Office of Environmental Justice in the implementation of this policy.  Each division and regional office will appoint a single point of contact for Indian Nation matters; and each will identify that individual to the Office of Environmental Justice.  Each division and regional office may issue its own guidance to further the implementation of this policy.  Such guidance shall be developed in consultation with the Office of Environmental Justice to ensure consistency with this policy and uniformity of application throughout the Department.

The Commissioner and Department staff will strive to meet with representatives of each Indian Nation on an annual basis to continue to foster this cooperative, government-to-government policy.

## V.  Procedure

This policy is intended solely for the purpose of facilitating intergovernmental cooperation between the Department and recognized Indian Nations and may not serve as a basis for any legal claim against the Department or its employees, agents, or contractors.  Nothing in

this policy shall or is intended to modify, diminish, or alter any rights and is not intended to create any right, benefit, obligation, or cause of action, whether direct or indirect, for any person or entity.

### A. Contact

Department staff are encouraged to engage in regular contact with representatives of Indian Nations, especially program counterparts, in order to facilitate a cordial and cooperative working relationship.  Informal contacts (e.g., telephone calls and in-person meetings) should be conducted on an as-needed basis, without the necessity of prior review or approval.  Formal written contacts or contacts resulting in commitments should be coordinated with the appropriate Department executive, Office of Environmental Justice and, if deemed necessary, legal staff.

### B. Consultation

Department staff shall consult with appropriate Indian Nation representatives on a government-to-government basis regarding matters affecting Indian Nation interests, with the goal of creating durable intergovernmental relationships that promote cooperative partnerships on environmental and cultural resource issues of mutual concern.  As used herein:

- "Consultation" means open and effective communication in a cooperative process that, to the extent practicable and permitted by law, works toward a consensus before a decision is made or an action is taken.  Consultation should begin as early as practical, and, where appropriate, consultation should continue through the implementation of such decision or action.  Consultation means more than simply informing affected Indian Nations about what the Department is planning.  Consultation is a process, not a guarantee of agreement on outcomes.  Consultation should not be limited to specific issues or actions, but applied broadly in order to achieve mutually beneficial priorities, programs and interests.

- "Affecting Indian Nation interests" means a proposed action or activity, whether undertaken directly by the Department or by a third party requiring a Department approval or permit, which may have a direct foreseeable, or ascertainable effect on environmental or cultural resources of significance to one or more Indian Nations, whether such resources are located on or outside of Indian Nation Territory.

- "Indian Nation Territory" means all lands within the exterior boundaries of any Indian reservation and all lands held in trust by the federal government for any Indian Nation.

It is expected that Department staff will work with each Indian Nation to identify categories of actions or activities that will likely require consultation.  As this policy is implemented, the Department will cooperatively establish with affected Indian Nations the manner and time frame for consultation, and will strive to accommodate the differences in deliberative processes.  When a regulatory or policy change is planned that may affect Indian Nation interests, the Department will invite interested Indian Nations to consult on a government-to-government basis.  The Department will be receptive to requests from Indian Nations for intergovernmental consultation on actions, policies, and issues within the Department's authority.

To further achieve proper contact and consultation the Department will develop and conduct sensitivity training of all staff who will or may implement this policy.  To the

4

extent that it is achievable, the development and conduct of such training shall include Indian Nation representation.

### C.  *General Consultation Subjects*

#### 1.  **Environmental Resources**

The Department is committed to working cooperatively with Indian Nations to address issues of mutual concern involving environmental resources, whether located on or outside of Indian Nation Territory.  The Department recognizes that environmental resources transcend these boundaries, and that protection and preservation of those resources requires close cooperation between the Department and Indian nations.  The Department also recognizes that environmental impacts transcend these boundaries and remediation and reduction of impacts should be addressed cooperatively.

Where appropriate, the Department may consider entering into a written cooperative agreement or agreements with one or more Indian Nations where it will achieve protection, preservation, or remediation of such environmental resources. With respect to environmental matters occurring wholly or partly on Indian Nation Territory, the Department shall seek to achieve protection, preservation or remediation of such resources through development of a cooperative agreement or agreements with that Indian Nation.

#### 2.  **Hunting, Fishing, and Gathering**

The Department recognizes that hunting, fishing, and gathering are activities of cultural and spiritual significance to the Indian Nations.  The Department is committed to collaborating with Indian Nations to develop written cooperative agreements that protect the rights of such Nations to engage in these activities consistent with the Department's interest in protection and management of the State's natural resources.

#### 3.  **Cultural Resources**

The Department recognizes the importance of Native American Sites and Objects to Indian Nations.  Specifically, for example, the Department recognizes the profound connection Indian Nations and their citizens have with their ancestors and their preeminent desire, therefore, to protect them from disturbance.  The Department also recognizes that there are locations within the State that have great cultural and pre- and post-contact historical significance to Indian Nations that require similar protection.

The Department, in consultation with each Indian Nation and with the Office of Parks, Recreation and Historic Preservation, will develop a map showing the area of aboriginal occupation of each Indian Nation within the State.  When the Department undertakes an action that might affect a Native American Site or Object, including but not limited to a known or potential burial, or pre- or post-contact historic site, or traditional cultural property or sacred site, it will use this information to notify and consult with any Indian Nation claiming interest in the site location, including Nations that formerly resided within the State.  Similarly, the Department will

consult with the Indian Nations before it takes any action with respect to any law, regulation or policy that relates to Native American Sites and Objects.

## VI.  Related References

- State Historic Preservation Act [Article 14, Parks, Recreation and Historic Preservation Law]

- National Historic Preservation Act [16 U.S.C. 470 et seq.]

- State Environmental Quality Review Act [ECL Article 8]

- Native American Graves Protection and Repatriation Act [25 USC 3001 et seq.]

PLAINTIFFS' EXHIBIT 23

**To:** Lynch, Kenneth (DEC)[kenneth.lynch@dec.ny.gov]; Tighe, Julia W (DEC)[julia.tighe@dec.ny.gov]
**Cc:** Mahar, Sean C (DEC)[Sean.Mahar@dec.ny.gov]
**From:** Ringewald, Erica R (DEC)
**Sent:** Thur 1/25/2018 10:28:38 AM
**Subject:** FOR REVIEW & INPUT: NEW YORK TIMES Shinnecock –

Corey Kilgannon, NYT

DEADLINE: COB TODAY

PROPOSED FOR ATTRIBUTION:

New York State authorities maintain that Native Americans are not exempt from fishing regulations.

• Please use: *"Outside of the Nation boundaries, Native Americans are not exempt from fishing regulations prohibiting the harvest of American eel less than nine inches long in New York waters."*

Major Scott Florence, with the agency's Division of Law Enforcement, said the state's fishing regulations "apply to every New Yorker, native or not."

• Please use: *"... apply to anyone who fishes in the waters of New York State."*

"There are no special exemptions for any groups in New York to fish outside of New York State rules and regulations."

• Please use: *"DEC does not dispute that they maintain sovereign jurisdiction over fishing within reservation boundaries."*

DO NOT USE: "We don't dispute that they have the legal right to do what they want on the reservation, but off the reservation, they are subject to the same regulations as other New Yorkers."

**ON BACKGROUND**

Mr. Silva has been charged with the following violations of Environmental Conservation Law:

• Taking fish by commercial means without a food fish license
• Possession of eels less than the legal size (minimum size is 9")
• Possession of over the limit eels (limit is 25 eels for individuals)

**Potential Fines**

Fines that apply to these violations are $100 per fish per violation.

• Taking fish by commercial means (247 bucket elvers + 98 still in net)
• Possession of eels less than the legal size (247 bucket elvers)
• Possession of over the limit (247 bucket fish – 25 = 222 elvers)

That Suffolk prosecutors are handling the case, in Southampton Town Court,

Is this correct?

*The case is being handled by the Suffolk District Attorney's Office in Town of Southampton Court.*

And in this 2014 case:

http://riverheadnewsreview.timesreview.com/2014/04/53579/dec-group-with-indian-nation-ties-arrested-for-poaching-baby-eels/

The defendants, charged with felonies, wound up pleading guilty to violations, for illegally harvesting the eels.

*The 2014 case involved a much larger quantity of eels and the value allowed charging as felonies under Illegal Commercializations in 71-0924 of the ECL. Two subjects were adjournment in contemplation of dismissal (ACOD), six subjects settled on a plea to 71-0923 (violation penalty section) for $325.00, all other charges dismissed.*

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Thanks for connecting us. I'll check in with you on Monday.

On Fri, Jan 19, 2018 at 2:55 PM, Corey Kilgannon <corey@nytimes.com> wrote:

NYSDEC-0002647

Agh sorry I missed u. Try again if u still got him pls

Sent from my iPhone

On Jan 19, 2018, at 1:56 PM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

Will call abt 2:30 or so with Major Scott Florence, head of our Division of Law Enforcement

Interview on background and then can work on attribution, ok?

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Kilgannon, Corey
**Sent:** Friday, January 19, 2018 12:37 PM
**To:** Ringewald, Erica R (DEC)
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

I am, thanks. at 917 971 5639

On Fri, Jan 19, 2018 at 12:19 PM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

Are you avail this afternoon? Maybe 2 or 2:30?

**From:** Kilgannon, Corey [mailto:corey@nytimes.com]
**Sent:** Friday, January 19, 2018 9:43 AM
**To:** Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov>
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

On radio? on what?

On Fri, Jan 19, 2018 at 9:12 AM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

Story on wamc this morning I think too

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Kilgannon, Corey
**Sent:** Friday, January 19, 2018 8:55 AM
**To:** Ringewald, Erica R (DEC)
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

OK thanks. I read that LATimes piece you sent. fascinating. and i got request into US F and W.

Seems like harvesting elvers is only legal in Maine and SC.

On Fri, Jan 19, 2018 at 8:50 AM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

Trying to get someone from DLE on with you today to discuss and will send some background info

**From:** Kilgannon, Corey [mailto:corey@nytimes.com]
**Sent:** Thursday, January 18, 2018 10:10 AM
**To:** Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov>
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

No, I'll certainly reach out to you closer to deadline, if the story is happening Was just hoping you could give me an idea if DEC has any info on
1. harvesting elvers. regulations/incidents.

2. whether the Shinnecocks/Poospatucks have to follow DEC fishing regs in waters around their reservations.

On Thu, Jan 18, 2018 at 9:59 AM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

Have I missed your window on this?

NYSDEC-0002648

**From:** Kilgannon, Corey [mailto:corey@nytimes.com]
**Sent:** Friday, January 12, 2018 5:29 PM
**To:** Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov>
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

thanks, i'll read it.

On Fri, Jan 12, 2018 at 5:05 PM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

Corey, still tracking down numbers on this for you.

I didn't realize illegal eel harvesting was such a thing - http://beta.latimes.com/nation/la-na-baby-eel-2017-story.html

Did you reach out to USFWS? They've had some cases on elvers, too

More next week.

ER

**From:** Kilgannon, Corey [mailto:corey@nytimes.com]
**Sent:** Thursday, January 11, 2018 6:43 PM
**To:** Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov>
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Sure. I dont need a final answer. Not writing it yet. I just need to get a sense of the state's 'side' to this.

On Thu, Jan 11, 2018 at 5:00 PM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

should have for you tomorrow, ok?

**From:** Kilgannon, Corey [mailto:corey@nytimes.com]
**Sent:** Thursday, January 11, 2018 12:17 PM
**To:** Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov>
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

thanks.

Not writing it yet but I'd like to check w your people if any other instances exist of DEC citing fishermen for taking elvers.

And the Indian fishing rights claim, which they are making to me.

On Thu, Jan 11, 2018 at 12:14 PM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

Will gather up some information for you and see what we can do

**From:** Kilgannon, Corey [mailto:corey@nytimes.com]
**Sent:** Thursday, January 11, 2018 12:13 PM
**To:** Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov>
**Subject:** Re: LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Hi, just wondering if you have someone/info on this.

The harvesting of 'elvers' (little eels) on LI, and whether local Indians are exempt from NYS regs/quotas in waters around their reservations.

On Mon, Jan 8, 2018 at 4:15 PM, Kilgannon, Corey <corey@nytimes.com> wrote:

no, not urgent. thanks.

On Mon, Jan 8, 2018 at 3:50 PM, Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov> wrote:

I like fishery ishery – will connect you with Benning DeLaMater (cc'd) who is closer to this

Are you on deadline?

**From:** Kilgannon, Corey [mailto:corey@nytimes.com]

NYSDEC-0002649

**Sent:** Monday, January 08, 2018 3:41 PM
**To:** Ringewald, Erica R (DEC) <Erica.Ringewald@dec.ny.gov>
**Subject:** LI fishery ishery, i mean, issue

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Erica,

This Newsday story touches upon a persistent issue: Native Americans harvesting elvers, pricey little eels.

Might you have anyone who deals w this enforcement.

I spoke to the Shinnecock fisherman, who said DEC unfairly goes after tribal members fishing in their tribal waters. But as with a lot of this stuff, it's more complicated and mercenary thant that, I think.

https://www.newsday.com/long-island/politics/shinnecock-suffolk-fishing-rights-1.15872716

much bigger bust in '14
http://riverheadnewsreview.timesreview.com/2014/04/53579/dec-group-with-indian-nation-ties-arrested-for-poaching-baby-eels/

NYSDEC-0002650

# PLAINTIFFS' EXHIBIT 24

1

2      SOUTHAMPTON TOWN JUSTICE COURT

3      STATE OF NEW YORK: COUNTY OF SUFFOLK
       - - - - - - - - - - - - - - - - - - - X
4      PEOPLE OF THE STATE OF NEW YORK,

5                              Plaintiff,

6            -against-

7                              Docket# 17060545

8      DAVID SILVA,

9                              Defendant.

10     - - - - - - - - - - - - - - - - - - X

11                    32 Jackson Avenue

12                    Hampton Bays, New York

13

14                    August 30, 2018

15                    9:00  AM

16

17

18

19

20     B E F O R E: Honorable Judge Gary J. Weber

21

22

23

24                    Jennifer Campbell
                      Court Reporter
25                    (631) 848-4231

45

People v Silva

1

2    20th and it was Officer Laczi notifying me a

3    vehicle pulled up and it appeared someone was

4    going to walk up to that net.

5        Q.    You said 6:00 a.m., what day was

6    that?

7        A.    On the 20th of April.

8        Q.    What year?

9        A.    2017.

10       Q.    What happened when you got that

11   phone call?

12       A.    I advised him to try and stay out of

13   sight and when whoever it was returned back

14   from that location to check them, what they

15   had taken out of the net.

16       Q.    What did you do next?

17       A.    I started to prepare and notified my

18   supervisor at the time, Captain Bengal, that

19   there was activity on the net in case we were

20   going to need anymore assistance.

21       Q.    What happened next?

22       A.    About half hour later; I received

23   more notification from Officer Laczi that they

24   had a subject that had a bucket with him that

25   had glass eels in it and that the person had

46

1                    People v Silva

2    claimed to be a member of the Shinnecock

3    Tribe.

4         Q.    What happened after that?

5         A.    I took that information and

6    forwarded it to Captain Bengal, as well as any

7    time we have interaction with a Native

8    American, we notify through our chains of

9    command up to Albany where our commissioner

10   and our legal people know that this is

11   occurring and to make sure if there is

12   anything necessary, the government office

13   would be notified as well.

14        Q.    What happened after you compiled

15   that information?

16        A.    I responded to the location where I

17   met with Officer Laczi and Officer Farrish to

18   observe what they had and to supervise the

19   collection of documentation of the evidence

20   that was taken at that time.

21        Q.    Was there anybody else there when

22   you arrived other than Officers Farrish and

23   Laczi?

24        A.    No.

25        Q.    Where did you arrive to?

1                    People v Silva

2        A.    I do not note the conditions of that

3    area in 1938.

4        Q.    You testified that a person claimed

5    to be a member of the Shinnecock Tribe, then

6    you described a chain of command going up the

7    line to the commissioner and possibly the

8    governor's office, what commissioner are you

9    speaking of?

10        A.    The commissioner of New York State

11    Department of Environmental Conservation

12        Q.    Can you describe how that worked?

13    When you gave notice of the chain of command

14    to these other officers, can you describe how

15    you did that and what offices were notified?

16        A.    We have four things that are called

17    significant incidents.  We have significant

18    incident reports that someone has to generate

19    and send to the people in a preestablished

20    mailing list, and, in this case, being I was

21    driving to the location, Captain Bengal

22    generated the report and he sent the e-mail to

23    the required people on that e-mail list.

24        Q.    Was that because it involved a

25    Shinnecock Indian?

People v Silva

1

2        A.    Yes.  That was one of our

3    significant incidents, interaction with a

4    Native American for enforcement purposes.

5        Q.    Were you instructed to prosecute

6    anybody?

7        A.    I asked Captain Bengal --

8               MS. GREENWOOD: Objection.

9               THE COURT: Why?

                MS. GREENWOOD: Because the

11              Department of Environmental

12              Conservation doesn't prosecute.

13              It's to the form of the question,

14              the term prosecute because the

                Department of Environmental

16              Conservation is not the prosecutor

17              and it's not their function.

18              THE COURT: Yeah, but they issue

19              tickets and arrest people.

20              MS. GREENWOOD: Yes.

21              THE COURT: Guess if you want to

22              ask if somebody told him to do that

23              or not.

24        Q.    Did you receive any instruction to

25    issue tickets after you went up this chain of

PLAINTIFFS' EXHIBIT 25

**To:** Witt, David E (DEC)[david.witt@dec.ny.gov]
**From:** Gilmore, James J (DEC)
**Sent:** Mon 4/4/2016 6:23:45 PM
**Subject:** FW: NYSDEC request for info on Poospatuck land ownership

FYI: Missed you on the cc list. Sorry David. See chain below.

# Attorney-Client Privilege, Attorney Work Product

**From:** Tighe, Julia W (DEC)
**Sent:** Monday, April 04, 2016 6:30 PM
**To:** Moser, Kathleen M (DEC); Gilmore, James J (DEC)
**Cc:** Walke, Peter W (DEC); Lynch, Kenneth (DEC)
**Subject:** FW: NYSDEC request for info on Poospatuck land ownership
 What's the scoop on this one?
**Julie Tighe**
Assistant Commissioner for Intergovernmental & Legislative Affairs
**New York State Department of Environmental Conservation**
625 Broadway, Albany, NY 12233-1010
P: (518) 402-2797 | F: (518) 402-9016 | julia.tighe@dec.ny.gov

www.dec.ny.gov |

**From:** Vanessa Lockel [mailto:Vanessa.Lockel@exec.ny.gov]
**Sent:** Tuesday, March 29, 2016 2:08 PM
**To:** Tighe, Julia W (DEC)
**Subject:** Fw: NYSDEC request for info on Poospatuck land ownership
Hey Julie!
Did we ever get anywhere with this? Even if its a Native American issue- its also an environmental issue and I just want to know if there is an update on your end before I meet with them soon.
Best Regards,
**Vanessa Pino Lockel**
**Suffolk County Regional Representative**
**Office of Governor Andrew M. Cuomo**
160 South Ocean Avenue
Patchogue, New York 11772
Office: 631-687-4823
Cell: 631-603-7983
Vanessa.Lockel@exec.ny.gov
www.governor.ny.gov

---

**From:** Vanessa Lockel
**Sent:** Saturday, February 13, 2016 8:09 AM
**To:** Basil Seggos; Aimee Vargas; Julissa Gutierrez; David Turley; Kathleen Moser (dec.ny.gov); Peter Walke (dec.ny.gov); James Gilmore (dec.ny.gov)
**Cc:** Jeanine Dillon (labor.ny.gov); Scott A Martella (labor.ny.gov)
**Subject:** Re: NYSDEC request for info on Poospatuck land ownership
 Thanks everyone for your help on identifying the approprirtae course of action.
This eel issue is just one of the main concerns going on with the reservation. Last night they had a house fire where the Red Cross had to find shelter for 4 families. This adds to the ongoing concern for our County and Towns on how to work with part of the region that is held under a different jurisdictional power even beyond the State. It would be very helpful to know who in Chamber actually deals with Native American reservations concerns. There was a recent issue with the Shinnecocks in Southampton and I heard we had legal counsel and a rep there on our behalf. How do we access this person? I am having ongoing/mounting issues with three reservations in Suffolk.
Thanks everyone.

