UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                         Plaintiffs,

        - against -

  BRIAN FARRISH,
  JAMIE GREENWOOD,
  EVAN LACZI,
  BASIL SEGGOS,
  NEW YORK STATE DEPARTMENT OF
  ENVIRONMENTAL CONSERVATION,
  and SUFFOLK COUNTY DISTRICT
  ATTORNEY'S OFFICE,

                    Defendants.
-----------------------------------------------------x

Case No.: 18-cv-3648 (SJF) (SIL)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Scott M. Moore, Esq.
MOORE INTERNATIONAL LAW PLLC
45 Rockefeller Plaza, 20th Floor,
New York, NY 10111
(212) 332-3474
*Attorneys for Plaintiffs*

TABLE OF CONTENTS

Table of Authorities ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS ............................................................................2

STANDARD OF REVIEW ...........................................................................2

ARGUMENT.................................................................................................3

    A.  Defendant Greenwood is not entitled to absolute prosecutorial immunity...3

    B.  The County Defendants are not protected by Sovereign Immunity..............3

    C.  Silva's claim is not barred by *Heck v. Humphrey* .......................................16

CONCLUSION..............................................................................................16

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986)......................................................................................2

*Antoine v. Washington*,
    420 U.S. 194 (1975)............................................................................................5

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................2

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965)............................................................................................9

*Ex parte Young*,
    209 U.S. 123 (1908)............................................................................................3

*Hafer v Melo*,
    502 US 21 (1991).............................................................................................16

*Heck v. Humphrey*,
    512 U.S. 477 (1994)............................................................................................1

*Herrera v. Wyoming*,
    Slip Op, No. 17–532 .........................................................................................4

*Idaho v. Coeur D'Alene Tribe*,
    521 U.S. 261 (1997)............................................................................................5

*Igoe v. Apple*,
    NY Slip Op 28170, May 31, 2018 (Supreme Court, Albany County)..................16

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005)................................................................................2

*Johnson v. Killian*,
    680 F.3d 234 (2d Cir. 2012)................................................................................2

*Lucente v. Int'l Bus. Machs. Corp.*,
    310 F.3d 243 (2d Cir. 2002)................................................................................2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................2

*Menominee Tribe v. United States,*
    391 U.S. 404 (1968) ............................................................................................4

*New York v. David T. Silva,*
    No. 17-7008, Southampton Justice Court ...............................................................1

*Smith v. Gribitz,*
    958 F.Supp. 145 (S.D.N.Y. Mar. 6, 1997) ............................................................16

*Timpanogos Tribe v. Conway,*
    286 F.3d 1195, 1205 (10th Cir. 2002) .....................................................................5

*U.S. v. Winans,*
    198 U.S. 371 (1905) ................................................................................................5

*Vargas v City of New York,*
    105 AD3d 834 (2d Dept 2013), lv granted 22 NY3d 858 (2013) .........................16

*W. Mohegan Tribe & Nation v. Orange County,*
    395 F.3d 18 (2d Cir. 2004) ......................................................................................5

*Younger v. Harris,*
    401 U.S. 37 (1971) ..................................................................................................9

## State Statutes

CNT 705 ...................................................................................................................16

## **Statutes**

42 U.S. § 1981(c) ...................................................................................3

42 U.S.C. §§1981 and 1982 of the 1866 Civil Rights Act, as amended ............................1

## **Rules**

Fed. R. Civ. P. 56 ...................................................................................1

Fed. R. Civ. P. 56(a) .................................................................................2

Fed. R. Civ. P. 65 ...................................................................................1

## **Federal Constitution**

U.S. Const., Art. VI, Cl.2 ..........................................................................1

## **Other Authorities**

Executive Order of the President No. 13175 ....................................................11

NY Commissioner's Policy 42 / Contact, Cooperation, and Consultation with
Indian Nations, March 27, 2009 ...............................................................3

