UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                    Plaintiffs,                CV 18-3648
                                                  (SJF)(SIL)

     -against-

BRIAN FARRISH,
JAMIE GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT ATTORNEY'S
OFFICE,

                    Defendants.
----------------------------------------------------------------x

## STATE DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT

Defendants New York State Department of Environmental Conservation ("DEC"), Basil Seggos, Brian Farrish, and Evan Laczi ("State Defendants"), by their attorney, LETITIA JAMES, Attorney General of the State of New York, respectfully submit this statement of undisputed facts pursuant to Local Civil Rule 56.1:

**Background**

1.      Plaintiffs filed a Complaint in this matter on June 22, 2018.  *See* Docket Entry ("D.E.") 1.

2.      Plaintiffs also filed a Motion for a Preliminary Injunction on the same date.  *See* D.E. 2, 3.

3.      The Complaint sought 1) declaratory and injunctive relief preventing Defendants from interfering with alleged aboriginal fishing rights protected under the Supremacy Clause of the

Constitution, and 2) monetary damages for an alleged pattern of illegal racial discrimination under 42 U.S.C. Sections 1981 and 1982.  D.E. 1.

4.      State Defendants opposed Plaintiffs' preliminary injunction motion by Memorandum of Law in Opposition and by Affidavit of James Gilmore, Director of the Division of Marine Resources of the New York State Department of Environment Conservations, filed on July 23, 2018.  D.E. 46, 47.

5.      Judge Feuerstein denied Plaintiffs' motion for preliminary injunction by Memorandum and Order dated July 31, 2018.

6.      State Defendants moved to dismiss and filed the fully briefed Motion to Dismiss for failure to state a claim and for lack of jurisdiction on August 23, 2018.  D.E. 56.

7.      Judge Feuerstein referred the Motion to Magistrate Judge Locke on August 24, 2018.  *See* Docket at 8/24/18 Order Referring Motions.

8.       Judge Locke issued his Report and Recommendations ("R&R") on January 7, 2019, recommending dismissal of Plaintiffs' claims in their entirety.  D.E. 63.

9.      Plaintiffs filed objections to Judge Locke's R&R, which State Defendants opposed. *See* D.E. 64, 65.

10.     By conference held before Judge Feuerstein on July 31, 2019, Judge Feuerstein terminated Defendants' Motions to Dismiss and Judge Locke's R&R and ordered a briefing schedule for a Motion for Summary Judgment.  *See* D.E. 74.

**Criminal Prosecution of Silva**

11.     Plaintiffs David T. Silva, Gerrod Smith and Jonathan Smith are Members of the Shinnecock Indian Tribe of New York State.   *See* Tribal Verification Letter and Tribal Identification Cards, D.E. 3, Ex. 1-3.

12.     On April 20, 2017, DEC Environmental Conservation Officers Evan Laczi and Brian Farrish observed Silva using a "Fyke net," and in possession of a bucket of "Elver eels" in Taylor Creek in the vicinity of 450 Meadow Lane, in the Town of Southampton.  *See* Declaration of Richard Yorke, dated October 4, 2019 ("Yorke Decl.") at Exhibit D, Memorandum Decision of Hon. Gary J. Weber, dated June 5, 2019, pp. 2-3; Simplified Information/Complaints Issued Against David Silva (Silva Tickets), D.E. 3 Ex. 4.

13.     The location of the net is outside the boundaries of the Shinnecock Nation Reservation.  *See* Yorke Decl. Ex. D at p. 6; Yorke Decl. Ex B., Affirmation of Jamie Greenwood, Assistant District Attorney, in Opposition to Defendant's Motion, dated December 11, 2017 ("Greenwood Aff."), p. 2, Ex. A.

14.     Silva was issued an appearance ticket for possession of an undersized species.  *See* Yorke Decl. Ex. D at p. 4; D.E. 3 Ex. 4.

15.     Silva was subsequently charged with Possession of Eels Over Limit (NYCRR 40-1(b)(iii)), Fishing Without a License (ECL 13-0355), and Possession of Undersized Fish (Eels)(NYCRR 40-1(b)(ii).  *See* D.E. 3 Ex. 4, Ex. 5 Memorandum Decision & Order of Hon. Gary J. Weber, dated January 9, 2017[sic.] p. 1.

