# Exhibit A

JUSTICE COURT: TOWN OF SOUTHAMPTON
COUNTY OF SUFFOLK: STATE OF NEW YORK

2017 OCT 12  PM 1  44

PEOPLE OF THE STATE OF NEW YORK,

    -against-

DAVID T. SILVA,

           Defendant.

Case No.: 17-7008

Hon. Gary J. Weber, T.J.

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law in

Support of Defendant's Motion to Dismiss, and all the pleadings and proceedings herein,

Defendant, David T. Silva, by and through his undersigned counsel, will move this Court for an

order of dismissal pursuant to NY CPL 170.30, at the Southampton Town Justice Court, 32

Jackson Avenue, Hampton Bays, New York, before the Honorable Gary J. Weber, Town Justice,

on the 27th of November, 2017. at 1:00 p.m., or as soon thereafter as Counsel may be heard.

PLEASE TAKE FURTHER NOTICE that, pursuant to NY CPLR § R2214 (2012), the

People's opposition papers, if any, shall be served on Defendant at least eight days prior to the

hearing date.

Dated: October 10, 2017
New York, New York

MOORE INTERNATIONAL LAW PLLC

By:

Scott M. Moore, Esq.
Rockefeller Center
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
(212) 332-3474
(smm@milopc.com)
*Attorneys for Defendant, David T. Silva*

To:    ADA Jamie Greenwood
       Office of the Suffolk County District Attorney's Office
       32 Jackson Avenue
       Hampton Bays, NY 11946

2

JUSTICE COURT: TOWN OF SOUTHAMPTON
COUNTY OF SUFFOLK: STATE OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK,

    -against-

DAVID T. SILVA,

             Defendant.

Case No.: 17-7008

Hon. Gary J. Weber, T.J.

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

## PRELIMINARY STATEMENT

The Defendant, David T. Silva, respectfully moves this Honorable Court, pursuant to NY CPL 170.30, to dismiss all charges against him on the basis of lack of jurisdiction. The following three provisions apply: 170.30 (c) "The prosecution is barred by reason of a previous prosecution, pursuant to section 40.20," (f) "There exists some other jurisdictional or legal impediment to conviction of the defendant for the offense charged," and (g) "Dismissal is required in furtherance of justice, within the meaning of section 170.40."

This is not the first time Environmental Conservation Officers have unsuccessfully attempted to prosecute Shinnecock fishing in Shinnecock Reservation waters, losing each time.

## STATEMENT OF FACTS

Defendant, David T. Silva, ("Defendant" or "Silva"), is a member of the Shinnecock Indian Nation, a state and federally recognized Tribe, ("the Shinnecock Nation"), and resides on the Shinnecock Indian Reservation, ("the Shinnecock Reservation"). (See, Enrollment Document, annexed hereto as Exhibit 1)

The Shinnecock Nation fished in the oceans, and, in what today is known as Shinnecock Bay, for time immemorial. This is reflected in Shinnecock ancestors, for example, retaining

rights to free trade under the 1664 Fort Albany Treaty, also known as, Articles between Col. Cartwright and the New York Indians, *Documents Related to the Colonial History of the State of New York*, v. III, pp. 67-68, and retaining the right to fish in ceded territory under the 1659 Wyandanch Deed, *Records of the Town of Southampton*, v. I, p. 162, annexed hereto as Exhibits 2 and 3, respectively.

On April 20, 2017, Silva was stopped by two New York Environmental Conservation Officers, Evan Laczi, ("Laczi"), and Brian Farrish, ("Farrish"), while Silva was fishing for eels in Shinnecock Bay. Specifically, Silva's eel net was set in the headwaters of Halsey Creek, ("Taylor's Creek" the larger body of water, in the charging instruments), which flows East to Halsey Neck Pond, on the Eastern side of Shinnecock Bay. Silva's eels, net, and other fishing equipment were seized, and Silva was issued an appearance ticket alleging possession of undersized eels in violation of New York State law, 6 NYCRR 40-1(b)(ii). Silva was later charged with two additional offenses, ECL 13-0355 (no fish license), and 6 NYCRR 40-1(b)(iii) (possession of eels over limit).

In response to a discovery request by the Defendant, the People disclosed a Suffolk County Geographical Information Systems map, ("the GIS map"), which was apparently accessed and printed through a Suffolk County website, annexed hereto as Exhibit 4.

This is not the first time one of the ECOs involved, Farrish, tried to use a map in prosecuting Shinnecock fishing. See, People's Exhibit 1 (map), the trial transcript, and the Decision by the Hon. Deborah Kooperstein, dated January 28, 2009, from *People of the State of New York v. Salvatore J. Ruggiero*, Case No. 08-101350, Southampton Town Justice Court, annexed hereto as Exhibits 5, 6, and 7, respectively.[1]

---

[1] This Court ordered release of the entire record in the *Ruggiero* case. See Order, dated August 11, 2017.

2

Judge Kooperstein found that the People failed to prove jurisdiction beyond a reasonable

doubt at the *Ruggiero* trial. (Decision, p. 3)

> There were several discrepancies in the testimony presented by the
> People's witnesses regarding the water boundaries of the Shinnecock Reservation.
> The New York State Environmental Police are empowered to enforce fishing
> rules and regulations and their failure to have clarity with regard to the exact
> boundaries constituting tribal fishing territory cannot be ignored. In order to find
> this defendant guilty, the People were required to prove beyond a reasonable
> doubt that the illegal fishing occurred within the jurisdiction of the State of New
> York. The defendant succeeded in creating doubt that this defendant was fishing
> outside the boundary of the Shinnecock Reservation. It is the opinion of the Court
> that such a doubt created a presumption, not rebutted by the prosecution, that the
> laws of the State of New York may not be enforced. The Court of Appeals in
> *Mulkins v. Snow* stated "..no law runs on an Indian Reservation save the Indian
> Tribal Law and custom." *Mulkins v. Snow*, 232 N.Y. 47, 133 N.E. 123 (1921).
>
> Therefore, based on the testimony heard and the evidence submitted, the
> Court rules as follows. The People have failed to prove their case by the requisite
> standard of proof, beyond a reasonable doubt. The Court finds the defendant not
> guilty of violation Sections 40.1b1ii, 40.1b1i, and 40.b1i of the Environmental
> Conservation Law.

ECO Farrish testified at the *Ruggiero* trial on the jurisdiction element of those ECL

charges, and testified he created the map introduced in *Ruggiero* as People's Exhibit 1. (Trial

transcript, (T), Brian Farrish, December 1, 2008, p. 17, lns. 17-19). Farrish also testified that the

vessel in *Ruggiero* was located in Shinnecock Bay. (T, p. 18, lns. 12-19)

Q.     Officer Farrish the coordinates that you listed, what are those coordinates?

A.     These coordinates are the latitude and longitude of the vessel when we

arrived on scene.

Q.     And what body of water does that latitude and longitude occur in?

A.     Shinnecock Bay.

On cross-examination, Farrish admitted he was trained that the Shinnecock Reservation

"is off limits" and admitted he was not sure how far the reservation boundaries extended into the

surrounding waters. (T, p. 20, lns 23-25)

3

Q.     So is it fair to say that you're not sure?

A.     Yes.

Also in other cases, charges initiated by some of these same Environmental Conservation

Officers, including Farrish, involving Shinnecock fishing have consistently been dismissed. See

disposition records in *People v Gerrod T. Smith*, Case No. 08-101351, *People v. Jonathan K.*

*Smith*, Case No. 09-031419, *People v. Jonathan K. Smith*, cv-09-0571 (NYED), annexed hereto

as Exhibits 8, 9, and 10.

## **ARGUMENT**

The charging statute, 6 NYCRR 40-1(b) provides in pertinent part:

General provisions.

(1) It is unlawful for any person to take or possess <u>on the waters of the marine and
coastal district, as defined in Environmental Conservation Law (ECL) section 13-
0103, or the shores thereof, or anywhere inland from such shores in the Counties
of Suffolk,</u> Nassau, Queens, Kings, Richmond, New York, Bronx, and those
portions of Westchester County within the marine and coastal district bordering
on Long Island Sound, fish of the species listed in Table A, B or C:

...

(ii) of a size less than that specified for such species or outside of any slot size
limit specified for such species;

(iii) in excess of the possession limit or trip limit specified for such species,
except that where a weekly limit or biweekly limit is specifically authorized by
the department pursuant to subdivision (i) of this section, such fish shall not be
taken or possessed in excess of the weekly limit or biweekly limit specified for
such species;
[emphasis added]

...

The other charging statute, ECL 13-0355, provides, in pertinent part:

(1) Definitions of registrations; privileges.  A recreational marine fishing
registration entitles the holder who is sixteen years of age or older to take fish
<u>from the waters of the marine and coastal district</u> and to take migratory fish of the
sea <u>from all waters of the state</u>, except as provided in sections 13-0333 and 13-
0335 of this title.  A recreational marine fishing registration is effective for one
year from the date it was issued.

4

[emphasis added]

The above jurisdictional language restricts the People's jurisdiction to state and county waters.

The law provides for a presumption of unabrogated Indian fishing rights

We start with the legal doctrine of retained treaty rights. *U.S. v. Winans*, 198 U.S. 371, 381 (1905) ("the treaty was not a grant of rights to the Indians, but a grant of right from them -- a reservation of those not granted."). Treaties and laws must be construed in favor of Indians, and the Supremacy Clause precludes application of state game laws to a tribe on ceded territory. *Antoine v. Washington*, 420 U.S. 194, 199 (1975)("The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice."). Indians' historical hunting and fishing rights are kept absent an express abrogation of such rights by Congress. *Menominee Tribe of Indians v. U.S.*, 391 U.S. 404, 412 (1968)("We decline to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians.")

As Justice Kooperstein stated in *Ruggerio*,

> "The Court of Appeals in *Mulkins v. Snow* stated "..no law runs on an Indian Reservation save the Indian Tribal Law and custom." *Mulkins v. Snow*, 232 N.Y. 47, 133 N.E. 123 (1921)."
> *Ruggerio* Decision, at 3.

In the instant case, there has been no abrogation of Shinnecock fishing rights.

The Shinnecock have a free trade treaty right, and retained fishing rights on ceded territory

Article 3 of the 1664 Fort Albany Treaty provides:

> That they may have free trade, as formerly. [emphasis added]

As such, the Shinnecock have a treaty based right to free trade.

5

The 1659 Wyandanch Deed contains the following explicit language reserving fishing

rights, when territory was ceded on the behalf of the Shinnecock:

> And it is also agreed that we shall keepe our privilege of fishing, fowling, or
> gathering of berries or any other thing for our use, and for the full and firme
> confirmation hereof we have both parties set too our hands markes and seals
> interchangeably The date and year above written
> [emphasis added]

The GIS map disclosed by the People shows that Silva was ticketed for fishing in the

traditional Shinnecock fishing grounds of the Shinnecock Bay estuary, an area of retained fishing

rights, whether or not outside Shinnecock Reservation waters.

The People's GIS map shows the People are re-litigating an old issue of Shinnecock Reservation
jurisdiction, and Collateral Estoppel bars re-prosecution.

The GIS map disclosed by the People shows the People, and ECO Farrish in particular,

are merely attempting to re-prosecute an issue of Shinnecock Reservation jurisdiction they

already lost, and re-prosecution is barred by Collateral Estoppel. "Application of the principle

inevitably has two phases. The first is to determine what the first judgment determined, a process

in which, as the *Sealfon* case makes plain, the court must look not simply to the pleadings but to

the record in the prior trial. The second is to examine how that determination bears on the second

case." *United States v. Kramer*, 289 F.2d 909 (2d Cir. 1961). See also, *People v. O'Toole*, 2013

NY Slip Op 08193, December 10, 2013 (NY Court of Appeals) ("This case is controlled by our

holding in *People v Acevedo* (69 NY2d 478, 480 [1987]) that "the doctrine of collateral estoppel

can be applied to issues of 'evidentiary' fact." As we explained in Acevedo, in the analysis of

collateral estoppel issues, facts essential to the second judgment are considered "ultimate" facts;

other facts are only "evidentiary" (id. at 480 n 1). Under Acevedo, when an issue of evidentiary

fact has been resolved in a defendant's favor by a jury, the People may not, at a later trial, present

evidence that contradicts the first jury's finding.")

6

In *Ruggiero*, a judgment of dismissal issued from this Court, which determined that, through the People's own conflicting testimony, including that of ECO Farrish, the People failed to prove the element of jurisdiction - specifically the People failed to prove beyond a reasonable doubt the boundary line of the Shinnecock Reservation waters. Now, 9 years later, ECO Farrish wants a "second bite of the apple," but re-litigating the same issue is barred by collateral estoppel. The present Defendant is not the same defendant in *Ruggiero*, however the non-Indian defendant in *Ruggiero* was fishing with a Shinnecock Indian on board the vessel in Shinnecock Bay whose tickets were dismissed.

## CONCLUSION

The law and facts show the People lack jurisdiction to bring fishing charges against the Defendant and other Shinnecock Indians for fishing in Shinnecock Reservation waters of Shinnecock Bay. Yet, the People, and ECO Farrish, continue to do so, burdening the courts, and now this Defendant.

