UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                    Plaintiffs,              CV 18-3648
                                         (SJF)(SIL)

     -against-

BRIAN FARRISH,
JAMIE GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT ATTORNEY'S
OFFICE,

                    Defendants.
----------------------------------------------------------------x

## STATE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General of the State of New York
200 Old Country Road, Suite 240
Mineola, New York 11501
(516) 248-3302
Attorneys for State Defendants

RICHARD HUNTER YORKE
Assistant Attorney General
Of Counsel

## PRELIMINARY STATEMENT

Plaintiffs' claims to be exclusively unconstrained by fishing regulations in New York State waters fail.  Plaintiffs' claims are barred under the 11th Amendment and principles of Sovereign Immunity, to which *Ex Parte Young* provides no exception.  Moreover, the *Younger* abstention principle along with Plaintiffs' lack of standing provide a jurisdictional bar.

Plaintiffs identify no treaty-based fishing rights, and their unsupported claims to possess aboriginal fishing rights fail as any such rights were extinguished when the Shinnecock Tribe conveyed land to non-Indians.  Extinguishment of aboriginal rights was conclusively confirmed by the subsequent Determinations and Patents of the colonial Governors of New York, which ratified right and title to the lands in the Town of Southampton.  Even were the Court to find that Plaintiffs possess an off-reservation fishing right, regulation by the state would still be proper under the doctrine of conservation necessity, and Plaintiffs' claims would be barred under the principles articulated under the *Sherrill* Doctrine.

Moreover, Plaintiffs have offered no evidence of discriminatory intent or racial motivation by State Defendants in support of their claims under 42 U.S.C. Sections 1981 and 1982 as they are required, and the individual State Defendants are in any event shielded from Plaintiffs' claims by qualified immunity.

Defendants New York State Department of Environmental Conservation, Basil Seggos, Brian Farrish, and Evan Laczi ("State Defendants") are thus entitled to Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

For a full recitation of the facts, State Defendants respectfully refer the Court to the Statement of Undisputed Facts, pursuant to Local Rule 56.1.

## LEGAL STANDARD

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), 56(c).  The moving party has the burden of demonstrating the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Atlantic Mutual Insurance Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  No genuinely triable factual issue exists when the moving party demonstrates that no rational jury could find in the non-movant's favor.  *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).  The burden then shifts to the non-moving party to come forward with admissible evidence sufficient to support each essential element of the claim, and "designate specific facts showing that there is a genuine issue for trial." *See Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted); *see also Cordiano*, 575 F.3d at 204. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (*citing Celotex Corp.*, 477 U.S. at 322-23); *see also* Fed. R. Civ. P. 56(c)(1)(B).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir.

1990)(*quoting Anderson*, 477 U.S. at 252), and a motion for summary judgment cannot be defeated

on the basis of conclusory assertions, mere denials or unsupported alternative explanations of facts.

*See Major League Baseball Props., Inc.*, 542 F.3d at 310; *see also Senno*, 812 F. Supp. 2d at 467

(citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

## ARGUMENT

### I.      Sovereign Immunity Bars This Suit Against the State

Plaintiffs' claims against Department of Environmental Conservation ("DEC"), and the

State Defendants in their official capacities are barred by the Eleventh Amendment and principles

of Sovereign Immunity.  Unless a State has explicitly and unequivocally consented, it is immune

from suit in federal court.  *Sossamon v. Texas*, 563 U.S. 277, 131 S.Ct. 1651, 1657-1658 (2011);

*Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193 (2006).  This bar applies to

claims against State agencies and State officials in their official capacities and bars both monetary

and equitable relief.  *See Dekom v. New York*, 2013 U.S. Dist. LEXIS 85360, *33 (E.D.N.Y.

2013)(citing *Edelman v. Jordan*, 415 U.S. 651 (1974); *see also Will v. Michigan Dep't of State

Police*, 491 U.S. 58, 71 (1989); *Quern v. Jordan*, 440 U.S. 332, 341-345 (1979); *Salvador v.

Adirondack Park Agency*, 35 Fed. Appx. 7, 10 (2d Cir. 2002).

*Ex Parte Young*, 209 U.S. 123 (1908), provides a limited exception to the above principles.

Whether  the  *Ex  Parte  Young* exception to  the Eleventh  Amendment's bar  applies  is  a

straightforward inquiry that asks whether the complaint alleges an ongoing violation of federal law

and seeks relief properly characterized as prospective.  *See In re Dairy Mart Convenience Stores,

Inc.*, 411 F.3d 367, 372 (2d Cir. 2005)(citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535

U.S. 635, 645 (2002)).

Plaintiffs fail to satisfy this standard.  Plaintiffs have alleged only that Plaintiff Silva is currently facing prosecution, and that the remaining Plaintiffs were each subject to a nearly decade-old dismissed prosecution.  This Court should abstain from addressing the relief sought as to Plaintiff Silva under the doctrine of *Younger* abstention.  The remaining Plaintiffs have failed to put forth facts supporting an ongoing violation of federal law.  Temporally remote single prosecutions do not constitute an ongoing violation for purposes of *Ex Parte Young*.  See *KM Enters. v. McDonald*, 2012 U.S. Dist. LEXIS 138599, *29 (E.D.N.Y. 2012).  The Complaint alleges only a dismissed prosecution for undersized flounder, blackfish, and porgy as to Gerrod T. Smith in 2009, and a dismissal in 2010 as to Jonathan K. Smith for a shellfish farm without a license.  This Court has already held that Plaintiffs Gerrod Smith and Jonathan Smith lack standing to seek injunctive relief, as they have alleged no injury in fact supporting such relief.  *See* D.E. 48, Memorandum and Order, dated July 31, 2018.  For this reason, they 1) fail to demonstrate an ongoing violation and 2) cannot seek prospective relief.

## II.     *Ex Parte Young* is Inapplicable Under *Coeur D'Alene* and Its Progeny

This Court should reject the applicability of *Ex Parte Young*, based upon the relief requested in this case.  Plaintiffs are in effect seeking "a determination that the lands in question are not even within the regulatory jurisdiction of the State, which declaration would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters."  *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 282 (1997).  The *Coeur D'Alene* Court held the *Ex Parte Young* exception inapplicable where a tribe "sought a declaratory judgment to establish its entitlement to the exclusive use and occupancy and the right to quiet enjoyment of the submerged lands as well as a declaration of the invalidity of all Idaho statutes, ordinances, regulations, customs or usages which purport to regulate, authorize, use or affect in any way the

submerged lands" and in effect sought quiet title to certain lands, and where "if the Tribe were to prevail, [the state's] sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Coeur D'Alene*, 521 U.S. at 265, 287.  The relief requested by Plaintiffs here would likewise affect the state's sovereign interest and regulatory authority over its waters, along with its ability to regulate and protect its wildlife.

The Second Circuit applied similar reasoning in declining to apply *Ex Parte Young* to avoid Eleventh Amendment Immunity where a tribe argued "that it seeks only 'Indian title,' which it describes as the right 'to camp, to hunt, to fish, [and] to use the waters and timbers' in the contested lands and waterways." *W. Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18, 22 (2d Cir. 2004).  The Second Circuit interpreted the requested relief as seeking "a determination that the lands in question are not even within the regulatory jurisdiction of the State[,]" citing *Coeur D'Alene*.  *W. Mohegan Tribe*, 395 F.3d at 23.

