UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                Plaintiffs,            Case No.: 18-cv-3648 (SJF) (SIL)

    - against -             **PLAINTIFFS' LOCAL RULE
56(1)(b) COUNTER-STATEMENT
OF MATERIAL FACTS
AS TO STATE DEFENDANTS**

BRIAN FARRISH,
JAMIE GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE,

                Defendants.
----------------------------------------------------x

Plaintiffs respectfully submit the following Local Rule 56.1(b) counter statement of

material facts corresponding to the State Defendants' numbered paragraphs:

**Background**

1. Procedural. No genuine issue of material fact.

2. Procedural. No genuine issue of material fact.

3. The Complaint sought 1) declaratory and injunctive relief preventing Defendants from

interfering with alleged aboriginal fishing rights protected under the Supremacy Clause of the

Constitution, and 2) monetary damages for an alleged pattern of illegal racial discrimination

under 42 U.S.C. Sections 1981 and 1982.  D.E. 1.

    <u>**Genuine issue of material fact.**</u>

Defendants mischaracterize the complaint. 1), Makes no mention of ceded territory, etc.

"Continuing Supremacy Clause Violations of Un-relinquished Aboriginal Usufructuary

Fishing Rights Retained in Ceded Territory." Complaint p. 21.

2) "Continuing Pattern of Illegal Racial Discrimination in Violation of 42 U.S.C. §§ 1981 and 1982 of the 1866 Civil Rights Act, as amended." Complaint, pr. 24.

**Exhibit 1 - complaint**

4. Procedural. No genuine issue of material fact.

5. Procedural. No genuine issue of material fact.

6. Procedural. No genuine issue of material fact.

7. Procedural. No genuine issue of material fact.

8. Judge Locke issued his Report and Recommendations ("R&R") on January 7, 2019, recommending dismissal of Plaintiffs' claims in their entirety.  D.E. 63.

**Genuine issue of material fact.**

Defendants omit part of Judge Locke's ruling. "However, the Court further recommends that Plaintiffs be granted leave to replead, but only as to their statutory claims for monetary damages against Farrish, Laczi and Seggos in their individual capacities."

9. Procedural. No genuine issue of material fact.

10. By conference held before Judge Feuerstein on July 31, 2019, Judge Feuerstein terminated Defendants' Motions to Dismiss and Judge Locke's R&R and ordered a briefing schedule for a Motion for Summary Judgment.  See D.E. 74.

Procedural. No genuine issue of material fact. Plaintiffs add that the County Defendants declined to participate at this conference and were not included in the present briefing schedule.

**Criminal Prosecution of Silva**

11. No genuine issue of material fact.

12. On April 20, 2017, DEC Environmental Conservation Officers Evan Laczi and Brian

Farrish observed Silva using a "Fyke net," and in possession of a bucket of "Elver eels" in

Taylor Creek in the vicinity of 450 Meadow Lane, in the Town of Southampton.  See

Declaration of Richard Yorke, dated October 4, 2019 ("Yorke Decl.") at Exhibit D,

Memorandum Decision of Hon. Gary J. Weber, dated June 5, 2019, pp. 2-3; Simplified

Information/Complaints Issued Against David Silva (Silva Tickets), D.E. 3 Ex. 4.

**Genuine issue of material fact**.

Plaintiffs allege "Shinnecock Bay and its estuary(ies)." Complaint, par. 14.

**Exhibit 1**

13. The location of the net is outside the boundaries of the Shinnecock Nation Reservation.

See Yorke Decl. Ex. D at p. 6; Yorke Decl. Ex B., Affirmation of Jamie Greenwood, Assistant

District Attorney, in Opposition to Defendant's Motion, dated December 11, 2017

("Greenwood Aff."), p. 2, Ex. A.

**Genuine issue of material fact**.

The southern boundary of the Shinnecock Indian Reservation has never been established.

Whatever the boundary, the location of the Silva fishing fyke net is clearly within retained

fishing rights.

 "The Shinnecock Nation and other coastal Algonquin peoples on Long Island have depended from
time immemorial on the bounty from their maritime environment". p. 2
"The English acknowledged this relationship in a series of nation to nation agreements beginning in
the spring  of 1648 when Nowehdonah, the Shinnecock sachem, joined with the sachems from the
Montauketts, Manhassetts and Corchaugs to negotiate with the governors of New Haven and
Connecticut for the purchase of thirty thousand acres of land in what is now the town of East
Hampton". p. 2.
"On June 10, 1658 Sachem Wyandanch met with Lion Gardiner, one of the first English settlers on
Long Island, to negotiate a nation to nation agreement concerning access to beaches adjacent to the
Shinnecock lands in Southampton". p. 2.
"The above agreements were made while the towns of Southampton, East Hampton, and
Brookhaven were under the jurisdiction of Connecticut colony."  p. 3.
Dr. Strong concludes, "(t)he above documents clearly support the rights of the Shinnecock and the
other native peoples of eastern Long Island to fish in the waters adjacent to their communities
"without let or hinderance" and to dispose of their catches "as they think good". p. 4.
**Exhibit 2  - Strong report - May 27, 2018**

"There has been a court decision establishing the northern boundary of the reservation but the water boundaries around Shinnecock Neck have never been officially established." P. 6.

