UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                    Plaintiffs,

       - against -

BRIAN FARRISH,
JAMIE GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE,

                   Defendants.

-----------------------------------------------------x

Case No.: 18-cv-3648 (SJF) (SIL)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Scott M. Moore, Esq.
MOORE INTERNATIONAL LAW PLLC
45 Rockefeller Plaza, 20th Floor,
New York, NY 10111
(212) 332-3474
*Attorneys for Plaintiffs*

TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 2

STANDARD OF REVIEW ....................................................................................... 2

ARGUMENT ............................................................................................................. 2

    A.  The State Defendants are not entitled to sovereign immunity ..................... 2

    B.  *Ex Parte Young* applies ............................................................................ 3

    C.  The Court is not required to abstain under the Younger Doctrine .............. 8

    D.  Plaintiffs have standing .............................................................................. 14

    E.  Collateral Estoppel does not apply ............................................................ 15

    F.  Shinnecock aboriginal fishing rights exist ................................................ 17

    G. The State cannot regulate those fishing rights ........................................... 27

    H. *Sherrill* does not apply to Plaintiffs' use rights ........................................ 31

    I.  Purposeful racial discrimination can be shown .......................................... 32

    J. Defendant Seggos was personally involved ................................................ 33

    K. The individual State Defendants do not enjoy qualified immunity .............. 34

CONCLUSION .......................................................................................................... 35

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 248 (1986)...................................................................................2

*Antoine v. Washington*,
  420 U.S. 194 (1975)..........................................................................................4

*Berg v. Kelly*,
  2018 U.S. App. LEXIS 20646 (2d Cir. 2018) ....................................................34

*Cayuga Indian Nation of N.Y. v. Pataki*,
  413 F.3d 266 (2d Cir. 2005)..............................................................................31

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..........................................................................................2

*City of Sherrill v. Oneida Indian Nation*,
  544 U.S. 197 (2005)..........................................................................................31

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965)..........................................................................................9

*Drimal v. Tai*,
  786 F.3d 219 (2d Cir. 2015)..............................................................................35

*Ex parte Young*,
  209 U.S. 123 (1908)..........................................................................................3

*Herrera v. Wyoming*,
  Slip Op, No. 17–532 .........................................................................................3

*Idaho v. Coeur D'Alene Tribe*,
  521 U.S. 261 (1997)..........................................................................................4

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005)..............................................................................2

*Johnson v. Killian*,
  680 F.3d 234 (2d Cir. 2012)..............................................................................2

*Lucente v. Int'l Bus. Machs. Corp.*,
  310 F.3d 243 (2d Cir. 2002)..............................................................................2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).....................................................................................2

*Menominee Tribe v. United States*,
391 U.S. 404 (1968).....................................................................................3

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)...................................................................................29

*New York v. Shinnecock Indian Nation*,
No. 08-1194 (2d Cir. 2012)........................................................................20

*Spokeo, Inc.* v. *Robins*,
136 S. Ct. 1540 (2016)...............................................................................14

*Sullivan v. Gagnier*,
225 F.3d 161 (2d Cir. 2000)........................................................................16

*Timpanogos Tribe v. Conway*,
286 F.3d 1195 (10th Cir. 2002) (2016) ........................................................4

*U.S. v. Washington*,
384 F. Supp. 312 (W.D. Wash. 1974).........................................................4

*U.S. v. Winans*,
198 U.S. 371 (1905).....................................................................................4

*Unkechaug Indian Nation, et al v. New York State Department of
Environmental Conservation, et al*,
18-cv-1132 (EDNY) ...................................................................................15

*W. Mohegan Tribe & Nation v. Orange County*,
395 F.3d 18 (2d Cir. 2004)..........................................................................5

*Wash. State Dep't of Licensing v. Cougar Den, Inc.*,
Slip Op., No. 16–1498, 139 S. Ct. 1000 (2019).......................................28

*Younger v. Harris*,
401 U.S. 37 (1971).......................................................................................8

## **State Statutes**

ECL 13-0355.................................................................................................15

## **Statutes**

42 U.S.C. §§1981 and 1982 of the 1866 Civil Rights Act, as amended.......................6

iv

**Rules**

Fed. R. Civ. P. 56.................................................................................1

Fed. R. Civ. P. 56(a) ...........................................................................2

Fed. R. Civ. P. 65...............................................................................1

**Federal Constitution**

U.S. Const., Art. VI, Cl.2....................................................................2

**State Constitution**

Constitution of the State of New York, Section 14 ....................................17

**Other Authorities**

Executive Order of the President No. 13175 ..........................................10

NY Commissioner's Policy 42 / Contact, Cooperation, and Consultation with Indian Nations, March 27, 2009 .................................................................12

# I.
## <u>PRELIMINARY STATEMENT</u>

Plaintiffs, David T. Silva, Gerrod T. Smith, and Jonathan K. Smith, all on-Reservation Shinnecock Indians, have filed a two count complaint. Count I seeks a declaratory judgment under the Supremacy Clause, U.S. Const., Art. VI, Cl.2, that Plaintiffs enjoy un-relinquished aboriginal usufructuary fishing rights retained in ceded territory, and a request pursuant to Fed. R. Civ. P. 65 enjoining the Defendants from enforcing the laws of the State of New York against Plaintiff Silva in Southampton Town Justice Court in Case No. 17-7008, and from otherwise interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters. Compl., Count I, ¶¶ 21-23.[1] Exhibit 1. Count II is a claim for money damages for the continuing prosecutions and interference with their property and civil rights under 42 U.S.C. §§ 1981 and 1982 of the 1866 Civil Rights Act, as amended. Compl., Count II, ¶¶ 24-25. *Id*.

Defendants, Brian Farrish, ("Defendant Farrish" or "Farrish"), Evan Laczi, ("Defendant Laczi" or "Laczi"), Basil Seggos, ("Defendant Seggos" or "Seggos"), and New York State Department of Environmental Conservation, ("Defendant DEC" or "DEC"), (collectively, "the State Defendants"), have now served a motion for summary judgment pursuant to Fed. R. Civ. P. 56. All the State Defendants eleven contentions are without merit, and the motion should be denied in its entirety.

---

[1] Plaintiffs' complaint will be referred to as "Compl., ¶_".

## II.
## PLAINTIFFS' COUNTER-STATEMENT OF FACTS

Plaintiffs respectfully incorporate and refer the Court to their separately filed Rule 56 counter-statement of facts.

## III.
## STANDARD OF REVIEW

Rule 56(a) provides "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). If the moving party meets its burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial' in order to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

## IV.
## ARGUMENT

**A.  The State Defendants are not entitled to sovereign immunity.**

The Supreme Court has long ago held that an individual governmental officer cannot hide behind the immunity and sovereignty of their office when acting outside the scope of their duties, such as the repeated, fruitless, and race-based Shinnecock prosecutions in excess of jurisdiction by the County Defendants as in this case. *Ex parte Young*, 209 U.S. 123 (1908). "The attempt of a State officer to enforce an unconstitutional statute is a proceeding without authority of, and does not affect, the State in its sovereign or governmental capacity, and is an illegal act, and the officer is stripped of his official character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to its officer immunity from responsibility to the supreme authority of the United States." *Ex parte Young*, 209 U.S., at 124.

**B.   *Ex Parte Young* applies.**

Under *Ex parte Young*, a suit against a state official is not barred if prospective relief is sought, as in this case. *Ex parte Young*, 209 U.S., at 123. The right to fish is one of the aboriginal usufructuary rights included within the totality of use and occupancy rights which Indian tribes might possess. *Menominee Tribe v. United States,* 391 U.S. 404 (1968). Present reliance on *Menominee Tribe* by the Supreme Court makes clear *Menominee Tribe* is of current and important precedential value. See, *Herrera v. Wyoming*, Slip Op, No. 17–532 (Sotomayor, J.). (Holding in favor of the Crow Tribe's hunting rights. "Congress 'must clearly express' any intent to abrogate Indian treaty rights", p. 14)

Plaintiffs' Complaint clearly and expressly invokes treaty rights through pre-revolutionary deeds and other documents executed under Crown Patents. See, e.g. Compl., ¶ 15. *Herrera* reaffirms that "Indian treaties 'must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians,' *Mille Lacs*, 526 U. S., at 206, and the words of a treaty

3

must be construed 'in the sense in which they would naturally be understood by the Indians,' *Fishing Vessel Assn*., 443 U. S., at 676." *Herrera*, at 14.

