UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

DAVID T. SILVA, GERROD T. SMITH,
and JONATHAN K. SMITH, Members of
the Shinnecock Indian Nation,

          Plaintiffs,

   v.

BRIAN FARRISH, EVAN LACZI, NEW
YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE, and BASIL
SEGGOS,

          Defendants.

-----------------------------------------------------X

Case No. 18-CV-3648-GRB-SIL

**BRIEF OF *AMICI CURIAE* LAW AND HISTORY PROFESSORS
GREGORY ABLASVSKY, JENNIFER ANDERSON
BETHANY BERGER, KRISTEN CARPENTER, SETH DAVIS,
DYLAN R. HEDDEN-NICELY, MONTE MILLS,
ELIZABETH HILDALGO REESE, ANGELA R. RILEY,
JOSEPH WILLIAM SINGER, and MICHALYN STEELE**

Deborah A. Sivas, *Pro Hac Vice* (CA Bar No. 135446)
Amy E. Cass (CA Bar Student Cert. No. 1164200)
Riya Mehta (CA Bar Student Cert. No. 1164421)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stnford Law School
599 Nathan Abbott Way
Stanford, California  94305
Telpehone: (650) 725-8751
Facsimile: (650) 723-4426
Email:  dsivas@stanford.edu

*Attorneys for AMICI CURIA Law and History Professors*
[See Appendix A for Names and Biographical Information]

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

I.     Under seventeenth-century property law, the original Shinnecock land
       grants could not have extinguished tribal fishing rights. .................................... 1

       A.     Seventeenth-century property law had a strong presumption
              against alienation of navigable waters. ................................................... 2

       B.     The 1640 deed to Southampton did not extinguish tribal fishing
              rights in Shinnecock Bay, Great Peconic Bay, and the Atlantic
              Ocean. ..................................................................................................... 4

       C.     Shinnecock land sales to individual settlers did not extinguish
              tribal fishing rights. ............................................................................... 5

II.    No sovereign action has ever extinguished the Shinnecock's aboriginal
       fishing rights with respect to the navigable waters at issue in this case. .......... 6

       A.     The 1666 Nicolls Declaration, 1676 Andros Patent, and 1686
              Dongan Patent did not extinguish the Shinnecock's fishing rights. ..... 7

       B.     The 1703 lease of Shinnecock Hills to the Shinnecock did not
              extinguish the Tribe's fishing rights. .................................................... 9

       C.     After the Founding, neither New York State nor the U.S. Federal
              Government acted to extinguish Shinnecock fishing rights. .............. 10

III.   Even if the Court reads the 1640 deed as extinguishing Shinnecock fishing
       rights in Shinnecock Bay, the 1703 lease and 1859 deed restored those
       fishing rights. .................................................................................................. 11

IV.    Courts continue to recognize the type of aboriginal usufructuary rights that
       the Shinnecock possess. ................................................................................... 13

CONCLUSION ........................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. David,*
    889 S.E.2d 114 (Ga. Ct. App. 2023) ..................................................................1

*Brookhaven Baymen's Ass'n v. Town of Southampton,*
    201 A.D.3d 856 (N.Y. App. Div. 2022) ..........................................................9

*Brookhaven v. Strong,*
    60 N.Y. 56 (1875) ...........................................................................................4

*Cayuga Indian Nation of N.Y. v. Pataki,*
    413 F.3d 266 (2d Cir. 2005) ............................................................................14

*Johnson v. M'Intosh,*
    21 U.S. 543 (1823) ...........................................................................................7

*Martin v. Waddell's Lessee,*
    41 U.S. 367 (1842) .......................................................................................2, 3

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999) .........................................................................................15

*Muraca v. Meyerowitz,*
    818 N.Y.S.2d 450 (Sup. Ct. 2006) ..................................................................12

*Oneida Indian Nation of N.Y. v. Oneida Cnty.,*
    414 U.S. 661 (1974) .........................................................................................6

*Percy Summer Club v. Astle,*
    145 F. 53 (C.C.D.N.H. 1906) ..........................................................................3

*Pueblo of Jemez v. United States,*
    63 F.4th 881 (10th Cir. 2023) ..........................................................................15

*Sherrill v. Oneida Indian Nation,*
    544 U.S. 197 (2005) .................................................................................13, 14

*Silva v. Farrish,*
    47 F.4th 78 (2d Cir. 2022) ...............................................................................14

*Tiffany v. Town of Oyster Bay,*
    234 N.Y. 15 (1922) ..........................................................................................13

*Town of Brookhaven v. Smith*, .
188 N.Y. 74 (1907) .................................................................................12

*United States v. Abouselman*,
976 F.3d 1146 (10th Cir. 2020) ...............................................................15

*Worcester v. Georgia*,
31 U.S. (6 Pet.) 515 (1832) .......................................................................7

**Statutes**

The Duke of York's Laws (1665) ...................................................................7

Indian Trade and Intercourse Act of July 22, 1790, ch. 33, 1 Stat. 137 .......................10

**Other Authorities**

Bethany Berger, *Eliding Original Understanding in* Cedar Point Nursery v.
Hassid, 33 YALE J. L. & HUMANITIES 307 (2022) ...................................3

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 2.02[2] (Nell Newton and Kevin
Washburn eds., 2024) ..........................................................................2, 7

FIRST BOOK OF RECORDS OF THE TOWN OF SOUTHAMPTON 1, 4 (John H. Hunt ed.,
1874) .......................................................................................................3

Hugo Grotius, *Defense of Chapter V of the Mare Liberum, in* THE FREE SEA 77,
123 (David Armitage ed., Richard Hakluyt trans., Liberty Fund, Inc. 2004)
(1609) ......................................................................................................5

*June Meeting Day: Shinnecocks Held Theirs on Last Sunday*, BROOKLYN DAILY
TIMES, Jun. 8, 1901 ...............................................................................14

Jack Altshul, *Heads and Tails*, NEWSDAY (Nassau), Apr. 28, 1953 ...........................14

*Ponquogue and Its Attractions—Shinnecock Bay and the Shinnecock Indians*,
BROOKLYN DAILY EAGLE, Jun. 15, 1871 ...............................................14

Matthew Hale, *De Jure Maris, reprinted in* STUART MOORE, A HISTORY OF THE
FORESHORE AND THE LAW RELATING THERETO 370 (1888) .......................2

