UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DAVID T. SILVA,
GERROD T. SMITH, and
JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

                    Plaintiffs,                  18-CV-3648
                                                (GRB)(SIL)

     -against-

BRIAN FARRISH,
JAMIE GREENWOOD,
EVAN LACZI,
BASIL SEGGOS,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT ATTORNEY'S
OFFICE,

                    Defendants.
----------------------------------------------------------------x


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

                                   LETITIA JAMES
                                   Attorney General of the State of New York
                                   200 Old Country Road, Suite 240
                                   Mineola, New York 11501
                                   (516) 248-3302
                                   Attorney for Defendants


                                   RICHARD HUNTER YORKE
                                   Assistant Attorney General
                                   Of Counsel

Table of Contents

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

LEGAL STANDARD ......................................................................................................... 2

ARGUMENT ..................................................................................................................... 2

   I.   Collateral Estoppel Bars Plaintiffs' Claims ...................................................... 2

   II.   Shinnecock Aboriginal Title Is Unambiguously Extinguished ........................... 5

      A.   The 1640 Southampton Deed Unambiguously Conveyed All Title ............................ 10

      B.   The Topping Purchase as Ratified by Governor Nicolls's Determination Extinguished Aboriginal Title ......................................................................................................... 12

      C.   The Andros and Dongan Patents Unambiguously Extinguished Aboriginal Title ....... 14

      D.   The 1703 Deed Relinquished Any Shinnecock Rights Within Southampton Boundaries 18

   III.   Plaintiffs Identify No Treaty That Gives Rise to Treaty-Based Fishing Rights ............. 19

   IV.   The Real Property Deeds and Orders That Plaintiffs Rely Upon Do Not Reserve Shinnecock Off-Reservation Fishing Rights ........................................................ 22

      A.   The April 29, 1648 Deed for East Hampton ................................................... 22

      B.   June 10, 1658 Deed to Beach ........................................................................ 23

      C.   May 12, 1659 Deed to John Ogden ............................................................... 24

      D.   June 8, 1659, Deed to Lion Gardiner Concerning Whale Rights ....................... 24

      E.   The Topping Purchase ................................................................................. 25

      F.   January 22, 1674-5 Resolution ...................................................................... 26

      G.   May 23 and 24, 1676 Order Regarding Unkechaug ........................................ 26

   V.   Even If Plaintiffs Could Establish a Treaty-Reserved or Aboriginal Fishing Right, the State May Regulate Under the Doctrine of Conservation Necessity .............................. 28

   VI.   Plaintiffs' Claims are Barred Under the Sherill Doctrine .................................... 32

CONCLUSION ................................................................................................................. 34

Page(s)

**Cases**

*Alliance to Save the Mattaponi v. Commonwealth Dep't of Envtl. Quality ex rel. State Water Control Bd.*,
270 Va. 423, 452 (Va. 2005) ................................................................................................21

*Atlantic Mutual Insurance Co. v. CSX Lines, L.L.C.*,
432 F.3d 428, 433 (2d Cir. 2005) ...........................................................................................2

*Brookhaven Baymen's Assn., Inc. v. Town of Southampton*,
201 A.D.3d 856 (N.Y. App. Div. 2d Dep't 2022) ..................................................................17

*Cayuga Indian Nation of N.Y. v. Pataki*,
413 F.3d 266 (2d Cir. 2005) ..................................................................................................33

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................................2

*Chertkova v. Conn. Gen. Life Ins. Co.*,
92 F.3d 81 (2d Cir. 1996) ........................................................................................................2

*City of Sherill v. Oneida Indian Nation*,
544 U.S. 197 (2005) ........................................................................................................ 32-33

*Confederated Tribes of Chehalis Indian Reservation v. Washington*,
96 F.3d 334 (9th Cir. 1996) ....................................................................................................9

*County of Oneida v. Oneida Indian Nation*,
470 U.S. 226 (1985) ................................................................................................................7

*Gelb v. Royal Globe Ins. Co.*,
798 F.2d 38 (2d Cir. 1986) ......................................................................................................3

*Georges v. United Nations*,
834 F.3d 88 (2d Cir. 2016) ............................................................................................. 19-20

*Gessin v Throne-Holst*,
134 A.D.3d 31 (N.Y. App. Div. 2d Dep't 2015) ..................................................................17

*Gilberg v. Barbieri*,
53 N.Y.2d 285 (1981) ..............................................................................................................3

*Herrera v. Wyoming*,
139 S. Ct. 1686 (2019) ..........................................................................................................28

iii

*In Re Wilson*,
   30 Cal. 3d 21, 177 Cal. Rptr. 336, 634 P.2d 363 (Sup. Ct. Cal. 1981) ...................................9

*Johnson v. M'Intosh*,
   21 U.S. 543 ...................................................................................................................8

*Johnson v. M'Intosh*,
   21 U.S. (8 Wheat.) 543 (1823)......................................................................................7

*Menominee Indian Tribe v. Thompson*,
   161 F.3d 449 (7th Cir. 1998) ....................................................................................6, 10

*Minnessota v. Mille Lacs Band of Chippewa Indians*,
   526 U.S. 172 (1999)......................................................................................................28

*Mitchel v. United States*,
   34 U.S. 711 (1835)........................................................................................................11

*Native Vill. of Eyak v. Blank*,
   688 F.3d 619 (9th Cir. 2012) ........................................................................................7

*New York Chinese TV Programs, Inc. v. U.E. Enters.*,
   954 F.2d 847 (2d Cir. 1992)..........................................................................................19

*New York ex rel. Kennedy v. Becker*,
   241 U.S. 556 (1916).......................................................................................................29

*New York v. Shinnecock Indian Nation*,
   523 F. Supp. 2d 185 (E.D.N.Y. 2007), *vacated on other grounds*, 686 F.3d 133 (2d Cir. 2012) ................................................................................................... 12-13, 16

*New York v. Smith*,
   952 F. Supp. 2d 426 (E.D.N.Y. 2013) ..........................................................................5

*Oneida Indian Nation v. County of Oneida*,
   617 F.3d 114 (2d Cir. 2010).................................................................................... 33-34

*Oneida Indian Nation v. New York*,
   860 F.2d 1145 (2d Cir. 1988).........................................................................................8

*Or. Dep't of Fish and Wildlife v. Klamath Indian Tribe*,
   473 U.S. 753 (1985)...................................................................................................9, 11

*People ex rel. Howell v. Jessup*,
   160 N.Y. 249 (N.Y. 1899) ...........................................................................................16

*People v. Patterson*,
   5 N.Y.3d 91 (N.Y. 2005) ................................................................................28

*Puyallup Tribe v. Department of Game*,
   391 U.S. 392 (1968)......................................................................................29

*Rosebud Sioux Tribe v. Kneip*,
   430 U.S. 584 (1977) ......................................................................................12

*Seneca Nation of Indians v. New York*,
   382 F.3d 245 (2d Cir. 2004).....................................................................6-8, 11

*Shinnecock Indian Nation v. New York*,
   2006 U.S. Dist. LEXIS 87516, 2006 WL 3501099 (E.D.N.Y. 2006), *aff'd by* 628 Fed.
   Appx. 54 (2d Cir. 2015)................................................................................34

*South Dakota v. Bourland*,
   508 U.S. 679 (1993).....................................................................................7, 10

*State v. Coffee*,
   97 Idaho 905 (Sup. Ct. Idaho 1976).................................................................10

*State v. Keezer*,
   292 N.W.2d 714 (Sup. Ct. Minn. 1980)............................................................10

*State v. Trustees of Freeholders & Commonalty*,
   99 A.D.2d 804 (N.Y. App. Div. 2d Dep't 1984) ................................................17

*Stockbridge-Munsee Cmty. v. New York*,
   756 F.3d 163 (2d Cir. 2014)...........................................................................34

*Strough v Incorporated Vil. of W. Hampton Dunes*,
   167 A.D.3d 800 (N.Y. App. Div. 2d Dep't 2018) ..............................................17

*Sullivan v. Gagnier*,
   225 F.3d 161 (2d Cir. 2000).............................................................................2

*Trustees, etc. of Southampton v. Mecox Bay Oyster Co.*,
   116 N.Y. 1 (N.Y. 1889) .................................................................................16

*Tulee v. Washington*,
   315 U.S. 681 (1942)......................................................................................29

*United States v. Adair*,
   723 F.2d 1394 (9th Cir. 1983), *cert. denied* 467 U.S. 1252 (1984)..........................9

*United States v. Alcea Band of Tillamooks*,
329 U.S. 40 (1946) ........................................................................................8

*United States v. Minn.*,
466 F.Supp. 1382 (D. Minn. 1979), *aff'd. sub nom.*, *Red Lake Band of Chippewa Indians v. Minn.*, 614 F.2d 1161 (8th Cir. 1980), *cert. den.* 449 U.S. 905 ........................9, 11

*United States v. Myers*,
206 F. 387 (8th Cir. 1913) ..........................................................................12

*United States v. Santa Fe Pac. R.R. Co.*,
314 U.S. 339 (1941) ......................................................................................8

*United States v. U.S. Currency in Amount of $119,984.00, More or Less*,
304 F.3d 165 (2d Cir. 2002) ..........................................................................3

*United States v. Winans*,
198 U.S. 371 (1905) ......................................................................................8