NYSDEC-0002287

Best Regards,
**Vanessa Pino Lockel**
**Suffolk County Regional Representative**
**Office of Governor Andrew M. Cuomo**
160 South Ocean Avenue
Patchogue, New York 11772
Office: 631-687-4823
Cell: 631-603-7983
Vanessa.Lockel@exec.ny.gov
www.governor.ny.gov

---

**From:** Seggos, B B (DEC) <b.seggos@dec.ny.gov>
**Sent:** Thursday, February 11, 2016 2:44 PM
**To:** Aimee Vargas; Vanessa Lockel; Julissa Gutierrez; David Turley; Kathleen Moser (dec.ny.gov); Peter Walke (dec.ny.gov); James Gilmore (dec.ny.gov)
**Cc:** Jeanine Dillon (labor.ny.gov); Scott A Martella (labor.ny.gov)
**Subject:** *Re: NYSDEC request for info on Poospatuck land ownership*
There is a very dicey history on glass eels. Adding Kathy Moser and Jim Gilmore here. Team, pls provide context and whether there is a path
forward. Thx.
**From:** Aimee Vargas
**Sent:** Thursday, February 11, 2016 2:39 PM
**To:** Lockel, Vanessa (EXT); Gutierrez, Julissa (CHAMBER); Turley, David (CHAMBER)
**Cc:** Dillon, Jeanine (LABOR); Martella, Scott A (LABOR); Seggos, B B (DEC)
**Subject:** RE: NYSDEC request for info on Poospatuck land ownership

Looping Basil.
Basil, does this still fall under the EJ folks? Thank you!

**From:** Vanessa Lockel
**Sent:** Thursday, February 11, 2016 2:31 PM
**To:** Julissa Gutierrez <Julissa.Gutierrez@exec.ny.gov>; David Turley <David.Turley@exec.ny.gov>
**Cc:** Aimee Vargas <Aimee.Vargas@exec.ny.gov>; Jeanine Dillon (labor.ny.gov) <jeanine.dillon@labor.ny.gov>; Scott A Martella (labor.ny.gov)
<scott.martella@labor.ny.gov>
**Subject:** *Fw: NYSDEC request for info on Poospatuck land ownership*
I heard we have a person that covers native American reservation issues but don't know who it is- thought you might know. I have a request below from the Town of Brookhaven
and their issues with Poospatuck. How can we proceed?
Thank you!!!
Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.
**From:** Daniel Panico <councilmanpanico@BROOKHAVEN.ORG>
**Sent:** Thursday, February 11, 2016 1:58 PM
**To:** Vanessa Lockel
**Subject:** Fwd: NYSDEC request for info on Poospatuck land ownership

>>> Anthony Graves 02/10/2016 12:31 PM >>>
Hi Annette: An NYSDEC officer came to our office today to ask if we can determine land ownership of the Poospatuck Reservation. The tribe is claiming water rights
to take thousands of baby eels which then get shipped to China. The officer said that if they can establish that the reservation ends at the high water mark they can
ticket and arrest tribe members for taking eels off the reservation. Can Law determine the boundary of the reservation?
Also, we had started discussions on the marina the tribe built on what we believe to be Town underwater lands. The ECO said that there is now a houseboat in that
marina that is discharging waste directly to the Forge River. We had some discussions last spring on enforcement to address the marina but we never resolved a
course of action.
Anthony
Anthony Graves
Chief Environmental Analyst
Town of Brookhaven
(631) 451-6457

NYSDEC-0002288

# PLAINTIFFS' EXHIBIT 26

Supreme Court
Luther Bunn,
       agst.
Phíletus Pierson
Samuel Bishop
Jesse Halsey &
Peter Fournier

    To Philetus Pierson, Samuel Bishop, Jesse
Halsey & Peter Fournier —

: You are hereby summoned to answer the
complaint in this cause of which a copy
is herewith served upon you & to serve a
copy of your answer on me at Riverhead
in Suffolk Co. within twenty days after the
service hereof exclusive of the day of such
service, and if you fail to answer the
complaint as aforesaid the plaintiff will
apply to the next special term of this court
at the Court House in Riverhead in Suffolk
County on the 4th tuesday of February next
for the relief demanded in the complaint.
Riverhead October 19th 1848.

                    George Miller
                    atty for Pltff.

Supreme Court
Suffolk County
Luther Bunn
        agst

**507      64**

Philetus Pierson
Samuel Bishop
Jesse Halsey &
Peter Fournier

The Plaintiff complains that the defendants on the first day of September 1848 wrongfully took possession of four waggon loads of sea weed belonging to the plaintiff & converted the same to their own use. Wherefore he prays damages to the amount of three dollars.

George Miller
Plaintiff's attorney

Suffolk County ss: George Miller attorney for the plaintiff being duly sworn saith that he believes the foregoing complaint to be true

George Miller

Sworn this 24 day of October 1848 before me
J. Wickham Case Clerk

Supreme Court

Luther Bunn

Agt

Phelitia Shown

Samuel Bishop

Jesse Halsey &

Peter Fournier

The said Defendants for
answer to the Complaint in this action say
That the Seaweed alleged in the said complaint
of the said Plaintiff to belong to him was in
truth the property of the said Defendants.

And for a further answer to the complaint
of the said Plaintiff these Defendants say
that the place where the said Seaweed mentioned
in said Complaint was situated and from
which it was taken as alleged in said com-
plaint was and is called Little Beach & is
situated on the east side of Shinnecock Bay
in the town of Southampton in Suffolk County
And that said Beach is and was at the time
mentioned in said Complaint the property
and in the possession of the freeholders &
Commonalty of the town of Southampton
and is not and was not at the time mentioned
in said Complaint the property nor in the
possession of the said Plaintiff, and that as such
property the Trustees of the freeholders & common-
alty of the Town of South Hampton have from
time to time regulated the improvement thereof
and at the time mentioned in said Complaint
there was a Bye Law in force made by said
Trustees and prohibiting the heaping up of

66

507

Seaweed upon the said Little Beach, And that the Seaweed mentioned in said complaint came on Shore by drifting upon said Little Beach and was heaped up thereon contrary to the provisions of said Byelaw And that by the said heaping the said Plaintiff acquired no right and title to said Seaweed, Which said Bye law is in the words & figures following to wit:     "Voted no man shall be entitled to any sea weed heaped upon the Shore" "Passed April 14th 1845";   And the Defendant demand Judgment against the said Plaintiff with Cost of Suit,

Henry P. Hedges
Defts Atty

Supreme Court
Luther Brown
against
Philetus Reeve

Copy Answer
Henry P. Hedges,
Defts Atty

Supreme Court

Luther Bunn
agst
Philetus Pierson
Samuel Bishop
Jesse Halsey &
Peter Fournier

The plaintiff replies to the answer
of the defendants and says that he denies the
beach mentioned in the said answer was
or is the property or in the possession of the
freeholders and commonalty of the Town of
Southampton or that the Trustees of the said
Freeholders and commonalty ever had any power
or authority to regulate the same or to make
any by laws relating thereto or that there was
any by law in force at the time of the trespass
alleged in the complaint which prohibited the
plaintiff from heaping up the sea weed men-
tioned in the complaint & claiming & owning
such sea weed as his own property. —

George Miller
Plffs attorney

507    68

Supreme Court

Luther Brown

a faint

Philetus Perew, Samuel

Bishop, Jesse Halsey

& Peter Fournier

Copy Reply —

George Miller

Plaintiffs atty —

Supreme Court
Luther Brown
agst
Philetus Pinson
Samuel Bishop
John Haley &
Peter Zimmer

November 23 - 1854.

Judgment ——

This cause having been tried on the issue of fact and the jury therein having found a verdict for the plaintiff for the sum of fifty cents now on motion of George Miller attorney for the plaintiff it is adjudged by the said Court that the plaintiff recover of the defendants the said sum with six cents costs & disbursements making the sum of fifty six cents.

James Moore Clk

PLAINTIFFS' EXHIBIT 27





## Office of the Assistant Secretary-Indian Affairs

Date: June 15, 2010
Contact: Nedra Darling
202-219-4152

# Skibine Issues a Final Determination to Acknowledge the Shinnecock Indian Nation of Long Island, NY

**WASHINGTON** – Acting Principal Deputy Assistant Secretary – Indian Affairs George T. Skibine on June 13, 2010, issued a final determination that affirms the proposed finding of December 15, 2009, to acknowledge the Shinnecock Indian Nation (Petitioner #4) as an Indian tribe. This petitioner, located in Southampton, Suffolk County, N.Y., has 1,292 members.

The evidence in the record for the proposed finding demonstrated that the petitioner met all seven of the mandatory criteria for Federal acknowledgment as set forth in 25 CFR 83.7. The Department did not receive comments from any party other than the petitioner during the comment period. Its comment did not change the overall findings of the proposed finding that the petitioner meets all seven mandatory criteria. In accordance with the regulations (section 83.6(c)), a petitioning group that meets all seven criteria is an Indian tribe within the meaning of Federal law. Therefore, the Department affirms the proposed finding to acknowledge the Shinnecock petitioner.

This final determination treats the Shinnecock Indian tribe of New York that existed in 1789 as the "historical Indian tribe." Only three years later in 1792, an act passed by the State of New York re-organized this tribe as a trusteeship. At the time, its members lived on a leasehold created in 1703 in Southampton, N.Y. The new law provided for annual elections of three Indian trustees, and these trustee elections have taken place from 1792 to the present. The trustees have allocated the group's land and resources consistently for almost 220 years. The proposed finding found that the petitioner met the acknowledgment criteria by demonstrating that it has evolved from this historical Shinnecock Indian tribe of New York and has continuously existed. This final determination affirms the proposed finding.

**-Continued-**

**Shinnecock - Page 2**

The petitioner commented on the procedural evaluation in the proposed finding that found that the evidence in the record did not demonstrate that the Federal government had ever recognized the Shinnecock Indian tribe, but knew of its state relationship.  The evidence submitted with the petitioner's comments reinforced the proposed finding that the Federal government has never recognized the Shinnecock Indian tribe.  Therefore, the provisions of the regulations (83.8) relating to previously acknowledged Indian tribes, that would have reduced the petitioner's evidentiary burden, did not apply to the evaluation of the Shinnecock petitioner.

The Shinnecock petitioner meets the seven criteria and affirms the proposed finding as follows:

Criterion 83.7(a) requires that external observers have identified the petitioner as an American Indian entity on a substantially continuous basis since 1900.  This final determination affirms the proposed finding that state and local government officials, missionaries, journalists, and others have identified the petitioning group continuously as an American Indian entity since 1900, and the petitioner meets this criterion.

Criterion 83.7(b) requires that a predominant portion of the petitioning group has comprised a distinct community since historical times.  The proposed finding did not use direct evidence as described at 83.7(1) and 83.7(i)-(iv) to demonstrate the group meets this criterion.  Rather, it found that the petitioner meets criterion 83.7(b) from 1789 to the present based on its meeting criterion 83.7(c) using "high" evidence described at 83.7(c)(2)(i) for the same period.  The regulations at 83.7(b)(2)(v) provide a "crossover" provision for groups with especially high evidence for demonstrating criterion 83.7(c).  This final determination affirms those findings.

Criterion 83.7(c) requires that the petitioning group has maintained political influence over its members as an autonomous entity since historical times.  The proposed finding determined that because the group's three elected trustees have allocated and managed the reservation's lands and resources since 1792, it demonstrated it meets this criterion using "high" evidence described at 83.7(c)(2)(i).  This final determination affirms those findings.

Criterion 83.7(d) requires that the petitioner provide a copy of its governing document including its membership criteria.  The proposed finding determined that the petitioner described its membership criteria and how it governs itself for this process.  This final determination affirms these findings.

Criterion 83.7(e) requires that the petitioner's members descend from a historical Indian tribe.  The evidence in the record shows that at least 97 percent of the 1,292 members descend from the historical 1789 Shinnecock tribe, as determined by their descent from the 1865 reservation residents listed in the New York State census.  Thus, this final determination affirms the proposed finding—but with a revised membership total and percentage of descent—that the petitioner meets this criterion.

**-Continued-**

**Shinnecock - Page 3**

Criterion 83.7(f) requires that the petitioner's membership be composed principally of persons who are not members of another federally recognized Indian tribe. The proposed finding determined that the petitioner meets this criterion, and this final determination affirms that finding. Only ten members are enrolled in other federally recognized tribes, including Ft. Sill Apache, Hoopa Valley, Mashantucket Pequot, Navajo, Taos Pueblo, and White Mountain Apache.

Criterion 83.7(g) requires that the petitioner not be subject to congressional legislation that has terminated or forbidden the Federal relationship. This final determination affirms the proposed finding that there is no act of Congress or other legal impediment to the Department's acknowledging the group as a Federal tribe.

In view of the receipt of minimal substantive comments, the Department has not produced a report or summary under the criteria for the final determination other than the *Federal Register* notice. Therefore, the *Federal Register* notice is the Final Determination.

The petitioner or an interested party may request reconsideration by the Interior Board of Indian Appeals of this Final Determination. The settlement agreement provides a 30-day deadline for filing an appeal.

The Assistant Secretary–Indian Affairs has responsibility for fulfilling the Interior Department's trust responsibilities and promoting self-determination on behalf of the 564 federally recognized American Indian and Alaska Native tribal governments. When the decision becomes final and effective for the Department, the Shinnecock Indian Nation will be the 565th federally recognized Indian tribe. The Assistant Secretary also oversees the Bureau of Indian Affairs, which is responsible for providing services to approximately 1.8 million individual American Indians and Alaska Natives from the federally recognized tribes, and the Office of Federal Acknowledgment (OFA), which is responsible for administering the Federal acknowledgment process.

The Assistant Secretary–Indian Affairs delegated authority to sign certain Federal acknowledgment findings, including this proposed finding, to the Acting Principal Deputy Assistant Secretary–Indian Affairs effective June 4, 2009.

Copies of the *Federal Register* notice will be posted on the Department of the Interior website at http://www.doi.gov.

**-DOI-**

PLAINTIFFS' EXHIBIT 28

*The New York Times*

**N.Y. / REGION**

# Paterson Endorses Shinnecock Tribe's Bid for Recognition

By DANNY HAKIM    SEPT. 24, 2009

ALBANY — Gov. David A. Paterson has endorsed an Indian tribe's bid for federal recognition, an important step for a tribe that wants to build the first casino in New York City or its suburbs.

Mr. Paterson is the first governor to make such a public embrace of the marathon effort by the Shinnecock Indian Nation to gain recognition. In a Sept. 22 letter to Ken Salazar, the secretary of the interior, the governor wrote, "to say federal recognition of the Shinnecock is long overdue would be an understatement" and called for the Obama administration to recognize the tribe, which is based in Southampton, N.Y.

Tribal leaders hailed his move as a key victory, because the federal government is in the final stages of considering the tribe's application and might have been deterred without support from the governor.

"There have been a lot of things said about Governor Paterson in the media," said Randy King, the chairman of the tribe. "Politics is a rough business. To us, he's a man of principle."

In May, the Shinnecock cleared a major hurdle toward its goal when it **entered into a settlement** with the Interior Department that requires a preliminary ruling on its tribal status by Dec. 15. After a court fight of more than three decades, the Shinnecocks believe that federal recognition is at hand. A final decision will be made by the spring, after a public comment period that will follow the preliminary ruling.

If they are federally recognized, the tribe members could build a Class II gaming center on their 800-acre reservation, a designation meaning they could have thousands of video slot machines, but no table games.

The tribe would prefer to negotiate with the state to build a full-blown casino somewhere else in the region, and Long Island political leaders generally agree that the idea of any gambling facility in the Hamptons would create a traffic headache.

The tribe, which has about 1,000 members, has expressed interest in the past in the Aqueduct racetrack in Queens, but the state appears poised to select an established gambling operator to build a Class II gaming facility there.

Federal recognition would most likely lead to negotiations with the state. The tribe hopes to resolve over $1 billion worth of land claims in the Hamptons. The state would insist on revenue-sharing as part of a casino deal and may try to resolve a dispute over sales of untaxed cigarettes on the reservation.

"We are guardedly optimistic," Mr. King said, adding that the governor is "taking a stand where others have remained silent."

A version of this article appears in print on September 25, 2009, on Page A26 of the New York edition with the headline: Paterson Endorses Shinnecock Tribe's Bid for Recognition.

© 2019 The New York Times Company

PLAINTIFFS' EXHIBIT 29

**To:** taobi.silva@gmail.com[taobi.silva@gmail.com]
**Sent:** Wed 3/2/2016 4:22:04 PM
**Subject:** Introduction

Mr. Silva,

I wanted to reach out and introduce myself to you. I am the new Indian Nations Affairs Coordinator, having replaced Jeff Gregg after his retirement. Aphrodite Montalvo emailed me a while ago that you were planning on contacting me, but unfortunately her email slipped my mind. I apologize for not following up on that and contacting you sooner.

She mentioned that you had worked with Jeff concerning tribal and town patent issues. I've recently become a bit familiar with the topic, and would like the opportunity to discuss this with you. My understanding is that the various patents, including the Dongan Patent, gave the towns authority to purchase land from the Native American nations, after which the land would become part of the jurisdiction of the town and recognized as such by the English crown. I personally feel that it's unfortunate that so many people have ignored the Native American side of that equation, or just blindly assumed the Native Americans signed over all rights and titles to the entirety of the island.

From what I can find in the historical records, the nations did occasionally sell underwater territory to the towns, for instance, Brookhaven's purchase of territory from the Unkechaug in 1755. However, I'm not as familiar with Shinnecock history as I am with the Unkechaug, and I don't want to assume that the Shinnecock ever sold underwater land to the colonies. I get the feeling that at some point, someone just 'assumed' the towns held title to the underwater lands, notwithstanding the fact that that land had rightfully belonged to the Indian nations.

Unfortunately, this is the situation in which we find ourselves. If you have the time, and are willing, I would like any information you are willing to share concerning this topic. I can't promise to be able to change the circumstances, but I would like to be as informed as possible so I can fulfill my responsibilities to the best of my ability.


**David E. Witt, Ph.D.**
Indian Nations Affairs Coordinator, Office of Environmental Justice
**New York State Department of Environmental Conservation**
625 Broadway, Albany, NY 12233-1500
P: (518) 402-8556 | F: (518) 402-9018 | david.witt@dec.ny.gov


www.dec.ny.gov |

PLAINTIFFS' EXHIBIT 30

**To:** Lynch, Kenneth (DEC)[kenneth.lynch@dec.ny.gov]
**Cc:** King-DeJesus, Lisa E (DEC)[Lisa.King-DeJesus@dec.ny.gov]
**Sent:** Mon 5/9/2016 12:11:48 PM
**Subject:** Shinnecock Overview (was RE: An Invitation to Seggos)

Ken,

Sorry this took so long. As I suspected, the Shinnecock seem to be one of the more cooperative nations in the state. It was recognized by the feds in 2010, but was a state recognized nation prior to that. Jeff did not leave much concerning them in his files—only 2 folders, compared to the dozens for some of the other nations.