# I.
## PRELIMINARY STATEMENT

Plaintiffs, David T. Silva, Gerrod T. Smith, and Jonathan K. Smith, all on-Reservation Shinnecock Indians, have filed a two count complaint. Count I seeks a declaratory judgment under the Supremacy Clause, U.S. Const., Art. VI, Cl.2, that Plaintiffs enjoy un-relinquished aboriginal usufructuary fishing rights retained in ceded territory and request a preliminary and permanent injunction pursuant to Fed. R. Civ. P. 65 enjoining the Defendants from enforcing the laws of the State of New York against Plaintiff Silva in Southampton Town Justice Court in Case No. 17-7008, and from otherwise interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters. (Doc. 1) (Compl., Count I, ¶¶ 21-23).[1] Count II is a claim for money damages for the continuing race based prosecutions and interference with their property and civil rights under 42 U.S.C. §§1981 and 1982 of the 1866 Civil Rights Act, as amended. (Compl., Count II, ¶¶ 24-25)

Defendants, Suffolk County District Attorney's Office, ("Defendant, DA" or "DA"), and its employee, Assistant District Attorney, Jamie Greenwood, ("Defendant, Greenwood" or "Greenwood"), (collectively, "the County Defendants"), have filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. The County Defendants erroneously contend that Plaintiffs' claims are barred by absolute prosecutorial immunity, sovereign immunity, and by *Heck v. Humphrey,* 512 U.S. 477 (1994).

---

[1] Plaintiffs' complaint will be referred to as "Compl., ¶".

.

## II.
## STATEMENT OF FACTS

Plaintiffs respectfully incorporate and refer the Court to Plaintiffs' separately filed Counter-Statement of Facts.

## III.
## STANDARD OF REVIEW

Rule 56(a) provides "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the moving party meets its burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial' in order to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

## IV.
## ARGUMENT

### A.  Defendant Greenwood is not entitled to absolute prosecutorial immunity.

Under the below discussion of *Ex parte Young*, 209 U.S. 123 (1908), Defendant Greenwood has no immunity as she is deemed acting in her personal, rather than official capacity, by her alleged participation in the continuing prosecution of the Plaintiffs in excess of state jurisdiction and in violation of the supremacy clause protections of their aboriginal fishing rights under Count I, and in violation of the civil rights laws, Sections 1981 and 1982 under Count II. Further, 42 U.S. § 1981(c) expressly strips the County Defendants of immunity. "The rights protected by this section are protected against impairment … under color of State law."

Greenwood urges the Court to see her actions as within her official duties, but the evidence below shows otherwise. The internal DEC emails show the Plaintiffs were singled out for race based enforcement and prosecution by the Defendants, 1) because Plaintiffs were fishing while Shinnecock, 2) after the requirements of NY Commissioner's Policy 42 / Contact, Cooperation, and Consultation with Indian Nations, March 27, 2009 were blatantly ignored by all parties, and 3) after the Defendants knew the legitimacy of Plaintiffs' claims of aboriginal fishing rights. Greenwood's participation in this scheme was and is outside the scope of legitimate official duties because this illegal scheme could not work without her participation.

### B.  The County Defendants are not protected by sovereign immunity.

Since the County Defendants' sovereign immunity argument closely resembles the State Defendants' similar argument, the section below is borrowed from Plaintiffs' memorandum in opposition to the State Defendants' motion for summary judgment.

The Supreme Court has long ago held that an individual governmental officer cannot hide behind the immunity and sovereignty of their office when acting outside the scope of

3

their duties, such as the repeated, fruitless, and race-based Shinnecock prosecutions in excess

of jurisdiction by the County Defendants as in this case. *Ex parte Young*. "The attempt of a

State officer to enforce an unconstitutional statute is a proceeding without authority of, and

does not affect, the State in its sovereign or governmental capacity, and is an illegal act, and

the officer is stripped of his official character and is subjected in his person to the

consequences of his individual conduct. The State has no power to impart to its officer

immunity from responsibility to the supreme authority of the United States." *Ex parte Young*,

209 U.S., at 124.

    **A.**   **Ex Parte Young applies.**

    Under *Ex parte Young*, a suit against a state official is not barred if prospective relief is

sought, as in this case*. Ex parte Young*, 209 U.S., at 123. The right to fish is one of the aboriginal

usufructuary rights included within the totality of use and occupancy rights which Indian tribes

might possess. *Menominee Tribe v. United States,* 391 U.S. 404 (1968). Present reliance on

*Menominee Tribe* by the Supreme Court makes clear *Menominee Tribe* is of current and

important precedential value. See, *Herrera v. Wyoming*, Slip Op, No. 17–532 (Sotomayor, J.).