16.     In the criminal proceeding, Silva, represented by Plaintiffs' current attorney, brought a motion to dismiss based on lack of jurisdiction, arguing in relevant part that the Shinnecock Nation has unabrogated fishing rights outside the Shinnecock Reservation, pursuant to the 1664 Fort Albany Treaty and the May 12, 1659 Wyandanch Deed to John Ogden ("Quogue Purchase").  *See* Yorke Decl. Ex A, Notice of Motion and Defendant's Memorandum of Law in Support of Motion to Dismiss, dated October 10, 2017 at Ex. 3.

17.     Silva argued, "The GIS map disclosed by the People shows that Silva was ticketed for fishing in the traditional Shinnecock fishing grounds of the Shinnecock Bay estuary, an area of retained fishing rights, whether or not outside Shinnecock Reservation waters."  *Id*. at p. 6.

18.     The Suffolk County District Attorney's Office, through Assistant District Attorney Jamie Greenwood, opposed Silva's motion to dismiss.  *See* Yorke Decl. Ex. B.

19.     ADA Greenwood argued in relevant part that, under the Dongan Patent of 1686, the Town of Southampton owns the bodies of water within its boundaries and was conveyed the easements of fishing, that the Indian Deed of December 13, 1640 for Southampton reserved no fishing rights, and that Silva provided no treaty or law that reserved fishing rights in the body of water in question.  *Id*. at pp.  3-4.

20.     Silva submitted a Reply Memorandum of Law arguing in relevant part that the People's arguments regarding the Dongan Patent, the Quogue Purchase, and the 1640 Indian Deed for Southampton fail to abrogate any aboriginal fishing rights.  *See* Yorke Decl. Ex. C, p. 1-2. Silva characterized his claims as a "water boundary dispute," and concerning the "water boundary lines" of the Reservation.  *Id*.

21.     Judge Weber's Decision dated January 9, 2017[sic], denied Silva's motion to dismiss, noting that Silva argued, in part, "That, since the Defendant in the instant matter is, concededly, a member of the Shinnecock Indian Tribe, he had the right to fish, without regulation by the State of New York, in the waters of the Shinnecock Indian Reservation in Shinnecock Bay." D.E. 3, Ex. 5, at p. 1.

22.     Judge Weber denied the motion to dismiss, holding as to a prior case, upon which Silva relied for estoppel: "It was not based upon the proposition that the area in question in the instant matter is or is not within the waters belonging to the Shinnecock Reservation or that a member of that Tribe may fish anywhere within the State without a constraint by New York State regulation.  *Id*. at p. 2.

23.     Judge Weber noted that "It may well be that on the trial of the matter at least one of these issues, as has happened before, will be resolved in favor of the Defendant."  *Id*.

24.     Judge Weber further asked the parties for clarification as to their positions on whether the Defendant, as a member of the Shinnecock Tribe, must have a New York State fishing license to fish in non-tribal waters.  *Id*.

25.     On June 5, 2019, Judge Weber, following trial, issued his Decision in Silva's criminal case.  *See* Yorke Decl. Ex. D.

26.     At trial, after the prosecution rested, Silva again moved for dismissal, based on lack of jurisdiction.  *Id*. at 5.

27.     Judge Weber held that Silva's fyke net was placed in Taylor Creek and "there appears to be no dispute that the location shown by the red circle on People's Exhibit 4 where the net was placed, is outside of the boundaries of the Shinnecock Nation."  *Id*. at 6.

28.     Judge Weber's decision noted that Bryan Polite, a defense witness and member of the Shinnecock Nation, and member of its government for at least 7 years, testified that the area is not within the Shinnecock Reservation as the boundaries currently stand.  *Id*. at 5, 6.

29.     Judge Weber held that, "Here, based upon the current and indisputed mapping of the area, the fyke net was most certainly placed on Taylor Creek outside of the established boundaries of the Shinnecock Nation."  *Id*.

30.     Further, the Court held that, "this court is without the power to alter the legally established boundaries of the Shinnecock Nation or of the State of New York.  Even if the court had such authority, on this record at least, no other conclusion can be drawn except that the subject fyke net was, in fact, placed not on waters or land belonging to the Shinnecock Nation, but on territory within the jurisdiction of the State of New York, acting through its D.E.C."  *Id*.