## RELIEF REQUESTED

The Defendant, David T. Silva, respectfully requests this Honorable Court to dismiss all charges against him.

Dated: October 10, 2017
New York, New York

MOORE INTERNATIONAL LAW PLLC

By:

Scott M. Moore. Esq.
Rockefeller Center
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
(212) 332-3474
(smm@milopc.com)
*Attorneys for Defendant, David T. Silva*

7

# DEFENDANT'S

# EXHIBIT 1



**SHINNECOCK INDIAN NATION**
Shinnecock Indian Reservation
P.O. Box 5006
Southampton, New York 11969-5006
Phone (631) 283-6143 Fax (631) 283-0751

**Tribal Trustees**
*Frederick C. Bess, Chairman*
*Lance A. Gumbs*
*Gordell Wright*

May 13, 2008

### TRIBAL VERIFICATION

To Whom It May Concern:

This letter is to verify that **David Taobi Silva** is a member of the **SHINNECOCK INDIAN TRIBE of NEW YORK STATE.**

This letter is to be used solely for educational purposes.

Sincerely,

Frederick C. Bess

Lance A. Gumbs

Gordell Wright

# DEFENDANT'S

# EXHIBIT 2

LONDON DOCUMENTS : I.                              67

*Col. Nicolls to the Governor and Council of Boston.*

[ New England, I. 264. ]

To the Govern[r] and Councill of Boston.

Gentlemen.

I have herewith sent yow a copy of a Comission from the L[ds] Commissioners of Prizes wherein I am empowered as one of the Sub-Comissioners for New England whilst His Ma[ty] shall be in hostility with the Dutch. In prosecution of the trust reposed in mee as Sub-Comissioner I am oblig'd to give yow advertisement hereof, and that yow will please to give strict order in all your ports from time to time that seizure be made of all and every Dutch ship vessell or goods belonging to the States of the United Provinces of the Netherlands their subjects or inhabitants within any of their dominions, as also if any prizes shall be brought into any of your ports by any persons comissionated thereunto by his R. H[s] the Duke of Yorke, that yow will please to cause the same to be preserv'd entire without imbezlement, with all their papers, bills of lading or other writinges, untill such a legall prosecution can be made as is directed by His Ma[ties] authority to the L[ds] Comissioners, and given at large in their L[ps] instructions to mee and Capt. Philip Carteret, as Sub-Comissioners in N. England ; wherein your assistance and concurrence is requisite for His Ma[ties] service, as also that some able and fitting persons be chosen in your Colony to sitt as a Court of Admiralty when occasion presents. Be pleased also to remitt unto me Yo[r] proceedings herein, according to the resolutions yow shall take ; and if in this or any other quality I can render myselfe serviceable to yourselves you may comand mee as

[ About July, ] 1664.                          Yo[r] aff[te] humble Servant

R. NICOLLS.

*Articles between Col. Cartwright and the New York Indians.*

[ New England, I. 207. ]

ARTICLES made and agreed upon the 24th day of September 1664 in Fort Albany between Ohgehando, Shanarage, Soachoenighta, Sachamackas of y[e] Maques; Anaweed Conkeeherat Tewasserany, Aschenoondah, Sacharoakaa of the Synicks, on the one part; and Colonell George Cartwright, in the behalf of Colonell Nicolls Governour under his Royall Highnesse the Duke of Yorke of all his territoryes in America, on the other part, as followeth, viz[t] —

1 Imprimis. It is agreed that the Indian Princes above named and their subjects, shall have all such wares and commodities from the English for the future, as heretofore they had from the Dutch.

2. That if any English Dutch or Indian (under the proteccon of the English) do any wrong injury or violence to any of y[e] said Princes or their subjects in any sort whatever, if they complaine to the Governo[r] at NewYorke, or to the Officer in Cheife at Albany, if the person so offending can be discovered, that person shall receive condigne punishm[t] and all due satisfaccon shall be given; and the like shall be done for all other English Plantations.

3. That if any Indian belonging to any of the Sachims aforesaid do any wrong injury or damage to the English, Dutch, or Indians under the protection of the English, if complaint be

made to y⁰ Sachims and the person be discovered who did the injury, then the person so offending shall be punished and all just satisfaccôn shall be given to any of His Ma^tie subjects in any Colony or other English Plantacôn in America.

4. The Indians at Wamping and Espachomy and all below the Manhatans, as also all those that have submitted themselves under the proteccôn of His Ma^tie are included in these Articles of Agreement and Peace ;

In confirmacôn whereof the partyes above mencônèd have hereunto sett their hands the day and yeare above written

GEORGE CARTWRIGHT

In the presence of



T. Willett
John Manning
Tho. Breedon
Dan. Broadhead

{ Smith John
{ his marke

{ Stephen an Indian
{ his marke

These Articles following wer likewise proposed by the same Indian Princes & consented to by Colonell Cartwright in behalfe of Colonell Nicolls the 25ᵗʰ day of September 1664.

1 That the English do not assist the three Nations of the Ondiakes Pinnekooks and Pacamtekookes, who murdered one of the Princes of the Maques, when he brought ransomes & presents to them upon a treaty of peace.

2. That the English do make peace for the Indian Princes, with the Nations down the River.

3. That they may have free trade, as formerly.

4. That they may be lodged in houses, as formerly.

5. That if they be beaten by the three Nations above mencônèd, they may receive accommodacôn from y⁰ English.

---

## Col. Nicolls to the Secretary of State.

[ State Paper Office, Trade Papers. XVI. 42. ]

Fort James in New Yorke

this      day of October 1664.

Right Hon^ble

Since my last by Capt. Hill and Capt. Groves here is arrived Capt. Hyde, to whose more ample relation of the reducing Delaware Bay, I must referre my selfe.  My instructions to Sir Rob^t Carr tooke the effect which was design'd, for by a distinct treaty and agreement with the

# DEFENDANT'S

# EXHIBIT 3

162          RECORDS: TOWN OF SOUTHAMPTON

### Wyandanch's Deed to Iohn Ogden

May 12 1658 Be it knowne unto all men that by this present writing that I Wiandance Sachem of Paumanwche on Long Island have vpon deliberate consideration, and with my sonne Weeayacomboune, both of us together, given and granted vnto Mr Iohn Ogden and his heirs for ever, I say freely given a certain tract of land, beginning at the westward end of Southampton bounds, which land is bounded, eastward with Southampton bounds, and with a small piece of meadow which I gave to Mr Iohn Gosmer, which he is to enjoy, Northward to the water of the bay and to the creek of Accabouckc, Westward to the place called Pehecannache, and Southerly to Potunckc, three miles landward in from the high water marke, and creeke of accaboucke, and soe to the west, But from this three miles bredth of land southward all the land and meadows towards the south sea, the beach only excepted which is sold to Iohn Cooper, I say all the lands and meadows I have sold for a considerable price unto Mr. Iohn Ogden for himself his heirs executors and assigns for ever upon coditions as followeth, first that Thomas Halsey and his associates shall have the privilege of the place of meadow called quaquanantuck, the 'term of years formerly granted to him or them, but the land lying betweene quaquanantuck and three miles, northward he shall or may possess and improve at present, but when the years of the aforesaid Thomas Halsey shall be expired, then shall the aforesaid Mr Iohn Ogden or his assigns fully possess and improve all quaquanantuck meadow with the rest aforesaid, and then shall pay or cause to be paid unto me Wyandance my heirs and assignes the summe of twenty-five shillings a yeare as a yearly acknowledgement or rent for ever, And it is also agreed that we shall keepe our privilege of fishing, fowling, or gathering of berries or any other thing for our use, and for the full and firme confirmation hereof we have both parties set too our hands markes and seals interchangably The date and year above written

IOHN OGDEN [L. S.[

In the presence of us

DAVID GARDINER

LION GARDINER

Records of the
Town of Southampton,
I, p. 162

# DEFENDANT'S

# EXHIBIT 4



GIS Viewer

Suffolk County, NY

Find address or place

| Tax Map Number | 09040250001000005000 |
| --- | --- |
| FIRST NAME | |
| LAST NAME | DIAMOND A HOLDINGS LTD |
| TAX MAP NUMBER | 09040250001000005000 |
| ADDR NUMBER | 450 |
| STREET | MEADOW |
| STREET TYPE | LN |
| STREET DIR | |
| CITY | SOUTHAMPTON |
| ZIP CODE | 11968 |
| ACRE | 3.47 |

# DEFENDANT'S

# EXHIBIT 5



# DEFENDANT'S

# EXHIBIT 6

1

```
1    STATE OF NEW YORK: TOWN OF SOUTHAMPTON
     SOUTHAMPTON JUSTICE COURT
2    --------------------------------------------- X

3    In the Matter of:

4    THE PEOPLE OF THE STATE OF NEW YORK,

5                     Plaintiff.

6                            Index No. 08-101350

7

8            -against-

9

10   SALVATORE J. RUGGIERO,

11                   Defendant.

12   --------------------------------------------- X

13

14                          December 1, 2008

15                          116 Hampton Road,
                            Southampton, New York
16

17

18

19

20   B E F O R E: Honorable Deborah Kooperstein

21

22

23

24

25
```

PEOPLE -VS- S. RUGGIERO                    2

```
1

2                    A P P E A R A N C E S

3

4

5

     SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE
6         Attorneys for the People

7         32 Jackson Avenue
          Hampton Bays, New York 11946
8
          BY: KIMBERLY SHALVEY, ESQ.
9

10

11   SALVATORE RUGGIERO, Defendant, Pro Se

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PEOPLE -VS- S. RUGGIERO                14

1              B R I A N   F A R R I S H, the

2              Witness herein, having first been

3              duly sworn by a Court Officer of the

4              State of New York, was examined and

5              testified as follows:

6    BY OFFICER CARTER:

7        Q.  Please state your name, rank, and

8    affiliation for the court reporter.

9        A.  New York State Environmental Conservation

10   Officer Bryan Farrish, 512.  ECO.

11              THE COURT:  You are under oath.

12              You may question the witness.

13              MS. SHALVEY:  Thank you.

14   DIRECT EXAMINATION

15   BY MS. SHALVEY:

16       Q.  Officer Farrish, by whom are you currently

17   employed?

18       A.  New York State DEC.

19       Q.  And for how long have you been employed by

20   the DEC?

21       A.  Approximately, four years.

22       Q.  What training do you have that enables you

23   to perform your duties as a DEC officer?

24       A.  Six month academy.

25       Q.  Now do you empower to enforce the New York

1    State Environmental Conservation Law?

2        A.  Yes, I do.

3        Q.  Directing your attention to October 5th of

4    2008, were you working on that date?

5        A.  Yes, I was.

6        Q.  What tour were you working?

7        A.  I believe I started at 9 o'clock.

8        Q.  And what area were you assigned to?

9        A.  I am assigned to Nassau and Suffolk

10   Counties.  Marine Unit.

11       Q.  And where is the Marine Unit based out

12   of?

13       A.  Our Headquarter's in located at 205 North

14   Belle Meade Road, East Setauket.

15       Q.  And if you recall, directing your attention

16   to approximately 11:00 that morning, where were

17   you?

18       A.  At 11:30 in the morning, I was working the

19   Coast Guard vessels.  I received a call from

20   dispatch saying that there were violations in

21   progress in Shinnecock Bay and to respond to

22   the United States Coast Guard Station in

23   Shinnecock.

24       Q.  And is Shinnecock Bay one of the waterways

25   that you have jurisdiction over?

PEOPLE -VS- S. RUGGIERO                    16

1      A.  Yes.

2      Q.  Did there come a time when you responded to

3  that vessel in the water?

4      A.  Yes, there was.

5      Q.  What vessel was that?

6      A.  When we arrived at the Coast Guard Station,

7  we were underway.  Approximately 10:58 hours and

8  we arrived to the disabled vessel which was

9  anchored up at approximately 11:05.

10      Q.  And did you recall how many people were on

11  that vessel?

12      A.  There were approximately two persons on

13  board.

14      Q.  Did there come a time when you identified

15  those people?

16      A.  Yes.

17      Q.  And who were they identified to be?

18      A.  Two individuals.  One was Salvatore

19  Ruggiero and the other one was Mr. Jared

20  Smith.

21      Q.  And where were these vessels located?

22      A.  Their vessel was located approximately 1.77

23  miles northeast of Shinnecock Inlet and

24  approximately 4,000 feet from Heady Creek.

25              MS. SHALVEY:  Your Honor, may I

PEOPLE -VS- S. RUGGIERO                    17