Plaintiffs here seek analogous relief, as their intent is to circumvent New York's regulatory jurisdiction within its borders, preventing the State from regulating wildlife and conservation matters in state waters.  This Court cannot provide the relief that Plaintiffs seek absent a holding that Plaintiffs maintain aboriginal Indian title over the lands in question or hold off-reservation treaty fishing rights—of which Plaintiffs can show no evidence.  As held in *Western Mohegan Tribe*, this claim is "fundamentally inconsistent with the State of New York's exercise of fee title over the contested areas.  To the extent that the complaint alleges that there has never been a lawful extinguishment of the Tribe's Indian title, it seeks a declaration from this court that New York's exercise of fee title remains subject to the Tribe's rights, *i.e.*, a determination that the lands in question are not even within the regulatory jurisdiction of the State."  *Id.* (internal quotations and

citations omitted). Plaintiffs here allege unrelinquished aboriginal rights. D.E. 1 at ¶¶1, 16, 22. In fact, Plaintiffs' papers clarify that their claims go far beyond an ill-defined "use" right, exposing the true nature of their argument: that these state waters are "contested," are under Shinnecock "jurisdiction," and indeed are part of Shinnecock Reservation land. *See* D.E. 64 at 7, 9; D.E. 73, Ex. 2. This Court should decline to apply *Ex Parte Young* in these circumstances.

### III. The Court Should Decline Jurisdiction Under *Younger* Abstention

The Court should abstain from exercising jurisdiction over Plaintiff Silva's claims seeking injunctive or declaratory relief under the *Younger* abstention doctrine. *Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims. *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2004). "*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D"*, 282 F.3d at 198. "This doctrine of federal abstention rests foursquare on the notion that, in the ordinary course, a state proceeding provides an adequate forum for the vindication of federal constitutional rights." *Id.* at 198 (citations and quotations omitted). *Younger* abstention applies to suits seeking declaratory and injunctive relief. *See Samuels v. Mackell*, 401 U.S. 66, 73-74 (1971); *Hansel v. Town Court*, 56 F.3d 391, 394 (2d Cir. 1995); *Temple of Lost Sheep, Inc. v. Abrams*, 930 F.2d 178, 183 (2d Cir. 1991).

Plaintiff Silva has not shown that any alleged constitutional issues cannot be adequately adjudicated in state court. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930 (1975)(stating: "The principle underlying *Younger* and *Samuels* is that state courts are fully competent to

adjudicate constitutional claims, and therefore a federal court should, in all but the most exceptional circumstances, refuse to interfere with an ongoing state criminal proceeding."). "*Younger* v. *Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts." *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973). Plaintiff Silva cannot seek prospective declaratory and injunctive relief during the pendency of a state proceeding. *See Andujar v. City of New York*, 2012 U.S. Dist. LEXIS 151562, *10 (S.D.N.Y. 2012)("The potential of the federal court's ruling to influence the state court's judgment is therefore 'precisely the sort of interference condemned by the Supreme Court in *Younger*.'"). In *Andujar*, the court applied *Younger* abstention where there were "ongoing state proceeding, which the federal action could influence, if not completely dispose of," stating the "federal and state cases are so closely related that if Plaintiff prevailed in this Court, it would 'render [his state criminal] conviction moot and influence the decision on appeal.'" *Id*. at *10-11. "[W]hen a state prosecution is pending, claims of injunctive relief seeking to enjoin future prosecutions still trigger the *Younger* doctrine." *Id*.; *see also Canny v. Ray*, 1991 U.S. Dist. LEXIS 17994, *12 (N.D.N.Y. 1991) (*Younger* abstention applies where plaintiffs seek prospective relief). Declaratory or injunctive relief preventing enforcement of state laws would influence an issue central to the present state court proceedings, and "any injunction or declaratory judgment against future state action issued by a federal court would affect the course and outcome of the pending state proceedings." *Andujar*, 2012 U.S. Dist. LEXIS 151562, *10 (quoting *Ballard v. Wilson*, 856 F.2d 1568, 1570 (5th Cir. 1988)).

It is of no consequence that Plaintiff Silva has been criminally convicted. "With respect to whether there is an ongoing state proceeding, it is settled that for purposes of *Younger* abstention, a proceeding is considered pending until all appellate court remedies have been exhausted." *Levy*

*v. Lerner*, 853 F. Supp. 636, 641 (E.D.N.Y. 1994) (applying *Younger* abstention where the opportunity for plaintiff to appeal his conviction available, and where plaintiff had filed notice of appeal).  "A state action is considered 'pending' for *Younger* purposes through the completion of the state appeals process, even if the federal plaintiff has failed to exercise his state appellate rights." *Jureli, LLC v. Schaefer*, 53 F. Supp. 3d 552, 559 (E.D.N.Y. 2014).  The Court should abstain from exercising jurisdiction over Plaintiffs' claims for declaratory and injunctive relief.

## IV.    <u>Plaintiffs Lack Standing to Seek Declaratory or Injunctive Relief</u>

Plaintiffs Gerrod Smith and Jonathan Smith lack standing to seek injunctive or declaratory relief preventing Defendants from "interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters."

When seeking injunctive relief, "a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  In order to establish standing to seek declaratory or injunctive relief, a plaintiff must establish that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged conduct.  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)(citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)); *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (1998).  "For an alleged injury to support constitutional standing, it must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015)(internal citations and quotations omitted).  A threatened injury must be certainly impending to constitute injury in fact, and allegations of possible future injury are not sufficient. *See McLennon v. City of New York*,

171 F. Supp. 3d 69, 104 (E.D.N.Y. 2016)(internal quotations and citations omitted).  "[A] plaintiff cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future."  *Id*.  Further, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ."  *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Plaintiffs Gerrod Smith and Jonathan Smith have not offered evidence that they are currently being prosecuted or facing criminal charges.  They have put forth evidence of isolated dismissed prosecutions, nearly a decade old, for violating generally applicable State fishing laws.  They have not put forth evidence of any recent interactions with Defendants.  Their request for injunctive relief is speculative and remote.  They have not stated a concrete and particularized injury.  *Shain*, 356 F.3d at 215.  As the Court held in deciding Plaintiffs' Motion for Preliminary Injunction, the allegations in the Complaint are insufficient to support the required concrete and particularized injury.  *See* Memorandum and Order, dated July 31, 2018, ECF No. 48.  These Plaintiffs lack standing to seek declaratory or injunctive relief.

Plaintiff Silva likewise does not have standing to seek prospective declaratory and injunctive relief enjoining Defendants from "interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters."  Past injury does not supply a predicate for prospective injunctive relief "since the fact that such practices had been used in the past did not translate into a real and immediate threat of future injury."  *Shain*, 356 F.3d at 215 (quoting *Lyons*, 461 U.S. at 105-106).

## V.     Collateral Estoppel Bars Plaintiffs' Aboriginal Rights Claims

Plaintiffs are precluded from litigating the issue of whether they have aboriginal fishing

rights, as Plaintiff Silva was found guilty at criminal trial.  As a federal court must apply the

rules of collateral estoppel of the state in which the conviction was rendered, New York state rules

of collateral estoppel apply.  *See Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000).  For

collateral estoppel to apply, the Court must find (1) the issues in both proceedings are substantially

the same; (2) the issue has been actually litigated and decided in the prior proceeding; (3) there

has been a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the

resolution of the issue was necessary to support a valid and final judgment on the merits.  *See*

*Blackwell v. Town of Greenburgh*, 2017 U.S. Dist. LEXIS 44404, *21-22 (S.D.N.Y. Mar. 24,

2017) (citing *United States v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d

165, 172 (2d Cir. 2002)).[1]  "To meet the identity-of-issues prong of collateral estoppel, it is not

necessary that the issues be exactly identical; it is sufficient that 'the issues presented in the earlier

litigation are substantially the same as those presented by the later action.'"  *Zherka v. City of New*

*York*, 459 Fed. Appx. 10, 13 (2d Cir. 2012).  The pendency of a criminal appeal does not impact

the collateral estoppel effect of an otherwise final and valid judgment.  *See United States v. All*

*Right, Title & Interest in Real Property etc.*, 901 F.2d 288, 292 (2d Cir. 1990); *SEC v. Contorinis*,

2012 U.S. Dist. LEXIS 19961 at *9 (S.D.N.Y. Feb. 3, 2012).

Plaintiffs previously made the same arguments they make in this case.  They lost.  In the

criminal proceeding, Silva brought a motion to dismiss based on lack of jurisdiction, arguing in

relevant part that the Shinnecock Nation has unabrogated fishing rights outside the Shinnecock

---

[1] A litigant may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case, and because mutuality of estoppel is not an absolute requirement, a party other than the Government may assert collateral estoppel based on a criminal conviction.  *See Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir. 1986) (internal citations omitted); *Gilberg v. Barbieri*, 53 N.Y.2d 285, 291 (1981).