"Although the jurisdictional boundaries over the off-shore water east of the Shinnecock Reservation have never been officially marked, all of the area on the eastern half of Shinnecock Bay around Shinnecock Neck have traditionally been considered Shinnecock waters." P. 6.

"The use of these waters by the Shinnecock have never been challenged." P. 6.

"More recently the tribal oyster project began floating racks out in these waters in 1977 and is still operating there today." P. 6.

**Exhibit 3 - Strong report - November 3, 2018]**

Q. (by Scott Moore) Dr, Strong, regardless of where the reservation boundaries are or may be, do the Shinnecocks have fishing rights in the waters in any event?

A. You mean treaty rights?

Q. Yes.

A. Yes.

Q. Can you explain to the Judge what you mean by that?

A. … In that 1648 deed (to Easthampton) it says that the native peoples will have rights to hunt and fish, and I think the language is fish in all creeks and ponds, and in terms of that document and the terms of the people that were signing it at the time, that's what they understood it would be because they just kept fishing where they have been… 4/11/2019 Trial Transcript. p. 35

A … the Supreme Court has dealt with this many times and one of the conclusions that they drew was that whenever there were disagreements between fishing rights and ancient treaty rights, that they should be resolved by nation to nation interaction or agreement… 4/11/2019 Trial Transcript. p. 36

Q. (by Jamie Greenwood) On direct-examination that was, in fact, the only deed you indicated for retention of any rights to fish in creeks and ponds, correct; on direct-examination, that's the only deed you mentioned? 4/11/2019 Trial Transcript. p. 51

A. No. There was several other documents that related to fishing rights and they are all cited; 1657, 1662. This whole area here. It's a pattern. Id.

Q. (Greenwood) You would agree with me, the present day legal boundaries of the Shinnecock Reservation, is the area outlined in yellow on People's exhibit 4? Id. 57.

A. The yellow line there on the tax map? No. I would not agree with that.

Q. (Greenwood) Just to be clear, you indicated in what is marked as Defense Exhibit F, which is your additional report, that the Shinnecocks would use what we know as Taylor Creek to fish in, right? Id. pp. 58-59

A. Yes.

Q. So that wasn't land, correct?

A. It was Shinnecock waters, yes.

**Exhibit 4 -  Strong trial testimony April 11, 2019**

14. No genuine issue of material fact.

15. No genuine issue of material fact.

16. In the criminal proceeding, Silva, represented by Plaintiffs' current attorney, brought a

motion to dismiss based on lack of jurisdiction, arguing in relevant part that the Shinnecock

Nation has unabrogated fishing rights outside the Shinnecock Reservation, pursuant to the 1664 Fort Albany Treaty and the May 12, 1659 Wyandanch Deed to John Ogden ("Quogue Purchase").  See Yorke Decl. Ex A, Notice of Motion and Defendant's Memorandum of Law in Support of Motion to Dismiss, dated October 10, 2017 at Ex. 3.

**Genuine issue of material fact**.

Silva's Town Court trial motion to dismiss led with *US v Winans* reserved rights and was not examined by Judge Weber.

17. No genuine issue of material fact.

18. No genuine issue of material fact.

19. No genuine issue of material fact.

20. Silva submitted a Reply Memorandum of Law arguing in relevant part that the People's arguments regarding the Dongan Patent, the Quogue Purchase, and the 1640 Indian Deed for Southampton fail to abrogate any aboriginal fishing rights.  See Yorke Decl. Ex. C, p. 1-2. Silva characterized his claims as a "water boundary dispute," and concerning the "water boundary lines" of the Reservation.  Id.

**Genuine issue of material fact**.

The Defendants cherry picked and placed undue emphasis here.

21. No genuine issue of material fact.

22. No genuine issue of material fact.

23. No genuine issue of material fact.

24. No genuine issue of material fact.

25. No genuine issue of material fact.

26. No genuine issue of material fact.

27. Judge Weber held that Silva's fyke net was placed in Taylor Creek and "there appears to be

no dispute that the location shown by the red circle on People's Exhibit 4 where the net was

placed, is ou*tsi*de of the boundaries of the Shinnecock Nation."  Id. at 6.