Aboriginal use is easily workable. "If any person shows identification, as provided in the Decision of the Court, that he is exercising the fishing rights of a Treaty Tribe and if he is fishing in a usual and accustomed place, he is protected under federal law against any State action which affects the time, place, manner, purpose or volume of his harvest of anadromous fish, unless the State has previously established that such action is an appropriate exercise of its power." *U.S. v. Washington*, 384 F. Supp. 312, 408 (W.D. Wash. 1974) (Boldt, J.) *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1205 (10th Cir. 2002) (holding *Ex Parte Young* applicable and action not barred by Eleventh Amendment); *Menominee Tribe; U.S. v. Winans*, 198 U.S. 371, 381 (1905) ("the treaty was not a grant of rights to the Indians, but a grant of right from them -- a reservation of those not granted."). Treaties and laws must be construed in favor of Indians, and the Supremacy Clause precludes application of state game laws to a tribe on ceded territory. *Antoine v. Washington*, 420 U.S. 194, 199 (1975)("The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice."). Indians' historical hunting and fishing rights are kept absent an express abrogation of such rights by Congress. *Menominee Tribe,* 391 U.S., at 412 ("We decline to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians.

The State Defendants contend that the relief requested by Plaintiffs does not fall within the *Ex parte Young* exception, arguing that the relief sought here extends beyond prospective relief, and enters into the equivalent realm of a "quiet title" action which was barred in *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261 (1997). The State Defendants insist in their defiant misreading of the complaint that the relief sought here is of the nature of a quiet title action,

citing *W. Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18 (2d Cir. 2004)

In the State Defendants' misplaced reliance on *Coeur D'Alene* and *W. Mohegan Tribe,* the State Defendants fail to cite any language from the complaint that the relief sought is not limited to prospective relief, and completely mischaracterize the relief sought by Plaintiffs in conclusory fashion as analogous to a quiet title suit. Plaintiffs seek no such relief defining ownership or its equivalent. Plaintiffs' relief is limited to prospective relief to protect Plaintiffs' rights:

> Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed.R.Civ.P. 65, the Plaintiffs request the Court to issue a declaratory judgment, and preliminary and permanent injunctive relief in favor of Plaintiffs and *against* the Defendants, enjoining the Defendants from enforcing the laws of the State of New York against Plaintiff Silva in Southampton Town Justice Court in Case No. 17-7008, and from otherwise *interfering* with Plaintiffs' *use* of the waters, fishing, *taking* fish, and *holding* fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters. [emphasis added] (Compl., Relief, ¶1)

A plain reading of the relief requested, in particular the language emphasized above, "against," "interfering," "use," "taking," and "holding," show Plaintiffs seek protection of a **use right** of the waters. It is well documented that the Shinnecock Indian Tribe has historically shared these waters. The Shinnecock have a significant, historic and contemporary exertion of regulatory and jurisdictional powers of the Shinnecock Indian Nation over the same contested waterways. See, the supporting documentation by the BIA, Exhibit 18,[1] as part of the BIA's "Proposed Finding for Federal Acknowledgement of the Shinnecock Indian Nation," December 21, 2009. 74 FR 67895. The PF was finalized on June 18, 2010, which "affirms the reasoning, analysis, and conclusions in the [Shinnecock Indian Nation] Proposed Finding (PF)." 75 FR 34760.

Federal acknowledgments of the Shinnecock Indian Nation's use and regulatory authority in the PF and over the contested waters include:

---

[1] Excerpts from "Summary under the Criteria and Evidence for the Proposed Finding for Acknowledgment of the Shinnecock Indian Nation (Petitioner #4)" approved on December 14, 2009. ("the BIA Summary")

- A 1977 report from the U.S. Department of Commerce, "Aquaculture, Fisheries, and Food Processing as a Combined Economic Development Option for Indian Communities," has a chapter entitled, "Designing a Food Processing Industry for the Shinnecock Tribe." The chapter states that the "Shinnecock Indian Tribe . . . is presently engaged in the production of shellfish." BIA Summary, p. 26.

- "Elected Trustees allocated residential sites, fields for cultivation and grazing, wood, *seafood*, and other resources connected to the land *and tidal areas under the group's control*." [emphasis added] BIA Summary, p. 35.

- "These leaders *consistently controlled access to resources* not only to group members but also to non-Indian short-term leaseholders. Leases of common lands to outsiders produced income, which the group used for their common benefit." [emphasis added] BIA Summary, p. 35.

- "In addition, through consensual decision-making and joint actions, the group has protected the land and resource base from trespass by non-Indians or encroachments by unauthorized persons building on its lands or taking wood, *seaweed, and other resources without permission*. They have *regulated hunting and fishing there*. [emphasis added] BIA Summary, p. 35.

- "Finally, the group has *significantly influenced economic activities by its members* by controlling access to agricultural fields, woodlots, *seafood collection areas*, allotments with access from Montauk Highway, where individual Shinnecock operate businesses, *and other resources*." [emphasis added] BIA Summary, p. 35.

- "On occasion, they rented piers to non-Indian summer residents and leased *rights to harvest oysters and seaweed*." [emphasis added] BIA Summary, p. 37.

- "In two other actions before 1853, Luther Bunn and Oliver Kellis, leasehold residents, *sued non-Indians for 'taking and carrying away sea weed' from the 'shores of Shinnecock Bay. (New York Court of Appeals 3/-/1860).'* " BIA Summary, p. 56.

- "The Trustees also *auctioned seaweed privileges* "for the good of the tribe," and "the pasture field" (Indian Records book 5/11/1880; 4/11/1881).  Trustees made administrative decisions involving fences and gates.  The Shinnecock electorate voted on matters, *such as the number of seaweed lots to rent to outsiders*." [emphasis added] BIA Summary, p. 60.

- "The Trustees sent a message by way of the newsletter warning people about trespassers—defined as anyone not a blood Shinnecock or their spouse— and handling fire arms *and hunting and fishing rules*." [emphasis added] BIA Summary, p. 70.

- "Trustees preserve the peace on the Shinnecock Reservation and are responsible for contacting State police in emergency situations. They enforce restrictions on reservation hunting and fishing by outsiders." BIA Summary, p. 87.

The PF serves a dual function here. Firstly, it categorically substantiates the fact that when the United States recognized the Shinnecock Indian Nation as an Indian Tribe, it also acknowledged its water resource jurisdiction and usage. Secondly, it proves that even when the Shinnecock Indian Nation has absolute and uncontested control of a resource, it shares it with non-Indian neighbors thereby emphatically disproving the notion that the Plaintiffs have unstated or implied intentions of exclusion of others.

The Federal government also recognizes Shinnecock fishing rights in publications. The 1977 report from the U.S. Department of Commerce, "Aquaculture, Fisheries, and Food Processing as a Combined Economic Development Option for Indian Communities," U.S. Department of Commerce, Office of Minority Enterprise, 1977, Exhibit 19, ("the DOC Handbook") reveals undoubtable federal acknowledgement of the retained and unextinguished aboriginal Shinnecock Indian Nation water rights, combined with *direct federal financial support for the then State Recognized Tribe* for developing those water rights into a mechanism for economic development.

The DOC Handbook is essentially a feasibility study using the Shinnecock Indian Nation as a model for other water rights possessing tribes to follow. The Executive Summary of the DOC Handbook states, "(t)he model development scheme in Figure 14 which shows the time and kind of work which were required to create an industry based on *Shinnecock's most abundant resources, shellfish and underutilized fish species*." [emphasis added] DOC Handbook, p. v.

It further states, "Indian communities over the years have historically developed their own specific resource utilization systems based on experience and need." DOC Handbook, p. 2.  This cannot be overstated as it corroborates both historical, aboriginal Shinnecock water resource usage as outlined in the PR and also rationally explains the relatively new glass eel fishery developed by the Plaintiffs in a cultural context and as a natural response to ever-evolving, culturally appropriate, economic development opportunities.

The DOC Handbook adds, "AIDA (Department of Commerce agent, American Indian Development Association) personnel visited over 20 Indian reservations, mostly in the northern tier of States across the United States (Fig. 1). Specific studies and interviews were conducted at nine reservations having water resources which were felt to be typical of reservations within the region." DOC Handbook, p. 2. Shinnecock was indeed one of the nine reservations visited and was listed as being most likely to cultivate a salmon ranching or salmon cultivation in containment system of aquaculture.

The DOC Handbook accurately and presciently observes, "virtually every reservation visited had underdeveloped resources from two standpoints. First, water resources were totally unused or were managed by outside influences for the sole benefit for the outside persons." Reasons for the underutilization of the resource included, "White prejudice" and "White religious and economic exploitation". DOC Handbook, p. 4.