Maureen E. Brady, *The Forgotten History of Metes and Bounds*, 128 YALE L.J.
782 (2019) ...............................................................................................4

*The Shinnecock Bay Question*, SOUTH SIDE SIGNAL, Mar. 17, 1883 ...................10, 11

*The Shinnecock Reservation*, N.Y DAILY TRIBUNE, Sept. 14, 1881 ...........................14

2 WILLIAM BLACKSTONE, COMMENTARIES...................................................................2

# INTRODUCTION

As Plaintiffs argue, application of fundamental federal Indian law principles establishes the Shinnecock's unextinguished rights to fish. This amicus underscores how the principles of ordinary property law support the same conclusion. Although this case involves a complicated history of seventeenth- and eighteenth-century deeds and transfers, the underlying property principle is simple, even axiomatic: owners retain what they do not convey. *See, e.g.*, *Anderson v. David*, 889 S.E.2d 114, 121 (Ga. Ct. App. 2023) ("[T]he general property principle [is] that the grantor retains all rights not granted").

All agree that the Shinnecock had a precontact usufructuary right to fish in the waters surrounding Long Island. The legal question is thus whether the Shinnecock's long-ago conveyances of land to English settlers extinguished that right. They did not, for two reasons. First, the relevant navigable waters were not subject to exclusive ownership in the seventeenth century, and so could not have been transferred through a deed to a private party. Second, even more basically, these waters lay outside the deeds' metes and bounds. No sovereign action has since extinguished Shinnecock fishing rights. The Nation, therefore, retains these rights.

Critically, the Shinnecock are not claiming any *title* to Long Island waters – they seek only to exercise their non-possessory, usufructuary right to fish alongside non-Indians, continuing their tradition of sharing their ancestral waters with all who call Long Island home. Ultimately, a judicial decision recognizing the Shinnecock's aboriginal fishing rights would not disrupt New York's property interests and would be consistent with recent precedent.

## I.    Under seventeenth-century property law, the original Shinnecock land grants could not have extinguished tribal fishing rights.

Widespread English colonial practice in the seventeenth century was to purchase Native lands through so-called "Indian deeds," though these transfers were long shadowed by legal

uncertainty. *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 2.02[2] (Nell Newton and

Kevin Washburn eds., 2024). Shinnecock history exemplifies this pattern, with a series of deeds

purporting to convey title to specific parcels. *See* ECF No. 126-12, -13, -14, -15, -16, -17. But

even if these transactions were legally valid, under seventeenth-century property law, these

transfers could not confer exclusive fishing rights in the surrounding navigable waters.

>    **A.    Seventeenth-century property law had a strong presumption against alienation of navigable waters.[1]**

Writing in the 1660s, Sir Matthew Hale explained that "the common people of England

have a regular liberty of fishing in the seas or creeks or arms thereof, as a publick common of

piscary, and may not without injury to their right be restrained of it . . . ." Matthew Hale, *De Jure*

*Maris*, *reprinted in* STUART MOORE, A HISTORY OF THE FORESHORE AND THE LAW RELATING

THERETO 370, 377 (1888). Blackstone's *Commentaries* reflected this view of public fishing

rights as superseding private title and the right to exclude. *See* 2 WILLIAM BLACKSTONE,

COMMENTARIES *34 (defining common of piscary as "a liberty of fishing in another man's

waters"). According to Blackstone, only the king could convey exclusive fishery rights and his

power to do so was restricted by the Magna Carta in 1215. *Id.* at *39-40.[2]

---

[1] While under English common law the term "navigable" was used to refer to waters in which the tide "ebbs and flows," in the United States it includes any waters that are navigable in fact, meaning that bodies of water which are passible by vessel are thus "navigable," even in absence of tidal action. *Genesee Chief*, 53 U.S. 443, 454-55 (1851). This distinction is irrelevant here because the bodies of water at issue (Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean) are both tidal and navigable in fact.

[2] There has been much debate over whether, after the Magna Carta, the king had the power to convey the soil beneath navigable waters and an accompanying exclusive right of fishery to private parties. At the heart of this debate is Blackstone's distinction between *free* fishery (the "exclusive right of fishing in a public river") and *several* fishery (which required "owner[ship] of the soil") and whether the Magna Carta should be understood to restrict only the former. 2 WILLIAM BLACKSTONE, COMMENTARIES *39-40. In *Martin v. Waddell's Lessee*, the U.S. Supreme Court opined on this subject, stating that "the question must be regarded as settled in England, against the right of the king, since Magna Charta, . . . to grant to a subject a portion of the soil covered by the navigable waters of the kingdom, so as to give him an immediate and exclusive right of fishery, either for shell-fish or floating fish, within the limits of his grant." 41 U.S. 367, 410 (1842). Although the Court declined to address whether this conclusion applied to the United States, *id.* at 410-11, there is support in both colonial and early American law for such a finding, given that colonial law offered even greater protections for public fishing rights than English law, *see*

Early New England settlements—where the first white settlers of Long Island came from—also rejected exclusive rights to public waters. *See Percy Summer Club v. Astle*, 145 F. 53, 63 (C.C.D.N.H. 1906) ("[T]he laws designed to secure several and exclusive fisheries, as existed and practiced in England, were regarded here as oppressive."); *Martin v. Waddell's Lessee*, 41 U.S. 367, 414 (1842) ("[T]he men who first formed the English settlements, could not have been expected to encounter the many hardships . . . if the land under the water at their very doors was liable to immediate appropriation by another, as private property."). The Town of Southampton's founding documents exemplified this view, guaranteeing that "ffreedom of fishing, fowling and nauigation shall be common to all within the bankes" of all "seas, rivers, creekes, or brooks howsoeuer bounding or passing through [private] grouude." *The Disposall of the Vessell* (1639), *reprinted in* First Book of Records of the Town of Southampton 1, 4 (John H. Hunt ed., 1874).

Given such strong colonial protections for public access to waters and their fisheries, the U.S. Supreme Court has cautioned against interpreting deeds from this period in a manner that would undermine common access:

> [I]t would require very plain language in these letters-patent, to persuade us that the public and common right of fishery in navigable waters, which has been so long and so carefully guarded in England, and which was preserved in every other colony founded on the Atlantic borders, was intended, in this one instance, to be taken away . . . if the right of common fishery for the common people, stated by HALE in the passage before quoted, was intended to be withdrawn, the design to make this important change in this particular territory would have been clearly indicated by appropriate terms; and would not have been left for inference from ambiguous language.