*Unkechaug Indian Nation v. N.Y. State Dep't of Env't Conservation*,
677 F. Supp. 3d 137 (E.D.N.Y. 2023), *aff'd by Unkechaug Indian Nation*, 126 F.4th 822
..................................................................................................29, 32

*Unkechaug Indian Nation v. Seggos*,
126 F.4th 822 (2d Cir. 2025) ..............................................................21, 28

*W. Mohegan Tribe & Nation v. Orange County*,
395 F.3d 18 (2d Cir. 2004) ............................................................................7

*Wahkiakum Band of Chinook Indians v. Bateman*,
655 F.2d 176 (9th Cir. 1981) ...............................................................9-10, 20

*Wash. State Dep't of Licensing v. Cougar Den, Inc.*,
139 S. Ct. 1000 (2019) ................................................................................28

*Western Shoshone Nat'l Council v. Molini*,
951 F.2d 200 (9th Cir. 1991), *cert. denied*, 506 U.S. 822 (1992) ........................9, 12

*Zherka v. City of New York*,
459 Fed. Appx. 10 (2d Cir. 2012) ................................................................3

## Constitutions

United States Constitution ............................................................................16

**State Statutes**

E.C.L.
   § 13-0335/71-0923 ........................................................................................4

**Federal Statutes**

Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C.
   §§ 5101-5108 ..............................................................................................31

Cohen's Handbook of Federal Indian Law
   §§ 18.02, 20.01 (2025)................................................................................6
   § 18.02 (2025)..........................................................................................6-7
   § 20.01 (2025)...........................................................................................10

**State Regulations**

6 NYCRR
   §§ 10.1(a) and (b), 40.1(f) and (i) ............................................................31

**Rules**

Fed. R. Civ. P. 56(a), 56(c) ...........................................................................2

## **PRELIMINARY STATEMENT**

Plaintiffs, members of the Shinnecock Indian Nation, claim to possess off-reservation fishing rights within the Town of Southampton, New York, exclusively free from regulation by the State of New York.  These claims have no basis.  Plaintiffs assert a violation of the Supremacy Clause, based on aboriginal and retained fishing rights, purportedly secured when the Shinnecock Tribe ceded territory to the English in various colonial deeds.  However, Plaintiffs do not possess aboriginal fishing rights within the Town of Southampton because the Shinnecock Tribe does not possess aboriginal title to the territory in which Plaintiffs claim these rights.  Any aboriginal title was lost when the Shinnecock Tribe conveyed land to non-Indians.  Further, any aboriginal title—and incidental rights—was conclusively extinguished by the then-sovereign, Great Britain, through Royal Determinations and Patents.  Moreover, Plaintiffs possess no reserved off-reservation fishing rights as they can point to no treaty or agreement that reserved such rights, and the Shinnecock Tribe never entered a treaty with Great Britain or the United States.

Even were the Court to find that Plaintiffs possess off-reservation fishing rights, regulation by New York State would be proper under the doctrine of conservation necessity, and Plaintiffs' claims would be barred under the principles articulated by the *Sherrill* Doctrine.  Plaintiffs are not uniquely free from complying with fishing regulations in off-reservation New York State waters, and unlimited waters beyond.  Defendants Basil Seggos, Brian Farrish, and Evan Laczi ("Defendants") are therefore entitled to summary judgment, and all claims against them should be dismissed.

## STATEMENT OF FACTS

For a full recitation of the facts, Defendants respectfully refer the Court to their Statement of Undisputed Facts, pursuant to Local Rule 56.1, dated October 18, 2024 (Defendant's "56.1").

## LEGAL STANDARD

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Atlantic Mutual Insurance Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005). No genuinely triable factual issue exists when the moving party demonstrates that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

## ARGUMENT

### I.    *Collateral Estoppel Bars Plaintiffs' Claims*

Plaintiffs are precluded from relitigating the issue of whether the Shinnecock Tribe possesses aboriginal or reserved fishing rights within the Shinnecock Bay and other bodies of water within the Town of Southampton because the issue of the Tribe's fishing rights was determined when Plaintiff Silva was found guilty at his criminal trial for fishing without the proper license and use of a fyke net. To wit, at Silva's criminal trial, it was determined that the Shinnecock Tribe does not possess off-reservation aboriginal or reserved fishing rights within the Shinnecock Bay and other waters within the Town of Southampton.

Because a federal court must apply the rules of collateral estoppel of the state in which a conviction was rendered, New York state rules apply. *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d

Cir. 2000). Collateral estoppel applies where: (1) the issues in both proceedings are substantially the same; (2) the issue has been litigated and decided in the prior proceeding; (3) there has been a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. *United States v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d Cir. 2002). A litigant may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case, and because mutuality of estoppel is not an absolute requirement, a party other than the Government may assert collateral estoppel based on a criminal conviction. *Gelb v. Royal Globe Ins. Co*., 798 F.2d 38, 43 (2d Cir. 1986) (internal citations omitted); *Gilberg v. Barbieri*, 53 N.Y.2d 285, 291 (1981).

All four prongs are met here because Silva relied on the same theory of retained aboriginal fishing rights in his criminal proceeding, the issue was litigated and decided against Silva, and that determination was necessary to support a final judgment on the merits. *Zherka v. City of New York*, 459 Fed. Appx. 10, 13 (2d Cir. 2012) ("To meet the identity-of-issues prong of collateral estoppel, it is not necessary that the issues be exactly identical; it is sufficient that the issues presented in the earlier litigation are substantially the same as those presented by the later action." (internal quotation marks omitted)). In his criminal case, Silva argued that the Shinnecock Nation has unabrogated off-reservation fishing rights pursuant to the 1664 Fort Albany Treaty and the May 12, 1659 Wyandanch Deed to John Ogden ("Quogue Purchase"). *See* 56.1 at ¶23; Declaration of Richard Yorke, dated Oct. 18, 2024 ("Yorke Decl."), Ex. A, Notice of Motion and Defendant's Memorandum of Law in Support of Motion to Dismiss, dated October 10, 2017, p. 5, Ex. 3. Silva argued that these rights extended to the Shinnecock Bay estuary, which he claimed constituted "an

area of retained fishing rights, whether or not outside Shinnecock Reservation waters." 56.1 at ¶ 24; Yorke Decl., Ex. A, p. 6.

In opposition, the Suffolk County District Attorney argued that, under the Dongan Patent of 1686, the Town of Southampton owns the bodies of water within its boundaries and was conveyed the easements of fishing; that the Southampton Deed of December 13, 1640 reserved no fishing rights to the Shinnecock Tribe; and that the documents that Silva identified did not constitute treaties or laws reserving fishing rights. *See* 56.1 at ¶ 26; Yorke Decl. Ex B, Affirmation of Jamie Greenwood, Assistant District Attorney, in Opposition to Defendant's Motion, dated December 11, 2017, pp. 3-4. Silva replied that the Dongan Patent and the 1640 Indian Deed for Southampton failed to abrogate aboriginal fishing rights. *See* 56.1 at ¶ 27; Yorke Decl, Ex. C, Defendant's Reply Memorandum of Law in Support of Motion to Dismiss, dated December 18, 2017, pp. 1-2. Hon. Gary Weber denied Silva's motion to dismiss, rejecting Silva's argument that, "since the Defendant in the instant matter is, concededly, a member of the Shinnecock Indian Tribe, he had the right to fish, without regulation by the State of New York, in the waters of the Shinnecock Indian Reservation in Shinnecock Bay." *See* 56.1 at ¶ 28; Docket Entry ("D.E.") 3, Ex. 5, Memorandum Decision & Order of Hon. Gary J. Weber, dated January 9, 2017[sic.], p. 1.

At trial, Silva renewed his motion to dismiss for lack of jurisdiction; nevertheless, he was found guilty of the violation of E.C.L. Section 13-0335/71-0923, for lack of a marine commercial food fishing license and use of a fyke net. *See* 56.1 at ¶¶ 31-37; Yorke Decl. Ex. D, Memorandum Decision of Hon. Gary J. Weber, dated June 5, 2019, at 5. Denying Silva's motion for a Trial Order of Dismissal, Judge Weber held, "the People have proven beyond a reasonable doubt that the subject fyke net was set, maintained, operated or used in an area (Taylor's Creek) subject to the jurisdiction of the State of New York acting through the D.E.C." *Id*. Judge Weber held, "Here,

4

based upon the current and indisputed [sic.] mapping of the area, the fyke net was most certainly placed on Taylor Creek outside of the established boundaries of the Shinnecock Nation." *Id*.  In finding Silva guilty, the court rejected his argument that the Shinnecock Tribe has aboriginal fishing rights, and that Silva therefore had the right to fish without regulation both on and off the Shinnecock Reservation. *Id*.

Additionally, Plaintiff Jonathan K. Smith has unsuccessfully claimed Shinnecock aboriginal fishing rights in this court.  In *New York v. Smith*, 952 F. Supp. 2d 426 (E.D.N.Y. 2013), after Smith removed a criminal case against him to federal court, the plaintiff therein, the People of the State of New York, brought a motion to remand the case to Criminal Court of the Town of East Hampton, which was granted.  *Id*. at 432.  In opposition, Smith "assert[ed] that he enjoys aboriginal rights . . . and that he has fishing rights in Peconic Bay in the ceded territory under the Wyandanch to Ogden Deed of 1659." *Id*. at 431.  The court rejected Smith's arguments, holding that Smith "fails to state a federally protected right to have undersized scallops," and "The Wyandanch to Ogden Deed of 1659 is also inapplicable because when an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right to absolute and exclusive use and occupation of the conveyed lands." *Id*. (citing *South Dakota v. Bourland*, 508 U.S. 679, 689 (1993)).