Similar to the Unkechaug, their largest concern is with fishing & oystering rights in the waters adjacent to their reservation. This issue is the result of the colonial patents that gave the various towns in Long Island permission to buy land from the indigenous people—these patents included the bays between Long Island and the adjacent barrier islands. The confusion stems from what seems to be an assumption on many people's part that just because the town received the patents, they automatically owned the (underwater) land. However, there is an example from 1755 in which the Town of Brookhaven purchased the rights to a portion of the Great South Bay from the Unkechaug, illustrating that at the time, some town officials understood they had to buy the rights from the Native Americans.

The state's position is that the towns do own those lands and have the right to license activities affecting those lands (such as seeding oysters, etc). The Shinnecock's position is based upon a 1659 deed in which they reserved their "privilege of fishing, fowling, or gathering of berries or any other thing for our use" in ceded territories. This was agreed upon and signed by both parties. Given that this was in writing, they have a stronger case for fishing rights than the other nations in New York.

In the past, they have stated their intentions to comply with DEC and state laws to carry out their objectives, but via intergovernmental agreements rather than through our permit system. (Contrary to this, the Shinnecock have applied for and received permit and licenses for shellfishing activities prior to federal recognition in 2010. The permits are necessary to sell shellfish on the market. In the past, they have seemed willing to work with us and through our system, while reserving discussions of sovereignty for later times.) Their recent activities reflect a willingness to work with federal agencies, as well as cooperating with us, albeit with clear reminders that they are a sovereign nation independent of New York. I believe that we could come to understandings, memorialized via letters of agreement, that accomplish our regulatory interests while also allowing the Shinnecock to accomplish their goals.

Recent complaints (at least, those saved in the files) seem to deal more with local individuals having Southampton permits to shellfish and impacting the Shinnecock beds. Interactions between ECOs and Shinnecock members have focused on hunting and fishing, as expected. Some notable/recent ones included Shinnecock hunters shooting ducks near the homes of adjacent property owners, and altercations in 2012 between the owner of the Shinnecock Oyster Farms and ECOs due to their confiscation of undersized scallops.

They have also shown interest in the Long Island Nitrogen Action Plan (LINAP), because of the impact it will have on their shellfish related efforts, and the .

I feel that we have an opportunity for a positive relationship here, especially if we are willing to take that extra step to work towards LOAs. If you have any questions, please feel free to ask.

**David E. Witt, Ph.D.**
Indian Nations Affairs Coordinator, Office of Environmental Justice
New York State Department of Environmental Conservation
625 Broadway, Albany, NY 12233-1500
P: (518) 402-9512 | F: (518) 402-9018 | david.witt@dec.ny.gov

www.dec.ny.gov | 

**From:** Lynch, Kenneth (DEC)
**Sent:** Thursday, May 05, 2016 3:47 PM
**To:** Witt, David E (DEC)
**Subject:** RE: An Invitation to Seggos
No problem. I don't need it immediately

**From:** Witt, David E (DEC)
**Sent:** Thursday, May 05, 2016 3:27 PM
**To:** Lynch, Kenneth (DEC); King-DeJesus, Lisa E (DEC)
**Subject:** RE: An Invitation to Seggos
Ken,
If it's ok, let me do some research on that and get back to you in the next day or so.
Off the top of my head, we have had the usual issues with fishing/shellfishing, and them believing the ECL does not apply to them, but from what I can remember from Jeff's files is that they have been one of the more congenial nations in New York.
**David E. Witt, Ph.D.**
Indian Nations Affairs Coordinator, Office of Environmental Justice
New York State Department of Environmental Conservation
625 Broadway, Albany, NY 12233-1500
P: (518) 402-9512 | F: (518) 402-9018 | david.witt@dec.ny.gov

www.dec.ny.gov | 

**From:** Lynch, Kenneth (DEC)
**Sent:** Thursday, May 05, 2016 3:17 PM
**To:** Witt, David E (DEC); King-DeJesus, Lisa E (DEC)
**Subject:** RE: An Invitation to Seggos
Can you give me a brief overview of what our past relationship has been and what the current issues are?

**From:** Witt, David E (DEC)
**Sent:** Thursday, May 05, 2016 2:34 PM
**To:** King-DeJesus, Lisa E (DEC); Lynch, Kenneth (DEC)
**Subject:** FW: An Invitation to Seggos
Ken & Lisa,
For your info, please see the attached invitation from the Shinnecock council to the commissioner. This was submitted directly to CCU, and they should also be receiving a hard copy of the letter soon.
**David E. Witt, Ph.D.**

*Indian Nations Affairs Coordinator, Office of Environmental Justice*
**New York State Department of Environmental Conservation**
625 Broadway, Albany, NY 12233-1500
P: (518) 402-9512 | F: (518) 402-9018 | david.witt@dec.ny.gov

www.dec.ny.gov | [f] [t]

**From:** Raymond Clendenin [mailto:RaymondClendenin@shinnecock.org]
**Sent:** Thursday, May 05, 2016 2:30 PM
**To:** Seggos, Basil (DEC)
**Cc:** Witt, David E (DEC); Gallagher, Carrie M (DEC); Banks.nicky@yahoo.com; Bryan Polite; Daniel Collins; EUGENE CUFFEE 2; fishwoman@optonline.net; Raymond Clendenin; Rezrev@optonline.net; Shavonne Smith; Sienna Hunter-Cuyjet; Terrell Terry
**Subject:** An Invitation to Seggos

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Dear Acting Commissioner Seggos,

Please accept our invitation to have a Government-to-Government meeting on Shinnecock Territory

Regards,

Ray Clendenin Jr.
Tribal File Clerk
Shinnecock Indian Nation
Phone: 631-283-6143
Fax: 631-283-0751
E-mail: RaymondClendenin@Shinnecock.org

PLAINTIFFS' EXHIBIT 31

**OFFICE OF ENVIRONMENTAL JUSTICE**

New York State Department of Environmental Conservation
625 Broadway, 14th Floor, Albany, New York 12233-1500
Phone: (518) 402-8556 · Fax. (518) 402-9018
www.dec.ny.gov

# MEMORANDUM

TO:        Lisa DeJesus

FROM:    David Witt

SUBJECT:  Unkechaug Territorial History & Fishing Rights

DATE:      March 23, 2016

Lisa, here is the write-up for my research into Unkechaug history and how it relates to fishing rights, in preparation for the upcoming meeting between Chief Wallace and the Commissioner.

**1666, March 7: Nicholls Patents**, Southampton Patent described the purchase of Unkechaug land within borders of Southampton, including Moriches. Brookhaven Patent likewise granted the town all the lands within the town borders which had been or would be purchased from the local native groups. This patent was surrendered by the town to Governor Dongan, who reissued the town's patent in 1686 (see below). The Nicholls Patent for Brookhaven is no longer in effect.

**1670, December 1:** "Seatalcott [aka, Brookhaven] Busyness for Enlargment. That the whole Towne have liberty to purchase of the Indyans what is within their Patent, but not to debarr any that can pay their Proportion, or have Stocks ; The Names of those that make Purchase to be returned to the Governor." (Doc Col His NY v 3:644)

**1678 & 1680**: Various patents allowing individual Brookhaven settlers to buy land from Native American populations were issued by the governor. (Doc Col His NY v 3:731-733, 761-762)

## 1686, December 27: Dongan Patent of Brookhaven

The patents were usually written to give the town sole permission to buy land from the Native Americans. For example, the Dongan patent of Southampton says "...all that tract of land which already hath been or hereafter shall be purchased for and on behalf of the said town, whether from the Native Indian Proprietors or others...."

However, the Dongan patent of Brookhaven says "...saveing to his most sacred majesty Aforesaid, his heires & Successors, all the tracts & necks of land that lye to the South, within



NEW YORK
STATE OF OPPORTUNITY

Department of
Environmental
Conservation

the limits and bounds aforesaid, that remaine unpurchased from the native Indians, any thing contained herein to the contrary in any wise notwithstanding…"

So the patents were the establishment of town borders, but the land still had to be purchased in separate actions. In Brookhaven, those lands owned by the Native Americans were to be reserved to the king, if they were purchased at some point. This is why Colonel William "Tangier" Smith had to go to the governor (as royal representative) to get legal recognition of his purchase of Unkechaug lands as part of his manor (see below).

**1691?**: Col. Smith purchased a tract of land east from Carmans River to the Mastic/Forge River from the Unkechaug John Mahue (Mayhew), whose authority to sale the lands was accepted by the Unkechaug. This area is now Mastic Beach and included the future reservations established by Smith. It is important to note that, at least at this point, it is uncertain if this purchase included the underwater lands of Mastic River.

**1691, May**: Col. Smith purchased additional land from John Mahue from the Mastic/Forge River east to the Southhampton town line, with the exception of Moriches and Mamanock Necks. This is generally referred to as the Moriches Purchase. Again, Mahue's authority to sale was accepted by the Unkechaug.

## 1693, September/October 9: Fletcher Patent

The Surveyor General, Augustine Graham, surveyed land for Col. Smith. Graham states within his report "within these bounds there are three patents granted by Governor Dongan, and that all the meadows had been long since purchased and enjoyed by the town of Brookhaven." Based upon this report, Governor Fletcher granted a patent to Col. Smith to establish a "St. George Manor," including the right to purchase land from the native inhabitants. This patent included all of Mastic Beach, as well as two tracks east of Mastic River (aka Forge River). The patent specifically included the "maine branch of Mastick River, and fro thence alongst ye easternmost bank of sd river, the whole river and all its branches included, to the maine sea…." It goes on to say "too small tracts of upland and meadow, lying east of mastic river, called Puencatame and Hogges neck, and bounded easterward from ye maine sea to a river or creek, called Senckes [Senex, Latin for "Old"] Creek…and west by bounds aforesaid mentioned." (It's interesting to note that these two tracts east of Mastic River were sold by John Mahue to Governor Dongan in December 1685. So the question is: how did this land get transferred from Dongan to Smith?)

So, Governer Fletcher gave Col. Smith permission to buy the underwater land of Mastic/Forge River and neighboring land, especially in the area immediately adjacent to the modern Poospatuck Reservation. When the Manor of St. George and its patent passed to the Town of Brookhaven, any titles for the underwater land of the river obtained pursuant to this patent would probably have passed to the town. I still can't say if the underwater lands were ever purchased from the Unkechaug.

From what I can tell, 7 parcels in total were bought by Col. Smith as part of his manorial grant. However, these sales lacked specific boundaries. These unspecified boundaries were subject to a number of court cases by other settlers, and Smith was afraid that he might lose claim to some of the land.

2

**1697, June 17**: Col. Smith receives a patent from Governor Fletcher adding the Moriches purchase to the Manor of St. George

**1700, July 2: Unkechaug Reservation/Smith Grant, 4 parcels totaling 175 acres**

In order to protect his investment, Smith went back to the individuals with whom he had dealt, and had them reconfirm all of his previous purchases, in exchange of a grant of 175 acres from Smith to the Unkechaug. This grant included 50 acres at Poospatuck, the location of the current reservation, 100 at Constables Neck/Mastic Neck, another 15 at Constables Neck, and 10 at Qualicon.

The document that was drawn up explained how the Unkechaug "did bargain, sell, alienate rights, and confirm onto me and my heirs and assigns to have and to hold and enjoy for ever all their right titles." In order to that the Unkechaug and their descendants "may not want land to plant on," they "shall without any molestation from me, my heirs, or assigns, shall and may plant and sow forever" on various plots of land, including Poospatuck, but "have not any privilege to sell, convey, alienate, or lease this planting right or any part thereof to any person or persons whatsoever, but his planting right shall descend to them and their children forever" for a payment of 2 ears of corn annually.

So, there are two ways to interpret this information. The first is pretty much a straight reading of the material—that the Unkechaug and related people sold the land with all rights to Smith, and Smith then leased the land back to the Unkechaug with limited rights to plant. There's nothing about fishing at all here, nor even the rivers that bound the reservation.

However, the grant did allow for the Unkechaug to provide for themselves, and in the minds of the Unkechaug of that time, planting and sowing as a means of provision *may* have been a concept that included fishing and hunting. Additionally, the grant does say "without any molestation" so Chief Wallace will likely bring that up, and the Unkechaug in particular had a history of fishing and whaling, as recognized by the governor (e.g., Doc Col His NY v 3:720). It *might* also be that everyone at the time recognized that the Unkechaug still owned the Mastic River, or that the river could not be "owned" by any one person or group, and thus the Unkechaug had rights to fish the river independent of the Smith Grant.

Additionally, the general impression from the historical documents of the era is that the Unkechaug and other tribes were selling shared rights to the land, not title and exclusive rights. This was a general concept in Native American culture, and functioned much like the town commons held in trustee by both colonial and European towns. For example, there's a few decades (1640s-1690s) worth of documents that show that the tribes were in conflict with the English settlers, because the English settlers were inhibiting indigenous use of land somehow (either by their cattle scaring away deer, English farms taking over areas that were once Native American farms, English killing dogs, etc etc). Furthermore, there were complaints that some unscrupulous settlers were taking advantage of the cultural differences and tricking the Native Americans out of rights that they thought they were maintaining. Usually, the English governors (or their appointees) tried to resolve these issues for mutual benefit, illustrating (at least in my mind) that the Native American claims had validity.

NYSDEC-0002320

Finally, one of the Unkechaug land sales in the area of Brookhaven included a statement that reserved rights to "sufficient planting land for those that are the true proprietors and their heirs" and both parties were to have rights to fishing, fowling, and hunting. This *may* have also been true for the land that was included in the Smith Grant.

I think investigating the period of time after the establishment of the reservation will help us further understand Unkechaug claims, so here's some more information:

**1705**: Col. Smith dies in 1705, St. George Manor passes to William Henry Smith. Additionally, Brookhaven resident Richard Floyd confirms the 1664 sale of Unkechaug territory west of Carmans River (at the time, Connecticut River) and east of Accombomack Meadow.

**1718, May 17**: William Smith sold to Richard Floyd II a tract of land which surrounds the parcels previously reserved to the Unkechaug. Floyd gives the land to his son, Nicoll Smith, who probably established residence in 1729.

**1730: Land sale—100 acres on Constables Neck from Unkechaug to Nicholl Floyd**

Nicholl Floyd bought the 100 acre parcel from the Unkechaug. This is both contrary to Smith deed and apparently against New York colonial law which required governor approval (as established by Nicolls and confirmed by Andros), but Floyd and Smith both thought it was acceptable if the Unkechaug leaders approved of the sale.

**1755: Underwater land sale—south shore of Brookhaven, from Carmans River west to town border**

In 1755, the Unkechaug sold an underwater tract of land along the south shore of Long Island from Carmans River to the western border of Brookhaven (basically, Patchogue and Belport Bays; these were referred to as 'Great South Bay') to the Town of Brookhaven. As before, the sale may have not been so much about the land itself, but rather the rights to fish the land (either individual or joint). This sale was uncontested, and my impression from the material is that by 1755, the Unkechaug knew what the English settlers were saying when they wanted to buy the land, but that's my impression and Chief Wallace may claim/demonstrate otherwise. At any rate, at least in 1755, both the English settlers and the Native American tribes recognized the right of the Unkechaug to sell underwater lands and/or accompanying rights (this time, for oyster harvesting), independent of the four reservations that were established by the Smith grant (they were on the other side of Mastic and not contiguous to underwater lands sold).

Other circumstantial evidence for Unkechaug ownership of underwater interests is the fact that they had historical obtained a large portion of their income from the processing of wampum. It was, and still is, a huge part of their cultural identity—I don't think they would have given that up lightly. They must have kept some way to harvest the shells necessary for that activity. Also, they have been involved in whaling for centuries, so again, this can illustrate a link to fishing rights.

The letter that went out to Chief Wallace asks them to provide information concerning their rights, to help clarify the situation. Given the huge amount of work that they've put into documenting their history, I'm hoping they'll be able to provide us with something. But if we go solely on the Smith grant, no, it doesn't address fishing. However, other evidence does

NYSDEC-0002321

suggest that both English and Native Americans recognized that the Unkechaug had that right, at least in some areas. <u>And I reiterate, that at this time, I cannot find any evidence that the Unkechaug sold any rights to underwater lands of Mastic River.</u>

Finally, the 1977 OCS report on the jurisdiction of underwater lands of New York indicates that "the Town of Brookhaven tried to strengthen its position by acquiring the lands underwater of the Great South Bay from the Indians" (p. 16). This tactic had been used in other examples, where there was an initial patent, but because the holder of the patent wished to strengthen his claim in case of a court challenge, the patent was confirmed in a separate document. The Smith grant is an example of this.

**1771:** Related to the purchase of underwater lands of South Bay, the Trustees of Brookhaven ordered "that no oysters or clams shall be taken out of ye South Bay, opposite our town, within our patent, unless first obtaining liberty of us, ye Trustees, or from our order…" So at least by then, they were using their authority in the matter.

**1789: Land sale—15 acres on Constables Neck sold to William Floyd.**

The final land sale that is documents occurred in 1789, in which the 15 acre parcel on Constables Neck was sold by the Unkechaug to William Floyd, and the 1730 purchase was reconfirmed. This was illegal under 1777 New York constitution. 50 acres at Poospatuck (the current reservation) and 10 acres at Qualiecan supposedly remained. Qualiecan, which was a burial ground, and sacred to the Unkechaug was somehow lost to the Unkechaug. What happened to this parcel is somewhat of a mystery.

I strongly suggest we be cognizant of, and respectful to, the background in which the Smith grant was written, which I hope I provided here. The grant (in particular) was written to protect Smith's investments, and not particularly to protect the Unkechaug. If Chief Wallace discusses this grant, he is probably going to say something along the lines of the Unkechaug having an implicit right to fish, whether or not the Smith grant mentions it, similar to claims made by other tribes. The question of ownership of the lands under Mastic River relates to this is a complicating factor.

Now, all that being said, I don't think this invalidates our responsibility or abrogates our ability to protect the eels. I think the court cases are pretty clear on that. But I think we can be respectful to the historical and the modern Unkechaug community, and if we can convey that respect, it might make it easier for us to protect the resource.

The interesting thing that I'm trying to figure out is how/why the Town of Brookhaven has title to the lands under the Forge (aka Mastic) River and Poospatuck Creek, on which the Poospatuck Reservation borders—if at some point the Unkechaug sold that title, or if this was an oversight when they were figuring out tax parcels.

NYSDEC-0002322

6

NYSDEC-0002323

PLAINTIFFS' EXHIBIT 32

STATE, COUNTY AND TOWN

BOUNDARIES, JURISDICTIONS AND OWNERSHIPS

FOR LANDS UNDERWATER

IN THE MARINE DISTRICT OF NEW YORK STATE

COMPLEMENTS MAP SERIES #2

STATE, COUNTY AND TOWN: BOUNDARIES, LANDS UNDERWATER JURISDICTIONS

OCS Task 7.5

The preparation of this report was financially aided through a Federal Grant from the Office of Coastal Zone Management, National Oceanic and Atmospheric Administration, under the Coastal Zone Management Act of 1972, as amended, Grant # 04-5-158-50002.

This Report was prepared for the Division of State Planning
New York State Department of State

August, 1977

Revised and Edited By:

Ronald E. Hartmann
Assistant Land Surveyor I
Region I, Stony Brook
New York State Department of
Environmental Conservation

Richard C. Ryan
Regional Supervisor
Bureau of Real Property Services
Region I, Stony Brook
New York State Department of
Environmental Conservation

Legal Analysis by:

Kathleen Liston Morrison
Special Assistant to the General Counsel
New York State Department of
Environmental Conservation

NYSDEC-0003426

The legislative intent is important because in construing the description of a boundary line, the same rule should operate as in the case of construction of a deed: the intent of the parties as evidenced by the document and the circumstances surrounding the making thereof must be given expression wherever it is possible to do so without violating law and reason. [Lipton v. Bruce, 1 NY 2d 631, 154 NYS 2d 951 (1956).] The intention of the parties should be taken from the whole instrument, and every effort made to reconcile apparently inconsistent clauses. [Schwab v. Schwab, 280 App. Div. 139, 112 NYS 2d 354 (4th Dept., 1952).] In the situation at hand, the "parties" are the members of the legislature.