(Holding in favor of the Crow Tribe's hunting rights. "Congress 'must clearly express' any intent

to abrogate Indian treaty rights", p. 14)

    Plaintiffs' Complaint clearly and expressly invokes treaty rights through pre-

revolutionary deeds and other documents executed under Crown Patents. See, e.g. Compl., ¶ 15.

*Herrera* reaffirms that "Indian treaties 'must be interpreted in light of the parties' intentions,

with any ambiguities resolved in favor of the Indians,' *Mille Lacs*, 526 U. S., at 206, and the

words of a treaty must be construed 'in the sense in which they would naturally be understood by

the Indians,' *Fishing Vessel Assn*., 443 U. S., at 676." *Herrera*,  at 14.

Aboriginal use is easily workable. "If any person shows identification, as provided in the Decision of the Court, that he is exercising the fishing rights of a Treaty Tribe and if he is fishing in a usual and accustomed place, he is protected under federal law against any State action which affects the time, place, manner, purpose or volume of his harvest of anadromous fish, unless the State has previously established that such action is an appropriate exercise of its power." *U.S. v. Washington*, 384 F. Supp. 312, 408 (W.D. Wash. 1974) (Boldt, J.) *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1205 (10th Cir. 2002) (holding *Ex Parte Young* applicable and action not barred by Eleventh Amendment); *Menominee Tribe; U.S. v. Winans*, 198 U.S. 371, 381 (1905) ("the treaty was not a grant of rights to the Indians, but a grant of right from them -- a reservation of those not granted."). Treaties and laws must be construed in favor of Indians, and the Supremacy Clause precludes application of state game laws to a tribe on ceded territory. *Antoine v. Washington*, 420 U.S. 194, 199 (1975)("The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice."). Indians' historical hunting and fishing rights are kept absent an express abrogation of such rights by Congress. *Menominee Tribe,* 391 U.S. at 412 ("We decline to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians.

The relief requested by Plaintiffs falls within the *Ex parte Young* exception, as the relief sought here is prospective relief, and is not a "quiet title" action which was barred in *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261 (1997) and *W. Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18 (2d Cir. 2004).

Plaintiffs' relief is limited to prospective relief to protect Plaintiffs' rights:

> Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed.R.Civ.P. 65, the Plaintiffs request the Court to issue a declaratory judgment, and preliminary and permanent injunctive relief in favor of Plaintiffs and *against* the Defendants, enjoining the Defendants from enforcing the laws of the State of New York against Plaintiff Silva in Southampton Town Justice Court in Case No. 17-7008, and from otherwise *interfering* with Plaintiffs' *use* of the waters, fishing, *taking* fish, and *holding* fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters. [emphasis added] (Compl., Relief, ¶1)

A plain reading of the relief requested, in particular the language emphasized above, "against," "interfering," "use," "taking," and "holding," show Plaintiffs seek protection of a **use right** of the waters. It is well documented that the Shinnecock Indian Tribe has historically shared these waters. The Shinnecock have a significant, historic and contemporary exertion of regulatory and jurisdictional powers of the Shinnecock Indian Nation over the same contested waterways. See, the supporting documentation by the BIA, Exhibit 18,[1] as part of the BIA's "Proposed Finding for Federal Acknowledgement of the Shinnecock Indian Nation," December 21, 2009. 74 FR 67895. The PF was finalized on June 18, 2010, which "affirms the reasoning, analysis, and conclusions in the [Shinnecock Indian Nation] Proposed Finding (PF)." 75 FR 34760.

Federal acknowledgments of the Shinnecock Indian Nation's use and regulatory authority in the PF and over the contested waters include:

- A 1977 report from the U.S. Department of Commerce, "Aquaculture, Fisheries, and Food Processing as a Combined Economic Development Option for Indian Communities," has a chapter entitled, "Designing a Food Processing Industry for the Shinnecock Tribe." The chapter states that the "Shinnecock Indian Tribe . . . is presently engaged in the production of shellfish." BIA Summary, p. 26.