31.      For these reasons, Judge Weber denied Silva's motion for a Trial Order of Dismissal.  *Id*.

32.     Judge Weber did not consider the People's evidence of Silva's buckets containing Elver Eels, or statements given by Silva to the DEC Officers, as the Court did not determine such evidence to be procured voluntarily or upon consent.  *Id*. at 6-7.

33.     Judge Weber also held that the Elver eels in the fyke net were found after Silva left the scene, and that there was no testimony as to how the eels entered the net.  *Id*. at 7.

34.     Thus, Judge Weber held that the People had not proven beyond a reasonable doubt that Silva was in possession of the Elver eels over the limit, or that he was in possession of undersized eels.  *Id*.

35.     However, Judge Weber held that, "the People have proven beyond a reasonable doubt that the subject fyke net was set, maintained, operated or used in an area (Taylor's Creek) subject to the jurisdiction of the State of New York acting through the D.E.C."  *Id*. at 5.

36.     Silva was found guilty of the violation of E.C.L. Section 13-0335/71-0923, dated June 6, 2017 relating to the lack of a marine commercial food fishing license and the use of a fyke net.  *Id*.

37.      Plaintiffs indicated in this Federal action that they are appealing the criminal decision.  *See* D.E. 73.

**The American Eel**

38.     The American Eel are a protected resource, whose population is depleted and at historically low levels.  *See* Affidavit of James Gilmore, Director of Division of Marine Resources, New York State Department of Environmental Conservation, dated July 23, 2018 at ¶4.

39.     Juvenile American Eel are known as Elvers or Glass Eel.  *Id*.

40.     The reasons that the population of American Eel is depleted and at historically low levels include overfishing.  *Id*.

41.     A recent stock assessment recommended that mortality be reduced on all life stages of American Eel.  The assessment found that further fishing of American Eel at every stage, particularly glass eels, could be particularly detrimental to the stock, especially if other sources of mortality are not controlled.  *Id.*

42.     Demand for glass eels for human consumption is great in Asian markets, with prices reaching over $2000.00 per pound.  *Id.* at ¶5.

43.     The Atlantic States Marine Fisheries Commission ("ASMFC") coordinates and manages the fishery resources, including American Eel fisheries, of fifteen Atlantic coastal states from Maine to Florida.  *Id.* at ¶6.

44.     The current Commission fishery management plan prohibits the taking of juvenile eels, or glass eels, in thirteen of the states, including New York, and authorizes a limited quota of glass eels in Maine and South Carolina.  *Id.*

45.     Pursuant to Federal law, any state that does not comply with the ASMFC fishery management plan may have its fishery shut down by the Secretary of Commerce.  *Id.*; *see* 16 U.S.C. Section 5106(c).

46.     New York State Department of Environmental Conservation ("DEC") complies with the ASMFC fishery management plan through its fishing regulations in 6 NYCRR Sections 10.1(a) and (b), 40.1(f) and (i), making it illegal to take or possess American Eels less than nine inches long in New York State.  *Id.* at ¶7.

47.     Glass eels are less than nine inches long.  *Id.*

**Deeds, Leases and Orders**

48.     The original purchase deed for the Town of East Hampton, is dated April 29, 1648, between the Governors of the colonies of New Haven and Connecticut, and the sachems from the

Montaukett, Manhansett, Corchaug, and Shinnecock tribes. *See* Yorke Decl. Ex. E, Records of the Town of East Hampton, LI, Volume I, 2-4.

49.     This deed does not include Southampton, which provided one of the boundaries to limit the deed: "all the land lyinge from the bounds of the Inhabitants of Southampton . . . not Intrenching uppon any in length or breadth, which the Inhabitants of Southampton, have and do possess, as they by Lawful right shall make appeare . . ." *Id*.

50.     The deed states of the Sachems, "in consideration thereof, we doe give upp unto the said Purchasers, all our right and Interest in the said Land, to them and their heirs forever." *Id*.

51.     The deed states:

> Allsoe, we, the said Sachems, have Covenanted to have Libertie, freely to fish in any or all the cricks and ponds, and hunt up and downe in the woods without Molestation, they giving the English Inhabitants noe just offence, or Iniurie to their goods and Chattells.  Likewise, they are to have the fynns and tails of allsuch whales as shall be cast upp, to their proper right and desire they may bee dealt with in the other part.  Allsoe, they reserve libertie to fish in all convenient places, for Shells to make wampum.  Allsoe, if the Indyans, hunting of any deare, they should chase them into the water, and the English should kill them, the English shall have the body, and the Sachem the skin.