```
1            have this one page document marked
2            for identification?
3                THE COURT:  You may.
4                (Whereupon, a document, marked as
5            People's Exhibit 1 for
6            identification purposes only.)
7       Q.  Officer Farrish, if you could just look at
8    what I handed you and look up when you're done?
9       A.  (Witness complies.)
10      Q.  Do you recognize that document?
11      A.  Yes.
12      Q.  And what is it?
13      A.  This is the document of the coordinates of
14   the vessel in which I received from the Coast
15   Guard when we arrived on scene, the latitude and
16   longitude.
17      Q.  Who created that actual document?
18      A.  I created this document on our Lornet
19   (phonetic) system on our computers.
20      Q.  And is that system used within the regular
21   course of business as a DEC officer?
22      A.  Yes.
23      Q.  And is the piece of paper in front of you
24   the same or substantially the same condition as
25   when you created that document?
```

PEOPLE -VS- S. RUGGIERO                    18

1    A.   Yes.

2              MS. SHALVEY:  Your Honor, at this

3         time, I would ask to have that map

4         moved into evidence.

5              THE COURT:  Show it to the

6         defendant.

7              Any objections?

8              MR. RUGGIERO:  No objections.

9              (Whereupon, People's Exhibit 1,

10        document, was entered into evidence

11        at this time.)

12   Q.   Officer Farrish the coordinates that you

13   listed, what are those coordinates?

14   A.   These coordinates are the latitude and

15   longitude of the vessel when we arrived on

16   scene.

17   Q.   And what body of water does that latitude

18   and longitude occur in?

19   A.   Shinnecock Bay.

20   Q.   And where in relation to Shinnecock

21   Reservation property is that coordinates?

22   A.   Approximately, 4,028 feet from the entrance

23   off Heady Creek.

24   Q.   And to the best of your knowledge,

25   where does Shinnecock Native American property

1    end?

2       A.  To the best of my knowledge it ends on the

3    land itself.  I know they have -- they split the

4    creek.  Heady Creek right down the middle.  So on

5    one side.

6       Q.  And when you approached this vessel, was he

7    near Heady Creek?

8       A.  No, he was not.

9       Q.  Was he any where near Native American

10   Property?

11      A.  No.

12      Q.  Did there come a time when you issued

13   summons to any person on that vessel?

14      A.  Yes, we did.

15      Q.  And who did you specifically issue --

16      A.  I specifically issued summons -- three

17   summons to Jared Smith.

18      Q.  And to your knowledge, was anyone issued to

19   the defendant, as well.

20      A.  Yes.  He was written three as well.

21          MS. SHALVEY:  Okay.  I have no

22      further questions.

23          THE COURT:  Cross Examination?

24          MR. RUGGIERO:  Yes.

25   CROSS EXAMINATION

1    BY MR. RUGGIERO:

2        Q.  Do you consider yourself -- let me retract

3    that.

4            In all your training as a DEC officer, how

5    much of it is dedicated to Native American rights

6    within the DEC law?

7        A.  In the academy we are trained, basically

8    anything with the fish and wild life on the

9    reservation itself is -- is pretty much off

10   limits to us.  They can do whatever they want.

11   They have the right to do whatever they want.

12       Q.  Okay.  To the best of your knowledge, is

13   there any concrete law in the books that you as

14   DEC agent has to follow that states that the

15   reservation and where the water begins, does it

16   end there?

17       A.  Not what -- yes, that is what I believe.

18       Q.  Is it law?

19       A.  In the law it briefly states anything on

20   the reservation.

21       Q.  So is it fair to say that you're not

22   sure?

23       A.  Yes.

24            MR. RUGGIERO:  No more

25            questions.

PEOPLE -VS- S. RUGGIERO                21

1          THE COURT:  Okay.

2          MS. SHALVEY:  Just one more, Your

3     Honor.

4  REDIRECT EXAMINATION

5  BY MS. SHALVEY:

6     Q.  Officer Farrish, what law and rule applies

7  to Native Americans off the reservation with

8  regards --

9     A.  With regards off the reservation,

10  everything ECL and any additional wildlife

11  law.

12          MS. SHALVEY:  No further

13     questions.

14          THE COURT:  You may step down.

15          Any other witnesses?

16          MS. SHALVEY:  One further

17     officer, Officer Snowden.

18          THE COURT:  Okay.  We are going

19     to take a short recess.

20          (Whereupon, a short recess was

21     taken at this time to conduct

22     arraignments.)

23          THE COURT:  Call the officer.

24

25

PEOPLE -VS- S. RUGGIERO                    40

1

2                    INDEX TO TESTIMONY

3

4         Witness                          Page

5

6   Lt. Joseph Vollado

7

8   By Mr. Shalvey                         4/20

9   By Mr. Ruggiero                        11/2

10

11  Officer Brian Farrish

12

13  By Mr. Shalvey                         14/16

14                                         21/6

15  By Mr. Ruggiero                        20/2

16

17  Officer Eoin Snowden

18

19  By Mr. Shalvey                         22/17

20                                         29/8

21  By Mr. Ruggiero                        27/21

22

23

24

25

PEOPLE -VS- S. RUGGIERO                    41

1

2    Salvatore Ruggiero

3

4    By Mr. Ruggiero                    32/17

5    By Mr. Shalvey                     34/7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PEOPLE -VS- S. RUGGIERO                    42

1

2              C E R T I F I C A T I O N

3

4         I, Jessica DiLallo, a Notary Public for

5    and within the State of New York, do hereby

6    certify:

7         THAT, the witness(es) whose testimony is

8    herein before set forth, was duly sworn by me,

9    and,

10        THAT, the within transcript is a true

11   record of the testimony given by said

12   witness(es).

13        I further certify that I am not related

14   either by blood or marriage to any of the

15   parties to this action; and that I am in no

16   way interested in the outcome of this matter.

17

18        IN WITNESS WHEREOF, I have hereunto set my

19   hand this day, June 30, 2017.

20

21   _____

22   (Jessica DiLallo)

23

24            *          *          *          *

25

# DEFENDANT'S

# EXHIBIT 7

JUSTICE COURT: TOWN OF SOUTHAMPTON
COUNTY OF SUFFOLK: STATE OF NEW YORK
------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK                 :
                                                :
            -against-                           :        Docket No. 08-101350
                                                :
                                                :        DECISION
SALVATORE J. RUGGIERO                            :
                                                :
                    Defendant                   :
------------------------------------------X

        Defendant is charged with violating the following Sections of
the Environmental Conservation Law of the State of New York (ECL)
Section 40.1b1ii, Possessing undersize blackfish; Section 40.1b1i,
Possessing undersized flounder; and  Section 40.1b1i, Possessing
undersized porgy. The case was tried before the bench; the
defendant represented himself.

        The trial consisted of testimony from the arresting
officer, two other officers who were present and the defendant.

        The People's first witness was Lieutenant Joe Bilotto
employed by the New York State Environmental Police for twenty-
three years and the Supervisor of marine enforcement for Long
Island. His testimony is as follows: On October 6, 2008, he was
working  the 8 AM to 4 PM shift on a Coast Guard boat when he
received a call from Salvatore Ruggiero stating he had illegal
fish, needed assistance and wanted to be arrested. He arrived at
the vessel and both the defendant and Gerrod Smith were on board.
They admitted having illegal fish on board and they showed him the
catch. The fluke season ended on September 1; the scup season
ended September 26; and the two blackfish on board were too small.
He stated that Heady Creek is exempt and outside his jurisdiction
because it's considered tribal land. He didn't issue the tickets,
Officer Snowden issued the defendant these tickets. Under cross-
examination, he said he remembered being asked by the defendant
what the boundaries of the Shinnecock Reservation were. He thinks
State waters go out three miles.

        An arresting officer, Officer Brian Farrish of the New York
State Environmental Police, testified that he has been employed by
this New York State agency for four years. He further testified
that on October 6, 2008, he was on a vessel responding to a call.

Docket No. 08-101350

He observed the defendant and Gerrod Smith on board. Their vessel was approximately 1.77 miles northeast of Shinnecock Inlet and 4,000 feet from Heady Creek. The People entered a map of the coordinates into evidence to support this testimony (People's Exhibit 1). He issued three summonses to Gerrod Smith

Under cross-examination, Officer Farrish testified that he had been trained at the Academy that the Shinnecock Reservation is off limits to them. He also testified that he thinks this particular law, these ECL Sections, pertains to the Reservation.

The arresting officer, Officer Snowden, testified as follows: He has been employed by the New York State Environmental Police for five years and is assigned to Monroe County. On October 6, 2007 he was assigned to Long Island. He received a complaint while he was at the Shinnecock Inlet that there were people with undersize fish. He boarded a vessel which had two passengers, defendant was one of them. He saw a basket filled with fish-summer flounder, fluke, porgies and black fish. Summer flounder season ended September 1; porgie season ended September 26; the two blackfish were undersized, under the minimum which is 14 inches.

Under cross-examination, he said he didn't recall who owned the vessel and wasn't sure if the defendant had caught all the fish. On re-direct, he stated that the summonses were written to both passengers because both are considered to be in possession under the theory of "community possession."

The defendant, Salvatore Ruggiero, testified as follows: He said he did nothing wrong, that he was a guest of Gerrod Smith, a friend and a Native American, who took him fishing. He also said the fish were not in his possession, they belonged to Gerrod Smith. He also stated that he believes it's unclear where Native Americans can fish during this trial in his questioning of the two Officers.

Under cross-examination, he said that he went fishing with Gerrod Smith because he was under the impression that they were in Trbal territory

In this criminal matter, as in all criminal trials, the people must sustain the burden of proof pursuant to the mandate of Criminal Procedure Law (CPL) Section 70.20 which states:

Docket No. 08-101350

"No conviction of an offense by verdict is valid unless based Upon trial evidence which is legally sufficient and which Establishes beyond a reasonable doubt every element of such offense and the defendant's commission thereof."

There were several discrepancies in the testimony presented by the People's witnesses regarding the water boundaries of the Shinnecock Reservation. The New York State Environmental Police are empowered to enforce fishing rules and regulations and their failure to have clarity with regard to the exact boundaries constituting tribal fishing territory cannot be ignored. In order to find this defendant guilty, the People were required to prove beyond a reasonable doubt that the illegal fishing occurred within the jurisdiction of the State of New York. The defendant succeeded in creating doubt that this defendant was fishing outside the boundary of the Shinnecock Reservation. It is the opinion of the Court that such a doubt created a presumption, not rebutted by the prosecution, that the laws of the State of New York may not be enforced. The Court of Appeals in Mulkins v. Snow stated "...no law runs on an Indian Reservation save the Indian Tribal Law and custom." Mulkins v. Snow, 232 N.Y. 47, 133 N.E.123 (1921).

Therefore, based on the testimony heard and the evidence submitted, the Court rules as follows. The People have failed to prove their case by the requisite standard of proof, beyond a reasonable doubt. The Court finds the defendant not guilty of violating Sections 40.1b1ii, 40.1b1i, and 40.b1i of the Environmental Conservation Law.

The matter is dismissed.

This is a final decision of the Court.
So ordered.

HON. DEBORAH KOOPERSTEIN
Town Justice

Dated: January 28, 2009
      Southampton, N.Y.

# DEFENDANT'S

# EXHIBIT 8

# CERTIFICATE OF DISPOSITION

STATE OF NEW YORK
SUFFOLK COUNTY

SOUTHAMPTON TOWN COURT
CRIMINAL PART

PEOPLE OF THE STATE OF NEW YORK

vs.

GERROD T. SMITH; Defendant

CASE NO: 08101351

| | | |
|---|---|---|
| Date of Birth: | 04/14/1955 |
| Date of Arrest: | 10/06/2008 |
| Disposition Date: | 10/14/2009 |

| Section Charged | Section Disposed | Ticket No & Description | Disposition | Fine | Civil-Fee | Surchg |
|---|---|---|---|---|---|---|
| NYC 40.1b 1 ii | NYC 40.1b 1 ii | BA8767496 POSS OOS SUM FLNDER | Dismissed | 0.00 | 0.00 | 0.00 |
| NYC 40.1b 1 ii | NYC 40.1b 1 ii | BA8767485 POSS UNDERSIZE BLKFS | Dismissed | 0.00 | 0.00 | 0.00 |
| NYC 40.1b 1 ii | NYC 40.1b 1 ii | BA8767474 POSS OOS PORGY | Dismissed | 0.00 | 0.00 | 0.00 |

Upon a proper request for an official statement of disposition,
I certify that the above named defendant having appeared before
this court was charged as shown above.  Each of the charges was
disposed of as indicated.

Dated: The 19th day of October 2009

Hon. Andrea H Schiavoni

NOTE: A copy of the request will be filed with this certificate
in the case records.

CAUTION: This information must not be divulged if the case is
sealed or where the defendant has been adjudicated a youthful
offender.

Copies: ____ Court, ____ Defendant, ____ Agency, ____ DA

# DEFENDANT'S

# EXHIBIT 9



# Justice Court

**TOWN OF SOUTHAMPTON**
32 JACKSON AVENUE
HAMPTON BAYS, N.Y. 11946

JUSTICES
DEBORAH KOOPERSTEIN
BARBARA L. WILSON
ANDREA H. SCHIAVONI
EDWARD D. BURKE

COURT CLERK
(631) 702-2990

Scott M. Moore, Esq.
Moore International Law PLLC
45 Rockefeller Plaza, Suite 2000
New York, NY 10111

Re: Jonathan Smith
Docket # 09-031419
BA8767264

August 12, 2010

Dear Mr. Moore:

Per your request, I am formally notifying you of the disposition of the case against your client Jonathan K. Smith. This matter was removed to the Eastern District on February 12, 2009 from this Court. Judge Wexler dismissed the case for failure to prosecute per an Order of Dismissal.

This Court has therefore lost jurisdiction and recognizes that. This matter is dismissed and marked off the calendar.

Hon. Deborah Kooperstein
Town Justice

# DEFENDANT'S

# EXHIBIT 10

C(m

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

PEOPLE OF THE STATE OF NEW
YORK,

                              Plaintiff,

          - against -                                    ORDER OF DISMISSAL
                                                         CV: 09-0571
JONATHAN K. SMITH,                                       WEXLER, J.