10

Reservation, pursuant to the 1664 Fort Albany Treaty and the May 12, 1659 Wyandanch Deed to John Ogden ("Quogue Purchase").  *See* Declaration of Richard Yorke, dated Oct. 4, 2019 ("Yorke Decl.") Ex. A, Notice of Motion and Defendant's Memorandum of Law in Support of Motion to Dismiss, dated October 10, 2017, p. 5, Ex. 3.  Silva argued, "The GIS map disclosed by the People shows that Silva was ticketed for fishing in the traditional Shinnecock fishing grounds of the Shinnecock Bay estuary, an area of retained fishing rights, whether or not outside Shinnecock Reservation waters."  *Id*. at p. 6.

In opposition, the Suffolk County District Attorney's office argued in relevant part that, under the Dongan Patent of 1686, the Town of Southampton owns the bodies of water within its boundaries and was conveyed the easements of fishing, that the Indian Deed of December 13, 1640 for Southampton reserved no fishing rights, and that Silva provided no treaty or law that reserved fishing rights in the body of water in question.  *See* Yorke Decl. Ex B, Affirmation of Jamie Greenwood, Assistant District Attorney, in Opposition to Defendant's Motion, dated December 11, 2017 pp. 3-4.  Silva submitted a Reply Memorandum of Law arguing in relevant part that the People's arguments regarding the Dongan Patent, the Quogue Purchase, and the 1640 Indian Deed for Southampton fail to abrogate any aboriginal fishing rights.  *See* Yorke Decl, Ex. C, Defendant's Reply Memorandum of Law in Support of Motion to Dismiss, dated December 18, 2017, p. 1-2.

Judge Gary J. Weber's Decision, dated January 9, 2017 [sic.], noting that Silva argued, "That, since the Defendant in the instant matter is, concededly, a member of the Shinnecock Indian Tribe, he had the right to fish, without regulation by the State of New York, in the waters of the Shinnecock Indian Reservation in Shinnecock Bay," denied Silva's motion to dismiss, *See* Docket Entry ("D.E.") 3, Ex. 5, Memorandum Decision & Order of Hon. Gary J. Weber, dated January 9, 2017[sic.], p. 1.  At bench trial, Silva renewed his motion to dismiss the charges for lack of

jurisdiction; nevertheless, Silva was found guilty of the violation of E.C.L. Section 13-0335/71-0923, dated June 6, 2017 relating to the lack of a marine commercial food fishing license and the use of a fyke net. *See* Yorke Decl. Ex. D, Memorandum Decision of Hon. Gary J. Weber, dated June 5, 2019 at 5. Judge Weber held, "the People have proven beyond a reasonable doubt that the subject fyke net was set, maintained, operated or used in an area (Taylor's Creek) subject to the jurisdiction of the State of New York acting through the D.E.C." *Id*.

In finding Silva guilty, the court necessarily rejected Silva's argument that as a Shinnecock he had unrelinquished aboriginal fishing rights provided by documents, including the May 12, 1659 deed. Further, Plaintiff Jonathan K. Smith previously made this same argument in this Court, claiming an aboriginal right to possess undersized scallops, based upon this same deed. *See New York v. Smith*, 952 F. Supp. 2d 426, 431 (E.D.N.Y. 2013). Plaintiff Jonathan Smith likewise lost.

## VI.   Plaintiffs Have No Aboriginal or Treaty-Based Off-Reservation Fishing Rights

Plaintiffs identify no treaty-based or aboriginal right establishing off-reservation fishing for the Shinnecock Nation. Plaintiffs have merely dredged up an unrepresentative sampling of individual deeds and colonial orders that do not establish fishing rights.

### April 29, 1648 Deed for East Hampton

The original purchase deed for the Town of East Hampton, was signed between the Governors of the colonies of New Haven and Connecticut, and the sachems from the Montaukett, Manhansett, Corchaug, and Shinnecock tribes. The relevant language, partially quoted by Plaintiffs is:

> Allsoe, we, the said Sachems, have Covenanted to have Libertie, freely to fish in any or all the cricks and ponds, and hunt up and downe in the woods without Molestation, they giving the English Inhabitants noe just offence, or Iniurie to their goods and Chattells. Likewise, they are to have the fynns and tails of allsuch whales as shall be cast upp, to their proper right and desire they may bee dealt with in the other part. Allsoe, they reserve libertie to fish in all convenient places, for Shells to make wampum. Allsoe, if the Indyans, hunting

of any deare, they should chase them into the water, and the English should kill them, the English shall have the body, and the Sachem the skin.

Yorke Decl. at Exhibit E.

This deed was for the purchase of land in what is now the town of East Hampton, not Southampton where Plaintiff Silva was ticketed.   This area does not encompass or abut the Shinnecock Bay.   Southampton provided one of the boundaries to limit the deed: "all the land lyinge from the bounds of the Inhabitants of Southampton . . . not Intrenching upon any in length or breadth, which the Inhabitants of Southampton, have and do possess, as they by Lawful right shall make appeare . . ." *Id.*  Plaintiffs fail to quote the qualifying language.  These covenants were limited, in that the sachems would give "the English Inhabitants noe just offence, or Iniurie to their goods and Chattells."   The deed states of the Sachems, "in consideration thereof, we doe give upp unto the said Purchasers, all our right and Interest in the said Land, to them and their heirs forever." *Id*.

Plaintiffs offer no evidence that this was more than an individually negotiated term of sale for land.   Terms vary considerably in contemporaneous deeds, even within Plaintiffs' slim sampling.   Unacknowledged by Plaintiffs is that this 1648 East Hampton deed exists within a history that conflicts with their claims.

### December 13, 1640 Indian Deed for Southampton

Notably, Plaintiffs have failed to acknowledge the original Indian Deed for Southampton, of December 13, 1640, in which town Silva was ticketed for fishing.   This deed, signed by Mandush, the Shinnecock sachem, reserves no fishing rights, concerned with securing English protection from attacks by other Indians.  It states:

& further in consideration that the above named English shall defend us the sayed Indians from the unjust violence of whatever Indians shall illegally assaile us, doe absolutely and forever give and grant and by these presents doe acknowledge ourselves to have given and

13

> granted to the partyes above mentioned without any fraud, guile, mentall reservation or equivocation to them their heirs and successors forever all the lands, woods, waters, water courses, easmts, profits & emoluments, thence arising whatsoever . . .

Further:

> In full testimonie of this our absolute bargaine contract and grant indented and in full and complete ratification and establishment of this our act and deed of passing over all our title & interest in the premises with all emoluments & profits thereto appertaining, or in any wise belonging, from sea or land within our Limits above specified without all guile wee have sett to our hands the day and yeare above sayd.

Yorke Decl. Ex.F.