**Genuine issue of material fact**.

Judge Weber at this bench trial did not know where Silva was fishing, and had to solicit

fact testimony from the Prosecution to ascertain the location of the fyke net after the

Prosecution rested its case against Silva. "Where on the map was the fyke net, anybody know",

he asked. He pressed, "(w)here is the net? Where is the fyke net on the map?"  *People v Silva* ,

2/21/19, Page 146, lines 4-11. Silva objected, Page 146, lines 7-8, and later moved to dismiss,

4/11/2019 Page 3, line 14 – page 6, line 4.

**Exhibits 5 & 6  -  J. weber remarks and objection transcripts**

28. Judge Weber's decision noted that Bryan Polite, a defense witness and member of the

Shinnecock Nation, and member of its government for at least 7 years, testified that the area is

not within the Shinnecock Reservation as the boundaries currently stand.  Id. at 5, 6.

**Genuine issue of material fact**.

Out of context. Bryan Polite testified that he was not familiar with Taylor Creek. The

follow up Prosecution questions refer to terrestrial landmarks such as the Southampton Village

Meadow Lane ticketing location, which was not relevant to the in-water placement of Silva's

fyke net in Shinnecock Bay.

"Q.   Just turning your attention to People's 4 again, are you familiar with this creek?
A. No, ma'am.
Q.   Are you familiar with Southampton Village?
A. Correct.  Yes.
Q.   You would agree that this area of Meadow Lane is Southampton Village?
A. Correct.  Yes.
Q.   You would agree that location is not on the Shinnecock Indian Reservation as the
boundaries stand?
A.   Currently, yes." 2/21/2019 *People v Silva,* Page 138, line 21 – Page 139, line 10.
**Exhibit 7  - polite transcript**

29. Judge Weber held that, "Here, based upon the current and indisputed mapping of the area, the fyke net was most certainly placed on Taylor Creek outside of the established boundaries of the Shinnecock Nation."  Id.

**Genuine issue of material fact**.

Out of context. Assessor Lisa Goree testified that maps of Shinnecock have been wrong before.

Q.  Could you briefly summarize what that error was?
A.  I believe -- well, these tax maps are made by Suffolk County Real Property Tax Office and I believe sometime ago there was an error in drawing the line which is part of the reservation.
Q.  So it's possible the tax maps, as they are represented today, could be incorrect?
A.  It's possible.
 2/21/2019 People v Silva pages 119-120
**Exhibit 8 - Goree testimony**

30. Further, the Court held that, "this court is without the power to alter the legally established boundaries of the Shinnecock Nation or of the State of New York.  Even if the court had such authority, on this record at least, no other conclusion can be drawn except that the subject fyke net was, in fact, placed not on waters or land belonging to the Shinnecock Nation, but on territory within the jurisdiction of the State of New York, acting through its D.E.C."  Id.

**Genuine issue of material fact**.

Error in Judge Weber's decision. Silva presently is seeking an appeal. See 37.

31.  For these reasons, Judge Weber denied Silva's motion for a Trial Order of Dismissal.  Id.

32. Judge Weber did not consider the People's evidence of Silva's buckets containing Elver Eels, or statements given by Silva to the DEC Officers, as the Court did not determine such evidence to be procured voluntarily or upon consent.  Id. at 6-7.

**Genuine issue of material fact**.

See 34.

33. No genuine issue of material fact.

34. Thus, Judge Weber held that the People had not proven beyond a reasonable doubt that Silva was in possession of the Elver eels over the limit, or that he was in possession of undersized eels.  Id.

**Genuine issue of material fact.**

This narrative is misleading. Judge Weber also said, "The search and seizure which yielded the evidence and the attendant statement was not proven to be constitutional," leading to the possession of undersized eels charge dismissed and possession of more than 25 eels charge dismissed.

35. However, Judge Weber held that, "the People have proven beyond a reasonable doubt that the subject fyke net was set, maintained, operated or used in an area (Taylor's Creek) subject to the jurisdiction of the State of New York acting through the D.E.C."  Id. at 5.

**Genuine issue of material fact**.

See 30 and 37.

36. No genuine issue of material fact.

37. No genuine issue of material fact.

**The American Eel**

38. The American Eel are a protected resource, whose population is depleted and at historically low levels.  See Affidavit of James Gilmore, Director of Division of Marine Resources, New York State Department of Environmental Conservation, dated July 23, 2018 at ¶4.

**Genuine issue of material fact**.

False. American Eel are not a protected resource either by the State of New York or the federal government.