In its Guide (to other tribes) for Investigating Your Water Resources With Your Own Planners and Management, the top long-range consideration is, "(h)as the tribe established water rights?" DOC Handbook, p. 8. The implication is clear, tribes lacking aboriginal water rights should not consider this method of economic development. Alternatively, it must follow that Shinnecock inherently possesses water rights to have been considered for the program and the assertion is that the Shinnecock Indian *Nation must possess a high level of water rights* to become the model tribe.

For these reasons, Plaintiffs seek protection of a **use right** of the waters, and *Ex Parte Young* applies.

## C.  The Court is not required to abstain under the Younger Doctrine.

The State Defendants contend abstention by the Court is mandatory under the Younger Doctrine. *Younger* is a limitation of the *Ex parte Young* exception to sovereign immunity and is properly part and parcel of the immunity section above. *See, Younger v. Harris,* 401 U.S. 37, 43-

46 (1971).

Nowhere do the State Defendants address the "bad faith," "harassment," and "unusual circumstances" exceptions, distinguishing *Dombrowski v. Pfister,* 380 U.S. 479 (1965) as a limited exception in *Younger v. Harris*, 401 U.S., at 54. Justice Brennen's concurring opinion in *Younger* (joined by White and Marshall), pointed out that "He [the plaintiff] has not alleged that the prosecution was brought in bad faith to harass him." *Younger*, 401 U.S., at 56. A chilling effect upon rights might result from such prosecution regardless of its prospects of success or failure. *Dombrowski*, 380 U.S., at 487-489. The abstention doctrine is inappropriate where a statute is justifiably attacked on its face, or as applied for the purpose of discouraging protected activities. *Dombrowski*, 380 U.S., at 489-491. The state court's ultimate interpretation of a statute would be irrelevant to meet the claim that it was being applied to discourage civil rights activities. *Dombrowski*, 380 U.S., at 490.

The Plaintiffs have plainly plead facts showing bad faith, harassment, and special circumstances of failed prosecutions, seized property, and a continuing pattern of interference with their aboriginal and retained Shinnecock fishing rights:

> Over the last decade, the Defendants have ticketed, seized fish and fishing equipment, and prosecuted the Plaintiffs for alleged criminal offenses in alleged violation of New York State law involving fishing and raising shellfish in Shinnecock Bay and its estuary waters, which are adjacent to the lands of the Shinnecock Indian Reservation. Each of the prosecutions failed. Yet, the Defendants persist and continue to ticket and threaten prosecution. The Plaintiffs are in fear of exercising those same usual and customary aboriginal fishing rights secured and retained for them by their ancestors when Shinnecock territory was ceded to the English. Ironically Plaintiff Silva is presently scheduled to stand trial on August 30, 2018, in the Town of Southampton Justice Court, located in Hampton Bays, New York, the building itself sitting on ceded Shinnecock territory. (Compl., ¶16)

> On January 28, 2009, in *People of the State of New York v. Salvatore J. Ruggiero*, Case No. 08-101350, Southampton Justice Court, Southampton, New York, after a bench trial and prosecution testimony by Farrish, that court found the Defendant, a non-Indian who was fishing with Gerrod Smith, not guilty of possession of undersized flounder, undersized blackfish, and undersized porgy,

for the Defendants' failure to prove jurisdiction. (Compl., ¶17)

On October 14, 2009, in *People v Gerrod T. Smith*, Case No. 08-101351, Southampton Justice Court, Southampton, New York, after removal to this federal court, three criminal counts of possession by Gerrod Smith of undersized flounder, blackfish, and porgy in Shinnecock Bay, were dismissed in the Justice Court. (Compl., ¶18)

On June 17, 2010, in *People v. Jonathan K. Smith*, Case No. 09-031419, Southampton Justice Court, Southampton, New York, after removal to this federal court and known as Case No. 09-0571 in the United States District Court for the Eastern District of New York, (Wexler, J.), a judgment of dismissal of criminal possession by Jonathan Smith of a shellfish farm in Shinnecock Bay without a license was entered for failure of the Defendants to prosecute. (Compl., ¶19)

Most recently on April 20, 2017, Silva was stopped by two DEC Officers, Laczi and Farrish, while Silva was fishing for elver eels in Shinnecock Bay. Silva's eels, net, and other fishing equipment were seized, and Silva was issued a criminal appearance ticket alleging possession of undersized eels in violation of New York State law, 6 NYCRR 40-1(b)(ii). Silva was later charged with two additional criminal offenses, ECL 13-0355 (no fish license), and 6 NYCRR 40-1(b)(iii) (possession of eels over limit). This case is presently lodged and pending in the Southampton Town Justice Court as Case No. 17-7008 and is being prosecuted by Greenwood. Silva's attempt to obtain a voluntary dismissal by Greenwood was unsuccessful, and Silva's motion to dismiss for lack of jurisdiction was denied by that court. Over Silva's objection, that case is presently scheduled for trial on August 30, 2018 at 9:00 am. (Compl., ¶20)

The Plaintiffs exercised their lawful rights to use waters, fish, take fish, and hold their fish clearly within an area of aboriginal usufructuary fishing rights un-relinquished and retained by Plaintiffs' ancestors in the aforementioned Colonial Deeds and related documents ceding Shinnecock territory, all protected under the Supremacy Clause, U.S. Const., Article VI, clause 2. (Compl., ¶22)

The Defendants' repeated interference, seizures, and prosecution of the Plaintiffs by application of New York State fishing regulations violates Plaintiffs' fishing rights protected under the Supremacy Clause, was and is void, and was and is in excess of New York State jurisdiction. (Compl., ¶23)

Bad faith and harassment are also shown by these continued prosecutions on one hand, and the Defendants' complete failure to consult with the Shinnecock Indian Nation on matters involving Plaintiffs' fishing rights in accordance with obligations under Presidential Executive Order No. 13175. *See, e.g.,* no mention of Executive Order No. 13175 in the Affidavit of James Gilmore, dated July 23, 2018, even though Mr. Gilmore states he serves "as the New York

Commissioner on the Atlantic States Marine Fisheries Commission (ASMFC or Commission)…." There is no mention of required consultation in any filing by any of the Defendants.[7]

Plaintiffs have shown blatant discriminatory language of internal DEC emails indicating the racial profiling of Shinnecock people for enforcement as a racial group. The internal DEC email from DEC Captain Dallas Bengel of March 28, 2017, Exhibit 20, to Farrish, Gilmore, Laczi, and others, states in pertinent part:

> Word is out that the *Shinnecocks* are actively seeking a shipper for glass eels. Apparently they have been in contact with the *Unkachaugs* and the *Passamaquoddys* (Maine).
> …
> Lt. Carbone – your thoughts on the creek adjacent to the east side of the reservation? Lts – please put together a elver patrol/detail plan for your Zones.
> …
> Thanks and good luck. [emphasis added]

Besides this documented evidence of racial profiling, the adage "Where there is smoke, there is fire" applies here. Hypothetically, consider if another race, such as "Black" is substituted for the word "Shinnecock" above. Would there be any question of racial profiling?

An important internal DEC email from Monica Kreshic on April 25, 2017 to Gilmore and Bengel, among others, Exhibit 21, provides in pertinent part:

> The Shinnecock assert that they have a treaty right to exercise their aboriginal fishing practices. *This may be true.* [emphasis added]

This email is obviously part of the same racial profiling email trail as above, but this email shows a factual, plain and pointed internal DEC recognition of precisely the fishing rights Plaintiffs are asserting in this case. Further evidence of bad faith in Count I, and racial discrimination in Count II.

Even if the order Executive Order No. 13175  does not apply, the DEC is bound by its own similar mandated consultation requirement. New York State DEC has a similar guidance and policy

11

document entitled, "Commissioner's Policy 42 / Contact, Cooperation, and Consultation with Indian Nations," issued by then DEC Commissioner Alexander B. Grannis on March 27, 2009, Exhibit 22. ("CP-42"). "It is the policy of the Department that relations with the Indian Nations shall be conducted on a government-to-government basis." CP-42, p. 1. The protocol of CP-42 includes, but is not limited to "Contact" and "Consultation," (CP-42, p. 4), including on the subjects of "Hunting, Fishing, and Gathering, (CP-42, p. 5).

CP-42 protocol includes:

- The Department recognizes the unique political relations based on treaties and history, between the Indian Nation governments and the federal and state governments. In keeping with this overarching principle, *Department staff will consult with appropriate representatives of Indian Nations on a government-to government basis on environmental and cultural resource issues of mutual concern.*

- Where appropriate and productive, will *seek to develop cooperative agreements* with Indian Nations on such issues.