*Martin*, 41 U.S. at 414, 416. Only unequivocal language extinguishing Shinnecock fishing rights could overcome this strong presumption against exclusive fishery.

---

Bethany Berger, *Eliding Original Understanding in* Cedar Point Nursery v. Hassid, 33 Yale J. L. & Humanities 307, 317 (2022).

**B.    The 1640 deed to Southhampton did not extinguish tribal fishing rights in Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean.**

The 1640 deed from the Shinneock to the founders of Southhampton conveyed "all the lands, woods, waters, water courses, easements, profits and emoluments thence arising whatsoever." Exh. F. But seventeenth-century property law—which, as discussed, strongly disfavored exclusive fisheries—would not have interpreted this language to extinguish the Shinnecock right to fish. Rather, this language is better read as cabining the Shinnecock claim to *exclusive* rights by *extending* usufructuary rights to Southampton's founders. This non-exclusive interpretation is consistent with the deed as a whole, which, as Defendants' expert acknowledges, explicitly reserved the Shinnecock's right to continue growing crops in certain areas. Rebuttal Expert Report of Amalia Baldwin, ECF No. 127-4 ("Baldwin Report") at 9. But, while this language was necessary to preserve the Shinnecock's rights to access the conveyed *land*, no such provision would have been necessary for the Shinnecock's ongoing use of the surrounding *waters*—Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean—which were not subject to exclusive ownership at the time.

The 1640 deed also confronts an even more basic problem: even if usufructuary rights to Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean *could* have been conveyed, these waters were outside the boundaries of the 1640 deed.[3] Then as now, deeds had to contain a description of the property conveyed, known as the property's "metes and bounds." Maureen E. Brady, *The Forgotten History of Metes and Bounds*, 128 YALE L.J. 782, 875 (2019). Unsurprisingly, deeds only conveyed the property *within* those boundaries.

---

[3] Where New York state courts have recognized title to underwater lands, they have restricted title to waters "within the bounds of the grant." *Brookhaven v. Strong*, 60 N.Y. 56, 71-72 (1875) (quoting *Rogers v. Jones*, 1 Wend. 237, 255 (N.Y. Sup. Ct. 1828)).

Here, the parcel described in the deed extended from "the place where the Indians hayle over their cannooes out of the North bay to the south side of the Island, from thence to possess *all the lands lying eastward between the forsaid boundes by water* . . . ." ECF No. 126-12 (emphasis added). Visually, this description corresponds to the boundaries outlined in red on the map in Appendix B, encompassing the lands to the east of Canoe Place (marked with a star). These lands were explicitly bounded "by water," with Great Peconic Bay, Shinnecock Bay, and the Atlantic Ocean marking the northern, western, and southern borders of the grant. *Id.* The Tribe only conveyed its interests "within our Limits above specified." *Id.* Based on this language, the ponds, streams, and smaller bays that lay *within* the land grant were part of the conveyance. But waters *outside* the grant's boundaries—Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean—were excluded. *See* Plaintiffs' Brief at 23.[4]

## C. Shinnecock land sales to individual settlers did not extinguish tribal fishing rights.

These principles of seventeenth-century property law apply with equal force to the deeds conveying Shinnecock lands surrounding the western portion of Shinnecock Bay to individual English settlers. Again, Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean remained outside the scope of these deeds which only purported to transfer *lands*. And even if these waters had been within the bounds, the deeds would not have been understood as granting an exclusive right to fish in those waters. *See supra* 2-3.

---

[4] The 1640 deed's reference to "sea" within its stated limits, ECF No. 126-12, likely referred to the smaller inlets and bays, such as Mecox Bay, that were entirely encompassed by the land grant, or to the profits of the sea that touched the shore, such as beached whales and oysters. Granting an exclusive right to fish in the ocean would have been incompatible with not just colonial property law, but also the era's law of nations. Writing in 1609, Hugo Grotius explained that the sea "is not occupable" and "can become the property of no one. Hugo Grotius, *Defense of Chapter V of the Mare Liberum, in* THE FREE SEA 77, 123 (David Armitage ed., Richard Hakluyt trans., Liberty Fund, Inc. 2004) (1609). Grotius specifically addressed fishing rights, writing that "fishing likewise is open to all without distinction. For fishing likewise is using the sea, and the fruits of what belong to no one become the property of the occupier." *Id.* at 89.

The language of Gardiner, Ogden, and Topping purchases confirms these points. All contained provisions expressly reserving some form of tribal fishing rights or profits from the sea, including beached whales, ECF No. 126-13, fishing, ECF No. 126-14, or "fish whale or whales," ECF No. 126-17. But each of the provisions reserving profits for the Tribe explicitly involved items either along or washed up on the *shorelands* encompassed in each deed, rather than the *waters* of the surrounding bays and ocean. Given that seventeenth-century property law already preserved access to those open-water resources, this omission strongly suggests that the signatories understood that the Shinnecock's claim to take whales in open water remained unaffected by the land grants. Only once the whales washed ashore would competing claims arise, requiring more explicit language.

Southampton ultimately acquired the individual land tracts purchased by Gardiner, Ogden, and Topping, expanding the town borders westward. But these subsequent land transfers did nothing to alter tribal fishing rights because these settlers could only convey the property they had received in the original deeds—which, like the 1640 deed, excluded navigable waters.

## II.    No sovereign action has ever extinguished the Shinnecock's aboriginal fishing rights with respect to the navigable waters at issue in this case.

Aboriginal title is "good against all but [the] sovereign," *Oneida Indian Nation of N.Y. v. Oneida Cnty.*, 414 U.S. 661, 667 (1974). Here, the Shinnecock have established non-exclusive usufructuary rights to fish based on their actual, continuous, and exclusive use and occupancy of those waters. *See* Plaintiffs' Brief at 11-20. The question, then, is whether any sovereign took the "plain and unambiguous" action, *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 346-47 (1941), required to extinguish Shinnecock fishing rights. The history underscores that the answer is no. Even in the broadest reading, the sovereign actions at issue here merely confirmed the prior deeds, which, as we have seen, did not extinguish or transfer Shinnecock fishing rights.