This Court should hold that collateral estoppel applies, based on the *Silva* and *Smith* cases, to bar further litigation of Plaintiffs' claim that the Shinnecock Tribe possesses aboriginal or reserved fishing rights.

## II.    *Shinnecock Aboriginal Title Is Unambiguously Extinguished*

Even were the Court to hold that collateral estoppel does not apply, Plaintiffs' claims to be uniquely free from regulation in off-reservation waters should be rejected because the record

establishes that the Shinnecock Tribe does not possess aboriginal title, along with the occupancy and use rights it encompasses.  Plaintiffs assert an unsupported claim to hold aboriginal rights in unspecified "usual and customary" Shinnecock fishing waters, purportedly retained through colonial deeds that ceded Shinnecock territory.  *See* Complaint at ¶¶ 16, 22, "Causes of Action," Count I, "Prayer for Relief," Count I.  But aboriginal rights to fish or hunt do not exist separately from aboriginal title to territory; instead, aboriginal rights to fish or hunt are encompassed by and contingent on aboriginal title.  And, as set forth below (*see infra*, Points II(A)-(D)), Plaintiffs do not hold aboriginal title within the Town of Southampton.

The foundation of Indian tribes' hunting, fishing, trapping, and gathering rights (collectively referred to as usufructuary rights) may be as reserved rights—formally recognized by a treaty or agreement with the United States, or as an aspect of aboriginal title.  *See* 1 Cohen's Handbook of Federal Indian Law, "Legal Foundations of Hunting, Fishing, and Gathering Rights," §§ 20.01(2), (3) (2025); *see also Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

Aboriginal title, also known as original Indian title, is a distinct concept in federal Indian law, standing for the proposition that "[t]ribal nations may hold title to their lands by virtue of possessing it and exercising sovereignty over it."  1 Cohen's Handbook of Federal Indian Law §§ 18.02, 20.01 (2025).  Aboriginal title refers to the Indians' exclusive right to use and occupy lands they have inhabited from time immemorial, but that had subsequently been "discovered" by European nations.  *See Seneca Nation of Indians v. New York*, 382 F.3d 245, 248 n. 4 (2d Cir. 2004) (internal citations and quotation marks omitted).  Aboriginal title is distinct from "recognized title," which is title to Indian lands that has been recognized by federal treaty or statute.  *See* 1 Cohen's Handbook of Federal Indian Law § 18.02 (2025).  The concept of aboriginal

title is instead derived from the doctrine of discovery, which provides that "discovering nations held fee title to these lands, subject to the Indians' right of occupancy and use." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234 (1985). Under aboriginal title, a tribe's members are "the rightful occupants of the soil, with a legal as well as just claim to retain possession of it." *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 574 (1823).

The Second Circuit has stated that Indian title encompasses the right to exclude others. *See W. Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18, 22 (2d Cir. 2004) ("[Plaintiff] Tribe also describes Indian title as the right 'to exclude all others, including holders of fee simple title, through state law possessory actions such as ejectment and trespass.' This description of the concept of Indian, or aboriginal, title is consistent with the law of this Circuit. . ."); *see also* 1 Cohen's Handbook of Federal Indian Law § 18.02 (2025) ("Until title is extinguished, a tribe has a collective right to occupy and use its lands as it sees fit. A tribe with Indian title may bring a federal common law action to enforce its ownership rights.") (citing *Johnson v. M'Intosh*, 21 U.S. 543; *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. at 235–36).

Tribes asserting aboriginal title "have the burden of proving actual, exclusive, and continuous use and occupancy for a long time of the claimed area." *Native Vill. of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012). Exclusivity is only established where a tribe proves that it used and occupied land to the exclusion of other Indian groups. *Id.* at 623. Further, private use of a territory is inconsistent with aboriginal title, and the grant of possessory rights or title to a tract extinguishes Indian title. *See South Dakota v. Bourland*, 508 U.S. at 689 ("[W]hen an Indian tribe conveys ownership of its tribal lands to non-Indians, it loses any former right of absolute and exclusive use and occupation of the conveyed lands."); *Seneca Nation of Indians v. New York*, 382

F.3d at 262. ("the grant of possessory rights in, if not title to, the Islands to [a private party], if valid, extinguished the Senecas' own possessory rights in that property.").

Aboriginal title is not inviolable and could be extinguished by the sovereign. *Seneca Nation of Indians v. New York*, 382 F.3d at 248, n. 4 ("Indians were secure in their possession of aboriginal land until their aboriginal title was extinguished by the sovereign discoverer.") (internal citation and quotation marks omitted). Prior to the American Revolution, this power to extinguish was held by Great Britain. *See Oneida Indian Nation v. New York*, 860 F.2d 1145, 1150 (2d Cir. 1988) ("The right to extinguish Indian title, sometimes called a right of extinguishment, was held by the sovereign -- Great Britain in the period prior to the American Revolution."). Aboriginal title existed at the pleasure of the sovereign, which "possessed exclusive power to extinguish the right of occupancy at will." *United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 46 (1946); *see also Johnson v. M'Intosh*, 21 U.S. at 588 ("All our institutions recognise the absolute title of the crown, subject only to the Indian right of occupancy, and recognise the absolute title of the crown to extinguish that right."). The sovereign could extinguish aboriginal title in various ways, such as by taking through war, physical dispossession, contract or treaty, and by other means. *Seneca Nation of Indians v. New York*, 382 F.3d at 248, n. 4; *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 347 (1941) (holding that aboriginal title can be extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise") (citation omitted). Typically, extinguishment of aboriginal title resulted in the joining of the possessory and ownership rights to the land in fee simple in the sovereign. *Seneca Nation of Indians v. New York*, 382 F.3d at 248, n. 4.

In addition to the right to occupy lands, holding aboriginal title refers to and encompasses the use of the waters and natural resources on those lands. *See United States v. Winans*, 198 U.S.

8

371, 381 (1905) (treaty reserved to the Indians their pre-existing right to fish at all usual and accustomed places); *United States v. Adair*, 723 F.2d 1394, 1413-1414 (9th Cir. 1983), *cert. denied* 467 U.S. 1252 (1984) (tribe's aboriginal title included timber rights and aboriginal hunting and fishing rights).

However, aboriginal fishing and hunting rights are not independent from aboriginal title but are part of the use and occupancy rights over territory; therefore, extinguishment of aboriginal title "terminates corresponding use and occupancy rights, including fishing rights," unless expressly or impliedly reserved in a treaty, statute, or executive order. *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 341 (9th Cir. 1996); *see also Or. Dep't of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766 (1985) (general conveyance of title carried with it whatever hunting and fishing rights the Indians possessed); *Western Shoshone Nat'l Council v. Molini*, 951 F.2d 200, 202-03 (9th Cir. 1991) (rejecting tribe's claimed "distinction between title and hunting and fishing rights and argu[ment] that a taking of the former does not entail a taking of the latter," and holding that aboriginal hunting and fishing rights were lost when title extinguished absent express reservation), *cert. denied*, 506 U.S. 822 (1992); *Wahkiakum Band of Chinook Indians v. Bateman*, 655 F.2d 176, 180 n.12 (9th Cir. 1981) (rejecting the plaintiffs' assumption of "the existence of an 'aboriginal right to fish' separate from land ownership or treaty recognition."); *United States v. Minn.*, 466 F.Supp. 1382, 1385 (D. Minn. 1979) (holding "aboriginal hunting, fishing, trapping . . . rights . . . are mere incidents of Indian title, not rights separate from Indian title, and consequently if Indian title is extinguished so also would these aboriginal rights be extinguished."), *aff'd. sub nom*., *Red Lake Band of Chippewa Indians v. Minn.*, 614 F.2d 1161 (8th Cir. 1980), *cert. den*. 449 U.S. 905. *See also In Re Wilson*, 30 Cal. 3d 21, 177 Cal. Rptr. 336, 634 P.2d 363 (Sup. Ct. Cal. 1981) (surveying case law and holding that

extinguishment of aboriginal title extinguishes incidental occupancy rights of hunting and fishing); *State v. Keezer*, 292 N.W.2d 714, 7211 (Sup. Ct. Minn. 1980) (holding that hunting rights are incidents of Indian title); *State v. Coffee*, 97 Idaho 905, 908 (Sup. Ct. Idaho 1976) (holding that "hunting and fishing rights are part and parcel with aboriginal title"); Cohen's Handbook of Federal Indian Law § 20.01 (2025) ("If original Indian title to land is extinguished, the hunting, fishing, and gathering rights on the land are extinguished as well, unless those rights are expressly or implicitly reserved by treaty, statute, or executive order.").

Once aboriginal title is extinguished, "[i]t is irrelevant whether members of the Tribe continued to use [] off-reservation resources." *Menominee Indian Tribe v. Thompson*, 161 F.3d at 462 (rejecting claim of off-reservation fishing rights, where tribe asserted they used the resources of the waters from time immemorial) (citing *Santa Fe Pacific R.R.*, 314 U.S. at 357); *Wahkiakum Band of Chinook Indians*, 655 F.2d at 180 (holding aboriginal fishing right extinguished regardless of tribe's long history of fishing in Columbia River).