Therefore, although it appears that some towns will benefit more than others as a result of this extension, the statute appears clear: the boundary lines of the towns are to be extended northwardly into Long Island Sound at right angles to the general trend of the coast until they intersect the Connecticut-New York line. Thus, the right angle to be established (and which is controlling over the more general terms of "northwardly" and "general trend of the coast" because it is more specific) is located at that point where the town boundary leaves the Long Island coast and meets the waters of Long Island Sound. The existence or non-existence of a right angle intersection occurring at the Connecticut-New York boundary is irrelevant.

3. Conclusion

Sheet Number 2 reflects extension of the boundaries of the counties of Queens, Nassau, and Suffolk and the towns within them, "northwardly into Long Island Sound at right angles to the general trend of the coast at several respective points, until they intersect the boundary line between the States of New York and Connecticut".

IV. MAP SERIES #2, SHEET #3

A. Boundaries and Jurisdiction

The state boundary found on this sheet is the Three Mile Limit off the Atlantic coast. This is the southernmost extent of state jurisdiction. By international convention, and as set forth in Public Law 31 (Submerged Land Act), the Three Miles are measured from the Mean Low Water mark.

NYSDEC-0003427

The only county boundary on this sheet is the Mean High Water line of the Atlantic Ocean as per R.S., Pt. 1, Ch. 2, tit. 1, §2, ¶1.

The Towns of Southampton, Brookhaven, and Islip have jurisdiction over the regulation of vessels up to 1,500 feet into the Atlantic Ocean as set forth in New York Town Law §130(7).

The town boundaries in the Moriches Bay and Great South Bay areas are as now shown in the new County of Suffolk Tax Map.

The National Park Service, U.S. Department of Interior, has been deeded lands underwater in the Atlantic Ocean adjacent to the Fire Island National Seashore for the purpose of use and occupation, by the State of New York (Deed Liber 6386 cp. 235 filed in the office of the Suffolk County Clerk). This land area extends seaward 1,000 feet from the Mean High Water and falls within the National Park Service jurisdiction line depicted on Official Map No. O.G.P. - 0002, dated June, 1964. Said Map is referenced in U.S. Public Law 88 - 587, 88th Congress S. 1365, September 11, 1964.

The lands underwater of Great South Bay within the Fire Island National Seashore boundaries are presumed to be under federal jurisdiction, although the ownership is generally private and town. It appears that the Federal Government has not yet exercised its powers of eminent domain in this area to thereby gain complete control.

NYSDEC-0003428

The boundary of Brookhaven and Islip Town in the Great
South Bay is of historical derivation. The currently accepted
north/south line is the "Ranges Line" as agreed upon, described,
and surveyed by a committee of representatives of the Towns
of Brookhaven, Huntington, and Islip in the year 1833. The
Brookhaven-Islip Town boundary along the north side of the bay
is surveyed and described in the Field Book of Brookhaven
Survey, December 5, 1797.

B.  Ownership of Lands Underwater

This sheet is a good indicator of the status of
submerged land ownership along the south shore of Long
Island. The state has ownership in the Atlantic Ocean out
to the Three Mile Limit. The ownership of the bays is mostly
divided between the townships and large privately owned tracts
which have base title founded in colonial days.

The lands underwater indicated for the Town of Southampton
are interpreted from the Andros Patent dated November 1, 1676,
and the Dongan Patent dated December 6, 1686. The lands
underwater indicated for the Town of Brookhaven are by virtue
of the Nicolls Patent, March 7, 1666, and the Dongan Patent,
December 27, 1686.

The lands underwater in the Great South Bay have, since
colonial times, been under contest of ownership. Brookhaven
Town claimed the submerged lands by virtue of its colonial
patents. Colonel William Smith simultaneously claimed the

NYSDEC-0003429

submerged lands by virtue of an unsigned patent by Governor Benjamin Fletcher which created the vast Manor of St. George on October 9, 1693. The Town of Brookhaven tried to strengthen its position by acquiring the lands underwater of the Great South Bay from the Indians (Indian Deed dated April 8, 1755).

In 1767 the Smith Family heirs and the Brookhaven Town Trustees became tenents in common for all the bay by a signed agreement. As a result of a New York State Supreme Court judgment in partition dated November 30, 1900, the easterly part of the Great South Bay as deliniated by the "Heirs line" was given to the Town Trustees, whereas the submerged lands west of the "Heirs line" to the previously described "Ranges line" were given to the Smith Family heirs. This area is now under the private ownership of the Blue Points Company, Inc. and others as derived from the Smith family chain of title.

An area of private ownership derived from the original Smith grant is located in Bellport and Narrow Bay, and extends eastward from a north/south line drawn just east of Pattersquash Island. Part of this area is currently in ownership of the Fish & Wildlife Service, U.S. Department of Interior, and is known as the Werthiem National Wildlife Refuge (Deed Liber 2714, cp. 356, filed in the office of the Suffolk County Clerk).

NYSDEC-0003430

As noted in the documentation section for this sheet, the Fire Island Nation Seashore has jurisdiction on the Great South Bay side within in its boundaries, and ownership of a specialized nature on the Atlantic ocean side for a distance seaward of 1,000 feet.

C. Legal Analysis of Boundary and Ownership Problems

1. Summary

Ownership of lands underwater in the Peconic River and the Flounders Bay area is unclear.

The State of New York claims ownership of a portion of the lands underwater in this area. The Town of Southampton claims the bottom south of the existing Riverhead - Southampton Town line. The Town of Riverhead avows to a historical claim to all the submerged lands in the Flanders Bay area south to Red Creek on the Southampton side.

2. Text

A case concerning claims in this area, Town of Riverhead v. Fire Island Fisheries Inc. and Blue Points Company, Inc., in which the State of New York intervened, involved an application by the town for a preliminary injunction to restrain the two private companies from engaging in clamming operations on lands under water in the Peconic River or Flanders Bay on the grounds that the town claimed title to those lands. The Court: (1) found that a serious question existed as to what rights, if any, the town had in the lands underwater in Flanders or Peconic Bays (2) found that a serious issue of fact existed as to the question of whether the town would suffer irreparable damage if the injunction were not granted, and therefore (3) denied the request for the injunction. (Unreported case, Sup. Ct., Suffolk County, Index No. 75-5337, May 10, 1973, Thom. J).

Although a notice of appeal was timely filed (May 18, 1973), a motion to dismiss the appeal was granted (March 1974) and this particular case appears closed although the generic issues remain unresolved.

NYSDEC-0003431

3.    Conclusions

Legal issues concerning ownership of lands underwater
in the Peconic River and Flanders Bay area remain unresolved.

V.   MAP SERIES #2, SHEET #4

A.   Boundaries and Jurisdiction

The Connecticut - New York State boundary is legislated
and described in the Laws of New York 1912, Chapter 352 and
Laws of 1913, Chapter 18.

The portion of the New York - New Jersey State boundary
on this sheet is described by New York Laws of 1889,
Chapter 212.  Said Law is a compilation and revision of
several early laws regarding said boundary.

The current existing Nassau - Suffolk County boundary
overwater depicted on this sheet begins at the southern end
of Cold Spring Harbor and traverses up the center of the lower
harbor in a series of courses and distances as shown on a
map recorded in the Huntington Town Clerk's Office, entitled
"County Line from Head of Cold Spring Harbor to the Sound,"
surveyed in 1873.  This line comes ashore on Lloyds Neck at
a location called Fleets Hole.  The New York Laws of 1886,
Chapter 667, which annexes Lloyds Neck to the Town of
Huntington, Suffolk County from the Town of Oyster Bay,
Nassau County, has the boundary commencing at the Mean High
Water Mark at Fleets Hole and following the shore of the
neck around to East Fort Point.  The boundary then progresses
northwardly into Long Island Sound to the state line as set
forth in New York Laws of 1881, Chapter 695, Section 1.

NYSDEC-0003432

PLAINTIFFS' EXHIBIT 33

Case 2:18-cv-03648-SJF-SIL  Document 83-9  Filed 11/18/19  Page 232 of 291 PageID #: 1052

U.S. SMITHSONIAN INSTITUTION
BUREAU OF AMERICAN ETHNOLOGY: J. W. POWELL, DIRECTOR

BULLETIN 25

121667

# NATICK DICTIONARY

BY

## JAMES HAMMOND TRUMBULL



WASHINGTON
GOVERNMENT PRINTING OFFICE
1903

nohtau, nohteau, n. fire, Ps. 105, 39;
Prov. 30, 16; Gen. 22, 6. See *chikkod-
mog*.

[Quir. *mai'* and *yowi*, Pier. 22. Narr.
*middáppeh póliry*, sit by the fire, R. W. 30;
*nôte, yóte, chickot, squitta*, fire; *notôwese*
and *chickuntâwese*, a little fire, ibid. 47,
48. Peq. *prot*, Stiles. Abn. *skôdaï,
skôter, *fire*, Rasles. Del. *lúeü*, it burns;
an. *n'lusei*, I burn, Zeisb. Gr. 162, Voc.
70.]

notimis, n. an oak tree, 2 Sam. 18, 9;
Is. 44, 14.

[Narr. *poughtemisk*, R. W. 89.]

nontinat, v. t. to lift or take up a burden.

notiôônat, v. t. an. to lift as a burden;
an. obj. *noôônôp nippôteau*, I drew him
out of the water, Ex. 2, 10.

[Narr. *nôtuüah*, 'take it on your
back', R. W. 51. [Cree *ne nôtôin*, I
fetch him, Howse 52.]

nowwantamôos. See *antamtam, he grieves*.

nowwanok, n. a saying (that which is
said, Deut. 1, 23; 1 Sam. 18, 8); *nutin-
nowwaont*, my saying, Gen. 4, 23; *nutin-
nowwoapnash*, 'my commandments',
Ex. 16, 28.

nowwesuonk, my name, Is. 42, 8. See
*wesuonk*.

nowwtat. See *nodtaut*.

*nquitaqdinnegat (Narr.), one day.
See *nequt; quinne*.

nuhhog, nuhog, my body, Matt. 26, 26;
myself. See *nuhhog (m'hog)*.

nuhhogkat, unto me, Is. 6, 6; Cant. 7,
10.

nuhkuhkôdonat, v. t. an. obj. to come
upon, to overwhelm, Ex. 14, 28; *piuh
nukkuhkouon woukimok*, 'he shall come
upon princes', Is. 41, 25.

nuhkuhkomunât, v. t. to cover over, to
envelop, to overwhelm; *nuhkukkom*, it
covered, Ex. 14, 28; 40, 34; *wunnih-
kukkoman*, it covered it, Ex. 24, 15, 16.
From *mohtuá*.

nuhog. See *nuhhog*.

nuhquainat, nunuhquainat, v. i. to look,
to direct the eye, without reference to an
object (cf. *nadtauwômpu*, he looks for a
purpose, he looks in order to see some-
thing which is or is not within sight);
*nutnuhquáin noggwe*, I look toward (it),
Jonah 2, 4 (cf. *noggwe*); *nuhquaiog*, they

nuhquainat, etc.—continued.
looked or faced (to the north, etc.), 1 K.
7, 25; *toh wutch nuhquaióg kesukquieu*,
why do you look toward heaven? Acts
1, 11. V. t. *noh nôggweh*, he who sees me,
Gen. 15, 13; *wuhquáou, nhuwohquou*,
'he looked this way and that way',
Ex. 2, 12. The compounds are numer-
ous, as *onqooouhquaimõ*, to look back
or behind; *wohkoquaiuut (wonkoshq-)*, to
look out from, to look forth; *wohquah-
quáinat (amp-, ishp-, op-)*, to look up-
ward, etc. From (*wunnunoui) woun*, to
see; *nohquôr*, to that side, in that direc-
tion (?). See *nô, nôwái; *pôuôkquai;
wompu*. (Cf. *tohkinauússuea*, to take a
view, C. 214.)

nukkeemou, it was shaken, Ps. 18, 7; pl.
*inan. =ash*, they were shaken, ibid.
See *munnôhtuwunumôh*.

nukkies, yes. See *nux*.

nukkodtumunôh, v. t. to leave behind,
to abandon, to forsake (inan. obj.),
Prov. 13, 14; 16, 17; Dan. 9, 5; *ne teng
nugkodtumuk*, a thing left, C. 172. With
an. obj. *nukkonônat* (q. v.); *nukodtu-
wônah*, to leave, C. 199; *nuunukohtun-
 wônah*, I leave, ibid.

[Narr. *nickúttash*, leave or depart; pl.
*nickúttamwock, nickuttunáteu*, let us de-
part, R. W. 55. Cree *nágga-tum*, he
fetcheth him, Howse 42.]

nukkomauonâs [*negaune-ouónsi*], to be
first, in advance; *nukkomou*, he came
first to . . . , John 20, 4.

nukkonôos, adv. by night, in the night,
Ex. 13, 21; Ps. 32, 4; 42, 8; 105, 39.
See *nukkog*.

[Narr. *nukkocks nokanu-nâwi*, by night,
R. W. 70.]

nukkône [ =*neyoune*, first], adj. old, an-
cient, of old, Eccl. 1, 10 ('original',
'old', C. 173); —— *sip*, ancient river,
Judg. 5, 21; —— *gunnonou*, old lion,
Is. 30, 6; —— *mayash*, the old ways,
Job 22, 15; *nukkonôhtu*, the ancient
mountain, Deut. 33, 15; *peush nukhkôn-
nyeukish*, 'these are ancient things', 1
Chr. 4, 22; *nyinnup neyoune nukkônye-
uut*, 'he hath made the first old'; *ne
negonneuyeuuh*, 'that which waxeth
old', Heb. 8, 13.

[Abn. *negaunài*, c'est une vieille cou-
tume; *negaunât arennûkôt*; les anciens;

PLAINTIFFS' EXHIBIT 34

New York State. Governor, 1807-1817 (Daniel
D. Tompkins.

# PUBLIC PAPERS

OF

# DANIEL D. TOMPKINS

## GOVERNOR OF NEW YORK

### 1807—1817

### MILITARY—Vol. II.

WITH AN INTRODUCTION BY

### HUGH HASTINGS, State Historian.

PUBLISHED BY THE STATE OF NEW YORK.

ALBANY
J. B. LYON COMPANY, STATE PRINTERS
1902

Checked
May 1913

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

sent you by them, concerning which pray let me have your speedy resolution and answer. Your humble Servant

Pb. Carteret.

———

Book A., page 2 } Directions and instructions to James Bollen, Esqr. Secretary of
March 28, 1681. }   our province of East New Jersey, from Lady Elizabeth Carteret.
"You are to lay claim to Statten island, as belonging to us, according to his Royal Highnesses grant, and also the farme at Horsemuss, and to take it into possession for my use."

Articles (by Philip Carteret) to John Ogden, Servt. and others, undertaking a fishing trade, and also the taking and preserving of whales and such like great fish &c. "Imp." I doe give and grant unto the aforenamed John Ogden, Caleb Carwithy, Jacob Molleins, William Johnson and Jeffrey Jones and company, and to all and every of them, free leave and liberty to take or kill any whale, whales, or such like great fish in any place or places where they may be found or taken, whether at sea or in any creek, or Cove, between Barnegate and the Easternmost parts of this province, without any exception of drifts or wrecks.

"2nd. That the said persons and company shall have free liberty to bring on shore, at any convenient place or places within the bounds and limits before mentioned, all such whales or great fish as they shall find, kill or take, and to erect huts or cabines on any person's land by the water side, upon occasion, for their better preservation of the said whales or great fish, and trying them for the making of oil, or curing other fish they shall take: Provided they do not trespass upon Cornfields, nor do damage to the Stock or Cattle of any such persons, upon whose grounds they shall come."

3rdly. Extends the limits of the charter to three years.

4thly. That, for the encouragement of the said persons and company in the prosecution of this design, I doe promise and grant unto them, in case Staten island falls within this government, some convenient place or tract of land upon the said island, near unto the water side, fit for the settlement of a town or societie, to consist of twenty four families; and that they shall have a competent proportion of land allotted to each family, or lott with meadow ground, as well as planting land and free commonage, upon the island, each family or lott to pay a quit-rent to the lords proprietors' their heirs or assigns, one bushel of wheat yearly.

Same book page 52 }  "License to John Timerson, ferryman between Bergen, Comunipa,
January 18, 1672 }  and New York, with rates and conditions, as was formerly granted
to Peter Hirtfelsen.

Same book page 152 }  "License to Joseph Huet and others, to take whale &c. within
February 14th, 1681 }  the same bounds as was granted in page 22.
Minutes of Board of Proprietors
A. B. page 13.

At a meeting and council of the proprietors & proxies to proprietors of the province, 15th May, 1685,

Present, the Deputy Governor &c.

Petition from John Palmer, Esqr. to have a pattent for the lands he has had and taken upon Statten Island, upon consideration thereof, and that it may be of no ill consequence, but rather of service, in our claime to that Island, it's agreed and ordered, that the Governor and councill may make a patent of the ground to him.

Book A page 185 }  Patent from the proprietors of East New Jersey, to John Palmer, of
May 26th, 1681 }  Statten Island, within the said province, Esqr. "all that his capital
messuage or dwelling house, with the appurtenances, situate, lying and being on the north side of Staten island aforesaid, within Constable's hook, near the mill creeke lately erected and built by the said John Palmer, and in the possession of the said John, or his assigns; and that other parcell of land," &c.

Book C. 2 commissions }
page 1st, August 4th }  Charter to the City of Perth Amboy, by Governor Robert
1718. }  Hunter, describes the bounds as follows: "Beginning upon
the north side of the Rariran river, by the upper corner of that called Peter Souman's land, and by the lower corner of that now in the possession of James Moore, of Woodbridge; thence extending, on a straight line, as said Moore's land goes, to land now possessed by one John Veal; thence, continuing upon a direct line to the South west corner of David Herriots land, and so extending along by said Herriot's land, to the southwest corner thereof; from thence, extending on a straight line, to the southwesterly corner of the land lately in the tenure and occupation of John Carhart, formerly one Henry Lefsendiss, and so along the line thereof, easterly, as it goes to the meadow or marsh on the north side of a gully where water generally runs; thence, extending on a direct east line, through the marsh and sound, to low water mark on the easterly side thereof; from thence running down the sound southerly, as far as the southernmost point of Statten island; from thence, in a direct line, to George Willocks plantation called Rudyard's and Joyns by a creek to that plantation of late belonging to Andrew Bowne, deceased; thence, extending along the lines of said Bowne's land, excluding the same to Matewan Creek; thence up the creek, to a bridge thereon, where the highway from Amboy ferry to Freehold and Middletown crosseth the same; thence, extending along the partition line betwixt the counties of Middlesex and Monmouth, to Milstonbrook; thence down the said brook, to the post road; thence, along the same, to South river, as it goes to Raritan river, and so down Raritan river (including the said river) to high water mark on the north side thereof, to where the limits of the said town is said to begin."

Book C. 3 page 224 }  License from Governor Cosby to Archibald Kennedy, of New York,
January 7th 1773 }  to settle a ferry in the County of Bergan, in the province of East
New Jersey, to carry passengers from thence to New York, and from New York thither.