---

[1] Excerpts from "Summary under the Criteria and Evidence for the Proposed Finding for Acknowledgment of the Shinnecock Indian Nation (Petitioner #4)" approved on December 14, 2009. ("the BIA Summary")

- "Elected Trustees allocated residential sites, fields for cultivation and grazing, wood*, seafood*, and other resources connected to the land *and tidal areas under the group's control*." [emphasis added] BIA Summary, p. 35.

- "These leaders *consistently controlled access to resources* not only to group members but also to non-Indian short-term leaseholders. Leases of common lands to outsiders produced income, which the group used for their common benefit." [emphasis added] BIA Summary, p. 35.

- "In addition, through consensual decision-making and joint actions, the group has protected the land and resource base from trespass by non-Indians or encroachments by unauthorized persons building on its lands or taking wood, *seaweed, and other resources without permission*. They have *regulated hunting and fishing there*. [emphasis added] BIA Summary, p. 35.

- "Finally, the group has *significantly influenced economic activities by its members* by controlling access to agricultural fields, woodlots, *seafood collection areas*, allotments with access from Montauk Highway, where individual Shinnecock operate businesses, *and other resources*." [emphasis added] BIA Summary, p. 35.

- "On occasion, they rented piers to non-Indian summer residents and leased *rights to harvest oysters and seaweed*." [emphasis added] BIA Summary, p. 37.

- "In two other actions before 1853, Luther Bunn and Oliver Kellis, leasehold residents, *sued non-Indians for 'taking and carrying away sea weed' from the 'shores of Shinnecock Bay*. (New York Court of Appeals 3/-/1860).' " BIA Summary, p. 56.

- "The Trustees also *auctioned seaweed privileges* "for the good of the tribe," and "the pasture field" (Indian Records book 5/11/1880; 4/11/1881).  Trustees made

administrative decisions involving fences and gates.  The Shinnecock electorate voted on matters, *such as the number of seaweed lots to rent to outsiders*." [emphasis added]   BIA Summary, p. 60.

- "The Trustees sent a message by way of the newsletter warning people about trespassers—defined as anyone not a blood Shinnecock or their spouse— and handling fire arms *and hunting and fishing rules*." [emphasis added] BIA Summary, p. 70.

- "Trustees preserve the peace on the Shinnecock Reservation and are responsible for contacting State police in emergency situations. They enforce restrictions on reservation hunting and fishing by outsiders." BIA Summary, p. 87.

The PF serves a dual function here. Firstly, it categorically substantiates the fact that when the United States recognized the Shinnecock Indian Nation as an Indian Tribe, it also acknowledged its water resource jurisdiction and usage. Secondly, it proves that even when the Shinnecock Indian Nation has absolute and uncontested control of a resource, it shares it with non-Indian neighbors thereby emphatically disproving the notion that the Plaintiffs have unstated or implied intentions of exclusion of others.

The Federal government also recognizes Shinnecock fishing rights in publications. The 1977 report from the U.S. Department of Commerce, "Aquaculture, Fisheries, and Food Processing as a Combined Economic Development Option for Indian Communities," U.S. Department of Commerce, Office of Minority Enterprise, 1977, Exhibit 19, ("the DOC Handbook") reveals undoubtable federal acknowledgement of the retained and unextinguished aboriginal Shinnecock Indian Nation water rights, combined with *direct federal financial support for the then State Recognized Tribe* for developing those water rights into a mechanism for economic development.

8

The DOC Handbook is essentially a feasibility study using the Shinnecock Indian Nation as a model for other water rights possessing tribes to follow. The Executive Summary of the DOC Handbook states, "(t)he model development scheme in Figure 14 which shows the time and kind of work which were required to create an industry based on *Shinnecock's most abundant resources, shellfish and underutilized fish species*." [emphasis added] DOC Handbook, p. v.

It further states, "Indian communities over the years have historically developed their own specific resource utilization systems based on experience and need." DOC Handbook, p. 2. This cannot be overstated as it corroborates both historical, aboriginal Shinnecock water resource usage as outlined in the PR and also rationally explains the relatively new glass eel fishery developed by the Plaintiffs in a cultural context and as a natural response to ever-evolving, culturally appropriate, economic development opportunities.