52.     The original purchase deed for Southampton, is dated December 13, 1640.  *See* Yorke Decl. Ex. F, First Book of Records of the Town of Southampton, 12-14.

53.     The deed states, in relevant part:

> & further in consideration that the above named English shall defend us the sayed Indians from the unjust violence of whatever Indians shall illegally assaile us, doe absolutely and forever give and grant and by these presents doe acknowledge ourselves to have given and granted to the partyes above mentioned without any fraud, guile, mentall reservation or equivocation to them their heirs and successors forever all the lands, woods, waters, water courses, easmts, profits & emoluments, thence arising whatsoever . . .

54.     The deed for Southampton mentions no fishing rights.  *Id*.

55.     The June 10, 1658 Deed of Beach between Wyandanch, Sachem of the Montaukett tribe and Lion Gardiner, states:

> Wiandance hath sould for a considerable sum of money and goods, a certaine tract of beach land, with all ye rest of ye grass that joynes to it, not seperated from it by water, which beach begins Eastward at the west end of Southampton bounds, and westward where it is separated by ye waters of ye sea, coming in out of the Ocean Sea, being bounded Southwards with the great sea, Northwards with the inland water; this land and the grass thereof for a range, or run, for to feed horses or cattle on, I say, I have sold to the aforesaid Lion Gardiner, his heirs, executor and assigns forever, for the sum aforesaid, and a yearly rent of twenty-five shillings a year, which yearly rent is to be paid to the foresaid Sachem, his heirs, executors and assigns for ever, in the eight month, called October, then to be demanded, but the whales that shall be cast upon this beach shall belong to me, and the rest of the Indians in their bounds, as they have beene anciently granted to them formerly by my forefathers.

*See* Yorke Decl. Ex. G, Records of the Town of Southampton, 170-171, Records of the Town of Brookhaven, 3-4.

56.     This deed sold Lion Gardiner the grazing rights to this tract of beach, for "a considerable sum of money and goods" and a yearly rent of twenty-five shillings. *Id*.

57.     The tract's eastern boundary was at the time of the conveyance the "west end of Southampton bounds." *Id*.

58.     The May 12, 1659 deed between Wyandanch, the Montauket Sachem, and John Ogden, states in relevant part:

> I say all the land and meadow I have sold for a considerable price unto Mr Iohn Ogden for himselfe his heirs executors and assigns for ever, upon condition as followeth, first that Thomas Halsey and his Associates shall have the privilidge of the peice of meadow called quancawnantuck the terms of yeares formerly granted to him or them but the land lying between quancawnantuck and three miles northward he shall or may possess and improve at present, but when the yeares of the aforesayed Thomas Halsey shall be expired then shall the aforesaid Mr Iohn Ogden or his assigns fully possess and improve all quancaunantucke meadow with the rest aforesayed and then shall pay or cause to be payed unto me wiandance my heires or assigns the summe of twenty five shillings a yeare as a yearly acknowledgement or rent for ever.  It is also agreed that wee shall keepe our prividges of fishing fowling hunting or gathering of berrys or any other thing for our use . . .

*See* Yorke Decl. Ex H, Second Book of Records of the Town of Southampton, 162, 354-355.

59.     The deed states that this land begins, "at the westward end of Southampton boundes, which land is bounded Eastwards with Southampton boundes . ." *Id.*

60.     At the time of this conveyance to Ogden, these lands were outside of the territorial limits of Southampton, and were not part of the Colony of Connecticut. *Id*.

61.     This sale also exempted the beach lands which were already sold to John Cooper. *Id*.

62.     In the June 8, 1659 deed between Wyandanch, the Montaukett Sachem, and Lion Gardiner, Wyandanch sells to Lion Gardiner, "all the Bodyes and Bones of all the Whales that shall come upon the Land, or come a Shoare from the Western end of Southhampton Bounds, unto the place called Kitchaminchoke, yet reserving to ourselves and Indyans, all the Tailes and fins for Ourselves . . ." The document sets a term of twenty-one years for the agreement. *See* Yorke Decl. Ex. I, Department of State Book of Deeds, Unpublished documents, Office of the Secretary of State, Albany, New York, 2: 85-86. (New York State Archives. Series 453, vols. 1-9).