                              Defendant.
---------------------------------------------------------X

          The complaint having been filed over 120 days ago, and no further actions
having been taken or any explanation for the lack of prosecution having been filed with this
Court.  Letter, dated May 6, 2010 (Document # 4, docketed 5/6/2010) from defendant Smith
to the Court indicating that the above action is abandoned by the plaintiff,  it is

          ORDERED that this action is dismissed, without prejudice for failure to
prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure with the right to
reopen by showing of good cause within _30 days_ from the date of this order.

SO ORDERED:




Dated: Central Islip, New York
       June 15, 2010

                                        _____
                                        LEONARD D. WEXLER
                                        United States District Judge




          MOVANT'S COUNSEL IS DIRECTED TO SERVE A COPY
          OF THIS ORDER ON ALL PARTIES UPON RECEIPT.

Case 2:18-cv-03369-JFB-SIL Document 84-15 Filed 11/19/19 Page 47 of 91 PageID #: 1222
Case 2:09-cv-00571-LDW-WDW Document 7 Filed 06/17/10 Page 1 of 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK,

                              Plaintiff,

                   - against -                                **JUDGMENT**

JONATHAN K. SMITH,                                  CV-09-0571 (LDW)

                              Defendant.

-------------------------------------------------------------X

     An Order of Dismissal of Honorable Leonard D. Wexler, United States District Judge,
having been filed on June 15, 2010, dismissing this action without prejudice for failure to
prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure with the right to reopen
by showing of good cause within 30 days from the date of said order, it is

     **ORDERED AND ADJUDGED** that Plaintiff take nothing of Defendant; that this action
is dismissed without prejudice for failure to prosecute pursuant to Rule 41(b) of the Federal
Rules of Civil Procedure; and that Plaintiff has the right to reopen by showing of good cause
within 30 days from the date of the Order fo Dismissal.

Dated: Central Islip, New York
     June 17, 2010

                              ROBERT C. HEINEMANN
                              CLERK OF THE COURT

                   By:    /s/ Catherine Vukovich
                              Deputy Clerk

# Exhibit B

JUSTICE COURT:        TOWN OF SOUTHAMPTON
COUNTY OF SUFFOLK:   STATE OF NEW YORK
_____X

THE PEOPLE OF THE STATE OF NEW YORK

                                            AFFIRMATION IN
                                            OPPOSITION TO
                                            DEFENDANT'S MOTION

- against-

                                            DOCKET NO.: 17-060545

DAVID SILVA,

                        Defendant.
_____X

I, **Jamie H. Greenwood**, an Assistant District Attorney of Suffolk County, admitted to practice law in the State of New York, do hereby affirm under the pains and penalty of perjury that the following is true. I appear of counsel to Emily Constant, the Acting District Attorney of Suffolk County, and attorney of record for the People of the State of New York, and pursuant to the rules of the Appellate Division, Second Department, submit the following in response to defendant's Omnibus Motion.

The Defendant, DAVID SILVA, is charged with:

      a.     possessing American Eels in excess of the limit specified for such species and for setting.

      b.     maintaining, operating, or using a net without possessing a marine commercial food fishing license while taking of food fish; and

      c.     possessing American Eels of a size less than specified for such species.

The Defendant, by "Notice of Motion" dated October 10, 2017, moves this Court for the following relief: dismissal of all charges based on lack of jurisdiction. The Court should deny the defendant's motion as: the defendant was not on reservation land or in reservation waters during the commission of these violations; the Department of Environmental Conservation (hereinafter "DEC") can enforce fishing regulations for the purpose of conservation; and the matter of jurisdiction is not collaterally estopped.

## I.   THE DEPARTMENT OF ENVIRONMENTAL CONSERVATION HAD JURISDICTION TO CHARGE THE DEFENDANT WITH VIOLATIONS

### a.   *Defendant was fishing off the Shinnecock Indian Reservation*

The defendant was not fishing on the Shinnecock Indian Reservation. As a result, the DEC had jurisdiction to charge the defendant with violating several of the ECL's provisions regarding fishing.

The location of the violations remains undisputed: the defendant was observed fishing and cited with related violations in Taylor Creek, in the Town of Southampton, County of Suffolk, State of New York. More specifically, the illegal fishing occurred off the coast of 450 Meadow Lane, in the Town of Southampton, County of Suffolk, State of New York. This property is not on the Shinnecock Indian Reservation, as is evidenced by Exhibits A and B, which both outline the boundaries of the Shinnecock Indian Reservation and marks the locations where the DEC officers observed and ticketed the defendant. *See, also, Brenner v. Great Cove Realty Co. Inc.* (attached as Exhibit C) (outlining the boundaries of the Shinnecock Indian Reservation).

2

Moreover, it is clear from the language in the Dongan Patent of 1686 (attached as Exhibit D), dated subsequently to the Fort Albany Treaty and the Wyandanch Deed[1], that the Town of Southampton owns the bodies of water within its boundaries. The Dongan Patent ratified and confirmed the grant of land, and conveyed also the waters, lakes, ponds, and easements of fishing, hawking and fowling. *See also, People v. Miller* (attached as Exhibit G). Further, "there is no historical evidence that the Shinnecock Tribe or any of its members ever challenged or contested, in any way, the validity, legality, or effectiveness of the Dongan Patent." *New York v. Shinnecock Indian Nation*, 532 F.Supp. 2d 185 (E.D.N.Y. 2007).

Thus, as the body of water in question is not on the Shinnecock Indian Reservation, or even immediately bordering the Reservation, it is owned by the Town of Southampton. Further, the defense has not provided any concrete treaty or law that reserves unfettered fishing rights in

---

[1] The defense cites the Wyandanch Deed of 1659 (attached as Exhibit E) as "reserving fishing rights, when territory was ceded on behalf of the Shinnecock." However, the language of the deed is specific to the parcel of land being sold, which was "northward to the water of the bay and to the creek of Accaboucke, Westward to the place called Pehecannache, and Southerly to Potuncke, three miles landward in from the high water marke, and creeke of accaboucke, and soe to the west." This deed is also known as the Quogue Purchase, concerning the purchase of land west from what was then the boundary of Southampton.

Moreover, the Indian Deed of 1640 (attached as Exhibit F) states that the Indians:

> "Doe absolutely and forever give and grant by these presents doe acknowledge ourselves to have given & granted the partyes above mencioned without any fraud, gile, metal Reservation or equivocation to them their heirs and successors forever all the lands, woods, waters, water courses, easements, profits & emoluments, thence arising whatsoever, from the place commonly known by the name of the place where the Indians hayle over their canoes out of the North bay to the south side of the Island, from thence to possess all lands lying eastward betweene the foresaid boundes by water, to wit all the land pertaining to the parteyes aforesaid, as also all the old ground formerly planted lying eastward from the first creek at ye westermore end of Shinecock plaine."

In addition, the Indian Deed of 1640 states that the Indians "in full and complete ratification and establishment of this our act and deed of passing over all our title & interest in the premises... from sea or land within our limits." In this deed, the only reservation of Indian rights was that the Indians "shall have liberty to breake up ground for their use to the westward of the creek aforementioned on the west side of Shinecock plain."

the particular body of water in question.  As such, the DEC did have jurisdiction to cite the defendant for the violations in question.

      b.  *The DEC is able to enforce laws protecting the American Eel against all people*

The laws regarding the size and amount of eels caught as well as the method of fishing are enforceable against all people, as the purpose of the law is the preservation of the American Eel.  As such, the DEC lawfully charged the defendant with the violations in question.

      i.  States can regulate fishing and enforce the regulation against Native Americans fishing off reservation land.

It is fundamental that states have sovereign power to regulate hunting and fishing within their borders.  *See People v. Patterson*, 5 N.Y. 3d 91, 94 (2005).  This power must be balanced with treaties made with Native American nations regarding hunting and fishing rights.  Inasmuch as those interests can be in contravention of each other, both New York State and Federal Courts has grappled with the vying concerns of Native American fishing rights and conservation of marine species.

Generally, the State may regulate "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like…in the interest of conservation" as it occurs outside of the Indian Reservation.  *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968).  The United States Supreme Court held that:

> We do not think it is a proper constriction of the reservation in the conveyance to regard it as an attempt either to reserve sovereign prerogative or so to divide the inherent power of preservation as to make its competent exercise impossible.  Rather, we are of the opinion that the clause[2] is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands in common with the

---

[2] The clause in question states: "Also excepting and reserving to them, the said parties of the first part and their heirs, the privilege of fishing and hunting on the said tract of land hereby intended to be conveyed."

grantees, and others to whom the privilege might be extended, but subject, nevertheless, to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the state over the lands where the privilege was exercised.

*Kennedy v. Becker* 241 U.S. 556, 563-64 (1919); *see also United States v. Winans*, 198 U.S. 371, 384 (1905) ("[S]urely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as 'taking fish at all usual and accustomed places.' Nor does it restrain the State unreasonably, if at all, in the regulation of the right").

Although a state may regulate fishing off of an Indian Reservation, the state may not qualify or condition the basic right to fish outside the reservation where there is a treaty right to fish. *Tulee v. Washington*, 315 U.S. 681 (1942). For example, where there is a treaty right guaranteeing an Indian Nation the right to fish "at all usual and accustomed places in common with citizens," the state cannot require a member of the Indian Nation to pay for a fishing license. *Id.* In other words, the state can "impose on Indians, equally with others, such restrictions of purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish," but cannot "foreclos[e] the state from charging the Indians a [licensing] fee." *Id.*

Moreover, if a state does regulate fishing with the intent of conservation, the regulation must be expressed in nondiscriminatory measures for conserving fish resources. *See, e.g., Puyallup Tribe*, 391 U.S. at 684. Generally, this means that a state law or regulation may impair an off-reservation treaty fishing right only when: "(1) it represents a reasonable and necessary conservation measure and (2) does not discriminate against the Native American treaty rightholders." *Patterson*, 5 N.Y. 3d at 95-96.

      ii. The Federal and State governments have an interest in conservation of the
American Eel population.

Fishing of the American eel, specifically the glass eel in question, is restricted due to a
diminished population. The restriction was put in place by the Atlantic States Marine Fisheries
Commission, created pursuant to an act of Congress in 1942. In 1993, Congress enacted the
Atlantic Costal Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101-5108, to "support
and encourage the development, implementation, and enforcement of effective interstate
conservation and management of Atlantic costal fishery resources." 16 U.S.C. § 5101(b).

Pursuant to the Act, the Commission was empowered and directed to "prepare and adopt
costal fishery management plans to provide for the conservation of coastal fishery resources"
that are "based on the best scientific information available." 16 U.S.C. § 5104(a)(1) and (2)(A).
Once a fishery management plan is adopted, the Commission identifies each state required to
enforce the plan and those states are required to implement and enforce the measures of such
plan within the established timeframe. 16 U.S.C. § 5104(a)(1) and (b)(1).

In 1999, the Commission adopted the American Eel Fishery Management Plan, which
currently prohibits glass eel (juvenile eel) fisheries in all states except South Carolina and Maine,
and which applies to New York State. The goal of the plan is to "conserve and protect the
American eel resource to ensure its continued role in the ecosystems while providing the
opportunity for its commercial, recreational, scientific, and educational use. Specifically, the
goal aims to: (1) protect and enhance the abundance of American Eel in inland and territorial
waters of the Atlantic States and jurisdictions and contribute to the viability of the American eel
spawning population; and (2) provide for sustainable commercial, subsistence, and recreational

fisheries by preventing overharvest of any eel life stage." *Interstate Fishery Management Plan for American Eel*, p. iv (hereinafter, Exhibit H).

Specifically, the Plan requires that "all member states jurisdictions shall establish uniform possession limits for recreational fisheries of a six inch minimum size and a possession limit… no more than 50 eels per person." *Id.* at 51. The Plan states, in no uncertain terms, that "all state programs must include a regime of restrictions on recreational and commercial fisheries consistent with the requirements of Sections 4.1 and 4.2" unless an alternative plan is proposed and approved. *Id.* at 60.

Even now, although not considered an endangered species under the Endangered Species Act, the overarching agency did recommend continuing efforts to maintain healthy habitats, monitor harvest levels, and improve river passage of the American Eel. *2017 American Eel Stock Assessment Update*, p 5 (hereinafter Exhibit I). Although not listed as endangered under the Endangered Species Act, the International Union for Conservation of Nature did list the American Eel as endangered in 2014. *Id.* Thus, the Commission is still focused on protecting the American Eel from future population deterioration. *Id.*

The New York Department of Environmental Conservation provides for compliance with the Commission fishery management plan via its fishing regulations in 6 N.Y.C.R.C. parts 10 and 40. Those regulations prohibit the taking and possession of any American eels fewer than nine inches in length, and further limits possession of the American Eel at 25 for individuals and 50 for party charter boat captain and crew. 6 N.Y.C.R.R. 40.1(f).