### June 10, 1658 Deed to Beach

A June 10, 1658 deed between Wyandanch, sachem of the Montaukett tribe, and Lion Gardiner, sold Gardiner grazing access for horses and cattle on a specific land tract, replete with a yearly rental price.  Plaintiffs have without support characterized this deed as a "nation to nation agreement."  It states:

> Wiandance hath sould for a considerable sum of money and goods, a certaine tract of beach land, with all ye rest of ye grass that joynes to it, not seperated from it by water, which beach begins Eastward at the west end of Southampton bounds, and westward where it is separated by ye waters of ye sea, coming in out of the Ocean Sea, being bounded Southwards with the great sea, Northwards with the inland water; this land and the grass thereof for a range, or run, for to feed horses or cattle on, I say, I have sold to the aforesaid Lion Gardiner, his heirs, executor and assigns forever, for the sum aforesaid, and a yearly rent of twenty-five shillings a year, which yearly rent is to be paid to the foresaid Sachem, his heirs, executors and assigns for ever, in the eight month, called October, then to be demanded, but the whales that shall be cast upon this beach shall belong to me, and the rest of the Indians in their bounds, as they have beene anciently granted to them formerly by my forefathers.

Yorke Decl. Ex. G.

The tract's eastern boundary was at the time of the conveyance the "west end of Southampton bounds."  *Id*.

As Professor John A. Strong—upon whose report the Complaint exclusively relies—points out, this deed was for beach land adjacent to Shinnecock lands.  Drift whaling was a highly

lucrative aspect of the early Long Island economy. This was the processing and sale of the carcasses of dead whales that washed up on shore. *See* John A. Strong, *The Montaukett Indians of Eastern Long Island* 25 (Syracuse University Press 2001). Plaintiffs have offered no evidence that a deed selling grazing rights establishes an exclusive reservation of fishing rights. The language in this deed makes no reference to fishing. Indeed, as shown below, lucrative rights to drift whale carcasses were bargained and sold in a variety of ways, in different deeds throughout this period.

### May 12, 1659 Deed to John Ogden

The May 12, 1659 deed between Wyandanch, the Montaukett sachem, and John Ogden states in relevant part:

> I say all the land and meadow I have sold for a considerable price unto Mr Iohn Ogden for himselfe his heirs executors and assigns for ever, upon condition as followeth, first that Thomas Halsey and his Associates shall have the privilidge of the peice of meadow called quancawnantuck the terms of yeares formerly granted to him or them but the land lying between quancawnantuck and three miles northward he shall or may possess and improve at present, but when the yeares of the aforesayed Thomas Halsey shall be expired then shall the aforesaid Mr Iohn Ogden or his assigns fully possess and improve all quancaunantucke meadow with the rest aforesayed and then shall pay or cause to be payed unto me wiandance my heires or assigns the summe of twenty five shillings a yeare as a yearly acknowledgement or rent for ever. It is also agreed that wee shall keepe our privilidges of fishing fowling hunting or gathering of berrys or any other thing for our use . . .

Yorke Decl. Ex. H.

This particular deed, known as the "Quogue Purchase" involved a tract west of the present Shinnecock Canal. The deed states that this land begins, "at the westward end of Southampton boundes, which land is bounded Eastwards with Southampton boundes . ." *Id*. The sale exempted the beach lands that were already sold to John Cooper. *Id*. The agreement includes conditional language that also gives Thomas Halsey, a colonist, certain rights to the tract. Plaintiffs submit no evidence that this was more than an individually negotiated term in the private sale of land.

**June 8, 1659 Deed to Lion Gardiner Concerning Whale Rights**

The June 8, 1659 deed between Wyandanch, the Montaukett sachem, and Lion Gardiner is a detailed apportionment of the rights and profits from drift whale carcasses from a certain beach tract.  In it, Wyandanch sells to Lion Gardiner, "all the Bodyes and Bones of all the Whales that shall come upon the Land, or come a Shoare from the Western end of Southhampton Bounds, unto the place called Kitchaminchoke, yet reserving to ourselves and Indyans, all the Tailes and fins for Ourselves . . ."  The document sets a term of twenty-one years for the agreement.  It states further:

> that if any Whale shall bee cast up in the bounds aforementioned, whether it bee found by English or Indyons, it shall bee judged by them both whether it bee a whole Whale or a halfe or otherwise.  Now for every whole whale that shall come up, the aforesaid Lyon Gardiner or his Assigns, shall pay or cause to be paid unto mee wyandance, the Sum of five pounds Sterling, or any good pay which wee shall accept of, but if it bee a halfe whale, a third part, or otherwise, they shall pay according to Proportion, and this pay shall be within two Monethes after they have cutt out and carryed the Whale home to their Houses, but in case there shall not five whales come up, within the terme abovesaid, then shall the aforesaid Lyon Gardiner, or his Assigns, have the next five Whales, that shall come up after the Terme, paying to mee, my heirs, Executors or Assigns, the Sum above mentioned, and for the true performance of the promises, Wee have hereunto Sett our hands and Seales.

Yorke Decl. Ex. I (State Defendant have provided their transcription of this document).

This document does not mention fishing.  A similar deed sells drift whale rights to Lion Gardiner for further beach land, dated July 28, 1659.  Yorke Decl. Ex.J.  These documents reflect the lucrative and prized nature of drift whale carcasses.  They reflect that they were sold and traded through a variety of negotiated terms.  They do not reserve exclusive fishing rights.  Plaintiffs' highly misleading and context-free quote from this document misstates its meaning.

Undercutting the argument that these deeds reserved exclusive rights to the Indians, Professor Strong has noted, in his academic work:

> The question of drift whales came up again in November 1658 when Wyandanch gave Lion Gardiner and the Reverend Thomas James of East Hampton half the whales "or other great fish" that drifted onto the beach between Napeague and the far end of

> Montauk.  This was an important grant because it gave the two men an exclusive right to all of the ocean beaches on Montaukett lands.  The town of East Hampton owned the whale rights from Napeague west to the Southampton border and held them in common trust.  Wyandanch did require a small percentage of their profit, but left it to James and Gardiner to pay "what they shall judge meete and according as they find profit by them" ([Records of the Town of East Hampton] I:150).

John A. Strong, *The Montaukett Indians of Eastern Long Island* 26 (Syracuse University Press

2001).

> The Southampton settlers, in contrast, had begun to take advantage of the lucrative whaling potential along the south shore as early as 1650, when John Ogden, an English settler in Southampton, established the first private whaling company (RTSH 1874-77, 1:70-71).  Ogden employed Indian whalers to hunt whales that migrated along the Atlantic shore from November through March.  In 1659 Southampton entrepreneurs had pushed their control of whaling rights on the south beach westward into Unkechaug territory.  In 1662 Ogden met with sachems Tobacus and Winecroscum to negotiate a contract for the rights to drift whales on the south beach lying to the west of the lease held by Anthony Waters. This area of the barrier beach was probably between Enaughquamuck at the mouth of the Carman River and Namkee Creek on the west.

John A. Strong, *The Unkechaug Indians of Eastern Long Island* 56 (University of Oklahoma

Press 2011)

Professor Strong has himself elsewhere expanded on the June 8, 1659 document,

characterizing it in a markedly different manner:

> The following month Gardiner leased the whale rights to a section of Atlantic beach west of the area he had purchased from Wyandanch the year before (DSBD, 2:85-86). The lease ran for twenty-one years, and Wyandanch was promised five pounds sterling or an equivalent amount of goods for each whole whale carcass. The sachem reserved the tails and fins for himself. Gardiner then turned over the whale rights to John Cooper, who was beginning to develop a whaling enterprise, which would soon become a major industry on the south shore of eastern Long Island.