1) *The DEC publishes a document on its website titled "List of Endangered, Threatened and Special Concern Fish & Wildlife Species of New York State". The American eel is not*

*listed under any category.*

**Exhibit 9 -  DEC list**

2) *The U.S. Fish & Wildlife Service previously issued a press release on its website titled:*

   *"American Eel Population Remains Stable, Does not need ESA Protection".*

**Exhibit 10 - USFW publication**

3) *The U.S. Fish & Wildlife Service finding that the American Eel is not endangered is*

   *published in the Federal Register, Vol. 80, No. 195 (October 8, 2015) at 60834. The*

   *USF&W states "we find that the stressors are not of sufficient imminence, intensity, or*

   *magnitude to indicate that the American eel is in danger of extinction (an endangered*

   *species), or likely to become an endangered species within the foreseeable future (a*

   *threatened species), throughout all of its range. There are no threats currently affecting the*

   *American eel throughout the species range." 60837. Id.*

**Exhibit 11 -  FR eel**

39. No genuine issue of material fact.

40. The reasons that the population of American Eel is depleted and at historically low levels

include overfishing.  Id.

**Genuine issue of material fact**.

   Mr. Gilmore cites the 2012 American Eel Benchmark Stock Assessment in his affidavit.

The same Stock Assessment warns, "the overfishing and overfished status (of the American

Eel) … cannot be stated with confidence."

**Exhibit 12 - ASMFC 2012 Report**

41. A recent stock assessment recommended that mortality be reduced on all life stages of

American Eel.  The assessment found that further fishing of American Eel at every stage,

particularly glass eels, could be particularly detrimental to the stock, especially if other sources

of mortality are not controlled.  Id.

**Genuine issue of material fact**.

Out of context.

1) Mr. Gilmore is New York's representative on the ASMFC American Eel Management

Board.

2) Mr. Gilmore and the ASMFC American Eel Management Board increased the Atlantic

Coastwide landing of the American eel on August 8, 2018, shortly after his affidavit dated July

23, 2018.

**Exhibit 13  -ASMFC American Eel Board Approves Addendum V . p. 1**

**Exhibit 14 – ASMFC eel status 2018**

42. No genuine issue of material fact.

43. The Atlantic States Marine Fisheries Commission ("ASMFC") coordinates and manages

the fishery resources, including American Eel fisheries, of fifteen Atlantic coastal states from

Maine to Florida.  Id. at ¶6.

**Genuine issue of material fact**.

The Shinnecock, Unkechaug and other Native American nations are not signatories to the

interstate compact creating the ASMFC. Article I of the interstate compact states, "It is not the

purpose of this compact to authorize the states joining herein to limit the production of fish or

fish products for the purpose of establishing or fixing the price thereof, or creating and

perpetuating monopoly." ASMFC Compact. p. 2.

**Exhibit 15 - ASMFC Compact**

44. The current Commission fishery management plan prohibits the taking of juvenile eels, or

glass eels, in thirteen of the states, including New York, and authorizes a limited quota of glass

eels in Maine and South Carolina.  Id.

**Genuine issue of material fact**.

See 43.

45. No genuine issue of material fact.

46. New York State Department of Environmental Conservation ("DEC") complies with the ASMFC fishery management plan through its fishing regulations in 6 NYCRR Sections 10.1(a) and (b), 40.1(f) and (i), making it illegal to take or possess American Eels less than nine inches long in New York State.  Id. at ¶7.

**Genuine issue of material fact**.

This statement makes no mention of reserved fishing rights as plead in the Complaint.

47. No genuine issue of material fact.

**Deeds, Leases and Orders**

48. No genuine issue of material fact.

49. No genuine issue of material fact.

50. The deed states of the Sachems, "in consideration thereof, we doe give upp unto the said Purchasers, all our right and Interest in the said Land, to them and their heirs forever."  Id.

**Genuine issue of material fact**.

The ceded territory was bound "from Sea to Sea", not inclusive of and excepting the reserved, "Libertie, freely to fish in any and all cricks and ponds… without Molestation". *Id.*

51. No genuine issue of material fact.

52. No genuine issue of material fact.

53. The deed states, in relevant part:  & further in consideration that the above named English shall defend us the sayed Indians from the unjust violence of whatever Indians shall illegally assaile us, doe absolutely and forever give and grant and by these presents doe acknowledge ourselves to have given and granted to the partyes above mentioned without any fraud, guile,

mentall reservation or equivocation to them their heirs and successors forever all the lands, woods, waters, water courses, easmts, profits & emoluments, thence arising whatsoever . . .

   **Genuine issue of material fact**.

   Exchanges of land for military support between sovereigns typically denotes a treaty.

54. The deed for Southampton mentions no fishing rights.  Id.

   **Genuine issue of material fact**.

   The deed for Southampton makes no mention of underwater lands outside of its boundaries.