- The Department interacts with Indian Nations in two critical areas of mutual importance: the environment and cultural resources. It does so in several capacities, including, but not limited to, permit application review, site remediation, *hunting and fishing regulation, and the development, implementation, and enforcement of regulations.*

- Additionally, mutually beneficial cooperation and the appropriate resolution of occasional disagreements or misunderstandings can best be achieved if there is a commitment to *regular consultation on environmental and cultural resource issues of mutual concern.*

- The Department and Indian Nations share key roles in protecting and preserving natural and cultural resources important to all citizens, and *early consultation and cooperation* between the Department and Indian Nations will foster more comprehensive protection and preservation of those resources.

- "Consultation" means open and effective communication in a cooperative process that, to the extent practicable and permitted by law, works toward a consensus *before a decision is made or an action is taken.*
  [emphasis added]

The State Defendants failed to meet *even a single* obligation under Executive Order No. 13175 and CP 42 and have met the good faith intentions of these documents with indifference. The triggers for consultation with the Shinnecock are clear. On March 28, 2017, internal emails reveal DEC

Captain Dallas Bengel calling attention to Shinnecock fishing activities. Recipients include Defendants Farrish, Laczi as well as Mr. James Gilmore. "Word is out that Shinnecocks are actively seeking a shipper for glass eels", he states. "(Lieutenants), please put together a [sic] elver patrol/detail plan for your Zones",  he adds.

This incident should have *immediately* triggered a consultation with the Shinnecock Indian Nation, yet none took place. The intent to target Shinnecock specific fishermen is absolutely clear and is consistent with previous actions against the Plaintiffs. The State Defendant's zeal overshadowed and completely overrode any responsibility for cooperation and consultation the State Defendant has for the Indian Nations of its State. This is evidence of bad faith and of the discrimination alleged by Plaintiffs. The DEC prosecutions of Plaintiffs occurred *after* the issuance of CP-42.

More instances of bad faith and harassment: The State Defendants' Mr. Gilmore testified in his affidavit that "American eel (*Anguilla rostrate*) are an important and protected resource. Their population is *depleted* and at historically low levels for several reasons, including *overfishing*…." Gilmore Aff, ¶4 (emphasis added). But Mr. Gilmore is impeached by the ASMFC, "… the overfishing status … cannot be stated with confidence." Exhibit 12, p. 12. Mr. Gilmore also is impeached by the DEC's own publication where the American eel appears nowhere. See, List of Endangered, Threatened and Special Concern Fish & Wildlife Species of New York State - NYS Dept. of Environmental Conservation. Exhibit 9. Also studies of the U.S. Fish & Wildlife Service, has on two occasions, 2007 and 2015, made findings that the American eel stock is "stable" and should not be placed in a protected status. See, USFW press release, October 7, 2015, Exhibit 10, and the USFW findings in the Federal Register, Exhibit 11.

For these reasons, the Court is not mandated to decline injunctive relief under the Younger

Doctrine because the facts, alleged and shown, show bad faith, harassment, and special circumstances.

**D.  Plaintiffs have standing.**

The State Defendants contend Plaintiffs lack standing because their claims are speculative and remote, and past injury does not supply a predicate for prospective relief.

The Plaintiffs have set forth in detail three failed prosecutions and seizure of their fishing property, and a pending one, by the Defendants for Shinnecock fishing under their aboriginal rights in Shinnecock Bay within a stone's throw of the land base of the Shinnecock Indian Reservation. The detailed pleading of the pattern of actual seizures of fishing property, and actual criminal charges against the Plaintiffs, and the chilling effect such prosecutions have upon their enjoyment of their rights, constitutes facts establishing the Article III requirement of standing: 1) an "injury in fact" by a showing of a "concrete and particularized" injury to the Plaintiffs, as well as the requirements that 2) said acts are fairly traceable to the conduct of the State Defendants, and 3) the conduct is likely to be redressed by a favorable judicial decision. *Spokeo, Inc.* v. *Robins,* 136 S. Ct. 1540, 1547-48 (2016). Further, the fact that all prior prosecutions failed with dismissals and an acquittal, and the Defendants continue to prosecute Shinnecock Indians for fishing, shows bad faith and harassment on the part of the Defendants. It stands to reason with little effort that a declaratory judgment in favor of Plaintiffs will result in Plaintiffs being able to enjoy their aboriginal fishing rights without interference by the Defendants in Shinnecock Bay and other usual and customary Shinnecock fishing areas.

Plaintiffs have met the standing requirements under *Spokeo*. 1) the injury in fact is established by a concrete and particularized injury to each Plaintiff. Each Plaintiff has had criminal charges brought against him and property seized for fishing in Shinnecock Bay. 2) the acts are fairly traceable to the conduct of the State Defendants. Each arrest and criminal charge was conducted by the appropriate named officer of the DEC. With respect to Seggos, the arrest

and criminal charges of Shinnecock Indians was approved as a matter of policy at the top, by Seggos, Commissioner of the DEC. And 3) the conduct is likely to be redressed by a favorable judicial decision.

See also the statement by DEC Major Scott Florence in a January 25, 2018 email to the New York Times: "… the state's fishing regulations … apply to anyone who fishes in the wasters of New York State." Exhibit 23.

Judge William F. Kuntz II of this Court has previously held in favor of the Unkechaug, a neighboring Tribe asserting similar fishing rights, on standing (and ex parte Young) issues. "Plaintiffs do not aver "mere some day intentions to commit an act," but instead have articulated a concrete plan, including fishing in waters they consider customary under their treaty rights, which would violate the regulations in question." *Unkechaug Indian Nation, et al v. New York State Department of Environmental Conservation, et al*, 18-cv-1132 (EDNY) (Decision & Order, April 18, 2019, p. 12). Exhibit 17.

For these reasons, Plaintiffs have standing.

### E.  Collateral Estoppel does not apply.

State Defendants opine that the doctrine of collateral estoppel from the recent related criminal conviction in Southampton Justice Court (a prosecution Plaintiffs sought to stop here), and now seeking appeal to the Appellate Division, Second Department, bars this Court from deciding Plaintiffs' fishing rights here, being Order, January 9, 2018, and Decision, dated June 5, 2019, respectively. Silva was convicted of violating ECL Section 13-0335/71-0923 relating to lack of a New York marine commercial food fishing license and use of a fyke net, and acquitted of two other counts.

Both in its trial decision and in deciding an earlier motion to dismiss, the Southampton Justice Court avoided and did not decide the merits of any Shinnecock fishing rights issue

raised by Silva. The Town Court decision was among other things, against the great weight of evidence, as it did not even mention the testimony and two reports of Dr. John Strong that the southern boundary of the Shinnecock Reservation has never been established and the Shinnecock also have retained fishing rights where Silva was fishing. Exhibits 2, 3 and 4. Both reports by Dr. Strong dated May 27, 2018 and November 3, 2018, were introduced into evidence in Silva's criminal trial. The Town Court decision also erred in not mentioning the testimony of Shinnecock Chairman Bryan Polite that the Shinnecock Indian Nation never relinquished any rights to Shinnecock Bay (Exhibit 7, p. 135, lines 19 - 24), and on cross examination the prosecution merely asked about a land mass in adjacent Southampton Village, because Polite was not familiar with the specific water area in Shinnecock Bay in which Silva's fyke net was placed (Exhibit 7, p. 140, lines 4 – 10).

Here, the elements of collateral estoppel are not met and the Defendants fail to meet their burden of proof. *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000) "The doctrine of collateral estoppel requires a detailed examination of the record in the prior state criminal case, including the pleadings, the evidence submitted and the jury instructions, in order to determine what issues were actually litigated and necessary to support a final judgment on the merits. The burden of proof with respect to whether an issue is identical to one that was raised and necessarily decided in the prior action rests squarely on the party moving for preclusion." (internal citation omitted)

Here the Defendants merely contend in conclusory fashion the Town Court decision on its face decided the important tribal and federal issues in this case, without any detailed examination of the record. Even if the all the elements of collateral estoppel were met here, and none were, such an outcome would offend the Supremacy Clause, Article VI, Clause 2, of the federal constitution, because federal common law and the treaties asserted by Silva here and in

the Town Court, and ignored by the Town Court, trump the DEC regulations under which Silva was convicted.

In 2019, the Supreme Court reviewed state court decisions in both *Herrera, supra* (Decided May 20, 2019) and *Cougar Den, infra* (Decided March 19, 2019).

For these reasons, collateral estoppel does not apply.

**F.  Shinnecock aboriginal fishing rights exist.**

The Defendants are bound to honor and abide by Shinnecock reserved fishing rights contained in Shinnecock deeds and treaties. Section 14, Constitution of the State of New York. Federal Supremacy Clause.