**A.    The 1666 Nicolls Declaration, 1676 Andros Patent, and 1686 Dongan Patent did not extinguish the Shinnecock's fishing rights.**

Starting in the 1660s, the English Crown took steps to authorize Southampton's property rights through a series of declarations and land patents by colonial governors of New York. None of these actions altered the Shinnecock Nation's property rights because they solely concerned the claims of Europeans—the English Crown, the Town of Southampton, and English settlers—as against each other. Under federal Indian law, the question of title *among* non-Indians does not affect the underlying rights of Indians. *See Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 546 (1832) ("[The] grants asserted a title against Europeans only, and were considered as blank paper so far as the rights of the natives were concerned."); *Johnson v. M'Intosh*, 21 U.S. 543, 574 (1823) (competing claims by European nations remained subject to the Indian right of occupancy); COHEN'S HANDBOOK § 2.02 (noting the colonial-era distinction between "Crown" and "Indian title"). Moreover, these royal patents, like the Indian deeds before them, were limited to their stated borders, which excluded Great Peconic Bay and the Atlantic Ocean, and subject to the presumption against exclusive fishery.

*1666 Nicolls Declaration:* Governor Nicolls required all existing land claims to be submitted for confirmation. *See* The Duke of York's Laws (1665). Through this process, Nicolls reviewed Shinnecock land sales to individual settlers which had resulted in overlapping claims between the Town, which acquired Ogden's land; John Cooper, who purchased Gardiner's land; and Thomas Topping. *See* Baldwin Report at 9-10. The 1666 Nicolls Declaration resolved these claims by defining the property rights of the Town and settlers as against each other, but it did nothing to alter Shinnecock property rights. ECF No. 126-18. Moreover, the Nicolls Declaration only reviewed the Shinnecock's land sales to individual settlers, since Southampton did not submit the 1640 deed for approval.

*1676 Andros Patent:* In 1676, the Town of Southampton submitted its Indian deeds for review by Governor Andros. The resulting Andros Patent defined the boundaries of Southampton and "Confirmed and granted" to the Town's proprietors and inhabitants "All the aforementioned Tract of Land, with the Necks and Islands within the said Bounds . . . Together with all Rivers, Lakes, waters Quarrys Wood land Plaines Meadows, pastures, Marshes, ffishing, Hawking Hunting and ffowling, and all other Proffits, Commodities, Emoluments and Hereditaments . . . ." ECF No. 126-21. Notably absent from this list was the ocean, which, in addition to Great Peconic Bay, remained beyond Southampton borders. The patent legitimized the Town's existing claims to the land within its borders under the English Crown. It did nothing, however, to alter the terms of the original Indian deeds or the Shinnecock's property rights.[5]

*1686 Dongan Patent:* In 1683, Governor Dongan called for the reissue of town land patents. After reviewing Southampton's documents and securing confirmation of earlier sales from the Shinnecock, Dongan issued the Dongan Patent in 1686. In near-identical language to the Andros Patent, the Dongan Patent reaffirmed the Town's title to the lands within the boundaries described in the earlier document. ECF No. 126-21. The Dongan Patent also addressed a dispute between the Shinnecock and the Town over additional lands, finding that these lands had been lawfully purchased from the Nation by the Town. *Id*.

Finally, the Dongan Patent gave Southampton's Trustees authority over, among other items, the "marshes swamps plaines Rivers Rivolets waters lakes ponds Brookes streames beaches Quarris mines mineralls Creeks harbours highwayes and Easements fishing hawking

---

[5] Indeed, the Andros Patent conditioned the Town's property rights on not prejudicing or interfering with "the particular propriety of any person or persons who have right by Patent or other Lawfull Clayme, to any part of parcell of Land or Tenements within the Limits aforesaid . . . ." ECF No. 126-21. The patent also excluded any land within Town boundaries that still belonged to Indians: "[if] any part or parcell of the Lande within the bounds and Limits afore described be not already Purchased of the Indyans It may bee purchased (as occasion) according to Law . . . ." *Id.* Thus, the Andros Patent acknowledged the Shinnecock's independent property claims as beyond its scope.

hunting and fowling (silver and gold mines Excepted) and all other franchizes profitts Comodityes and hereditaments whatsoever to the said tracts & neckes of land . . . ." This language has been cited as the basis for the Town's regulatory authority over its natural resources, including bodies of water and fishing activities. *See, e.g.*, *Brookhaven Baymen's Ass'n v. Town of Southampton*, 201 A.D.3d 856, 857-58 (N.Y. App. Div. 2022). But, while the Dongan Patent conveyed provincial regulatory authority to Southampton and its elected trustees, it did nothing to extinguish the Shinnecock's fishing rights. The patent merely transferred governing authority from the Crown and colonial government to the Town. As such, the Dongan Patent, like the Nicolls Declaration and Andros Patent before it, constituted a transfer of powers between Europeans that had no bearing on the Nation's rights.

### B.    The 1703 lease of Shinnecock Hills to the Shinnecock did not extinguish the Tribe's fishing rights.

In 1703, the Town of Southampton purchased all remaining Indian land within its boundaries in exchange for a 1,000-year lease of Shinnecock Hills to the Shinnecock people. The lease grants the Shinnecock "all and singular the privileges and advantages of plowing and planting and timber for fireing & fencing, and all other conveniencies and benefits whatsoever excepting what before is excepted to the only use & behoof of the said Indians." ECF No. 126-23. Because the 1640 deed did not extinguish Shinnecock fishing rights, "what before is excepted" to the "use & behoof" of the Indians included the right to fish in the waters abutting the leased land. *Id*. Moreover, it would be very odd to interpret a conveyance of property *to* the Shinnecock as somehow taking rights *from* them.