Here, Plaintiffs rely on various 17th Century deeds through which the Shinnecock Tribe conveyed land to non-Indian private purchasers. *See* Complaint at ¶ 15 a) through e). However, these documents undercut Plaintiffs' claims, as the Tribe's conveyances to individuals abrogated aboriginal title. *See South Dakota v. Bourland*, 508 U.S. at 689. Moreover, as set forth below, the Southampton Deed, along with Royal Determinations and Patents unambiguously extinguished Shinnecock aboriginal title.

### A. The 1640 Southampton Deed Unambiguously Conveyed All Title

The Complaint fails to acknowledge the 1640 Deed for Southampton (the "1640 Deed"), the original Indian Deed for the Town of Southampton, dated December 13, 1640. The 1640 Deed

conveyed all title in the deeded territory, without reservation.  The 1640 Deed, signed by Mandush,

a Shinnecock sachem (*i.e.* tribal leader), states the Indians:

> *doe absolutely & forever give & grant* & by these presents doe acknowledge ourselves to have given & granted to the partyes above mentioned without any fraud, guile, mentall reservation or equivocation to them & their heirs & successors forever *all the lands, woods, waters, water courses, easmts, profits & emoluments, thence arising whatsoever* . . .
>
>             \* \* \*
>
> To have & to hold forever without any claime or challenge of the least title, interest of propriety whatsoever of us the sayd Indians or our heyres or successors or any others by our leave, appointment license counsel or authority whatsoever, all the land bounded as is above said. In full testimonie of this our absolute bargaine contract & grant indented & in full & complete ratification & establishment of this our act & deed of *passing over all our title & interest in the premises with all emoluments & profits thereto appertaining*, or any wise belonging, from sea or land within our limitts above specified without all guile wee have set to our hands the day and yeare above sayd.

56.1 at ¶¶ 133-40; Yorke Decl., Ex. F (emphasis added).

      The 1640 Deed, unlike the deeds with individual purchasers cited by Plaintiffs, was

executed under the authority of the British Crown.  *See* 56.1 at ¶¶ 129-133.  The sovereign thereby

extinguished Shinnecock aboriginal title.  *See Mitchel v. United State*s, 34 U.S. 711 (1835)

(holding tribe's aboriginal rights extinguished when Spain ratified tribe's sale of tribal land).

      The 1640 Deed did not reserve fishing rights.  Instead, the generally encompassing

language of the Deed extinguished aboriginal title and any unreserved incidental rights.  *See Or.*

*Dep't of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. at 766 (holding "The Treaty language.

. . stated only that the Tribe ceded 'all their right, title, and claim' to the described area. Yet that

general conveyance unquestionably carried with it whatever special hunting and fishing rights the

Indians had previously possessed. . ."); *Seneca Nation of Indians v. New York*, 382 F.3d at 260

("cede," "grant," "for ever, in full Right," and "quit claim," reflected clear intention to extinguish

any title the tribe held); *United States v. Minn.*, 466 F. Supp. at 1385 ("[T]he 'all right, title, and

interest' language is 'precisely suited' for the purpose of eliminating Indian title. . .") (citation omitted); *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 266-7 (E.D.N.Y. 2007) ("The use of language such as 'all our right title and interest' is precisely the type of language used when there is an intent to transfer all title in land."), *vacated on other grounds*, 686 F.3d 133 (2d Cir. 2012)[1]; *United States v. Myers*, 206 F. 387, 392 (8th Cir. 1913) ("[T]he Indians 'ceded, conveyed, transferred, relinquished and surrendered forever and absolutely, without any reservation whatever, express or implied, all their claim, title and interest of every kind and character.' It would be impossible to select words operating more completely to extinguish every vestige of Indian title."); *Western Shoshone Nat'l Council v. Molini*, 951 F.2d at 202-03 (aboriginal hunting and fishing rights lost when title extinguished absent express reservation of those rights), *cert. denied*, 506 U.S. 822 (1992). *Cf. Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 597-98 (1977) (language in 1904 act providing that tribe "do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest . . ." disestablished reservation).

## B. The Topping Purchase as Ratified by Governor Nicolls's Determination Extinguished Aboriginal Title

The 1662 purchase of Shinnecock lands by Thomas Topping (the "Topping Purchase") relinquished any exclusive rights the Shinnecock Tribe held west of Canoe Place (the Shinnecock Canal). The deed memorializing this purchase, the Topping Deed of April 10, 1662, states that the Shinnecock have "given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a certain tract of land. . ." *See* 56.1 at ¶ 179; Yorke Decl., Ex. K. This language conveyed all rights and title in the tract. *See New York v. Shinnecock Indian*

---

[1] Although the Second Circuit determined that the district court lacked subject matter jurisdiction without reaching the merits, and thus not precedential, Defendants cite to Judge Bianco's decision for its detailed overview of the law of aboriginal title and informative discussion of extinguishment by the same colonial deeds and Patents cited here.

*Nation*, 523 F. Supp. 2d at 266-7, 269 (stating "The Ogden and Topping Deeds reflect the plain and unambiguous conveyance of Southampton lands . . . by the Shinnecock Tribe to non-Indians," and finding "the clear and unambiguous intention to extinguish aboriginal rights in the lands involved in the Ogden and Topping Deeds") (citing *South Dakota v. Bourland*, 508 U.S. at 689).

Though Topping lacked Royal authority for this purchase (*see* 56.1 at ¶¶ 180-81), the subsequent Royal Determination of then-Colonial Governor of New York, Richard Nicolls unambiguously extinguished any aboriginal title.  Following the Topping Purchase, on September 17, 1666, a group of Shinnecock appealed to Governor Nicolls for a determination of the rights in the land of the Topping Purchase (the "1666 Shinnecock Application"), claiming to be "the true proprietors of the said lands," and seeking to "assigne all our said Interest in ye said lands . . . unto our ancient and loving ffriends the Townes men of Southampton, to them & their successors for ever, with this proviso and consideration. . ."  *See* 56.1 at ¶ 191; Yorke Decl., Ex. L at 169.  The 1666 Shinnecock Application did not mention fishing rights.

On October 3, 1666, Governor Nicolls issued a Determination, with Royal authority (the "Nicolls Determination"), that "all the right and interest . . . in the said tract of land meadows or beach mentioned in their said deeds is belonging, doth and shall belong unto the towne of Southampton . . ."  56.1 at ¶¶ 194-7; Yorke Decl., Ex. L at 172-4.  The Nicolls Determination recited that Topping's "interest in all the profits of whales & fish shall belong unto him the said John Cooper his heirs and assignes for ever…"  *Id*.  It did not mention Shinnecock fishing rights. The Nicolls Determination thereby extinguished any aboriginal title in the tract.  *See New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d at 270 ("The language of the 1666 Nicolls Determination reveals the plain and unambiguous intent . . . to extinguish the Shinnecock's

aboriginal title to the lands of the Topping Purchase . . . and to recognize that those lands were now owned exclusively by the Town, subject to no other rights or interests.").

### C.  The Andros and Dongan Patents Unambiguously Extinguished Aboriginal Title

To the extent prior conveyances left any doubt that aboriginal title was extinguished, the Royal Patents issued by New York's Colonial Governors in 1676 and 1686 ratified the land conveyances from the Shinnecock Tribe to Southampton and explicitly extinguished any aboriginal title and dependent rights.

On November 1, 1676, New York's Governor, Edmund Andros, holding authority from the King of England, issued a patent confirming Royal endorsement of Southampton (the "Andros Patent").  *See* 56.1 at ¶¶ 218-223; Yorke Decl., Ex. O at 279-80.  The Andros Patent confirmed the Town of Southampton as owner of all lands within its boundaries:

> Now for a Confirmation unto the present Freeholder, Inhabitants of the said Towne and precincts: Know Yee, That by vertue of his Ma'ties Letters Patents, and the Commission and Authority unto mee given by his Royall Highness I have Ratifyed Confirmed and granted; and by these presents, do hereby Ratifie Confirme and grant, unto [the Southampton Pantentees], as Patentees, for and on the behalfe of themselves and their Associates, the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes, All the aforementioned Tract of Land, with the Necks and Islands within the said Bounds sett forth and described as aforesaid, *Together with all Rivers, Lakes, waters Quarrys Wood land Plaines Meadows, pastures, Marshes, ffishing, Hawking Hunting and ffowling, and all other Proffits, Commodities, Emoluments and hereditaments, to the said Towne* . . .

*Id*. (emphasis added).

The Andros Patent conveyed: "To Have And To Hold, all and singular their said lands, hereditaments, and premises, with their and every of their Appurtenances, and of every part and parcell thereof, to the said Patentees [*i.e.*, of Southampton] and their Associates, their Heires Successors and Assignes to the proper use and behoofe of the said Patentees and their Associates, their Heires Successors and Assignes for ever…"  *Id*.; 56.1 at ¶ 221.

On December 6, 1686, New York's Colonial Governor, Thomas Dongan, likewise holding authority from the King of England, issued another Patent (the "Dongan Patent") to the proprietors of Southampton, which confirmed the grants of the Andros Patent "includeing all the necks of Land and Islands wihin the aforesaid described bounds and limitts together with all Rivers Lakes water quarries Woodland plaines meadowess pastures marshes fishing hawking hunting and fowling and all other profitts Comodityes and hereditaments . . ." 56.1 at ¶¶ 228-34; Yorke Decl., Ex. O at 281.