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

PLAINTIFFS' EXHIBIT 35

# AMERICAN
# STATE TRIALS

*A Collection of the Important and Interest-*
*ing Criminal Trials which have taken place*
*in the United States, from the beginning*
*of our Government to the Present Day.*

### WITH NOTES AND ANNOTATIONS

## JOHN D. LAWSON, LL.D.
### EDITOR

### VOLUME III

### ST. LOUIS
### F. H. THOMAS LAW BOOK CO.
### 1915

# THE ACTION OF JAMES MAURICE AGAINST SAMUEL JUDD, FOR A PENALTY, NEW YORK CITY, 1818.

## THE NARRATIVE.

Is a whale a "fish"?  This was the question that for many days engaged the attention of a court and jury, a distinguished array of counsel and a crowded court room, in the City of New York in the first quarter of the nineteenth century.  The New York Legislature had passed a law requiring all "fish oil" sold in the state to be first inspected and branded, with a penalty for any one who should buy or sell any oil that was not so inspected and branded.  The defendant was sued for the penalty and his plea was that the uninspected and unbranded oil that he admitted having purchased was not "fish oil," but was whale oil.

And to show that a whale was not a fish, the defendant brought a number of witnesses, captains of whaling ships from New Bedford and other Massachusetts ports, the seat of the whaling trade, and dealers in oils in several states, who deposed that they never regarded the whale as a fish and never considered fish oil to mean or include whale oil.  But their star witness was Doctor Samuel L. Mitchill, the leading scientific man of his day in America; a professor in Columbia College, and a man of affairs, who had represented his state in the United States Senate.  He unhesitatingly declared that a whale was no more a fish than a man, and added that nobody thought it was but lawyers and politicians.

All that the state had to present in reply were the opinions of merchants in New York, who said that no matter what the Yankees in the East thought, in this city everybody called a whale a fish and called whale oil fish oil.  And the jury, being

604        *III. AMERICAN STATE TRIALS*

all New York men themselves, rejected the opinions of the celebrated naturalist, and the Massachusetts captains, and found in accordance with local sentiment and local ideas, that a whale was a fish and that whale oil was fish oil.

### THE TRIAL.[1]

*In the Mayor's Court, New York City, December, 1818.*

Hon. Richard Riker,[2] *Recorder.*

*December 31.*

The declaration claimed the sum of seventy-five dollars against the defendant, for buying of one John W. Russell in the City of New York on March 31, 1818, three casks of fish oil, which had not been gauged, inspected and branded according to law. The statute which required this of all fish oil sold in the state gave the official gaugers (the plaintiff Maurice being one of them) a penalty of twenty-five dollars for every barrel of the oil not so inspected and branded which any person should buy, sell, barter, ship or convey.

The *Defendant* pleaded that the oil in question was not fish oil, but was whale oil.

The following jurors were ballotted for and sworn: Elijah Curtis, William S. Hick, Augustus Craft, Samuel Dodge, Robert Wiley, Garret Banta, Isaac Underhill, George Niven, William Cruikshanks, Robert Blake, William Wilmerding, Robert McCoubrey.

*Mr. Anthon*[3] and *Mr. Sampson,*[4] for the Plaintiff.
*Mr. Price* and *General Bogardus,* for the Defendant.

[1] *Bibliography.* *"Is a Whale a Fish? An Accurate Report of the Case of James Maurice against Samuel Judd, tried in the Mayor's Court of the City of New York, on the 30th and 31st of December, 1818; wherein the Above Problem is discussed Theologically, Scholastically and Historically. By William Sampson, Counsellor at Law. Who says a Whale's a Bird?—Sheridan. New York. Printed and Published by C. S. Van Winkle, 101 Greenwich street. 1819."

[2] See 1 Am. St. Tr. 361.
[3] See 2 Am. St. Tr. 541.
[4] See 1. Am. St. Tr. 63.

PLAINTIFFS' EXHIBIT 36

Case 2:18-cv-03648-SJF-SIL  Document 83-9  Filed 11/18/19  Page 242 of 291 PageID #: 1062

IX.

# NEW NETHERLAND IN 1627.

LETTER FROM

## ISAACK DE RASIERES TO SAMUEL BLOMMAERT,

FOUND IN THE ROYAL LIBRARY AT THE HAGUE,

AND

TRANSMITTED BY DR. M. F. A. G. CAMPBELL TO THE
N. Y. HISTORICAL SOCIETY.

TRANSLATED FROM THE ORIGINAL DUTCH

BY J. ROMEYN BRODHEAD.

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

# TRANSLATION

OF

AN ORIGINAL LETTER FROM ISAACK DE RASIERES TO SAMUEL BLOM-
MAERT, FOUND IN THE ROYAL LIBRARY AT THE HAGUE.

Mr. Blommaert:

As I feel myself much bound to your service, and in return
know not how otherwise to recompense you than by this
short memoir, (wherein I have in part comprised as much
as was in my power concerning the situation of New Ne-
therland and its neighbors, and should in many things have
been able to treat of or write the same more in detail, and
better than I have now done, but that my things and notes,
which would have been of service to me herein, have been
taken away from me,) I will beg you to be pleased to re-
ceive this, on account of my bounden service, &c.

On the 27th of July, Anno 1626, by the help of God, I
arrived with the ship "The Arms of Amsterdam," before
the Bay of the great Mauritse River,* sailing into it about
a musket shot from Godyn's Point,† into Coenraet's Bay;‡
(where the greatest depth is, because from the East point
there stretches out a sand bank on which there is only from
9 to 14 feet water,) then sailed on North-East, and North-
North-East, to about half way from the low sand bank
called Godyn's Point, to the Hamel's-Hoofden,§ the mouth
of the river, where we found, at half ebb, 16, 17, 18 feet wa-
ter, and which is a sandy reef a musket shot broad, stretch-
ing for the most part North-East and South-West, quite
across, according to my opinion, and to have been formed there
by the stream, inasmuch as the flood runs into the bay from

* The North River ;—so called, after Prince Maurice of Orange.
† Sandy Hook ;—so named after Samuel Godyn, one of the Directors of the
West India Company at Amsterdam.
‡ The Lower Bay of New York ;  also called Port May, or Godyn's Bay.
§ Hamel's Hoofden ;—the narrows, between Staten and Long Islands.  These
"Hoofden," or headlands, were named after Hendrick Hamel, one of the Di-
rectors of the West India Company.

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

344                      DE RASIERES' LETTER.

the sea, East-South-East; the depth at Godyn's Point is caused by the ebb flowing out along there with such rapidity.

Between the Hamels-Hoofden the width is about a cannon's shot of 2,000 [yards.]  The depth 10, 11, 12 fathoms. They are tolerably high points, and well wooded.  The West point is an island, inhabited by from 80 to 90 savages, who support themselves by planting maize.  The East point is a very large island, full 24 miles* long, stretching East by South and East-South-East along the sea-coast, from the river to the East end of the Fisher's Point.†  In some places it is from 3 to 4 miles broad, and it has several creeks and bays, where many savages dwell, who support themselves by planting maize and making sewan, and who are called Souwenos and Sinnecox.  It is also full of oaks, elms, walnut and fir trees, also wild cedar and chesnut trees.  The tribes are held in subjection by, and are tributary to, the Pijquans, hereafter named.  The land is in many places good, and fit for ploughing and sowing.  It has many fine valleys, where there is good grass.  Their form of government, as well as that of their neighbors, is described hereafter.

The Hamels-Hoofden being passed, there is about a mile width in the river, and also on the West side there is an inlet, where another river runs up about 20 miles, to the North-North-East, emptying into the Mauritse River in the highlands, thus making the North-West land opposite to the Manhatas, an island 18 miles long.  It is inhabited by the old Manhatans; [Manhatesen;] they are about 200 to 300 strong, women and men, under different chiefs, whom they call "Sackimas."  This island is more mountainous than the other land on the South-East side of the river, which opposite to the Manhatas is about a mile and a half in breadth.  At the side of the before-mentioned little river, which we call "Achter Col,"‡ there is a great deal of waste reedy land; the rest is full of trees, and in some places there is good soil, where the savages plant their maize, upon which they live, as well as by hunting.  The other side of the same small river, according to conjecture, is about 20 to 23 miles broad to the South river, in the neighborhood of the Sancicans, as well as I have been able to make it out from the mouths of the savages; but as they live in a state of constant enmity with those tribes,

* Dutch miles.  A Dutch mile is equal to about three English miles.
† Visscher's Hoeck—Montauk Point.
‡ The Kills.

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

PLAINTIFFS' EXHIBIT 37

DOCUMENT RESUME

*Released* 7/18/77

02446 - [A1752778] (Restricted)

[The Lummi Indian School of Aquaculture]. HRD-77-108;
B-164031(1). June 17, 1977. 6 pp. + 8 enclosures (12 pp.).

Report to Rep. Lloyd Meeds; by Gregory J. Ahart, Director, Human
Resources Div.

Issue Area: Education, Training, and Employment Programs:
    Relation of Students' Educational Experiences to Society and
    the Work World (1105); Education, Training, and Employment
    Programs: Programs for Specific Target Groups (1108).
Contact: Human Resources Div.
Budget Function: Education, Manpower, and Social Services:
    Elementary, Secondary, and Vocational Education (501).
Organization Concerned: Department of Health, Education, and
    Welfare; Department of the Interior; Community Services
    Administration; Department of Commerce.
Congressional Relevance: Rep. Lloyd Meeds.

        A review was made of the activities of the Lummi Indian
School of Aquaculture, near Bellingham, Washington, from June
1973 through February 1977. The review concentrated upon: (1)
the sources and use of Federal Funds, (2) the extent and use of
equipment purchased with Federal funds, (3) the overhead costs
in administering the program, (4) the per-student cost compared
with similar programs, (5) job opportunities and duration and
salary of such employment, and (6) the training-related job
market. Findings/Conclusions: Funding by four Federal Agencies
during the period June 1973 through September 1976 amounted to
$1.5 million, with the Bureau of Indian Affairs providing 55%.
The cost of instructional equipment purchased was $48,000, and
six vans and one truck were purchased for about $40,000. Except
for a few items, all were being used by the school for student
training. Through August 1976, $36,645 went for tribal overhead
expenses. On the basis of 110 completed 9-month school terms,
average annual cost per completed student was $13,209, compared
with Peninsula College's $1,386 per student. Of 62 students from
the Aquaculture school who entered the job market, 40 obtained
employment, but only 26 were in training-related jobs. These 26
have held a total of 32 different positions--27 with Indian
tribes. The hourly rate ranged from $3.00 to $5.19. The job
market was "fair to poor" at all hiring levels. (DJM)

## UNITED STATES GENERAL ACCOUNTING OFFICE

**WASHINGTON, D.C. 20548**

HUMAN RESOURCES
DIVISION

B-164031(1)

RESTRICTED — Not to be released outside the General
Accounting Office except on the basis of specific approval
by the Office of Congressional Relations

*Released* **JUN 17 1977**
*7/18/77*

The Honorable Lloyd Meeds
House of Representatives

Dear Mr. Meeds:

Your letter of December 10, 1976, requested that the
General Accounting Office review certain aspects of the
operation of the Lummi Indian School of Aquaculture located
near Bellingham, Washington. The school is one of several
enterprises operated by the Lummi Indian tribe. These enter-
prises include a profit-oriented aquaculture project.

Specifically, you requested information on (1) the
sources and use of Federal funds, (2) the extent and use
of equipment purchased with Federal funds, (3) the overhead
costs incurred by the Lummi Tribe in administering the pro-
gram, (4) the per-student cost compared to similar programs,
(5) where training-related jobs were obtained, and the dura-
tion and salary of such employment, and (6) the training-re-
lated job market for aquaculture school graduates.

For this review we interviewed officials of the aquacul-
ture school and the Lummi Business Council, Peninsula College,
Washington State; and the various Federal agencies funding
the school's operations. We also examined records at each
of the organizations above. Our review covered the aquacul-
ture school's activities from June 1973 through February 1977.

### SOURCES AND USE OF FEDERAL FUNDS

The aquaculture school received over $1.5 million from
four Federal agencies since its inception in 1973 through
September 1976. The Bureau of Indian Affairs has provided
55 percent of the funds; the Community Services Administration
(formerly the Office of Economic Opportunity), 25 percent;
the Office of Education, 12 percent; and the Economic Develop-
ment Administration, 8 percent. A summary of the funding from
each agency is contained in enclosure I.

B-164031(1)

The aquaculture school's major costs are staff salaries (33 percent), student stipends (31 percent), and space rental (8 percent). However, because funds were commingled and contract periods overlapped, the funds use could not be precisely matched to sources in all cases. However, our analysis of the sources and use of Federal funds, to the extent that we could determine based on records and documents available at the aquaculture school, is contained in enclosure II.

## UTILIZATION OF EQUIPMENT
## PURCHASED WITH FEDERAL FUNDS

The aquaculture school's financial records showed purchases of about $48,000 in instructional equipment were charged to the Office of Education, Community Services Administration, and Bureau of Indian Affairs funds; many items were of low unit cost. We identified 34 items with a nit cost of $250 or more. (See enclosure III.)

We physically verified that each of the 34 items of equipment existed. Excepting a few items in storage or being used for administrative support, we found that all equipment was being used by the aquaculture school for training students. Tribal officials obtained a copy of your letter to us before we visited them and were, therefore, aware of your concern regarding possible equipment misuse. We could not determine if this equipment had been used for the Lummi profit-oriented aquaculture project. However, we have no reason to believe that this equipment is not necessary for, and used for, school instruction.

The aquaculture school also purchased six vans and one pickup truck with about $40,000 of Federal funds provided by the Office of Education, Community Services Administration, and Bureau of Indian Affairs. Two vans were purchased outright in 1973, and the other five vehicles were acquired under a time-purchase arrangement. The school was using all seven vehicles at the time of our fieldwork.

## OVERHEAD COSTS INCURRED BY TRIBE
## IN ADMINISTERING THE AQUACULTURE
## SCHOOL PROGRAM

At the time of our review, the $20,000 mentioned in your letter as budgeted for tribal overhead had not been approved and funded by the Bureau of Indian Affairs. According to Lummi Indian Business Council officials, the $20,000 was to cover school activities such as preparing contracts, administering aquaculture school funds, and student use of the Lummi neighborhood facility.

2

B-164031(1)

Charges for tribal overhead expenses associated with the aquaculture school were first made in April 1975, and through August 1976 the council was paid $36,645 for such expenses. Our analysis of these past charges raised questions about the rate of certain charges and about the propriety of other charges. For example, the largest single item of tribal overhead was student use of the tribe's neighborhood facility. The school population averages about 45 students--30 percent are resident Lummis--compared to about 900 Lummis residing on or near the reservation; however, the school's overhead charge represents 36 percent of the operating cost for the facility for the 18-month period. We also noted that certain overhead charges appeared to be costs directly associated with operating the school, such as $8,355 in taxes and interest on the property used by the school. Enclosure IV presents our analysis of tribal overhead associated with the aquaculture school.

In a 1976 audit report on funds provided to the aquaculture school, the Community Services Administration stated that the business council had charged the aquaculture school with "unauthorized and unsupported" tribal overhead costs. Subsequently, the Community Services Administration ordered the business council to return all funds received for overhead costs to the aquaculture school. The business council has not yet responded to this order.

## PER-STUDENT COST

The aquaculture school's training program consists of two 9-month school terms. A student completing at least one term is considered to have successfully completed the program. We used three different methods for computing the school's per-student cost: (1) the 1977 budget divided by the present student population, (2) total costs divided by total student months, and (3) total costs divided by total students who completed at least one term. The following describes each of these methods and the results of our computations:

    1. The aquaculture school's budget for the present school year, 1976-77, is $291,633, excluding student stipends. The school's 1976-77 student enrollment through February 1977 ranged from 35 in September to 50 in February. Assuming 50 students, the annual per-student cost would be about $5,830. In addition, each student receives a minimum monthly stipend of $300. On this basis, the 1976-77 average annual per-student cost will be at least $8,530.

3

B-164031(1)

    2. From its start in June 1973, through June 1976, the Federal Government has provided the school funds totaling $1,452,960. 1/ This figure includes student stipends. During this period 1,448 student-months 2/ were recorded. On this basis, the average cost per student-month was $1,003, or $9,027 average annual per-student cost.

    3. The aquaculture school has experienced a substantial dropout rate. Of 213 students enrolled between June 1973 and February 1977, only 83 3/ completed one 9-month term, and 27 of these 83 completed the second 9-month term. See enclosure V for details on student status. On the basis of 110 completed 9-month school terms, the average annual cost per completed student term was $13,209.

As requested, we attempted to identify and compare the cost of attending a similar work training program. As far as we could determine, the Lummi Indian School of Aquaculture is the only fishery training program managed by an Indian tribe. We did find, however, that similar fishery training is provided by Peninsula College, located near Port Angeles, Washington. The cost to attend Peninsula College is about $3,000 per year for Washington State residents and $3,400 per year for nonresidents. This covers tuition, books, and room and board. Peninsula is a State-supported institution, and as such, the $252 tuition cost covers only about 18 percent of the college's operating costs, estimated by State officials to total $1,386 per student. Thus, the total per-student cost would be $4,386 per year for Washington State residents and $4,786 per year for nonresidents. Since July 1974, 10 Indian students receiving Bureau of Indian Affairs funds have attended the Peninsula fisheries program. One is still enrolled in the program, but none have completed the 2-year program.

---

1/The school was first closed for summer vacation from June 19 through September 26, 1976; therefore $69,400 awarded for the period July 1 through September 30, 1976, was not included.

2/One student in attendance during a month equals a student-month.

3/Twenty-one of these students are presently in the second term of school.

B-164031(1)

## LENGTH OF EMPLOYMENT AND SALARY
## LEVEL OF AQUACULTURE SCHOOL GRADUATES

Sixty-two students have completed at least one 9-month term and entered the job market.  Of these, we were able to substantiate, by contacting their employers, that 40 obtained employment of one type or another but only 26 were in training-related jobs.  As of February 28, 1977, 18 were still employed in training-related positions and 7 of these had been employed for 1 year or more.

Most training-related employment has been with Indian tribes.  The 26 graduates who obtained training-related employment have held a total of 32 different positions-- 27 were with Indian tribes.  The hourly rate ranges from $3.00 to $5.19 with an average of $3.78.

Enclosures VI, VII, and VIII detail the jobs obtained by the graduates of the aquaculture school.

## JOB MARKET FOR FUTURE
## AQUACULTURE SCHOOL GRADUATES

Since most aquaculture school students have been Washington State residents, we confined our job market analysis to Washington.  Our analysis showed that the job market was "fair to poor" at all hiring levels--Indian tribe, State, Federal, and private sectors.

Graduates of the Lummi Indian School of Aquaculture obtained 23 training-related jobs in the State of Washington; 20 of these jobs were with Indian tribes.  The Lummi Tribe provided 12 of these jobs.  It currently employs 44 people in fishery positions requiring aquaculture training.  The tribe has reached a saturation level in its ability to absorb new aquaculture school graduates.  According to the personnel officer for the tribal enterprises, the tribe will provide few fishery job opportunities during 1977 because of low job turnover and an austere budget.  She added, however, that additional Federal funding could create three new fishery positions.

Lummi Indian School of Aquaculture graduates have obtained only three training-related jobs with Washington's non-Indian employers, and future opportunities appear scarce. According to Washington State officials, the State hires about 15 people annually for fisheries positions; however, the State presently has frozen hiring.  In addition, eight Indians were working in State hatcheries under an Indian on-the-job training program in which the State provides

5

B-164031(1)

facilities and instruction and the Federal Government pro-
vides the trainees' salaries.  According to a State person-
nel officer, these individuals would have an advantage in
obtaining permanent employment as it becomes available.