The DOC Handbook adds, "AIDA (Department of Commerce agent, American Indian Development Association) personnel visited over 20 Indian reservations, mostly in the northern tier of States across the United States (Fig. 1). Specific studies and interviews were conducted at nine reservations having water resources which were felt to be typical of reservations within the region." DOC Handbook, p. 2. Shinnecock was indeed one of the nine reservations visited and was listed as being most likely to cultivate a salmon ranching or salmon cultivation in containment system of aquaculture.

The DOC Handbook accurately and presciently observes, "virtually every reservation visited had underdeveloped resources from two standpoints. First, water resources were totally unused or were managed by outside influences for the sole benefit for the outside persons." Reasons for the underutilization of the resource included, "White prejudice" and "White

religious and economic exploitation". DOC Handbook, p. 4.

In its Guide (to other tribes) for Investigating Your Water Resources With Your Own Planners and Management, the top long-range consideration is, "(h)as the tribe established water rights?" DOC Handbook, p. 8. The implication is clear, tribes lacking aboriginal water rights should not consider this method of economic development. Alternatively, it must follow that Shinnecock inherently possesses water rights to have been considered for the program and the assertion is that the Shinnecock Indian *Nation must possess a high level of water rights* to become the model tribe.

For these reasons, Plaintiffs seek protection of a **use right** of the waters, and *Ex Parte Young* applies.

### C.  The Court is not required to abstain under the Younger Doctrine under the bad faith and harassment exceptions

*Younger* is a limitation of the *Ex parte Young* exception to sovereign immunity and is properly part and parcel of the immunity section above. *See, Younger v. Harris,* 401 U.S. 37, 43-46 (1971).

This case involves all Defendants' "bad faith," "harassment," and "unusual circumstances" exceptions, distinguishing *Dombrowski v. Pfister,* 380 U.S. 479 (1965) as a limited exception in *Younger v. Harris*, 401 U.S., at 54. Justice Brennen's concurring opinion in *Younger* (joined by White and Marshall), pointed out that "He [the plaintiff] has not alleged that the prosecution was brought in bad faith to harass him." *Younger*, 401 U.S., at 56. A chilling effect upon rights might result from such prosecution regardless of its prospects of success or failure. *Dombrowski*, 380 U.S., at 487-489. The abstention doctrine is inappropriate where a statute is justifiably attacked on its face, or as applied for the purpose of discouraging protected activities. *Dombrowski*, 380 U.S., at 489-491. The state court's ultimate interpretation of a

statute would be irrelevant to meet the claim that it was being applied to discourage civil rights activities. *Dombrowski*, 380 U.S., at 490.

The Plaintiffs have plainly plead facts showing bad faith, harassment, and special circumstances of failed prosecutions, seized property, and a continuing pattern of interference with their aboriginal and retained Shinnecock fishing rights:

> Over the last decade, the Defendants have ticketed, seized fish and fishing equipment, and prosecuted the Plaintiffs for alleged criminal offenses in alleged violation of New York State law involving fishing and raising shellfish in Shinnecock Bay and its estuary waters, which are adjacent to the lands of the Shinnecock Indian Reservation. Each of the prosecutions failed. Yet, the Defendants persist and continue to ticket and threaten prosecution. The Plaintiffs are in fear of exercising those same usual and customary aboriginal fishing rights secured and retained for them by their ancestors when Shinnecock territory was ceded to the English. Ironically Plaintiff Silva is presently scheduled to stand trial on August 30, 2018, in the Town of Southampton Justice Court, located in Hampton Bays, New York, the building itself sitting on ceded Shinnecock territory. (Compl., ¶16)

> On January 28, 2009, in *People of the State of New York v. Salvatore J. Ruggiero*, Case No. 08-101350, Southampton Justice Court, Southampton, New York, after a bench trial and prosecution testimony by Farrish, that court found the Defendant, a non-Indian who was fishing with Gerrod Smith, not guilty of possession of undersized flounder, undersized blackfish, and undersized porgy, for the Defendants' failure to prove jurisdiction. (Compl., ¶17)