63.     The deed further states:

> that if any Whale shall bee cast up in the bounds aforementioned, whether it bee found by English or Indyons, it shall bee judged by them both whether it bee a whole Whale or a halfe or otherwise.  Now for every whole whale that shall come up, the aforesaid Lyon Gardiner or his Assigns, shall pay or cause to be paid unto mee wyandance, the Sum of five pounds Sterling, or any good pay which wee shall accept of, but if it bee a halfe whale, a third part, or otherwise, they shall pay according to Proportion, and this pay shall be within two Monethes after they have cutt out and carryed the Whale home to their Houses, but in case there shall not five whales come up, within the terme abovesaid, then shall the aforesaid Lyon Gardiner, or his Assigns, have the next five Whales, that shall come up after the Terme, paying to mee, my heirs, Executors or Assigns, the Sum above mentioned, and for the true performance of the promises, Wee have hereunto Sett our hands and Seales.

*Id*.

64.     A similar document, between Lion Gardiner and Wyandanch, selling rights to drift whales that come ashore on another tract of beach under similar terms is dated July 28, 1659. *See* Yorke Decl. Ex. J, Second Book of Records of the Town of Southampton, 34-35.

65.    These documents selling rights to drift whale carcasses do not mention fishing or reserve general fishing rights.  *Id.*

66.    A sale of land to Thomas Topping, "The Topping Purchase," of April 10, 1662 states in relevant part:

> Witnesseth that we the said Weany Anabackus and Iackanapes have given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a certain tract of land lying and being westward of the said Shinecock and the lawful bounds of Southampton above said, that is to say to begin at the canoe place otherwise Niamuck and soe to run westward te a place called and known by the name of Seatuck, and from thence to run northward across the said Island or neck of land unto a place called the head of the bay with all the meadow and pasture, arable land, easements profits benefits emoluments as is or may be contained within the limits and bounds before mentioned together with half the profits and benefit, of the beach on the south side the said Island in respect of fish whale or whales that shall by God's providence be cast up from time to time, and at all times, with all the herbage or feed that shall be, or grow thereon.
>
> To Have and To Hold, all the forementioned demised premises with all and singular the appurtanances thereto belonging or in any ways appertaining to him the said Thomas, his heirs executors, administrators, or assigns forever, without the lett trouble denial or molestation of us the said Weany, Anabaekus, and Iackanapes our heirs or assigns or any other person or persons lawfully claiming from, by, or under us our heirs executors Administrators or assigns…

*See* Yorke Decl. Ex K, First Book of Records of the Town of Southampton, 167-168.

67.    At the time of the Topping Purchase, the conveyed lands were not part of the Colony of Connecticut, as they were outside of the then-territorial limits of Southampton.  *Id.*

68.    In a document dated September 17, 1666, a group of Shinnecocks made protest against the Topping Purchase, claiming that they were "the true proprietors of the said lands."  *See* Yorke Decl. Ex L, First Book of Records of the Town of Southampton, 169.

69.    The Shinnecock group sought to convey the lands to Southampton, stating that they "do hereby Assigne and make over all our said Interest in the said tract of land . . . wee say wee doe impart and Assigne all or said Interest in ye said lands . . . vnto our ancient and loving ffriends the

11

Townesmen of Southampton, to them & their successors for ever with this provise and consideration . . ." *Id*.

70.     This document reserved no fishing rights.  *Id*.

71.     On October 3, 1666, Governor Nicolls issued a Determination that Southampton was the rightful owner of the lands of the Topping Purchase, stating that "all the right and interest . . . in the said tract of land meadows or beach mentioned in their said deeds is belonging, doth and shall belong unto the towne of Southampton . . ." *Id*. at 172-4.

72.     In a January 22, 1674-5 Resolution, the Royal interest and privilege over the products of drift whales was preserved.  *See* Yorke Decl. Ex M, Documents Relating to the Colonial History of the State of New York, Vol. XIV, 686.