> iii. New York State can regulate the size and amount of the catch and the manner
> of fishing for the American Eel and the DEC can enforce such regulations against
> members of the Shinnecock Nation fishing outside of the reservation.

The laws regarding the minimum length of the American Eel, the possession limit of the American Eel, as well as the method of fishing are enforceable against the defendant. First, the laws in question are merely regulatory; they are not preventing individuals from fishing nor are they requiring a specific license. Instead, these laws are merely regulating "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like…in the interest of conservation" as it occurs outside of the Indian Reservation. *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968).

Moreover, the DEC does not require Native American Members to have a fishing license, as its website states that "when fishing off of reservation land, a community card may serve as a fishing license." (http://www.dec.ny.gov/permits/6097.html). *Cf. Tulee v. Washington*, 315 U.S. 681 (1942) (holding that requiring Native Americans protected by treaty rights to pay for and obtain a fishing license is in contravention of a treaty giving the Yakima Indians an "exclusive right of taking fish in all the streams, where running through or bordering said reservation").

Further, the regulations regarding the American Eel are directed at preserving the species. As described above, the population of the American Eel is diminishing. As a result, a commission created by an act of Congress saw it fit to legislate in favor of the preservation of the American Eels. New York State's restrictions on the size of the eels, the number of eels, and the manner of the catch are a result of the State being required to legislate for the protection of the American Eels.

Therefore, the statues in question are necessary for the conservation of the American Eels and the regulations do not discriminate against the Shinnecock Indians as they apply equally to

all people. As a result, the regulations are enforceable against members of the Shinnecock
Nation fishing outside the boundaries of the Indian Reservation.

## II.     Collateral Estoppel Does Not Apply

The decision in *People v. Ruggiero* does not collaterally estop the issue of jurisdiction in
this case as the two violations occurred in two different bodies of water. Thus, collateral
estoppel does not apply to the matter of jurisdiction in the present case.

Collateral estoppel, generally, "means simply that when an issue of ultimate fact has once
been determined by a valid and final judgment, that issue cannot again be litigated between the
same parties in any future lawsuit." *Ashe v Swenson*, 397 US 436, 443 (1970). Originally
developed in civil litigation, courts have applied the doctrine generally to criminal proceedings
as well. *People v. Goodman*, 69 N.Y.2d 32, 37 (1986). However, while the focus in civil
litigation is on "swift, impartial and peaceful resolutions of disputes," the preeminent concern in
criminal cases is to reach a correct result. *Id.* Moreover, the courts have held that "collateral
estoppel should be applied sparingly in criminal cases." *People v. O'Toole*, 22 N.Y.3d 335, 339
(2013).

A defendant claiming the benefit of estoppel carries the "heavy burden" of identifying the
particular issue on which he seeks to foreclose evidence and then establishing that the fact finder
in the first trial, by its verdict, necessarily resolved that issue in his favor. *Baim v. Eidens*, 279
A.D. 2d 787, 789-90 (3d Dept., 2001); *Goodman*, 69 N.Y. 2d at 40.

Here, the defendant has not identified a particular issue on which he seeks to foreclose
evidence and did not establish that the fact finder in the first trial necessarily resolved the issue in
his favor. Defense counsel frames the particular issue as where the boundary lines of the
Shinnecock Reservation waters are located. *Defense Motion*, p 7. However, the issue, as it is

9

framed in the ultimate decision is whether that defendant, Ruggiero, was fishing in waters of the Shinnecock Indian Reservation.

Defendant Ruggiero was fishing in the Shinnecock Bay. Specifically, he was fishing approximately 4, 028 feet from the entrance off Heady Creek in the Shinnecock Bay. On the other hand, the defendant in the present matter was fishing at the entrance of Taylor Creek, right off the shore of property located within the Village of Southampton. Any decision in *People v. Ruggiero* is not relevant to the location of the crime in the instant case. Therefore, the Court in this case should not consider the decision in *Ruggiero* to be relevant to this case.[*]

Thus, the Court should find that collateral estoppel does not apply in the present matter.

*   *   *

**WHEREFORE**, it is respectfully requested that Defendant's motion be denied in all respects as the defendant was not on Reservation land , the defendant does not have an unfettered right to fish in the waters of Southampton Town, the DEC can enforce the regulations regarding fishing of the American Eel, and collateral estoppel does not apply to this case regarding the matter of jurisdiction. Thus, the Court should rule in accordance with the People's Affirmation in Opposition.

**The People announce their readiness to proceed to trial pursuant to Section 30.30 of the Criminal Procedure Law.**

---

[*] Moreover, the Court in *Ruggiero* did not make a finding that the fishing rights of members of the Shinnecock Nation extended to the open waters. Nor did it decide that the DEC is, under all circumstances, prohibited from charging members of the Shinnecock Nation fishing off of the reservation with violations or crimes related to their fishing activities. As a result, the decision in *Ruggiero* is irrelevant in this matter.

Respectfully submitted.

Jamie H. Greenwood
Assistant District Attorney

Dated:      December 11, 2017
          Hampton Bays, New York

To:     Scott M. Moore, Esq.
       Attorney for the Defendant
       45 Rockefeller Plaza, 20th Floor
       New York, New York 10111

# Exhibit A



1) Lat Long

40.86349.29 - 72.4128.79
GPS
40* 51'48.3444"N
72*24'46.344"W

2) Lat Long

40.863965 - 72.412737
GPS 40* 51'50.274"N
72*24'45.8532"W

# Exhibit B



Find address or place

GIS Viewer

Suffolk County, NY

**Tax Map Number:09040250001000005000**

| FIRST NAME | |
| LAST NAME | DIAMOND A HOLDINGS LTD |
| TAX MAP NUMBER | 09040250001000005000 |
| ADDR NUMBER | 450 |
| STREET | MEADOW |
| STREET TYPE | LN |
| STREET DIR | |
| CITY | SOUTHAMPTON |
| ZIP CODE | 11968 |
| ACRE | 3.47 |

Zoom to

# Exhibit C

At a Term of the County Court,
held in and for the County of
Suffolk at the Court House,
Riverhead, Suffolk County, N.Y.,
on the // day of //pril,
1955.

P R E S E N T :

HON. EDGAR F. HAZLETON,

Surrogate and Acting County Judge.

- - - - - - - - - - - - - - - - -

In the Matter of the Application of :
HARRY C. BRENNER, District Attorney of
the County of Suffolk, for an Order of
Removal, :

- against - :

GREAT COVE REALTY CO., INC., DEVONSHIRE :
CONSTRUCTION CORP., their Agents, Servants
and Employees, and JOHN DOE and RICHARD :
ROE, as Intruders on Indian Tribal Lands. :

- - - - - - - - - - - - - - - - -

Application having been heretofore made to Hon. Fred J.

Munder, County Judge of the County of Suffolk, by Harry C.

Brenner, District Attorney of Suffolk County, for an order

under Section 8 of the Indian Law removing Great Cove Realty

Co., Inc., Devonshire Construction Corp., their agents, ser-

vants and employees, and John Doe and Richard Roe, from the

lands owned and occupied by the Shinnecock Tribe of Indians

known as the Shinnecock Indian Reservation at Southampton,

Suffolk County, New York, upon the ground that they are in-

truders thereon, and after reading and filing the complaint

of Harry C. Brenner, said District Attorney, verified the 13th

day of October, 1954, and the said County Judge having issued

a notice directed to said Great Cove Realty Co., Inc. and

Devonshire Construction Corp., their agents, servants and

employees, and John Doe and Richard Roe requiring them to

appear before him on the 25th day of October, 1954 at 10

o'clock in the morning of that day, and the said Great Cove

Realty Co., Inc. and Devonshire Construction Corp., having

thereupon appeared by Morris Fersel, Esq., and William H.

Kinn, Esq., and Realty Associates, Inc., served as John Doe;

having appeared by Joseph V. McKee, Esq. by John C. O'Malley,

Esq. of counsel and the Monarch Power and Heating Co. and

and Shillito Doors Corporation and Edelman Realty Company, all served as John Doe, having thereupon appeared by Morris and Mitchell, Esqs. by Sidney D. Mitchell, Esq., of counsel, and Great Cove Realty Co. Inc. and Devonshire Construction Corp. and Realty Associates, Inc., having answered the complaint therein, and Monarch Power and Heating Co., Shillito Doors Corporation and Edelman Realty Company not having answered the complaint herein, and the matter having been adjourned to the 10th day of November, 1954, and proof of the personal service of such notice having been duly made, and proof of the facts alleged in the complaint having been taken at a hearing before Edgar F. Hazleton, Surrogate and Acting County Judge of Suffolk County, in the Suffolk County Court House at Riverhead, New York, on November 10, 1954, November 12, 1954, November 17, 1954, November 30, 1954, December 1, 1954, December 10, 1954, December 15, 1954, December 16, 1954 and before said Surrogate and Acting County Judge at 602 Main Street, Greenport, Suffolk County, New York, on December 17, 1954, and at 2 Woodbine Ave., Northport, Suffolk County, New York, on December 30, 1954, and the Court thereafter having made its memorandum of decision in writing dated January 17, 1955, determining that said Great Cove Realty Co., Inc., Devonshire Construction Corp., Monarch Power and Heating Co., Shillito Doors Corporation and Edelman Realty Company, their agents, servants and employees are intruders upon the lands of said Reservation, to wit, the northerly portion thereof, consisting of a triangular portion thereof and shown and designated on a certain survey of Shinnecock Hills dated September 11, 1952 made by Theodore F. Squires, said lands being hereinafter described and the Court having granted the motion of Realty Associates, Inc. to dismiss the complaint as to it,

NOW, on motion of Harry C. Brenner, District Attorney of Suffolk County, it is

ORDERED, ADJUDGED and DECREED that the complaint in this proceeding against the defendant Realty Associates, Inc.,

ORDERED, ADJUDGED and DECREED that Great Cove Realty Co., Inc., Devonshire Construction Corp., Monarch Power and Heating Co., Shillito Doors Corporation and Edelson Realty Company, their agents, servants and employees, intrude and are intruders upon the lands owned and occupied by the Shinnecock Indian Tribe, to wit, the reservation lands of the Shinnecock Tribe of Indians at Southampton, Suffolk County, New York, and upon that portion thereof hereinafter described, without permission so to do and without authority by law so to do, and it is further

ORDERED, ADJUDGED and DECREED that a warrant issue to the Sheriff of the County of Suffolk, commanding him within 10 days from the receipt thereof to remove Great Cove Realty Co., Inc., Devonshire Construction Corp., Monarch Power and Heating Co., Shillito Doors Corporation and Edelson Realty Company, their agents, servants and employees from the reservation lands of the Shinnecock Tribe of Indians at Southampton, Suffolk County, New York, and from that portion thereof hereinafter described, and it is further

ORDERED, ADJUDGED and DECREED that the lands owned and occupied by the Shinnecock Tribe of Indians and affected by this determination are bounded and described as follows:-

All that certain tract or parcel of land situate, lying and being at Southampton, in the Town of Southampton, County of Suffolk and State of New York, bounded and described as follows:-

Beginning at a point on the southwesterly side of Montauk Highway where the easterly side of land now or formerly of Duncan Gcables intersects the said southwesterly side of Montauk Highway; running thence along Montauk Highway south 74 degrees 8 minutes East 359.92 feet and South 69 degrees 10 minutes 10 seconds East 2,036.06 feet to a point; thence along other lands of Shinnecock Indian Reservation North 76 degrees 23 minutes 40 seconds West 473.92 feet; thence North 75 degrees 21 minutes West 783.12 feet; thence North 79 degrees 41 minutes 54 seconds West 361.96 feet; thence north 79 degrees 29 minutes 54 seconds West 525.79 feet and North 81 degrees 3 minutes 53 seconds West 327.26 feet to a monument;



thence North 21 degrees 22 minutes 7 seconds
East 330.96 feet to the southwesterly side of
Montauk Highway at the point or place of begin-
ning.

E N T E R,

Surrogate and Acting County Judge.

GRANTED

# Exhibit D

## PATENT OF GOV. DONGAN

THOMAS DONGAN Capt. Generall Governor in Chiefe and Vice Admirall in and over the Province of Newyorke and Territoryes Depending thereon in America &c. under his Majesty JAMES the second By the grace of God King of England Scotland ffrance & Ireland Defender of the faith &c.  To all whom this shall come sendeth GREETING Whereas the Right Honorable Edmund Andross Esquire Seigneur of Suzrai nte Lievt. and Governr. Genll. under his Royall Highs James Duke of yorke and Albany &c:  now his present Majesty of all his Territoryes in America did by a certaine writeing or Patent under the scale of the Province bearing date the first day of November One thousand six hundred and seventy six grant Ratifye and confirme unto John Toping. Justice of the peace Capt. John Howell Thomas Halsey Senior Joseph Raynor Constable Edward Howell John Jagger John Foster and Francis Sayres Overseers Lievt. Joseph Fordham Henry Pierson John Cooper Ellice Cooke Samuell Clarke Richard Post and John Jenings as Patentees for and in behalfe of themselves and their Associates the ffreeholders and Jnhabitants of the Towne of Southampton a certaine tract of Land lyeing and being scituate in the southside of Long Island in the Eastriding of Yorkshire towards the Maine sea the Eastward bounds where of extends to a certaine place or plaine called Wainscott where the bounds are settled betwixt their Neighbors of the Towne of Easthampton and them their southern bounds being the sea and so runns Westward to a place called Seatuck where a stake was sett at their furthest extent that way then crossing over the Island to the northward to Peaconack great river not contradicting the agreement made betweene their towne and the towne of southold after their tryall at the Court of Assizes and so to runn Eastward alongst their north bounds to the Easternmost part of Hoggenoch over against shelter Island includeing all the necks of Land and Islands within the aforesaid described bounds and limitts together with all Rivers Lakes waters quarries Woodland plaines meadowes pastures marshes fishing hawking hunting and fowling and all other profitts Comodityes and hereditaments to the said Towne tract of Land and premises within the Limitts and bounds aforemenconed described belonging or in any wise appertaineing TO HAVE AND TO HOLD all and singular the said Lands hereditaments and premisses with their and every of their appurtennces and of every part and parcell thereof to the said Patentees and their associates ther heires Successors and Assignes forever according to the tenure & custome of the Manor of East Greenwich within the County of Kent in England in free and Comon Soccage and by fealty only Provided alwayes notwithstanding that the extent of the bounds beforerecited do nowayes prejudice or infringe the particular proprietyes of any person or persons who have right by Patent or other lawfull claime to any part or parcel of land or Tenements within the Limitts aforesaid only that all the Land and Plantacons within the said Limitts or bounds shall have relacon to the towne in Genll for the well government thereof And if it shall so happen that any part or parcell of the lands within the bounds and limitts afordeseribed be not already purchased of the Indyans it may be purchased (as occasion) according to law  And moreover he the said Edmund Andross Lievt and Governr Genll as aforesaid did further grant and confirme unto the said Patentees and their Associates their heires Successors and Assignes all the priviledges and Imunityes belonging to a towne within