John A. Strong, *Wyandanch: Sachem of the Montauketts*  p. 17 of 23 (East Hampton Library,

1998 East Hampton 350th Anniversary Lecture Series January 31, 1998)

http://easthamptonlibrary.org/wp-content/files/pdfs/history/lectures/19980131-2.pdf (last visited

7/16/18).

These various sales and leases of whaling rights do not support a reservation of exclusive whaling rights to the Shinnecock tribe, to say nothing of exclusive fishing rights.

### April 1662 Topping Purchase

Plaintiffs have again mischaracterized the cited deed.  The deed states:

> Witnesseth that we the said Weany Anabackus and Iackanapes have given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a certain tract of land lying and being westward of the said Shinecock and the lawful bounds of Southampton above said, that is to say to begin at the canoe place otherwise Niamuck and soe to run westward te a place called and known by the name of Seatuck, and from thence to run northward across the said Island or neck of land unto a place called the head of the bay with all the meadow and pasture, arable land, easements profits benefits emoluments as is or may be contained within the limits and bounds before mentioned together with half the profits and benefit, of the beach on the south side the said Island in respect of fish whale or whales that shall by God's providence be cast up from time to time, and at all times, with all the herbage or feed that shall be, or grow thereon.

> To Have and To Hold, all the forementioned demised premises with all and singular the appurtanances thereto belonging or in any ways appertaining to him the said Thomas, his heirs executors, administrators, or assigns forever, without the lett trouble denial or molestation of us the said Weany, Anabaekus, and Iackanapes our heirs or assigns or any other person or persons lawfully claiming from, by, or under us our heirs executors Administrators or assigns…

Yorke Decl. Ex. K.

At the time of the Topping Purchase, the conveyed lands were not part of the territorial limits of Southampton and were not part of the Colony of Connecticut.  *Id*.  The deed transfers half of the whaling profits from the beach, along with the herbage and feed to Thomas Topping.  It again shows that land and whaling rights were sold and transferred in a variety of ways.  It does not reserve an exclusive fishing right to the Shinnecocks.

### September 17, 1666 Shinnecock Application

Subsequently, in a document dated September 17, 1666, a group of Shinnecocks protested the Topping Purchase to "General Nicolls" (the Colonial Governor of New York), claiming that

they were "the true proprietors of the said lands."  Yorke Decl. Ex. L.  The Shinnecock group sought to convey the lands to Southampton, stating that they "doe hereby assigne and make over all our said Interest in the said tract of land . . . wee say wee doe impart and assigne all our said Interest in ye said lands . . . unto our ancient and loving ffriends the Townes men of Southampton, to them & their successors for ever, with this proviso and consideration . . ." *Id.*  This document reserved no fishing rights.

### January 22, 1674-5 Resolution

Plaintiffs blatantly mischaracterize a January 22, 1674-5 Resolution.  Plaintiffs claim that this document states that Indians who discover drift whales shall have such reasonable satisfaction as hath been usual.  D.E. 3 at 5.  Plaintiffs, naturally, do not state from whom this satisfaction shall be.  The Resolution protected the Royal interest in drift whales.  The Crown maintained privilege over drift whales and attempted to protect its interests on Long Island in the 17th Century.  This document states:

> The preserving of his Royal Highnesse Interest in a proportion of ye Drift as in ye Law is set forth, the same being taken into Consideracon.  It is resolved, That there be some particular man commissioned to take care of drift whales in ye middle & westernmost part of *Long Island*, who is to be acceptable for his Royall Highnesse dues thereof, according to Law.

> That if an Indyan find and give notice of any such drift whales, he shall have such reasonable satisfaccon as hath been usuall.  If a christian shall find any such whale or great fish & secure it, or give due notice to ye person empowered, where by the said Fish may be saved, hee shall be allowed a quartr part for his share.  Provided yt no such whale being found, shall be cut up or embezeled, before notice be given to such Officrs or prsons empowered to take care therein.

Yorke Decl. Ex. M at 686.

This Order affirms the Royal possessory interest in the drift whales, and the proportion for the Crown and the discoverer, when a drift whale is discovered.  It does not mention Shinnecock Indians and reserves no rights to them.

19

Several other orders illuminate the Royal claims.  In an Order from May 2, 1672, concerning neglect of the Royal share of the drift whales on Long Island, two men were appointed to make inquiry by Indians or others as to drift whales cast up on the beach.  *Id*. at 664.  This Order was for the purposes of "securing his Royal Highness his part of Drift Whales or Great ffish cast upon ye Beach or Shoare according to ye Directions in ye Law . . ."  *Id.*

Another order, from May 10, 1672, gave Jonathan Cooper warrant to seize the whale-bone from a drift whale carried off his beach lands by several Indians.  *Id*. at 665.  In Orders Relating to Whaling on L.I., from April 19, 1673, inhabitants of Brook-haven and Seatalcott complained that Indians were disturbing their whaling rights, and demanding payment from them.  The Order required that the Indians cease their unlawful actions, and cease molesting the whalers, to whom liberty had been given to use the beach.  *Id*. at 678.

### May 23 and 24, 1676 Order Regarding Unkechaug

Plaintiffs have baldly mischaracterized this Order, selectively quoting the language in a misleading manner.  The records state on May 23, 1676:

> At a meeting of the Unchechaug Indyans of Long Island—before the Go: at the Fort.
>
> They give thankes for their peace, and that they may live, eate and sleepe quiet, without feare on the Island, They give some white strung seawant.
>
> They desire they being free borne on the said Island, that they may have leave to have a whale boate with all other materiells to fish and dispose of what they shall take, as to whom they like best.
>
> They complaine that fish being driven upon their beach etc. the English have come and taken them away from them per force.
>
> The Go: Demands if they made complainte of it to the Magistrates in the Townes, who are appointed to redresse any Injuryes.
>
> They say no, but another time will doe it.
>
> The Go: will consider of it and give them Answer tomorrow.

20

On May 24, 1676:

> The Indyans come againe to the Governor in presence of The Councell.
>
> What they desire is granted them as to their free liberty of fishing, if they bee not engaged to others; They say they are not engaged.
>
> They are to have an Order to shew for their priviledge.

The Order itself states:

> Resolved and ordered that they are at liberty and may freely whale or fish for or with Christians or by themselves and dispose of their effects as they as they thinke good according to law and Custome of the Government of which all Magistrates officers or others whom these may concerne are to take notice and suffer the said Indyans so to doe without any manner of let hindrance or molestacion they comporting themselves civilly and as they ought.

Yorke Decl. Ex. N.

The Unkechaug party who petitioned the Colonial Governor are a separate tribe from the Shinnecock Nation.  This document does not mention Shinnecocks, reserves no fishing rights, and in fact establishes that the Unkechaug needed to seek the Governor's leave for fishing and whaling, just as the English did.  Plaintiffs further misleadingly omit the qualifying language that the order was "according to law and Custome of the Government."

Plaintiffs have failed to establish the existence of a treaty-based off-reservation fishing rights.  Plaintiffs' selective reference to individual deeds, largely concerning the sale of whale carcasses does not establish a treaty.  Nor do Plaintiffs put forth evidence that any aboriginal fishing rights exist in property that by their own evidence was conveyed in private sales.  Any aboriginal rights were lost when the Shinnecock Nation conveyed the land.  "[W]hen an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands."  *South Dakota v. Bourland*, 508 U.S. at 689.

"Aboriginal title refers to the Indians' exclusive right to use and occupy lands they have inhabited from time immemorial, but that have subsequently become discovered by European settlers." *Seneca Nation of Indians v. New York*, 382 F.3d 245, 248 n. 4 (2d Cir. 2004) (internal citations and quotations omitted). "The right to extinguish Indian title, sometimes called a right of extinguishment, was held by the sovereign -- Great Britain in the period prior to the American Revolution." *Oneida Indian Nation v. New York*, 860 F.2d 1145, 1150 (2d Cir. 1988). The sovereign could extinguish aboriginal title though among other things contracts or treaty. *Seneca Nation of Indians v. New York*, 382 F.3d at 248 n. 4; *See also United States v. Santa Fe Pac R.R. Co.*, 314 U.S. 339, 347 (1941) (holding that aboriginal title can be extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise") (citation omitted).