55. No genuine issue of material fact.

56. This deed sold Lion Gardiner the grazing rights to this tract of beach, for "a considerable sum of money and goods" and a yearly rent of twenty-five shillings.  Id.

   **Genuine issue of material fact**.

1) No evidence has been offered recording the yearly twenty-five shillings payments.

2) Wyandanch reserved the whales for himself and the rest of the Indians.

3) The rights have been, "anciently granted to them formerly by my forefathers."

57. No genuine issue of material fact.

58. No genuine issue of material fact.

59. No genuine issue of material fact.

60. At the time of this conveyance to Ogden, these lands were outside of the territorial limits of Southampton, and were not part of the Colony of Connecticut.  Id.

   **Genuine issue of material fact**.

1) "(a)t the time of this conveyance to Ogden, these lands were outside of the territorial limits of Southampton." The citation does not support the statement. (The statement is correct, but the citation is wrong. The proper citation is in the 1666 Nicolls

Determination)

2) "not part of the colony of Connecticut".  The citation does not support the statement.

No submitted evidence supports this statement.

3) "The above agreements were made while the towns of Southampton, East Hampton, and Brookhaven were under the jurisdiction of Connecticut colony."

**Exhibit 2 - Strong report - May 27, 2018, p. 3**

61. No genuine issue of material fact.

62. No genuine issue of material fact.

63. No genuine issue of material fact.

64. No genuine issue of material fact.

65. These documents selling rights to drift whale carcasses do not mention fishing or reserve general fishing rights.  Id.

**<u>Genuine issue of material fact</u>**.

Whales have been categorized with "great fish" since colonial times. Whaling is termed a "fishery" in the 1946/7 International Convention for the Regulation of Whaling Treaty. Pages 249-250, 252.

**Exhibit 16  - whaling treaty**

66. No genuine issue of material fact.

67. At the time of the Topping Purchase, the conveyed lands were not part of the Colony of Connecticut, as they were outside of the then-territorial limits of Southampton.  Id.

**<u>Genuine issue of material fact</u>**.

See 60.

"The above agreements were made while the towns of Southampton, East Hampton, and Brookhaven were under the jurisdiction of Connecticut colony."

**Exhibit 2 - Strong report - May 27, 2018, p. 3**

68. No genuine issue of material fact.

69. The Shinnecock group sought to convey the lands to Southampton, stating that they "do hereby Assigne and make over all our said Interest in the said tract of land . . . wee say wee doe impart and Assigne all or said Interest in ye said lands . . . vnto our ancient and loving ffriends the Townesmen of Southampton, to them & their successors for ever with this provise and consideration . . ."  Id.

**Genuine issue of material fact**.

The emphasis is misplaced, additional **payment** was the goal of the second Shinnecock group. See Nicholls Determination in Yorke Decl. Ex. L, First Book of Records of the Town of Southampton, 172-174. "they shall alsoe pay unto ye Indians (concerned to receive it) four score fathoms of wampum, the wampum being accompted at six per penny, or soe much in value in pay equivalent, the same to be distributed to all the Indians (according to ye interest they had in ye premises purchased)…" Concerned to receive payment is the proper emphasis.

70. This document reserved no fishing rights.  Id.

**Genuine issue of material fact**.

The document was not a deed, treaty, etc.; it was a complaint and is not the proper instrument.

71. On October 3, 1666, Governor Nicolls issued a Determination that Southampton was the rightful owner of the lands of the Topping Purchase, stating that "all the right and interest . . . in the said tract of land meadows or beach mentioned in their said deeds is belonging, doth and shall belong unto the towne of Southampton . . ."  Id. at 172-4.

**Genuine issue of material fact**.

The statement mischaracterizes the quote and misplaces the emphasis. Nicholls' complete relevant quote states, "I doe conclude and determine as followeth, yt they the said Capt.

14

Thomas Topping and John Cooper shall fully and freely (upon demand) deliver unto the town of Southampton all their deeds, writings and evidences that they have of a certain tract of land now in a contraversie between them, and which the said towne purchased of John Scott as by his deed aforesaid, appeareth, and all the right and interest that ye said Capt. Thomas Topping and John Cooper have by the said deed or any other ways or means obtained, in the said tract of land meadows or beach mentioned in their said deeds is belonging, doth and shall belong unto the town of Southampton…" Id. at 172-4.

Nicolls concluded Topping, Cooper and Scott would convert **their** deeds, rights and interests to Southampton Town. Nicholls **did not** convert Shinnecock Indian interests, covenants, profits, fishing rights etc. into Town interests when given the opportunity. Nicolls declared his judgement to be, "the ultimate issue and final determination concerning the premises". Id.