**Unambiguous Federal Recognition of Shinnecock Fishing and Water Rights**

Plaintiffs enjoy aboriginal fishing rights in Shinnecock Bay, including the area fished by Silva, and other areas, reserved for them by their ancestors. Exhibits 2, 3 and 4. The original intent of the deeds cited by Plaintiffs' expert, Dr. John Strong, in this matter mean exactly what they say; reserving rights to the Indians as they understood them. A 1620s account of the Shinnecock by Dutch official Isaack de Rasieres describes the tribe as, "support(ing) themselves by planting maize and making sewan". Exhibit 36, p. 2.  Sewan is another name for wampum, traditionally harvested from the seas. Inarguably, marine resources have played a vital role in Shinnecock self-sufficiency since time immemorial. The intent of the Shinnecock during land cessations to reserve the right to access the resources for future generations is indelibly clear.

Defendants fail to challenge the federal recognitions, acknowledgments and subsidizations of Shinnecock fishing and water rights both historically and currently. The significance of this relationship cannot be understated. The Defendants do not deny the Proposed Finding for Federal Acknowledgement of the Shinnecock Indian Nation, December 21, 2009 which cites significant examples of the historic and modern Shinnecock use, dominion, jurisdiction, control and the

economic development of waterways through its water and fishing rights. The Bureau of Indian Affairs accepted as fact and conclusive evidence of Shinnecock political influence or authority.

On December 21, 2009, the BIA published a public notice in 74 FR 67895. 25 CFR 83.35 provides opportunity for public comment. Comments and rebuttals on this proposed finding were due on or before March 22, 2010 as published in 74 FR 67895. Defendants offered no comments or rebuttals as evidenced in a June 15, 2010 the Office of the Assistant Secretary-Indian Affairs press release which stated, "(t)he evidence in the record for the proposed finding demonstrated that the petitioner met all seven of the mandatory criteria for Federal acknowledgment as set forth in 25 CFR 83.7. *The Department did not receive comments from any party other than the petitioner during the comment period*." [emphasis added] Exhibit 27, p.1.

Defendants were again afforded an opportunity to rebut through the BIA Interior Board of Indian Appeals. The Defendants did not. Ample opportunities have been made available to the Defendants to rebut the aforementioned federally recognized water use rights for nearly a decade. Quite to the contrary, on September 24, 2009 New York Governor David A. Patterson delivered the official position of the State by endorsing the federal recognition findings in a letter to the BIA which was quite critical to the success of the petition. Exhibit 28, p.1.

Now the Defendants obstruct by selective prosecution Plaintiffs' rights even though the federal government spends money to train Native Americans to develop their own natural resource rights. A June 17, 1977 United States General Accounting Office report shows the Bureau of Indian Affairs, the Office of Economic Opportunity, the Office of Education and the Economic Development Administration subsidized 100% of Shinnecock tuition, stipends and other associated costs with attendance to the Lummi Indian School of Aquaculture between June 19, 1975 and April 1, 1976. Exhibit 37, p. 2. In fact, Plaintiff Gerrod Smith was among the Shinnecock graduates and recipient of the aforesaid federal subsidies in the 1977 Audit. *Id*. p. 16.

On November 12, 1980. The Shinnecock's oyster hatchery was awarded a grant to "provide business and technical assistance support necessary to achieve full-scale operation of the nation's first Solar Energy Shellfish Hatchery". Exhibit 38, p. 5. The Shinnecock were exempted from obtaining a federal OMB Circular A-95 clearinghouse review because of their status as a federally recognized tribe, fully thirty years earlier than their later 2010 federal recognition, clearly implying the federally protected nature of Shinnecock water rights. *Id*. p. 7. The expected outcome was to, "develop strategy to expand (the Shinnecock) bivalve market *nationally and internationally* [emphasis added]" and the Shinnecock, "*shall not be constrained by geographic limitations* in its efforts to carry out work requirements for this project". [emphasis added] *Id*. p. 10.

Later, in 2014, the Shinnecock applied for and received a multimillion-dollar National Fish and Wildlife Foundation grant to revitalize and bolster its shoreline, once again partnering with the federal government. Current Chairman of the Shinnecock Indian Nation, Bryan Polite, testified to the scope of the project. The project, "covered pretty much the entire south end of the (Shinnecock) bay where the barge was in the middle (of the water) and it cut it half and half". Exhibit 7, p. 131, lines 18-20. Chairman Polite further testified that *the Shinnecock reclaimed over one hundred feet of shoreline below the high tide mark* for nearly a quarter mile at the cost of roughly one million dollars, paid to the neighboring Suffolk County with the sand coming from nearby bay bottoms. *Id*. p. 130, line 21 – p. 134, line 24. Chairman Polite added that Defendant NYSDEC was aware of the project as it proceeded without permits and NYSDEC failed to administratively challenge this massive "off-reservation" undertaking. *Id*. p. 134, line 25 – p. 135, line 18. When asked whom from the federal government visited the reclamation project, Chairman Polite responded, "(t)he Secretary of the Interior, Sally Jewell". *Id*. p. 145, lines 12 - 18. This shoreline reclamation project unequivocally discredits the Defendants notion that Shinnecock aboriginal water rights are somehow extinguished.

## The Dongan Patent

The Defendant's motion and fact summary statement are rife with Dongan Patent references, quotes and citations largely with quotes out of context, rhetoric and half-truths against the Plaintiffs. For example, Defendants offer *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d at 273 as proof of title extinguishment but fail to offer critical subsequent history to the Court as this decision was vacated in *New York v. Shinnecock Indian Nation*, No. 08-1194 (2d Cir. 2012). As such it serves as no authority and is non-precedential in this matter. This vacated judgement serves at the Defendants lone evidence for extinguished aboriginal rights, beyond that they argue unsubstantiated theory and indulge in wild speculation.

As for the Dongan Patent itself, the Defendants lazily meander through the document, occasionally offering bits which may help their argument, but fails to offer either true insight or analysis of the document. The key emphasis and purpose of the Patent as it pertains here was to ratify previous land transactions with the Shinnecock Indians. Additionally, Governor Dongan declared that and lands not previously purchased from the Shinnecock may be purchased in the future. Yorke Decl. Ex. O p. 5. This bears repeating. *all lands, including underwater lands, must be purchased*.

Every single Shinnecock deed or treaty bounds the purchases to a great body of water and *is not inclusive of them*. The 1648 Deed to the Town of Easthampton is bound "from sea to sea", not inclusive of them. Yorke Decl. Ex E p. 4. The 1640 Deed to the Town of Southampton detailed, "all the land lying eastward, betweene the foresaid boundes by water" which is particularly relevant here as Taylor Creek, site of Plaintiff Silva's fishing location, is adjacent and to the west of the boundary as defined in the Deed, not inside of the bounds Yorke Decl. Ex. F p. 3.

The June 10, 1658 Deed to the Beach defines the area as being bound, "westward where it is separated by ye waters of ye sea, coming in out of the Ocean Sea, being bounded Southwards with

20

the great sea, Northwards with the inland water". Once again, bounded by the waters and the sea and not inclusive of them. And again, this is relevant because Plaintiff Silva's fishing area is adjacent and north of the boundary, not inside. Yorke Decl. Ex. G.

The May 12, 1659 Deed to Quogue bounds the area similarly, "Northward to the water of the bay and to the creeke of Accobaucke" and "three miles landward in from the high water marke", "three miles bredth of land Southward all the land and meadow towards the south sea". Bounded to the bay and creek but not including. Landward from the high tide mark but not including. Southward bounded by the sea but not including.

Defendants have not produced any evidence that the submerged lands within these ceded areas were ever purchased, as was required by the Dongan Patent. In fact, the Defendants are impeached by their own department here because these facts were indeed confirmed on three separate occasions by Dr. David Witt, Defendant New York State Department of Environmental Conservation's own professional archaeologist and NYSDEC departmental Indian Nations Affairs Coordinator with the Office of Environmental Justice.

On March 02, 2016, Dr. Witt advised Defendant Silva regarding the colonial patents and in particular the Dongan Patent.