9

**C.    After the Founding, neither New York State nor the U.S. Federal Government acted to extinguish Shinnecock fishing rights.**

The U.S. Constitution granted authority over "Indian affairs" to the federal government. *Haaland v. Brackeen*, 599 U.S. 255, 274 (2023). In 1790, Congress enacted the Indian Trade and Intercourse Act, which required that all purchases of Native property interests occur under federal authority. Act of July 22, 1790, ch. 33, 1 Stat. 137. But the federal government, far from exercising its exclusive authority to extinguish Shinnecock fishing rights, actively supported the Shinnecock fisheries, even before it formally recognized the Shinnecock Nation in 2010. For example, the federal government has supported the Tribe's oyster farm. *See* Plaintiffs' Brief at 16. A 1977 Department of Commerce Report even described the Shinnecock Nation as a model for other water rights-possessing tribes interested in using their natural resources for economic development, referring to the "Shinnecock's most abundant resources, shellfish and underutilized fish species." ECF No. 127-33.

Finally, even if New York somehow retained the power to extinguish the Shinnecock's fishing rights after 1790, it did not do so. In 1859, New York's legislature authorized Southampton to transfer fee title of Shinnecock Neck to the Shinnecock Nation in exchange for releasing the Town from the 1,000-year lease of Shinnecock Hills. ECF No. 126-27. But the language of the Act did nothing to extinguish Shinnecock fishing rights. Rather, it enabled the creation of a permanent homeland for the Shinnecock—Shinnecock Neck would become the Shinnecock Reservation—on land that touched Shinnecock Bay on three sides. *Id*.

Public statements following the 1859 Act underscore that it did not diminish the Shinnecock right to fish. In an 1883 newspaper article, the President of the Shinnecock Hills Company, which then owned the former Shinnecock lands transferred in the 1859 law, wrote that his company "never pretended to claim the exclusive right to fish" in the waters of Shinnecock

10

Bay. *The Shinnecock Bay Question*, SOUTH SIDE SIGNAL, Mar. 17, 1883, at 2. Instead, he argued, "The right to sail on the waters or fish in them belongs, as we understand it, to everybody to the same extent as in the waters of the ocean." *Id.* He also clarified that "the only exclusive right [his company] claim is the use of the *land* for any and all such purposes as any other parties claim to use their lands for" and that his public statement should serve to relieve Shinnecock people "of any doubts or fears they may now entertain as to [the company's] intention to claim the exclusive right to fish." *Id.*[6]

### III.    Even if the Court reads the 1640 deed as extinguishing Shinnecock fishing rights in Shinnecock Bay, the 1703 lease and 1859 deed restored those fishing rights.

The 1640 deed retained for the Shinnecock people the right to fish in Shinnecock Bay. *See supra* 4-5. But even if the Court were to interpret the 1640 deed and its successors as extinguishing tribal fishing rights, it was not the final property conveyance: the subsequent 1703 lease and 1859 deed would have returned those rights to the Shinnecock.

First, as stated above, in leasing Shinnecock Hills, the 1703 lease provided the Shinnecock with "all other conveniencies and benefits whatsoever excepting what before is excepted to the only use & behoof of the said Indians." ECF No. 126-23. Thus, even if fishing rights are not encompassed in "what before [was] excepted" to the use of the Shinnecock, this lease conveys such "conveniencies and benefits," which included the right to fish in the waters abutting the leased land. *Id*. Defendants' expert testimony falls back on the fact that this lease "did not mention fishing" to argue that it somehow restricted Shinnecock fishing rights. Baldwin

---

[6] In the same newspaper, directly above J.A. Bowman's letter and in an "Editor's Signal," Southampton resident William S. Pelletrau clarifies that, contrary to an earlier newspaper article, he is not "the purchaser[] of the bottom of the bay." W.S. Pelletrau, *The Shinnecock Bay Question*, SOUTH SIDE SIGNAL, Mar. 17, 1883, at 2. Pelletrau goes on to write that "the following letter from the President of the company now owning the bottom of the bay will be an assurance that the fisherman and the eel-catcher will not be disturbed . . . The idea that the town owns the land under water can never be maintained, and it will be folly to try." *Id.*

Report at 32. But the broad language of "conveniencies and benefits" encompassed the right to fish. ECF No. 126-23. If the town wanted to exclude any particular "conveniencies and benefits," it would have needed to do so explicitly.

The 1859 deed, enabled by the 1859 Act, tells a similar story. That deed provided the Shinnecock with "convenient access [to meadows and lands that had been allocated and assigned to particular proprietors] or passage to and from for the purpose of improving and enjoying the same with all and singular and hereditaments and appurtenances to the same belonging or in anywise appertaining." Appendix C (Deed to Shinnecock Neck (Apr. 21, 1859)). This language explicitly grants the Shinnecock "appurtenances," including the nonpossessory right to fish. Thus, even if the previous agreements somehow restricted the right to fish, this deed restored that right.[7]

The State of New York's application of the riparian rights doctrine lends further support to this conclusion.[8] In *Town of Brookhaven v. Smith*, the court held that the town of Brookhaven could not stop a waterfront property owner from asserting his riparian right to build a pier in the waters abutting his property. 188 N.Y. 74, 88 (1907) (The town could not "avail to abrogate or destroy a right, which appertained to a riparian ownership, to make available the easement, or right of access, by the construction of a landing pier or wharf").

---

[7] Alternatively, the 1859 deed could be interpreted to mean that, when the deed "excepted" "ALL such meadows and lands" that had been allocated and assigned to particular proprietors, those *proprietors* retained the "covenant access or passage to and from." Appendix C. But if the parties to the deed needed to explicitly specify that these proprietors retained their "covenant access," it goes to show that such "covenant access" cannot be impliedly taken from the Shinnecock. The "covenant access" in the 1859 deed refers to use rights that attach to land that is not part of the transfer; because the deed is silent on "covenant access" to lands that are part of the transfer, it follows that the Shinnecock retain such access. *Id.*

[8] Technically, the term "riparian rights" refers to the interests of landowners whose property abuts a river or stream. When the issue involves lands that are adjacent to "tidal navigable waters," the proper term is "littoral rights." *Muraca v. Meyerowitz*, 818 N.Y.S.2d 450, 453 (Sup. Ct. 2006). But this distinction is "often blurred by the courts and the terms [are] used interchangeably." *Id.*

In other words, absent infringement of a navigational servitude, a landowner's right to the appurtenant water prevailed over the town's right to control those waters for the public trust. This opinion has been adopted by subsequent New York courts. In *Tiffany v. Town of Oyster Bay*, for example, the court explicitly addressed fishing rights when it reiterated that "the rights of the riparian owner . . . are rights of reasonable, safe, and convenient access to the water for navigation, fishing, and such other uses as commonly belonging to riparian ownership." 234 N.Y. 15, 21 (1922). When the Shinnecock gained fee title to Shinnecock Neck, they became riparian owners with respect to Shinnecock Bay and thus secured fishing rights in the Bay, even if they did not have that right previously.