The Dongan Patent responded to a Southampton Freeholder's application that Governor Dongan "confirm unto ye ffreeholders of said Town in a more full & ample manner all the abovecited tracts and parcells of land within the limitts and bounds aforesaid and finally determine the difference between the Indyans and the ffreeholders of the said towne of Southampton . . ." 56.1 at ¶ 229; Ex. O at 282. The Dongan Patent states that the Governor had:

> examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid . . .

56.1 at ¶231; Ex. O at 282-3.

The Dongan Patent, "Granted, Ratified, Released and Confirmed" to the Freeholders and Inhabitants of Southampton:

> all the afore recited tracts & necks of land within the bounds and limitts aforesaid together with all and singular the houses Messuages Tenements buildings millnes millnedames fencing Inclosures gardens orchards fields pastures woods underwoods trees timber Comon of pattue feedings meadowes marshes swamps plaines Rivers Rivolets waters lakes ponds Brookes streames beaches . . . Creeks harbors . . . and Easements fishing hawking hunting and fowling . . . and all other franchizes profits Comodityes and hereditaments whatsoever to the said tracts & necks of

> land . . . To Have And To Hold all the aforerecited tract and parcel of land and premises with their and every of their appurtenances unto the said . . . ffreeholders and commonalty of the towne of Southampton and their Successors forever. . .

56.1 at ¶ 232; Ex. O at 283.

Following the American Revolution and the ratification of the United States Constitution, New York confirmed the Andros and Dongan Patents through legislation.  For example, in April 1831, New York enacted legislation confirming that the Town of Southampton would remain a corporation with elected trustees.  *See* 56.1 at ¶¶ 252-54; York Decl. Ex. T.  Reflecting the Andros and Dongan Patents, the 1831 legislation gave the trustees of the freeholders and commonalty "the sole control over all the fisheries, fowling, sea weed, waters and productions of the waters within the said town, not the property of individuals, and all the property, commodities, privileges and franchises granted to them by the charter of Governor Dongan . . ."  *Id.*

Accordingly, the Andros and Dongan Patents extinguished any Shinnecock aboriginal title. *See New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d at 273 (stating "the Dongan Patent again emphasizes in clear and unmistakable language the prior extinguishment of the Shinnecock's aboriginal rights to any and all lands within the bounds of Southampton . . ." and "In short, these colonial era documents plainly and unambiguously demonstrate beyond any question the extinguishment of aboriginal title by the sovereign authority on all Southampton lands. . ..").

It is long established as a matter of law that the Andros and Dongan Patents conveyed to the trustees of the freeholders of the Town of Southampton title and rights to the lands, including under Shinnecock Bay.  *See, e.g., Trustees, etc. of Southampton v. Mecox Bay Oyster Co.*, 116 N.Y. 1, 12 (N.Y. 1889) ("As to the lands under water . . . [t]he absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time."); *People ex rel. Howell v. Jessup*, 160 N.Y. 249, 261-262 (N.Y. 1899) ("the sovereign granted to the trustees

for the freeholders and commonalty of the town all the waters within the boundaries contained in the grant, as well as the title to the lands under water and all franchises relating thereto."); *Gessin v Throne-Holst*, 134 A.D.3d 31, 37 (N.Y. App. Div. 2d Dep't 2015) ("In addition to ratifying and confirming the Andros Patent, the Dongan Patent conveyed also the waters, lakes and ponds and the easements of fishing, hawking and fowling. Accordingly, title to all of the areas described in the Dongan Patent that were not already in the lawful possession of an individual, including the land under the waters of the town, was vested in the Trustees." (internal citations and quotation marks omitted)); *Brookhaven Baymen's Assn., Inc. v. Town of Southampton*, 201 A.D.3d 856, 859 (N.Y. App. Div. 2d Dep't 2022) ("To the extent that the manner in which the plaintiffs' attempts to remove migratory fish from the waters requires them to disturb the underwater lands, the Trustees, as the title owners to the underwater lands, may prohibit the plaintiffs. . . from trespassing on the Trustees' property." (internal citations and quotation marks omitted)); *State v. Trustees of Freeholders & Commonalty*, 99 A.D.2d 804, 805 (N.Y. App. Div. 2d Dep't 1984) ("[P]roprietary rights to certain lands and waters of the Town of Southampton and their right to legislate and control the same as a body politic is derived from antique, royal land grants and patents which have been repeatedly confirmed and upheld throughout the history of this State for over 300 years."); *Strough v Incorporated Vil. of W. Hampton Dunes*, 167 A.D.3d 800, 801 (N.Y. App. Div. 2d Dep't 2018) ("Among other provisions, the Dongan Patent gave the Trustees the right to own and control certain lands, including, *inter alia*, waters, beaches, and the lands under the water within the boundaries of the Town.").  Accordingly, the Shinnecock Tribe retains no aboriginal title or incidental use and occupancy rights in lands and waters outside the Shinnecock reservation within Southampton, and title is conclusively vested in the Town of Southampton through Royal authority.

17

**D. The 1703 Deed Relinquished Any Shinnecock Rights Within Southampton Boundaries**

In 1703, Southampton established ownership of any remaining Indian land within its boundaries through a final confirmatory deed. *See* 56.1 at ¶ 237; Yorke Decl., Ex. P. The Southampton proprietors sought to have the Shinnecock sell any lands within the Town in a single transaction in exchange for a 1,000-year lease in the Shinnecock Hills. *See* 56.1 at ¶¶ 238-41. The August 16, 1703, Deed between the Shinnecock sachems and the Town of Southampton (the "1703 Deed") states the sachems:

> doth fully clearly and absolutely give grant Remise Release and for ever Quit Claim unto ye said trustees… of ye Commonalty of ye town of Southampton and their associates their heirs and sucksesers forever, in their full and peasable possession and seaseing, for all such Right, Estate, title, Interest and Demand whatsoever, as they ye said pomgomo Chice and Mahanaman and their people had or out to have of in or to all that tracte of Land of ye township of Southampton…

*See* 56.1 at ¶ 242-44; Yorke Decl., Ex. P.

The 1703 Deed conveyed the tract, "together with all and singular ye Libertyes and privileges and advantages whatsoever to ye said tracte of Land and town ship, with all beaches pintes medows marshes swamps Rivers brooks coves ponds of water timber and stones belonging or in any manner of wise appertaining to ye said tracte of Land or township as above bounded . . ." *Id*.

The 1703 Deed stated that neither the sachems nor "their people nor any of their heirs and sucksessers nor any other person or persons for them or any of them or in their or any of their names right or stead of any of them shall or will by any way or means hereafter Claime Chaleng or Demand any Estate Right title or intrist In or to ye premises or any part or parcel thereof . . ." *Id*. The 1703 Deed did not mention fishing rights. Subsequently, in 1859, the Shinnecock Tribe relinquished the 1,000-year lease in exchange for fee simple title in the land on Shinnecock Neck

that became known as the Shinnecock Reservation; the transaction was affirmed through a law passed by the New York State Legislature.  *See* 56.1 at ¶¶ 255-60; Yorke Decl. Ex. U.

Accordingly, any aboriginal title the Shinnecock Tribe possessed was lost when the Tribe conveyed lands to non-Indians.  Aboriginal title was conclusively extinguished by the sovereign British Crown through the Nicolls Determination and Andros and Dongan Patents.

### III.    *Plaintiffs Identify No Treaty That Gives Rise to Treaty-Based Fishing Rights*

The Court should enter summary judgment for Defendants for the independent reason that Plaintiffs have identified no federal treaty or agreement that establishes off-reservation fishing rights for the Shinnecock Indian Nation, and that would thereby preempt New York law.  Plaintiffs instead point to various 17th Century real property deeds between sachems and individual colonists, claiming that they retained fishing rights when territory was "ceded to the English."  *See* Complaint at ¶¶ 16, 15, Count I.  But these real property deeds are not treaties within the meaning of the Supremacy Clause.

As an initial matter, Plaintiffs' expert now characterizes these deeds as "joint use contracts," rather than treaties.  *See* Expert Report of John A. Strong dated January 5, 2024, pp. 12-16, 30.  Plaintiffs' expert does not define a "joint use contract," or explain how such contracts relate to federal treaty rights.  And Plaintiffs cite no support for the proposition that a "joint use contract" is a federal treaty within the meaning of the Supremacy Clause.

In any event, the deeds upon which Plaintiffs rely are not treaties on their face, as their language bears none of the hallmarks of a treaty.  For example, a treaty is a contract between nations.  *See New York Chinese TV Programs, Inc. v. U.E. Enters*., 954 F.2d 847, 852 (2d Cir. 1992) (citing *Trans World Airlines v. Franklin Mint Corp*., 466 U.S. 243, 253 (1984)); *Georges v. United Nations*, 834 F.3d 88, 92-93 (2d Cir. 2016) ("[A] treaty is a contract . . . between nations. .

.") (citing *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014)). Accordingly, the signatories to a treaty are typically individuals acting in a representative capacity on behalf of the sovereign parties.  In the Southampton deeds relied of by the Plaintiffs, however, the sale is to individual purchasers, who lacked Royal authority.  *See, e.g.*, 56.1 at ¶¶ 157, 168, 175, 181.

These various 17th Century deeds within Southampton are instead discrete sales of land to individual purchasers.  They are not contracts between nations, as the individual signatories had no authority on behalf of the Crown.  *See Georges v. United Nations*, 834 F.3d at 92-93.  The only deed within Southampton to have been executed with Royal authority (and not cited by Plaintiffs), the 1640 Southampton Deed, does not mention Shinnecock fishing rights, as laid out in depth above (*see supra* Point II (A)).