Opportunities for Federal fishery employment in Wash-
ington are very limited.  According to U.S. Fish and Wild-
life and National Marine Fisheries Service officials, the
primary Federal fishery position not requiring a college
degree is a biological technician position, and 43 of these,
as permanent positions, exist in Washington.  The Fish and
Wildlife Service hired five technicians during 1976 while the
National Marine Fisheries hired only one or two.  No sig-
nificant increase is anticipated in the foreseeable future.

According to State officials, private fishery opera-
tions in Washington are in their infancy, consisting of 11
salmon and over 100 freshwater game hatcheries   However,
only the salmon and 15 to 20 of the game hatcheries employ
nonfamily members, and most of the game hatcheries are small
operations.  State officials said that the private hatcheries
were looking for individuals with a level of experience ex-
ceeding graduates of aquaculture schools.

Although we did not obtain formal comments on the con-
tents of this report from officials of the Lummi Indian School
of Aquaculture or the Lummi Indian Business Council, we did
discuss our findings with the chairman of the business council.
He expressed concern about the overhead and fishery jobs data
because it could be interpreted as showing excessive overhead
and low job placement.  He believed that the tribe was charging
a nominal overhead rate compared to other educational institu-
tions and that the aquaculture school's job placement percent-
age was commendable when compared to other Federal training
programs.

A copy of this report is also being provided to the Chairman,
Subcommittee on Indian Affairs and Public Lands, House
Committee on Interior and Insular Affairs, as suggested by
your office.

Sincerely yours,

/Gregory J. Anart
Director

Enclosures - 8

6

## SUMMARY OF FEDERAL ASSISTANCE TO

## THE LUMMI INDIAN SCHOOL OF AQUACULTURE

## THROUGH SEPTEMBER 1976

| Source of funds | Period of funding | Amount of assistance |
|---|---|---|
| Office of Education | 7/73-10/74 | $180,000 |
| Economic Development Administration | 3/73-9/74 | 127,165 |
| Bureau of Indian Affairs | 7/74-12/74 | 98,368 |
| Office of Economic Opportunity/ Community Services Administration | 7/74-11/75 | 373,050 |
| Bureau of Indian Affairs | 7/75-9/76 | 486,617 |
| Bureau of Indian Affairs | (a) | 255,160 |
| Total | | $1,522,360. |

a/This assistance was provided during fiscal years 1974 and
  1975.  It included $78,281 which the aquaculture school re-
  ceived from the Bureau of Indian Affairs as monthly reim-
  bursements for student tuition, and $176,879 which the Bureau
  of Indian Affairs provided directly to aquaculture school
  students in the form of stipends.

ENCLOSURE II

## SUMMARY OF FUNDS USE BY SOURCE

### LUMMI INDIAN SCHOOL OF AQUACULTURE

#### THROUGH SEPTEMBER 1976

| Type of expenditure | Office of Education | Economic Development Administration | OEO/CSA (notes a, c) | Bureau of Indian Affairs (note a) | Bureau of Indian Affairs tuition | Total |
|---|---|---|---|---|---|---|
| Personnel costs | $105,052 | $58,946 | $ 88,631 | $254,459 | $   545 | $507,633 |
| Student stipends | | | 133,042 | b/345,629 | | 478,671 |
| Space costs | | 19,925 | 26,980 | 67,707 | 5,458 | 120,070 |
| Consultants | | 16,225 | 9,000 | 3,048 | 3,637 | 31,910 |
| Travel and per diem | 754 | 5,632 | 16,764 | 4,941 | 1,083 | 29,174 |
| Consumable supplies | 18,022 | 3,890 | 19,150 | 12,178 | 629 | 53,869 |
| Rental, lease, or purchase of equipment | 43,112 | | 30,916 | 6,497 | 12,703 | 93,228 |
| Other direct costs | 13,074 | 21,573 | 15,529 | 16,802 | 3,891 | 70,869 |
| Tribal overhead | | | 26,645 | 10,000 | | 36,645 |
| Administrative costs | | | | 25,110 | 7,195 | 32,305 |
| Operating costs | | | | 29,579 | | 29,579 |
| Remodeling | | | | | 13,102 | 13,102 |
| Under (over) expenditures | (14) | 974 | 6,393 | (12,086) | 30,038 | 25,305 |
| TOTAL | $180,000 | $127,165 | $373,050 | $763,864 | $78,281 | $1,522,360 |

a/Federal expenditures for the Office of Economic Opportunity/Community Services Administration
and the Bureau of Indian Affairs were commingled and the allocation between the two was made
by aquaculture school officials.  Accounting records do not support the allocation in all
cases.

b/$176,879 of student stipends went directly from Bureau of Indian Affairs to students.

c/Office of Economic Opportunity/Community Services Administration.

ENCLOSURE II

## EQUIPMENT PURCHASES EXCEEDING $250 PER UNIT

### LUM' I INDIAN SCHOOL OF AQUACULTURE

| Type of equipment | Date of purchase | Use or description | Location | Number of units | Total cost |
|---|---|---|---|---|---|
| Electric shaker | 8/73 | Shaking vaccines | Micro-laboratory | 1 | $ 385 |
| Distilling unit | 8/73 | Distills water | Micro-laboratory | 1 | 495 |
| Boat trailer | 8/73 | Hauls boats onto beach | Beach | 1 | 267 |
| 16-ft. fiberglass skiffs and outboard moto's | 8/73 | To haul nets for gathering samples | In bay or storage | 2 | 2,446 |
| Portable dissolved oxygen meters | 2/74 | Measures oxygen in water | Water quality laboratory | 2 | 1,314 |
| Olivetti typewriter | 2/74 | Secretary's use | Storage | 1 | 446 |
| Pipeline | 3/74 | Polyvinyl chloride pipeline | Seawater system | 1 | 1,188 |
| Plankton centrifuge | 6/74 | Spins down plankton from water samples | Micro-laboratory | 1 | 435 |
| Flow meter | 6/74 | Used to determine stream flow | Water quality laboratory | 1 | 500 |
| Stereo microscopes | 6/74 | For student use in laboratory | Teaching laboratory | 2 | 1,190 |
| Compound microscopes | 6/74 | For student use in laboratory | Teaching laboratory | 1 | 1,100 |
| Portable coliform kit | 6/74 | Measures pollution in freshwater streams | Water quality laboratory | 2 | 1,103 |
| Physiology kit | 6/74 | Teaching device for demonstration | Teaching laboratory | 1 | 315 |
| Salinometer probe | 6/74 | Measures salinity in water | Water quality laboratory | 1 | 470 |

3

ENCLOSURE III                                          ENCLOSURE III

| Type of equipment | Date of purchase | Use or description | Location | Number of units | Total cost |
|---|---|---|---|---|---|
| Hand winch | 6/74 | Part of subsurface sampling system | Storage | 1 | 308 |
| Metering wheel | 6/74 | Part of subsurface sampling system | Storage | 1 | 281 |
| Compound microscope | 6/74 | For student use in laboratory | Storage | 1 | 1,185 |
| Deepwater pump | 6/74 | Brings in seawater | Seawater system | 1 | 882 |
| Thermistor thermometer | 6/74 | Monitors temperatures | Seawater system | 1 | 475 |
| Minicorder | 6/74 | Records temperatures | Water quality laboratory | 1 | 475 |
| Electrofisher | 12/74 | Attracts fish for samples | Water quality laboratory | 1 | 766 |
| Compound microscope | 4/75 | For student use in laboratory | Teaching laboratory | 1 | 1,741 |
| Dionizer | 5/75 | Makes distilled water | Micro-laboratory | 1 | 493 |
| IBM typewriter | 7/75 | Secretary's use | Main office | 1 | 635 |
| Blower | 7/75 | To grow algae | Storage | 1 | 758 |
| 40 h.p. outboard motor | 8/75 | For use on power boat | Storage | 1 | 325 |
| Mettler top loader | 3/76 | Measures out chemicals | Water quality laboratory | 1 | 1,496 |
| Scanning tele-thermometer | 5/76 | Monitors temperatures | Seawater system | 1 | 485 |
| Deepwater pump | 6/76 | Backup pump for bringing in seawater | Seawater system | 1 | 889 |
| Thelco waterbath | 7/76 | Chemical testing | Water quality laboratory | 1 | 375 |
| | | | | 34 | $23,183 |

4

## ANALYSIS OF USE OF TRIBAL OVERHEAD ASSOCIATED

## WITH LUMMI INDIAN SCHOOL OF AQUACULTURE

| Type of expenditures | Expenditures by source of funds | | |
|---|---|---|---|
| | OEO/CSA (note a) | Bureau of Indian Affairs | Total |
| Neighborhood facility | $10,675 | $ 2,602 | $13,277 |
| Real estate taxes and interest on school property | 2,359 | 5,996 | 8,355 |
| Administrative budget for tribal expenses | 5,896 | | 5,896 |
| Storage bill paid to former school property owner | 2,180 | | 2,180 |
| Travel | 2,761 | 259 | 3,020 |
| Administrative budget for enrollment seminar | 656 | | 656 |
| Tribal telephone bill | 918 | | 918 |
| Health facility kitchen equipment | | 269 | 269 |
| Other | 1,200 | 874 | 2,074 |
| Total | $26,645 | $10,000 | $36,645 |

a/Office of Economic Opportunity/Community Services Administration.

5

ENCLOSURE V

ENCLOSURE V

## STATUS OF STUDENTS AS OF FEBRUARY 18, 1977

### LUMMI INDIAN SCHOOL OF AQUACULTURE

| Tribe | Tribe location | Number of students currently enrolled | | Number of students who completed and left program | | Number of students who dropped out | Total |
|---|---|---|---|---|---|---|---|
| | | 1st year | 2nd year | 1st year | 2nd year | | |
| Lummi | Washington | 14 | 8 | 12 | 8 | 26 | 68 |
| Tlinget | Alaska | | 3 | 3 | 3 | 6 | 15 |
| Other Alaska tribes | Alaska | 2 | | 1 | 1 | 11 | 15 |
| Klallum | Washington | | | 1 | 1 | 6 | 8 |
| Sioux | North Dakota | | 1 | | | 8 | 9 |
| Skokomish | Washington | | | | | 5 | 5 |
| Nooksack | Washington | | | 1 | 1 | 4 | 6 |
| Colville | Washington | | 1 | 3 | 1 | 2 | 7 |
| Suquamish | Washington | | 1 | 1 | 3 | 1 | 6 |
| Shinnecock | New York | | | a/4 | | | 4 |
| Paiute | Nevada | | | 1 | 2 | 1 | 4 |
| Nez Perce | Idaho | | | 1 | 1 | 3 | 5 |
| Blackfeet | Montana | 2 | 1 | | 1 | 2 | 6 |
| Apache | Arizona | | | 2 | | 1 | 3 |
| Swinomish | Washington | 1 | | 1 | 1 | 1 | 4 |
| Hoh River | Washington | 1 | | | | 3 | 4 |
| Quinault | Washington | 1 | | 1 | | 3 | 5 |
| Crow | Montana | | | | | 2 | 2 |
| Chippewa | Michigan | | | | | 2 | 2 |
| Makah | Washington | 1 | | | 1 | 1 | 3 |
| Suak-Suiattle | Washington | | 2 | 1 | 1 | | 4 |
| Wampanoag | Massachusetts | | c/2 | | c/2 | | 4 |
| Flathead | Montana | 1 | | | | 1 | 2 |
| Passamaquoddy | Maine | 2 | 2 | | | | 4 |
| Upper Skagit | Washington | 2 | | | | | 2 |
| Other (note b) | Various | 1 | 1 | 2 | | 12 | 16 |
| Total | | 28 | 22 | 35 | 27 | 101 | 213 |

a/The four members of the Shinnecock Tribe attended the aquaculture school
for 7-1/2 months under a special program and returned to training-
related jobs with their tribe. We considered them to be completions.

b/No more than one individual per tribe.

c/One of these individuals has returned to the program, although he had
completed the second year. For purposes of this schedule, he is counted
both as having completed the second year program and as being
currently enrolled.

## SUMMARY OF TRAINING-RELATED JOBS OBTAINED

## BY GRADUATES OF THE LUMMI INDIAN SCHOOL

## OF AQUACULTURE AS OF FEBRUARY 28, 1977

| Employer | Jobs |
|---|---|
| Lummi Tribe | 12 |
| Other Washington State Tribes | 8 |
| Tribes outside Washington State | 7 |
| State Government | 3 |
| Federal Government | 1 |
| Private | 1 |
| Total jobs | 32 |

7

### GRADUATES OF LUMMI INDIAN SCHOOL OF

### AQUACULTURE EMPLOYED IN TRAINING-RELATED JOBS

| Graduate's tribe | Last day of school | Employment period | Employer | Position | Hourly wage |
|---|---|---|---|---|---|
| Lummi | 3/1/74 | 5/1-6/7/74 | Lummi Tribe | Oyster culturist | $3.25 |
| | | 9/6/74-5/8/76 | Lummi Tribe | Janitor (note a) | $2.50 |
| | | 5/9/76- | Lummi Tribe | Fishery watchwoman | $3.25 |
| Colville | 3/15/74 | 5/15/74 | Washington State Fish and Game | Fish culturist | $3.30-4.50 |
| Apache | 5/25/74 | 8/74-Unknown | Arizona Fish and Game | Fish culturist | $3.00 |
| | | Unknown | U.S. Fish and Wildlife | Biological aide | Unknown |
| Paiute | 5/31/75 | 12/9/75-6/13/76 | Paiute Tribe | Fish culturist | $3.40 |
| | | 6/14/76- | Paiute Tribe | Game warden | $4.09 |
| Lummi | 5/31/75 | 6/5/75- | Lummi Tribe | Aquaculture school instructor | $4.14-4.42 |
| Quinault | 7/18/75 | 2/76- | Boh River Tribe | Fish technician | $3.75-4.25 |
| Lummi | 7/31/75 | 3/24/75-Unknown | State of Washington | Fisheries technician | $3.25 |
| | | 10/1/75- | Lummi Tribe | Adm. asst. fisheries | $3.83-4.02 |
| Makah | 10/1/75 | 9/25/75-7/23/76 | Lummi Tribe | Fish culturist | $3.61-4.08 |
| | | 8/1/76 | Makah Tribe | Fish culturist | Unknown |
| Klallum | 6/18/76 | 7/12/76- | Suquamish Tribe | Fish technician | $4.62-5.19 |
| Swinomish | 6/18/76 | 7/12/76- | Lummi Tribe | Wet laboratory technician | $4.28 |

8

| Graduate's tribe | Last day of school | Employment period | Employer | Position | Hourly wage |
|---|---|---|---|---|---|
| Lummi | 6/18/76 | 10/5-11/12/76 | Lummi Tribe | Production monitor | $3.12 |
| | | 12/6/76- | Lummi Tribe | Production monitor | $3.86 |
| Wampanoag | 6/18/76 | 1/77- | Wampanoag Tribe | Shellfish warden trainee | $4.00 |
| Colville | 12/17/76 | 2/77- | Suquamish | Fish technician | $4.62 |
| Suquamish | 12/31/76 | 2/23/77- | Domsea (private) | Seafarm technician | Unknown |
| Shinnecock | 6/19/75 | 4/1/76- | Shinnecock Tribe | Project director | $4.57 |
| Shinnecock | 6/19/75 | 4/1/76- | Shinnecock Tribe | Water quality technician | $3.85 |
| Shinnecock | 6/19/75 | 4/1/76- | Shinnecock Tribe | Water quality technician | $3.85 |
| Shinnecock | 6/19/75 | 4/1/76- | Shinnecock Tribe | Water quality technician | $3.85 |
| Paiute (note b) | 6/1/74 | 4/14/74-2/28/75 & 4/14/75-2/3/77 | Lummi Tribe | Oyster culturist | $3.22-4.38 |
| Sauk-Suiattle (note b) | 6/18/76 | 1/10-14/77 | Lummi Tribe | Fish culturist | $3.86 |
| Nooksack (note b) | 1/31/75 | 6/75-3/1/76 | Nooksack Tribe | Fish technician | Unknown |
| | | 9/13-10/8/76 | Skagit Tribe | Fish technician | $4.33 |

9

ENCLOSURE VII                                    ENCLOSURE VII

| Graduate's tribe | Last day of school | Employment period | Employer | Position | Hourly wage |
|---|---|---|---|---|---|
| Lummi (note b) | 3/1/74 | 5/23-6/7/74 | Lummi Tribe | Oyster culturist | $3.22 |
| Lummi (note b) | 3/1/74 | 4/3-6/28/74 | Lummi Tribe | Oyster culturist | $3.22 |
| Lummi (note b) | 12/31/75 | 4/7-7/19/76 | Lummi Tribe | Culture technician | $3.50 |
| | | 7/20/76- | Lummi Tribe | Fish a/butcher | $3.75 |
| Colville (note b) | 3/1/74 | 3/25/74- Unknown | Colville Tribe | Fish and Wildlife technician | $4.50 |
| Suquamish | 8/31/75 | 4/29- 7/15/76 | Suquamish Tribe | Fisheries enforcement officer | $4.33 |
| | | 8/76- | Self-employed | a/Fisherman | Unknown |

a/Nontraining-related job.

b/Not employed in training-related work as of February 28, 1977.

10

## GRADUATES OF LUMMI INDIAN SCHOOL OF

## AQUACULTURE EMPLOYED IN NONTRAINING-RELATED JOBS

| Graduate's tribe | Last day of school | Employment period | Employer | Position | Hourly wage |
|---|---|---|---|---|---|
| Tlinget | 3/1/74 | a/Unknown | Clear Creek Logging Company | Logger | Unknown |
| Lummi | 3/1/74 | 9/26/74-Unknown, 7/12/76-Unknown, 2/10/77- | Lummi Tribe | Fish processing crew | $2.75-4.00 |
| Colville | 3/1/74 | 4/28/74- | Colville Tribe | Community center director | $5.87 |
| Lummi | 3/1/74 | 9/6/74-10/19/76 | Lummi Tribe | Janitor | $2.50 |
| | | 10/20/76- | Lummi Tribe | Fish processor | $3.45 |
| Lummi | 3/1/74 | 9/26/74-Unknown | Lummi Tribe | Fish processing crew | $2.75 |
| | | Unknown (note a) | Local rest home | Aide | Unknown |
| Lummi | 1/74 | 3/24-9/15/75 | Lummi Tribe | Preventive education coordinator | $2.50 |
| Lummi | 7/1/74 | 5/2/76-Unknown | Lummi Tribe | Fish processing crew | $3.25 |
| Tlinget | 7/31/75 | 8/76- | City of Kake, Alaska | Teacner aide | Unknown |
| Tlinget | 7/31/75 | 1/77- | City of Kake, Alaska | Work study coordinator | Unknown |

ENCLOSURE VIII                                    ENCLOSURE VIII

| Graduate's tribe | Last day of school | Employment period | Employer | Position | Hourly wage |
|---|---|---|---|---|---|
| Lummi | 7/31/75 | 6/30/76- | Lummi Tribe | Community health represen- tative | $3.00- 3.25 |
| Pawnee | 10/8/75 | 11/1/76- 1/21/77 | Paiute Tribe | Secretary | Unknown |
| Klallum | 10/31/75 | Unknown (note a) | Suquamish | Construction | Unknown |
| Tlinget | 2/28/76 | Unknown (note a) | City of Kake, Alaska | Law and order officer | Unknown |
| Lummi | 6/18/75 | 10/6/76- | Lummi Tribe | Community health represen- tative | $3.00 |
| Suquamish | 6/18/76 | Unknown (note a) | Self- employed | Fisherman | Unknown |
| Suquamish | 6/18/76 | Unknown (note a) | Self- employed | Fisherman | Unknown |
| Suak- Suiattle | 6/18/76 | 7/8/76- | Lummi Tribe | Maintenance worker | $3.50 |
| Nez-Perce | 12/17/76 | 12/19/76- | Bureau of Indian Affairs | Clerk/ typist | $3.37 |
| Lummi | 1/21/77 | 2/3/77- | Lummi Tribe | Maintenance worker | $2.63 |

a/Employment data for these jobs was provided by aquaculture school
  officials and have not been verified by us.