> On October 14, 2009, in *People v Gerrod T. Smith*, Case No. 08-101351, Southampton Justice Court, Southampton, New York, after removal to this federal court, three criminal counts of possession by Gerrod Smith of undersized flounder, blackfish, and porgy in Shinnecock Bay, were dismissed in the Justice Court. (Compl., ¶18)

> On June 17, 2010, in *People v. Jonathan K. Smith*, Case No. 09-031419, Southampton Justice Court, Southampton, New York, after removal to this federal court and known as Case No. 09-0571 in the United States District Court for the Eastern District of New York, (Wexler, J.), a judgment of dismissal of criminal possession by Jonathan Smith of a shellfish farm in Shinnecock Bay without a license was entered for failure of the Defendants to prosecute. (Compl., ¶19)

Most recently on April 20, 2017, Silva was stopped by two DEC Officers, Laczi and Farrish, while Silva was fishing for elver eels in Shinnecock Bay.

Silva's eels, net, and other fishing equipment were seized, and Silva was issued a criminal appearance ticket alleging possession of undersized eels in violation of New York State law, 6 NYCRR 40-1(b)(ii). Silva was later charged with two additional criminal offenses, ECL 13-0355 (no fish license), and 6 NYCRR 40- 1(b)(iii) (possession of eels over limit). This case is presently lodged and pending in the Southampton Town Justice Court as Case No. 17-7008 and is being prosecuted by Greenwood. Silva's attempt to obtain a voluntary dismissal by Greenwood was unsuccessful, and Silva's motion to dismiss for lack of jurisdiction was denied by that court. Over Silva's objection, that case is presently scheduled for trial on August 30, 2018 at 9:00 am. (Compl., ¶20)

The Plaintiffs exercised their lawful rights to use waters, fish, take fish, and hold their fish clearly within an area of aboriginal usufructuary fishing rights un-relinquished and retained by Plaintiffs' ancestors in the aforementioned Colonial Deeds and related documents ceding Shinnecock territory, all protected under the Supremacy Clause, U.S. Const., Article VI, clause 2. (Compl., ¶22)

The Defendants' repeated interference, seizures, and prosecution of the Plaintiffs by application of New York State fishing regulations violates Plaintiffs' fishing rights protected under the Supremacy Clause, was and is void, and was and is in excess of New York State jurisdiction. (Compl., ¶23)

Bad faith and harassment are also shown by these continued prosecutions on one hand, and the Defendants' complete failure to consult with the Shinnecock Indian Nation on matters involving Plaintiffs' fishing rights in accordance with obligations under Executive Order No. 13175. *See, e.g.,* no mention of Executive Order No. 13175 in the Affidavit of James Gilmore, dated July 23, 2018, even though Mr. Gilmore states he serves "as the New York Commissioner on the Atlantic States Marine Fisheries Commission (ASMFC or Commission)…." There is no mention of required consultation in any filing by any of the Defendants.[7]

Plaintiffs have shown blatant discriminatory language of internal DEC emails indicating the racial profiling of Shinnecock people for enforcement as a racial group. The internal DEC email from DEC Captain Dallas Bengel of March 28, 2017, Exhibit 20, to Farrish, Gilmore, Laczi, and others, states in pertinent part:

> Word is out that the *Shinnecocks* are actively seeking a shipper for glass eels. Apparently they have been in contact with the *Unkachaugs* and the *Passamaquoddys* (Maine).
> …
> Lt. Carbone – your thoughts on the creek adjacent to the east side of the reservation?
> Lts – please put together a elver patrol/detail plan for your Zones.
> …
> Thanks and good luck. [emphasis added]

Besides this documented evidence of racial profiling, the adage "Where there is smoke, there is fire" applies here. Hypothetically, consider if another race, such as "Black" is substituted for the word "Shinnecock" above. Would there be any question of racial profiling?

An important internal DEC email from Monica Kreshic on April 25, 2017 to Gilmore and Bengel, among others, Exhibit 21, provides in pertinent part:

> The Shinnecock assert that they have a treaty right to exercise their aboriginal fishing practices. *This may be true.* [emphasis added]

This email is obviously part of the same racial profiling email trail as above, but this email shows a factual, plain and pointed internal DEC recognition of precisely the fishing rights Plaintiffs are asserting in this case. Further evidence of bad faith in Count I, and racial discrimination in Count II.