73.     This resolution states:

> The preserving of his Royal Highnesse Interest in a proportion of ye Drift as in ye Law is set forth, the same being taken into Consideracon.  It is resolved, That there be some particular man commissioned to take care of drift whales in ye middle & westernmost part of *Long Island*, who is to be accomptable for his Royall Highnesse dues thereof, according to Law.
>
> That if an Indyan find and give notice of any such drift whales, he shall have such reasonable satisfaccon as hath been usuall.  If a christian shall find any such whale or great fish & secure it, or give due notice to ye person empowered, where by the said Fish may be saved, hee shall be allowed a quartr part for his share.  Provided yt no such whale being found, shall be cut up or embezeled, before notice be given to such Officrs or prsons empowered to take care therein.
>
> That an Order be sent to the Sachems on the Southside of *Long Island*, to be here in the Fort upon ye 9th day of ffebr, next, of which Mr. Nicolls the Secry. is to take care to send to them & give them timely notice.

*Id*.

74.     This resolution does not mention Shinnecock Indians, and it reserves no fishing rights to them.  *Id*.

75.     This resolution preserves the Crown's interest in a proportion of the drift whales discovered, and commissions a person to be noticed, in order to be accountable for the Crown's dues thereof.  *Id.*

76.     In an Order from May 2, 1672, concerning neglect of the Royal share of the drift whales on Long Island, two men were appointed to make inquiry by Indians or others as to drift whales cast up on the beach.  *Id.* at 664.

77.     This Order was for the purposes of "securing his Royal Highness his part of Drift Whales or Great ffish cast upon ye Beach or Shoare according to ye Directions in ye Law . . ."  *Id.*

78.     Another Order, from May 10, 1672, gave Jonathan Cooper warrant to seize the whale-bone from a drift whale carried off his beach lands by several Indians.  *Id.* at 665.

79.     In Orders Relating to Whaling on L.I., from April 19, 1673, inhabitants of Brookhaven and Seatalcott complained that Indians were disturbing their whaling rights, and demanding payment from them.  The Order required that the Indians cease their unlawful actions, and cease molesting the whalers, to whom liberty had been given to use the beach.  *Id.* at 678.

80.     In the historical minutes of the Governor's meeting with Unkechaug Indians on May 23, 1676, the record states:

> At a meeting of the Unchechaug Indyans of Long Island—before the Go: at the Fort.
>
> They give thankes for their peace, and that they may live, eate and sleepe quiet, without feare on the Island, They give some white strung seawant.
>
> They desire they being free borne on the said Island, that they may have leave to have a whale boate with all other materiells to fish and dispose of what they shall take, as to whom they like best.
>
> They complaine that fish being driven upon their beach etc. the English have come and taken them away from them per force.
>
> The Go: Demands if they made complainte of it to the Magistrates in the Townes, who are appointed to redresse any Injuryes.
>
> They say no, but another time will doe it.

13

The Go: will consider of it and give them Answer tomorrow.

*See* Yorke Decl. Ex. N, Documents Relating to the Colonial History of the State of New

York, Vol. XIV, 720; The Andros Papers 373-4.

81.    On May 24, 1676, the Unkechaug Indians returned:

The Indyans come againe to the Governor in presence of The Councell.

What they desire is granted them as to their free liberty of fishing, if they bee not engaged to others; They say they are not engaged.

They are to have an Order to shew for their priviledge.

*Id*.

82.    The Order states:

Resolved and ordered that they are at liberty and may freely whale or fish for or with Christians or by themselves and dispose of their effects as they thinke good according to law and Custome of the Government of which all Magistrates officers or others whom these may concerne are to take notice and suffer the said Indyans so to doe without any manner of let hindrance or molestacion they comporting themselves civilly and as they ought.

*Id*.

83.    These minutes, and the Order of May 24, 1676, concern only Unkechaug Indians,

and do not mention Shinnecocks or reserve any rights to Shinnecocks.  *Id*.

84.    On November 1, 1676, New York's Colonial Governor Edmund Andros, holding

Royal authority, issued a patent, confirming the town of Southampton, and its ownership of the

land in its general present-day boundaries.  *See* Yorke Decl. Ex. O, History of the Town of

Southampton, East of Canoe Place, 279-80.