this Government and that the place of theire present habitacon & abode shall continue and retaine the name of Southampton by which name & stile it shall be distinguished and knowne in all bargaines & sales Deed Records and writeings they the said Patentees and their Associates their heires Successors and Assignes makeing improvement on the said land and confirmeing themselves according to law and yielding and paying therefore yearly & every yeare as an acknowledgement or Quittrent on fat lamb unto such officer or officers as shall be impowered to receive the same as by said Patent Recorded in the Secretaryes Office relacon being thereunto had may more fully and at large appeare And Whereas of Late some difference hath happened betweene the Inhabitants of said towne of Southampton and the Indyans adjacent to said towne concerning the bounds above specifyed and also that the clauses above expressed for constituting them a towne and giving them privileges & Jmunityes are not sufficient in the law to convey to them such privileges & Jmunityes as was designed to be given them AND Whereas Major John Howell a ffreeholder and one of the Patentees of the aforesaid towne of Southampton by Order of the ffreeholders of the said towne hath made application unto me that I would confirm unto ye ffreeholders of said Towne in a more full & ample manner all the abovecited tracts and parcells of land within the limits and bounds aforesaid and finally determine the difference between the Indyans and the ffreeholders of the said towne of Southampton And also that I would Erect the said towne of Southampton within the Limitts and bounds aforesaid into one Towneship NOW KNOW YEE That I the said Thomas Dongan By virtue of the power and authority to me derived from his most Sacred Majesty aforesaid and in pursuance of the same have examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid and for and in consideracon of the Quittrent hereinafter reserved and other good and lawfull consideracons me thereunto moveing Have Granted Ratifyed Released and Confirmed and by these presents do grant Ratifye Release and Confirme unto Major John Howell Thomas Hallsey Senior Edward Howell John Jagger John Foster Francis Sayres Joseph ffordham Henry Pearson Samuell Clarke Job Sayers William Barker Isaac Halsey ffreeholders & Jnhabitants of Southampton heerin after erected and made one body Corporate and Politique and willed and determined to be called by the name of the trustees of the ffreeholders and commonality of the Towne of Southampton and their Sucessors all the afore recited tracts & necks of land within the bounds and limits aforesaid together with all and singular the houses MESSUAGES Tenements buildings millnes millnedames fencings Jnclosures gardens orchards fields pastures woods underwoods trees timber Comon of pastue feedings meadowes marshes swamps plaines Rivers Rivolets waters lakes ponds Brookes streames beaches Quarris mines minerals Creeks harbours highways and Easements fishing hawking hunting and fowling (silver and gold mines Excepted) and all other franchizes profitts Comodityes and hereditaments whatsoever to the said tracts & neckes of land and premises belonging or in any wise appurtaineing or therewith all used occupyed accepted reputed or taken to belong or in any wayes to appertaine to all intents purposes and constructions whatsoever as also all and singular the rents arrearages of rents Issues and profitts of the said tract of land and

premises heretofore due and payable TO HAVE AND TO HOLD all the aforerecited tract and parcell of land and premises with their and every of their appurtennces unto the said Major John Howell Thomas Hallsey Senior Edward Howell John Jagger John Foster Francis Sayres Joseph Fordham Henry Pierson Samuell Clarke Job Sayers William Barker Isaac Halsey ffreeholders and comonalty of the towne of Southampton and their Successors forever to and for the severall and Respective uses following and to no other use intent and purpose whatsoever  That is to say as for and concerning all and singular the severall respective parcells of Land and meadow part of the granted premises in any wayes taken up and appropriated before the day of the date hereof unto the several and respective present ffreeholdres and Inhabitants of the said towne of Southampton by virtue of the aforerecited deed or Patent to the only use benefit and behoofe of the said respective present freeholders and Inhabitants and to their severall and respective heires and Assignes forever  And as for and concerning all and every such parcell or parcells tract or tracts of land Remainder of the Granted premises not yet taken up or appropriated to an particular person or persons by virtue of the aforerecited deed or Patent to the use benefite and behoofe of such as have been purchasers thereof and their heires and assigns forever in proporcon to their severall and respective purchases thereof made as tenants in Comon without any lett hindrance or molestation to be had or reserved upon pretence of joynt tenancy or survivorship any thing contained herein to the contrary in any ways notwithstanding TO BEE HOLDEN of his said Majesty his heires and Successors in ffree and Comon Soccage according to the Mannor of East Greenwich in the County of Kent within his Majestyes Realme of England YEILDING rendering and paying therefore yearly and every yeare from henceforth unto our Sovereigne Lord the King his heires and Successors or to such Officer or Officers as shall be appointed to receive the same the sume of one lamb or the value thereof upon the five and twentieth day of march at Newyorke in full of all Rents or former reserved rents services acknowledgements and demands whatsoever  AND further By virtue of the power and authority to me the said Thomas Dongan as aforesaid given and in pursuance of the same and for the reasons and consideracons above recited I have willed determined declared and granted  And by these presents do will determine declare and grant that the said Inhabitants and ffreeholders the ffreemen of Southampton aforesaid Comonly called by the name of the ffreeholders and Inhabitants of the towne of Southampton or by whatever name or names they are called or named & their heires and Successors forever hence forward are and shall be one body Corporate and Politique in Deed and name by the name of the trusteess of the ffreeholders & comonalty of the towne of Southampton and them by the name of the Trustees of the ffreeholders  and comanality of the towne of Southampton one body corporate and Politique in Deed and name I have really and fully for his said Majesty his heires and Successors erected made ordained constituted and declared by these presents and that by the same name they have succession forever  And that they and their Sucessors by the name of the Trustees of the ffreeholders and commonality of the towne of Southampton be and shall be forever in future times persons able and Capable in law to have perceive receive and possesse not only all and singular the premises but other messuages lands Tenements Priviledges Jurisdictions franchizes and hereditaments of whatsoever kind or species they shall be to them and their Successors in ffee forever or for the term of a yeare or yeares or otherwise whatsoever manner it be and also goods Chattells and all other things of whatsoever name nature quality or species they shall be

and also to give grant release aliene assigne and dispose off lands Tenements hereditaments and all and every other act and acts thing and things to do and Execute by the name aforesaid and that by the same name of the trustees of the ffreeholders and comonalty of the towne of southampton to plead and be impleaded answer and be answered unto defend and be defended they are and may be Capable in whatsoever place and places and before whatsoever Judges and Justices or other persons or officialls of his said Majesty his heires and Successors in all & all manner of accons Plaints suites Complaints causes matters and demands whatsoever of what kind quality and species the same be and shall be in manner and forme as any other of his majestyes Liedge people within this Province can or are able to have require receive possesse Enjoy retaine give grant release aliene assigne and dispose plead & be impleaded answer and be answered unto defend and be defended do permitt or execute AND for the better enabling the Trustees of the ffreeholders and comonalty of the towne of Southampton aforesaid in doing and Executing all and singular the premisses I have willed granted and determined and by these presents do will grant and determine that from henceforward and forever hereafter the said Trustees of the ffreeholders and Comonalty of the towne of Southampton doe and may have and use a Common seale which shall serve to Execute the causes and affairs whatsoever of them and their Successors And further I will and by these presents in behalfe of his said Majesty his heires and Successors that henceforward forevermore there be and shall be Trustees of the ffreeholders and comonalty of the towne of Southampton aforesaid to be chosen and elected in these presents hereafter is menconed who shall be and shall be called the Trustees of the ffreeholders and Comonalty of the towne of Southampton and they and their Successors shall and may at all convenient times hereafter upon a publique sumons to be obteined at the request of any three of the Trustees aforesaid from any of his Majesty's Justices of the peace of the said towne or for default thereof from any of the Justices of the County of Suffolk for the time being assemble and meet together in the towne house of the said towne or in such other publique place as shall be from time to time appointed to make such acts and orders in writing for the more orderly Doeing of the premisses as they the said Trustees of the ffreeholders and Comonalty of the towne of Southampton aforesaid and their Successors from time to time shall and may think CONVENIENT so allwayes as the said acts and orders be in no wayes repugnant to the laws of England and of this Province which now are or hereafter may be Established and that they be not in any wayes against the true intent and meaning of these presents AND also I will ordaine and determine that all and singular the aforesaid acts and orders from time to time shall be made and ordered by the vote of the Major part of the said Trustees of the ffreeholders and Comonalty of the towne of Southampton aforesaid or at least by the vote of the Major part of such of them as shall from time to time Assemble and meet together in manner as aforesaid so allwayes there be not fewer in number than seaven of the said Trustees present at such meetings so to be held as aforesaid and for the better execucon of this grant in this behalfe I have assigned nominated Created Constituted and made and by these presents do assigne nominate Create Constitute and make Major John Howell Thomas Halsey Senior Edward Howell John Jagger John Foster Francis Sayres Joseph Fordham Henry Pearson Samuell Clarke Job Sayers William Barker Isaac Halsey to stand and be the first modern Trustees of the ffreeholders and Comonalty of the Towne of Southampton to continue in the aforesaid Office from and after the date of these presents until the time

that others be elected and Chosen in their stead According to the manner and forme herein after expressed AND moreover I do by these presents for and on the behalfe of his Most Sacred Majesty aforesaid his heires and Successors appoint that the Trustees of the ffreeholders and Comonalty of the town of Southampton Constables and Assessors within the towne of Southampton aforesaid be yearly Chosen on the first twesday of Aprill forever Viz: twelve Trustees of the ffreeholders and Comonalty of the towne of Southampton two Constables and two Assessors in such publique place as the trustees for the time being shall appoint and direct and that the Trusteess Constables and assessors be Chosen by the Majority of voices of the ffreeholders and freemen of the towne of southampton aforesaid AND Lastly I give and grant for and on behalfe of his said Majesty his heires and Successors by these presents to all and every person and persons and to whatsoever person subject to his said Majesty his heires and Successors free and lawfull power ability and authority that they or any of them any messuages Tenements Lands meadows feedings pastures woods underwoods rents revercons services and other hereditaments whatsoever within the said County of Suffolke (which they hold of his Sayd Majesty his heires and Successors unto the aforesaid Trustees of the ffreeholders and Comonalty of the towne of Southampton and their Successors shall and may Give grant Bargaine sell and alienate to have hold and Enjoy unto the said Trustees of the ffreeholders and Comonalty of the Towne of Southampton and their Successors forever YEILDING and paying therefor unto his said Majesty his heires and Successors on the said twenty fifth day of march yearly and every yeare forever the full and just sume of forty shillings Current money of this Province at Newyorke WHEREFORE by virtue of the power and authority aforesaid I do will and Command for and on behalfe of his said Majesty his heires & Successors that the aforesaid ffreeholders and Comonalty of the towne of southampton and their Successors have hold use and Enjoy And that they shall and may forever have hold use and Enjoy all the Libertyes authorityes Customes orders ordinances franchizes acquittances lands Tenements and hereditaments goods and Chattells aforesaid according to the tenure and effect of these presents without the lett or hinderance of any person or persons whatsoever IN TESTIMONY Whereof J have caused the seale of the said Province to be hereunto affixed and these presents to be entered in the Secretaryes Office Witness my hand at FORT JAMES the sixth day of December – One Thousand six hundred Eighty six & in the second yeare of his said Majestyes Reigne

THOMAS DONGAN