Plaintiffs have relied on a series of deeds that conveyed ownership of land to private parties. Plaintiff Jonathan K. Smith, and his current attorney, have attempted this claim in this Court before. In *New York v. Smith*, 952 F. Supp. 2d 426, 431 (E.D.N.Y. 2013), Plaintiff Smith "assert[ed] that he enjoys aboriginal rights . . . and that he has fishing rights in Peconic Bay in the ceded territory under the Wyandanch to Ogden Deed of 1659." The Court rejected these arguments, holding, "The Wyandanch to Ogden Deed of 1659 is also inapplicable because when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right to absolute and exclusive use and occupation of the conveyed lands. In sum, the Defendant, as a Shinnecock Indian, fails to state a federally protected right to have undersized scallops." *Id.* (citing *South Dakota v. Bourland*, 508 U.S. at 689) (internal quotations and citations omitted).

Likewise, this court previously held that the Topping Purchase relinquished any exclusive rights the Shinnecock Nation claimed to hold. "The Topping Deed specifically provides that the

Shinnecock have 'given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a certain tract of land. . . .' The use of language such as 'all our right title and interest' is precisely the type of language used when there is an intent to transfer all title in land." *See New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 266-7 (E.D.N.Y. 2007), *vacated for other reasons by* 686 F.3d 133 (2d Cir. 2012) (citing *Or. Dep't of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766 (1985)).[2] "The Ogden and Topping Deeds reflect the plain and unambiguous conveyance of Southampton lands . . . by the Shinnecock Tribe to non-Indians." *Id*.; *id*. at 269 (finding "the clear and unambiguous intention to extinguish aboriginal rights in the lands involved in the Ogden and Topping Deeds").

Plaintiffs' sparse sprinkling from the language of the Topping Purchase is devoid of historical and legal context. As noted above, on September 17, 1666, a Shinnecock group appealed to Governor Nicolls for a determination of the rights in the land of the Topping Purchase, seeking to "assigne all our said Interest in ye said lands . . . unto our ancient and loving ffiends the Townes men of Southampton. . ." Yorke Decl. Ex. L at 169. Governor Nicolls, on October 3, 1666, settled the controversy of rights in the property. *Id*. at 172-4. In the "Nicolls Determination," Governor Nicolls determined that "all the right and interest . . . in the said tract of land meadows or beach mentioned in their said deeds is belonging, doth and shall belong unto the towne of Southampton . . ." *Id*. Governor Nicolls determined that Southampton "shall alsoe pay unto ye Indians . . . four score fathoms of wampum . . . (according to ye interest they had in ye premises purchased) . . ." *Id*. The Nicolls Determination recited that Topping's claimed "interest in all the profits of whales

---

[2] Although the Second Circuit subsequently determined that the court lacked subject matter jurisdiction, without reaching the merits of the court's decision, State Defendants cite to Judge Bianco's painstakingly thorough decision following bench trial, for its excellent historical analysis of the documents.

& fish shall belong unto him the said John Cooper his heirs and assignes for ever…" *Id*.   "The language of the 1666 Nicolls Determination reveals the plain and unambiguous intent of Governor Nicolls (the sovereign authority at that time) to recognize the validity of the Topping Deed and to extinguish the Shinnecock's aboriginal title to the lands of the Topping Purchase . . . and to recognize that those lands were now owned exclusively by the Town, subject to no other rights or interests." *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d at 270.

Subsequent Patents issued by New York's Colonial Governors ratified the legitimacy of all conveyances from the Shinnecocks to Southampton and confirmed the extinguishment of any aboriginal rights.   On November 1, 1676, New York's Colonial Governor Edmund Andros, holding Royal authority, issued a patent, confirming the town of Southampton, and its ownership of the land in its general present-day boundaries.   Yorke Decl. Ex. O at 279-80.   The Andros Patent confirmed that the Town of Southampton was the owner of all lands within its boundaries:

> Now for a Confirmation unto the present Freeholder, Inhabitants of the said Towne and precincts: Know Yee, That by vertue of his Ma'ties Letters Patents, and the Commission and Authority unto mee given by his Royall Highness I have Ratifyed Confirmed and granted; and by these presents, do hereby Ratifie Confirme and grant, unto [the Southampton Pantentees], as Patentees, for and on the behalfe of themselves and their Associates, the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes, All the aforementioned Tract of Land, with the Necks and Islands within the said Bounds sett forth and described as aforesaid, Together with all Rivers, Lakes, waters Quarrys Wood land Plaines Meadows, pastures, Marshes, ffishing, Hawking Hunting and ffowling, and all other Proffits, Commodities, Emoluments and hereditaments, to the said Towne . . .

Subsequently, on December 6, 1686, New York's Colonial Governor Thomas Dongan, holding authority from the King of England, issued another Patent to the proprietors of Southampton, which confirmed and reiterated the grants of the Andros Patent "includeing all the necks of Land and Islands wihin the aforesaid described bounds and limitts together with all Rivers

Lakes water quarries Woodland plaines meadowess pastures marshes fishing hawking hunting and fowling and all other profitts Comodityes and hereditaments . . ." *Id*. at 281.

The Dongan Patent was made in response to a Southampton Freeholder's application that Governor Dongan "confirm unto ye ffreeholders of said Town in a more full & ample manner all the abovecited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the Indyans and the ffreeholders of the said towne of Southampton . . ." *Id*. at 282.  The Dongan Patent recited that the Governor had:

> examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid . . .

*Id*. at 282-3.

The Dongan Patent explicitly granted, ratified and conveyed to the Freeholders and Inhabitants of Southampton, the "Rivers Rivolets waters lakes ponds Brookes streames beaches . . . Creeks harbors . . . and Easements fishing hawking hunting and fowling . . ." *Id*. at 283.

This Court previously noted, "the Dongan Patent again emphasizes in clear and unmistakable language the prior extinguishment of the Shinnecock's aboriginal rights to any and all lands within the bounds of Southampton . . ." *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d at 273.  "In short, these colonial era documents plainly and unambiguously demonstrate beyond any question the extinguishment of aboriginal title by the sovereign authority on all Southampton lands . . ." *Id*.  Plaintiffs cannot state an exclusive or aboriginal right of use and occupation.

The Supreme Court's most recent Native American treaty law cases are readily distinguished on the basis that Plaintiffs have identified no treaty right.  In *Washington State*

*Department of Licensing v. Cougar Den, Inc*., 139 S. Ct. 1000 (2019), the question before the Court was the interpretation of language in an 1855 treaty between the United States and the Yakama Nation.  There was no question that a treaty existed and had been negotiated by the United States.  By the terms of the treaty, the Yakamas negotiated with the United States for the reservation of certain rights, including "the right, in common with citizens of the United States, to travel upon all public highways."  *Id*. at 1007.  The question in *Cougar Den* was whether that explicitly reserved right prevented Washington State from imposing a general tax on fuel importers who travel by public highway upon fuel importers who were members of the Yakama Nation.

In *Herrera v. Wyoming*, 139 S. Ct. 1686 (2019), likewise, the existence of the 1868 treaty negotiated between the Crow Tribe and the United States was not in question.  The questions presented were whether a treaty-protected hunting right negotiated with the United States expired when Wyoming became a state, and whether the lands within Bighorn National Forest became categorically "occupied" under the treaty when set aside as a national reserve.  *Id*. at 1689.