72. In a January 22, 1674-5 Resolution, the Royal interest and privilege over the products of drift whales was preserved.  See Yorke Decl. Ex M, Documents Relating to the Colonial History of the State of New York, Vol. XIV, 686.

**Genuine issue of material fact**.

The Crown intended to preserve a <u>proportion</u> as stated in 73 and 75.

73. No genuine issue of material fact.

74. This resolution does not mention Shinnecock Indians, and it reserves no fishing rights to them.  Id.

**Genuine issue of material fact.**

1) "(t)his resolution does not mention Shinnecock Indians". Shinnecocks and their Sachems of this era were primarily "southside of Long Island" residents and are implicitly included. See Yorke Decl. Ex E. Records of the Town of Easthampton , Ancient Documents of

Historic Value Vol. 1. Pages 2-4. (Deed to Easthampton)

2) "and it reserves no fishing rights to them". The clause, "(t)hat if an Indyan find and give notice of any such drift whales, he shall have such reasonable satisfaccon as hath been usuall" reaffirms and ongoing agency relationship with the Royal Highness introduced in a previous resolution. See Yorke Decl. Ex M, Documents Relating to the Colonial History of the State of New York, Vol. XIV, 664.

75. This resolution preserves the Crown's interest in a proportion of the drift whales discovered, and commissions a person to be noticed, in order to be accountable for the Crown's dues thereof.  Id.

   **Genuine issue of material fact**.

   The Crown limits rewards expressly to "Indyans" and "christians" for services rendered under the resolution.

76. No genuine issue of material fact.

77. No genuine issue of material fact.

78. Another Order, from May 10, 1672, gave Jonathan Cooper warrant to seize the whale-bone from a drift whale carried off his beach lands by several Indians.  Id. at 665.

   **Genuine issue of material fact**.

   No mention of Shinnecock Indians.

79. In Orders Relating to Whaling on L.I., from April 19, 1673, inhabitants of Brookhaven and Seatalcott complained that Indians were disturbing their whaling rights, and demanding payment from them.  The Order required that the Indians cease their unlawful actions, and cease molesting the whalers, to whom liberty had been given to use the beach.  Id. at 678.

   **Genuine issue of material fact**.

   Shinnecock Indians are not mentioned.

80. No genuine issue of material fact.

81. No genuine issue of material fact.

82. No genuine issue of material fact.

83. These minutes, and the Order of May 24, 1676, concern only Unkechaug Indians, and do not mention Shinnecocks or reserve any rights to Shinnecocks.  Id.

**Genuine issue of material fact**.

In Unkechaug v NYSDEC., Judge Kuntz ruled Shinnecock and Unkechaug customary fishing waters are coextensive to a certain degree. Unkechaug v. NYSDEC. p. 13

**Exhibit 17 - Unkechaug v. NYSDEC**

84. On November 1, 1676, New York's Colonial Governor Edmund Andros, holding Royal authority, issued a patent, confirming the town of Southampton, and its ownership of the land in its general present-day boundaries.  See Yorke Decl. Ex. O, History of the Town of Southampton, East of Canoe Place, 279-80.

**Genuine issue of material fact**.

There is no evidence Southampton purchased underwater lands from Shinnecock.

85. The Andros Patent confirmed that the Town of Southampton was the owner of all lands within its boundaries:

Now for a Confirmation unto the present Freeholder, Inhabitants of the said Towne and precincts: Know Yee, That by vertue of his Ma'ties Letters Patents, and the Commission and Authority unto mee given by his Royall Highness I have Ratifyed Confirmed and granted; and by these presents, do hereby Ratifie Confirme and grant, unto [the Southampton Pantentees], as Patentees, for and on the behalfe of themselves and their Associates, the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes, All the aforementioned Tract of Land, with the Necks and Islands within the said Bounds sett forth and described as

aforesaid, Together with all Rivers, Lakes, waters Quarrys Wood land Plaines Meadows, pastures, Marshes, ffishing, Hawking Hunting and ffowling, and all other Proffits, Commodities, Emoluments and hereditaments, to the said Towne . . .  Id.

**Genuine issue of material fact**.

See 84.

86. On December 6, 1686, New York's Colonial Governor Thomas Dongan, holding authority from the King of England, issued another Patent to the proprietors of Southampton, which confirmed and reiterated the grants of the Andros Patent "includeing all the necks of Land and Islands wihin the aforesaid described bounds and limitts together with all Rivers Lakes water quarries Woodland plaines meadowess pastures marshes fishing hawking hunting and fowling and all other profitts Comodityes and hereditaments . . ."  Id. at 281.