> My understanding is that the various patents, including the Dongan Patent, gave the towns authority to purchase land from the Native American nations, after which the land would become part of the jurisdiction of the town and recognized as such by the English crown. I personally feel that it's unfortunate that so many people have ignored the Native American side of that equation, or just blindly assumed the Native Americans signed over all rights and titles to the entirety of the island. From what I can find in the historical records, the nations did occasionally sell underwater territory to the towns, for instance, Brookhaven's purchase of territory from the Unkechaug in 1755. However, I'm not as familiar with Shinnecock history as I am with the Unkechaug, and I don't want to assume that Shinnecock ever sold underwater land to the colonies. I get the gut feeling that at some point, someone just "assumed" the towns held title to the underwater lands, notwithstanding the fact that that land had rightfully belong [sic] to the Indian nations.
> Exhibit 29

Then on May 09, 2016,  Dr. Witt advised then NYSDEC Executive Deputy Commissioner

Kenneth Lynch:

> The confusion stems from what seems to be an assumption on many people's part that just because the towns received the (colonial) patents, they automatically owned the (underwater) land. However, there is an example from 1755 in which the Town of Brookhaven purchased the rights to a portion of the Great South Bay from the Unkechaug, illustrating that at the time, some town officials understood they had to buy the rights from the Native Americans." The state's position is that the towns do own those lands and have the rights to license activities affecting those lands (such as seeding oysters, etc). The Shinnecock's position is based upon a 1659 deed in which they reserved their "privilege of fishing, fowling or gathering of berries or anything else for our use" in ceded territories. This was signed and agreed by both parties. Given that this was in writing, they have a stronger case for fishing rights than the other (Native American) nations in New York.
> Exhibit 30

Dr. Witt added, "I believe we should come to some understandings, memorialized via letters of

agreement, that accomplish our regulatory interests while also allowing the Shinnecock to

accomplish their goals." Dr. Witt advised, "I feel we have an opportunity for a positive relationship

here, especially if we are willing to take that extra step to work towards LOA's". He also referenced

a "notable" 2012 altercation between Plaintiff Jonathan Smith and his company, Shinnecock Oyster

Farms, and NYSDEC Environmental Conservation Officers regarding their confiscation of Smith's

allegedly undersized scallops.

On March 23, 2016, Dr. Witt analyzed Unkechaug fishing rights, particularly regarding the glass

eel, the Brookhaven colonial patents, titles, jurisdiction, etc. His results almost mirrored his

comments on and analysis of Shinnecock. Exhibit 31. As he advised his supervisor Lisa DeJesus, he

underlined certain sentences for emphasis. The relevant parts:

> So the patents were the establishment of town borders, but the land still had to be purchased in separate actions… This is why Colonel William "Tangier" Smith had to go to the governor (as royal representative) to get legal recognition of his purchase of Unkechaug lands as part of his manor… p. 2

> It is important to note, at least at this point, it is uncertain if this purchase included the underwater lands of the Mastic River. p. 2

> I still can't say if the underwater lands were ever purchased from the Unkechaug. P. 2
>
> And I reiterate, that at this time, I cannot find any evidence that the Unkechaug sold any rights to underwater lands of Mastic River. p. 5

Further, in 1977 the National Oceanic Atmospheric Administration (NOAA) generated a boundaries and lands underwater jurisdictions report for the division of State Planning, New York State Department of State revised and edited by three NYSDEC agents. Dr. Witt comments on the report to Ms. DeJesus. *Id*., p. 5. The report declares the ownership and jurisdiction of underwater lands in Long Island to be, "since colonial times, been under contest of ownership", "unclear", "what rights, if any, the town had in the lands under water in the Peconic River" and "unresolved." Exhibit 32, pp. 16, 18, 19.

The NOAA report continues, "(t)he Town of Brookhaven tried to strengthen its position by acquiring the lands underwater of the Great South Bay from the Indians (Indian Deed dated April 8, 1755)". *Id*. p. 17.  The report unmistakably identifies a singular moment in time where a purchase of underwater lands was made from the Native American proprietors and rightful owners. Alternatively, the report analyzes the underwater lands of the Town of Southampton. They are defined as, "*interpreted* [emphasis added] from the Andros Patent dated November 1, 1676 and the Dongan Patent dated December 6, 1686." *Id*., p. 16. This report also shows no evidence of even a single purchase made of underwater lands from the Shinnecock, as obviously required by the Dongan Patent. A mere *interpretation* does not convey title or jurisdiction.

Simply put, the evidence overwhelmingly supports Plaintiffs claims. The Dongan Patent did not expressly extinguish aboriginal fishing rights, it empowered the towns to purchase (underwater) lands from Native Americans, which they failed to do. The Shinnecock lands purchased were bounded by great bodies of water, categorically not inclusive of them and Defendants offer no evidence to the contrary.

Lastly, Dr. Witt's analysis parallels United States Supreme Court Justice McKenna's opinion in *US v. Winans*, both of which functionally articulates Plaintiffs position. Dr. Witt said, "the Unkechaug and other tribes were selling shared rights to the land, not title and exclusive rights". Exhibit 31, p. 3. He further likened it to Native Americans sharing the resource equally with the towns. Justice McKenna reasoned, "There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved "in common with citizens of the territory." As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision  of means for its exercise." *United States v. Winans*, 198 U.S., at 381.

### September 17, 1666 Shinnecock Application and the Subsequent Nicolls Patent Determination

The Defendants fail to note context and relevant language regarding the supposed 1666 Application and consequent  Patent determination. In no uncertain terms, the group of Shinnecock only sought payment as evidenced by, "that they shall pay unto us, as his said honor shall determine…". Yorke Decl. Ex. L. p. 2. Governor Nicolls thereafter decreed that all parties "absolutely reffered [*sic*] themselves to my determination". Yorke Decl. Ex. L. p. 4.

Gov. Nicolls ruled for prompt payment for *both* the 1662 Indian proprietors of the Topping Deed as well as the contesting 1666 Indian proprietors. Further, Defendants misguidedly hypothesize Gov. Nicolls extinguished aboriginal rights and title without offering proof. Quite the opposite is true.

Conspicuously absent from Defendants argument is that Nicolls only conveyed Topping and Cooper's interest to the Town of Southampton, not the Indian interest. "And they the said Capt. Topping and John Cooper and either of them shall hereafter sign any instrument in writing that be made for ye further confirmation of *their* [emphasis added] said interest vnto the said Southampton." *Id*. "Their" being the operative word. The Topping and Cooper interest in being

24

conveyed, *not* the Native American interest. The interest of the several townsmen was clearly converted into Town interest, leaving the Shinnecock half of the profits to the beach interest intact. No evidence refutes this fact.

Moreover, Defendants clearly articulate that a group of Shinnecock petitioned Gov. Nicolls. Absent is a Shinnecock appeal made to Gov. Dongan. Defendants cannot produce evidence of Shinnecock application to Gov. Dongan nor an acquiescence to be bound by his ruling.

**The Supposed June 8, 1659 Deed to the Beach**
**(State Defendants' Transcription)**

The Defendants offer the supposed June 8, 1659 Deed to the Beach as evidence. Yorke Decl. Ex. I. This is no "deed" at all, this is a contract. Lands are not sold or bargained for, privilege to drift whales was sold, for a period of 21 years. Lion Gardiner paid for access to a marine resource to the true owners of the resource, the Shinnecock.

Shinnecock ownership of the marine resources had been memorialized a year earlier with the June 10, 1658 Deed to Beach, "but the whales that shall be cast upon this beach shall belong to me, and the rest of the Indians in their bounds, *as they have beene anciently granted to them formerly by my forefathers*" (emphasis added). Yorke Decl. Ex. G.  "Nukkone" is the Shinnecock word for "ancient", it also means "original". Exhibit 33, p. 2.

The Native American right of resource ownership is ancient, handed down from generation to generation as memorialized here. Gardiner understood that and leased a share for a finite period. The chain of title is unmistakable. Regarding drift whales the Defendants state, "…they were sold and traded through a variety of negotiated terms". State Defendants Motion for Summary Judgement. p. 16. This begs the question, from whom were the rights purchased? The answer is; the Shinnecock. As the original, ancient owners of the resource, implicitly any right not sold is reserved.

In addition, Defendants continue to misunderstand historical contextual relevancy. They fail to

distinguish historic language usage from modern language. In this case, the Plaintiffs contend that "whales" "whaling" and "fish" were similar terms, synonymous or interchangeable terms to the creators of the now ancient documents under analysis. Such as:

- 1666 Nicolls Patent. "(P)rofits of whales & fish" and "Interest [sic] in whales or fish" are used in the same sentence interchangeably. The Defendants claim the supposed June 8, 1659 "Deed to the Beach" does not mention fishing. Summary Judgement Motion. p. 16. The Nicolls Patent indeed included this supposed "deed".

- Defendants quote Dr. John A. Strong's recital of ancient Town of Easthampton documents, "half the whales "or other great fish" that drifted onto the beach between Napeague and the far end of Montauk". Summary Judgement Motion. p. 16. Whales are included in the definition of "great fish".