Ultimately, the State's argument seems to rest on the implication that property rights could only go one way—from Natives to non-Natives. Thus, in their strained reading of the 1640 deed and its successors, the Shinnecock extinguished their nonpossessory use right outside the boundaries of the deed. But when the deeds went the other way—when Southhampton conveyed property *to* the Shinnecock in 1703 and 1859—suddenly the transactions did *not* confer the same usufructuary rights that the early conveyances had transferred. This "heads we win, tails you lose" logic underscores the contradiction underlying the State's claim.

## IV. Courts continue to recognize the type of aboriginal usufructuary rights that the Shinnecock possess.

Contrary to the Defendants' argument, the U.S. Supreme Court's decision in *Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005) and its application of *laches* does not foreclose relief. In *Sherrill*, the Court rejected the Oneida Nation' argument that a fee parcel within its historic reservation was immune from local taxation. *Id*. The Court was concerned about reviving a "long-dormant claim[]" when "long acquiescence" and "inaction" on the part of the Oneidas had led to "legitimate reliance" by state and local officials. *Id*. at 217-18.

As this summary suggests, the only meaningful commonality between *Sherrill* and this case is that they concern federally recognized Indian tribes in New York. Here, unlike in the Court's account in *Sherrill*, the Shinnecock never "acquiesced" to New York's authority. On the contrary, historical news coverage underscores that the Shinnecock have constantly fished in the waters surrounding Long Island. *See, e.g.*, *Ponquogue and Its Attractions—Shinnecock Bay and the Shinnecock Indians*, BROOKLYN DAILY EAGLE, Jun. 15, 1871, at 2; *The Shinnecock Reservation*, N.Y. DAILY TRIBUNE, Sept. 14, 1881, at 8; *Indians' June Meeting Day: Shinnecocks Held Theirs on Last Sunday*, BROOKLYN DAILY TIMES, Jun. 8, 1901, at 22. Moreover, the Shinnecock continuously asserted that their usufructuary rights were "exempt . . . from any fishing or hunting regulations." Jack Altshul, *Heads and Tails*, NEWSDAY (Nassau), Apr. 28, 1953, at 42. It is thus the State, not the Shinnecock, who seek to break from long-standing custom and practice.

Moreover, unlike *Sherrill*, this case concerns nonexclusive usufructuary rights. In *Sherrill*, the Court feared that Oneida Nation's claims would "disrupt[] the governance of central New York's counties and towns." 544 U.S. 197 at 202. It noted that "generations [had] passed during which non-Indians [had] owned and developed the area that once composed the Tribe's historic reservation." *Id.* But the Shinnecock's non-exclusive right to fish disrupts no one's pre-existing rights.[9] As the Second Circuit acknowledged in *Silva v. Farrish*, members' requested non-exclusive fishing right "is not a 'right to *exclude all others*.'" 47 F.4th 78, 85 n.7 (2d Cir. 2022) ((citation omitted)) (emphasis in original). Plaintiffs' requested relief "would not divest

_____

[9] Nor does *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 268 (2d Cir. 2005), apply here because it deals with a possessory land claim. In *Cayuga*, the Second Circuit applied *Sherrill* to "'disruptive' Indian land claims," and found that the "possession of a large swath of central New York State and the ejectment of tens of thousands of landowners" was "indisputably disruptive." *Id*. at 274-75. Here, the Shinnecock are not requesting any such possession or ejectment; the Tribe is simply seeking to establish its members' nonpossessory, nonexclusive, usufructuary right to continue fishing in the waters surrounding their homeland.

the state of its ownership of the submerged land or the waters"; rather, "[i]f the plaintiffs succeed in obtaining their requested relief, at most the state would need to tailor its regulatory scheme to respect the plaintiffs' fishing rights." *Id.* at 86. And Shinnecock fishing rights can coexist with New York State's regulatory authority over natural resources within the State's boundaries. *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999) (explaining that tribal rights to "hunt, fish, and gather on state land are not irreconcilable with a State's sovereignty over the natural resources in the State" and "can coexist with state management of natural resources").

While *Sherrill* is not analogous, two recent Tenth Circuit decisions are more squarely on point. In *United States v. Abouselman*, 976 F.3d 1146 (10th Cir. 2020), and *Pueblo of Jemez v. United States*, 63 F.4th 881 (10th Cir. 2023), the court applied well-established precedent to reiterate that aboriginal rights persist absent some "clear and adverse affirmative action" to extinguish them *Abouselman*, 976 F.3d at 1160; *see also Pueblo of Jemez*, 63 F.4th at 891 ("[N]o matter the method used, the sovereign's intent to extinguish must be clear and unambiguous'). In *Abouselman*, the lone dissent argued that *Sherrill* should affect how the lower courts construed the *scope* of the aboriginal water rights at issue, but conceded that even under *Sherrill* these rights were "not extinguished." *Abouselman*, 976 F.3d at 1164 (Tymkovich, C.J., dissenting). These recent rulings underscore that foundational principles governing aboriginal title endure and are consistent with *Sherrill*.

## CONCLUSION

For the foregoing reasons, the Court should recognize that the Shinnecock retain a nonexclusive, usufructuary right to fish in Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean.

Dated:  May 30, 2025                    Respectfully submitted,

                                        */s/Deborah A. Sivas*
                                        Deborah A. Sivas, Supervising Attorney
                                        Amy E. Cass, Certified Law Student
                                        Riya Mehta, Certified Law Student
                                        ENVIRONMENTAL LAW CLINIC
                                        Mills Legal Clinic at Stanford Law School
                                        559 Nathan Abbott Way
                                        Stanford, California  94305
                                        Telephone: (650) 725-8571
                                        Facsimile: (650) 723-4426
                                        Email: dsivas@stanford.edu

# Appendix A

## BIOGRAPHICAL INFORMATION FOR *AMICI CURIAE*

Gregory Ablavsky is the Marion Rice Kirkwood Professor of Law at Stanford Law School and Professor of History (by courtesy) at Stanford University. He is a legal historian of the early United States whose work has received multiple awards from the American Society for Legal History and the Law and Society Association. He is an executive editor of the 2024 edition of *Cohen's Handbook of Federal Indian Law* and the primary author of its chapter on the history of federal Indian law.