Plaintiffs have provided no evidence that either party to these purported "joint use contracts" considered these agreements to be a treaty.  In his deposition, Plaintiffs' expert, Professor John Strong, repeatedly acknowledged that the Shinnecock land transactions with individual purchasers lacked Royal authority.  *See* 56.1 at ¶¶ 158, 159, 169, 175, 182; Transcript of Deposition of Strong A. Strong, dated March 12, 2024 ("Strong Tr."), pp. 49-51, 59-60, 64, 68. Instead, Professor Strong described the purchasers as "squatters on Crown lands."  Strong Tr. 51:3-4; 59:3-25; 56.1 at ¶ 160.  Because the Shinnecock Tribe did not execute a treaty with England or with the United States (which did not exist at the time the deeds were executed), Plaintiffs possess no reserved fishing rights.  *Cf. Wahkiakum Band of Chinook Indians*, 655 F.2d at 179 n.9 (disregarding claims of treaty-based fishing rights where tribe was not a treaty signatory).

Even if the deeds and order relied on by Plaintiffs could be considered treaties—which they cannot—they are not federal treaties or agreements, enforceable under the Supremacy Clause, because they were not executed under the authority of the United States, which did not exist when

20

these documents were made.  The Second Circuit recently rejected a similar claim.  In *Unkechaug Indian Nation v. Seggos*, the Unkechaug tribe of eastern Long Island claimed that they possess a treaty right to fish in state waters without complying with DEC regulations, under a document issued in 1676 by then-colonial governor Edmund Andros (the "Andros Order"), which they claimed was a federal treaty enforceable under the Supremacy Clause of the Constitution.  *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822 (2d Cir. 2025).  As here, the *Unkechaug* case stemmed from plaintiffs' prohibited harvesting of elver eels in off-reservation waters, contrary to generally applicable DEC regulations.  The Second Circuit rejected plaintiffs' arguments, holding that the Andros Order was not a federal treaty and could not have been made under the authority of the United States, as the United States did not exist when the Order was executed.  Therefore, the Andros Order could not preempt New York law under the Supremacy Clause.  The Second Circuit held: "the plain text of the Supremacy Clause does not support plaintiffs' assertion that the Andros Order is a federal treaty that was ratified under the Constitution's Supremacy Clause and binding on the United States today."  126 F.4th at 834.  As in *Unkechaug*, Plaintiffs here cannot demonstrate the existence of any federal treaty that was ratified subject to the Supremacy Clause. The documents upon which Plaintiffs rely (which include the Andros Order) were not made under the "Authority of the United States," and thus cannot support their only remaining cause of action under the Supremacy Clause.  *See* Complaint at Count I, ¶¶ 21-23; *Unkechaug*, 126 F.4th at 833 ("[T]he only pre-existing treaties that are 'the supreme Law of the Land' under the Supremacy Clause are those made 'under the Authority of the United States,' not those made before the United States existed.").  *See also Alliance to Save the Mattaponi v. Commonwealth Dep't of Envtl. Quality ex rel. State Water Control Bd.*, 270 Va. 423, 452 (Va. 2005) ("The Supremacy Clause refers only to treaties made under the authority of the United States. The Treaty before us

was entered into in 1677, over 100 years before the Constitution was adopted in 1789. Because the United States did not exist in 1677, manifestly, the Treaty could not have been made under the authority of the United States.").

### IV. *The Real Property Deeds and Orders That Plaintiffs Rely Upon Do Not Reserve Shinnecock Off-Reservation Fishing Rights*

Even if these various 17th Century deeds conveying lands to unauthorized private purchasers could be considered treaties—which on their face they cannot—they would not reserve the unregulated off-reservation fishing rights that Plaintiffs claim. Each deed addresses sale of a discrete tract of land to an individual without Royal authority, and, to the extent they discuss fishing at all, such discussion is principally in the context of property rights to whale carcasses that have drifted ashore.

#### A. The April 29, 1648 Deed for East Hampton

The Complaint cites the 1648 Deed for East Hampton (the "1648 Deed"). *See* Complaint at ¶ 15(d). This deed was signed by the Governors of the colonies of New Haven and Connecticut, on the one hand, and sachems from the Montaukett, Manhansett, Corchaug, and Shinnecock tribes, on the other. 56.1 at ¶ 144. The relevant language states:

> Allsoe, we, the said Sachems, have Covenanted to have Libertie, freely to fish in any or all the cricks and ponds, and hunt up and downe in the woods without Molestation, they giving the English Inhabitants noe just offence, or Iniurie to their goods and Chattells. Likewise, they are to have the fynns and tails of allsuch whales as shall be cast upp, to their proper right and desire they may bee dealt with in the other part. Allsoe, they reserve libertie to fish in all convenient places, for Shells to make wampum. Allsoe, if the Indyans, hunting of any deare, they should chase them into the water, and the English should kill them, the English shall have the body, and the Sachem the skin.

56.1 at ¶ 148; Yorke Decl. at Exhibit E.

The 1648 Deed did not encompass Shinnecock Bay or Southampton, which was an explicit boundary: "all the land lyinge from the bounds of the Inhabitants of Southampton . . . not Intrenching uppon any in length or breadth, which the Inhabitants of Southampton, have and do possess, as they by Lawful right shall make appeare . . ." 56.1 at ¶ 146; Ex. E. Plaintiffs offer no evidence that this deed applied beyond East Hampton.

### B. June 10, 1658 Deed to Beach

The Complaint cites a June 10, 1658, deed between Wyandanch, sachem of the Montaukett tribe, and Lion Gardiner individually. *See* Complaint at ¶ 15(d). This deed sold Gardiner grazing access for horses or cattle on a specific tract. It states:

> Wiandance hath sould for a considerable sum of money and goods, a certaine tract of beach land, with all ye rest of ye grass that joynes to it, not seperated from it by water, which beach begins Eastward at the west end of Southampton bounds, and westward where it is separated by ye waters of ye sea, coming in out of the Ocean Sea, being bounded Southwards with the great sea, Northwards with the inland water; this land and the grass thereof for a range, or run, for to feed horses or cattle on, I say, I have sold to the aforesaid Lion Gardiner, his heirs, executor and assigns forever, for the sum aforesaid, and a yearly rent of twenty-five shillings a year, which yearly rent is to be paid to the foresaid Sachem, his heirs, executors and assigns for ever, in the eight month, called October, then to be demanded, but the whales that shall be cast upon this beach shall belong to me, and the rest of the Indians in their bounds, as they have beene anciently granted to them formerly by my forefathers.

56.1 at ¶ 152; Yorke Decl. Ex. G.

The tract's eastern boundary was the "west end of Southampton bounds," then outside the Town of Southampton. *Id.* Drift whaling, the processing and sale of the carcasses of dead whales that washed ashore, was a lucrative industry of the early Long Island economy. *See* John A. Strong, *The Montaukett Indians of Eastern Long Island* 25 (Syracuse University Press 2001). Plaintiffs offer no evidence that this deed reserved fishing rights. In fact, Plaintiff's expert acknowledges that this deed lacked Royal authority. 56.1 at ¶159.

### C. May 12, 1659 Deed to John Ogden

Plaintiffs cite a May 12, 1659, deed between Wyandanch, a Montaukett sachem, and John Ogden. *See* Complaint at ¶ 15(e). The deed states in relevant part:

> I say all the land and meadow I have sold for a considerable price unto Mr Iohn Ogden for himselfe his heirs executors and assigns for ever, upon condition as followeth, first that Thomas Halsey and his Associates shall have the privilidge of the peice of meadow called quancawnantuck the terms of yeares formerly granted to him or them but the land lying between quancawnantuck and three miles northward he shall or may possess and improve at present, but when the yeares of the aforesayed Thomas Halsey shall be expired then shall the aforesaid Mr Iohn Ogden or his assigns fully possess and improve all quancaunantucke meadow with the rest aforesayed and then shall pay or cause to be payed unto me wiandance my heires or assigns the summe of twenty five shillings a yeare as a yearly acknowledgement or rent for ever. It is also agreed that wee shall keepe our privilidges of fishing fowling hunting or gathering of berrys or any other thing for our use . . .

56.1 at ¶ 163; Yorke Decl. Ex. H.

This deed, known as the "Quogue Purchase" or "Ogden Purchase," involved a tract west of the present Shinnecock Canal, outside the then-bounds of Southampton. 56.1 at ¶¶ 164-65. The deed sold land beginning, "at the westward end of Southampton boundes, which land is bounded Eastwards with Southampton boundes. . ." *Id.* Plaintiffs submit no evidence that this was more than a private sale of land. In fact, Plaintiff's expert acknowledges that there was no Royal authority for this deed. 56.1 at ¶ 169. This deed was later mediated by Governor Richard Nicolls, as its terms conflicted with land transfers to Lion Gardiner and Thomas Topping.

### D. June 8, 1659, Deed to Lion Gardiner Concerning Whale Rights

Plaintiffs cite a June 8, 1659, deed between Wyandanch and Lion Gardiner. *See* Complaint at ¶ 15(a). This deed divided the profits from drift whales on a certain beach tract. Wyandanch sold to Lion Gardiner, "all the Bodyes and Bones of all the Whales that shall come upon the Land, or come a Shoare from the Western end of Southhampton Bounds, unto the place called

24

Kitchaminchoke, yet reserving to ourselves and Indyans, all the Tailes and fins for Ourselves . . ."