12

PLAINTIFFS' EXHIBIT 38



NOV 12 1980

**UNITED STATES DEPARTMENT OF COMMERCE**
**Minority Business Development Agency**
Washington, D.C. 20230

Mr. Bradden N. Smith
Shinnecock Tribe
Church Street
Shinnecock Reservation Tribal Center
Southampton, Long Island, New York  11968

Project I.D. Number 98-20-70009-00

Dear Mr. Smith:

Enclosed are three copies of our award in the amount of $100,000
for the purpose of providing a solar energy run shellfish
hatchery on the Shinnecock Reservation, Southampton, Long Island,
New York.

It is requested that you thoroughly review the packages, and if
you agree with the provisions, sign each of the three award
notices in Block 14.  You are to retain one award package and
return the other two to:

                Mr. George S. Parish
                Chief, Grants Administration Division
                Minority Business Development Agency
                U.S. Department of Commerce
                Washington, D.C.  20230

Payments under this award will be by advances.  Item 10 on the
Notice of Award automatically authorizes a payment in the amount
of $16,666 for the period of October 1, 1980 to November 30,
1980.  For the second payment, you should submit the enclosed
Standard Form 270 to the Project Administrator in accordance with
the requirements of the Advance Payment paragraph of the General
Terms and Conditions.

If you have any questions, please telephone George Parish at
(202)377-3165.

Sincerely,

Allan A. Stephenson
Deputy Director

Enclosure

## NOTICE OF AWARD

The Minority Business Development Agency (MBDA)   by its duly authorized Awards Officer (AO), hereby offers assistance to the recipient for the purpose of developing and administering a program designed to assist economically and socially disadvantaged individuals in gaining equal access to the American free enterprise system.  Said financial assistance is subject to the terms, conditions, and limitations set forth in this award and the documents attached hereto.

| 1.  Funding Instrument: <br><br> _X_ Grant _____ Cooperative Agreement | 2.  Project I.D. Number: 98-20-70009-00 |
|---|---|
| | 3.  Accounting Code(s): <br> W-81-1-71-10-13-10 |

4.  CFDA Program Name: Minority Business Development

**5.   RECIPIENT**

| | |
|---|---|
| Name: Shinnecock Tribe <br><br> Contact: Bradden N. Smith <br><br><br> Telephone No: 516-283-3776 | Shinnecock Tribe <br> Church Street <br> Shinnecock Reservation Tribal Center <br> Southampton, Long Island, NY.  11968 |

**6.   AWARDS OFFICER (AO)**

| | |
|---|---|
| Name:  Allan A. Stephenson <br><br> Telephone No:  (202) 377-2654 | U.S. Department of Commerce <br> Minority Business Development Agency <br> 14th & Constitution Ave., N.W.  Room 5053 <br> Washington, D.C.  20230 |

**7.   PROJECT ADMINISTRATOR (PA)**

| | |
|---|---|
| Name:     Harold Jones <br><br> Telephone No:  202-377-3816 | U.S. Department of Commerce <br> Minority Business Development Agency <br> 14th & Constitution Ave. N.W. <br> Washington, D.C.  20230 |

**8.   PROJECT DESCRIPTION AND GEOGRAPHIC SPECIFICATIONS**

To provide a solar energy run shellfish hatchery on the Shinnecock Reservation Southampton, Long Island, New York.

| 9.  PERFORMANCE PERIOD | 10.  PAYMENTS | |
|---|---|---|
| Starting Date: October 1, 1980 | A.  Type of Payment | B.  Initial Advance Payment |
| Ending Date:   September 30, 1981 | _X_ Advance | Amount:  16,666 |
| Number of Months: 12 | _____ Reimbursement | Period Covered: October 1, 1980 to November 30, 1980 |

**11.  BUDGET**

| CATEGORIES | MBDA | RECIPIENT | TOTAL |
|---|---|---|---|
| CASH | $100,000 | 0 | $100,000 |
| IN KIND | 0 | 0 | 0 |
| TOTAL | $100,000 | 0 | $100,000 |

12.  The following documents are attached to this award:

a.   Scope of Work
b.   Reporting Requirements
c.   Special Terms and  Conditions
d.   General Terms and Conditions
e.   Cost Principles for a Non-Profit Organization.

| 13.   OFFER OF AWARD | 14.   ACCEPTANCE OF AWARD |
|---|---|
| *(signature)* NOV 1 2 1980 <br> (Signature of Awards Officer)        (Date) <br><br> Allan A. Stephenson <br> Deputy Director <br> Minority Business Development Agency | <br><br> (Signature of Authorized Official)     (Date) <br><br> Shinnecock Tribe |

SCOPE OF WORK

The grantee shall, in implementing Phase II of a solar energy run shellfish hatchery, demonstrate the pilot solar energy run hatchery and provide technology commercialization transfer systems that can be extended to existing and projected shellfish aquaculture programs nationally. This project shall include, but not be limited by the following:

1.  By December 15, 1980   after award of grant, prepare and submit a time performance plan detailing the tasks   to be performed.

2.  Investigate alternative organization and management systems and select and test the organizational/operational structure that:

    (a) best suits the community and corporate needs;

    (b) allows for the development of a commercial hatchery program within the grant period;

    (c) allows for easy monitoring of the management system's progress and its refinement over the grant period.

3.  Investigate alternative shellfish hatchery production systems,   select appropriate system and:

    (a) develop activities needed to implement a smooth initial start-up and provide a system for smoother annual start-up of hatchery activities;

    (b) monitor hatchery performance against design expectations;

    (c) review hatchery performance and either implement immediate procedural improvements and/or recommend physical plant improvements;

    (d) provide revised annual operations plan (which also includes coordination with and includes consideration of solar/waste heat recovery operations).

4.  Establish and refine a solar/waste heat recovery system and:

    (a) develop criteria for evaluation of solar and waste heat recovery system ;

    (b) compare expected versus actual solar/heat recovery performance on a month by month basis;

    (c) provide a series of seasonally dependent operation schedules for the solar and the waste heat recovery systems with specific operator instructions for hourly and daily operation; daily, monthly and seasonal maintenance schedules; and trouble-shooting;

    (d) make recommendations for improvements or revisions to physical solar/waste heat recovery systems.



SCOPE OF WORK (CONTINUED)

5.   Develop markets and production programming and

(a)   establish 1980 - 1981 production schedule based upon Shinnecock Tribal Oyster Program needs and also antiticipated clam and oyster seed sales.

(b)   establish additional sales of clam and oyster seed locally, regionally and in the international market
explore alternatives

(c)   establish the hatchery as a regional shellfish hatchery supported by the State of New York.

(d)   identify markets for half shell oysters in order to provide for an orderly implementation of rearing phase of the business enterprise.

(e)   continuosly monitor alternative oyster marketing strategies such as overseas marketing and also processing.

6.   Develop financial and business plans and strategies to

(a)   continuously monitor hatchery performance in relation to financial predictions and fluctuations.

(b)   project short and long term capitol requirements

(c)   establish an annual credit cycle

(d)   investigate alternative capitol and credit sources.

Page 7                                  APPLICATION PACKAGE

| FEDERAL ASSISTANCE | 1. TYPE OF ACTION | | 2. APPLI-CANT'S APPLI-CATION | a. NUMBER 98-70-84-01 | | 3. STATE APPLICA-TION IDENTI-FIER | a. NUMBER |
|---|---|---|---|---|---|---|---|
| | ☐ PREAPPLICATION ☒ APPLICATION (Leave Blank) | | b. DATE Year month day 82   7  12 | | | b. DATE Year month day 19 |

2. LEGAL APPLICANT/RECIPIENT

a. Applicant Name : Shinnecock Tribe
b. Organization Unit : Shinnecock Tribal Oyster Project
c. Street/P.O. Box : P.O. Box 670
d. City : Southampton          e. County : Suffolk
f. State : New York            g. ZIP Code : 11968
h. Contact Person (Name & Telephone No.) : Bradden Smith  (516) 283-3776

5. FEDERAL EMPLOYER IDENTIFICATION NO.
11-2388825

6. PROGRAM
a. NUMBER  1 1 . 8 0 0 9
b. TITLE (From Federal Catalog) Minority Business Development

7. TITLE AND DESCRIPTION OF APPLICANT'S PROJECT

Solar Energy Shellfish Hatchery Project —
Provide the business and technical assistance
necessary to achieve full-scale operation of the
nation's first Solar Energy Shellfish Hatchery

8. TYPE OF APPLICANT/RECIPIENT
A—State    H—Community Action Agency
B—Interstate   I—Higher Educational Institution
C—Substate   J—Indian Tribe
Special District  K—Other (Specify):
D—County
E—City
F—School District
G—Special Purpose District
Enter appropriate letter [ ]

9. TYPE OF ASSISTANCE
A—Basic Grant   D—Insurance
B—Supplemental Grant  E—Other
C—Loan
Enter appropriate letter(s) [A]

10. AREA OF PROJECT IMPACT (Names of cities, counties, States, etc.)
Southampton
Suffolk,    New York

11. ESTIMATED NUMBER OF PERSONS BENEFITING

12. TYPE OF APPLICATION
A—New   C—Revision   E—Augmentation
B—Renewal  D—Continuation
Enter appropriate letter [ ]

13. PROPOSED FUNDING

| | | a. APPLICANT 1 (NY) | b. PROJECT 1 (NY) |
|---|---|---|---|
| a. FEDERAL | $100,000 .00 | | |
| b. APPLICANT | 24,300 .00 | | |
| c. STATE | .00 | | |
| d. LOCAL | .00 | | |
| e. OTHER | .00 | | |
| f. TOTAL | $124,300 .00 | | |

14. CONGRESSIONAL DISTRICTS OF:

15. TYPE OF CHANGE (For 12c or 12e)
A—Increase Dollars   F—Other (Specify):
B—Decrease Dollars
C—Increase Duration
D—Decrease Duration
E—Cancellation
Remain the same
Enter appropriate letter(s) [ ]

16. PROJECT START DATE Year month day 1982 10 1
17. PROJECT DURATION 12 Months
18. ESTIMATED DATE TO BE SUBMITTED TO FEDERAL AGENCY Year month day 1981 8 20
19. EXISTING FEDERAL IDENTIFICATION NUMBER 98-20-70009-00

20. FEDERAL AGENCY TO RECEIVE REQUEST (Name, City, State, ZIP code)
Development Agency Washington, D.C. 20230  Minority Busines

21. REMARKS ADDED
☐ Yes  ☐ No

22. THE APPLICANT CERTIFIES THAT ▶

a. To the best of my knowledge and belief, data in this preapplication/application are true and correct, the document has been duly authorized by the governing body of the applicant and the applicant will comply with the attached assurances if the assistance is approved.

b. If required by OMB Circular A-95 this application was submitted, pursuant to instructions therein, to appropriate clearinghouses and all responses are attached.

23. CERTIFYING REPRE-SENTATIVE

a. TYPED NAME AND TITLE
Bradden N. Smith
Tribal Trustee

b. SIGNATURE

c. DATE SIGNED Year month day 19

(Remaining lower form fields too faded to read reliably)

## APPLICATION PACKAGE

### PART II

### PROJECT APPROVAL INFORMATION

**Item 1.**
Does this assistance request require State, local, regional, or other priority rating?

_____ Yes _____ No

Name of Governing Body _____
Priority Rating _____

**Item 2.**
Does this assistance request require State, or local advisory, educational or health clearances?

_____ Yes _____ No

Name of Agency or Board _____

(Attach Documentation)

**Item 3.**
Does this assistance request require clearinghouse review in accordance with OMB Circular A-95?

_____ Yes ___X___ No

(Attach Comments)

**Item 4.**
Does this assistance request require State, local, regional or other planning approval?

_____ Yes _____ No

Name of Approving Agency _____
Date _____

**Item 5.**
Is the proposed project covered by an approved comprehensive plan?

_____ Yes _____ No

Check one   State   ☐
            Local   ☐
            Regional ☐
Location of Plan _____

**Item 6.**
Will the assistance requested serve a Federal installation?

_____ Yes _____ No

Name of Federal Installation _____
Federal Population benefiting from Project _____

**Item 7.**
Will the assistance requested be on Federal land or installation?

_____ Yes _____ No

Name of Federal Installation _____
Location of Federal Land _____
Percent of Project _____

**Item 8.**
Will the assistance requested have an impact or effect on the environment?

_____ Yes _____ No

See instructions for additional information to be provided.

**Item 9.**
Will the assistance requested cause the displacement of individuals, families, businesses, or farms?

_____ Yes _____ No

Number of:
Individuals _____
Families _____
Businesses _____
Farms _____

**Item 10.**
Is there other related assistance on this project previous, pending, or anticipated?

_____ Yes ___X___ No

See instructions for additional information to be provided.

**Item 11.**
Is the project in a designated flood hazard area?

_____ Yes _____ No

See instructions for additional information to be provided.

Item #3

Federally recognized Indian Tribes are not required to obtain
clearinghouse review as stated in OMB Circular A-95.

# PART III - BUDGET INFORMATION

## SECTION A - BUDGET SUMMARY

| Grant Program, Function or Activity (a) | Federal Catalog No. (b) | Estimated Unobligated Funds | | New or Revised Budget | | |
|---|---|---|---|---|---|---|
| | | Federal (c) | Non-Federal (d) | Federal (e) | Non-Federal (f) | Total (g) |
| 1. Solar Energy Hatchery | 11.800 | $ 100,000 | $ 24,300 | $ | $ | $ 124,300 |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. TOTALS | | $ 100,000 | $ 24,300 | $ | $ | $ 124,300 |

## SECTION B - BUDGET CATEGORIES

| 6. Object Class Categories | Grant Program, Function or Activity | | | | Total (5) |
|---|---|---|---|---|---|
| | (1) Fed | (2) Non-Fed | (3) | (4) | |
| a. Personnel | $ 75,000 | $ 16,500 | $ | $ | $ 91,500 |
| b. Fringe Benefits | 12,700 | 2,800 | | | 15,500 |
| c. Travel | 1,156 | -0- | | | 1,156 |
| d. Equipment | -0- | -0- | | | -0- |
| e. Supplies | 2,000 | -0- | | | 2,000 |
| f. Contractual | 3,144 | | | | 3,144 |
| g. Construction | -0- | -0- | | | -0- |
| h. Other | 1,000 | 5,000 | | | 6,000 |
| i. Total Direct Charges | 95,000 | 24,300 | | | 119,300 |
| j. Indirect Charges | 5,000 | -0- | | | 5,000 |
| k. TOTALS | $ 100,000 | $ 24,300 | $ | $ | $ 124,300 |
| 7. Program Income | $ | $ | $ | $ | $ |



Page

APPLICATION PACKAGE

Page 15

APPLICATION PACKAGE

## SECTION C — NON-FEDERAL RESOURCES

| (a) Grant Program | (b) APPLICANT | (c) STATE | (d) OTHER SOURCES | (e) TOTALS |
|---|---|---|---|---|
| 8. Solar Energy Shellfish Hatchery | $ 24,300 | $ | $ | $ 24,300 |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. TOTALS | $ 24,300 | $ | $ | $ 24,300 |

## SECTION D — FORECASTED CASH NEEDS

| | Total for 1st Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|---|
| 13. Federal | $ 100,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 |
| 14. Non-Federal | 24,300 | 6,750 | 6,750 | 6,750 | 6,750 |
| 15. TOTAL | $ 124,300 | $ 31,750 | $ 31,750 | $ 31,750 | $ 31,750 |

## SECTION E — BUDGET ESTIMATES OF FEDERAL FUNDS NEEDED FOR BALANCE OF THE PROJECT

| (a) Grant Program | FUTURE FUNDING PERIODS (YEARS) | | | |
|---|---|---|---|---|
| | (b) FIRST | (c) SECOND | (d) THIRD | (e) FOURTH |
| 16. Solar Energy Shellfish Hatchery | $ | $ | $ 100,000 | $ |
| 17. | | | | |
| 18. | | | | |
| 19. | | | | |
| 20. TOTALS | $ | $ | $ | $ |

## SECTION F — OTHER BUDGET INFORMATION
(Attach additional Sheets if Necessary)

21. Direct Charges:    See Attached

22. Indirect Charges:    See Attached

23. Remarks:

## PART IV PROGRAM NARRATIVE (Attach per instruction)

PART IV
Program Narrative Instructions for
The Shinnecock Tribe
Solar Energy Shellfish Hatchery

| | |
|---|---|
| Program Number and Title: | 11.800 |
| | Minority Business Development |
| Project I.D. Number: | 98-10-80021-02 |
| Project Start Date: | October 1, 1982 |
| Project Duration: | 12 months |
| Maximum Federal Funding: | $100,000 |
| Minimum Non-Federal Share: | $24,300 |

## Level of Effort

The Shinnecock Tribe is expected to achieve 80% of the new solar energy hatchery's seed capacity; 50% fuel savings over that of a conventional, comparable hatchery; and 30% increase in hatchery operation time over a conventional, comparable hatchery. They are expected to develop strategy to expand bivalve market nationally and internationally, and to determine technical and economic feasibility of bivalve species diversification, and shore-base/field nursery systems.

This effort will require _____6_____ professional and appropriate clerical support.

## Geographic Specifications

The project will be located on Southampton, Long Island, New York. However, the recipient shall not be constrained by geographic limitations in its efforts to carry out the work requirements for the project. Only travel outside the 48 contiguous states will require prior written authorization.

## Work Requirements

See Attached

## Short Title

To provide the technological, industrial and business development assistance necessary for a Solar Energy Shellfish Hatchery, and to develop replicable strategies which can be implemented by other minority business entities.

## WORK REQUIREMENTS

1. By April 30, 1983, the new solar energy shellfish hatchery shall attain 80% of its potential seed production. Document the actual operation and performance of the new hatchery with regard to its fluctuating seed capacity. Such documentation should include when, where and why capacity problems arise, and what and how solutions are developed.

2. Achieve fuel savings for the new hatchery of a maximum of 50% of the conventional hatchery fuel costs of $12,000 through optimal operations.

3. Extend the length of operation per year for the new hatchery over a tradition hatchery of comparable size by a maximum of 30%.

   Documentation of the operation and performance of the new hatchery with regard to its fuel consumption and length of functional activity should include when, where and why problems arise, and what and how solutions are developed.

4. Develop and document a market strategy for local, state, regional and international sales of bivalves (seed and adults).

5. Determine the technical and economical feasibility of diversifying the bivalve species to incorporate mussels and scallops into a solar energy shellfish hatchery.

6. Determine the technical and economical feasibility of establishing ancillary shore-based and field nursery systems. This determination will include, but not be limited to aspects of construction, operation and overall performance needed to improve survival rates of juvenile clams and oysters; and the cost of such work and possible sources of financing.