Even if the order Executive Order No. 13175  does not apply, the DEC is bound by its own similar mandated consultation requirement. New York State DEC has a similar guidance and policy document entitled, "Commissioner's Policy 42 / Contact, Cooperation, and

13

Consultation with Indian Nations," issued by then DEC Commissioner Alexander B. Grannis on March 27, 2009, Exhibit 22. ("CP-42"). "It is the policy of the Department that relations with the Indian Nations shall be conducted on a government-to-government basis." CP-42, p. 1. The protocol of CP-42 includes, but is not limited to "Contact" and "Consultation," (CP-42, p. 4), including on the subjects of "Hunting, Fishing, and Gathering, (CP-42, p. 5).

CP-42 protocol includes:

- The Department recognizes the unique political relations based on treaties and history, between the Indian Nation governments and the federal and state governments. In keeping with this overarching principle, *Department staff will consult with appropriate representatives of Indian Nations on a government-to government basis on environmental and cultural resource issues of mutual concern.*

- Where appropriate and productive, will *seek to develop cooperative agreements* with Indian Nations on such issues.

- The Department interacts with Indian Nations in two critical areas of mutual importance: the environment and cultural resources. It does so in several capacities, including, but not limited to, permit application review, site remediation, *hunting and fishing regulation, and the development, implementation, and enforcement of regulations.*

- Additionally, mutually beneficial cooperation and the appropriate resolution of occasional disagreements or misunderstandings can best be achieved if there is a commitment to *regular consultation on environmental and cultural resource issues of mutual concern.*

- The Department and Indian Nations share key roles in protecting and preserving natural and cultural resources important to all citizens, and *early consultation and*

14

*cooperation* between the Department and Indian Nations will foster more comprehensive protection and preservation of those resources.

• "Consultation" means open and effective communication in a cooperative process that, to the extent practicable and permitted by law, works toward a consensus *before a decision is made or an action is taken.*

[emphasis added]

The Defendants failed to meet *even a single* obligation under Executive Order No. 13175 and CP 42 and have met the good faith intentions of these documents with indifference. The triggers for consultation with the Shinnecock are clear. On March 28, 2017, internal emails reveal DEC Captain Dallas Bengel calling attention to Shinnecock fishing activities. Recipients include Defendants Farrish, Laczi as well as Mr. James Gilmore. "Word is out that Shinnecocks are actively seeking a shipper for glass eels", he states. "(Lieutenants), please put together a [sic] elver patrol/detail plan for your Zones",  he adds.

This incident should have *immediately* triggered a consultation with the Shinnecock Indian Nation, yet none took place. The intent to target Shinnecock specific fishermen is absolutely clear and is consistent with previous actions against the Plaintiffs. The State Defendant's zeal overshadowed and completely overrode any responsibility for cooperation and consultation the State Defendant has for the Indian Nations of its State. This is evidence of bad faith and of the discrimination alleged by Plaintiffs. The DEC prosecutions of Plaintiffs occurred *after* the issuance of CP-42.

More instances of bad faith and harassment: The State Defendants' Mr. Gilmore testified in his affidavit that "American eel (*Anguilla rostrate*) are an important and protected resource. Their population is *depleted* and at historically low levels for several

15

reasons, including *overfishing*….” Gilmore Aff, ¶4 (emphasis added). But Mr. Gilmore is

impeached by the ASMFC, “… the overfishing status … cannot be stated with confidence.”

Exhibit 12, p. 12. Mr. Gilmore also is impeached by the DEC’s own publication where the

American eel appears nowhere. See, List of Endangered, Threatened and Special Concern

Fish & Wildlife Species of New York State - NYS Dept. of Environmental Conservation.

Exhibit 9. Also studies of the U.S. Fish & Wildlife Service, has on two occasions, 2007 and

2015, made findings that the American eel stock is “stable” and should not be placed in a

protected status. See, USFW press release, October 7, 2015, Exhibit 10, and the USFW

findings in the Federal Register, Exhibit 11.