85.    The Andros Patent confirmed that the Town of Southampton was the owner of all

lands within its boundaries:

Now for a Confirmation unto the present Freeholder, Inhabitants of the said Towne and precincts: Know Yee, That by vertue of his Ma'ties Letters Patents, and the Commission and Authority unto mee given by his Royall Highness I have Ratifyed Confirmed and granted; and by these presents, do hereby Ratifie Confirme and

14

> grant, unto [the Southampton Pantentees], as Patentees, for and on the behalfe of themselves and their Associates, the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes, All the aforementioned Tract of Land, with the Necks and Islands within the said Bounds sett forth and described as aforesaid, Together with all Rivers, Lakes, waters Quarrys Wood land Plaines Meadows, pastures, Marshes, ffishing, Hawking Hunting and ffowling, and all other Proffits, Commodities, Emoluments and hereditaments, to the said Towne . . .

*Id.*

86.     On December 6, 1686, New York's Colonial Governor Thomas Dongan, holding authority from the King of England, issued another Patent to the proprietors of Southampton, which confirmed and reiterated the grants of the Andros Patent "includeing all the necks of Land and Islands wihin the aforesaid described bounds and limitts together with all Rivers Lakes water quarries Woodland plaines meadowess pastures marshes fishing hawking hunting and fowling and all other profitts Comodityes and hereditaments . . ." *Id.* at 281.

87.     The Dongan Patent was made in response to a Southampton Freeholder's application that Governor Dongan "confirm unto ye ffreeholders of said Town in a more full & ample manner all the abovecited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the Indyans and the ffreeholders of the said towne of Southampton . . ." *Id.* at 282.

88.     The Dongan Patent recited that the Governor had:

> examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid . . .

*Id.* at 282-3.

89.     The Dongan Patent granted, ratified and conveyed to the Freeholders and Inhabitants of Southampton, the "Rivers Rivolets waters lakes ponds Brookes streames beaches . . . Creeks harbors . . . and Easements fishing hawking hunting and fowling . . ." *Id.* at 283.

**Plaintiffs' Supplemental Filings**

90.     In objection to Judge Locke's R&R, Plaintiffs Attached a Federal Bureau of Indian Affairs Document prepared in response to the tribal petition for acknowledgment.  D.E. 64, Ex. 1.

91.     In their arguments against the R&R, Plaintiffs argued that "The Report fails to acknowledge the significant, historic and contemporary exertion of regulatory and jurisdictional powers of the Shinnecock Indian Nation over the same contested waterways," and argued regarding "the Shinnecock Indian Nation's use and regulatory authority in the PF and over the contested waters . . ."  D.E. 64 at 7.

92.     The Plaintiffs further argued that "when the United States recognized the Shinnecock Indian Nation as an Indian Tribe, it also acknowledged its water resource jurisdiction and usage.  Secondly, it proves that even when the Shinnecock Indian Nation has absolute and uncontested control of a resource, it shares it with non-Indian neighbors thereby emphatically disproving the notion that the Plaintiffs have unstated or implied intentions of exclusion of others." D.E. 64 at 9.

93.     Subsequent to Judge Locke's R&R, Plaintiffs filed several additional Documents, including an "Additional Report" of John A. Strong, dated November 3, 2018.  *See* D.E. 73-2.

94.      Professor Strong's report stated that he believed Silva was fishing within Shinnecock Reservation waters.  *Id*. at 1.

95.     In the report, Strong claims that the boundaries of the Shinnecock Reservation are unknown, and that the "water boundaries around the Shinnecock Neck have never been officially established."  *Id*. at 1, 2.

96.     Strong stated that "all of the area on the eastern half of Shinnecock Bay around Shinnecock Neck have traditionally been considered Shinnecock waters."  *Id*. at 2.

97.    Strong claimed that "David Silva was fishing in a stream . . . well within Shinnecock jurisdiction." *Id*. at 4.


Dated:  Mineola, New York
         October 4, 2019

                                            Letitia James
                                            Attorney General of the State of New York
                                            Attorney for State Defendants

                                            By:   /s/ Richard Yorke
                                                    Richard Hunter Yorke
                                            Assistant Attorney General
                                            200 Old Country Road - Suite 240
                                            Mineola, New York 11501
                                            (516) 248-3302


To:    Scott Michael Moore, Esq.
       Moore International Law PLLC
       45 Rockefeller Plaza, 20th Floor
       New York, New York 10111
       smm@milopc.com

       Brian C. Mitchell, Esq.
       Suffolk County Attorney
       H. Lee Dennison Building
       100 Veterans Memorial Hwy.
       P.O. Box 6100
       Hauppauge, NY 11788
       brian.mitchell@suffolkcountyny.gov