# Exhibit E

## INDIAN DEED OF QUOGUE PURCHASE

### May 12, 1659

Bee it knowne unto all men that by this present writing that I Wiandance Sachem of Paumanacke or Long Island have upon deliberate consideration. and with my sonne Weeaycombone both of us together giuen and granted vnto Mr John Ogden and his heires forever. I say freely given a certaine tract of land beginning at the west end of Southampton bounds. which land is bounded easthwards with Southampton bounds and with a small piece of meadow which I gave to Mr John Gosmer which he is to enjoy. Northward to the water of the bay and to the creeke of Accobaucke [Beaverdam stream] Westward to the place called peheconnacke. and Southerly to potunck. three miles landward in from the high water marke and creeke of accobaucke and so along to the west. But from this three miles bredth of land Southward all the land and meadow towards the south sea. the beach only excepted which is sold to John Cooper. I say all the land and meadow I have sold for a considerable price unto Mr John Ogden for himself his heirs executors and assigns for ever upon condition as followeth. first that Thomas Halsey and his associates shall have the privilege of the place of meadow called quaweanantucke the terme of years formerly granted to him or them. But the land lying betweene quaweanantucke and three miles northward he shall or may possess and improve at present but when the yeares of the aforesaid Thomas Halsey shall be expired then shall the aforesaid Mr John Ogden or his assigns fully possess and improve all quacannantucke meadow with the rest aforesaid and then shall pay or cause to be payd unto me Wiandance my heirs or assigns the summe of twenty five shillings a yeare as a yearly acknowledgement or rent for ever. And it is also agreed that wee shall keep our priviledges of fishing fowling hunting or gathering of beryes or any other thing for our vse and for the full and firme confirmation hereof we have both partyes set too our hands marke and seales interchangeably the date and yeare above written.

In presence of us
DAVID GARDINER                          JOHN OGDEN
LION GARDINER

NOTE. — The consideration for the above purchase appears to be L 400 paid to Wyandanch who for this sum became surety for the Shinnecock Indians who were thus fined apparently for burning some houses in Southampton.

Nov. 2, 1667, John Ogden of Elizabethtown N.J. sells to Southampton 100 acres of salt marsh or meadow lying on Pecaconic bay, the same having been apparently included in the above purchase.

# Exhibit F

INDIAN DEED OF DEC. 13, 1640

This Indenture made the 13th day of December Anno Dom. 1640, between Pomatuck, Mandush, Mocomanto, Pathemanto, Wybennett, Wainmenowog, Heden, Watemexoted, Checkepuchat, the native Inhabitants and true owners of the eastern part of the Long Island on the one part, and Mr. John Gosmer, Edward Howell, Daniell How, Edward Needham, Thomas Halsey, John Cooper, Thomas Sayre, Edward ffarrington, Job Sayre, George Welbe, Allen Bread, William Harker, Henry Walton, on the other part, witnesseth, that the sayd Indians for due Consideration of sixteen coats already received, and also three score bushells of Indian corn to be paid vpon lawfull demand the last of September which shall be in the yeare 1641, and further in consideration that the above named English shall defend vs the sayd Indians from the unjust violence of whatever Indians shall illegally assaile vs, doe absolutely and forever give and grant and by these presents doe acknowledge ourselves to have given & granted to the partyes above mencioned without any fraud, guile, mentall Reservation or equivocation to them their heirs and successors forever all the lands, woods, waters, water courses, easents, profits & emoluments, thence arising whatsoever, from the place commonly known by the name of the place where the Indians hayle over their canoes out of the North bay to the south side of the Island, from thence to possess all the lands lying eastward betweene the foresaid boundes by water, to wit all the land pertaining to the parteyes aforsaid, as also all the old ground formerly planted lying eastward from the first creek at ye westermore end of Shinecock plaine. To have & to hold forever without any claime or challenge of the least title, interest, or propriety whatsoever of vs the sayd Indians or our heyres or successors or any others by our leave, appointment, license, counsel or authority whatsoever, all the land bounded as is abovesaid. In full testimonie of this our absolute bargaine contract and grant indented and in full and complete ratification and establishment of this our act and deed of passing over all our title & interest in the premises with all emoluments & profits thereto appertaining, or in any wise belonging, from sea or land within our Limits above specified without all guile wee have sett to our hands the day and yeare above sayd.

Memorand.  Before the subscribing of this present writing it is agreed that ye Indians above named shall have liberty to breake up ground for their vse to the westward of the creek aforementioned on the west side of Shinnecock plain.

Witnesses of the deliverie & subscribing of this writing.

| | |
|---|---|
| "Abraham Pierson. | "Mamatacut. his x mark. |
| "Edward Stephenson. | "Mandush. his x marke. |
| "Robart Terry. | "Wybenet. his x mark. |
| "Joseph Howe. | "Howes. his x mark. |
| "Thomas Whitehone. | "Setommecoke. his x mark. |
| "Joseph Griffeths. | "Mocomanto. his x mark. |
| "William Howe. | "these in the name of all the rest. |

Recorded in ye office at New York Oct 3 1665. by Matthias Nicolls. Sec.

# Exhibit G

Supreme Court, Appellate Division, Second Judicial Dept.

LAZANSKY, P. J., YOUNG, KAPPER, HAGARTY AND CARSWELL, JJ.

People of the State of New York,

Respondents,

-against-

Richard Miller and The Trustees of the Freeholders and Commonalty
of the Town of Southampton,

Appellants

People of the State of New York,

Respondents,

-against-

Arthur Burnett and The Trustees of The Freeholders and
Commonalty of the Town of Southampton,

Appellants

Appeals by defendants from two judgments of the Special Term, both entered in the office of the Clerk of the County of Suffolk on the 9th day of October, 1931, awarding in each case a civil penalty of $60 with costs for the alleged violation by the individual defendants, Richard Miller and Arthur Burnett, of section 322 of the Conservation Law.

George W. Percy, for appellants Richard Miller
and Arthur Burnett.

Lucius H. Beers (Sherman Baldwin and Woodson D. Scott with him on the brief), for appellant The Trustees of the Freeholders and Commonalty of the Town of Southampton.

Robert E. Beyer, Deputy Assistant Attorney General (John J. Bennett, Jr., Attorney General, and Peter J. Brancato, Assistant Attorney General, with him on the brief, for the respondents.

The defendants Miller and Burnett took soft clams from the lands under the waters of Mecox Bay in the Town of Southampton, using for that purpose the propeller of a boat operated by a gasoline motor. Section 322 of the Conservation Law provides as follows:

"§322. Dredging and raking for shellfish. Dredges for taking of shellfish from public or unleased lands shall not be operated from any boat propelled otherwise than by sail or oars. Clams commonly known as hard and soft clams shall not be taken from such lands by the use of any device or instrument not operated solely by handpower nor shall such lands be dug, raked or otherwise loosened or disturbed, for the purpose of taking or in the taking of such clams, by the propeller or other part of any boat nor by any device or instrument not operated solely by handpower."

Defendants are both residents of the Town of Southampton. The method used by them in taking the clams complied with the provisions of an ordinance of the Trustees of the town, dated October 29, 1929, as follows: "the taking of any soft clams by use of motors or motor boats shall be prohibited in all waters of the Town of Southampton, with the exception of the waters of Mecox Bay, Shinnecock Bay, or Moriches Bay to the westerly limit of the Town. Any violation of this Amended Act will be subject to a penalty of not less than $25. or more than $50. This act shall take effect immediately upon its publication."

The questions raised by the appellants are as follows:

"(1) Have the Trustees of the Freeholders and Commonalty of the Town of Southampton title to the lands under the waters of Mecox Bay and the right to manage the productions of the waters?

"(2) Does the term 'public or unleased lands' in Section 322 of the Conservation Law include lands under water to which the state has no title?

"(3) If Section 322 of the Conservation Laws was intended to apply to the lands under the waters of Mecox Bay, does it violate Article 1, Sections 6 and 17 of the New York State Constitution and Article 1, Section 10, and the Fourteenth Amendment of the Federal Constitution?"

That the title to the land under the waters of Mecox Bay is in The Trustees of the Freeholders and Commonalty of the Town of Southampton is beyond question. This was decided in the case of Town of Southampton v. Mecox Bay Oyster Co. (116 N.Y.1). Judge Brown, writing the opinion in this case, referring to the charters under which the town asserted title, said: "Nearly all the Long Island towns were created by royal charters, and the patents were intended not only to create the corporate bodies and thus clothe the inhabitants with the power of government, but also to convey the title to the land within the bounds of the town."

There are two royal charters affecting the Town of Southampton. The first was dated November 1, 1676, known as the Andros Charter, and the second, dated December 6, 1686, known as the Dongan Charter. The Andros Charter, after describing the lands conveyed, provided as follows: "together with all rivers, lakes, waters, quarries, woodland, plains, meadows, pastures, marshes, fishing, hawking, hunting and fowling and all other profits, commodities * * * . TO HAVE AND TO HOLD all and singular the said lands, hereditaments and premises with their and every of their appurtances and of every part and parcel thereof to the said Patentees and their Associates, their heirs, successors and assigns forever."

The Dongan Charter ratified and confirmed the grant, and conveyed also the waters, lakes and ponds, and the easements of fishing, hawking and fowling.

As to these common lands under water, Judge Brown, writing in the Mecox Bay case, said:

"The absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time.

"They leased the fisheries to particular persons, generally on conditions that the fish be sold only to the inhabitants of the town. They prohibited the taking of fish, clams and oysters during certain periods of the year and enforced such prohibition by penalties.

"They leased the land under water for oyster planting, and agreed to indemnify and defend the lessees against assertion of hostile rights in the leased property.

"They sold the seaweed from the beaches, gave consent to the erection of wharves and docks, and regulated the use thereof. Provided for the building of mills on the streams, and in numerous instances passed and enforced ordinances regulating the fishing and oystering in the bay, which is the subject of this suit.

"Such was the usage under the patents down to the year 1818. The town held undisputed possession of the unallotted lands and of the water within the town, and claimed and assumed to hold the legal title."

In People ex rel. Howell v. Jessup (160 N.Y. 249), which was an action to compel the defendant to remove a bridge constructed by him over the waters of the Great South Bay near Westhampton in the Town of Southampton, it appeared that the defendant had been authorized to build the bridge by the Trustees of the Freeholders and Commonalty of the Town of Southampton, and the Court of Appeals held, reversing the judgment below, that the defendant could not be disturbed in constructing the bridge. In the opinion, it was stated that the real question involved was whether the Town of Southampton is the sovereign as to the lands under water and has control of the waters at this point, and, in the course of the opinion Chief Judge Parker said: "So, in express terms, and by the use of words about the meaning of which there can be no doubt, the sovereign granted to the trustees for the freeholders and commonalty of the town all the waters within the boundaries contained in the grant, as well as the title to the lands under water and all franchises relating thereto. From the sovereign's point of view, as well as from that of the public, this action was politic; for it lodged in the trustees of the town the authority to do all those things which would inure to the benefit of the inhabitants of the Town and at the same time it tended to stimulate them to think out such a course of action as should best employ the waters for the public good. To that end the trustees were invested with the power of management and authorized to perform such acts and make such orders, not repugnant to the laws of England, as they might see fit." (Pp. 261, 262) "* * * The result of our investigation is that we conclude that the crown had authority to grant not only the land and the lands under the water, but the waters as well as at this point, and that the title and the sovereignty over such water and the lands thereunder was by the Andros and Dongan charters vested in and conferred upon the trustees for the freeholders and commonalty of the Town of Southampton, a sovereignty that enabled them to permit the doing of all things that a government may do for the benefit of its people. Subsequently the validity of these charters was affirmed by legislation of the colony."(P. 265)

"* * * By the several Constitutions of this state great care has been taken to prevent the possibility of a claim that the Constitution affected any of the grants of land made by authority of the king, or annulled any charters to bodies politic made before the 14th day of October, 1775; indeed, the effect of the adoption of the first Constitution was to confirm the grants. (Sage v. Mayor, etc., 154 N.Y. 61, 81)" (P. 267) "* * * If we have reasoned accurately thus far, the title to the lands under water and the right of possession and control of the waters in question were in the trustees, who had the right in their sovereign character to do in the discharge of their trust precisely what their predecessor sovereign could have done, or what the state, had it instead of the town succeeded to the title and rights of the English government, might have done, or may yet do, shall it hereafter so succeed, by an exercise if its right of eminent domain. The state, as we have already seen, may authorize such a construction in waters over which it has either retained or regained control, and it follows that the action of the town trustees conferred upon the defendant lawful authority to make the construction." (P. 268)

In addition to this, it is pointed out that, on two occasions, the Legislature of the State has recognized that the title to Mecox Bay and the land thereunder was in the town. In 1818, the Legislature enacted a law providing that all the undivided lands of the town (Mecox Bay was never divided) should be managed by the Trustees of the Freeholders and Commonalty of the Town of Southampton, and empowered such Trustees to sell, lease or partition the same. In 1831, the Legislature passed another law re-affirming the rights and privileges granted by the Dongan Charter and providing as follows:

"Sec. 5. The said trustees shall have the sole control over all the fisheries, fowling, sea weed, waters and productions of the waters within the said town, not the property of individuals, and all the property, commodities, privileges and franchises granted to them by the charter of Governor Dongan, in one thousand six hundred and eighty-six, except so far as abrogated, changed and altered by the laws of this state, passed in conformity to the constitution and not now belonging to individuals nor to the proprietors, by virtue of an act entitled 'An act relative to the common and undivided lands and marshes in Southampton, in the county of Suffolk', passed April 15th 1818; and they have power to make rules, orders and by-laws for the management thereof and the regulation of their affairs, and to impose such penalties on any person offending against such rules, orders or by-laws, or any of them, as they shall deem meet and proper; such penalty shall not exceed the sum of fifty dollars for any one offence;

which penalty may be sued for and recovered in an action of debt, with costs, in the name of the said trustees, in their corporate capacity, in any court having cognizance thereof."

The foregoing plainly shows the legal situation regarding Mecox Bay. It is evident that the title to the waters and the land thereunder is in the town, and that for over two centuries, under the royal charters, as confirmed by legislation of the State, the town has exercised continuously acts of ownership, leasing the fisheries and regulating the taking of fish, clams and oysters from the bay; and the town, in passing the ordinance under which the defendant took the clams in question, was only continuing the exercise of its rights which had been carried on for a long period of time. Nevertheless, the respondent claims that section 322 of the Conservation Law applies to Mecox Bay in spite of the provisions of the charters and the acts of the Legislature giving to the town the sole control over all the fisheries, etc., within said town. The Attorney General states in his brief that, in so far as the grant of the land and the shellfish is concerned, it is a private grant, and the State may not be able to disturb the ownership, but in regard to the management by the State and making this property subject to general public law the State retained full power. The State evidently admits the ownership in the town of the lands and waters of Mecox Bay and even the clams living in the sand underneath the water, but argues that the State may still legislate as to the management of this property in the exercise of the police power. In the first place there is apparently no reason shown for the exercise of the police power in preventing the taking of clams in Mecox Bay. Furthermore, even if the State had such power reserved in spite of the royal charters, it apparently ceded such power when it passed the Act of 1831, giving to the Trustees of the town the sole control over all the fisheries, etc., within the town. Putnam, J. writing in Peo. ex rel. Squires v. Hand (158 App.Div. 510), states that, as to lands and estates, when the States cedes waters and lands it cannot retake them, and he quotes Chief Justice Marshall in the Dartmouth College case to the effect that a grant amounts to an extinguishment of the right of a grantor and implies a contract not to reassert that right. The Attorney General insists that the royal charters and the Acts of the Legislature referred to did not grant to the town the sovereign right of legislation in the conservation of aquatic life. A number of cases are cited; among them Phelps v. Racey (60 N.Y. 10); Barrett v. State of New York (220 N.Y. 423); Silz v. Hesterberg (221 U.S. 31, affirming 184 N.Y. 126); Miller v. McLaughlin (281 U.S. 261); Gratz v. McKee (258 Fed.Rep. 335); Matter of Fishway, Town of Deposit (131 App.Div. 403).

These cases have to do with migratory wild game and fish, including shellfish in the category of fish, and do not appear to be in point. Mecox Bay is entirely land-locked, with no

outlet, and it is wholly owned by a single party, to wit, the town. The argument of the Attorney General is that clams are generally classified as a kind of fish, and fish, because of their migratory character, are classed as ferae naturae and that their ownership while in a state of freedom is in the State in its sovereign capacity, and ownership thereof may not be claimed by any particular individual. The appellants, however, point out that clams are not migratory; that they never move and are not at all like fish and cannot be classified as ferae naturae. The appellants' counsel states that the only case he has been able to find which discusses the proper classification of clams is Sequim Bay Canning Co. v. Bugge (49 Wash. 127). This action was brought to enjoin the defendants from trespassing on certain lands for the purpose of taking and removing clams, which lands had been leased to the plaintiff. The defendant claimed that the lease did not give to the plaintiff a right to take clams superior to that of the public. Upon appeal, the Supreme Court of the State of Washington held for the plaintiff, Chief Justice Hadley stating in his opinion as follows: "...the gathering and taking of clams requires a digging down in the soil, a contact with and disturbance of the land itself. Even if clams should be classified as fish under the term "shellfish", as suggested by respondents, still they cannot be taken by the use of any methods exercised in the prosecution of the common right of fishing in the waters. Clams ordinarily live in the soil under the waters, and not within the waters. It is true they derive a part of their sustenance from the sea during the times the waters overspread the lands; but at other times they live, not merely upon, but actually within the land. They therefore, in a very material sense, belong with the land. When taken they must be wrenched from their beds, made well down in the soil itself. It must follow therefore that, if the state has authority to invest one with the private ownership of the tide lands, such investiture must carry with it the right to exercise dominion and ownership over what is upon the land, and especially over things so closely related to the soil as clams.

The appellants also cite People v. Conrad (125 Mich. 1). In this case, the defendant, with others owned a lake, covering over fifteen acres, which had no inlet or outlet. Permission was obtained from all the owners to spear fish in the lake, for which they were arrested and tried under a statute which prohibited the spearing of fish in any of the inland lakes of the State. The Court held that the statute did not apply to this privately owned lake, and in the opinion it was stated: "This lake is private property. Its owners have entire control over it, and the right to fish in it. If it were connected with other lakes and streams, so that fish might pass in and out of it, others than the owners would then have an interest in the protection of the fish in the lake. This act cannot be construed to include private ponds or lakes, in which the public have no interest."

Another case cited by the appellants is State v. Roberts (59 N. H. 256), in which the Court held that the State Legislature had a perfect right to regulate and protect the public right to have migratory fish pass up and down the rivers and streams. It also said as follows: "But while the legislature has power to regulate and limit the time and manner of taking fish in waters which are public-breeding places or passage-ways for fish, it has not assumed to interfere with the privileges of the owners of private ponds having no communication through which fish are accustomed to pass to other waters. Such ponds, whether natural or artificial, are regarded as private property, and the owners may take fish therefrom whenever they choose, without restraint from any legislative enactment, since the exercise of this right in no way interferes with the right of others."

I do not believe that clams can be classified as ferae naturae; and as to game and fish, so classed, I cannot find that the courts have upheld the right of the State to legislate over them when found upon private property, unless they were in streams or other waters from which they might escape. An interesting case cited by the appellants is Smith v. Odell (234 N.Y. 267). This was an action brought to cancel two leases given by the Trustees of the Freeholders and Commonalty of the Town of Brookhaven to one Kreamer, covering lands lying under water in the Great South Bay, and the leases were given for the sole purpose of permitting the lessee to shoot wild fowl on said water; and the Court of Appeals held that the title to the land leased was in the Trustees under the ancient charters (and these charters were similar to those governing Southampton Town), and upheld the power of the town to make the leases. It does not appear whether the leases given were in violation

of any of the conservation laws of the State, but no qualification, other than the right of the public to use the water for navigation, seems to be made in the opinion in this case of the absolute power of the Trustees to make the leases. In my judgment, the town in the present case has the absolute right under the ancient charters to control and manage Mecox Bay and its productions, and if there was any right reserved to the State to exercise its police powers over these waters it ceded such right when, by the Act of 1831, it gave to the town the sole right to control the fisheries, waters and production of the waters within the Town of Southampton. If I am right in this conclusion, it is unnecessary to discuss the other points raised by the appellants.

The judgment in each case should be reversed upon the law, with costs, and the complaint dismissed, with costs.

159 E. People of the State of New York, respondents, v. Richard Miller and The Trustees of the Freeholders and Commonalty of the Town of Southampton, appellants.

Judgment reversed on the law, with costs, and complaint dismissed, with costs. Findings of fact and conclusions of law inconsistent herewith are reversed and new findings and conclusions will be made to support this decision. Opinion by Young, J. Lazansky, P. J. Kapper and Hagarty, JJ., concur. Carswell, J., dissents.

Settle order on notice.


### THE JESSUP BRIDGE CASE.

From the Trustees Records, Vol. III, Page 127.

In December, 1899, the Court gave a decision concerning the long litigation of the Jessup bridge case, at Westhampton. The decision was a very important one, and in the opinion of many, sustains a contention of old residents that Southampton is a separate "State" or government of its own, and could have set up, years ago, had it desired to do so, as a separate corporation, also that "rights" granted in the old Patent are of more importance even today than many of the present generation (1899) think.

The Jessup bridge case occupied the public mind for years. The Court reversed the opinion of lower Courts.

Jessup secured permission to build, and built a draw bridge to connect tracts of mainland and ocean beach that he owned. Soon after he had built the structure and finished the draw bridge, it occurred to him that he could make the bridge more permanent by filling in the spaces between the piles with dirt and stones. Suits were instituted in the Courts, among them an action by the Attorney General. All of them were carried to the Court of Appeals, and Mr. Jessup was beaten. The Court directed the sheriff to remove the Jessup bridge.

The judgment was supposed to be final and to establish the right of Southampton town under old Colonial charters. The Court held that these rights were legally conferred before the State of New York, or the United States, had an existence; that these rights have been continued and protected by the constitution of the State. The Court held that land, including lands under water, and also the waters themselves within the limits of the Town of Southampton, were not vested in the English government in trust for the people at the time of the revolution, but were vested in the Town of Southampton by charters granted nearly one hundred years before the War of the Revolution, and that the town had a distinct political existence long before the creation of the State

# Exhibit C

JUSTICE COURT: TOWN OF SOUTHAMPTON
COUNTY OF SUFFOLK: STATE OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK,

    -against-

DAVID T. SILVA,

        Defendant.

Case No.: 17-7008

Hon. Gary J. Weber, T.J.

**DEFENDANT'S REPLY
MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO
DISMISS**

## REPLY FACTS

The People fail to oppose the free trade provision of the 1664 Fort Albany Treaty,
annexed to Defendant's motion, also known as, Articles between Col. Cartwright and the New
York Indians, *Documents Related to the Colonial History of the State of New York*, v. III, pp. 67-
68, and retained right to fish in ceded territory under the 1659 Wyandanch Deed, *Records of the
Town of Southampton*, v. I, p. 162.

The People further fail to oppose the judgments and orders annexed to Defendant's
motion showing that Shinnecock fishing citations have consistently been dismissed: the Decision
by the Hon. Deborah Kooperstein, dated January 28, 2009, from *People of the State of New York
v. Salvatore J. Ruggiero*, Case No. 08-101350, Southampton Town Justice Court, *People v
Gerrod T. Smith*, Case No. 08-101351, *People v. Jonathan K. Smith*, Case No. 09-031419, and
*People v. Jonathan K. Smith*, cv-09-0571 (NYED).

The People fail to show how exhibits A and B, merely maps, have any legal significance
relating to the water boundaries of the Shinnecock Indian Reservation. The People fail to show
how exhibit C, a partially reproduced Surrogate's Court decision, *In re Brenner*, has any legal
significance or precedential value: Said trespassing case involved a land boundary dispute, not a

water boundary dispute, the Shinnecock Indian Nation is a necessary party to any litigation involving its Reservations rights, was not a party to the case, and a Surrogate Court decision has no precedential value on this court. The People fail to show how exhibit D, E, or F, reproductions of the 1686 Dongan Patent, 1659 Quogue Purchase, and a 1640 Indian deed, abrogates or extinguishes any asserted rights under the free trade provision of the 1664 Fort Albany Treaty or the right to fish in ceded territory under the 1659 Wyandanch Deed, or how said documents otherwise abrogates any aboriginal fishing rights.

The People further fail to show the legal significance of Exhibit G, a Second Dept. decision in *People v. Miller* et al, when the Shinnecock Indian Nation, a necessary party to any litigation involving its Reservation rights, was not a party to the case.

The People further fail to show the legal significance of Exhibits H and I, eel papers, when the papers do not have a bearing on Reservation rights.

## **REPLY ARGUMENT**

The People's exhibits annexed to their response have no legal bearing on the water boundary lines of the Shinnecock Indian Reservation, nor on reserved fishing rights in ceded territory, and merely show the continuing confusion in the People's mind on jurisdiction in Shinnecock Bay. By no stretch of the imagination do the People show jurisdiction beyond a reasonable doubt. Defendant otherwise relies on his opening memorandum.


Dated: December 18, 2017
New York, New York

2

Respectfully submitted,

MOORE INTERNATIONAL LAW PLLC

By: _____

Scott M. Moore, Esq.
Rockefeller Center
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
(212) 332-3474
(smm@milopc.com)
*Attorneys for Defendant, David T. Silva*

3