Both cases involved the Supreme Court's interpretation of specific terms within explicit treaties negotiated between a certain tribe and the United States.  Here, Plaintiffs attempt to conjure a fishing-rights treaty from a smattering of deeds and Orders relating to a different tribe.  Plaintiffs fail to establish the existence of a treaty, and it is beyond argument that they never negotiated with the government of the United States.  The case law applying treaty interpretation is inapplicable.[3]

---

[3] Even were the Court to hold that these documents constituted a treaty—which they do not—these colonial-era documents do not constitute a treaty made "under the authority of the United States" within the meaning of the Supremacy Clause, U.S. Const. art. VI, cl. 2., because they were not entered into by the government of the United States, which did not exist at the time.  *See Alliance to Save the Mattaponi v. Commonwealth Dep't of Envtl. Quality ex rel. State Water Control Bd*., 270 Va. 423, 452 (Va. 2005) ("We conclude that these Constitutional provisions do not support the Tribe's position. The Supremacy Clause refers only to treaties made under the authority of the United States. The Treaty before us was entered into in 1677, over 100 years before the Constitution was adopted in 1789. Because the United States did not exist in 1677, manifestly, the Treaty could not have been made under the authority of the United States.").  These documents thus have no preemptive force as federal law, and do not displace contrary New York State law.

**VII.   Even Were The Court to Find That a Treaty Right Exists, the State May Regulate Under the Doctrine of Conservation Necessity**

Plaintiffs have failed to demonstrate the existence of a treaty.  "Absent a treaty fishing right, the State enjoys the full run of its police powers in regulating off-reservation fishing." *People v. Patterson*, 5 N.Y.3d 91, 96 (2005).

Even were the Court to find the existence of a treaty fishing right, regulation of Plaintiffs' fishing is proper under the "conservation necessity" doctrine long applied by the Supreme Court. Treaty-based usufructuary rights do not exempt Indians from state regulation, as the Supreme Court has often noted: "We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation."  *Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 205 (1999).  Where a treaty provides a tribe "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory," the state may impose on Indians, equally with others, regulatory restrictions on the manner of fishing, necessary for conservation.  *See Tulee v. Washington*, 315 U.S. 681, 684 (1942); *New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 563 (1916).  "The manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians."  *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968).

The Supreme Court has reaffirmed the conservation necessity doctrine in its most recent cases interpreting Indian treaty law.  *See Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1015 (2019)(" Nor do we hold that the treaty deprives the State of the power to regulate, say, when necessary for conservation. To the contrary, we stated in *Tulee* that, although the treaty forecloses the State from charging the Indians a fee of the kind in question here, the State

retained the power to impose on Indians, equally with others, such restrictions of a purely regulatory nature . . . as are necessary for the conservation of fish.") (internal quotations omitted). The Court likewise limited its decision in *Herrera*, noting that he state trial court had decided that Wyoming could regulate the exercise of the treaty "in the interests of conservation." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1703 (2019) (inviting the state to argue the conservation necessity doctrine as to its state conservations regulations on remand).

The American Eel are a protected resource, whose population is depleted and at historically low levels. *See* Affidavit of James Gilmore, Director of Division of Marine Resources, dated July 23, 2018 at ¶4. Juvenile American Eel are known as Elvers or Glass Eel. *Id.* The reasons that the population of American Eel is depleted and at historically low levels include overfishing. *Id.* A recent stock assessment recommended that mortality be reduced on all life stages of American Eel. The assessment found that further fishing of American Eel at every stage, particularly glass eels, could be particularly detrimental to the stock, especially if other sources of mortality are not controlled. *Id.*; *see* ASMFC, 2017 American Eel Stock Assessment Update of the Atlantic States Marine Fisheries Commission. Demand for glass eels for human consumption is great in Asian markets, with prices reaching over $2000.00 per pound. *Id.* at ¶5.

The Atlantic States Marine Fisheries Commission ("ASMFC") coordinates and manages the fishery resources, including American Eel fisheries, of fifteen Atlantic coastal states from Maine to Florida. *Id.* at ¶6. The current Commission fishery management plan prohibits the taking of juvenile eels, or glass eels, in thirteen of the states, including New York, and authorizes a limited quota of glass eels in Maine and South Carolina. *Id.* Pursuant to Federal law, any state that does not comply with the ASMFC fishery management plan may have its fishery shut down by the Secretary of Commerce. *Id.*; *see* 16 U.S.C. Section 5106(c). DEC complies with the ASMFC

28

fishery management plan through its fishing regulations in 6 NYCRR Sections 10.1(a) and (b), 40.1(f) and (i), making it illegal to take or possess American Eels less than nine inches long in New York State.  *Id.* at ¶7.  Glass eels are less than nine inches long.  *Id.*

## VIII.   Plaintiffs' Claims are Barred Under the *Sherill* Doctrine

Under the Supreme Court's doctrine announced in *City of Sherill v. Oneida Indian Nation*, 544 U.S. 197 (2005), and applied in subsequent Second Circuit cases, Plaintiffs' claims are barred under the equitable principles of laches, acquiescence and impossibility.

In *Sherill*, the Oneida Indian Nation claimed exemption from municipal taxation on historic tribal lands that had been sold, but reacquired on the open market, claiming that their purchase had revived tribal sovereignty over the land.  The Supreme Court denied the Oneida's claims, despite the Oneidas' aboriginal title, holding that such a "disruptive remedy" was barred by the "long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties."  *Sherrill*, 544 U.S. at 216-217.  In so holding, *Sherrill* invoked doctrines of laches, acquiescence, and impossibility.  *Id.*

Soon after *Sherill*, the Second Circuit decided *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266 (2d Cir. 2005).  In *Cayuga*, the Second Circuit reversed a pre-*Sherill* award of nearly $250 million in money damages ordered by the district court, where the Cayuga claimed ownership of historic reservation land.  The court, applying the equitable principles of *Sherill*, held that even monetary relief was precluded.  *Id.* at 273, 278.  The court held that *Sherill* did not limit these defenses to claims seeking equitable relief.  *Id.* at 275.  The Cayuga Court held that, "*Sherrill*'s holding is not narrowly limited to claims . . . seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' Indian land claims more generally."  *Id.* at 274

In *Oneida Indian Nation v. County of Oneida*, 617 F.3d 114, 127 (2d Cir. 2010), the Second Circuit clarified the nature of the equitable defenses, against a challenge that the traditional elements of a laches defense had not been met, holding: "the equitable defense recognized in *Sherrill* and applied in *Cayuga* does not focus on the elements of traditional laches but rather more generally on the length of time at issue between an historical injustice and the present day, on the disruptive nature of claims long delayed, and on the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury."  The *Oneida* court held that the *Sherrill* and *Cayuga* defenses were not limited to "possessory" land claims—"claims premised on the assertion of a current possessory right to tribal lands held by others"—but apply also to "nonpossessory" claims: "Rather, the defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief."  *Id*. at 135.

The Shinnecock Indian Nation itself was subject to the application of the *Sherrill* doctrine in *Shinnecock Indian Nation v. New York*, 2006 U.S. Dist. LEXIS 87516 (E.D.N.Y. 2006), *aff'd by* 628 Fed. Appx. 54 (2d Cir. 2015).  In that case, the Shinnecock Nation claimed rights to lands that were the subject of the 1703 "1000-year lease" with the Trustees of the Freeholders of the Town of Southampton, seeking damages and a declaration of possessory rights.  The court, relying on *Sherrill* and *Cayuga* dismissed the claims, listing among other reasons, the length of time that had passed between the alleged wrong and the relief sought and the "dramatic change in the demographics of the area and the character of the property."  *Shinnecock Indian Nation v. New York*, 2006 U.S. Dist. LEXIS 87516 at *16.