**Genuine issue of material fact**.

The quote is abridged. State Defendants removed the bounded by the sea/ocean and bounded by the Peconic River portions of the Patent.

The Dongan Patent defines the Town of Southampton as, "a certaine tract of Land lyeing and being scituate in the southside of Long Island in the Eastriding of Yorkshire towards the Maine sea the Eastward bounds where of extends to a certaine place or plaine called Wainscott where the bounds are settled betwixt their Neighbors of the Towne of Easthampton and them their southern bounds being the sea and so runs Westward to a place called Seatuck where a stake was sett at their furthest extent that way then crossing over the Island to the northward to Peaconock great river not contradicting the agreement made between their towne and the towne of southold after their tryall at the Court of Assizes and so to runn Eastward alongst their north bounds to the Easternmost part of Hoggenock over the shelter Island including all the necks of Land and Islands within the aforesaid described bounds and limitts together with all

18

Rivers Lakes water quarries Woodland plaines meadowess pastures marshes fishing hawking hunting and fowling and all other profitts Comodityes and hereditaments…*" Id. at 281.*

87. The Dongan Patent was made in response to a Southampton Freeholder's application that Governor Dongan "confirm unto ye ffreeholders of said Town in a more full & ample manner all the above cited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the Indyans and the ffreeholders of the said towne of Southampton . . ." Id. at 282.

**Genuine issue of material fact**.

There is no evidence that Shinnecock asked for determination, submitted to judgment or signed the document.

88. The Dongan Patent recited that the Governor had, "examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid . . ." Id. at 282-3.

**Genuine issue of material fact**.

The Patent also stated, "And if it shall so happen that any part or parcell of the lands within the bounds and limits aforedescribed be not already purchased of the Indians it may be purchased (as occasion) according to law." Id. at 282.

89. The Dongan Patent granted, ratified and conveyed to the Freeholders and Inhabitants of Southampton, the "Rivers Rivolets waters lakes ponds Brookes streames beaches . . . Creeks harbors . . . and Easements fishing hawking hunting and fowling . . ." Id. at 283.

**Genuine issue of material fact**.

1) The quoted section did not make conveyances. The proper quote is "Granted, Ratified, Released and Confirmed…"

2) "Rivers Rivolets waters lakes ponds Brookes streames beaches . . . Creeks harbors . . . and Easements fishing hawking hunting and fowling . . ." These are merely a listing of Southampton Town Trustee powers and it makes no reference to Shinnecock or Indian.

**Plaintiffs' Supplemental Filings**

90. Procedural. No genuine issue of material fact.

91. No genuine issue of material fact.

92. No genuine issue of material fact.

93. No genuine issue of material fact.

94. No genuine issue of material fact.

95. No genuine issue of material fact.

96. No genuine issue of material fact.

97. No genuine issue of material fact.

**Plaintiffs' additional statements of fact and exhibits**

98. "The Shinnecock Nation and other coastal Algonquin peoples on Long Island have depended from time immemorial on the bounty from their maritime environment."
**Exhibit 2**
Strong report - May 27, 2018, p. 2

99. "The English acknowledged this relationship in a series of nation to nation agreements beginning in the spring of 1648 when Nowehdonah, the Shinnecock sachem, joined with the sachems from the Montauketts, Manhassetts and Corchaugs to negotiate with the governors of New Haven and Connecticut for the purchase of thirty thousand acres of land in what is now the town of East Hampton."
**Exhibit 2**
Strong report - May 27, 2018, p. 2

100. "On June 10, 1658 Sachem Wyandanch met with Lion Gardiner, one of the first English settlers on Long Island, to negotiate a nation to nation agreement concerning access to beaches adjacent to the Shinnecock lands in Southampton."
**Exhibit 2**
Strong report - May 27, 2018, p. 2

101. Dr. Strong concludes, "(t)he above documents clearly support the rights of the Shinnecock and the other native peoples of eastern Long Island to fish in the waters adjacent to their communities "without let or hinderance" and to dispose of their catches "as they think good"". Id. p. 4.
**Exhibit 2**
Strong report - May 27, 2018, p. 4

102. "There has been a court decision establishing the northern boundary of the reservation but the water boundaries around Shinnecock Neck have never been officially established."
**Exhibit 3**
Strong report - November 3, 2018, p. 6

103. "Although the jurisdictional boundaries over the off-shore water east of the Shinnecock Reservation have never been officially marked, all of the area on the eastern half of Shinnecock Bay around Shinnecock Neck have traditionally been considered Shinnecock waters."
**Exhibit 3**
Strong report - November 3, 2018, p. 6

104. "The use of these waters by the Shinnecock have never been challenged."
**Exhibit 3 –**
Strong report - November 3, 2018, p. 6