- 1672 Resolution. "…his part of Drift Whales or Great ffish cast upon ye Beach or Shoare according to ye Directions in ye Law". Summary Judgement Motion. p. 20.

- 1674-5 Resolution. "If a christian [*sic*] shall find any such whale or great fish…". Summary Judgement Motion. p. 19.

- 1681 New Jersey Governor Philip Carteret's Articles to John Ogden and others. "(F)ree leave and liberty to take or kill any whale, whales or such like great fish in any place or places where they may be found or taken…" Exhibit 34

- *Maurice v. Judd, New York City Mayor's Court* (1818). Whale oil is found to be fish oil for tax purposes. In the New York locality, whales are thought to be fish. Exhibit 35, pp. 2-3.

The International Convention for the Regulation of Whaling treaty, as ratified by the United states in 1947, sought to "establish a system of international regulation for the whale fisheries. International Convention for the Regulation of Whaling. p. 2. Article III 6. reads, "(r)ecognizing

that specialized agencies related to the United Nations will be concerned with the conservation and development of whale fisheries…". Exhibit 16, p. 3. The gray whale is defined as "devil fish" in the treaty. *Id.*, p. 11.

The Plaintiffs are fully aware that whales are biologically mammals, the knowledge is common today. In years and centuries past, this knowledge was not as common. "Great fish", "fish" and "whale fishery" have all been applied to whales or whaling historically. Plaintiffs assert that at the time of the Shinnecock deeds and treaties, in the way that they would have been understood, reserved rights to whales are reserved rights in a broad sense, to marine resources comprehensively. Whales are not eels, but they have been called fish.

For these reasons, the Shinnecock have reserved aboriginal fishing rights.

### G. <u>The State cannot regulate those fishing rights.</u>

State Defendants opine that it still can regulate Plaintiffs' fishing rights under the "Doctrine of Conservation Necessity." State Defendants urge the Court to accept, without scrutiny, its proffered facts that "American Eel are a protected resource." This is a continuing and untenable fiction of Mr. Gilmore debunked by his own and Defendant Seggos' prior "dicey" statements, and by DEC and the USFWS positions that the American eel and the species is not endangered, protected, or even of concern. The State Defendants' debunked facts do not remotely support an argument of "conservation necessity."

The Supreme Court in *Herrera*, in upholding off-reservation hunting rights, limited its holding in two ways: "First, [and inapplicable here] we hold that Bighorn National Forest is not categorically occupied, not that all areas within the forest are unoccupied. On remand, the State may argue that the specific site where Herrera hunted elk was used in such a way that it was 'occupied' within the meaning of the 1868 Treaty." … "Second, the state trial court decided that Wyoming could regulate the exercise of the 1868 Treaty right 'in the interest of conservation.' … The

27

appellate court did not reach this issue. … On remand, the State may press its arguments as to why the application of state conservation regulations to Crow Tribe members exercising the 1868 Treaty right is necessary for conservation. We do not pass on the viability of those arguments today."

*Herrera*, Slip Op., at 21-22.

The Supreme Court recently upheld another Indian treaty right. In *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, Slip Op., No. 16–1498, 139 S. Ct. 1000 (2019), Justice Breyer's majority opinion, joined by Justice Sotomayor and Justice Kagan, concluded that the 1855 treaty between the United States and the Yakama Nation pre-empts the State of Washington's fuel tax as applied to Cougar Den's importation of fuel by public highway.

> In our view, the State of Washington's application of the fuel tax to Cougar Den's importation of fuel is pre-empted by the treaty's reservation to the Yakama Nation of "the right, in common with citizens of the United States, to travel upon all public highways." We rest this conclusion upon three considerations taken together. First, this Court has considered this treaty four times previously; each time it has considered language very similar to the language before us; and each time it has stressed that the language of the treaty should be understood as bearing the meaning that the Yakamas understood it to have in 1855. See Winans, 198 U. S., at 380– 381; Seufert Brothers Co. v. United States, 249 U. S. 194, 196–198 (1919); Tulee, 315 U. S., at 683–685; Washington v. Washington State Commercial Passenger Fishing Vessel Assn., 443 U. S. 658, 677–678 (1979).
>
> The treaty language at issue in each of the four cases is similar, though not identical, to the language before us. The cases focus upon language that guarantees to the Yakamas "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory." Art. III, para. 2, 12 Stat. 953.
> *Cougar Den*, Slip Op., at 10.
> …
> … as we explained in Tulee, Winans held that "Article III [of the treaty] conferred upon the Yakamas continuing rights, beyond those which other citizens may enjoy, to fish at their 'usual and accustomed places' in the ceded area." Tulee, 315 U. S., at 684 (citing Winans, 198 U. S. 371; emphasis added).  Also compare, e.g., Fishing Vessel, 443 U. S., at 677, n. 22 ("Whatever opportunities the treaties assure Indians with respect to fish are admittedly not 'equal' to, but are to some extent greater than, those afforded other citizens (emphasis added))"…
> *Cougar Den*, Slip Op., at 12.
> …
> Second, the historical record adopted by the agency and the courts below indicates that the right to travel includes a right to travel with goods for sale or

distribution. … In a word, the treaty negotiations and the United States' representatives' statements to the Yakamas would have led the Yakamas to understand that the treaty's protection of the right to travel on the public highways included the right to travel with goods for purposes of trade. We consequently so construe the relevant treaty provision. *Cougar Den*, Slip Op., at 12.

…

Third, to impose a tax upon traveling with certain goods burdens that travel. And the right to travel on the public highways without such burdens is, as we have said, just what the treaty protects. Therefore, our precedents tell us that the tax must be pre-empted. In Tulee, for example, we held that the fishing right reserved by the Yakamas in the treaty pre-empted the application to the Yakamas of a state law requiring fishermen to buy fishing licenses. 315 U. S., at 684. We concluded that "such exaction of fees as a prerequisite to the enjoyment of" a right reserved in the treaty "cannot be reconciled with a fair construction of the treaty." Id., at 685. If the cost of a fishing license interferes with the right to fish, so must a tax imposed on travel with goods (here fuel) interfere with the right to travel. We consequently conclude that Washington's fuel tax "acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve." Ibid. Washington's fuel tax cannot lawfully be assessed against Cougar Den on the facts here. Treaties with federally recognized Indian tribes—like the treaty at issue here—constitute federal law that pre-empts conflicting state law as applied to off-reservation activity by Indians. Cf. Mescalero Apache Tribe v. Jones, 411 U. S. 145, 148–149 (1973). *Cougar Den*, Slip Op., at 14.

Both *Herrera* and *Cougar Den* support Plaintiffs' assertion of reserved fishing rights. In fact, the marine relationship between the federal government and the Shinnecock *transcends* the relationship between the Yakima and the U.S. government in *Cougar Den*. The various agencies of the federal government are active participants in Shinnecock reserved rights, funding, guiding, empowering and protecting them.

Dr. John Strong concludes in his May 27, 2018 memo, "[t]he above documents clearly support the rights of the Shinnecock and the other native peoples of eastern Long Island to fish in the waters adjacent to their communities "without let or hindrance" and to dispose of their catches, "as they think good". Exhibit 2, p. 4. These conclusions are completely consistent with the Court in *Cougar Den*.

Trade, travel, religious importance, cultural importance and reserved rights are all constants when examining Shinnecock and Yakama. As the Court in Cougar Den noted;

29

> … that the Yakamas needed to protect their freedom to travel so that they could continue to fish, to hunt, to gather food, and to trade... The Yakamas maintained fisheries on the Columbia River, following the salmon runs as the fish moved through Yakama territory... The Yakamas traveled to the nearby plains region to hunt buffalo…The Yakamas' religion and culture also depended on certain goods, such as buffalo byproducts and shellfish, which they could often obtain only through trade... Indeed, the Yakamas formed part of a great trading network that stretched from the Indian tribes on the Northwest coast of North America to the plains tribes to the east.
> *Cougar Den*, Slip Op., at 12.

Plaintiffs offer examples from this matter as parallels;

- The Free Trade Clause of the 1664 Fort Albany guarantees Shinnecock free trade and vicariously, travel, Exhibit 40,

- An abundance of reserved fishing rights,

- The megis/migiis (cowrie) shell and wampum, both harvested from the seas, maintain significant religious, spiritual and cultural importance to the Shinnecock today,

- Whale parts presently authorized by NOAA to be harvested by Shinnecock today, maintaining religious, spiritual cultural and educational bonds, Exhibit 41, Exhibit 42.

- The modern Shinnecock harvest shellfish and other fish for market, through its reserved rights, with the assistance of the United States Department of Commerce.