Jennifer Anderson is an Associate Professor in the History Department at Stony Brook University in Long Island, New York. As a scholar of Long Island history, Professor Anderson studies Native history, settler-colonialism, agriculture, maritime industries (i.e. whaling, fishing, oystering, ship building, merchant trade, etc.), labor, migration, provisioning, and the environmental impacts of these activities. Professor Anderson also serves as an Associate Editor for the *Long Island History Journal*. In this role, she has produced special issues on the history of whaling on Long Island and local Native American heritage sites.

Bethany Berger is the Allan D. Vestal Professor of Law at the University of Iowa College of Law. Professor Berger is one of the nation's foremost experts in federal Indian Law. She is the co-author and executive editor of *Cohen's Handbook of Federal Indian Law*, and a co-author of *Property Law: Rules, Policies, and Practices*. Professor Berger's articles, book chapters, and other writings have appeared in the *Michigan Law Review*, *California Law Review*, *UCLA Law Review*, and the *Duke Law Journal*, among numerous other publications.

Kristen Carpenter is the Council Tree Professor of Law and Director of the American Indian Law Program at the University of Colorado Law School. Professor Carpenter teaches and writes in the areas of Property, Cultural Property, American Indian Law, Human Rights, and

Indigenous Peoples in International Law. She has published several books and legal treatises on these topics, and her articles appear in leading law reviews. Professor Carpenter was appointed to the United Nations Expert Mechanism on the Rights of Indigenous Peoples as its member from North America from 2017-2021, and served as a senior advisor to the U.S. Secretary of the Interior from 2023-2025.

Seth Davis is Professor of Law at the University of California, Berkeley School of Law. His research explores questions of sovereignty, responsibility, and redress as they arise in both public law and private law, focusing upon administrative law, the federal courts, federal Indian law, fiduciary law, and tort law. His scholarship has appeared in the *Stanford Law Review*, the *Columbia Law Review*, and the *California Law Review*, among other leading journals, and has been honored by the Association of American Law Schools (AALS). In addition, Davis is an executive editor of *Cohen's Handbook of Federal Indian Law*, the leading treatise in the field.

Dylan R. Hedden-Nicely, a citizen of the Cherokee Nation of Oklahoma, is associate professor of law and head of the College of Law's Native American Law Program at the University of Idaho College of Law. He is an executive editor on the 2024 edition of *Cohen's Handbook of Federal Indian* Law. He is currently chairman of the Idaho State Bar Indian Law Section and sits on the Governing Council of the Northwest Indian Bar Association. He continues to consult with tribes on issues related to Native American natural resources and water rights.

Monte Mills is the Charles I. Stone Professor of Law and the Director of the Native American Law Center at the University of Washington School of Law. He teaches American Indian Law, Property, and other classes focused on Native American and natural resource related topics. He serves as a co-author on two textbooks: *American Indian Law, Cases and Commentary* (along with Robert T. Anderson, Sarah A. Krakoff, and Kevin K. Washburn)

and *Native American Natural Resources Law* (with Michael Blumm and Elizabeth Kronk Warner). Monte also co-authored *A Third Way: Decolonizing the Laws of Indigenous Cultural Protection*, which was published by Cambridge University Press in July 2020. He is also an executive editor on the 2024 edition of *Cohen's Handbook of Federal Indian Law*.

Elizabeth Hidalgo Reese, Yunpoví (Tewa: Willow Flower), is Assistant Professor of Law at Stanford University. She is a scholar of American Indian tribal law, federal Indian law, and constitutional law focusing on the intersection of identity, race, citizenship, and government structure. Her scholarship examines the way government structures, citizen identity, and the history that is taught in schools, can impact the rights and powers of oppressed racial minorities within American law. Professor Reese is a nationally recognized expert on tribal law and federal Indian law and frequent media commentator on developments within the doctrine, particularly at the U.S. Supreme Court. Professor Reese is also a prominent Native policy expert and advocate. From 2023-2024, she served as the Senior Policy Advisor for Native Affairs at the White House, working within the Domestic Policy Council.

Angela R. Riley, a citizen of the Potawatomi Nation, is a Professor of Law and American Indian Studies at UCLA. She also serves as Special Advisor to the Chancellor on Native American and Indigenous Affairs and directs UCLA School of Law's Native Nations Law and Policy Center as well as the J.D./M.A. joint degree program in Law and American Indian Studies. She has chaired the UCLA campus Repatriation Committee since 2010. Professor Riley's research focuses on Indigenous peoples' rights, with a particular emphasis on cultural property and Native governance. Her work has been published in the nation's leading legal journals, including the *Yale Law Journal*, the *Harvard Law Review*, *Stanford Law Review*, *Columbia Law Review*, and numerous others. In 2003, Professor Riley became the first

woman and youngest Justice of the Supreme Court of the Citizen Potawatomi Nation. She has served as Chief Justice since 2010.

Joseph William Singer is the Bussey Professor of Law at Harvard Law School. At Harvard, he teaches and writes about property law, conflict of laws, federal Indian law, and legal theory with an emphasis on moral and political philosophy. He is also one of the executive editors of the 2024 edition of *Cohen's Handbook of Federal Indian Law*on. He has also written *Property* (with Nestor M. Davidson) (Aspen 6th ed. 2022); *Property Law: Cases, Policies, & Practices* (with Bethany R. Berger, Nestor M. Davidson, & Eduardo Moisés Peñalver) (Aspen 8th ed. 2022); *Persuasion: Getting to the Other Side* (2020); *Choice of Law: Patterns, Arguments, Practices* (2020); *No Freedom Without Regulation: The Hidden Lesson of the Subprime Crisis* (2015); *Entitlement: The Paradoxes of Property* (2000); and *The Edges of the Field: Lessons on the Obligations of Ownership* (2000).