56.1 at ¶ 171.  The deed sets a term of twenty-one years for the agreement.  It states further:

> that if any Whale shall bee cast up in the bounds aforementioned, whether it bee found by English or Indyons, it shall bee judged by them both whether it bee a whole Whale or a halfe or otherwise.  Now for every whole whale that shall come up, the aforesaid Lyon Gardiner or his Assigns, shall pay or cause to be paid unto mee wyandance, the Sum of five pounds Sterling, or any good pay which wee shall accept of, but if it bee a halfe whale, a third part, or otherwise, they shall pay according to Proportion, and this pay shall be within two Monethes after they have cutt out and carryed the Whale home to their Houses, but in case there shall not five whales come up, within the terme abovesaid, then shall the aforesaid Lyon Gardiner, or his Assigns, have the next five Whales, that shall come up after the Terme, paying to mee, my heirs, Executors or Assigns, the Sum above mentioned, and for the true performance of the promises, Wee have hereunto Sett our hands and Seales.

56.1 at ¶ 172; Yorke Decl. Ex. I (Defendants have provided a transcription of this document).

This deed does not mention fishing.  Plaintiff's expert again acknowledges that Lion Gardiner had no Royal authority to execute this deed.  56.1 at ¶ 175.

### E.  The Topping Purchase

Plaintiffs cite the April 1662 Topping Purchase.  *See* Complaint at ¶ 15(e).  The Topping Purchase, discussed above (*see supra*, Point II(B)), states:

> Witnesseth that we the said Weany Anabackus and Iackanapes have given and granted and by these presents do give and grant bargain sell assign and set over unto Thomas Topping aforesaid his heirs and assigns for ever all our right title and interest that we have or ought to have in a certain tract of land lying and being westward of the said Shinecock and the lawful bounds of Southampton above said, that is to say to begin at the canoe place otherwise Niamuck and soe to run westward te a place called and known by the name of Seatuck, and from thence to run northward across the said Island or neck of land unto a place called the head of the bay with all the meadow and pasture, arable land, easements profits benefits emoluments as is or may be contained within the limits and bounds before mentioned together with half the profits and benefit, of the beach on the south side the said Island in respect of fish whale or whales that shall by God's providence be cast up from time to time, and at all times, with all the herbage or feed that shall be, or grow thereon.

> To Have and To Hold, all the forementioned demised premises with all and singular the appurtanances thereto belonging or in any ways appertaining to him the said Thomas, his heirs executors, administrators, or assigns forever, without the lett trouble denial or molestation of us the said Weany, Anabaekus, and Iackanapes our heirs or assigns or any other person or persons lawfully claiming from, by, or under us our heirs executors Administrators or assigns…

56.1 at ¶ 179; Yorke Decl. Ex. K.

At the time of the Topping Purchase, the conveyed lands were not within Southampton. *Id*. The deed transferred half the drift whale profits from the beach, along with the herbage and feed, to Thomas Topping. Plaintiff's expert again acknowledges that this deed did not have Royal authority. 56.1 at ¶ 182. It did not reserve fishing rights to the Shinnecock Tribe.

## F. January 22, 1674-5 Resolution

Plaintiffs cite a January 22, 1674-5 Resolution. *See* Complaint at ¶ 15(c). However, this Resolution protected the Royal interest in drift whales. The Resolution states:

> The preserving of his Royal Highnesse Interest in a proportion of ye Drift as in ye Law is set forth, the same being taken into Consideracon. It is resolved, That there be some particular man commissioned to take care of drift whales in ye middle & westernmost part of *Long Island*, who is to be accomptable for his Royall Highnesse dues thereof, according to Law.

> That if an Indyan find and give notice of any such drift whales, he shall have such reasonable satisfaccon as hath been usuall. If a christian shall find any such whale or great fish & secure it, or give due notice to ye person empowered, where by the said Fish may be saved, hee shall be allowed a quartr part for his share. Provided yt no such whale being found, shall be cut up or embezeled, before notice be given to such Officrs or prsons empowered to take care therein.

56.1 at ¶¶ 202-5; Yorke Decl. Ex. M at 686.

This Resolution does not mention the Shinnecock Tribe and reserves no rights to them. *Id*.

## G. May 23 and 24, 1676 Order Regarding Unkechaug

Plaintiffs cite an Order that concerned only the Unkechaug Tribe (the "Andros Order").

*See* Complaint at ¶ 15(c).  The record states that on May 23, 1676:

> At a meeting of the Unchechaug Indyans of Long Island—before the Go: at the Fort.
>
> They give thankes for their peace, and that they may live, eate and sleepe quiet, without feare on the Island, They give some white strung seawant.
>
> They desire they being free borne on the said Island, that they may have leave to have a whale boate with all other materiells to fish and dispose of what they shall take, as to whom they like best.
>
> They complaine that fish being driven upon their beach etc. the English have come and taken them away from them per force.
>
> The Go: Demands if they made complainte of it to the Magistrates in the Townes, who are appointed to redresse any Injuryes.
>
> They say no, but another time will doe it.
>
> The Go: will consider of it and give them Answer tomorrow.

On May 24, 1676:

> The Indyans come againe to the Governor in presence of The Councell.
>
> What they desire is granted them as to their free liberty of fishing, if they bee not engaged to others; They say they are not engaged.
>
> They are to have an Order to shew for their priviledge.

The Order states:

> Resolved and ordered that they are at liberty and may freely whale or fish for or with Christians or by themselves and dispose of their effects as they as they thinke good according to law and Custome of the Government of which all Magistrates officers or others whom these may concerne are to take notice and suffer the said Indyans so to doe without any manner of let hindrance or molestacion they comporting themselves civilly and as they ought.

56.1 at ¶¶ 212-15; Yorke Decl. Ex. N.

The Unkechaug are a separate tribe from the Shinnecock Indian Nation.  This document did not concern the Shinnecock Tribe and reserves no rights to them.  Further, as discussed above, in *Unkechaug Indian Nation*, 126 F.4th at 835, the Second Circuit held that the Andros Order is not federal law, does not preempt New York's regulations, and therefore provides no off-reservation fishing rights to the Unkechaug tribe.

Plaintiffs fail to establish the existence of treaty-based, off-reservation fishing rights. Plaintiffs' reliance on unauthorized deeds conveying specific tracts to individual purchasers, along with an Order related to a separate tribe, does not establish off-reservation, reserved fishing rights to the Shinnecock Indian Nation.

### V.    *Even If Plaintiffs Could Establish a Treaty-Reserved or Aboriginal Fishing Right, the State May Regulate Under the Doctrine of Conservation Necessity*

Because Plaintiffs fail to establish that they possess a treaty-based or aboriginal fishing right, they are subject to all State fishing regulations off-reservation.  *See People v. Patterson*, 5 N.Y.3d 91, 96 (N.Y. 2005) ("Absent a treaty fishing right, the State enjoys the full run of its police powers in regulating off-reservation fishing.").  However, even were Plaintiffs able to establish a treaty-based or aboriginal fishing right—which they cannot—states may regulate such rights under the doctrine of conservation necessity.  *See Herrera v. Wyoming*, 139 S. Ct. 1686, 1695 (2019) ("States can impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation.").  The Supreme Court has consistently held that even where a tribe possesses treaty-based usufructuary rights, those rights are not exempt from state regulation under this doctrine.  *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 205 (1999) ("We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation."); *Wash. State Dep't*

*of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1015 (2019) ("Nor do we hold that the treaty deprives the State of the power to regulate . . . when necessary for conservation. To the contrary . . . the State retained the power to impose on Indians, equally with others, such restrictions of a purely regulatory nature . . . as are necessary for the conservation of fish." (internal quotations omitted)).  The very fishing regulations challenged here, prohibiting taking or possessing glass eels, have been held to be reasonable and non-discriminatory under the principle of conservation necessity.  *See Unkechaug Indian Nation v. N.Y. State Dep't of Env't Conservation*, 677 F. Supp. 3d 137, 161 (E.D.N.Y. 2023) (holding "The State has a clear interest in conserving the American eel population, and it has imposed reasonable, nondiscriminatory regulations in furtherance of this interest."), *aff'd by Unkechaug Indian Nation*, 126 F.4th 822.

Even where a treaty provides "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory," the state may impose on Indians, equally with others, regulatory restrictions on the manner of fishing, necessary for conservation.  *See Tulee v. Washington*, 315 U.S. 681, 684 (1942); *New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 563-64 (1916) (construing tribe's off-reservation treaty rights as "a reservation of a privilege of fishing and hunting upon the granted lands in common with the grantees, and others to whom the privilege might be extended, but subject, nevertheless, to that necessary power of appropriate regulation."). Under this doctrine, though the state cannot "qualify" a tribe's treaty-based right to fish "at all usual and accustomed places," it may nevertheless regulate the manner of fishing.  *See Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968) ("[T]he manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.").

Here, the State has a demonstrated interest and obligation in fisheries conservation, through its non-discriminatory fishing regulations.  For example, specifically relevant to Plaintiffs' claims and the facts of this case are conservation measures related to the American eel.  American eel is a protected resource, whose population is depleted and at historically low levels.  *See* 56.1 at ¶ 38.  American eel serve as an important prey species for many fish, aquatic mammals, and fish-eating birds.  *Id*. at ¶ 39. Overfishing is a reason the population of American eel is depleted and at historically low levels.  *Id*. at ¶ 53.