PLAINTIFFS' EXHIBIT 39

**From:** Gadomski, Thomas (DEC)
**Sent:** Thursday, April 20, 2017 2:51 PM
**To:** Bobseine, Ike G (DEC) <ike.Bobsei\_e@dec.ny.go\_>; Doroski, Jordan
P (DEC) <jordan.doroski@dec.ny.gov>; Laczi, Evan G (DEC)
<Evan.laczi@dec.ny\_ge\_>; Reilly, Sean A (DEC)
<sean.reilly@dec.ny.go\_>; Tabor, Benjamin P (DEC)
<benjamin.tabor@dec.ny.gov>; Brown, Timothy J (DEC)
<Timothy.Brown@dec.ny.gov>; Ferraro, Denise (DEC)
<denise.ferraro@dec.ny.gov>; Helmer, Ian S (DEC)
<ian.helmer@dec.ny.gov>; Howe, Robert R (DEC)
<robert.howe@dec.ny.gov>; Unger, Michael J (DEC)
<michael.unger@dec.ny.gov>; Bevis, Kyle A (DEC)
<Kyle.Bevis@dec.ny.gov>; Blaising, Matthew P (DEC)
<matthew.blaising@dec.ny.gov>; Bohling, Justanna N (DEC)
<justanna.bohling@dec.ny.gov>; Carpenter, Emma C (DEC)
<Emma.Carpenter@dec.ny.gov>; DeRose, Christopher M (DEC)
<christopher.derose@dec.ny.gov>; Godson, Nathan E (DEC)
<Nathan.Godson@dec.ny.gov>; Amato, Christopher J (DEC)
<Christopher.Amato@dec.ny.gov>; Fay, Timothy J (DEC)
<timothy.fay@dec.ny.gov>; Gadomski, Thomas (DEC)
<thomas.gadomski@dec.ny.gov>; Grady, Kaitlin M (DEC)
<kaitlin.grady@dec.ny.gov>; Simmons, Landon T (DEC)
<landon.simmons@dec.ny.gov>; Simmons, Mark (DEC)
<mark.simmons@dec.ny.gov>; Carbone, Frank D (DEC)
<frank.carbone@dec.ny.gov>; Eastwood, Jeremy T (DEC)
<jeremy.eastwood@dec.ny.gov>; Farrish, Brian R (DEC)
<brian.farrish@dec.ny.gov>; Hansen, Thomas (DEC)
<thomas.hansen@dec.ny.gov>; Jakaub, Katie L (DEC)
<Katie.Jakaub@dec.ny.gov>; Lawston, Alena (DEC)
<alena.lawston@dec.ny.gov>
**Cc:** Bengel, Dallas (DEC) <dallas.bengel@dec.ny.gov>; Burnell, William J
(DEC) <william.burnell@dec.ny.gov>
**Subject:** Elver patrol detail
**Importance:** High

This morning ECOs Farrish and Laczi apprehended a member of the Shinnecock Tribe harvesting elvers in Taylor Creek in Southampton. See the below narrative.

Region 1 MEU Officers received a call yesterday, April 19, 2017, from the Southampton Bay Constables of the discovery of a suspicious net located at the mouth of a tributary to Taylors Creek, which is approximately ½ mile east of the Shinnecock Reservation, and not a part of the reservation. After the Officers verified that the net appeared to be a fyke net set for elvers, ECOs Evan Laczi and Brian Farrish worked overnight on a surveillance detail. At approximately 0630 hrs, the Officers observed a lone individual,

6

later identified as David T Silva, pob 09/17/75, approach and tend the net, removing a small quantity of elvers, possibly up to ½ lb. Subject was apprehended, at which time he claimed to be a member of the Shinnecock Reservation, although he was unable to produce any document verifying the claim. Mr. Silva made statements that the Shinnecock Nation believes they have a right to fish off the reservation, and alluded that members of the Nation will continue to fish for elvers at nearby locations. Mr. Silva had in his possession the elvers, 2 dip nets, 2 buckets, one battery powered aeration unit, and the approximately 40′ fyke net. All items were seized, and Mr. Silva was issued an appearance ticket for possession of undersized eels and released. More charges will be filed as the investigation continues.

Using the above information we will be conducting an Elver Patrol Detail for the next five nights. The target areas will be tidal creeks that flow into freshwater tributaries from Seatuck Cove to the west to Mecox Bay to the east. Contact local ECOs or Lts. Reilly or Carbone for likely elver activity locations. If we receive more info on net locations we will concentrate on those creeks. Generally the most productive time to harvest elvers is around the high tide period. However, the subject apprehended this morning was checking his net at day break approximately 3 hours after the peak high tide in the area.

The high tide for Friday in Mecox is approx. 0300hrs and for Seatuck Cove is approx. 0500hrs. Each day the high tide will be approx. 1 hour later than the previous day. (You can do the math)

This will be a plain clothes detail using only unmarked vehicles, the black Jeep at Ridge and the silver Jeep that ECO Brown currently has. At the end of your assigned elver patrol leave the jeeps at Ridge for the ECOs to use the next night. You will be split into teams of two. One team work west of Shinnecock Canal and the other team east of the canal. If we receive better intel or see activity we can tighten the ring and work the areas where there is likely activity.

After your detail send an email to the R1 DLE members with info on any activity you had. We need everyone to work off of the latest information.

**Friday** – 2000hrs(Thurs) – 0700hrs(Fri)   **Farrish/Laczi** & **Ferraro/Fay**

# PLAINTIFFS' EXHIBIT 40

LONDON DOCUMENTS : I.                                    67

### Col. Nicolls to the Governor and Council of Boston.

[ New England, I. 204. ]

To the Govern^r and Councill of Boston.

Gentlemen.

I have herewith sent yow a copy of a Còmission from the L^ds Commissioners of Prizes wherein I am empowered as one of the Sub-Còmissioners for New England whilst His Ma^ty shall be in hostility with the Dutch.  In prosecution of the trust reposed in mee as Sub-Còmissioner I am oblig'd to give yow advertisement hereof, and that yow will please to give strict order in all your ports from time to time that seizure be made of all and every Dutch ship vessell or goods belonging to the States of the United Provinces of the Netherlands their subjects or inhabitants within any of their dominions, as also if any prizes shall be brought into any of your ports by any persons còmissionated thereunto by his R. H^s the Duke of Yorke, that yow will please to cause the same to be preserv'd entire without imbezlement, with all their papers, bills of lading or other writinges, untill such a legall prosecution can be made as is directed by His Ma^ties authority to the L^ds Còmissioners, and given at large in their L^rs instructions to mee and Capt. Phillip Carteret, as Sub-Còmissioners in N. England ; wherein your assistance and concurrence is requisite for His Ma^ties service, as also that some able and fitting persons be chosen in your Colony to sitt as a Court of Admiralty when occasion presents.  Be pleased also to remitt unto me Yo^r proceedings herein, according to the resolutions yow shall take ; and if in this or any other quality I can render myselfe serviceable to yourselves you may còmand mee as

[ About July, ] 1664.                          Yo^r aff^te humble Servant

                                                R. NICOLLS.

### Articles between Col. Cartwright and the New York Indians.

[ New England, I. 207. ]

ARTICLES made and agreed upon the 24th day of September 1664 in Fort Albany between Ohgehando, Shanarage, Soachoenighta, Sachamackas of y^e Maques ; Anaweed Conkeeherat Tewasserany, Aschanoondah, Sachamakas of the Synicks, on the one part ; and Colonell George Cartwright, in the behalf of Colonell Nicolls Governour under his Royall Highnesse the Duke of Yorke of all his territoryes in America, on the other part, as followeth, viz^t —

1 Imprimis. It is agreed that the Indian Princes above named and their subjects, shall have all such wares and commodities from the English for the future, as heretofore they had from the Dutch.

2. That if any English Dutch or Indian ( under the proteccòn of the English ) do any wrong injury or violence to any of y^e said Princes or their subjects in any sort whatever, if they complaine to the Governo^r at NewYorke, or to the Officer in Cheife at Albany, if the person so offending can be discovered, that person shall receive condigne punishm^t and all due satisfaccòn shall be given ; and the like shall be done for all other English Plantations.

3. That if any Indian belonging to any of the Sachims aforesaid do any wrong injury or damage to the English, Dutch, or Indians under the protection of the English, if complaint be

made to yᵉ Sachims and the person be discovered who did the injury, then the person so offending shall be punished and all just satisfacċon shall be given to any of His Maᵗᵗᵉˢ subjects in any Colony or other English Plantaċon in America.

4. The Indians at Wamping and Espachomy and all below the Manhatans, as also all those that have submitted themselves under the proteċon of His Maᵗᵉ are included in these Articles of Agreement and Peace;

In confirmaċon whereof the partyes above menċoned have hereunto sett their hands the day and yeare above written

                                                    GEORGE CARTWRIGHT

                                                            *Cawyugo*

In the presence of

        T. Willett
        John Manning
        Tho. Breedon
        Dan. Broadhead

        { Smith John
        {   his marke

        { Stephen an Indian
        {   his marke

THESE ARTICLES following wer likewise proposed by the same Indian Princes & consented to by Colonell Cartwright in behalfe of Colonell Nicolls the 25ᵗʰ day of September 1664.

1 That the English do not assist the three Nations of the Ondiakes Pinnekooks and Pacamtekookes, who murdered one of the Princes of the Maques, when he brought ransomes & presents to them upon a treaty of peace.

2. That the English do make peace for the Indian Princes, with the Nations down the River.

3. That they may have free trade, as formerly.

4. That they may be lodged in houses, as formerly.

5. That if they be beaten by the three Nations above menċoned, they may receive accommodaċon from yᵉ English.

---

### Col. Nicolls to the Secretary of State.

[ State Paper Office, Trade Papers. XVI. 42. ]

                            Fort James in New Yorke
                        this      day of October 1664.

Right Honᵇˡᵉ

Since my last by Capt. Hill and Capt. Groves here is arrived Capt. Hyde, to whose more ample relation of the reducing Delaware Bay, I must referre my selfe. My instructions to Sir Robᵗ Carr tooke the effect which was design'd, for by a distinct treaty and agreement with the

PLAINTIFFS' EXHIBIT 41



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

AUG 2 2 2019

Bryan Polite
Chairman, Council of Trustees
Shinnecock Indian Nation
P.O. Box 5006
Southampton, NY 11969

Dear Chairman Polite:

Over the past year, we have been in discussions regarding marine mammal strandings with Shane
Weeks and David Martine. In these discussions, we agreed upon a protocol for notifying the Tribe
of stranding events on Long Island. In addition, Mr. Weeks requested that we provide an updated
marine mammal parts authorization.

On April 29, 2005, we had provided the Tribe with an authorization to obtain baleen and other
marine mammal hard parts from the Northeast Region Marine Mammal Stranding Network for your
educational program. With this letter, we are renewing that authorization. In addition, Mr. Weeks
also inquired about the transfer of fins, tails, and flippers. The Marine Mammal Protection Act's
(MMPA) implementing regulations at 50 CFR 216.22(c)(5) and 216.37 authorize the transfer of
marine mammal parts if:

(1) The person/agency transferring the part does not receive payment for the part;
(2) The marine mammal part is transferred for scientific research purposes, curation in a
    professionally accredited scientific collection, or educational objectives; and
(3) An accession number, authorized or assigned by NMFS, is affixed to the marine mammal
    part. In most cases, this is the field number assigned by the Stranding Network for the
    stranding.

Pursuant to 50 CFR 216.22 and 216.37, this letter authorizes the Shinnecock Indian Nation to
receive soft and hard parts, including whole skeletons, from the NMFS Greater Atlantic Region
Marine Mammal Stranding Network for marine mammal education. Please note that this parts
authorization letter does not guarantee receipt of requested specimens. You may contact the Atlantic
Marine Conservation Society and the Riverhead Foundation for Marine Research and Preservation,
both with an active Stranding Agreement issued by NMFS, to arrange for collection, preservation,
and transfer of specimens. Transfer of parts must be coordinated with the Network organization to
ensure that no specimen is taken prematurely and to ensure accurate disposition of the parts.

Although payment is not allowed for marine mammal parts, the organization may assess processing
and/or shipping fees. Your acceptance of these marine mammal specimens absolves NMFS and the
Stranding Network of liability for any human health or safety risks, known or unknown, from
exposure to these parts. Should your marine mammal education cease, any transferred parts must be

returned to the Network and notice given to the NMFS Regional Administrator. This authorization expires in five years from the authorization date. Upon expiration, if you would still like to obtain marine mammal parts, please contact Ainsley Smith, GAR Marine Mammal Stranding Coordinator, 55 Great Republic Drive, Gloucester, MA 01930, email: Ainsley.Smith@noaa.gov, to request renewal of the authorization.

You are required to notify Ainsley Smith within 30 days of all specimens received. This notification should include the specimen/sample type, species, the field identification number of the animal from which the specimen was collected, the date you received the specimen, and the organization/individual from which you received the specimen.

The NMFS Greater Atlantic Region requires that you acknowledge the cooperating Stranding Network participants and NMFS in any publications or other reports resulting from the use of the transferred material or data. Please send copies of these reports to the NMFS Greater Atlantic Regional Fisheries Office for our files and for distribution to the Stranding Network. Reports and questions regarding this authorization should be directed to Ainsley Smith at (978) 281-9291 or Ainsley.Smith@noaa.gov.

Sincerely,

for   Michael Pentony
Regional Administrator

cc:   F/PR2 – T. Rowles
GAR – Keane, Smith

PLAINTIFFS' EXHIBIT 42

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 287 of 291 PageID #: 1107

# *Clash of Cultures on Southampton Beach*

**By Julia C. Mead**

April 10, 2005

SOUTHAMPTON - THE owners of some multimillion-dollar ocean-front mansions here were not amused when a 60-foot, 50-ton finback whale carcass washed up in their backyards in the April 3 storm. They demanded that it be moved -- and quickly, before any smell could waft over the dunes.

The marine biologist responsible for determining how the whale died viewed the prospect of performing the necropsy by hand as an unpleasant but necessary obligation.

For a few days, families streamed down the beach, many with a dog in tow. They encircled the whale, hamming for photos and leaning over the yellow police tape to poke at it. Someone came in the middle of the night and hacked off part of the whale's tail, a streak of blood-soaked sand marking the escape route.

But members of the Shinnecock Nation came to pay their respects.

The Shinnecocks, whose reservation abuts the Village of Southampton, held ceremonies on Monday and Tuesday to thank the whale for visiting them, and individual tribal members stopped by over the course of several days to pray. On Wednesday, the tribe asked the National Marine Fisheries Service for permission to use some of the whale's baleen -- the strainerlike plates in its upper jaw -- its fins and what was left of its tail in a ceremony. They said they would burn some of the parts and scatter the ashes in the water as a way to commend the whale's spirit back to the ocean.

Case 2:18-cv-03648-SJF-SIL    Document 83-9    Filed 11/18/19    Page 288 of 291 PageID #: 1108

"Certain things are messages," said Courtney Leonard, a tribal member and an artist. "These people taking photos? They will have a memory of this. But for the Shinnecocks, this whale is much more important spiritually." She said that a whale's tail had become a leitmotif in her clay sculptures.

Before and after the arrival of European settlers, the Shinnecocks were whalers. Though whales are now federally protected and hunting them is outlawed, they remain a symbol of life, sustenance and the tribe's historic connection to the ocean, Ms. Leonard said.

Though she is recovering from a dislocated hip after an automobile accident, she sat in the sand for several hours, sculpturing the finback's tail in clay. "I lived through an accident that I shouldn't have survived," she said. "So for me the message is that life is a gift."

Ms. Leonard also said that the Shinnecocks were continually challenged to keep their history alive. Her way is to work with clay, a traditional medium. Her brother's was to become a marine biologist.

"Traditionally, this is something that we would take care of," she said, waving a hand toward the enormous carcass. "This was our hunting grounds. We see this as having a purpose for coming here."

In their two ceremonies, on Monday evening and Tuesday morning, the Shinnecocks prayed for the whale's spirit. "That's how we have done it for centuries," said Charles Smith, a tribal trustee. Though hunting has been outlawed, he said tribal members still believe "that life is being given up for us to sustain our lives and we have to pay homage to the whale's spirit for that."

Mr. Smith said that the tribe was laying claim to the baleen, fins and tail under a 1640 treaty granting the Shinnecocks the right to any whale beached on Long Island. He said some of the parts would be used in a display in the tribal museum. Mr. Smith could not recall any other whale's washing up near the reservation in his lifetime and said many other Shinnecocks had never seen one up close. For that reason, he said, tribal leaders wanted the parts as educational

Case 2:18-cv-03648-SJF-SIL   Document 83-9   Filed 11/18/19   Page 289 of 291 PageID #: 1109

tools.

"This is a unique event because this whale came so near to the reservation," he said, noting that it washed up about a mile west of Halsey Neck Road on the barrier beach directly across Shinnecock Bay from the tribe's 800-acre reservation.

Despite the tribe's position that it had an automatic claim, Mr. Smith said tribal leaders filed an application with the fisheries service for the permit that would allow them to take the parts of the whale they wanted.

Chuck Bowman, the marine biologist in charge of the necropsy, said he could not save the whale's tail or the fins for the Shinnecocks, even if their permit is granted. "That's soft tissue, and it would rot," he said. "Can't keep it in a museum." He said he was putting aside only some baleen.

After the necropsy, Mr. Bowman planned to send samples and other data he collected to the fisheries service's regional office. Mr. Bowman is the president of the Riverhead Foundation for Marine Research and Preservation, based at the Atlantis Aquarium in Riverhead. The foundation is the only organization assigned to respond to marine-mammal and turtle strandings from Montauk Point to New York Harbor.

Mr. Bowman said that strandings -- mostly seals and turtles -- occurred three or four times a year in his jurisdiction but that finding a finback was rare.

The finback whale (Balaenoptera physalus), also known as a finner, migrates as far south as Florida but is most common in the northwest Atlantic and is spotted most often off the coasts of Newfoundland and Labrador. Though it feeds off Long Island, it generally stays in deep water, Mr. Bowman said.

"We don't see them very often, but they're always out there," he said. "It'll be interesting to find out why this one died."

Before the necropsy, all he knew was that the whale was a mature female that died at least a week before washing up. Rough winds and 15-foot waves pushed

Case 2:18-cv-03648-SJF-SIL    Document 83-9    Filed 11/18/19    Page 290 of 291 PageID #: 1110

the body high up on the beach, where it was found late on April 3 by a beach-cleaning crew, Mr. Bowman said.

What appeared to be long gouges and wide swaths of abraded skin may have been just the outer layer sloughing off, a natural result of decomposition, he said. Or they may have been signs that the whale was caught in fishing nets, that it was hit by a ship or that its body was slammed around in the rough surf.

In any case, Mr. Bowman said, the cold water had preserved the body somewhat, but warmer air temperatures and worried homeowners were forcing a swift disposal.

Downwind of the whale, the occasional breeze raised the stinging odor of rotting flesh. The town trustees, who manage the beaches, granted permission to bury the whale in the dunes just east of where it washed up, and the village hired heavy equipment, including a hydraulic excavator and a bulldozer, to move the body.

"The people here think there's some whale disposal fund to pay for this," Mr. Bowman said. "I told them my job is only to find out how it died." Laughing, he said it didn't take long for the homeowners to persuade village officials to find somewhere else to bury the carcass.

Harald G. Steudte, a Southampton Village trustee, said he hoped that the cost of disposal, which the village is splitting with the town trustees, would not exceed $10,000. "I don't know what whales are going for these days," he said. "I'm not sure if we'll be charged by the ton or the foot."

He said the costs would include rental of a portable toilet for the workers who helped with the necropsy and for those who controlled the crowd.

"We've had all sorts of strange things going on," he said. "Low-flying planes, school buses dropping off kids, people streaming over the dunes as if it was a Fourth of July fireworks celebration."

A version of this article appears in print on April 10, 2005, Section LI, Page 14 of the National edition with the headline: Clash of Cultures on

Case 2:18-cv-03648-SJF-SIL    Document 83-9    Filed 11/18/19    Page 291 of 291 PageID #: 1111

Southampton Beach