 “A governmental entity, as opposed to an individual official, possesses no personal

privilege of absolute immunity. Thus, the Office of the District Attorney, named by plaintiff as

a defendant in this action, may not avail itself of the absolute immunity defense.” *Smith v.

Gribitz*, 958 F.Supp. 145, 155 (S.D.N.Y. Mar. 6, 1997) (internal citation omitted, dismissed on

other grounds)

The prosecution fund provided by Suffolk County under New York County Law shows

the Defendant DA is a separate legal entity and is a justiciable entity capable of being sued.

(“The claimant, district attorney and the attorney general in actions or proceedings prosecuted

by him shall be jointly and severally liable for any item of expenditure for other than a lawful

county purpose disallowed upon a final audit, to be recovered in an action brought against

them by the board of supervisors in the name of the county.”) CNT § 705. Further, " ‘claims . .

. asserted against individual municipal employees in their official capacities . . . are tantamount

to claims against the municipality itself’ (*Vargas v City of New York*, 105 AD3d 834, 837 [2d

Dept 2013], lv granted 22 NY3d 858 [2013]; see *Hafer v Melo*, 502 US 21, 25 [1991]).” *Igoe*

*v. Apple*, NY Slip Op 28170, May 31, 2018 (Supreme Court, Albany County).

The Defendant DA's own website holds itself out to the public as a legal entity capable of holding intellectual property rights and asking for waivers from the public ("Suffolk County District Attorney's Office"). www.suffolkcountyny.gov/disclaimer) ("The owners of the copyrights are SCDAO, the County of Suffolk, New York, its affiliates, content suppliers or other third party licensors. The compilation of the content of the Site is exclusive property of SCDAO and is protected under United States and international copyright laws.") ("You agree to grant to SCDAO a non-exclusive, royalty-free, worldwide, perpetual license….") ("As a condition of your use of the Site, you warrant to SCDAO that you will not ….")

To the extent the Defendant DA is not a legal entity, which it is, that part of the action should be construed as brought against the DA in his personal and official capacities under *ex parte Young*.

For these reasons, the Court is not mandated to decline injunctive relief under the Younger Doctrine because the facts, alleged and shown, show bad faith, harassment, and special circumstances on the part of all the Defendants, including the County Defendants.

C.   **Silva's claim is not barred by *Heck v. Humphrey***

Lastly, County Defendants opine Plaintiffs have no cause of action under Section 1983, relying on *Heck v. Humphrey,* 512 U.S. 477 (1994). *Heck* involved a Section 1983 claim, only for damages, involving a contended unconstitutional state court criminal conviction which was on appeal in state court when the federal case was filed. *Id.*, 478-479. In *Heck*, the Supreme Court decided the question: "Thus, the question posed by § 1983 damages claims that do call into question the lawfulness of conviction or confinement remains open." *Id.*, at 483. In which the Supreme Court answered "whether the claim is cognizable under § 1983 at all. We conclude

that it is not." *Id.*

The County Defendants' reliance on *Heck* is entirely misplaced. *Heck* does not apply because 1) Plaintiffs have not alleged a Section 1983 claim, and 2) the gravamen of Plaintiffs' complaint and claim under 1981 and 1982 of the 1866 Civil Rights Act is assertion of aboriginal fishing rights, which are property rights, and a continuing pattern of actual and threatened prosecution based on Plaintiffs' race to suppress those fishing rights.

For these reasons, Plaintiffs' claims are not barred by *Heck*.

## V.
## CONCLUSION

 For the foregoing reasons, the County Defendants. Rule 56 motion for summary judgment should be denied in its entirety.


Dated:      November 4, 2019
            New York, New York


                              Respectfully submitted,

                              MOORE INTERNATIONAL LAW PLLC.

                                      /s/ Scott M. Moore
                         By: _____
                                      Scott Michael Moore, Esq.
                                          *Attorneys for*
                                      *Plaintiffs* 45 Rockefeller
                                      Plaza, 20th Floor New
                                      York, New York 10111
                                          T. (212) 332-3474
                                          F. (212) 332-3475
                                      **A.** smm@milopc.com

18