"[I]t is now well-established that Indian land claims asserted generations after an alleged dispossession are inherently disruptive of state and local governance and the settled expectations of current landowners, and are subject to dismissal on the basis of laches, acquiescence, and impossibility." *Stockbridge-Munsee Cmty. v. New York*, 756 F.3d 163, 165 (2d Cir. 2014). Plaintiffs' claims implicate the concerns of the *Sherill* Doctrine, as they are highly disruptive of the State's ability to regulate its waters and protect its resources. Plaintiffs' papers illustrate that their claims go far beyond their alleged ill-defined "use" right, to an argument that the waters themselves are "contested," and are in fact under Shinnecock "jurisdiction." *See* D.E. 64 at 7, 9; D.E. 73, Ex. 2. Further, if the Court were to apply Plaintiffs' logic, and construe the language of the documents Plaintiffs rely on as Plaintiffs do, their claims are not limited to aboriginal fishing rights, but encompass significant other rights over the lands, including hunting, fowling and gathering on private property, as well as ownership of any whale carcasses that wash ashore.

## IX. Plaintiffs Fail to Demonstrate a *Prima Facie* Case Pursuant to 42 U.S.C. §§ 1981 and 1982

### A. Plaintiffs Have Put Forth no Evidence of Discriminatory Intent

Plaintiffs' Section 1981 and 1982 claims fail as Plaintiffs' have put forth no evidence of intentional discrimination or racial motivation. 42 U.S.C. Section 1981 states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Section 1981 outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship. *See Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004). Section 1982 provides that "All citizens of the United States

shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

To establish a violation under Sections 1981 or 1982, a plaintiff must show: (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See Costello v. Town of Huntington*, 2015 U.S. Dist. LEXIS 38059 at *27-8 (E.D.N.Y. Mar. 25, 2015); *Campbell v. Grayline Air Shuttle*, 930 F. Supp. 794, 802 (E.D.N.Y. 1996). "It is fundamental to the success of a section 1981 claim that the plaintiff allege discriminatory intent." *Dasrath v. Stony Brook Univ. Med. Ctr.*, 2014 U.S. Dist. LEXIS 60410, *14 (E.D.N.Y. 2014). Absent proof of purposeful discrimination, liability may not be imposed. *General Bldg. Contractors Ass'n v. Pa.*, 458 U.S. 375, 389 (1982). As with Section 1981, under Section 1982, a plaintiff must put forth evidence that he was intentionally deprived of a property right based on race. *Bacon v. Suffolk Legislature*, 2007 U.S. Dist. LEXIS 57925, *29 (E.D.N.Y. 2007). To show discriminatory motive, Plaintiffs must show both purposeful discrimination and racial motivation. *Grajales v. Mendez*, 2011 U.S. Dist. LEXIS 81577, *3 (E.D.N.Y. July 25, 2011); *Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir. 1988)("Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory, and racially motivated.")(internal citations omitted).

Plaintiffs have put forth no evidence of discriminatory intent. The Complaint alleges only that Silva was ticketed by DEC Officers Laczi and Farrish for possession of undersized eels, and that two prior prosecutions against the other two Plaintiffs were dismissed nearly a decade ago. Plaintiffs have put forth no evidence that the officers were acting in any way other than enforcing generally applicable New York State laws in New York State waters. The Complaint itself alleges

that Salvatore J. Ruggiero, a non-Indian, was prosecuted for possession of undersized fish. Plaintiffs have failed to demonstrate discriminatory application of the laws.  Further, Plaintiffs have put forth no evidence of racial animus as a motivating factor for the actions of the individual State Defendants.

Plaintiffs do not identify any property or contractual right or activity in which they are being discriminated against in comparison to white citizens.  In fact, this contradicts Plaintiffs' argument: they are not alleging any right which they are being discriminatorily prevented from exercising; they are claiming that they have exclusive rights to fish, unregulated by the laws of the state, which no other citizens of the state may enjoy.

Furthermore, based on the allegations in the Complaint, Plaintiffs Gerrod Smith and Jonathan Smith's claims are time-barred, whether applying a three-year or four-year statute of limitations to their Section 1981 and Section 1982 claims, *see Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018); *Bacon v. Suffolk Legislature*, 2007 U.S. Dist. LEXIS 57925, *14-*17 (E.D.N.Y. 2007).

## B. Defendant Seggos Lacks Personal Involvement

Plaintiffs fail to put forth evidence of Commissioner Basil Seggos's personal involvement or direct connection to the alleged events, with respect to these intentional discrimination statutes. *See Patterson v. County of Oneida,* 375 F.3d 206, 229 (2d Cir. 2004); *Medina v. Cuomo*, 2015 U.S. Dist. LEXIS 152398 at *21 (N.D.N.Y. 2015).

 Defendant Seggos has had no direct involvement with the Plaintiffs' case and therefore cannot be found to be personally liable.  The sole fact that Seggos "held a high position of authority" is insufficient to prove his personal involvement.  *See Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir. 2004).  The Plaintiffs have offered no evidence

of Commissioner Seggos's personal involvement. *KM Enters. v. McDonald,* 518 Fed. Appx. 12, 14 (2d Cir. 2013).

## X.    Qualified Immunity Shields the Individual-Capacity Defendants

The State Defendants are entitled to qualified immunity in their individual capacities. "Qualified immunity often shields government officials performing discretionary functions . . . from liability for civil damages." *Stein v. Barthelson*, 419 Fed. Appx. 67, 69 (2d Cir. 2011)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity applies to the State Defendants here "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018)(quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  "Thus, the qualified immunity defense . . . protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful." *Berg v. Kelly*, 2018 U.S. App. LEXIS 20646, *21 (2d Cir. 2018)(internal quotations and citations omitted).  "To lose immunity, an official must violate a right, the contours of which are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Drimal v. Tai*, 786 F.3d 219, 225 (2d Cir. 2015)(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Here, it was objectively reasonable for the State Defendants to believe their actions were lawful.  Plaintiffs received tickets for violating generally applicable fishing laws and regulations, in New York State waters.  Plaintiffs have advanced a theory of Supremacy Clause violation based upon the premise that isolated 17th century deeds and colonial orders pertaining to whale carcasses exempt them from regulation.  There is no treaty that confers rights to them.  Such a convoluted theory cannot be understood by a reasonable official to provide a clearly established right.  No

clearly established law grants them such rights.  Further, Plaintiff Silva's subsequent criminal

conviction in Southampton Justice Court establishes probable cause entitling State Defendants to

qualified immunity.  *See Drayton v. Young*, 2018 U.S. Dist. LEXIS 190749, \*17 (S.D.N.Y. Nov

7, 2018).

## **CONCLUSION**

For the foregoing reasons, the State Defendants respectfully request that this Court grant

their Motion for Summary Judgment and grant such other and further relief as the Court deems

just and proper.

Dated:  Mineola, New York
      October 4, 2019

                Letitia James
                Attorney General of the State of New York
                Attorney for State Defendants

                By: */s/ Richard Yorke*

                    Richard Hunter Yorke
                Assistant Attorney General
                200 Old Country Road - Suite 240
                Mineola, New York 11501
                (516) 248-3302

To:    Scott Michael Moore, Esq.
       Moore International Law PLLC
       45 Rockefeller Plaza, 20th Floor
       New York, New York 10111
       smm@milopc.com

       Brian C. Mitchell, Esq.
       Suffolk County Attorney
       H. Lee Dennison Building
       100 Veterans Memorial Hwy.
       P.O. Box 6100
       Hauppauge, NY 11788
       brian.mitchell@suffolkcountyny.gov