105. "More recently the tribal oyster project began floating racks out in these waters in 1977 and is still operating there today."
**Exhibit 3**
Strong report - November 3, 2018, p. 6

106. Q. (by Scott Moore) Dr, Strong, regardless of where the reservation boundaries are or may be, do the Shinnecocks have fishing rights in the waters in any event?
A. You mean treaty rights?
Q. Yes.
A. Yes.
Q. Can you explain to the Judge what you mean by that?
A. … In that 1648 deed (to Easthampton) it says that the native peoples will have rights to hunt and fish, and I think the language is fish in all creeks and ponds, and in terms of that document and the terms of the people that were signing it at the time, that's what they understood it would be because they just kept fishing where they have been…
**Exhibit 4**
4_11_2019 Strong Testimony,  p. 35, lines 3-22

107. A … the Supreme Court has dealt with this many times and one of the conclusions that they drew was that whenever there were disagreements between fishing rights and ancient treaty rights, that they should be resolved by nation to nation interaction or agreement…
**Exhibit 4**
4_11_2019 Strong Testimony,  p. 36, lines 4-10

108. Q. (by Jamie Greenwood) On direct-examination that was, in fact, the only deed you indicated for retention of any rights to fish in creeks and ponds, correct; on direct-examination, that's the only

deed you mentioned?

A. No. There was several other documents that related to fishing rights and they are all cited; 1657, 1662. This whole area here. It's a pattern.

**Exhibit 4**

4_11_2019 Strong Testimony,  p. 51, lines 12-20


109.  Q. (Greenwood) You would agree with me, the present day legal boundaries of the Shinnecock Reservation, is the area outlined in yellow on People's exhibit 4? Id. 57.

A. The yellow line there on the tax map? No. I would not agree with that.

**Exhibit 4**

4_11_2019 Strong Testimony,  p. 56, line ___ to p. 57, line 5


110. Q. (Greenwood) Just to be clear, you indicated in what is marked as Defense Exhibit F, which is your additional report, that the Shinnecocks would use what we know as Taylor Creek to fish in, right?

A. Yes.

Q. So that wasn't land, correct?

A. It was Shinnecock waters, yes.

**Exhibit 4**

4_11_2019 Strong Testimony, p. 58, line 19 to p. 59, line 2


111. In an 1854 Suffolk County Supreme Court case, the Southampton Town Trustees were liable for harvesting Shinnecock seaweed from the shores of Shinnecock Bay.

**Exhibit 26**

*Bunn v. Pierson et al*, Judgment, November 23, 1854 (Suffolk County Supreme Court)


**See also Exhibit 18, p. 56 (BIA Summary)**

*Bunn* is one of the cases referred to in the BIA Summary, page 3, as evidence of Shinnecock "exercise of political influence or authority" for Recognition Criterion 83.7(c) (p. 2). "Luther Bunn and Oliver Kellis, leasehold residents, sued non-Indians for 'taking and carrying away sea weed' rom the 'shores of Shinnecock Bay' (New York Court of Appeals 3/-/1860)."


**Exhibit 27**

Skibine Issues a Final Determination to Acknowledge the Shinnecock Indian Nation of Long Island, NY


**Exhibit 28**

Gov Patterson NY Times 9_24_2009


**Exhibit 29**

Witt March_2_2016 Email


**Exhibit 30**

Witt_May 9 2016 Shinnecock Overview


**Exhibit 31**

Witt_March 23 2016 Unkechaug Territory and Fishing Rights

**Exhibit 32**
1977_NOAA Long Island Underwater Lands Report

**Exhibit 33**
Natick Dictionary

**Exhibit 34**
Public Papers of Daniel D Tompkins Military Vol II

**Exhibit 35**
American State Trials, Vol. III, F.H. Thomas Law Book Co., St. Louis (1915)

**Exhibit 36**
New Netherland in 1627, p 344

**Exhibit 37**
1977 Audit of Lummi Indian School

**Exhibit 38**
1980 Dept of Commerce Shinnecock Hatchery Grant

**Exhibit 39**
Gadomski DEC 4_20_17 Emails.

**Exhibit 40**
1664 Fort Albany Treaty

**Exhibit 41**
2019_NOAA Whale Part Request Authorization_Shinnecock

**Exhibit 42**
2005_Shinnecock Whale_1640 Deed_NYT Article

Dated: November 4, 2019
      New York, New York

Respectfully submitted,

MOORE INTERNATIONAL LAW PLLC.

/s/ Scott M. Moore

By: _____

Scott Michael Moore, Esq.
*Attorneys for Plaintiffs*
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
T. (212) 332-3474
F. (212) 332-3475
E. smm@milopc.com