The Defendants argument for the so-called "conservation necessity doctrine" is implausible as the necessity is undefined. A more plausible motive than conservation necessity for the Defendants is their original defense, "if the Tribe were to prevail, [the state's] sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury". Defendants' Motion to Dismiss. August 23, 2018. p. 5. Creating or perpetuating a monopoly to protect the state treasury runs counter to the premise of New York's obligation to the ASMFC, "(i)t is not the purpose of this compact to authorize the states joining herein to limit the production of fish or fish products for the purpose of establishing or fixing the

price thereof, or creating and perpetuating monopoly". Exhibit 15.

Further, in *Minnesota v. Mille Lacs*, the Supreme Court taught:

> As this Court's subsequent cases have made clear, an Indian tribe's treaty rights to hunt, fish, and gather on state land are not irreconcilable with a State's sovereignty over the natural resources in the State. See, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Assn., 443 U.S. 658 (1979); see also Antoine v. Washington, 420 U.S. 194 (1975). Rather, Indian treaty rights can coexist with state management of natural resources. Although States have important interests in regulating wildlife and natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated constitutional powers, such as treaty making.
> *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999)

The Defendants overestimate its role in resource management, ignoring the concurrent state, federal and tribal interests. Additionally, the Defendants do not deny they have ignored their own mandated consultation policy in CP 42.

For these reasons, the State Defendants' American eel debunked pretext for suppressing Shinnecock rights do not provide any facts or law justifying a "conservation necessity."

**H. *Sherrill* does not apply to Plaintiffs' use rights.**

State Defendants argue to expand the land possessory holding in *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005) to bar Plaintiffs' water use right claims under the equitable principles of laches, acquiescence and impossibility. The State Defendants serve up an apples and oranges comparison inapplicable to the case at bar. The facts are inconsistent and the equitable defense of laches is unjustified here. This case involves assertion of a Shinnecock fishing use right; *Sherrill* involved land claims- title to land. "This case concerns properties in the city of Sherrill, New York, purchased by the Oneida Indian Nation of New York (OIN or Tribe) in 1997 and 1998." *Sherrill*, 544 U.S., at 202. This case involves Shinnecock freedom from imposition of State fishing regulations on waters; State Defendants show no inequity to the State to justify such a defense. "[L]aches is not . . . a mere matter of time; but principally a question of the inequity of permitting

31

the claim to be enforced — an inequity founded upon some change in the condition or relations of the property or the parties." *Sherrill*, 544 U.S., at 217-18.

Same distinctions in *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 266 (2d Cir. 2005) and other cases cited by State Defendants. ("approximately $248 million in damages and prejudgment interest against the State for the late-eighteenth-century dispossession of their land, in violation of the Nonintercourse Act. 25 U.S.C. § 177." … "We understand the circumstances contemplated by Sherrill to include possessory land claims of the sort advanced here. We hold that plaintiffs' possessory land claim is subject to the defense of laches and conclude that the claim must be barred on that basis.") *Id*.

The Court should reject the State Defendants disingenuous attempt to redraft Plaintiffs' complaint into a *Sherrill* case. The relief sought by Plaintiffs in Count I is plainly, clearly and unambiguously a <u>use</u> right: "… Plaintiffs request … enjoining the Defendants from enforcing the laws of the State of New York *against Plaintiff Silva* in Southampton Town Justice Court in Case No. 17-7008, and from otherwise *interfering with Plaintiffs' use* of the waters, fishing, *taking* fish, and *holding* fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters." [emphasis added]

## I. <u>Purposeful racial discrimination can be shown.</u>

Defendants opine that Plaintiffs cannot show purposeful discrimination under their 1981 and 1982 claims. This contention defies the facts of racial profiling. The DEC's own CP-42 requires State to Indian Nation consultation and respect for traditional fishing rights. "It is the policy of the Department that relations with the Indian Nations shall be conducted on a government-to-government basis." CP-42, p. 1. The protocol of CP-42 includes, but is not limited to "Contact" and "Consultation," (CP-42, p. 4), including on the subjects of "Hunting, Fishing, and Gathering, (CP-42, p. 5). Yet, the March 28, 2017, internal emails show DEC Captain Dallas Bengel targeting

"Shinnecock" fishing activities. "Word is out that Shinnecocks are actively seeking a shipper for glass eels", he states. "(Lieutenants), please put together a [sic] elver patrol/detail plan for your Zones". The intent to prosecute Shinnecock fishermen is absolutely clear and is unrebutted evidence of the discrimination alleged by Plaintiffs.

Further, the internal DEC email from Monica Kreshic on April 25, 2017 to Gilmore and Bengel, among others, "The Shinnecock assert that they have a treaty right to exercise their aboriginal fishing practices. *This may be true*" [emphasis added] also shows Bengel purposefully targeted Plaintiffs based on their Shinnecock race not only in violation of CP-42, but in defiance of internal recognition of the legitimacy of Plaintiffs' assertion of their fishing rights.

Further, on April 20, 2017, immediately following Plaintiff Silva's ticket, another internal email by NYSDEC Lieutenant Thomas Gadomski show the Defendants again specifically targeting Shinnecock Indian Nation tribal members for enforcement as a racial group. Exhibit 39.

The actions by all Plaintiffs are not stale due to the fact that these discriminatory internal DEC emails are recent, the prosecution of Silva is recent, and none of the Plaintiffs can exercise their fishing rights with this DEC intent of prosecution.

For these reasons, summary judgment as to Count II is not appropriate.

**J.  Defendant Seggos was personally involved.**

Defendants contend that there is no evidence of personal involvement by DEC Commissioner Seggos. This contention defies the facts. At Silva's Town Court trial, DEC Lt. Reilly testified on August 30, 2018 that the DEC commissioner, Defendant Seggos, was notified of the Silva incident <u>before</u> action was taken. See Trial transcript, p. 45, line 22 – p. 46, line 13, and cross examination on p. 69, line 4 - p. 70, line 4. Exhibit 24. See in particular the following testimony by Lt. Reilly:

> 5    A. I took that information  and
>
> 6    forwarded it to Captain Bengal, as well as any

7    time we have interaction with a   Native

8    American, we notify through our chains of

9    command up to Albany where our   commissioner

10    and our legal people know that this   is

11    occurring and to make sure if there   is

12    anything necessary, the government   office

13    would be notified as   well.

p. 46

***

4    Q. You testified that a person claimed

5    to be a member of the Shinnecock Tribe,   then

6    you described a chain of command going up  the

7    line to the commissioner and possibly the

8    governor's office, what commissioner are   you

9    speaking  of?

10    A. The commissioner of New York  State

11    Department of Environmental   Conservation

p. 69

See also the February 11, 2016 email from Defendant Seggos participation relating to a glass eel sting involving the neighboring Unkechaug Tribe. "There is a very dicey history on glass eels." Exhibit 25. This shows Defendant Seggos personal involvement in targeting DEC enforcement against Native Americans for exercising their asserted fishing rights.

For these reasons, there is evidence that Defendant Seggos was personally involved.

**K.  The individual State Defendants do not enjoy qualified immunity.**

Lastly, the Defendants contend that the individual State Defendants enjoy qualified immunity in their personal capacities. As the Defendants point out: "Thus, the qualified immunity defense . . . protects an official if it was objectively reasonable for him at the time of the challenged action to

34

believe his acts were lawful." *Berg v. Kelly*, 2018 U.S. App. LEXIS 20646, *21 (2d Cir. 2018)(internal quotations and citations omitted). "To lose immunity, an official must violate a right, the contours of which are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Drimal v. Tai*, 786 F.3d 219, 225 (2d Cir. 2015)(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Here qualified immunity was lost because it was patently unreasonable for each and every individual State defendant, and indeed other non-named DEC affiliated individuals here, to participate in prosecuting the Plaintiffs by violating 1) the Shinnecock Nation consultation and respect of native fishing rights requirements of DEC's CP-42, and 2) Plaintiffs right to be free of racial profiling based on their Native American race.

For these reasons, there is evidence the individual State Defendants do not enjoy qualified immunity.

## V.
## CONCLUSION

For the foregoing reasons, the State Defendants Rule 56 motion for summary judgment is without merit and should be denied in its entirety.


Dated: November 4, 2019
   New York, New York

         Respectfully submitted,

         MOORE INTERNATIONAL LAW PLLC.

          /s/ Scott M. Moore
       By: _____
         Scott Michael Moore, Esq.
         *Attorneys for Plaintiffs*
         45 Rockefeller Plaza, 20th Floor
         New York, New York 10111
         T. (212) 332-3474
         F. (212) 332-3475
         E. smm@milopc.com