Michalyn Steele is the Marion G. Romney Professor of Law at BYU Law. She teaches Constitutional Law, Civil Rights, Federal Indian Law, and Law and Leadership. After beginning her legal career with Sonosky, Chambers, Sachse, Endreson & Perry, a highly regarded D.C. firm specializing in the representation of Indian tribes, Professor Steele worked for six years as a Trial Attorney in the U.S. Department of Justice's Civil Rights Division's Housing and Civil Enforcement section, where her work was honored with multiple Division awards. Beginning in late 2009, Professor Steele worked as a Counselor to the Assistant Secretary of Interior for Indian Affairs, Larry Echo Hawk. Professor Steele is also one of the executive editors of the 2024 edition of *Cohen's Handbook of Federal Indian Law.*

# Appendix B

**Appendix B:**



Source: John Strong, THE ALGONQUIAN PEOPLES OF LONG ILSAND FROM EARLIEST TIMES TO 1700 300-01 (1997).

# Appendix C

**Appendix C**

Recorded L 1859 P 486

THIS INDENTURE, Made the 21st day of April, 1859,

BETWEEN THE TRUSTEES OF THE PROPRIETORS OF the Common

and Undivided lands and marshes (or meadows) in the Town of Southampton

parties of the first part and

STEVEN H. WALKER, DAVID S. BUNN and WICKHAM CUFFEE as

Trustees of the Shinecock Tribe of Indians in behalf of and for the benefit

of said Tribe parties of the second part

WITNESSETH: That the said parties of the first part by

virtue of their Act of Incorporation passed April 15th 1818 and also by

virtue and force of the Act entitled "An Act to enable the Shinecock Tribe

of Indians to exchange certain Rights in land with the Trustees of the Prop-

rietors of the Common and undivided lands and marshes in the town of South-

ampton passed March 16th, 1859" and in consideration of a Deed bearing even

date herewith made by the said parties of the second part to the said parties

of the first part and conveying and releasing to said parties of the first part

ALL their Right, Title and interest in and to certain

lands therein more particularly mentioned and described which Deed was made in

pursuance and by virtue of said Act passed March 16th, 1859, and by the said

Steven H. Walker, David S. Bunn and Wickham Cuffee as Trustees of and in be-

half of said Shinecock Tribe of Indians and as the Deed of the Tribe and is

together with this deed and These Presents to be construed as part of one

and the same transaction.

Do hereby grant bargain sell release convey and con-

firm unto the said parties of the Second Part in behalf of and for the bene-

fit of said Shinecock Tribe of Indians forever

ALL that certain Tract or Neck of land commonly

called "Shinecock Neck" situated in said Town of Southampton County of Suffolk

and "lying south of a line commencing at the head of the Creek on the east side

of said Neck and running along the Indian Ditch where the fence now stands

to the Stephen Post meadow socalled; thence along the Old Ditch on the

south side of the said meadow to Old Fort Pond where the water fence formerly

stood", excepting therefrom All such meadows and lands as have been allotted

and assigned to particular proprietors or are owned by such persons with con-

venient access or passage to and from for the purpose of improving and enjoy-

ing the same with all and singular the hereditaments and appurtenances to the

NY-1472

Appendix C-1

-2-

same belonging or in anywise appertaining:

TO HAVE AND TO HOLD the said premises with their appurtenances hereby conveyed or so intended to be to the said parties of the second part in behalf of and for the benefit of said Tribe, forever. The true intent and meaning of this Deed is and it shall be construed to be to Release to and vest in the said parties of the second part in behalf of and for the benefit of said Tribe all the Right, Title and Interest and Estate possession claim and demand both in law and equity and in possession reversion expectancy and remainder which the said parties of the first part and their Successors in office have or might or could by any means have or convey therein.

IN TESTIMONY WHEREOF the said parties of the first part have by Edwin Rose Esq., their President signed these Presents and hereunto affixed their corporate seal and they to wit Erastus Foster, George O. Post, Jonathan Fithian, Edwin Post, Edward White, Selden Foster, Jeremiah O. Hedges, David Hedges, Isaac W. Osborn, David R. Rose, Austin Rose and Edwin Rose as said Trustees of said Proprietors parties of the first part have also hereunto set their hands and seals the day and year first above written.

Sealed and delivered in Presence of

      J. Lawrence Smith

| | |
|---|---|
| | EDWIN ROSE     L.S. |
| | President |
| | ERASTUS FOSTER L.S. |
| | GEO. O. POST    L.S. |
| | JON FITHIAN     L.S. |
| | EDWIN POST      L.S. |
| | EDWARD WHITE   L.S. |
| | SELDEN FOSTER  L.S. |
| | JEREMIAH O. HEDGES L.S. |
| | DAVID HEDGES   L.S. |
| | ISAAC W. OSBORN  L.S. |
| | DAVID R. ROSE   L.S. |
| | AUSTIN ROSE    L.S. |
| | EDWIN ROSE     L.S. |

STATE OF NEW YORK)
              )ss.
COUNTY OF SUFFOLK)

      On this twenty first day of April in the year one thous-

NY-147

Appendix C-2

-3-

and eight hundred and fifty nine before me came Edwin Rose, Erastus Foster, George O. Post, Jonathan Fithian, Edwin Post, Edward White, Selden Foster, Jeremiah O. Hedges, David Hedges, Isaac W. Osborn, David R. Rose, and Austin Rose to me severally known to be the same persons described in and who executed the within deed and acknowledged severally that they executed the same, and at the same time before me came Edwin Rose, the President of "The Trustees of the proprietors of the common and undivided lands and marshes (or meadows) in the town of Southampton" with whom I am personally acquainted and who being by me duly sworn deposes and says that he resides in the town of Southampton, County of Suffolk; that he is President of the Trustees of the proprietors of the common and undivided Lands, and marshes (or meadows) in the Town of Southampton. That the seal affixed to the within Indenture is the corporate Seal of said The Trustees of the Proprietors of the Common and Undivided Lands and Marhses (or meadows) in the Town of Southampton and was affixed by said indenture by order of said Trustees for the uses therein expressed. And that he by like order did subscribe his name thereto as President of said The Trustees of the Proprietors of the Common and Undivided Lands and Marshes or meadows in the Town of Southampton which is to me satisfactory evidence of the due execution of said indenture.

RECORDED:  On the 22nd day of April
          1859, at 2 O'clock and 45 min.P.M.



Appendix C-3