The aim of fisheries management is to achieve long term, sustainable, productive fisheries.  To do this, fisheries management plans ("FMP") are implemented, state compliance is tracked, and removals are quantified.  *Id*. at ¶ 54. FMPs are unique to each species, due to their different biology and fisheries.  *Id*. at ¶ 57.  An FMP must include conservation and management measures sufficient to ensure the long-term biological health and productivity of fishery resources under management.  *Id* at ¶ 75.  FMPs develop and evolve over time as challenges and opportunities change.  *Id*. at ¶ 58.  Multi-jurisdictional FMPs have been developed for transboundary stocks so that fisheries management practices are developed cooperatively using a consistent approach for a given species. *Id*. at ¶ 62.  Fisheries that occur primarily in State waters (<3 miles from the Coast) generally have an interstate fishery management plan, although a small number of species are managed individually by the States.  *Id*. at ¶ 65.  On the East Coast of the United States, interstate FMPs are developed cooperatively with other participating States under the Atlantic States Marine Fisheries Commission ("ASMFC").  *Id*. at ¶ 67.  The ASMFC is responsible for coordinating interstate fishery management for Atlantic coastal fisheries and has management authority for the 27 species/species complexes under Commission authority, including American eel.  *Id*. at ¶ 69.  All the Atlantic coastal states from Maine to Florida are members of the ASMFC compact.  *Id*. at

¶ 70.  The Atlantic Coastal Fisheries Cooperative Management Act ("ACFCMA"), 16 U.S.C. §§ 5101-5108, requires states to implement fishery management measures developed by the ASMFC that are necessary for conservation of coastal fisheries, and provides means of enforcement (including moratoria) when states fail to comply with such measures.  New York State complies with the ASMFC fishery management plan through its fishing regulations in 6 NYCRR Sections 10.1(a) and (b), 40.1(f) and (i), making it illegal to take or possess American eels less than nine inches long.

In the example of the American eel, recognizing a decline in the American eel population and the ASMFC's commitment to rebuild, restore, and maintain stocks to assure their continued long-term availability, the ASMFC developed the American eel FMP in 1999.  *Id*. at ¶ 76.  The ASMFC's American eel management program helps to ensure the long-term viability of the population for continued harvest and provide adequate quantities of juveniles and adults for use by other fish and wildlife resources.  *Id*. at ¶ 77.  A certain amount of American eel juvenile and adult biomass must be maintained to meet the needs of those species for which eel is an important food source.  *Id*. at ¶ 79.  Harvest data in the 1990s and fishery-independent data showed a decline in American eel population.  *Id*. at ¶¶ 82-84.  By the end of the 1990s, 11 of 15 Atlantic coastal states had bans on elver/glass eel fisheries.  *Id*. at ¶ 89.  The American eel FMP was developed by the ASMFC in response to a decline in the eel population.  *Id*. at ¶ 91.  The FMP requires each state/jurisdiction to implement the required management measures and protect American eel habitat within its jurisdiction to ensure the viability of the population segment residing within its boundaries.  *Id*. at ¶ 98.  All member states/jurisdictions were required to establish uniform limits, including a 6-inch minimum size and a "bag" limit of 50 eels per person.  *Id*. at ¶ 100.

Since its initial implementation in 1999, the American Eel FMP has been amended five times (Addenda I-V). *Id*. at ¶ 106. The 2012 benchmark stock assessment results indicated that the American eel stock had declined and that there were significant downward trends in multiple surveys across the coast (ASMFC 2012). *Id*. at ¶ 107. It was determined that the stock was depleted. *Id*. at ¶ 108. In response, Addendum III (2013) to the FMP includes a yellow eel recreational possession limit of 25 eel/person/day, with the option to allow an exception of 50 eel/person/day for party/charter employees for bait purposes, and the recreational and commercial size limit increased to a minimum of 9 inches. *Id*. at ¶¶ 109, 110. The 9-inch size limit also reduced mortality on yellow eel, increasing the opportunity for those eels to survive and spawn. *Id*. at ¶ 116. The ASMFC's American Eel Technical Committee found fishing for all life stages of eels, particularly young-of-year and in-river silver eels migrating to the spawning grounds, is likely to be particularly detrimental to the stock, especially if other sources of mortality (*e.g.*, turbine mortality, changing oceanographic conditions) cannot be readily controlled. *Id* at ¶ 111. It recommended reducing mortality at all life stages. *Id*. at ¶ 112. The 2017 stock assessment and 2023 Benchmark Assessment again concluded that the stock is depleted. *Id*. at ¶ 121, 122.

Because the State has a conservation interest in American eel and other species, reasonable and necessary regulation of the manner of Plaintiffs' fishing, equally with non-Indians, would be appropriate under the doctrine of conservation necessity. *See Unkechaug Indian Nation*, 677 F. Supp. 3d at 161.

## VI.    *Plaintiffs' Claims are Barred Under the Sherill Doctrine*

Under the Supreme Court's doctrine announced in *City of Sherill v. Oneida Indian Nation*, 544 U.S. 197 (2005), and applied in subsequent Second Circuit cases, Plaintiffs' disruptive claims are barred under the equitable principles of laches, acquiescence, and impossibility.

In *Sherill*, the Oneida Indian Nation claimed exemption from municipal taxation on historic tribal lands that had been sold, but reacquired on the open market, claiming that their purchase had revived tribal sovereignty over the land.  The Supreme Court denied the Oneida's claims, despite the Oneidas' aboriginal title, holding that such a "disruptive remedy" was barred by the "long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties."  *Sherrill*, 544 U.S. at 216-217.  *Sherrill* invoked doctrines of laches, acquiescence, and impossibility.  *Id*.

Soon after *Sherrill*, the Second Circuit decided *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266 (2d Cir. 2005).  In *Cayuga*, the Second Circuit reversed a pre-*Sherill* award of nearly $250 million in money damages ordered by the district court, where the Cayuga claimed ownership of historic reservation land.  The court, applying the equitable principles of *Sherill*, held that even monetary relief was precluded.  *Id*. at 273, 278.  The court held that *Sherill* did not limit these defenses to claims seeking equitable relief.  *Id*. at 275.  The Cayuga Court held that, "*Sherrill*'s holding is not narrowly limited to claims . . . seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' Indian land claims more generally."  *Id*. at 274

In *Oneida Indian Nation v. County of Oneida*, 617 F.3d 114 (2d Cir. 2010), the Second Circuit clarified the nature of the equitable defenses against a challenge that the traditional elements of a laches defense had not been met, holding: "the equitable defense recognized in *Sherrill* and applied in *Cayuga* does not focus on the elements of traditional laches but rather more generally on the length of time at issue between an historical injustice and the present day, on the disruptive nature of claims long delayed, and on the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury."  *Id*. at 127.  The *Oneida* court held that the *Sherill* and *Cayuga* defenses were

33

not limited to "possessory" land claims—"claims premised on the assertion of a current possessory right to tribal lands held by others"—but apply also to "nonpossessory" claims: "Rather, the defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief." *Id*. at 135.

The Shinnecock Nation was subject to the application of the *Sherill* doctrine in *Shinnecock Indian Nation v. New York*, 2006 U.S. Dist. LEXIS 87516, 2006 WL 3501099, 05 CV 2887 (E.D.N.Y. 2006), *aff'd by* 628 Fed. Appx. 54 (2d Cir. 2015). The Shinnecock Nation claimed rights to lands that were the subject of the 1703 "1000-year lease" with the Trustees of the Freeholders of the Town of Southampton, seeking damages and a declaration of possessory rights. The court, relying on *Sherill* and *Cayuga* dismissed the claims, listing among other reasons, the length of time that had passed between the alleged wrong and the relief sought and the "dramatic change in the demographics of the area and the character of the property." *Id.* at *16.

"[I]t is now well-established that Indian land claims asserted generations after an alleged dispossession are inherently disruptive of state and local governance and the settled expectations of current landowners, and are subject to dismissal on the basis of laches, acquiescence, and impossibility." *Stockbridge-Munsee Cmty. v. New York*, 756 F.3d 163, 165 (2d Cir. 2014). Plaintiffs' claims implicate the *Sherill* Doctrine, as they are disruptive of the State's ability to regulate its waters and protect its resources.

## **CONCLUSION**

For the foregoing reasons, the State Defendants respectfully request that this Court grant their Motion for Summary Judgment and grant such other and further relief as the Court deems just and proper.

Dated:  Mineola, New York
         April 25, 2025

                                        Letitia James
                                        Attorney General of the State of New York
                                        *Attorney for Defendants*

                                        By: /s/ Richard Yorke
                                              Richard Hunter Yorke
                                        Assistant Attorney General
                                        200 Old Country Road - Suite 240
                                        Mineola, New York 11501
                                        (516) 248-3302

To:     Joseph Plumer, Esq.
        Riley Plumer, Esq.
        Plumer Law Office
        9352 N Grace Lake Rd SE
        Bemidji, MN 56601
        rileyfplumer@gmail.com
        jplumer@paulbunyan.net

        Kaitlyn E Klass
        United South and Eastern Tribes
        Sovereignty Protection Fund
        1730 Rhode Island Ave NW
        Suite 406
        Washington, DC 20036

        Daniel Cordalis
        Ashley D. Anderson
        Native American Rights Fund
        National Congress of American Indians and
        Shinnecock Kelp Farmers
        250 Arapahoe Ave.
        Boulder, CO 80302